UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 05-CV-10365-JLT |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO WORCESTER BASEBALL'S MOTION TO DISMISS

### I.    PRELIMINARY STATEMENT

On Friday, February 18, 2005, the plaintiff and the defendants entered into a contract involving the construction of a minor league baseball stadium in Worcester, Massachusetts. They finalized the essential terms of their agreement, definitively stated their mutual intent to be bound by that agreement, and shook hands. The plaintiff, RI, Inc. d/b/a Seating Solutions ("Seating Solutions"), left that meeting assured that it had a binding agreement with the defendants, Worcester Professional Baseball, LLC, and Perfect Game Baseball Clubs, LLC (collectively, "Worcester Baseball" or "Defendants"). In the ensuing days, however, as a result of the malicious conduct of Geller Sport, Inc. and Geller Devellis, Inc. (collectively, "Geller"), Worcester Baseball breached the contract and deprived Seating Solutions of hundreds of thousands of dollars of anticipated profits. Seating Solutions filed this suit shortly thereafter.

Now, in a motion and supporting memorandum of law ("Defendants' Memo."), Worcester Baseball asks this Court to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). Defendants' motion lacks merit. Worcester Baseball faces considerable factual, legal, and procedural challenges in seeking the dismissal of this case. For example, Defendants _must_ admit

that the February 18, 2005 meeting occurred in the manner described by Seating Solutions in the Amended Complaint. The unequivocal statements and conduct of the parties at that meeting would lead a reasonable person to infer that Seating Solutions and Worcester Baseball had a contract. Even if Worcester Baseball disagrees at this point with that conclusion, they _must_ admit that whether a contract existed is a question of fact under Massachusetts law. Defendants _must_ acknowledge, furthermore, that under Rule 12(b)(6) all reasonable inferences that can be drawn from the Amended Complaint should be drawn in a manner that is favorable to Seating Solutions. The facts, the substantive law, and Fed. R. Civ. P. 12(b)(6) yield a clear result here: Worcester Baseball's motion should be denied. Seating Solutions should be permitted to pursue the claims that arise from Worcester Baseball's unfair conduct.

## II.    FACTS

### A.    The Project and the Parties

Seating Solutions is a leader in the seating system design and construction industry and specializes in the sale, rental, and timely installation of custom-designed spectator seating at athletic and recreational facilities. Amended Complaint ("Compl."), ¶ 9. Worcester Baseball is the owner and operator the Worcester Tornadoes, a professional baseball franchise that will begin playing in Worcester as part of the Canadian American Association of Professional Baseball during the Spring of 2005. *See id.* at ¶ 11. Geller is serving as Worcester Baseball's outside consultant in connection with the construction of its home stadium. *See id*. at 14.

In December of 2005, Seating Solutions and Worcester Baseball began discussing the possibility that Seating Solutions would perform an extensive renovation of Fitton Field, which is located on the campus of Holy Cross, so that Worcester Baseball could base its team there. *See id.* at ¶ 12. At several points during discussions concerning the renovation project, Worcester Baseball referred to itself as Perfect Game Baseball Clubs, LLC. *See id.* at ¶ 13.[1] In

---

[1] Contrary to Worcester Baseball's assertions, *see* Defendants Memo. at 2 n.1, therefore, Seating Solutions' decision to treat Worcester Baseball and Perfect Game as a single entity has a substantial factual basis.

or about late January 2005, Worcester Baseball entered into discussions with Holy Cross whereby Worcester Baseball would renovate Fitton Field and Holy Cross would allow the professional team to play baseball home games there. *See id.* at ¶ 16.

**B.     Seating Solutions and Worcester Baseball Negotiate and Finalize the Contract.**

Discussions between Seating Solutions, through vice president Scott Suprina ("Suprina") and Worcester Baseball accelerated significantly in or about the beginning of February 2005 and included preliminary drawings and design work. *See id.* at ¶ 17.

At a meeting with both Theodore Tye, vice president of Worcester Baseball ("Tye") and Patrick Maguire ("Maguire"), who represented Geller, Suprina shared with Worcester Baseball and Geller the drawings prepared by Seating Solutions and during that meeting they were revised to their final proposed designs for the Fitton Field project. *See id.* at ¶ 18. Suprina made this presentation using AutoCAD, a computer program that enables users to share architectural drawings in an electronic format rather than via traditional blueprints. *See id.* at ¶ 19. Each drawing that Suprina shared with Tye and Maguire was prominently stamped with the notation that the drawing was confidential and proprietary information that belonged to Seating Solutions and was not to be shared with any third party for any purpose under any circumstances. *See id.* at ¶ 20.

Suprina and his draftsman, Scott Ruczaj ("Ruczaj"), met again with Tye and Maguire on or about February 15, 2005 and revised the drawings. Seating Solutions modified its proposal based on the new drawings, and reduced the pricing to $1,519,880.90. Both the proposal and the drawings were left with Tye and Maguire. *See id.* at ¶ 26. On or about Thursday, February 17, 2005, Worcester Baseball received a revised proposal from Seating Solutions. *See id.* at ¶ 27. Suprina advised Tye that he would be in the Boston area on February 18, 2005 and arranged to meet with Tye so that an order could be placed as Tye was leaving town for a vacation. *See id.* at ¶ 28.

On or about Friday, February 18, 2005 Suprina and his associate Ross Jacobs flew to Boston and met with Tye. *See id.* at ¶ 29. At this meeting, Tye and Suprina, with Jacobs looking

on, walked through each facet of Seating Solutions' February 17 Proposal and made revisions to the Proposal to satisfy certain of Worcester Baseball's concerns. *See id.* at ¶ 30. Suprina also shared Seating Solutions' plans for integrating I-Beam and angle frame construction on the project in a manner that would maximize quality while keeping costs lower than if the project had employed only I-Beam construction. *See id.* at ¶ 31.

What happened next is of critical importance: Suprina stated "Excuse me for being so blunt, but I must start work on Saturday to make your date. Do I have an order?" *See id.* at ¶ 32. Tye responded "Yes. You have an order." At the close of this meeting, Tye shook hands with Suprina and confirmed that Worcester Baseball and Seating Solutions had an agreement concerning the renovations of Fitton Field. *See id.* at ¶ 33. Tye, with Suprina and Jacobs present, then told Worcester Baseball's president and chief executive officer Alan Stone that Worcester Baseball and Seating Solutions had reached an agreement. *See id.* at ¶ 34. Worcester Baseball, surprisingly, does not consider the events of the February 18, 2005 meeting to be material in this case. *See* Defendants' Memo at 2-3.

## C.     Worcester Baseball Breaches the Contract.

On the morning of Monday, February 21, 2005, Seating Solutions sent Worcester Baseball a final version of the agreement that had been reached based upon the revisions to which Tye and Suprina had agreed on the previous Friday. *See id.* at ¶ 35. On February 22, 2005, Worcester Baseball terminated its agreement with Seating Solutions. *See id.* at ¶ 38. On February 23, 2005, Suprina learned that Worcester Baseball had entered into a separate agreement with Dant Clayton Corporation ("Dant Clayton"), a seating systems company based in Louisville, Kentucky. *See id.* at ¶ 39. Maguire had worked extensively with the Dant Clayton in the past and he advised Worcester Baseball to terminate its agreement with Seating Solutions and enter into an agreement with Dant Clayton. *See id.* at ¶ 40.

After the agreement fell through, Suprina was reviewing electronic mail messages that he had received the previous week and noticed that he had received one concerning the Fitton Field project from a representative of a stadium lighting company located in Massachusetts. *See id.* at

- 5 -

¶ 41.  In the message, the lighting company representative described the Fitton Field project and stated that Geller, specifically Maguire, was the project's "designer."  He urged Suprina to review a set of AutoCAD drawings that were attached to the message and to consider getting involved with the project.  *See id.* at ¶ 42.  Suprina opened the message, and discovered that the attached AutoCAD drawings were the exact drawings that he had shared with Worcester Baseball and Geller, though Geller had intentionally removed the confidentiality stamp on the documents, which had stated that the drawings were proprietary information belonging to Seating Solutions.  *See id.* at ¶ 43.

In the Complaint, Seating Solutions alleges that Geller (Maguire) impermissibly and maliciously used the AutoCAD drawings that Seating Solutions had provided during the contract negotiations and shared those with other potential contractors on the Fitton Field project and requested other pricing.  *See id.* at ¶ 44.  Worcester Baseball took no reasonable steps to prevent Geller from acting in a manner contrary to the legitimate business interests of Seating Solutions, even though Worcester Baseball could have done so.  *See id.* at ¶ 46.  Renderings of the Fitton Field project released to the public in early March 2005 reveal that Worcester Baseball settled upon a design approach that is strikingly similar to the approach outlined by Seating Solutions during contract negotiations.  *See id*.  As this recitation of the facts makes clear, Seating Solutions and Worcester Baseball had a contract, and Worcester Baseball breached that contract and acted generally in a manner inconsistent with established concepts of business fairness.

## III.    DISCUSSION

### A.    The Legal Standard

Worcester Baseball has moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). The standard of review in this procedural context is generous to plaintiffs, which is a likely explanation for Worcester Baseball's decision not to set it forth in its papers.  In considering a motion to dismiss, "[T]he allegations of the complaint should be construed favorably to the pleader."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Conley v. Gibson*, 355 U.S. 41, 44-45 (1957) ("In appraising the sufficiency of the complaint we follow, of course, the accepted rule

that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."); *Northern Kare Facilities/Kingdom Kare, LLC v. Benefirst, LLC*, 344 F. Supp. 2d 283, 286 (D. Mass. 2004) (Tauro, J.) ("A claim should be dismissed pursuant to Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").  As this Court recently stated, "In considering a Rule 12(b)(6) motion to dismiss, a court should not decide questions of fact."  *GE Capital Mortgage Servs., Inc. v. Estate of Lugo*, 319 F. Supp. 2d 127, 130 (D. Mass. 2004) (Tauro, J.).  Instead, the Court "must view the facts presented in the pleadings and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Id.*  Given this favorable standard, Worcester Baseball's motion to dismiss lacks merit.

**B.    Seating Solutions' Contract Claims Survive the Motion to Dismiss.**

> **1.    Seating Solutions Has Adequately Pleaded Claims for Breach of Contract and the Covenant of Good Faith and Fair Dealing.**

By the time Scott Suprina and Ted Tye shook hands on Friday, February 18, 2005, Seating Solutions and Worcester Baseball had a contract.  They had reached a meeting of the minds on all essential terms.  Worcester Baseball's assertions to the contrary ignore applicable precedent and the generous standard of review in this procedural context.  Because Seating Solutions and Worcester Baseball had a contract, moreover, the claim for breach of the covenant of good faith and fair dealing survives.

A formal, final written document is not a prerequisite for the establishment of a contract.  What matters is the intent of the parties to be bound.  *See Chedd-Angier Prod. Co., Inc. v. Omni Publ'ns Int'l, Ltd.,* 756 F.2d 930, 935 (1st Cir. 1985) ("[U]nder Massachusetts law even where a writing was contemplated by the parties, if sufficient evidence exists to show that an oral contract has been entered into, the parties' intention to memorialize the contract in writing does not defeat the existence of an oral contract."); *White Spot Constr. Corp. v. Jet Spray Cooler, Inc.*, 344 Mass. 632, 634, 183 N.E.2d 719, 721 (1962) ("The jury was warranted in finding that the

- 7 -

parties entered into a bilateral contract at the time [they] shook hands . . . ."); *Hunneman Real Estate Corp. v. Norwood Realty, Inc*., 54 Mass. App. Ct. 416, 423, 765 N.E.2d 800, 806 (2002) ("Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract[s], it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation."), *rev. denied*, 437 Mass. 1105, 772 N.E.2d 590 (2002); *ESO, Inc. v. Kasparian*, 32 Mass. App. Ct. 731, 733-34, 594 N.E.2d 557, 559 (1992) ("It is well-settled that an agreement need not be in writing to be enforceable."); *Novel Iron Works, Inc. v. Wexler Constr. Co., Inc.*, 26 Mass. App. Ct. 401, 408, 528 N.E.2d 142, 146 (1988) ("If . . . the parties orally agree to the essential terms of the transaction, it may be inferred that they intended to bind themselves at that time . . . ."), *rev. denied*, 403 Mass. 1104, 530 N.E.2d 797 (1988).

Indeed, there are times when the execution of a final agreement is "hardly more than a formality." *Goren v. Royal Investments Inc*., 25 Mass. App. Ct. 137, 141, 516 N.E.2d 173, 176 (1987), *rev. denied,* 401 Mass. 1104, 519 N.E.2d 595 (1988). *See also McCarthy v. Tobin*, 429 Mass. 84, 87, 706 N.E.2d 629, 632 (1999) ("If . . . the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract."); *Coan v. Holbrook*, 327 Mass. 221, 224, 97 N.E.2d 649, 651 (1951) ("Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . . ."). This is such an instance, and Worcester Baseball's statements to the contrary at page 5 of Defendants' Memorandum are without merit.

Worcester Baseball incorrectly claims that there was no contract because written documents exchanged by the parties are referred to as "proposals," because there was a deposit requirement, and because Worcester Baseball was obligated to complete certain tasks by certain dates. *See* Defendants' Memo. at 5. Attempting to demonstrate the importance of these provisions, Defendants state that it was Seating Solutions that "expressly included such

requirements yet seeks to enforce an alleged contract even when its own terms were not met." *Id*. at 1. This is an inaccurate statement of the record before the Court. It is not clear who placed what terms in the written documents exchanged by the parties that are attached to the Complaint. Nor is it clear whether these terms were essential to the completion of the deal. It is just as likely that Worcester Baseball's failure to satisfy certain of these provisions is additional evidence of their breach of the contract with Seating Solutions. In any event, Worcester Baseball's attempts to derive favorable inferences from facts set forth in the Complaint are not appropriate. *See, e.g.*, *GE Capital Mortgage Servs., Inc.*, 319 F. Supp. 2d at 130 (requiring the Court to "view the facts presented in the pleadings and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party").

The facts concerning the existence of a contract between Seating Solutions and Worcester Baseball are unambiguous. At the February 18, 2005 meeting, Suprina (Seating Solutions) and Tye (Worcester Baseball) hammered out all of the essential terms of their agreement. *See* Compl. at ¶ 30. Worcester Baseball does not identify a single term – essential, trivial, or otherwise – upon which it disagreed with Seating Solutions. Suprina asked Tye to confirm that Worcester Baseball would use Seating Solutions for the Fitton Field Project. *See id.* at ¶ 32. Tye responded affirmatively in response to this request. *See id.* at ¶ 33. Tye repeated that the parties had an agreement at the close of the meeting and shook Suprina's hand. *See id.* Immediately thereafter, Tye told Worcester Baseball's president, Alan Stone, that Worcester Baseball and Seating Solutions had entered into a contract. *See id*. at ¶ 34.[2] Worcester Baseball and Seating Solutions had agreed upon all essential terms and entered into a contract. *See Chedd-Angier*

---

[2] The suggestion that these statements and actions evidence no intention by Worcester Baseball to be bound, *see* Defendants' Memo. at 6, is implausible. The logical ramifications of the argument at page 6 of Defendants' Memorandum, however, are worthy of further exploration. Worcester Baseball told Seating Solutions that there was an agreement. Worcester Baseball now tells the Court that this statement was knowingly false when it was made. Boiled to its essence, the assertion is "If we said it, we didn't mean it." Regardless of what this says about Worcester Baseball's credibility, this defense is not appropriate in a motion to dismiss.

*Prod. Co., Inc.,* 756 F.2d at 935; *White Spot Constr. Corp.*, 344 Mass. at 634, 183 N.E.2d at 721; *Hunneman Real Estate Corp.*, 54 Mass. App. Ct. at 423, 765 N.E.2d at 806; *ESO, Inc.*, 32 Mass. App. Ct. at 733-34, 594 N.E.2d at 559; *Novel Iron Works, Inc.*, 26 Mass. App. Ct. at 408, 528 N.E.2d at 146.  The parties' execution of a written document that memorialized the terms of the contract was a formality.  *See McCarthy*, 429 Mass. at 87, 706 N.E.2d at 632; *Coan*, 327 Mass. at 224, 97 N.E.2d at 651; *Goren*, 25 Mass. App. Ct. at 141, 516 N.E.2d at 176.  Seating Solutions and Worcester Baseball had a contract.[3]

**2.    Whether the Parties had a Contract is a Question of Fact.**

Worcester Baseball's decision to file this motion at all indicates that there is a disagreement as to whether Seating Solutions and Worcester Baseball had a contract.  At best, this is a question of fact.  *See Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 540 -541 (1st Cir. 1986) ("Under Massachusetts law, which governs this action, where there is conflicting testimony on the question of whether a contract has been created, the issue is one for the jury."); *Agri-Mark, Inc. v. Niro, Inc.*, 214 F. Supp. 2d 33, 43 (D. Mass. 2002) ("In Massachusetts, ordinarily the question of whether a contract has been made is one of fact and if the evidence does not consist only of writings or is uncontradicted, the question is for the jury."); *Kinchla v. Welsh*, 8 Mass. App. Ct. 367, 370, 394 N.E.2d 978, 981 (1979) ("In circumstances where there is conflicting testimony on the question of whether a contract has been created, the issue is one for the jury."); *David J. Tierney, Jr., Inc. v. T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 239, 392 N.E.2d 1066, 1068 (1979) ("Ordinarily the question whether a contract has been made is one of fact.  If the evidence consists only of writings, or is uncontradicted, the question is for the court; otherwise it is for the jury.").  Resolution of this factual dispute is not appropriate in the context of a motion to dismiss.  *See GE Capital Mortgage Servs., Inc.,* 319 F.

---

[3] Because there was a contract between the parties, Seating Solutions' claim against Worcester Baseball for breach of the covenant of good faith and fair dealing also survives.

Supp. 2d at 130.  *See also Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) ("In ruling on a motion to dismiss . . . a court should not decide questions of fact.").

      Here, the evidence consists of both the spoken words and writings of the parties.  Though it is not permitted to do so under Fed. R. Civ. P. 12(b)(6), Worcester Baseball is disputing critical evidence as to whether it entered into an agreement on February 18, 2005.  Defendants cannot bring themselves to admit, even for the purpose of their motion, that Tye and Stone both confirmed the existence of the contract.  Defendants refer to "Seating Solutions' failure to secure a contract for the Project."  Defendants' Memo. at 2.  Worcester Baseball refers to "a *purported* oral contract *allegedly* reached prior to submitting [the] last proposal."  *Id*. (emphasis supplied).  Worcester Baseball omits from its statement of "material facts" the verbal exchange between Tye and Suprina, Tye's subsequent confirmation of the existence of the contract to Suprina, Suprina and Tye's handshake, and Tye's verbal report to Stone.  *See id*. at 3.  They refer to "the alleged oral exchange."  *Id*. at 6.  They assert that Tye's statements were "made with an understood intention that it is not to be legally binding."  *Id*.  This supposed fact appears nowhere in the Complaint.  They question whether "the oral exchange here actually took place . . . ."  *Id*.  Not surprisingly, this leads Worcester Baseball to ignore the Complaint and procedural requirements, and to conclude that "Seating Solutions . . . understood that no binding agreement had been reached at the meeting."  *Id*.  Worcester Baseball can attempt to prove this unfounded assertion during the discovery process, but it has no basis on the current record before the Court.

### 3.    Worcester Baseball's Authority on the Issue of Contract Formation is Distinguishable.

      The legal authority upon which Worcester Baseball relies in support of its contract argument does not support dismissal of this case.  This authority falls into three categories.  In the first category are the cases that actually weigh *against* dismissal of this action.  In *Wellington v. Apthorp*, 145 Mass. 69, 13 N.E. 10 (1887), the court found that there had been a contract created by the conduct of the parties.  *See id.*, 145 Mass. at 76, 13 N.E. at 14.  The same is true in

the *Goren* case. *See Goren*, 25 Mass. App. Ct. at 141, 516 N.E.2d at 176 ("[T]he case falls into that category where execution of a more formal written instrument was hardly more than a formality.") (internal quotation marks omitted) (collecting cases). In *Laprade v. Fitchburg & L. St. Ry. Co.*, 205 Mass. 77, 90 N.E. 982 (1910), the court found that the question of whether a contract was formed based upon the conversations of the parties was appropriately left with the jury. *See id.*, 205 Mass. at 79, 90 N.E. at 983.

In the second category is the only case decided in a similar procedural context, *Montgomery Ward & Co. v. Johnson*, 209 Mass. 89, 95 N.E. 290 (1911). There, the plaintiff could not establish that a contract existed based upon the general distribution of a circular that listed prices for certain kinds of firearms. *See id.*, 209 Mass. at 90, 95 N.E. at 290. There was no allegation in the *Montgomery Ward* case that the parties had ever met, that they had discussed terms, or, as here, that the parties had settled upon the essential terms of their relationship. The assertion that the *Montgomery Ward* case justifies dismissal is without merit.

In the third and final category are cases decided upon factual records that were more significantly developed than what is present here. *See Wasserman v. Roach*, 336 Mass. 564, 564, 146 N.E.2d 909, 910 (1958) (basing ruling upon findings of fact in auditor's report); *Kuzmeskus v. Pickup Motor Co., Inc.*, 330 Mass. 490, 491, 115 N.E.2d 461, 462 (1953) (same); *Phoenix Spring Beverage Co. v. Harvard Brewing Co.*, 312 Mass. 501, 502, 45 N.E.2d 473, 474 (1942) (same); *Cronin v. National Shawmut Bank*, 306 Mass. 202, 203, 27 N.E.2d 717, 718 (1940) (same); *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 212, 195 N.E. 323, 323 (1935) (affirming trial court decision granting directed verdict);[4] *Tull v. Mister Donut Dev. Corp.*, 7

---

[4] Worcester Baseball's explication of the *Rosenfield* case is incomplete. Defendants imply that the case supports their argument that the parties here did not intend to be bound because they had not yet signed a formal contract. *See* Defendants' Memo. at 5. If anything, however, the principles set forth in the *Rosenfield* case cut both ways. As the court states:

> If all the material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered

- 12 -

Mass. App. Ct. 626, 627, 389 N.E.2d 447, 448 (1979) (basing ruling upon findings of fact in master's report).[5]

**B.      Seating Solutions States a Claim against Worcester Baseball Under Chapter 93A.**

The Supreme Judicial Court recently confirmed that conduct violates Mass. Gen. Law ch. 93A if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Morrison v. Toys "R" Us, Inc*., 441 Mass. 451, 457, 806 N.E.2d 388, 392 (2004). Worcester Baseball's statement, at page 8 of its Memorandum, that a violation of Chapter 93A requires *each* of these three elements is therefore an inaccurate statement of current Massachusetts law. *See* Michael C. Gilleran, *The Law of Chapter 93A* § 4.8 (Supp. 2004) (hereinafter "*Gilleran*") ("The test [is] disjunctive and therefore [does] not require that the higher second prong of immoral, unethical, oppressive or unscrupulous conduct ha[s] to be met."). Worcester Baseball, also on page 8 of its Memorandum, relies upon a standard of "rascality" and "raised eyebrows" that has been disavowed by the Supreme Judicial Court. *See Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc*., 420 Mass. 39, 42, 648 N.E.2d 435, 438 (1995) ("We view as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness', in deciding questions of unfairness under G.L. c. 93A.") (citations omitted); *Gilleran* at § 4.8 ("The SJC clearly was signaling that both the eyebrow test and the rancid flavor of unfairness test were to be abandoned.").

Seating Solutions' alleges substantially more than "[a] mere breach of contract". *See* Defendant's Memo at 8. Seating Solutions alleges in the Amended Complaint that Worcester

---

is a mere memorial of the contract already final by the earlier mutual assent of the parties to those terms.

*Rosenfield*, 290 Mass. at 216; 195 N.E. at 325.

[5] The lack of procedurally appropriate caselaw in support of Worcester Baseball's position is most likely due to the legal principle illustrated in Section III(B)(2) supra: the existence of a contract is a question of fact.

- 13 -

Baseball and Geller engaged in a conscious effort to deprive it of intellectual property and trade secrets. *See* Compl. at ¶¶ 31, 44-46. It is possible to infer from the Amended Complaint that Worcester Baseball and Geller cooperated in learning the details of Seating Solutions' plan to renovate Fitton Field in an innovative and cost effective manner, *see* Compl. at 31, and then shared this confidential information with Seating Solutions' competitors to get a better deal.[6] Conduct such as this is a clear violation of Chapter 93A. *See Moore v. Marty Gilman, Inc*., 965 F. Supp. 203, 220 (D. Mass. 1997) ("[D]eceptively induc[ing] plaintiffs to impart valuable commercial information without charge . . . alleges conduct that is sufficiently unscrupulous to constitute a violation of 93A."); *Prescott v. Morton Int'l, Inc*., 769 F. Supp. 404, 407 (D. Mass. 1990) ("The standards for finding misappropriation of a trade secret provide the criteria for finding an unfair or deceptive act.").

## IV.    CONCLUSION

Seating Solutions respectfully requests that Worcester Baseball's Motion to Dismiss be denied.

Respectfully Submitted,

RI, INC. d/b/a SEATING SOLUTIONS

/s/                    Terry Klein
THE LAW OFFFICE OF TERRY KLEIN
Terry Klein, BBO# 652052
1558 Dorchester Avenue, Ste. 202
Dorchester, Massachusetts  02122
Telephone: (617) 825-8175
Dated:  May 3, 2005          Facsimile: (617) 507-6454

---

[6] Geller's complete disregard of Seating Solutions' intellectual property and trade secrets is evident from its denial that the stadium design proposed by Seating Solutions constitutes proprietary information. *See* Answer of Geller Sport, Inc. and Geller Devellis, Inc. to Amended Complaint and Jury Demand, dated April 4, 2005, ¶ 20. Geller interposes this denial despite the fact that the drawings were stamped with the notation that they were confidential and proprietary information that belonged to Seating Solutions and were not to be shared with any third party for any purpose under any circumstances.

- 14 -

<u>CERTIFICATE OF SERVICE</u>

     I, Terry Klein, hereby certify that on May 3, 2005, a true copy of the above document was served by first class mail upon counsel for each other party.

                           /s/             Terry Klein