UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

RI, Inc. d/b/a SEATING SOLUTIONS,

                        Plaintiff,

                    v.

GELLER SPORT, INC., GELLER DEVELLIS,
INC., WORCESTER PROFESSIONAL BASEBALL
LLC, and PERFECT GAME BASEBALL CLUBS, LLC,

                        Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION
NO. 05-CV-10365-JLT

---

## AFFIDAVIT OF WARREN D. HUTCHISON

I, Warren D. Hutchison, hereby depose and state as follows

1.     I am a partner at the firm of Donovan Hatem LLP, 125 Summer Street, Boston, MA 02110.

2     represent the defendants, Geller Sport, Inc. and Geller DeVellis, Inc., in this action.

3     Attached are true and accurate copies of the following documents which have been listed as exhibits in the defendants' Memorandum in Support of the Motion for Summary Judgment·

Exhibit 1     Deposition of Scott Suprina, pg 6, lines 21-24, pg 23, lines 3-14, pg 24, lines 5-23, pg 100, lines 2-6, pg 102, lines 1-22, pg 114, lines 22-24, pg 121, lines 18-21, pg 122, lines 1-19, page 123, lines 12-24, pg 128, lines 4-24, pg 129, lines 1-24, pg 130, lines 1-16, pg 156, lines 17-24, pg 157, lines 1-24, pg 233, lines 18-24, pg 234, lines 15-18, pg 244, lines 1-19, pg 246, lines 21-24, pg 247, lines 1-2, pg 251, lines 4-12, pg 252, lines 1-20, pg 253, lines 7-10, pg 254, lines 7-24, pg 255, lines, lines 1-4, pg 258, lines 18-22, pg 263, lines 20-24, pg 264, lines 1-4, pg 271, lines 10-15, pg 295, lines 22-24, pg 296, lines 1-11, pg 297, lines 1-24;

Exhibit 2     Deposition of Ted Tye, pg 19, lines 14-17, pg 44, lines 17-24, pg 45, lines 1-6, pg 46, lines 6-8, pg 49, lines 11-24, pg 50, line 1, pg 70, lines 9-12 , pg 102, lines 17-24, pg 103, lines 1-11, pg 106, lines 3-17, pg 124, lines 8-

16, pg 136, lines 5-24, pg 137, lines 1-18, pg 146, lines 1-24, pg 164, lines 20-24, pg 165, lines 1-6, pg 187, lines 10-18, pg 188, lines 17-24, pg 189, lines 1-5, pg 192, lines 14-16;

Exhibit 3:    Deposition of Alan Stone, pg 9, lines 13-19, pg 15, lines 15-22, pg 26, lines 5-8, pg 30, lines 14-18, pg 90, lines 7-9;

Exhibit 4:    February 17, 2005, revised Proposal;

Exhibit 5:    February 21, 2005, revised Proposal;

Exhibit 6:    Seating Solutions plans;

Exhibit 7:    Affidavit of Patrick Maguire; and

Exhibit 8:    Affidavit of Alan Stone.

Signed under the pains and penalties of perjury this 7 day of October, 2005.

Warren D. Hutchison

00947976

# EXHIBIT 1

**Exhibits: 1-10**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
 5
 6   RI, Inc. d/b/a
     SEATING SOLUTIONS,
 7
            Plaintiff
 8
     VS.
 9
     GELLER SPORT, INC.,
10   GELLER DEVELLIS, INC.,
     WORCESTER PROFESSIONAL BASEBALL LLC,
11   and PERFECT GAME BASEBALL CLUBS, LLC,
12          Defendants
13
14       DEPOSITION OF SCOTT SUPRINA, taken
     at the request of the Defendants, pursuant
15   to Rule 30 of the Massachusetts Rules of
     Civil Procedure before
16   Kathleen M. Bradley, Notary Public and
     Registered Professional Reporter in and for
17   the Commonwealth of Massachusetts, on
     Friday, July 29, 2005, commencing at
18   10 a.m. at the offices of Bowditch & Dewey,
     311 Main Street, Worcester, Massachusetts.
19
20
21
22          BAY STATE REPORTING AGENCY
            76 MILL STREET (At Park Avenue)
23          WORCESTER, MASSACHUSETTS  01603
                   (508) 753-4121
24
```

---

**3**

**INDEX**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SCOTT SUPRINA | | | | |
| MR. CIAVARRA: | 4 | | 275 | |
| MS. KORN: | | 225 | | 294 |

**EXHIBITS**

| 1 | Proposal 2/2/05 | 59 |
|---|---|---|
| 2 | Email & Proposal 2/17/05 | 73 |
| 3 | Email & Edited 2/17/05 Proposal 2/19/05 | 89 |
| 4 | Email 2/21/05 | 91 |
| 5 | Email from Cris 2/21/05 and Revised Proposal | 118 |
| 6 | Emails 2/21/05 | 139 |
| 7 | Email 2/21/05 from S. Suprina to Ted | 146 |
| 8 | Email & Revised Proposal 2/22/05 | 157 |
| 9 | Email 2/22/05 | 157 |
| 10 | 2/23/05 Email Exchange | 165 |

---

**2**

**A P P E A R A N C E S :**

**FOR THE PLAINTIFF:**

THE LAW OFFICE OF TERRY KLEIN
84 State Street
Suite 760
Boston, Massachusetts 02109
BY:  Terry Klein, Esq.

**FOR THE DEFENDANTS WORCESTER BASEBALL AND PERFECT GAME BASEBALL CLUBS:**

BOWDITCH & DEWEY
311 Main Street
Worcester, Massachusetts 01615
BY:  LOUIS M. CIAVARRA, ESQ

**FOR THE DEFENDANTS GELLER:**

DONOVAN HATEM, LLP
Two Seaport Lane
Boston, Massachusetts 02210
BY:  LAUREN M. KORN, ESQ.

ALSO PRESENT   Ted Tye, Alan Stone

---

**4**

```
 1            P R O C E E D I N G S
 2        SCOTT F. SUPRINA, having been
 3   satisfactorily identified by the production
 4   of his driver's license, and duly sworn,
 5   was examined and testified as follows:
 6        (Stipulated by and between
 7   counsel that all objections except as to
 8   form are reserved until the time of the
 9   hearing.  Witness will read and sign the
10   deposition transcript within 30 days of
11   receipt)
12            DIRECT EXAMINATION
13   BY MR. CIAVARRA:
14   Q.   Sir, would you please state your full
15   name for the record?
16   A.   Scott Frank Suprina.
17   Q.   You understand you're here for your
18   deposition today?
19   A.   Yes.
20   Q.   And you understand you've been placed
21   under oath?
22   A.   Yes.
23   Q.   And you told me before you've had
24   your deposition taken before?
```

**5**

1  A.  Yes.
2  Q.  How many times?
3  A.  Fifteen or so.
·  Q.  A lot of lawyers. How old are you?
·  A.  I'm 46.
6  Q.  That's a good age. I am, too.  And
7  where do you live?
8  A.  26 Parkway Drive South, Commack, New
9  York.
10  Q.  And are you currently employed?
11  A.  Yes.
12  Q.  By whom?
13  A.  RI, Incorporated.
14  Q.  What does RI stand for?
15  A.  Just initials.
16  Q.  It's not Rhode Island, is it?
17  A.  No.
18  Q.  We were in court and the judge kept
19  referring to it as Rhode Island, Inc.  So
20  it's just RI?
21  A.  RI.
22  Q.  And you have a business name that you
23  go by as well?
24  A.  A d/b/a, Seating Solutions.

**6**

1  Q.  Do you typically refer to your
2  company as Seating Solutions or RI?
3  A.  Both.  Depends upon the application.
4  Q.  What's your position with the
5  company?
6  A.  Vice President.
7  Q.  Are you also an owner?
8  A.  Yes.
9  Q.  What percentage of ownership?
10  A.  Actually, technically, no, my wife
11  owns 90 percent.
12  Q.  Who's the President of the company?
13  A.  My wife.
14  Q.  What's her name?
15  A.  Lisa Suprina.
16  Q.  Does she have any operating
17  responsibilities at the company?
18  A.  To take care of the kids --  no.
19  Q.  She doesn't have a day-to-day?
·  A.  No, she doesn't.
21  Q.  Would it be fair to say that you
22  operate as the Chief Executive Officer of
23  the company?
24  A.  Yes.

**7**

1  Q.  For how long have you operated
2  Seating Solutions?
3  A.  Somewhere in the neighborhood of ten
4  years.
5  Q.  Mid-'90s?
6  A.  Yah.
7  Q.  What would you describe Seating
8  Solutions as a business, what does it do?
9  A.  We design, sell and install sports
10  and spectator seating systems and we also
11  have a rental division.
12  Q.  And has that been its business since
13  inception?
14  A.  Yes.
15  Q.  Were you involved in that business
16  before forming Seating Solutions?
17  Personally were you involved in this line
18  of business?
19  A.  I was involved in the park and
20  recreation equipment business, which
21  included some seating.
22  Q.  Is that a company you owned or did
23  you work for someone else?
24  A.  No, I owned the company.

**8**

1  Q.  What was the name of that company?
2  A.  I don't know -- it was Scott Suprina
3  Sports, Inc.
4  Q.  And for how many years had you
5  operated that approximately?
6  A.  Eight or so, ten.
7  Q.  Did that company stop doing business
8  at some point?
9  A.  Yes.
10  Q.  Why did you switch from that company
11  to Seating Solutions?
12  A.  It wasn't switched.  That company, we
13  closed down that company.  That company did
14  a lot of playground equipment.  And my
15  previous depositions were mostly spent in
16  the playground business.  And it just
17  became a business that was impossible to
18  make money at.
19  Q.  Personal injuries?
20  A.  Yah, for no apparent reason.
21  Q.  And Seating Solutions was the next
22  generation of your business activities
23  after Scott Suprina Sports?
24  A.  Yes.

**21**

1   A.   I create a spread sheet, but not on
2   computer.  I mean I'll do some math, some
3   notes, and figure out what I need and put
4   it into columns and evaluate it.
5   Q.   Have you provided those sheets to
6   your attorney in this case?
7   A.   I provided, I think what I was asked
8   for was the facts of the cost, not the
9   estimates of the costs.
10  Q.   Or the backup that went into
11  determining that cost?
12  A.   I provided the backup to my attorney,
13  yes.
14  Q.   Well, I have the stuff here.  You can
15  show me later on when we get to that.
16         Are there documents like those
17  sheets and stuff that you haven't provided
18  yet?
19  A.   No.
20  Q.   So you think you have provided these
21  so-called "spread sheets?"
22  A.   I either provided them or I don't
23  have them, I think.
24  Q.   You think you may have destroyed

**22**

1   them?
2   A.   I wouldn't save scratch paper, which
3   is what I'm talking about.
4   Q.   Well, I'm thinking about accounting
5   paper that has lined rules and columns on
6   it.
7   A.   You got the wrong guy.  No, I don't.
8   Q.   Whatever backup you have on the
9   contract price you provided me?
10  A.   Yes.
11  Q.   And to the best of your knowledge
12  it's been provided?
13  A.   Correct.
14  Q.   Now just focusing on this particular
15  project, do you call it Fitton Field or
16  Holy Cross?
17  A.   Doesn't matter to me.
18  Q.   Either one of those will be fine to
19  you?
20  A.   I know what you're talking about.
21  Q.   We are talking about Fitton Field.
22  Okay?
23  A.   Okay.
24  Q.   Your company has brought a lawsuit,

**23**

1   correct?
2   A.   Correct.
3   Q.   And it's been your position that you
4   had a contract to provide the seating for
5   Fitton Field?
6   A.   Provide and install, correct.
7   Q.   That's your position in this case?
8   A.   Correct.
9   Q.   Do you have any written agreement for
10  that?
11  A.   I think we have many written
12  agreements.
13  Q.   Signed by you and someone else?
14  A.   I don't believe we have that.
15  Q.   I just want to make sure.  I think I
16  know what the position is, that there was
17  an oral agreement.  But I want to take it
18  step by step.
19         It is not your position that
20  there is a signed, written contract by the
21  parties in this case, is there?
22         MR. KLEIN:  Objection to the
23  form.
24  A.   Yes, I have a position there is a

**24**

1   written contract.
2   Q.   And you're referring to the documents
3   that you prepared.  I think it's called a
4   proposal, is it not?
5   A.   I'm referring to the compilation of
6   everything creating the written contract.
7   Q.   You sent a number of documents to my
8   clients setting forth the terms of the
9   engagement, did you not?
10  A.   That's a tough question to answer
11  really.  I sent to your client documents
12  that led to the creation of other documents
13  that set forth the terms.
14  Q.   All right.  And you're familiar with
15  the format of a document that has on top of
16  it Proposal?
17  A.   Sure.
18  Q.   (Indicating.)  And none of those were
19  ever signed by my clients, were they?
20  A.   I don't believe so.
21  Q.   You believe, is it your position that
22  there was an oral agreement?
23  A.   Absolutely.
24  Q.   And who were the individuals that are

97

1 agreement and ask Mr. Tye to sign them?
2 A. Uh, no.
3 Q. You could have?
4 A. I think, as a matter of fact, Ted was
5 going on vacation and trying to get out of
6 the office. So I was trying to accommodate
7 my client who was spending a million and a
8 half dollars.
9 Q. Did he refuse to do that? Did you
10 say, "Hey, Ted. I'd like to get this
11 signed today. Could you spend another
12 minute, let's edit it and get it signed
13 off?" Did you say that to him?
14 MR. KLEIN: Objection.
15 A. No. I said, "Ted, I need to know do
16 I have a deal, yes or no."
17 And he answered yes, and shook
18 my hand.
19 Q. Why did you need to know?
20 A. So I could get to work. So I could
21 order materials, so I could plan my crews,
22 so I could commit to the project.
23 Q. And this was on a Friday, correct?
24 A. Yes.

98

1 Q. There wasn't anything that you were
2 going to do on that Friday, was there?
3 MR. KLEIN: Objection to form.
4 A. There absolutely was.
5 Q. What did you do on that Friday?
6 A. I called the factory, told them we
7 had the deal and we needed to get the
8 steel.
9 Q. Who did you call?
10 A. Treddy Kilpatrick or Eddy Spears.
11 Q. Sorry, you've got to help me with
12 names. What was the first one?
13 A. Kilpatrick.
14 Q. What was the first name though?
15 A. Treddy, T-R-E-D-D-Y. Geneva,
16 Alabama.
17 Q. Treddy?
18 A. Kilpatrick. Or Eddy Spears. I don't
19 recall. One is the owner. The other is
the sales manager.
21 Q. And you called them on that Friday?
22 A. Absolutely.
23 Q. Cell phone?
24 A. To get them?

99

1 Q. Yes.
2 A. Probably my cell phone when I left
3 the meeting.
4 Q. Do you recall did you use the land
5 line from Mr. Tye's office?
6 A. No, I don't do that.
7 Q. You're sure you called them by cell
8 phone?
9 A. I would think so. Could have been in
10 New York in the office on Saturday. I
11 spoke to him immediately after the meeting
12 and got it going.
13 Q. That's why I'm asking you. Did you
14 call him on that Friday? Did you do it
15 Saturday, or did you call him on Monday?
16 A. I'll check my phone records.
17 Q. Do you know as you sit here today?
18 A. No, I don't know.
19 Q. Did you send a Purchase Order?
20 A. I don't believe so.
21 MR. KLEIN: Objection.
22 Ambiguous.
23 Q. Did you receive an invoice?
24 MR. KLEIN: Objection.

100

1 Ambiguous.
2 Q. For the -- do you understand my
3 question?
4 A. For this particular? Nothing was
5 shipped so I never get invoices prior to
6 shipping.
7 Q. Do you communicate by Email with
8 Outdoor Aluminum?
9 A. Myself, no.
10 Q. Does your office?
11 A. Yes.
12 Q. Do you know if anybody from Seating
13 Solutions sent any Emails to Outdoor
14 Aluminum on this project?
15 A. Probably.
16 Q. Have you ever seen any? Because I
17 know none have been produced.
18 MR. KLEIN: Objection.
19 A. I haven't seen any.
20 Q. You can check that easy enough, can't
21 you?
22 A. Sure.
23 Q. Had prior copies of the proposal been
24 sent to Outdoor Aluminum?

101

1  A.   No.
2  Q.   Did they know anything about this
3  project on the 18th?
·   A.   Yes.
·  Q.   Had you described to them generally
6  the volume of seats you were going to need?
7  A.   Sent them a drawing and got pricing.
8  Q.   That's how you were able to price out
9  the contract?
10  A.   There you go.
11  Q.   And you called them up and said,
12  Listen, it's a go.  We're going to do this?
13  A.   There was a timeline.
14  Q.   When did you call them and tell them
15  that it was off?
16  A.   Ten days later.
17  Q.   You knew it was off the next day,
18  didn't you?
19  A.   Absolutely not.
20  Q.   When did you know that you didn't get
21  the contract?
22  A.   A week later.
23  Q.   How did you learn?
24  A.   The next Thursday or Friday.

102

1  Q.   How did you find out?
2  A.   Alan Stone told me that we've decided
3  to go with someone else.
4  Q.   Did you ever have to pay Outdoor
5  Aluminum any money for this order?
6  A.   No.
7  Q.   And they never actually -- do they
8  manufacture the seats per order or is this
9  something they stock?
10  A.   They manufacture all the steel and
11  the framing products and all the hardware
12  and they cut to size of the planking and
13  the deck.
14  Q.   But they don't go through that effort
15  until they have an order, is that fair to
16  say?
17  A.   Yes.
18  Q.   And so they never did that here?
19  A.   I wouldn't know unless I checked.
·   Q.   To the best of your knowledge?
21  A.   To the best of my knowledge I
22  wouldn't think they did, no.
23  Q.   Following your conversation that you
24  had with Mr. Tye did Seating Solutions do

103

1  anything else other than calling Outdoor
2  Aluminum for this project?
3          MR. KLEIN:  Objection.
4  Ambiguous.
5  A.   Yes.  Seating Solutions tried to
6  block out the time and make the schedule
7  available for the anticipated time of
8  delivery.  Started looking into where we'd
9  get our equipment to do, you know, the
10  construction.
11  Q.   Who did this?
12  A.   Probably myself and perhaps Ed Mark
13  helped me.  It didn't get that far along.
14  Q.   It didn't happen over the weekend,
15  did it?
16  A.   No.
17  Q.   And do you recall if you actually did
18  anything on Monday on the project?
19  A.   I don't recall.  Monday was a holiday
20  so I don't recall.  I don't even remember
21  what holiday it was.
22  Q.   Presidents Day, Martin Luther King
23  Day?
24          MR. KLEIN:  Presidents.

104

1          MR. CIAVARRA:  Thank you.  My
2  son was born the 20th so I should know
3  that.
4  A.   My son was born today.
5  Q.   Did you take that day off, Presidents
6  Day?
7  A.   Probably not.
8  Q.   Do you recall?
9  A.   No.
10  Q.   The meeting on the 18th, was Mr. Tye,
11  were you and Mr. Tye in the room together
12  the whole time?
13  A.   He went in and out of the room a
14  couple times.
15  Q.   When he wasn't in the room was there
16  anyone else you were talking to about the
17  project?
18  A.   Ross from my office.
19  Q.   What's Ross's last name?
20  A.   Jacobs.
21  Q.   And what was Ross's role in this?
22  A.   Ross was really coming into the
23  business at that time, relatively new to
24  the company.  And now he runs a division of

**113**

1 place to put them?

2 Q. Well-said.

3 A. Yes, I would agree to that. I would

believe that.

5 MR. KLEIN: Want to take a

6 break, Lou?

7 MR. CIAVARRA: I'm fine, but

8 why don't we take five minutes now.

9 (Recessed)

10 Q. Who's authorized at Seating Solutions

11 to sign contracts on behalf of the company?

12 A. Myself, Mark Ligator, Cris can. Right

13 now Larry Hickey is getting ready to.

14 Depends on the timeline.

15 Q. Today.

16 A. Larry Hickey, Mark, myself, Cris.

17 Q. What was Mr. Tye's position with the

18 baseball teams?

19 A. I have no idea.

20 Q. What was his title?

21 A. No clue.

22 Q. Do you know if he was a president?

23 A. I don't know.

24 Q. Do you know if he had an ownership

**114**

1 interest?

2 A. I was told by him he had an ownership

3 interest.

4 Q. Do you know how much?

5 A. No.

6 Q. Do you know what Mr. Stone's position

7 was?

8 A. Didn't meet Mr. Stone until that

9 afternoon on Friday. I believe he's, I

10 don't know what his title is, but according

11 he's the head guy.

12 Q. According to him or according to Mr.

13 Tye?

14 A. According to Ted and him.

15 Q. That's the first time you had met

16 him, physically met him?

17 A. Correct, or spoke to him, I believe.

18 Q. And you learned he was, to use your

19 term, "the head guy?"

A. Yes.

21 Q. Had you learned that any contracts

22 would have to be signed by him?

23 A. I believe I was told the contract

24 would be executed by him, yes.

**115**

1 Q. And you understood, did you not, that

2 the entities also had a Board of Directors?

3 A. I was told they did.

4 Q. And weren't you told that any deal

5 had to be approved by the Board?

6 A. I don't know if I was told, or if I

7 was told the Board was meeting. I don't

8 believe I was told any deal had to be

9 approved by the Board.

10 I was told there was a Board

11 meeting, I believe, Saturday. I had a

12 deal. I didn't have any deal to be

13 approved as far as I was concerned.

14 Q. What made you think that Mr. Tye had

15 the authority to make a deal on behalf of

16 the Board of Directors and the owner?

17 A. I had asked him if we had a deal and

18 then he told the head guy that he gave the

19 deal to me.

20 And the head guy said, "I look

21 forward to doing work with you. I hope

22 it's the beginning of a long relationship."

23 That's the head guy.

24 Q. Take it one step at a time. Mr. Tye

**116**

1 also told you that there was a Board

2 meeting the next day, didn't he?

3 A. For what purpose?

4 Q. For the purpose of discussing the

5 project. Didn't he tell you that?

6 MR. KLEIN: Objection to form.

7 A. He told me there was a Board meeting.

8 Q. And in your mind it had nothing to do

9 with you? He was just volunteering that to

10 you for the heck of it?

11 MR. KLEIN: Objection.

12 Argumentative.

13 A. From what I understood it had to do

14 with the school.

15 Q. You're having a conversation with Mr.

16 Tye about this project, correct?

17 A. Yes.

18 Q. You weren't talking about what the

19 name of the team was going to be, were you?

20 A. No.

21 Q. You weren't talking about the

22 business raising money, were you?

23 A. On occasion we were, about seats and

24 profits.

**121**

1   A.   As agreed between Ted and I, yes.

2   Q.   Have you ever compared this revised

3 proposal with what you understood the deal

4 to be?

5   A.   I compared Ted's notes that he said

6 that he would agree to with what I

7 understood the deal to be.

8   Q.   I'm talking about the document that

9 was then sent by your office?

10   A.   Did I ever review that? I don't

11 believe so.

12   Q.   So you don't know if this accurately

13 represents what you understood the deal to

14 be? When I say "this," Exhibit 5.

15   A.   Correct.

16   Q.   It might not?

17   A.   Correct.

18   Q.   We can agree that this document,

19 Exhibit 5, was never signed by anyone,

20 correct?

21   A.   Yes, we can agree with that.

22   Q.   Let me, if I can, sir, ask you to

23 turn, it's the second page of the letter,

24 the third page of the exhibit.

**122**

1       In approximately the middle

2 part of it you'll see that there's a line

3 that says: "The pricing and terms are

4 based on receipt of a signed proposal and

5 deposit by February 22, 2005 only."

6   A.   Mm-hm.

7   Q.   You have to say yes.

8   A.   Yes.

9   Q.   That's language that your office

10 created?

11   A.   Correct.

12   Q.   And we disagreed that you never

13 received a signed proposal, right?

14   A.   We disagreed?

15   Q.   Or we agreed?

16   A.   Correct.

17   Q.   And you never received a deposit by

18 February 22nd?

19   A.   That's correct.

20   Q.   So two of the conditions in Exhibit 5

21 were not met by the baseball team, isn't

22 that correct?

23       MR. KLEIN: Object to the

24 form.

**123**

1   A.   This is really an effort to do what

2 you said before, which is to iron out what

3 you said and what I said we agreed to.

4       The first part of the FAX

5 starts with "Thanks for the order."

6   Q.   I don't think you answered my

7 question, sir.

8   A.   I probably didn't.

9   Q.   Do you want to try and answer it this

10 time?

11   A.   What was it?

12   Q.   Two of the conditions you sent in the

13 letter, receipt of a signed proposal and a

14 deposit by February 22nd, did not occur,

15 isn't that correct?

16   A.   Which two conditions are you talking

17 about?

18   Q.   A signed proposal and a deposit by

19 February 22.

20       MR. KLEIN: Object to the

21 form.

22   A.   Yes, okay, I'll agree with that.

23   Q.   It didn't happen?

24   A.   Correct.

**124**

1   Q.   On the last page you see the word

2 Penalties, the section on Penalties?

3   A.   Yes, sure.

4   Q.   There's a line that says: "This

5 agreement is subject to an AIA contract."

6 Do you see that?

7   A.   Yes.

8   Q.   And that was new in this proposal,

9 wasn't it?

10   A.   I believe that was part of the terms

11 that Ted wanted.

12   Q.   He wanted an AIA contract signed,

13 right?

14   A.   Yes.

15   Q.   And you didn't have an AIA contract

16 prepared at this time, did you?

17   A.   I believe Ted was going to prepare

18 the AIA contract.

19   Q.   But my question was did you have one

20 prepared at this time?

21   A.   No.

22   Q.   Had you seen one for this project at

23 this time?

24   A.   No.

1   Q.   Had you discussed the terms of what
2   the AIA contract would say?
3   A.   They would duplicate the terms we
4   agreed to.
5   Q.   Are you familiar with AIA contracts?
6   A.   A little bit.
7   Q.   You've used them from time to time?
8   A.   Yes.
9   Q.   And they contain terms and provisions
10  in addition to those that are set forth in
11  this three-page document, don't they?
12  A.   They don't have to.
13  Q.   Do they typically, sir?
14  A.   I guess I don't have the education.
15  Q.   Well, you've read AIA contracts
16  because you've signed them, is that a
17  correct statement?
18  A.   I'm not making a clear distinction
19  between what's on here and what's on an AIA
20  off the top of my head.
21  Q.   Have you reviewed AIA contracts in
22  the past?
23  A.   Yes.
24  Q.   Have you signed AIA contracts in the

1   past?
2   A.   Sure.
3   Q.   In your experience are they always
4   longer than three pages?
5   A.   I would say yes.
6   Q.   And in your experience, without
7   asking you specifically what, do they
8   contain terms in addition to those which
9   you see in your proposal?
10  A.   Well, "terms" is a tough word.  Do
11  they contain --
12  Q.   Provisions?
13  A.   Do they contain better descriptions
14  of the specifics of what's going to go on
15  or the rules of how things are going to be
16  handled, yes.
17  Q.   Okay.  And every time you sign an AIA
18  contract have you simply signed it without
19  making any changes or comments to it?
20      A.   The majority of the time.
21  Q.   Sometimes you've made changes?
22  A.   Not to the body of the contract.  Very
23  few times.
24  Q.   The question was ever, have you ever

1   made changes to the form of an AIA
2   contract?
3   A.   Probably.
4   Q.   And have your customers made edits
5   and changes to the AIA contract?
6   A.   They usually send it to me.  So --
7   Q.   They've already made their changes?
8   A.   Not normal.  I don't see changes, so
9   no I would say.
10  Q.   So you understood at the time that
11  this document was sent that there was still
12  going to be further discussion, could be
13  further discussion about the terms of the
14  AIA contract?
15         MR. KLEIN:  Object to the
16  form.
17  Q.   Could be?
18  A.   That's not the way I understood it,
19  no.
20  Q.   What's wrong about what I said?
21  A.   It says here that the pricing and
22  terms are based on receipt of signed
23  proposal and deposit by February 22.
24         And then it says back here that

1   there's going to be an AIA contract.
2         I don't think it means -- I
3   already have a deal of prior to this.
4         So if it's not signed, I think
5   that affects the terms and the price,
6   meaning it could cost more money if they
7   delay in the signing of it.
8         If I can't get the money in the
9   bank, if they don't give me the deposit, it
10  could cost more money.  So the price could
11  change.  Okay?  Maybe I would have to
12  accelerate the payment.  But the order is
13  the order.
14  Q.   Let me be sure I understand that.
15  Let's assume that you didn't get your
16  deposit by February 22?
17  A.   Okay.
18  Q.   Are you telling me that you could
19  have increased the price and the baseball
20  teams would still be bound to a contract
21  with you?  Can you answer that question?
22  A.   Go ahead.  Say it again.
23  Q.   Okay.  In following what you just
24  said to me, that if the baseball team

**129**

1 didn't provide you with a deposit by
2 February 22 it could affect the price. Do
3 you remember saying that to me?
4 A.   Yes.
5 Q.   That's a yes?
6 A.   That's what it says in writing.
7 Q.   I'm asking you what the deal was.
8 A.   Yes.
9 Q.   And the deal was in your mind that if
10 you didn't get your deposit by the 22nd the
11 price could go up?
12 A.   If I had additional expenses they
13 would be passed on.
14 Q.   And they would have to pay it?
15 A.   Yes.
16 Q.   Regardless of how much it was?
17 A.   Or they could take the delay in time.
18 Q.   So there were were a variety of ways
19 in which the deal could change if you
20 didn't get a deposit by the 22nd?
21 A.   The deal wasn't changing.
22 Q.   You don't know that.
23 A.   The deal wasn't changing. I agreed
24 to take an order on a Friday and deliver on

**130**

1 this date. I guaranteed that.
2       If they didn't give me the
3 money by the date they promised, then I
4 could extend their delivery date.
5       The terms of what I agreed as
6 far as their functionality, it could
7 change.
8 Q.   So this document, Exhibit 5, dated
9 and sent on the 21st of February requires a
10 deposit the next day? Do you see that?
11       MR. KLEIN: Objection to form.
12 Q.   February 22 it says.
13 A.   The document, let's say the document
14 has a penalty -- has a possibility of a
15 penalty for not giving the deposit the next
16 day. I don't know that it requires it.
17 Q.   Again, I didn't create the language,
18 your office did. So let's look again at
19 what it says.
20       It says: "The pricing and
21 terms are based on receipt of a signed
22 proposal and deposit by February 22, 2005
23 only." I read it correctly, right?
24       MR. KLEIN: Object to the

**131**

1 form.
2 A.   You did.
3 Q.   And that's language created by
4 Seating Solutions?
5 A.   That's correct.
6 Q.   And you didn't receive the deposit by
7 the next day?
8 A.   Yes.
9 Q.   Okay. So February 23 comes and you
10 don't have your $150,000, okay?
11 A.   Yes.
12 Q.   Is it your testimony there's still a
13 binding agreement between the parties?
14       MR. KLEIN: Object to the
15 form.
16 Q.   Yes or no?
17 A.   Yes.
18 Q.   And you could on your own change the
19 price or the terms if you chose to, is that
20 your testimony?
21       MR. KLEIN: Object to the
22 form.
23 A.   I could take -- if it delayed, I
24 could relieve myself I'm sure of partial --

**132**

1 of the requirement to give them $50,000
2 back a week as they're holding up the
3 project. That's a term.
4       If they don't initiate the cash
5 deposit, I have the right not to initiate
6 my risk. But the contract is still in
7 force.
8 Q.   In your mind here in this deal you
9 could pick and choose the terms and the
10 price that would continue on if you didn't
11 get your deposit?
12       MR. KLEIN: Object to the
13 form.
14 Q.   Is that correct?
15 A.   In my mind I could pick and choose
16 the terms.
17 Q.   Like, for example, you said you could
18 extend the date of or eliminate the penalty
19 provision, is that your testimony?
20 A.   I could do what's right. My
21 testimony was if there's extra cost to me
22 based on them not delivering the deposit in
23 a timely fashion, then I would expect to be
24 able to recoup that, yes.

1 would you give the job to someone who
2 couldn't get it done.
3 **Q.** And you're telling my clients to be
4 concerned about somebody who on one day
5 tells you they can't do it, and the next
6 day they say they can?
7 **A.** That's correct.
8 **Q.** And then you go on to say, "Dan
9 Clayton won't get it done?" That's what
10 you said?
11 **A.** That's correct?
12 **Q.** How did you know that Dan Clayton
13 couldn't get it done?
14 **A.** I guess I'm psychic because they
15 didn't get it done.
16 **Q.** Is that your testimony, you're
17 psychic?
18 **A.** That's okay with me. They didn't get
19 it done.
20 **Q.** Like I said, this is being taken
21 down, and we're going to read it to a jury
22 some day.
23 **A.** That's okay.
24 **Q.** And do you have these psychic

1 had to then supply for?
2     MR. KLEIN: Objection to form.
3 **Q.** Is that what you said?
4 **A.** That's correct.
5 **Q.** Tell me some of those jobs.
6 **A.** I don't know the names of those jobs.
7 We have the information in our office.
8 **Q.** When you wrote this, what did you
9 have in front of you that told you that
10 that was a true statement?
11 **A.** The knowledge that we rented to a GC
12 who couldn't get the delivery of product
13 from Dan Clayton and put the product in so
14 they could have their event.
15 **Q.** So you knew that then, but you don't
16 know it now? Is that your testimony?
17 **A.** The name of the job. I didn't know
18 the name of the job then. It's irrelevant.
19 **Q.** So you knew it happened?
20 **A.** Absolutely.
21 **Q.** How many times did that happen?
22 **A.** I don't know. I'd have to consult
23 with Mark Ligator in my office.
24 **Q.** He didn't write the Email. You did,

154

1 experiences frequently?
2 **A.** When I'm lucky.
3 **Q.** So you're telling my client not to do
4 business with Dan Clayton because they
5 won't get the job done? Isn't that what
6 you're saying?
7 **A.** I'm telling them that in my
8 experience when someone tells you they
9 can't get it done and then comes backs and
10 all of a sudden says they can, you need to
11 look at it really closely.
12 **Q.** You thought you could get it done in
13 time, didn't you?
14 **A.** I knew I could get it done on time.
15 **Q.** Do you know if you're a larger or
16 smaller company than Dan Clayton?
17 **A.** I'm probably a smaller company.
18 **Q.** But you were pretty certain that Dan
19 Clayton couldn't get it done, weren't you?
20 I mean you said that.
21 **A.** Based on experience, yes.
22 **Q.** And then you said that you could
23 provide my clients with references on jobs
24 that Dan Clayton didn't get done that you

156

1 right?
2 **A.** I knew that there was one recent one.
3 **Q.** In your Email you said, "If you want
4 references on rental jobs," and you did
5 plural.
6     So I'd like to know what jobs
7 there were that you were referencing.
8 **A.** Well, I'll look it up and get it to
9 you.
10 **Q.** You don't know?
11 **A.** Off the top of my head?
12 **Q.** Or based on any source of information
13 you have. Do you know?
14 **A.** Can I get you the information, yes.
15 Do I know sitting here now? No.
16     (Witness phone interruption)
17 **Q.** By the end of that Monday you still
18 didn't have a signed proposal or a deposit?
19 **A.** Correct.
20 **Q.** That's a correct statement?
21 **A.** Yes.
22 **Q.** Your office then sent another
23 proposal on the 22nd, correct?
24 **A.** I wouldn't know unless I saw it.

157

1      (Exhibit 8, Email and Revised
2          Proposal, marked)
3   Q.   I'll show you a document marked as
4   Exhibit 8.  Have you seen that before?
5   A.   I don't recall.  There's so many
6   proposals, I don't know.
7   Q.   Do you know why Cris sent this Email
8   on the 22nd?
9   A.   I'm not sure sitting here.  I'm sure
10  there was a reason and I'm not sure what it
11  was.
12  Q.   Do you recall discussing it with her?
13  A.   I recall discussing that we wanted to
14  send it out.  But sitting here now I don't
15  recall what the motivation was.
16  Q.   No idea?
17  A.   No.
18  Q.   And we can agree, can't we, that this
19  proposal was never signed by my clients?
20  A.   Yes, we can agree.
21  Q.   And that you never received a
22  deposit?
23  A.   Correct.
24       (Exhibit 9, Email 2/22/05,

158

1          marked)
2   Q.   Let me show you a document marked as
3   Exhibit 9, February 22 Email from Cris to
4   Ted Tye and Alan Stone.  It purports to be,
5   though, from you on her Email address?
6   A.   Yes.
7   Q.   Did you create this Email?  And I
8   don't mean type it.  I mean write it.
9   A.   Yes, probably. (Reading document.)
10  Yes.
11  Q.   You wrote this, right?
12  A.   Yes.
13  Q.   And you sent it?
14  A.   Mm-hm.
15  Q.   Yes?
16  A.   Yes.
17  Q.   And you understood at this time that
18  there were were difficulties with Holy
19  Cross?
20  A.   I was being told there were were
21  difficulties.
22  Q.   By whom?
23  A.   Alan Stone.
24  Q.   Was that during the conversations on

159

1   Monday and Tuesday?
2   A.   Yes.
3   Q.   Now did you have further
4   conversations with Mr. Stone on Tuesday the
5   22nd?
6   A.   I believe they went all the way until
7   Thursday.
8   Q.   Tell me what you recall about the
9   conversations by telephone on Tuesday.
10  A.   Just very evasive.  And we're looking
11  at this and we're looking at that, and no
12  decisions have been made on the final
13  decision or how we want to go forward, but
14  you know, relax, that type of thing.  Ted
15  is not here.  It's hard to communicate.
16  You know.
17  Q.   So would it be fair to say that by
18  the end of the day on the 22nd that Mr.
19  Stone had still not committed to going
20  forward during these conversations?
21  A.   No, that wouldn't be fair to say.
22  Q.   Okay.  During any of these
23  conversations did he commit to going
24  forward with you?

160

1       MR. KLEIN: Objection.
2   Ambiguous.
3   A.   He was already committed to going
4   forward.
5   Q.   But it wasn't resaid in the
6   conversations?
7   A.   No.  It was said, "But we're not
8   walking away."  That was said.
9   Q.   Those were the words he used?
10  A.   Something to that effect.
11  Q.   Do you recall the words he used?
12  A.   No, it's too long ago.
13  Q.   Did Mr. Stone provide you with any
14  further detail about what was holding up
15  the project?
16  A.   Yes, very -- nothing of substance.
17  Nothing I can put my hands on, no.
18  Q.   Were you trying to press him for
19  details?
20  A.   I was, yes, I was trying to find out
21  what the issue was, yes.
22  Q.   And were you pressing him for the
23  deposit and the signed proposal?
24  A.   Not at all.

233

1 that it would save money and save time and
2 help us make the timeline, and Patrick
3 concurred.
4 Q.   And it's your testimony that you came
5 up with the idea to change the design in
6 the way you just explained?
7 A.   I explained to Patrick that --
8 Q.   Can you just say yes or no for that?
9 Is it your testimony that you came up with
10 the idea to change the design and in the
11 way you just explained?
12 A.   It's my testimony, yes -- yes, that
13 I came up with that, yes.
14 Q.   After this second meeting where
15 Patrick was at, did you have any other
16 meetings where Patrick was at?
17 A.   No.
18 Q.   Was Patrick at the February 18th
19 meeting?
20 A.   No.
21 Q.   And it's your testimony that when you
22 left the February 18th meeting you had a
23 deal?
24 A.   Absolutely.

234

1 Q.   Do you have any evidence that Patrick
2 had contact with Ted or Alan after that
3 meeting before they cancelled your
4 contract?
5 A.   Um, Ted's statement.
6 Q.   Which was?
7 A.   That he was meeting with Patrick.
8 Q.   Ted said he was meeting with Patrick
9 when?
10 A.   Ted said he was going to tell
11 Patrick about the closing of the deal.
12 Q.   Did he say when he was going to be
13 meeting with him?
14 A.   No, he didn't say.
15 Q.   Do you have any evidence that Patrick
16 said anything to Ted or Alan to cause them
17 to cancel your contract?
18 A.   No.
19 Q.   Do you have any evidence that Patrick
20 did anything to cause Alan or Ted to cancel
21 your contract?
22 A.   I have evidence of the Email being
23 sent with my title-blocking removed and
24 Patrick taking claim.

235

1 Q.   And you're referring to the February
2 15th Email?
3 A.   Yes.
4 Q.   Let's stop for a second.  You said on
5 February 18 you had a deal?
6 A.   Yes.
7 Q.   After February 18th do you have any
8 evidence that Patrick did anything to cause
9 Ted or Alan to cancel your contract?
10 A.   The evidence that I would say is an
11 ability to do stuff that's not kosher shown
12 to me earlier.
13 Q.   Do you have any evidence that he did
14 anything after February 18?  This Email is
15 February 15.
16 A.   And I'm telling you my evidence would
17 be that he had done it before.  For me that
18 would be evidence.
19 Q.   That's you extrapolating from things
20 that happened prior to February 18,
21 correct?
22         MR.  KLEIN:  Objection.
23 Argumentative.
24 A.   I would do that on the 18th.  I would

236

1 derive my conclusion from previous
2 experience on the 18th.
3 Q.   Do you have any evidence that Patrick
4 did anything after the 18th?
5 A.   No.
6 Q.   And regardless of what Patrick had
7 done prior to February 18, anything that he
8 had done, your position is that you had a
9 contract on February 18?
10 A.   Yes.
11 Q.   And earlier in the day you had made a
12 couple references to that Patrick preferred
13 Dan Clayton, is that correct?
14 A.   Correct.
15 Q.   Do you have any evidence that Patrick
16 preferred Dan Clayton?
17 A.   Patrick had pleaded, from what I
18 understand, in his own words, with Dan
19 Clayton to supply the job and do the job,
20 but they couldn't fit it in.  And that's
21 why he volunteered the information that
22 they couldn't make the date.
23 Q.   Is it your position that Patrick
24 didn't want your company to have the job?

1 away.
2 Q. Do you have any evidence that Patrick
3 or Geller interfered with your business
4 relations?
5 A. Um, yes.
6 Q. What is that evidence?
7 A. He circulated my proprietary product
8 with his name on it.
9 Q. Besides that, do you have any other
10 evidence?
11 A. No.
12 Q. Okay. Do you have any evidence that
13 Patrick knowingly caused Worcester Baseball
14 to end their relationship with you?
15          MR. KLEIN: Object to the
16 form.
17 A. I think "proof" is a better word. I
18 don't have proof that he did that.
19 Q. Do you have any evidence that Patrick
20 acted with malice in affecting your
21 relationship with Worcester Baseball?
22 A. Yes. And I go back to sending my
23 proprietary work and calling it his own.
24 Q. Besides that incident, do you have

242

1 any other evidence?
2 A. So you're asking me do I have any
3 evidence beside my evidence?
4 Q. Besides that Email.
5 A. I'm just clarifying the question.
6 Q. Do you have any evidence besides the
7 Email?
8 A. Yes. That he attended a meeting for
9 a project that the contract was given out
10 already with the intent of evaluating who
11 to give the contract to.
12 Q. How do you know what his intent was
13 in attending that meeting?
14 A. There's no other purpose for the
15 meeting.
16 Q. So you're assuming that that was his
17 intention in attending the meeting?
18 A. No, I'm saying there's no other
19 purpose for the meeting. You're buying a
20 product you already bought. It was bought
21 on Friday. They met on Sunday to buy it
22 again.
23 Q. All right. Let's talk about--
24          MS. KORN: Can I actually grab

1 your --
2          MR. CIAVARRA: Absolutely.
3 Q. This is Bates Number 205 to 208.
4 This is the Email and the documents that
5 you keep referring to that Patrick
6 improperly used, correct?
7 A. Correct. Let's say Geller improperly
8 used.
9 Q. Okay. How did that plan come about?
10 Who was the first one who drafted that from
11 a blank piece of paper?
12 A. Scott Ruczaj and myself.
13 Q. So you started with nothing, you
14 weren't basing that off of any other
15 previous design or --
16 A. No.
17 Q. You weren't basing that off of any --
18 A. It was designed to fit the lay of the
19 land.
20 Q. Do you have any documents that
21 illustrated the lay of the land that you
22 were using?
23 A. Yes.
24 Q. Where did you get those documents

244

1 from?
2 A. Ted Tye.
3 Q. So you sat looking at the documents
4 from Ted Tye and then you incorporated
5 those pieces from that document into your
6 document that you then created?
7 A. I actually overlaid or joined,
8 shadowed it so you could get the sizing
9 correct, and then drew my drawing.
10 Q. So how do you overlay something? Did
11 you have it on the computer?
12 A. Either scanned it or received an
13 Email. I don't remember which one.
14 Q. So you took the drawings that you had
15 from Ted?
16 A. Yes.
17 Q. And then you overlaid where the
18 seating would be?
19 A. Correct.
20 Q. Now these drawings here, were these
21 the ones that were printed at the first
22 meeting that Patrick was at that we think
23 it's like February 12, or was that the
24 second meeting which we think was February

245

1  16?
2  A.   I'm pretty sure this was the first
3  meeting.
4  Q.   The first meeting?
5  A.   Yes, because this is early on.  But
6  I'm not sure.
7  Q.   So at the first meeting there were
8  some drawings that you presented. And then
9  there were discussions about how to change
10  certain things.  And then did you go back
11  and change those initial drawings?
12  A.   We did it right there.  That's why I
13  brought my AutoCad operator.  The timeline
14  was such that I flew him up also.
15         And he sat there, and they gave
16  us four hours to revise our drawings,
17  printed them out and said here you go.
18  Q.   While he was revising those drawings
19  who was in the room?
20  A.   Me.
21  A.   You were the only other person in the
22  room?
23  A.   That's correct.
24  Q.   And at that February 12, I know that

246

1  might not be the exact date, but the
2  February 12 meeting -- not Scott.
3  A.   No, it's Scott.
4  Q.   After he revised the drawings, was
5  that the drawings in the final form or were
6  they revised again?
7  A.   I believe the way we constructed it,
8  it was revised again as far as what it was
9  fabricated out of, but the layout was kept
10  pretty much the same.
11  Q.   And so who came up with the layout?
12  A.   Me and Scott.
13  Q.   Who was the author of this plan?
14         MR. KLEIN:  Objection.
15  Ambiguous.
16  A.   Scott Ruczaj and myself.
17  Q.   Do you have a copyright in this plan?
18  A.   Do I have a copyright?
19         MR. KLEIN:  Objection.
   Ambiguous.
21  A.   Do I have copyright?  I don't believe
22  so.
23  Q.   You haven't registered this document
24  for copyright protection through an agency

247

1  to your knowledge?
2  A.   No.
3  Q.   So it's your testimony that the only
4  people who collaborated on the design of
5  the seats was yourself and Scott, is that
6  correct?
7  A.   It's my testimony that Scott and I
8  designed systems, spoke to them about what
9  they liked and didn't like, and then
10  designed any changes into it.
11         As far as the designs, it's
12  Scott and I.
13         As far as increased capacity,
14  "I need to get more people off in this
15  direction," that was input I would receive
16  from the client.
17         As far as how to do that and
18  engineer it so it complies with code and
19  everything, it was Scott and I.
20  Q.   As far as size, increasing the amount
21  of seating, is there any other requirements
22  or suggestions that Ted or anyone else had
23  that you then had to change in the
24  drawings?

248

1  A.   Yes, there was an issue with ADA
2  compliance.  That's people in wheelchairs.
3  Q.   Okay.  And so what did you change
4  then?
5  A.   We put some decks next to the dugout
6  so not only could they get into the stand,
7  but also into the field if they wanted to.
8  Q.   When did you put your logo on the
9  plan?
10  A.   We do it every time before we set it
11  up.  It's not a logo.  It's a title-block.
12  Q.   It's a title-block.
13  A.   With a boiler plate of "property
14  proprietary."
15  Q.   And there's not a copyright notation
16  in that boiler plate?
17         MR. KLEIN:  Objection.
18  Ambiguous.
19  A.   I don't know.  Unless I read it, no,
20  I wouldn't know.
21  Q.   So every time prior to sending out
22  any plans you put in -- what did you call
23  it?
24  A.   A title-block.

1  Q.  You put the title-block on?

2  A.  Yes.

3  Q.  So when you came to the February 12

4  meeting did you have that on?

5  A.  Yes.

6  Q.  It was already up there?

7  A.  It's always on there.

8  A.  It's always on there.

9  A.  Nothing leaves us without it on.

10  Q.  Is it possible for someone else to

11  remove that?

12  A.  Only if they ask for the plan in

13  AutoCad.  You can get it as a PDF.  If you

14  get it as a PDF, you can't remove it.  If

15  you get it in AutoCad, you can remove it.

16  Q.  And you gave AutoCad?

17  A.  At the request of Ted Tye we gave

18  AutoCad.

19  Q.  Do you normally do that?

20  A.  Rarely.

21  Q.  Did you put any limitations on Ted on

22  how he could view these plans?

23  A.  The purpose of him having AutoCad was

24  to add to the drawing, add a concession

---

1  cart, add a beer service station.

2  Q.  But did you put any limitations on

3  him?

4  A.  Yes, I told him he can't change the

5  drawing.

6  Q.  You told him he can't change the

7  drawing?

8  A.  Can't change our drawing.

9  Q.  Did you tell him that he couldn't

10  send it out to anyone?

11  A.  The only person that we authorized

12  him to send it to was Geller.

13  Q.  And you authorized that how?

14  A.  We called up and said, "Do you want

15  us to send it to Geller?  If you want us

16  to, we'll send it to him.  There can't be

17  changes to the bleacher parts, but if he

18  want to add stuff like concession carts,

19  knock yourself out."

20  Q.  But when you first gave them to Ted

21  did you tell him don't send this out to

22  anybody else?

23  A.  He didn't have it in AutoCad at that

24  time.  It was just a piece of paper.

---

1  Q.  Well, when he got it in AutoCad, did

2  you tell him don't send this to anyone

3  else?

4  A.  It had the block on it that it's

5  private and proprietary and it shouldn't be

6  shared.  It has a statement on it.

7  Q.  But besides that, did you tell him

8  you can't send this out to anyone else?

9  A.  No.

10  Q.  Did you tell Patrick don't send this

11  out to anyone else?

12  A.  Nope.

13  Q.  Who puts the title-block on the plan?

14  A.  Scott.

15  Q.  Scott does?

16  A.  Scott Ruczaj.

17  Q.  What information do you claim is

18  protected by trade secret?

19  A.  It's not -- I didn't, you know,

20  "trade secret" is a term I'm unfamiliar

21  with.

22  Q.  So you don't have any background or

23  knowledge about what a trade secret is?

24  A.  No.

---

1  Q.  Well, what information do you claim

2  is proprietary information?

3  A.  The conceptual design of the seating

4  system and the area.

5  Q.  So pretty much that plan?

6  A.  Well, that plan, section view, the

7  connections, the pieces, the design.  The

8  way that it is built to work.

9  Q.  So which proprietary information

10  specifically do you claim that Geller

11  misappropriated?

12  A.  Do we have that Email?  Oh, it's on

13  there.  "The designer of the new stadium is

14  Patrick Maguire of Geller Sports of

15  Boston."  The whole thing.  He's not the

16  designer of that stadium.

17  Q.  I'm just clarifying.  You claim that

18  Geller misappropriated every single piece

19  of paper you ever sent?

20  A.  Design credit for that stadium.

21  Q.  Do you claim that Geller

22  misappropriated credit for the stadium,

23  design credit is what you're saying?

24  A.  Not only took it from us, but

1 credited to himself.
2 Q. Besides crediting the design to
3 himself, I'm just trying to get at the
4 specific piece of paper or other
5 information that he --
6 A. I'm sure there will be more.
7 Q. Okay. Right now I'm just trying to
8 get at what information you claim that
9 Geller misappropriated.
10 A. This drawing.
11 Q. Okay. Are you claiming any other
12 information that he misappropriated besides
13 this drawing, that Geller misappropriated
14 besides that drawing?
15 A. At this point?
16 Q. Yes.
17 A. Am I claiming that he misappropriated
18 other information? Yes, I think I'm
19 claiming that.
20 Q. Well, what other information?
21 A. That will be found out.
22 Q. So at this moment you don't have any
23 other -- at this moment you can't tell me
24 what other information you claim that

---

254

1 Geller misappropriated?
2 A. That would be correct.
3 Q. Okay. When you gave these drawings
4 to Ted, did you have him sign a
5 nondisclosure agreement?
6 A. No.
7 Q. When the AutoCad drawings were
8 Emailed to Patrick, did you have him sign a
9 nondisclosure agreement?
10 A. No.
11 Q. Is your claim that Geller disclosed
12 your proprietary information by sending
13 them off to subcontractors?
14 A. Is that my whole claim? What's the
15 question?
16 Q. How did Geller misappropriate your
17 proprietary information?
18 A. He took our title-block acknowledging
19 that we were the designers of the system
20 off of the paperwork and then circulated it
21 --
22 Q. So the circulation --
23 A. --as his.
24 Q. So circulating these plans are the

---

1 means that you claim that Geller
2 misappropriated this proprietary
3 information?
4 A. At this time.
5 Q. Okay. I know you said earlier you
6 could tell the future, but I don't know
7 about --
8 A. I didn't say that. He said that.
9 Q. I don't think so, but -- but at this
10 time circulation is how he misappropriated
11 the information?
12 A. That's what I can prove at this time.
13 Q. The information contained in these
14 drawings, is it fair to say that everyone
15 at your company would have access to these
16 drawings?
17 A. No.
18 Q. How many people would have access to
19 these drawings?
20 A. Three
21 Q. Three?
22 A. If that.
23 Q. And who would those people be?
24 A. The people in AutoCad.

---

256

1 Q. Those are the other designers that
2 you previously identified?
3 A. Correct.
4 Q. And would you have access to that?
5 A. Yes.
6 Q. Would your sister have access to
7 that?
8 A. Through them. Through them, I mean,
9 yes.
10 Q. Did you do anything to actively
11 protect these drawings in your company?
12 MR. KLEIN: Object.
13 A. Yes, we put the block on it that
14 clearly says it's our property.
15 Q. Did you do anything to protect
16 against anyone seeing the drawings?
17 A. Yes, they were kept in the file at
18 the AutoCad guy or in the server that only
19 those three guys look at.
20 Q. Is that password-protected?
21 A. Yes.
22 Q. How many people know that password?
23 A. They each have an individual one.
24 Q. Were there photocopies of these plans

1  in your office?

2  A.   Not normally.

3  Q.   And didn't you say that at the

4  February 12 meeting you brought printouts?

5  A.   Yes.

6  Q.   So at some point those printouts were

7  left at your office I assume?

8  A.   With the title-block on them with

9  credit to us, yes.  Not as that sits there.

10 Q.   I'm not saying anything about the

11 title-block now.  I'm just saying --

12 A.   I am.

13 Q.   Okay. I understand, and it's

14 definitely on the record.

15 A.   Okay.

16 Q.   Were there photocopies of these plans

17 with the title-block in your office?

18 A.   The day before I went to see Ted,

19 yes, probably.

20 Q.   Were these protected in any way

21 against other people viewing them?

22       MR. KLEIN:  Objection.

23 Ambiguous.

24 A.   Yes, when the business was closed,

258

1  the office was locked.

2  Q.   But during the day could one of your

3  employees come and walk around and see

4  these plans?

5  A.   Probably not.  If it's my sale, it's

6  in my office in a file, so probably not.

7  Q.   Who else has access to your file?

8  A.   To my office, no one.

9  Q.   No one has access to --

10 A.   To my office.  To the files?  We

11 don't file drawings.  We keep them in

12 AutoCad.

13      So the paper drawing would be

14 in a file in my office.  I would go see the

15 client, give it to him, and that would be

16 the end of it.  Paper doesn't lay around in

17 my office.

18 Q.   Did you have a confidentiality

19 agreement with Geller?

20 A.   No.

21 Q.   No?

22 A.   No.

23 Q.   Did you assume that when you Emailed

24 Geller the AutoCad drawings that he would

abide by the conditions placed in your

title-block?

3  A.   Absolutely.

4  Q.   Why did you assume that?

5  A.   Because I've never had anyone do what

6  he did before.

7  Q.   Didn't you say earlier that you very

8  rarely Email AutoCad drawings?

9  A.   Mm-hm.

10 Q.   Just if you would say yes or no.

11 A.   Yes.

12 Q.   How many times have you Emailed

13 AutoCad drawings before?

14 A.   Couple of hundred.

15 Q.   But that's rare?

16 A.   In proportion to the length of time

17 and volume I've done in this business, it's

18 rare.

19 Q.   Would Geller get any benefit, did

20 Geller get anything by agreeing to abide by

21 those terms and conditions in the

22 title-block?

23 A.   Can you ask the question again?

24 Q.   Did Geller receive anything in

260

1  exchange for agreeing to abide by the terms

2  and conditions in the title-block?

3  A.   Yes.

4  Q.   What?

5  A.   He got use and the ability to see the

6  plan.

7  Q.   Wasn't it Patrick's idea to use more

8  -- I might not understand this exactly,

9  but wasn't it Patrick's idea to use more

10 aluminum angles to reduce the cost of your

11 design?

12 A.   We went through a discussion with

13 Patrick where Patrick said aluminum angles

14 is less than I-beam.  I-beam is more

15 expensive.

16      I said, Well, I can use a

17 combination frame and use aluminum angle in

18 the front and that will save us some money.

19      So Patrick was the one who

20 keyed in on the fact that aluminum angle is

21 less than I-beam.

22      Patrick knew nothing about a

23 combination design in a bleacher being

24 possible.

1  Was he party to coming up with
2  the idea that aluminum is less money in the
3  steel understructure as far as building it
4  and putting up, yes, he was party to that.
5  Did he have anything to do with
6  the design of the end product that utilized
7  that aluminum?  No, he didn't.
8  Q.  Going back to the title-block, are
9  there any terms of the title-block that
10  Seating Solutions has to comply with?
11  A.  Without reading it, I couldn't tell
12  you.
13  MR. CIAVARRA:  For the record,
14  Document 57.  For the record, I think it's
15  a pretty standard one from what I've seen.
16  A.  (Studying document.)  What was the
17  question?
18  Q.  My question was in that title-block
19  are there any terms that Seating Solutions
20  has to comply with?
21  A.  Not as far as I can tell.
22  Q.  Okay.  So your reading of that
23  title-block, there's nothing that Seating
24  Solutions has to do?

1  title-block --
2  A.  It directs Seating Solutions to
3  provide information.
4  Q.  Where are you getting that from?
5  A.  "Seating Solutions claims proprietary
6  rights in the information disclosed."
7  It directs Seating Solutions to
8  disclose information.
9  Q.  And you claim that title-block is
10  placing limits on parties who receive these
11  drawings?
12  A.  "May not be used in whole or in part
13  to manufacture anything, whether or not
14  shown hereon, reproduced or disclosed to
15  anyone without direct written permission
16  from Seating Solutions."
17  I think there's clearly limits.
18  Q.  Okay.  So the answer?
19  A.  Yes.
20  Q.  Okay.  So Seating Solutions didn't
21  have a written contract with Geller,
22  correct?
23  A.  Other than that, no.
24  Q.  You take that to be a written

262

1  A.  Seating Solutions has to share the
2  information with you in order for you to be
3  subject to that title-block.
4  Q.  Where does it say that?
5  A.  You wouldn't see the title-block
6  unless I shared it with you.
7  Q.  But it doesn't say that in the
8  title-block?
9  A.  To me it does.
10  Q.  Read me the part where it says that.
11  A.  If I don't have it, I can't.
12  Q.  So is it written in the title-block?
13  A.  By virtue of the title-block being
14  there, it's written, to me.  I can only
15  answer you for me.
16  Q.  I understand that that's what you are
17  extrapolating from this.  Does it say that
18  in the title-block?
19  A.  I'm not extrapolating it.  Now I
20  don't have it.  Now ask me your question.
21  Q.  Let's start this again.  This
22  title-block here, does it direct Seating
23  Solutions to do anything?
24  How about this?  The

264

1  contract?
2  A.  If he doesn't agree to it, he should
3  send it back.  It's the professional thing
4  to do.
5  Q.  Okay.  Besides in the drawings are
6  there any other written contracts that you
7  believe were between Geller and Seating
8  Solutions?
9  A.  I explained -- no, the answer to the
10  question is no.
11  Q.  Okay.  Were there any oral agreements
12  between Geller and Seating Solutions?
13  A.  I explained to both Ted Tye and
14  Geller that I don't go design bleachers as
15  a hobby.
16  Q.  What does that mean?
17  A.  That means what I do I expect to be
18  treated with the respect, that it's our
19  design, our creation, and they won't go
20  shop it at the last minute and expect
21  somebody to beat my price who invested no
22  time.
23  Q.  I'm going to repeat my question.  Did
24  Seating Solutions have an oral contract

269

1 that it is?  Not assuming, then what?
2 A.   Three years of education on how
3 people act and what they do, I have deduced
3 that that's what went on.
  Q.   Besides your deduction --
6 A.   Okay.
7 Q.   -- do you have any evidence that that
8 was Geller's purpose in attending the
9 meeting on Sunday with Dan Clayton, to get
10 the contract away from Seating Solutions?
11 A.   I would say I'd have a hard time
12 believing that Dan Clayton knew I had a
13 contract other than Mr. Geller telling him.
14 Q.   I understand that's your position.  I
15 just want an answer to my question.
16 A.   To me, that's evidence.  To me,
17 that's evidence.  Do you want physical
18 evidence?
19 Q.   I want to know -- I'm going to repeat
20 my question.
21 A.   Go ahead.
22 Q.   Do you have any evidence besides your
23 deduction that it was Geller's intent in
24 going to the meeting on Sunday with Dan

270

1 Clayton to get the contract away from your
2 company?
3 A.   I believe the meeting is evidence.
4 Q.   The fact that they had a meeting?
5 A.   You bought it on Friday.  What are
6 you doing on Sunday?  Buying it again?  You
7 only need one.
8 Q.   Okay.  Besides having the meeting,
9 besides going to the meeting do you have
10 any other evidence?
11 A.   Not currently, no.
12 Q.   What improper means did Geller use to
13 interfere with your relationship with
14 Worcester Baseball, if any?
15 A.   He removed that title-block and sent
16 out our information.
17 Q.   So by removing your title-block and
18 sending out that information, that was
19 interfering with your relationship with
20 Worcester Baseball?
21 A.   Absolutely possibly.
22 Q.   How?
23 A.   That he's claiming designer there and
24 claiming to Worcester that he's designing

271

1 that or whatever.
2 Q.   But you don't know that he is
3 claiming that to Worcester?
4 A.   No, I only know what I said, that he
5 sent the drawing out and claimed it was
6 his.
7 Q.   Okay.
8 A.   If you want to ask your question
9 again, I'll try again.
10 Q.   What improper means did Geller use to
11 interfere with your relationship with
12 Worcester Baseball, not with other subs or
13 other companies, but Worcester Baseball.
14 A.   He told them a nonfactual statement
15 about my pricing.
16 Q.   Okay.  So it was the pricing
17 statement, I guess, prior to that meeting,
18 that your prices were too high?
19 A.   It's not only the pricing statements
20 being inaccurate, it's why anybody would
21 say the inaccurate statement.
22 Q.   Why do you think that he said the
23 inaccurate statement?
24 A.   He had a preference to Dan Clayton.

272

1 Q.   Okay.  So the improper means -- were
2 there any other improper means that Geller
3 employed to interfere with your
4 relationship with Worcester Baseball
5 besides the comments about pricing?
6 A.   Besides telling my client I was a
7 crook, probably not.
8 Q.   Now, did Geller say that you were a
9 crook?
10 A.   Ted Tye said "that my consultant" --
11 I don't know if he said it to Ted Tye.  I
12 can only tell you what Ted Tye said to me.
13        Ted Tye said "that my
14 consultant said that this price is
15 robbery," or "this is criminal," one of
16 those phrases.  It that improper?  Yes.
17 Q.   But you did not hear Patrick
18 specifically say that? I understand that
19 you said you heard Ted say that.  But did
20 you hear Patrick say that, yes or no?
21 A.   Patrick defended his position on that
22 it would be criminal in his evaluation.
23 Q.   Did you hear Patrick say that it
24 would be criminal, specifically yes or no?

1  specific crew assigned to it?
2  A.  I knew who I was going to assign to
3  it.
4  Q.  Like the project manager?
5  A.  Yes.
6  Q.  And who was that?
7  A.  Vinnie Guzello.
8  Q.  How do you spell Vinnie's last name?
9  A.  G-U-Z-E-L-L-O.
10  Q.  Is Vinnie one of your top guys?
11  A.  Yes, he's a good guy.
12  Q.  And when this didn't happen, did you
13  have him on another job?
14  A.  Yes.
15  Q.  He's been busy this year?
16  A.  Yes.
17  Q.  And the people that you contemplated
18  using to support Vinnie on this job, were
19  you able to get them work for that
20  three-week period of time?
21  A.  I'd have to look at the calendar.
22  I'll have to look at the work schedule.
23  That's a fact.  It either happened or it
24  didn't.  It's not something I would keep in

1  MR. CIAVARRA:  I don't think
2  so.
3  Q.  Prior to Seating Solutions drafting
4  the first plan, did you get any drawings
5  from Geller?
6  A.  I don't know the answer to that.  I
7  know, I think we took drawings out of Ted's
8  office on one of the visits and digitized
9  them and then drew them.  But I don't think
10  it was from Patrick.  I think it was from
11  Ted.
12  Q.  So you think you took paper drawings
13  from Ted's office?
14  A.  Yes.
15  Q.  And then scanned them in?
16  A.  Correct.
17  Q.  But you don't know where Ted had
18  gotten those drawings?
19  A.  Correct.  I just know they were in
20  the office when I got there.  And I said I
21  needed a copy of that and got it.
22  Q.  Do you remember what was on those
23  drawings?
24  A.  Elevations.

1  my head.
2  Q.  Have you had a lot of down time in
3  May?
4  A.  I have -- I have -- you know,
5  anywhere from this time of year 50
6  employees up to 70 employees.
7      In May I probably had 40
8  employees.  So I could have had 30 more.
9      You know, you can look at it.
10  We can see exactly how many people were
11  working.  Could I have had more people
12  working?  Certainly.
13  Q.  Do you have a written work schedule
14  that we can look at to see how busy people
15  were at that time?
16  A.  Yes, absolutely.
17  Q.  All right.  We'll take a look at
18  that.
19      MR. CIAVARRA:  I have no
further questions.
21      REDIRECT EXAMINATION
22  BY MS. KORN:
23  Q.  Two more things.
24  A.  Then he's going to get another one.

1  Q.  Elevations of the land?
2  A.  Yes.
3  Q.  Was there a baseball diamond on it?
4  A.  Yes, I believe so.
5  Q.  Was there a dugout?
6  A.  No, those are ours.
7  Q.  Were there any seating on those
8  drawings?
9  A.  I think there was a players' bench on
10  the right and left side of the field, but I
11  don't recall.
12  Q.  Do you have a copy of the drawing
13  that you took from Ted initially?
14  A.  I'm sure we have it on AutoCad.  Now
15  I'm sure we have it in AutoCad.
16  Q.  Without the things that you then
17  added, you have like an initial scanned
18  version of that document?
19  A.  I don't know if Scott would have kept
20  it as the initial scan or just kept it with
21  his work on it.
22  Q.  Would there be a way to -- you might
23  not know this question-- but would there be
24  a way to remove the things that you added

**297**

1  to reveal the initial?

2  A.   It should be a layer.

3  Q.   Okay.  So you think there probably

would be a way to remove the initial?

4  A.   It's like an overlay.  I draw on this

6  sheet and peel it back.

7  Q.   So you think that there was a

8  baseball diamond, and maybe a players bench

9  on each side and elevations on the initial

10  drawings?

11  A.   I even think their old bleachers were

12  drawn in.

13  Q.   Their old bleachers were drawn in?

14  A.   Against the buildings and portables.

15  Q.   So there were bleachers before this

16  whole project started at this location?

17  A.   There were some horrendous bleachers

18  down there, old college -- should be thrown

19  away.  And they're drawn in.  It's their

20  site plan.

21  Q.   So it's the site plan from Holy

22  Cross?

23  A.   I believe.

24        MS. KORN:  Okay.  That's it.

**298**

1        MR. CIAVARRA   I'm done.  I

2  promise.

3        THE WITNESS:  Thank you.

4        (Whereupon the deposition was

5        concluded)

**299**

1

2    Submission to Witness; Changes; Signing.

3  When the testimony is fully transcribed,

the deposition shall be submitted to the

witness for examination and shall be read

to, or by him/her, unless such examination

and reading are waived by the witness and

4  by the parties.  Any changes in form or

substance which the witness desires to make

shall be entered upon the deposition by the

officer with a statement of the reasons

6  given by the witness for making them.

This procedure must be accomplished within

30 days of receipt of the transcript.

9  *********************************************

    I have read the foregoing, and it is a

10  true transcript of the testimony given by

11  me at the taking of the subject deposition.

12

13

14

15     Scott Suprina

16

17     DATE

18

19  CASE NAME:  RI, Inc. d/b/a Seating

    Solutions v. Geller Sport, Inc., et al

20

    DATE TAKEN:  July 29, 2005

**300**

1  **ERRATA SHEET**

2

3    In accordance with the rules of procedure

    governing depositions, you are entitled to

    read and correct your deposition.

4  Accordingly, please carefully read your

    deposition and, on this errata sheet, make

5  any changes or corrections in form or

    substance to your deposition that you feel

6  should be made.  PLEASE DO NOT MARK THE

    TRANSCRIPT.  After completing this

7  procedure, sign at the conclusion of such

    changes/corrections (if any) and return it

8  in accordance with your instructions.

9

10  PAGE  LINE  CHANGE       REASON

11

12

13

14

15

16

17

18

19

20

21

22

23

24     Scott Suprina

# EXHIBIT 2

1

Volume 1, Pages 1-228                 Exhibits: 1-44

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------

RI, INC D/B/A SEATING SOLUTIONS,
    Plaintiff


vs.                          Docket No. 05-CV-10365-JLT

GELLER SPORT, INC., GELLER DEVELLIS,
INC., WORCESTER PROFESSIONAL
BASEBALL, LLC AND PERFECT GAME
BASEBALL CLUBS, LLC,
    Defendants

-----------------------------

DEPOSITION OF THEODORE TYE

Wednesday, August 24, 2005

9:57 a.m. - 4:55 p.m.

HENSHON PARKER VYADRO, P.C.

84 State Street

Boston, Massachusetts


KACZYNSKI REPORTING

72 Chandler Street, Suite 3

Boston, Massachusetts

617.426.6060


-------Reporter:  Amy L. Samara-------

(Pages 2 to 5)

**2**

APPEARANCES:

HENSHON PARKER VYADRO, P.C.
Terry Klein, Esq.
84 State Street, Suite 760
Boston, Massachusetts
617.367.1800      Fax 617.367.1877
for the Plaintiff

BOWDITCH & DEWEY, LLP
Louis M. Ciavarra, Esq.
311 Main Street
Worcester, Massachusetts 01615-0156
508.926.3408      Fax 508.929.3011
lciavarra@bowditch.com
for Worcester Baseball, LLC and Perfect Game
Baseball Clubs, LLC

**3**

APPEARANCES:
DONOVAN HATEM, LLP
Lauren Michaels Korn, Esq.
World Trade Center East
Two Seaport Lane
Boston, Massachusetts 02210
617.406.4635      Fax 617.406.4501
for Geller Sport, Inc., and Geller Devellis, Inc.

IN ATTENDANCE:
Alan Stone

**4**

1
2                           INDEX
3   WITNESS:                 THEODORE TYE
4
5   EXAMINATION BY:               PAGE:
6   Mr. Klein                7
7
8   EXHIBITS:                     PAGE:
9   Exhibit 1, deposition notice...............8
10  Exhibit 2, e-mails dated February 7........55
11  Exhibit 3, e-mail dated February 8.........59
12  Exhibit 4, e-mail dated February 15........61
13  Exhibit 5, e-mail dated February 17........63
14  Exhibit 6, series of e-mails dated
15           February 17....................67
16  Exhibit 7, e-mail with attachments........93
17  Exhibit 8, CAD plan dated February 4.......94
18  Exhibit 9, e-mail.........................96
19  Exhibit 10, memo dated February 3..........99
20  Exhibit 11, e-mail dated February 3.......108
21  Exhibit 12, e-mail.......................111
22  Exhibit 13, e-mail and attachments dated
23           February 15....................113
24  Exhibit 14, e-mail dated February 20......117

**5**

1   EXHIBITS:(con't)                  PAGE:
2   Exhibit 15, e-mail dated February 20.......121
3   Exhibit 16, e-mail.......................127
4   Exhibit 17, e-mail dated January 31.......128
5   Exhibit 18, proposal from Seating Solutions
6           dated February 2, 2005.........128
7   Exhibit 19, Amended Complaint and Demand for
8           Jury Trial....................133
9   Exhibit 20, Answer to Amended Complaint....133
10  Exhibit 21, comments on proposal.........147
11  Exhibit 22, February 15 proposal..........149
12  Exhibit 23, e-mail.......................151
13  Exhibit 24, February 18 proposal..........156
14  Exhibit 25, e-mail version of proposal.....158
15  Exhibit 26, series of e-mails dated
16           February 21...................171
17  Exhibit 27, insurance certificate.........175
18  Exhibit 28, fax from Seating Solutions.....177
19  Exhibit 29, AIA document...................192
20  Exhibit 30, e-mail dated January 31......196
21  Exhibit 31, e-mail dated February 1.......197
22  Exhibit 32, e-mail dated February 1.......197
23  Exhibit 33, e-mail with attachment dated
24           February 1....................198

2

Theodore Tye
August 24, 2005

(Pages 18 to 21

**18**

1        MR. KLEIN: Can we go off the record?
2        (Off-the-record discussion)
3        MR. KLEIN: Back on the record. Can you
4    read back that last question?
5        Q. (Question read back by reporter)
6    BY MR. KLEIN:
7        Q. How do you divide your time between
8    National Development and what I'll just refer to as
9    Worcester Baseball?
10        A. I spend the majority of my time with
11    National Development. Worcester Baseball is a
12    start-up operation, and I have devoted considerable
13    time to Worcester Baseball this year as an investor
14    and a member of the Board of Directors.
15        Q. How much money have you invested in
16    Worcester Baseball?
17        A. $250,000.
18        Q. Was that just a cash investment or was that
19    in some other form?
20        A. It was a cash investment.
21        Q. Say this week, about how much time will you
22    spend working on National Development matters, how
23    much will you spend working on Worcester Baseball
24    matters?

**19**

1        MR. CIAVARRA: Do you want to exclude
2    the deposition here?
3        MR. KLEIN: No.
4        MR. CIAVARRA: How long are you going to
5    be here today?
6        A. Well, it's a difficult question to answer
7    because it varies from week to week. I would
8    typically spend forty to fifty hours on National
9    Development and five hours on Worcester Baseball.
10    BY MR. KLEIN:
11        Q. When was Worcester Baseball established?
12        A. I'm not positive of the date it was legally
13    established.
14        Q. I think you mentioned it earlier but if you
15    could, just for the record, repeat what your title
16    is with Worcester Baseball?
17        A. Chairman of the Board of Directors.
18        Q. When did you take on that role?
19        A. From the formation of the Company I was a
20    member of the Board that formed the Company, and I
21    believe that I became Chairman of the Board upon the
22    legal establishment of the Company, and I've been
23    active in that role since December probably.
24        Q. Does Worcester Baseball have an office of

**20**

1    its own?
2        A. Yes, it does.
3        Q. Where is that office located?
4        A. It's in Worcester.
5        Q. Do you know the precise address?
6        A. 303 Main Street, I believe. That may not
7    be the correct number.
8        Q. How long has it been located at 303 Main
9    Street?
10        A. I would be guessing, but I would say
11    probably since somewhere in the neighborhood of
12    January.
13        Q. And what would you say your
14    responsibilities are as Chairman of the Board?
15        A. Currently my responsibility as Chairman of
16    the Board is to Chair Board meetings, which occur
17    every few weeks.
18        Q. And as Chairman, what other types of
19    activities do you engage in for Worcester Baseball?
20        A. Currently?
21        Q. Yes.
22        A. I work closely with our Chief Executive
23    Officer in helping to provide some guidance in terms
24    of the operation of the organization.

**21**

1        Q. And the CEO is Mr. Stone; is that correct?
2        A. That's correct.
3        Q. What type of guidance are we talking about?
4        A. Related to various business issues that may
5    come up for the Company.
6        Q. What types of business issues?
7        A. They may involve everything from operations
8    to work with our stadium to capital issues and
9    budget issues, anything that a normal business might
10    encounter.
11        Q. How did you get involved with Worcester
12    Baseball?
13        A. I was invited to join a group of people who
14    were putting a Worcester baseball team together.
15        Q. Who invited you?
16        A. Alan Stone.
17        Q. When did he extend that invitation?
18        A. I believe I first met with Alan to discuss
19    the baseball team in late October or early November
20    of 2004.
21        Q. Who else was part of the group of people?
22        A. Thomas Alperin, A-l-p-e-r-i-n, Philip
23    Rosenfield, and Brad Michaels.
24        Q. Are each of these three individuals

6

(Pages 42 to 45)

**42**

1  31?
2     A. I don't believe so.
3     Q. So do you have a notion as you sit here
4  today as to what date they achieved I guess the buzz
5  word is "substantial completion?"
6         MR. CIAVARRA: Objection.
7     A. Dant Clayton was one of several major
8  contractors who were involved, all of whom were
9  trying to meet a very difficult schedule. As I
10  recall, I know that Dant Clayton had certainly
11  completed the majority of their work by June 6, and
12  there were a number of different contractors who
13  were racing to get to the completion date and that
14  included electrical work and site work, a sound
15  system, and field lighting. What I do recall is
16  that the substantial completion by all of the
17  contractors was in place in order to allow us to
18  have opening day on June 6.
19  BY MR. KLEIN:
20     Q. Did any of the contractors come to you when
21  May 28 was the operative date and say to you, "We
22  just can't make the date"?
23     A. Not that I can recall. I used a gentleman
24  to help supervise the construction. I used my own

**43**

1  observations when I was out on the site. I
2  recognized very early on in the project the
3  difficulty of the schedule. We had some delays in
4  the project due to weather and having a very wet
5  spring, and I think it was my judgement that it was
6  a very difficult schedule to meet.
7     Q. Do you remember when you decided to move
8  from May 28 to June 6 as the date?
9     A. To the best of my memory, it was sometime
10  early in May.
11     Q. Now, one of the things I noted is that
12  among the five contracts that we discussed earlier,
13  Geller Sport and Geller Devellis weren't mentioned.
14  Did Worcester Baseball have a contract of some kind
15  with I'll just call it Geller?
16     A. Yes.
17     Q. When did Worcester Baseball get connected
18  with Geller?
19     A. I think sometime in January to the best of
20  my memory.
21     Q. Do you know who was responsible for
22  bringing Geller and Worcester Baseball together?
23     A. Yes, it was me.
24     Q. Why did you decide to get Geller and

**44**

1  Worcester Baseball together?
2     A. Because I felt that Worcester Baseball
3  needed a consultant with experience in the design of
4  athletic facilities.
5     Q. Are there other companies that do
6  consulting work of this type other than Geller?
7     A. I'm sure there are.
8     Q. So why did you pick Geller over the other
9  ones?
10     A. I had lots of experience in my business
11  with Geller. I found them to be a very competent
12  firm, and I knew of them, and that's why I called
13  them.
14     Q. How many projects had you worked on with
15  Geller before the Fitton project?
16     A. I would guess over twenty.
17     Q. So what was Geller's role as a consultant?
18  Describe what they did.
19     A. Geller had several roles as a consultant.
20  One was to assist us in evaluating different
21  locations for the baseball park. Another was to
22  provide master planning for the park that we
23  ultimately selected, and then a third role was to
24  provide the ultimate engineering plans and site

**45**

1  plans for the location that we selected. And
2  another role was to assist in evaluating the firm
3  that we chose to work with for the seating selection
4  of the park.
5     Q. Anything else?
6     A. Not that I recall.
7     Q. What do you mean by "master planning"?
8     A. Master planning is taking what exists on
9  the ground when you find a particular site and
10  helping to determine how the improvements are
11  provided at the site.
12     Q. In terms of the evaluation of the seating
13  supplier, what specifically was kind of Geller's
14  scope of work in that category?
15     A. They sat with me at various meetings and
16  provided advice when requested.
17     Q. Who is Chris Sgarzi?
18     A. Chris Sgarzi is an architect.
19     Q. What did he do on the Fitton Field project?
20     A. Chris was someone who had worked with
21  Geller in the past and who had some experience in
22  athletic facility projects and served as an
23  architect and a consultant.
24     Q. How, if at all, did Geller and Sgarzi's

12

**46**

1  roles differ?
2      A. Geller's role was focused on site planning
3  issues. Sgarzi is an architect and was more
4  concerned on building and design of the building and
5  structural design issues.
6      Q. Who was Worcester Baseball's primary
7  contact at Geller?
8      A. For this project it was Patrick Maguire.
9      Q. Who else did you work with at Geller on
10  this project? When I say "you" I mean Worcester
11  Baseball.
12      A. Andy Truman, Theo Kindermanns, maybe at an
13  early stage Rebecca Bachand.
14      Q. But would you say it's fair to say that
15  Maguire was kind of your lead contact?
16      A. Yes.
17      Q. When did you first meet Mr. Maguire?
18      A. I would say approximately five to seven
19  years ago.
20      Q. How did you meet him?
21      A. Through a project that my firm worked on
22  with Geller.
23      Q. Which project, do you remember?
24      A. It was a project in Southerton,

**47**

1  Connecticut.
2      Q. What type of project was it?
3      A. It was a housing project.
4      Q. How many other projects had you worked on
5  with Mr. Maguire before this Fitton Field project?
6      A. I was involved in one other project that I
7  was working directly with Mr. Maguire.
8      Q. What was that project?
9      A. That was a project for the City of Newton.
10      Q. What type of project was it?
11      A. Sports fields.
12      Q. What sports?
13      A. Baseball, soccer, lacrosse, and football.
14      Q. Is that project complete at this point?
15      A. No.
16      Q. When did you start working with Mr. Maguire
17  on that?
18      A. August of 2004.
19      Q. What's your target completion date?
20      A. September of 2007.
21      Q. And the owner on that project is the City
22  of Newton?
23      A. Yes.
24      Q. Where are these sports fields going to be

**48**

1  located?
2      A. Various fields in the City of Newton.
3      Q. At different locations?
4      A. Yes.
5      Q. And will these projects have seating
6  elements?
7      A. Yes.
8      Q. Who is going to provide the seating?
9      A. It's not determined.
10      Q. Do you know if, prior to the Fitton Field
11  project, Mr. Maguire had ever worked on a minor
12  league baseball stadium before?
13      A. I don't know.
14      Q. Do you know if he had any experience with
15  other types of professional sports facilities?
16      A. I don't know.
17      Q. How about high school sports?
18      A. Yes.
19      Q. What's your understanding of the experience
20  he had with high school sports facilities?
21      A. I know that Mr. Maguire has been involved
22  in the development of several high school sports
23  fields, as well as collegiate fields.
24      Q. Do you know which high schools he's worked

**49**

1  for?
2      A. I've seen a list but I don't recall them.
3      Q. How about college fields?
4      A. Again, I have seen a list, but I don't
5  recall exactly which ones.
6      Q. Any baseball stadiums on those lists?
7      A. I don't know.
8      Q. Have you generally been happy with
9  Mr. Maguire's work?
10      A. Yes.
11      Q. Let's talk about Mr. Maguire on this
12  particular project. Did Mr. Maguire ever talk to
13  you about Seating Solutions?
14      A. Yes.
15      Q. Did he ever share his opinion regarding
16  Scott Suprina personally, not to the quality of his
17  work, but personally?
18      A. Not that I recall.
19      Q. Did he ever share an opinion with you
20  regarding the quality of Seating Solutions' work as
21  a general matter?
22      A. As a general matter, no.
23      Q. Did he ever share an opinion regarding any
24  of Seating Solutions' specific proposals?

**Theodore Tye**
**August 24, 2005**

(Pages 50 to 53

---

50

1    A. Yes.
2    Q. How many times would you say this happened?
3    A. Several.
4    Q. Let's just kind of start with the first
5  one. When was the first time that he shared an
6  opinion regarding a specific Seating Solutions
7  proposal?
8    A. I believe that I shared Seating Solutions
9  proposals with him in his role as my consultant and
10 asked for his advice.
11    Q. And when was the first time that you did
12 that, do you recall?
13    A. I don't specifically recall.
14    Q. How many of Seating's proposals did you
15 share with him?
16    A. I would say most of them, but I can't tell
17 you precisely.
18    Q. Do you know how many times you discussed
19 specific proposals with Mr. Maguire, Seating's
20 proposals?
21    A. I don't know how many times. I don't know
22 how many times.
23    Q. The first time you shared a proposal with
24 him and he shared his opinion with you, what did he

---

51

1  say?
2    A. I don't remember the specifics. I do
3  remember that we had several meetings to review
4  comments and that he provided some input.
5    Q. What input did he provide?
6    A. We talked about various aspects of the
7  plan, how it was oriented on the site, things like
8  dugouts and press box locations, and he was involved
9  in those discussions as were several others.
10    Q. How many discussions?
11    A. I don't know how many.
12    Q. Well, generally, then. Again, let's back
13 up to the first time you shared a proposal with him,
14 what opinion did he share with you about that
15 proposal?
16    A. When you say "proposal," are you referring
17 to — why don't you tell me what you're referring
18 to.
19    Q. I'm using a word that you used. You said,
20 I believe earlier, and correct me if I'm wrong, that
21 you shared specific proposals that Seating Solutions
22 had provided to you with Mr. Maguire; is that right?
23    A. Yes, those proposals included plans. I
24 guess what I was referring to is that Mr. Maguire

---

52

1  was involved in the review of plans and written
2  materials.
3    Q. Starting with the first time he ever
4  expressed an opinion to you regarding any of the
5  plans or any of the proposals, what opinion did he
6  share with you?
7    A. I don't recall specifically what opinion he
8  shared. I do recall that we had several meetings
9  with various people involved. We reviewed plans and
10 we also reviewed written proposals. In terms of
11 what Mr. Maguire provided specifically on a first
12 review, I don't recall.
13    Q. Can you tell me was it a favorable opinion
14 at any point that he provided of Seating's
15 proposals?
16    A. I wouldn't call it either favorable or
17 unfavorable. He reacted to various aspects of the
18 proposal like other people on my team did.
19    Q. What aspects do you recall that Mr. Maguire
20 shared opinions about, and I'm talking now of
21 drawings or proposals, anything?
22    A. I don't recall any specific comments that
23 Mr. Maguire had. We were working, like is typical
24 in a project like this, where you review a set of

---

53

1  plans and various people make comments on them.
2  That happened in at least several meetings and
3  possibly several phone conversations. And there's
4  nothing that Mr. Maguire said that particularly
5  stands out in my mind as coming from him during the
6  process.
7    Q. Do you remember any opinions that
8  Mr. Maguire shared with you regarding any Seating
9  Solutions' — let's start with proposals?
10    A. I do remember that at one point in the
11 process Mr. Maguire told me that he was reviewing a
12 Seating Solutions proposal and he thought that the
13 number, the price, was exceptionally high. I do
14 remember that.
15    Q. Do you remember the date of that
16 conversation?
17    A. I don't.
18    Q. Do you remember the precise words he used?
19    A. I don't remember the precise words.
20    Q. Do you have an approximate recollection?
21    A. Yes. I do remember him saying that, based
22 on a per seat calculation of what a project like
23 this should cost, he felt that the Seating Solutions
24 proposal was high.

---

14

(Pages 70 to 73)

**70**

1 lowest possible price.
2    Q. So now that you've had a chance to review
3 some of these e-mail messages, do you now recall any
4 other opinions that Mr. Maguire might have shared
5 with you regarding Seating's proposals or drawings?
6    A. Consistent with what I said earlier, I do
7 remember that the pricing was very high that we were
8 being provided.
9    Q. So just to close the loop again, did he
10 ever share any opinions regarding Mr. Suprina
11 personally?
12    A. Not that I remember.
13    Q. Did you attend any meetings where both Pat
14 Maguire and Scott Suprina were present?
15    A. Yes.
16    Q. How many meetings?
17    A. At least one.
18    Q. But it could have been more?
19    A. It could have been more, but I do
20 specifically remember one meeting.
21    Q. Do you remember what the date was on that
22 meeting?
23    A. I don't remember the exact date.
24    Q. If I was to say February 15, would that

**71**

1 strike you as horribly incorrect?
2    A. No, that sounds just about correct.
3    Q. Who was present?
4    A. I remember Patrick Maguire being there,
5 myself, Scott Suprina, I believe Scott Ruczaj from
6 Mr. Suprina's office, and I don't recall if anyone
7 else was there for that meeting.
8    Q. How about Joe Gallagher?
9    A. He may have been.
10    Q. And just for the record, who is Joe
11 Gallagher?
12    A. Joe Gallagher was formerly employed as the
13 Director of Business Development at Cranshaw
14 Construction, which is a subsidiary of my company.
15    Q. And was he involved in the selection of a
16 seating contractor?
17    A. He at that time was assisting me with some
18 project management tasks.
19    Q. I'm going to ask the question again. Was
20 he involved in the selection of the seating
21 contractor?
22    A. He wasn't involved in the selection, but he
23 was involved in assisting me in meeting with some of
24 the people involved in the process.

**72**

1    Q. Did he assist you with assessing various
2 seating contractors?
3    A. No.
4    Q. Did he attend any meetings?
5    A. Yes, he did.
6    Q. Did he attend any meetings with potential
7 seating contractors?
8    A. Yes, he did.
9    Q. Why did you have him at those meetings?
10    A. To provide me with some project management
11 services, to help me administratively because I was
12 extremely busy at the time.
13    Q. What do you mean by "project management
14 services"?
15    A. He sat through the meeting. I know I asked
16 him to check at least one reference, and he provided
17 some help with any follow-up items that I needed as
18 a result of the meetings that he sat through, which
19 were relatively few because he left the Company
20 shortly thereafter.
21    Q. And when you say that "he sat through the
22 meeting," are we talking about the February 15
23 meeting or just some other meeting that you might
24 recall?

**73**

1    A. I believe he sat through the February 15
2 meeting, but I don't recall exactly if he was there.
3    Q. What administrative tasks would he assist
4 you with?
5    A. I actually planned for him to play a
6 greater project management role if he had not left
7 the Company, and I wanted him to have background on
8 the process so that he would be able to play a
9 stronger role later on.
10    Q. Where was this meeting?
11    A. It was at my office.
12    Q. In Newton?
13    A. Yes.
14    Q. How long did it last?
15    A. I don't remember exactly. I would guess
16 somewhere between one and two hours.
17    Q. Who called it? Do you know who called the
18 meeting?
19    A. I would suspect that I did, but I don't
20 remember exactly.
21    Q. What generally happened at the meeting?
22    A. I believe at that meeting we provided
23 Mr. Suprina with some input on a proposal that he
24 had provided to us and worked on a plan proposal

**102**

1 that I described a minute ago.
2    Q. Do you recall discussing at all at that
3 meeting whether it would be appropriate to send to
4 Dant Clayton Seating Solutions' layout plan?
5    A. No.
6    Q. Could it have been discussed?
7        MR. CIAVARRA: I object.
8    A. I don't remember it being discussed.
9 BY MR. KLEIN:
10   Q. Did Patrick ever tell you that he wanted
11 Worcester Baseball to hire someone other than
12 Seating to do the work on the bleachers?
13   A. No --
14   Q. He didn't?
15   A. -- not in those words.
16   Q. What words did he use?
17   A. As I mentioned earlier, he was employed as
18 a consultant by the baseball group to provide advice
19 on the project. He had a very favorable experience
20 with another company and had urged us to consider
21 that company as part of our deliberations on who to
22 hire, based upon his positive experience with that
23 company.
24   Q. And that other company was Dant Clayton.

**103**

1 Correct?
2    A. Correct.
3    Q. So what you're saying is: It wasn't so
4 much that he was saying don't hire Seating
5 Solutions, it was that he was saying hire Dant
6 Clayton?
7    A. That's correct, and Pat provided some
8 input. Ultimately the baseball board was the one
9 making the decision on it, but Pat clearly had a
10 very positive experience with Dant Clayton and
11 expressed that to us.
12   Q. Did you ever share any of the CAD files
13 that Seating Solutions sent you with anybody other
14 than Geller?
15   A. No.
16   Q. Did you personally, you Ted Tye, ever
17 authorize anybody at Geller to disclose the CAD
18 files to anybody else?
19   A. No.
20   Q. When you talked with Dant later in
21 February, did Dant say that they had seen Seating's
22 drawings?
23   A. They had seen -- I don't know if they said
24 they saw Seating's drawings. They had seen Geller's

**104**

1 drawings.
2    Q. Do you know what drawings they were
3 referring to when they were talking about Geller's
4 drawings?
5    A. Geller developed a series of plans that
6 showed again the whole area of the baseball field,
7 and I believe that they superimposed by CAD, some
8 of the Seating Solutions' proposed layouts on their
9 own plan.
10   Q. And so did you personally see some of these
11 Geller drawings?
12   A. Yes, I did.
13   Q. Did you recognize the seating plans as
14 Seating Solutions' plans?
15   A. Yes, I did. And, just to expand on that a
16 bit, those -- we're talking now in mid-February
17 because we had Geller plans earlier that had other
18 designs superimposed on it not created by Seating
19 Solutions.
20   Q. Was the design that was created beforehand
21 created by a seating contractor or no?
22   A. It was created by a seating architect, a
23 stadium architect.
24   Q. Who was that architect?

**105**

1    A. It's an architectural firm called Sink
2 Combs Dethleff, which I believe is located in
3 Denver.
4    Q. Would you then have used those designs to
5 go out and get a contractor to throw the seats in?
6 Was that an initial idea?
7    A. We had two alternatives. One would be to
8 -- if this was a more typical construction project,
9 we would have hired an architect like Sink Combs
10 Dethleff's to produce the plans and then the plans
11 would have been bid out to several different
12 contractors. Because of the tight timing involved,
13 we chose to go the design-build route, which was to
14 discuss the project with design-build contractors
15 who would then provide us with a design and
16 proposal.
17   Q. Did you ever share the Sink Combs drawings
18 with the Seating folks?
19   A. Yes, I believe we did.
20   Q. When you met with Dant later in February,
21 did Dant say that they were incorporating any of
22 Seating's design ideas?
23   A. No.
24   Q. Based on your review of the plans they

(Pages 106 to 109)

**106**

1  provided you, did it look like they were
2  incorporating any of Seating's designs in it?
3      A. As I mentioned, we originally had Sink
4  Combs Dethleff involved. That was even before my
5  involvement with the baseball group. They developed
6  a basic plan for this site that probably if you gave
7  it to ten architects they would come up with a very
8  similar plan because the site had some constraints
9  to it that required a plan that looked like this.
10  That Sink Combs Dethleff plan we then gave to Geller
11  and Geller, with some additional comment, created
12  their own version of that plan. That plan, the
13  Geller plan, was then given to both Dant and to
14  Seating Solutions and they used that to base their
15  plans upon. So I would tell you that the Dant plan,
16  in the end, was very similar to the Sink Combs plan
17  in the beginning.
18      Q. Did it seem apparent to you at the meeting
19  with Dant -- I think it was February 20, I'm not
20  sure what the date was at this point -- that they
21  were familiar with what Seating's design plans were?
22      A. I think that they were generally familiar
23  with it, and I believe that they had a copy of the
24  Geller plan that showed the Seating Solutions'

**107**

1  seating on it.
2      Q. So do you know how Dant came to know
3  whatever it did know about Seating Solutions' plans?
4      A. Do I know, no.
5      Q. Do you have any suspicions?
6          MR. CIAVARRA: Objection.
7      A. I suspect that the plan was probably
8  provided by Geller before the meeting.
9  BY MR. KLEIN:
10      Q. Who do you think at Geller provided the
11  plan?
12      A. I have no idea.
13      Q. Do you have an understanding today as to
14  whether you or Geller could share those CAD files
15  with third parties?
16          MS. MICHAELS KORN: Objection.
17          MR. CIAVARRA: I'm going to caution the
18  witness. If you can't answer that question without
19  revealing the advice you've received from counsel,
20  then you can't answer it, and I instruct you not to
21  answer.
22          MR. KLEIN: Let's rewind to the dates in
23  question.
24          MR. CIAVARRA: And that's not today.

**108**

1  BY MR. KLEIN:
2      Q. At that time, did you have a belief as to
3  whether those CAD files could be or any CAD that
4  were disclosed to you by Seating Solutions could be
5  shared with third parties?
6          MR. CIAVARRA: If you thought about it
7  at the time.
8      A. I did not think about it at the time.
9  BY MR. KLEIN:
10      Q. So you had, as far as you can recall, no
11  understanding as to whether you could disclose CAD
12  files provided by Seating Solutions to anybody other
13  than Geller?
14      A. I did not think about that at the time. I
15  provided them only to Geller.
16          MR. KLEIN: Counsel, we're going to be
17  looking at tab 9. Can you mark this?
18          (Exhibit 11, e-mail dated February 3,
19  marked)
20  BY MR. KLEIN:
21      Q. Mr. Tye, if you could just take a look at
22  that and then let me know when you're done.
23          Just for the record, the second two
24  pages are actually an eleven-by-seventeen document,

**109**

1  and if you yank them apart you can kind of get a
2  sense of what the document would look like as an
3  eleven-by-seventeen.
4          Could you identify this document for the
5  record?
6      A. There's an e-mail from Rebecca Bachand to
7  Matt Dougherty dated February 3, and on top of it an
8  e-mail from Matt Dougherty to Patrick Maguire with
9  copies to Rebecca Bachand and Chris Sgarzi dated
10  February 7.
11      Q. Matt Dougherty works for Dant Clayton.
12  Correct?
13      A. Correct.
14      Q. In the attachment if you could just take a
15  quick look, do you see the seating plan that is
16  attached there?
17      A. Yes.
18      Q. Is that a CAD version of a seating plan
19  that was prepared by Seating Solutions?
20      A. I don't see it labeled, but it appears to
21  be, but I can't be sure.
22          MR. CIAVARRA: Don't guess. If you
23  don't know, don't guess.
24  BY MR. KLEIN:

28

**122**

1 "They brought some graphics to show that the Seating
2 Solutions plan," et cetera et cetera et cetera?
3     A.  Yes.
4     Q.  Describe those graphics for me.
5     A.  I remember them showing us a graphic that
6 showed what we typically call a "cut section," which
7 would be a cut through of the stands with a typical
8 fan sitting on the stands and the view line that
9 that fan would have looking at the field.
10    Q.  What Patrick's e-mail says, right, is "It
11 shows the Seating Solutions' plan blows from a sight
12 line standpoint"; do you see that?
13    A.  Yes.
14    Q.  How specifically did, if you recall, Dant
15 go about showing the shall we say "inadequacies" of
16 the seating plan?
17        MS. MICHAELS KORN:  Objection.
18    A.  I remember them bringing in a plan that
19 showed their proposal.  Whether they actually had
20 anything that had been provided by Seating
21 Solutions, I don't recall.
22 BY MR. KLEIN:
23    Q.  Did it seem to you at that meeting though
24 that they were basically familiar with the Seating

**123**

1 Solutions plan?
2        MS. MICHAELS KORN:  Objection.
3     A.  They had — I want to be careful about the
4 term "Seating Solutions' plan."
5 BY MR.KLEIN:
6     Q.  Sure.
7     A.  Geller had taken the Seating Solutions
8 layout and put it on the overall ballpark plan, and
9 they did seem familiar with the overall ballpark
10 plan.  So I don't know whether that was a plan from
11 Seating Solutions or a plan from Geller, but there
12 was a difference.  I just want to make sure I'm
13 clear on that.
14    Q.  Understood.  Let's talk in terms of the
15 overall ballpark plan.  Did you have any
16 understanding on that date as to how Dant had become
17 familiar with what you just referred to as the
18 "overall ballpark plan"?
19    A.  I believe the plan had been sent to them by
20 Geller.
21    Q.  But you don't know that today?
22    A.  I don't know that for a fact, but I believe
23 that's the case.
24    Q.  So you weren't copied on e-mails from

**124**

1 Patrick or anybody who worked with that were sent to
2 Dant?
3     A.  To Dant Clayton, no, not that I recall.
4     Q.  Did you know at that February 20 meeting
5 and beforehand that Patrick was in discussion with
6 Dant?
7        MS. MICHAELS KORN:  Objection.
8     A.  I had asked Pat several times to give Matt
9 Dougherty a call and see if we can get Dant
10 interested.  We liked Dant.  We thought they were
11 the right guys.  We wanted them involved in the
12 project, so I asked Pat to do that several times.
13 Obviously, before I met with them, I knew that they
14 were coming.  I knew that we were having a meeting,
15 and I knew that they had a renewed interested in
16 becoming involved with the project.
17 BY MR. KLEIN:
18    Q.  Well, we'll come back to Dant in a little
19 bit.
20        Now, let's talk about Philip Rosenfield
21 I think you testified earlier that Mr. Rosenfield
22 was not on the Board of Directors —
23    A.  That's correct.
24    Q.  — of Worcester Baseball.  He was

**125**

1 previously or no?
2     A.  He was never on the Board, no.
3     Q.  Was he involved?
4     A.  Yes.
5     Q.  Is he now?
6     A.  No.
7     Q.  Why not?
8        MR. CIAVARRA:  I object and let me think
9 about it.  I'm going to instruct him not to answer
10 that.  There are ongoing negotiations between Mr.
11 Rosenfield and the team which are confidential and
12 involve counsel.  If there comes a time in which
13 that becomes relevant to this case, I'll certainly
14 make Mr. Tye available to answer those questions.
15 But at this point, I don't see any relevance to any
16 issues that are going on with Mr. Rosenfield today,
17 so I instruct him not to answer those.
18        MR. KLEIN:  You're instructing him not
19 to answer based on relevance, Lou.
20        Mr. CIAVARRA:  I just made my objection.
21 Terry, move on.
22        MR. KLEIN:  You're instructing him —
23        MR. CIAVARRA:  You just heard me, move
24 on.  I'm not going to explain it any further.  We're

32

**134**

1  please?
2      A.  This is Answer to Amended Complaint.
3      Q.  Whose Answer is that?
4      A.  Worcester Professional Baseball, LLC and
5  Perfect Game Baseball Clubs, LLC.
6      Q.  If you could take a look at your responses,
7  Worcester Baseball's responses, to paragraph 29
8  through 34.
9      A.  Okay.
10     Q.  Now, do you see in the answer paragraph 32
11 is denied?
12     A.  Correct.
13     Q.  If you could just for record, what does
14 paragraph 32 say?
15         MR. CIAVARRA:  Of the Complaint?
16         MR. KLEIN:  Yes.
17     A.  The Complaint says, "Suprina then stated
18 excuse me for being so blunt, but I must start work
19 on Saturday to make your date.  Do I have an order?"
20     Q.  Do you know why paragraph 32 was denied?
21         MR. CIAVARRA:  Objection.  He can't
22 answer that without disclosing conversations with
23 Counsel.  I instruct him not to answer.
24 BY MR. KLEIN:

**135**

1      Q.  What about paragraph 32 is inaccurate?
2      A.  The entire statement.
3      Q.  The entire statement.  So Scott Suprina, it
4  is your testimony today, never said, "Excuse me for
5  being so blunt, but I must start work on Saturday to
6  make your date.  Do I have an order?"
7      A.  Never said it.
8      Q.  Did he say anything similar to that?
9      A.  No.
10     Q.  Paragraph 33.  If you could just look at
11 that and tell me what is inaccurate about that
12 paragraph?
13     A.  I never confirmed that there was an
14 agreement between Worcester Baseball and Seating
15 Solutions.
16     Q.  Did you say anything similar to "Yes, you
17 have an order"?
18     A.  I said nothing similar to that at all.
19     Q.  So bringing it down to its smallest parts,
20 did you ever shake hands with Mr. Suprina during the
21 meeting?
22     A.  I did.
23     Q.  Did you, in the process of shaking hands,
24 ever confirm that there was a deal of any type

**136**

1  between Seating Solutions and Worcester Baseball?
2      A.  I never confirmed there was any deal, quite
3  the contrary.
4      Q.  What do you mean by "quite the contrary?"
5      A.  Any discussions that I ever had with
6  Mr. Suprina were around his proposal.  We reviewed
7  his proposal at the meeting.  He was very clear that
8  until a proposal was signed and until a deposit
9  check was provided to him that there was no deal.  I
10 had a number of points at that meeting that we
11 discussed that I was not comfortable with.  I told
12 him that I would provide him with additional
13 comments after the meeting.  I also told him at the
14 meeting that I was not authorized to make an
15 agreement, that any agreement would have to be
16 agreed upon by our entire Board.
17         Additionally, I told him that any
18 proposal be subject to an AIA construction contract,
19 and I also told him that any deal would be subject
20 to the approval of Holy Cross.  So based on
21 everything that he was told, I find it just
22 unbelievable that he would go out of the room
23 thinking that he had a contract when he walked out
24 with an unsigned proposal with all of those

**137**

1  different issues remaining on the table.
2      Q.  Moving on.  We'll get into that with a
3  little bit more flesh in a couple of moments.
4      A.  I hope so.
5      Q.  Paragraph 34.  Can you tell me what is
6  inaccurate about paragraph 34 of the Complaint?
7      A.  I never stated that we had reached an
8  agreement.
9      Q.  Did you say anything similar to that?
10     A.  I may have said that we made progress on an
11 agreement.  But, again, anything that I would have
12 said would have come with the caveat that was very
13 clearly stated that it was subject to -- and I think
14 I told him in the meeting that Alan Stone would sign
15 anything that needed to be signed because he was the
16 person who would sign things on behalf of the group.
17 I told him quite clearly that it was subject to a
18 meeting of our Board.
19     Q.  All right.  Let's rewind to the first time
20 that you ever met Scott Suprina.  Do you remember
21 the date of that meeting?
22     A.  I believe it was January 28, or
23 thereabouts.
24     Q.  Where did that meeting happen?

(Pages 146 to **149**)

146

1    Q. We're going to get to the February 18 in
2  more detail in a moment. Mr. Suprina, at the
3  February 18, specifically asked you to sign his
4  proposal. Correct?
5    A. He told me that he wanted to begin the
6  project. He wouldn't do that until he had a signed
7  proposal and a check, and I understood that very
8  clearly and I would have expected that he would have
9  made that request because that's standard industry
10 practice.
11    Q. So that's more of a statement. Did he ask
12 you to sign the proposal at the February 18 meeting?
13    A. We spoke on the phone prior to that
14 meeting, and he came to the meeting, I believe,
15 expecting that I would sign a proposal and give him
16 a check. It was made very clear by me at the
17 meeting that I was not ready to do that.
18    Q. How do you know that he was expecting that?
19    A. Well, his proposal said it for one thing.
20 It says in his proposal that it requires a signature
21 and a check, as did all of his proposals. So, as a
22 prudent businessman, I would believe, if I were
23 going to do business with him, I would be giving him
24 a signed proposal and a check.

147

1    Q. So just backing up to the February 15
2  meeting, apart from what we've discussed, do you
3  have any other recollections of the February 15
4  meeting?
5    A. No.
6        MR. KLEIN: Let's just take a look at
7  some of these proposals that predated the February
8  18 meeting, and I think we can start with --
9  Counsel, this is tab 6 and it is Exhibit 18.
10 BY MR. KLEIN:
11    Q. You can just take a look at that document
12 in a little more detail than you did before and let
13 me know when you're done.
14    A. Okay.
15        MR. KLEIN: Now, related to that
16 document, I believe, Counsel, if you take a look at
17 tab 12, which I'm going to have the court reporter
18 mark.
19        (Exhibit 21, comments on proposal,
20 marked)
21 BY MR. KLEIN:
22    Q. I'm showing you what has been marked as
23 Exhibit 21. If you just want to take a look at that
24 and look up at me when you're done.

148

1    A. Okay.
2    Q. Now, as you look back at Exhibit 18, which
3  is the proposal, and it looks like Exhibit 21 are
4  some of your comments on that proposal. What were
5  your major concerns about the proposal that was
6  submitted on February 2 and some of the drawings
7  that accompany them?
8    A. What were some of my major concerns. Well,
9  I do a lot of business in the construction area and
10 this is a very minimal proposal. That was a major
11 concern and I certainly wouldn't commit to a 1.8
12 million dollar contract based upon a three-page
13 memo. It's lacking in detail. The plans that went
14 with it we had been working with both Geller and
15 Holy Cross to get their comments, as noted in this.
16 We had a meeting with them that was coming up
17 afterwards. I provided a number of comments that
18 are noted in the e-mail based on some of my thoughts
19 and I requested additional detail from Seating
20 Solutions in this e-mail.
21    Q. Is it fair to say that of your concerns
22 price was the most significant?
23    A. No. There were a number of concerns, one
24 being price, and other concerns were that we put

149

1  together here the best possible stadium to meet the
2  needs of our business. As I said, we were in the
3  process of trying to understand that and make sure
4  we understood what we were getting in this proposal.
5    Q. Looking back at Exhibit 21, in your e-mail
6  addressed to Cristie, but also to Scott Suprina, the
7  last line of that is, "We look forward to working
8  with you on the project." What did you mean by
9  that?
10    A. I meant that if we were working with him on
11 the proposal and, like I would say to any potential
12 bidder, we hope we can work with you on the project.
13 Obviously, subject to having an agreement in place.
14 So it's more of a courtesy line. It does not have
15 any additional meaning to it than that.
16        MR. KLEIN: Counsel, we're looking at
17 tab 17. Can you mark this?
18        (Exhibit 22, February 15 proposal,
19 marked)
20 BY MR. KLEIN:
21    Q. If you could just take a quick look at
22 that, then I'm going to ask you a couple of
23 questions about this.
24    A. Okay. I've taken a quick look.

38

**Theodore Tye**
**August 24, 2005**

(Pages 162 to **165**)

---

**162**

1    MR. CIAVVARA:  You're talking about the
2  date that liquidated damages would begin to accrue?
3    MR. KLEIN:  That's correct.
4    A.  May 15, 2005.
5  BY MR. KLEIN:
6    Q.  So back to my original question:  Are there
7  terms, for example, that are in an AIA contract that
8  are not in this document that you would have liked
9  to have seen in this document?
10    MR. CIAVARRA:  Objection.
11    MS. MICHAELS KORN:  Object also.
12    A.  Yes.
13  BY MR. KLEIN:
14    Q.  What terms?
15    A.  An AIA document is a carefully-worded legal
16  document that is customarily used in the
17  construction business.  I am not a lawyer and I
18  would not enter into any agreement for a
19  construction project anything close to this size
20  without relying on the AIA document, which has much
21  detail to it, more than I can describe here.
22    Q.  So what I'm trying to figure out is when
23  you add your edits, your notes, were there any
24  terms, any contract or deal points if you will, that

---

**163**

1  you would have wanted to have in a final agreement?
2    MR. CIAVARRA:  Objection.  Asked and
3  answered.
4    MR. KLEIN:  I agree about the asked
5  part.
6    MR. CIAVARRA:  Well, it's been answered
7  too.
8    A.  I added additional provisions in here after
9  the meeting with Suprina and I made very clear to
10  him that I would be meeting with my Board and that
11  they may also have additional provisions that they
12  wanted included in the agreement before they signed
13  off on it.
14  BY MR. KLEIN:
15    Q.  So it could be that the Board might have
16  some additional terms that you might not have
17  identified?
18    A.  Or that there may be additional terms that
19  would come out of the negotiation of an AIA
20  contract.
21    Q.  So as of you sending this proposal out, was
22  there anything you still had to negotiate with
23  Seating Solutions?
24    A.  I did not fully negotiate this for one

---

**164**

1  thing.  For a second thing, I was about to meet with
2  my Board and I did not know what issues they would
3  bring up.  For a third thing, I had not had full
4  input from Holy Cross in terms of their review of
5  the project so I did not know what issues they would
6  bring up.  So all of those things had to be done
7  prior to us executing the unsigned proposal.
8    Q.  So the terms that were not included in this
9  proposal, let's say remained open for negotiation,
10  were the terms that the Board would identify, that
11  Holy Cross would identify, and that you could
12  identify as the negotiation process moved forward;
13  is that your testimony?
14    A.  Until there was a signed proposal, any
15  terms in my mind would be subject to change and
16  negotiation.  This was a negotiation.  It was never
17  an agreement.  So until there was an agreement, in
18  my mind, and in industry practice, anything remains
19  open for discussion.
20    Q.  So you never said to Scott, "We have a
21  deal"?
22    A.  I never said to Scott, "We have a deal."
23    Q.  You never said to Scott, "You have an
24  order"?

---

**165**

1    A.  I never said to Scott, "We have an order."
2    Q.  And at a certain point during the meeting
3  on February 18, did Scott ask you to confirm that
4  Worcester Baseball and Seating Solutions had a
5  contract?
6    A.  No.
7    Q.  At a certain point, did he ask Worcester
8  Baseball to hire Seating Solutions to install the
9  seating system at Fitton Field?
10    A.  He was there with a proposal in hand.  He
11  asked us to -- he was there to get a signature on
12  his proposal and get a deposit check, and I did not
13  give it to him.
14    Q.  Did Scott Suprina ever say that he wouldn't
15  begin work until you gave him a deposit?
16    A.  Yes.
17    Q.  Did he ever tell you that he wasn't going
18  to begin work until you signed the proposal?
19    A.  Yes.
20    Q.  Did he place any other conditions on
21  starting work?
22    A.  He told me he needed to order -- he wanted
23  to begin the process of ordering materials and that
24  he couldn't do that until he had a deposit and a

---

42

Theodore Tye
August 24, 2005

(Pages 186 to 189)

186

1  was that we would be better off not accepting a
2  proposal from Seating Solutions and trying to
3  negotiate with Dant Clayton.
4     Q. Was Patrick Maguire in the room, do you
5  remember?
6     A. He was there for a good part of the day.
7  We had a very long meeting, and he was there for a
8  good part of it.
9     Q. At this point, did you have a notion of how
10 Patrick Maguire felt about Scott Suprina and Seating
11 Solutions?
12       MS. MICHAELS KORN: Objection.
13    A. I think it was clear that Patrick had a
14 good deal of experience with Dant Clayton. He
15 respected Dant Clayton, and he, as did we, felt they
16 were the superior firm based on their background and
17 experience and people who were sitting in front of
18 us. We all had the same opinion that Pat did on
19 that.
20 BY MR. KLEIN:
21    Q. He didn't express any negative opinions
22 about Seating Solutions' product?
23    A. In his role as a consultant he helped us
24 consider what both firms were putting in front of

187

1  them. And there were various aspects of both
2  proposals that he commented on.
3     Q. I think you've stated this in response to a
4  number of different questions, but I just want to
5  get an answer in a single question.
6        How did Patrick Maguire affect your
7  decision to choose Dant Clayton versus Seating
8  Solutions?
9        MS. MICHAELS KORN: Objection.
10    A. He was a consultant. Consultants are paid
11 to provide good opinions, but he's not a decision
12 maker. The decision makers were the members of the
13 Board group. He expressed opinions that I would
14 consider to be good professional opinions. They
15 were objective and they were based upon the
16 information that was put in front of him. Beyond
17 that, I think you're really looking for something
18 that isn't there.
19 BY MR. KLEIN:
20    Q. So you don't think, for example, that Pat
21 Maguire just didn't like Scott Suprina and didn't
22 want him to get the deal?
23    A. He may not have liked Scott Suprina. You'd
24 have to ask him that question, but I think what he

188

1  was doing was providing good professional advice as
2  a consultant to try to help his client make the best
3  decision.
4     Q. And that advice was to choose Dant Clayton.
5  Right?
6        MS. MICHAELS KORN: Objection.
7     A. He never told us nor would we expect him to
8  tell us to choose one consultant or the other, but
9  he provided some advice on various aspects of both
10 proposals. Consultants don't choose contractors.
11 He didn't do it in this case.
12 BY MR. KLEIN:
13    Q. So he didn't advise you that the Dant
14 Clayton proposal was better than the Seating
15 proposal?
16       MS. MICHAELS KORN: Objection.
17    A. He sat through the same meeting and looked
18 at the same proposal that we did, and it was very
19 clear to us that the Dant Clayton proposal, as well
20 as the Dant Clayton organization, were the people we
21 wanted to work with. That was very clear to us from
22 the very first time we met both organizations when
23 Patrick Maguire wasn't even in the room. We had
24 wished from that first meeting that Dant Clayton was

189

1  able to build the project for us, and that was our
2  independent judgment. Pat helped us with some of
3  the technical aspects of the proposal. Whether he
4  liked Scott Suprina or not was completely irrelevant
5  and never part of any consideration.
6  BY MR. KLEIN:
7     Q. Had you ever worked with Dant before?
8     A. Never.
9     Q. We have talked in some detail about the
10 Dant Clayton meeting. Do you remember when it was
11 scheduled?
12    A. What was scheduled?
13    Q. The Dant Clayton meeting.
14       MR. CIAVARRA: The one on Sunday?
15    A. Which Dant Clayton meeting?
16 BY MR. KLEIN:
17    Q. February 20.
18    A. When the meeting was scheduled?
19    Q. Yes.
20    A. When the time of the meeting was
21 determined?
22    Q. Exactly.
23    A. I believe that we knew late that week that
24 Dant Clayton was interested in coming in and meeting

48

190

1 with us, and I think the actual scheduling of the
2 meeting took place sometime late on Friday
3 afternoon.
4    Q. So after the meeting with Scott Suprina?
5    A. That's correct.
6    Q. That meeting was held at your office.
7 Correct?
8    A. That's correct.
9    Q. What time did it start would you say?
10    A. 2:00 o'clock.
11    Q. And if you want to turn your attention to
12 Exhibit 14, it lasted until 7:00; is that right?
13    A. That's right.
14    Q. And the meeting with the Board about which
15 of these two seating suppliers to choose, was that
16 before or after 7:00 o'clock?
17    A. There were several points in the meeting
18 where we broke into groups and at the conclusion of
19 the meeting the team from Dant Clayton left and we
20 continued to meet, but we did break several times
21 from the meeting and go into a different room.
22    Q. Now, it was kind of as if there was a board
23 meeting going on, but then there was another sales
24 pitch going on at the same time. Right?

191

1    A. Well, there was a sales pitch and at the
2 conclusion of that the group met --
3    Q. The three of you?
4    A. -- without Dant Clayton there.
5    Q. You, Brad, and Alan?
6    A. Correct.
7    Q. Did you get anybody else on the phone at
8 this point?
9    A. No. Tom Alperin was away. It was a
10 holiday weekend. He was not available, although he
11 is my business partner, and I did speak with him at
12 some point, and that was the group. So we had three
13 out of the four. Phil Rosenfield was invited but
14 not active at that point.
15    Q. He was invited but not active at that
16 point. So he wasn't there?
17    A. He was not at the meeting.
18    Q. Was he on the Board at that point?
19    A. At that point --
20    MR. CIAVARRA: Which entity, Perfect
21 Game or Worcester Baseball?
22    MR. KLEIN: Either, both.
23    MR. CIAVARRA: You have to tell him what
24 you want him to answer. Was he on the Board of

192

1 either, is that the question?
2    MR. KLEIN: Yes.
3    MR. CIAVARRA: He's already said that he
4 was never on the Board of Perfect Game.
5    A. We need to check our dates in terms of when
6 the Board was actually constituted.
7    MR. CIAVARRA: It's okay to say you
8 don't know.
9    A. His active involvement in the group was
10 curtailed around that time, so that while he was
11 part of our organizing group, he ceased to be
12 actively involved in the activities of our Board.
13 BY MR. KLEIN:
14    Q. So ultimately you entered into a contract
15 with Dant Clayton. Right?
16    A. Right. Ultimately, we did.
17    MR. KLEIN: Can we mark that?
18    (Exhibit 29, AIA document, marked)
19 BY MR. KLEIN:
20    Q. This is our only copy of this, and I'm not
21 going to ask you to read the entire thing or we'll
22 be here until Mr. Stone arrives on Friday. I would
23 like to just ask you a couple of quick questions
24 about it.

193

1        Just identify that for the record, first
2 of all.
3    A. It's an AIA document A101 between Worcester
4 Professional Baseball LLC and Dant Clayton
5 Corporation.
6    Q. What was the contract price?
7    A. $1,895,000.
8    Q. Was that a higher price or a lower price
9 than Seating Solutions last proposal?
10    A. It was a higher price.
11    Q. What accounted for the price difference?
12    A. Difference in scope.
13    Q. How did the scope differ?
14    A. We already reviewed some of the ways it
15 differed. This was based on some plans, some
16 detailed plans and specifications that were
17 negotiated with Dant Clayton. Some of the items
18 that we outlined were a seating system, I-beam
19 structure, ability to accommodate future phases,
20 concrete concourse, different seating widths,
21 different seats, different aisle widths. I'm sure
22 there were many changes that I haven't noted.
23    Q. So would you call $1,895,000 an
24 exceptionally high price?

# EXHIBIT 3

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

                            CIVIL ACTION NO. 05-CV-10365-JLT
3

4

5        *********************************
         RI, INC. d/b/a SEATING SOLUTIONS,   *
6              Plaintiff,                     *
                                             *
7        v.                                  *
                                             *
8        GELLER SPORT, INC., GELLER          *
         DeVELLIS, INC., WORCESTER           *
9        PROFESSIONAL BASEBALL LLC, and      *
         PERFECT GAME BASEBALL CLUBS LLC,    *
10             Defendants.                    *
         *********************************
11

12

13

14                       DEPOSITION OF ALAN R. STONE, taken
    pursuant to the applicable provisions of the Federal
15  Rules of Civil Procedure, before Michelle Kaczynski, a
    Registered Professional Reporter and Notary Public in
16  and for the Commonwealth of Massachusetts, at the
    offices of Henshon, Parker & Vyadro, P.C., 84 State
17  Street, Suite 360, Boston, Massachusetts, on Friday,
    August 26, 2005, at 9:55 a.m.

18

19

20

21

22

                       KACZYNSKI REPORTING
23            72 CHANDLER STREET, SUITE 3
            BOSTON, MASSACHUSETTS   02116
24                 (617) 426-6060

Page 6

1  question. Of course if you don't understand the
2  question, feel free to ask and I'll just rephrase it.
3  Of course if you need a break or if anybody in the room
4  needs a break at any time, just speak up and I will be
5  more than happy to go off the record.
6          Have you ever been deposed before,
7  Mr. Stone?
8      A.  No.
9      Q.  Okay. What did you do to prepare for this
10 deposition?
11     A.  Consult with my attorney.
12     Q.  And what documents did you look at in
13 preparation for the deposition?
14     A.  Could you maybe be a little more specific in
15 terms of --
16     Q.  Well, did you look at any documents in, as
17 you were preparing for this deposition today?
18     A.  I reviewed the transcript of Scott Suprina's
19 deposition and reviewed some e-mails in the attorney
20 binder.
21     Q.  Okay, and did you discuss the deposition with
22 anybody else apart from your attorney?
23     A.  No.
24     Q.  What's your residential address, Mr. Stone?

Page 7

1      A.  57 Lawrence Road, Weston, Mass., that's
2  W E S T O N.
3      Q.  And your business address?
4      A.  303 Main Street, Worcester, Mass.
5      Q.  Any other business addresses?
6      A.  No.
7      Q.  I --
8      A.  Let me qualify.
9      Q.  Sure.
10     A.  I still maintain a recruitment firm in
11 Boston, it's not active, but I have an address still
12 listed at 12 Post Office Square.
13     Q.  Okay. What's the name of that firm?
14     A.  Stone/Twining Legal Recruiting, Twining,
15 T W I N I N G.
16     Q.  Does -- is Mr. Twining still in the
17 recruiting business?
18     A.  Yes, he is.
19     Q.  And does he does business, do business as
20 Stone/Twining or --
21     A.  Yes, he does.
22     Q.  Okay, and that is right here in Boston?
23     A.  Yes, it is.
24     Q.  How many employees?

Page 8

1      A.  Just the two of us.
2      Q.  Okay, and how old are you?
3      A.  Fifty-four.
4      Q.  And your date of birth?
5      A.  June 28th, 1951.
6      Q.  Where were you born?
7      A.  Boston.
8      Q.  And your Social Security number?
9      A.  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.
10     Q.  Are you married?
11     A.  Yes, I am.
12     Q.  And what's your spouse's name?
13     A.  Marla, M A R L A, Stone.
14     Q.  How long have you been married?
15     A.  Since 1976, over twenty-nine years, I
16 believe.
17     Q.  Congratulations, and have you ever been
18 married before?
19     A.  No.
20     Q.  And do you have any kids?
21     A.  Four boys.
22     Q.  And what are their names?
23     A.  Jeffrey, Michael, James and Douglas.
24     Q.  And what are their ages?

Page 9

1      A.  Twenty-two, nineteen, seventeen and fourteen.
2      Q.  Where do they live?
3      A.  Well, my oldest resides in the
4  Allston-Brighton area. The other three reside at home.
5      Q.  And the twenty-two year old, is he employed?
6      A.  He is.
7      Q.  And where does he work?
8      A.  Works for a company called Yellow Pepper.
9      Q.  And what type of company is Yellow --
10     A.  It's a -- my VCR blinks on 12:00, so you'll
11 have to excuse me, but it's a cellular telephone
12 technology company.
13     Q.  Okay, and who is your current employer?
14     A.  Worcester Professional Baseball.
15     Q.  And what do you do for Worcester Baseball?
16     A.  I'm president and chief executive officer.
17     Q.  How long have you held that position?
18     A.  Since right at the end of 2004, December of
19 2004.
20     Q.  Okay. Have you ever been a party to any
21 litigation in the United States or elsewhere in the
22 world?
23     A.  Yes.
24     Q.  Could you just -- how many cases?

3 (Pages 6 to 9)

Page 14

1    A.   Took a year hiatus, because having left a
2 company that was acquired, had a noncompete, came back
3 to recruiting in 2002 until I moved into the Worcester
4 Professional Baseball arena in late 2004.
5    Q.   And what was the name of the PR firm in New
6 York?
7    A.   Michael W. Moynihan Public Affairs
8 Consultants.
9    Q.   Are they still in business?
10    A.   They're not.
11    Q.   And I was at Bingham Dana too, but what
12 caused you to leave Bingham?
13    A.   The quick answer was probably a desire to get
14 back dealing with people in an outside environment as
15 opposed to the perhaps back room life of a young
16 associate.
17    Q.   And were you on the corporate side or the
18 litigation side, or kind of a combination of the two?
19    A.   I actually had a rotation system.
20    Q.   I see.
21    A.   They did in place at the time, so I touched
22 on several areas of practice.
23    Q.   I see, and who did Stone Legal Resources,
24 there was a purchase or a sale of that business, is

Page 15

1 that what you said?
2    A.   Yes.
3    Q.   Who bought it?
4    A.   A company called Select Appointments North
5 America.
6    Q.   And are they still in business?
7    A.   They were acquired in late '98, I believe.
8    Q.   I see.  Was there a period during which you
9 worked for Stone Legal Resources while it was owned by
10 another company?
11    A.   Yes.
12    Q.   I see, and what was that period?
13    A.   In terms of a period of time, it was
14 approximately two years.
15    Q.   Okay, and as for your current employment,
16 what do you do on a daily basis?
17    A.   I serve as president and chief executive
18 officer, which means I make decisions in terms of the
19 general operation of the company.  I'm authorized to
20 make decisions, enter into contracts, hire and fire
21 staff, serve as a voice and a presence of the team in
22 the Worcester community.
23    Q.   And do you consider yourself to report to
24 anybody or any group of people or anything like that?

Page 16

1    A.   I think the board of directors of our firm.
2    Q.   And who is on that board at this time?
3    A.   Well, our chair is Ted Tye, I'm also a member
4 of the board.  We have Tom Alperin, Thomas Alperin,
5 Bradly Michals, Bruce Ginsberg, Peter Merrigan, Thomas
6 Maher, Robert Richards.
7    Q.   And is there any sort of logic behind having
8 you be the CO and having Mr. Tye be the chairman and
9 not having those positions be merged?
10        MR. CIAVARRA:  Objection.  You can
11 answer.
12    A.   I'm not sure I quite understand when you say
13 logic, I'm not trying to be difficult, but I'm trying
14 to be responsive --
15    Q.   Sure.  Is there any reason that the chairman
16 and CEO are not just a single position?
17        MR. CIAVARRA:  Objection.
18    A.   I think as much out of respect for Ted Tye
19 and his business background and acumen.
20    Q.   I see.
21    A.   And perhaps also the extent of my busy
22 schedule, to rely upon another seasoned person in that
23 chair is appropriate.
24    Q.   I see, and how many Worcester Baseball

Page 17

1 employees report to you?
2    A.   They all do.
3    Q.   And how many employees are there?
4    A.   Year-round employees right now approximately
5 eight or nine.  In season we have a very large game day
6 staff.
7    Q.   I see, and do you do any other work for
8 Worcester Baseball in any other capacity?
9    A.   Everything falls under my title --
10    Q.   Sure.
11    A.   -- as president and CEO, but I definitely
12 wear many hats.
13    Q.   Sure, and how is the season going?
14    A.   Very well.
15    Q.   From a financial prospective?
16    A.   For a start-up operation I think we're doing
17 fine financially.
18    Q.   And how is the team performing on the field?
19    A.   Very well.  We're in the playoffs in our
20 first year of operation, which is a very satisfying
21 achievement.
22    Q.   Excellent.  I'm just going to put a couple of
23 exhibits in front of you.  I'm showing you what's been
24 marked as Exhibit 1.  If you could just identify that

5 (Pages 14 to 17)

Page 26

1 tacit experience perhaps in leasing office space.
2    Q.   Yes.
3    A.   But neither of us would be regarded as
4 experts in construction.
5    Q.   Well, I guess I should back up.  You had to
6 figure out a place to play, right?
7    A.   Correct.
8    Q.   And let's say, let's start just mid-November.
9 What locations were on your wish list?
10    A.   My knowledge of Worcester was growing by the
11 day.
12    Q.   Mm-hmm.
13    A.   But we were relying on predominantly city
14 officials to tell us what locations might be on our
15 list, so early on it would probably be a combination of
16 fields that were controlled and operated by the city,
17 perhaps some colleges and universities, also
18 theoretically vacant land that could be developed.
19    Q.   Okay.  I'm going to try to focus us just a
20 little bit.  Was somewhere called Lake Park on the
21 list?
22    A.   Yes.
23    Q.   And Clark University?
24    A.   Clark as well.

Page 27

1    Q.   And Holy Cross?
2    A.   Yes.
3    Q.   And who -- when did Lake get on the wish
4 list?
5    A.   I believe it was already on Phil's list when
6 he and I spoke.
7    Q.   Sure, and how did Clark, how and when did
8 Clark get on the list?
9    A.   I'm not exactly sure when things arrived on
10 the list.
11    Q.   Sure.
12    A.   But Clark was on the list of the area
13 colleges and universities where we knew there were
14 baseball facilities.
15    Q.   And would you say that apart from, would you
16 say that Lake Park, Clark and Holy Cross were the three
17 principal sites, or were there others that were, that
18 you considered seriously?
19    A.   I'm not trying to be cute, but when you say
20 considered seriously --
21    Q.   Sure.
22    A.   -- at the beginning of our venture,
23 everything was under consideration.
24    Q.   Right.

Page 28

1    A.   There were a variety of fields, and as I
2 mentioned, possibilities from vacant land to already
3 developed fields.
4    Q.   Right.  Well, at a certain point, right, you
5 really sort of focused on Holy Cross, right?
6    A.   Well, there, I think it's fair to say the
7 list shrank to, you know, several possibilities.
8    Q.   And what were those, after the list shrank,
9 what were the possibilities?
10    A.   Once again, various universities, you
11 mentioned Clark, Holy Cross.  I viewed Assumption and
12 Worcester Polytech as two other possibilities that we
13 looked at.
14    Q.   Okay, and once you had sites, for these
15 sites, did all of them, were all of them going to
16 require some kind of improvements?
17    A.   It's fair to say, yes.
18    Q.   And did someone as part of your group, as
19 part of the team that was developing focus on those
20 improvements, being responsible for the logistics
21 associated with that?
22    A.   Yes, yes.
23    Q.   Who was that?
24    A.   At some point I asked Ted Tye to be the lead

Page 29

1 person on that.
2    Q.   Had Phil Rosenfield also been working on that
3 stuff too?
4    A.   Not in an -- yes, but not in a quote/unquote
5 expert capacity.
6    Q.   Sure, and how would you describe what he was
7 doing?
8    A.   Well, first, I don't mean to be asking the
9 questions, I apologize, but I want to make clear that
10 you had asked me about my early discussions with Phil
11 Rosenfield.
12    Q.   Yes.
13    A.   And by mid-November, the group had expanded
14 so that Ted was part of the group, and it was easy to
15 ask my colleague Ted Tye to run with this
16 responsibility based on his experience and expertise.
17    Q.   Yes, and his expertise, how would that
18 contrast with Mr. Rosenfield's experience?
19    A.   Ted Tye is an experienced real estate
20 businessman and entrepreneur, Philip is not.
21    Q.   When did Patrick Maguire get involved?
22    A.   This is early in, relatively early in the
23 process.
24    Q.   Who brought him in?

8 (Pages 26 to 29)

Page 30

1    A.    Ted Tye's recommendation.
2    Q.    Okay, and how long have you known Mr.
3 Maguire?
4    A.    Only since the Worcester Baseball project.
5    Q.    I see, so you haven't worked with him on
6 anything?
7    A.    No, I'm not in the real estate industry.
8    Q.    Okay. Now, let's talk just a little bit
9 about your authority in your current role as the CEO.
10 How would you describe your authority as the chief
11 executive officer?
12    A.    I guess the quick answer is the buck stops
13 here, I have ultimate authority in the company.
14    Q.    And do -- who signs contracts that Worcester
15 Baseball enters into?
16    A.    I do.
17    Q.    Does anybody else?
18    A.    No.
19    Q.    How about checks?
20    A.    I sign them.
21    Q.    Does anybody else sign them?
22    A.    My general manager has authority with respect
23 to payroll issues and so forth, but with respect to
24 vendors and contracts I would have that authority.

Page 31

1    Q.    And what's your general manager's name?
2    A.    Michael Lieberman.
3    Q.    Okay. Do certain contracts or deals need
4 board approval first?
5    A.    I would seek board approval when I deemed
6 appropriate.
7    Q.    Is it kind of a smell test?
8    A.    To some degree. I mean, under advice of
9 counsel, I would not leave it merely to my whims. You
10 know, if I felt a contract or a decision was of
11 sufficient magnitude, I would make sure I would err on
12 the side of bringing it to the board at least for
13 discussion.
14    Q.    Okay. Now, Worcester Baseball ultimately
15 selected a site, correct, for the stake?
16    A.    Yes.
17    Q.    And what was that site?
18    A.    What is known as Fitton Field at Holy Cross.
19    Q.    And were there improvements that were needed?
20    A.    Yes.
21    Q.    Just what were the improvements that you had
22 to do?
23    A.    Fitton Field prior to any improvements was a
24 grass baseball field, not to repeat the information

Page 32

1 that Mr. Tye provided, but we were dealing with
2 essentially some temporary bleachers on either base
3 line, a wooden press box facility, somewhat
4 dilapidated, and two wooden dugouts in similar
5 condition, and there was I believe a chain link fence
6 out in the outfield and very little else, certainly not
7 in a state of affairs for a professional baseball
8 operation.
9    Q.    Who opened the discussions with Holy Cross to
10 start playing there?
11    A.    As I recall, we started our journey, if you
12 will, with meetings with city officials.
13    Q.    Mm-hmm.
14    A.    And we relied heavily on their suggestions,
15 and at one of our early meetings with city officials
16 the Holy Cross site came up for consideration, and I
17 remember that we then met with Holy Cross officials; by
18 we, meaning Philip Rosenfield and I.
19    Q.    Just to the first meeting?
20    A.    First meeting, yes.
21    Q.    And late January is when things really jelled
22 with Holy Cross, is that right?
23    A.    Things really started to focus on Holy Cross.
24 Things didn't really jell until mid to late March.

Page 33

1    Q.    And when did you start, do you know when kind
2 of the construction and design process on Fitton Field
3 got underway?
4    A.    I think it was not until we signed a lease
5 with Holy Cross, I believe in late March.
6    Q.    Were you looking at people to do improvements
7 on Fitton Field before then though?
8    A.    Yes. When you say looking for, we were
9 engaging in discussions with a variety of vendors and
10 contractors to do improvements, yes.
11    Q.    And again, just the kind of the broad
12 category of the improvements that you were looking for,
13 what were the general categories?
14    A.    I would say in the rubric of fan amenities
15 and player amenities. With respect to Fitton Field, it
16 would be seating, it would be access ways, concourses
17 and walkways, dugouts, press facilities, restroom
18 facilities, revamping some of the field, the condition,
19 looking at the condition of the infield and the
20 condition of the turf, and it's a lot of interrelated
21 developments. I think I've just about exhausted my
22 construction experience in my answer, but a lot of
23 things had to be done to bring it up to grade.
24    Q.    And in bringing it up to grade, were there

9 (Pages 30 to 33)

Page 90

1    A.    Not, I don't recall anything meaningful
2    beyond what we've discussed.
3    Q.    What was your personal opinion as to who had
4    a superior product at this time?
5    A.    As to, quote/unquote, superior product, I was
6    relying on Ted Tye and our consultants.
7    Q.    And by your consultants, who are you
8    referring to?
9    A.    Geller Sport, Mr. Maguire specifically.
10    Q.    And did they, did Mr. Tye make, did he let
11    you know who he thought had a superior product?
12    A.    I'm sure he rendered an opinion as did Mr.
13    Maguire.
14    Q.    And what was their opinion; what was Mr.
15    Tye's opinion, first of all?
16    A.    The quick answer was that Ted appeared to go
17    with a feeling that Dant Clayton was a preferable
18    supplier.
19    Q.    Even at a higher price?
20         MR. CIAVARRA:  I object.
21    A.    That was not determined at that time.
22    Q.    Sure, okay, and Mr. Maguire, did he express
23    an opinion to you?
24    A.    I recall him expressing the same opinion,

Page 91

1    that Dant Clayton, that he preferred Dant Clayton and
2    their proposal.
3    Q.    And did he say what about Dant Clayton's
4    proposal he preferred?
5    A.    I recall nothing, less specific and more
6    banter, but it, clearly we touched on things like price
7    and the ability to perform.  In my mind, there were
8    still many questions to pursue and answer.
9    Q.    And what were those questions?
10    A.    Well, components of what would make the
11    project all in be one that we could go with.  Once
12    again, it wasn't just a function of selecting a seating
13    supplier.  There were other contractors that would be
14    part of this exercise in terms of the improvements at
15    Fitton Field, there was the big question of Holy Cross
16    approval that was still yet to be finalized.  There
17    were also other contingencies, a very real one being
18    that we might have been a travel team in 2005, and that
19    we would have elected not to go with any seating
20    supplier but would have deferred the decision to '06 or
21    beyond.
22    Q.    That's interesting.  What do you mean by a
23    travel team?
24    A.    If we were, if we determined as an entity

Page 92

1    that it was in our best interests not to play home
2    games in 2005, we would still be a member of the league
3    and in a sense underwrite travel expenses, and that was
4    an option that was being actively discussed.
5    Q.    And that was something that the league was
6    willing to consider?
7    A.    Yes.
8    Q.    Okay.  Interesting.  Were there any other
9    sites in Worcester that you had as a backup plan at
10    this point?
11    A.    Could you describe what point?
12    Q.    I mean, at this point when you say that there
13    are a lot of other things on your mind, if Holy Cross
14    falls through, is there another site in Worcester, or
15    is your next, is your escape hatch the traveling
16    option?
17    A.    I'm almost certain that at that stage if Holy
18    Cross had fallen through that we would have been
19    thinking travel team.
20    Q.    Okay.  Page two of the contract here, there's
21    a date, a little, just a notation, substantial
22    completion date, do you see that?
23    A.    Mm-hmm.
24    Q.    What's the date underneath there?

Page 93

1    A.    May 24th, 2005.
2    Q.    And was Dant, did Dant hit that substantial
3    completion date?
4    A.    I actually wouldn't be the one to give you an
5    appropriate answer because of the definition of
6    substantial completion, I don't know if it's subjective
7    or objective.
8    Q.    Right.
9    A.    I don't have the expertise.
10    Q.    But was the stadium done on May 24th, 2005?
11    A.    I would say there was still more work to be
12    done on May 24th.
13    Q.    Okay, and --
14    A.    But may I add, I'm not sure whether it was to
15    be done by Dant Clayton or other contractor.
16    Q.    The date on this contract, on this document
17    is, could you just look at the first page here, is
18    what?
19    A.    It says agreement made as to the 22nd day of
20    February.
21    Q.    Okay.  Did you actually affix your signature
22    on the 22nd of February?
23    A.    To the best of my recollection I did not.
24    Q.    Okay, so it was retroactive?

24 (Pages 90 to 93)

# EXHIBIT 4

 **SOLUTIONS**

63 Deer Avenue
Hauppauge, NY 11788
Phone: 631-848-0449
Fax: 631-845-0470

www.sitonthis.com



## PROPOSAL

February 17, 2005

Mr. Ted Tye
Perfect Game
c/o 6 Draper Road
Wayland, MA 01778

*Worcester Professional Baseball, LLC*
*PO Box 2221*
*Worcester, MA 01613-2221*

Re: Perfect Game Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum
flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package
Two front field walls – plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and
contrasting aisle nosing. Complete front 10 rows aluminum square tube frame combo.
Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent,
comfortable and durable product that I strongly recommend.

Price delivered and assembled:          $1,519,880.90

Pricing excludes concrete, electric and water connections. Earthwork by others. Pricing does not include any applicable sales tax and is based on Seating Solutions standard levels of insurance. *Specify levels. Insurance certificate to be provided.*

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.

Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement. *Bathroom must be ADA compliant and meet MA plumbing code.*

We will provide stamped engineered drawings for your approval. We can design concrete footings if you give us soil information. ~~Design of concrete footings.~~ *Design of concrete footings is included and must be provided by* ~~engineers~~ *. All plans (stands and footings) must be signed by a MA architect and MA Structural engineer. All plans must conform with ADA requirements.*

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.

Note, to fast-track this project your contract and payments, with the exception of the deposit check, will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

*client Baballett provide info.*

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

*OK*

### Terms and Conditions

All prices quoted are subject to the following terms and conditions.

All measurements are approximate.

Price does not include any permits or bonds required.

Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have. *Must met ADA requirements.*

Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.

Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.

Price based on installation area being free of obstacles and clear for the crews to do the work outlined.

Should the buyer choose, for any reason, to delay installation or assembly when the product is fabricated and ready for delivery all money due on delivery will be immediately paid.

Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.

It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

*and by Worcester Professional Baseball LLC*

Any and all liability on RI Inc./Seating Solutions under this agreement is limited to fees paid. *plus penalties outlined herein.*

Any controversy or claim arising out of this contract ~~shall~~ *may* be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in ~~the County of Suffolk or Nassau.~~ *Massachusetts.* ~~If RI, Inc./Seating Solutions retain an attorney to collect money due under this contract, it is entitled to its reasonable attorneys fees as well.~~ *Either party may also pursue a claim in a Massachusetts Court.*

Material Status: Materials Delivered and Assembled

Pricing is based on acceptance of offer no later than 5 days from date of proposal unless otherwise specified in the proposal. Additional charge may apply for orders signed later than 5 days from date of proposal issuance.

Please place your initials next to each line item on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.

Please fill in date of first use or substantial completion: _____

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.

Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

Total Contract Amount: $1,519,880.90

I look forward to working with you. Thanks for the opportunity.

Sincerely,


Scott Suprina – Vice President


_____        _____
Authorized Signature of Acceptance                Date


_____
Print Name and Title


1. Penalties. There shall be a penalty of $50,000 per week for late delivery. Penalties shall begin to accrue if the material is not ~~s~~ installed and substantially complete and in compliance with plans and specifications by May 15, 2005.

2. Schedule — [please provide] *to follow* ~~Approved~~ *Based on col. infor + eleval. 10 dys to arch + 14 dys complete + 4-5 week fab + del*

3. Subject to our ~~an~~ AIA contract.

4. ~~At~~ Based on Rct of signed contract + deposit By Feb 22nd *Langton only*

# EXHIBIT 5

# SEATING SOLUTIONS

RI, Inc.

www.sitonthis.com

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470



## PROPOSAL

February 21, 2005

Mr. Ted Tye
Worcester Professional Baseball, LLC
PO Box 2221
Worcester, MA 01613-2221

Re: Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package
Two front field walls – plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and contrasting aisle nosing.  Complete front 10 rows aluminum square tube frame combo. Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent, comfortable and durable product that I strongly recommend.

Price delivered and assembled:          $1,519,880.90

Pricing excludes concrete, electric and water connections. Earthwork by others. Pricing does not include any applicable sales tax and is based on Seating Solutions standard levels of insurance. An insurance certificate will be provided. General Liability $1,000,000.00 per occurrence and $2,000,000.00 general aggregate; $1,000,000.00 Automobile Liability.

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.
Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement. Bathroom must be included and must be provided by March 15, 2006

We will provide stamped engineered drawings for your approval. We will design concrete footings and Worcester Professional Baseball, LLC is to provide soil information. All plans (stands and footings) must be signed by MA architect and MA Structural Engineer. All plans must conform with ADA requirements.

The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.
Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.
Note, to fast-track this project your contract and payments, with the exception of the deposit check, will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

### Terms and Conditions

All prices quoted are subject to the following terms and conditions.
All measurements are approximate.
Price does not include any permits or bonds required.
Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have. Plans must comply with ADA requirements.
Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.
Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.
Price based on installation area being free of obstacles and clear for the crews to do the work outlined.
Should the buyer choose, for any reason, to delay installation or assembly when the

product is fabricated and ready for delivery all money due on delivery will be immediately paid.

Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.

It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

Any and all liability on RI Inc./Seating Solutions and by Worcester Professional Baseball LLC under this agreement is limited to fees paid plus penalties outlined herein.

Any controversy or claim arising out of this contract may be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in Massachusetts. Either party may also pursue a claim in a Massachusetts Court.

Penalties:
-There shall be a penalty of $50,000.00 per week for late delivery. Penalties shall begin to accrue if the material is not installed and substantially complete and in compliance with plans and specifications by May 15, 2005.
-Seating Solutions will provide a delivery and installation schedule by 2/24/05.
-This agreement is subject to an AIA Contract.

Material Status:  Materials Delivered and Assembled
Please place your initials next to each page on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.
Please fill in date of first use or substantial completion: May 15, 2005.

**The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.**

**Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.**
Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.
**Total Contract Amount: $1,519,880.90**

I look forward to working with you. Thanks for the opportunity.

Sincerely,


Scott Suprina – Vice President


_____        _____
Authorized Signature of Acceptance                              Date


_____
Print Name and Title

# EXHIBIT 6



"FITTON FIELD"

TOTAL BENCH WITH BACKREST SEAT COUNT = 512 SEATS
TOTAL BENCH SEAT COUNT = 969 SEATS
TOTAL FLIP-UP SEAT COUNT = 1,706 SEATS
TOTAL SEAT COUNT = 3,187 SEATS

S 0056

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION |
| | )    NO. 05-CV-10365-JLT |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) |
| | |
| Defendants. | ) |

## AFFIDAVIT OF PATRICK MAGUIRE

I, Patrick Maguire, under oath, hereby depose and state as follows:

1  I am the President of Geller Sport, Inc., which is located at 77 North Washington St.

Boston MA 02114.  Geller Sport, Inc. is a division of Geller DeVellis, Inc. ("Geller").

2.  Geller provides recreation and athletic facility design consulting services.

3.  Geller was hired by Worcester Professional Baseball, LLC ("Worcester Baseball") to act

as a consultant to aid in efforts to secure and improve on a location for its Baseball team

to play ("the Project").

4.  All of the advice given by Geller to Worcester Baseball was pursuant to its role as a

consultant.

5  Seating Solutions sent a set of plans to Geller for its use on the Project.

6.  The drawings ultimately produced by Seating Solutions were compilations of drawings

from a couple of different parties and were worked on by employees of Seating Solutions

and employees of Geller.

1

7. The layout of Fitton Field required a certain structural design and there were limited ways the seating could be installed.

8. The information provided by Seating Solutions on the drawings was not used in whole or in part to manufacture anything.

Signed under the pains and penalties of perjury this ___7th___ day of October, 2005

_____
Patrick Maguire

00948053//24410.88

**2**

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc., d/b/a SEATING SOLUTIONS,<br>Plaintiff<br><br>v.<br><br>GELLER SPORT, INC., GELLER DEVELLIS,<br>INC., WORCESTER PROFESSIONAL BASEBALL<br>LLC, and PERFECT GAME BASEBALL CLUBS,<br>LLC,<br>Defendants | )<br>)<br>)<br><br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>05-CV-10365-JLT |

**AFFIDAVIT OF ALAN STONE**

I, Alan Stone, do depose and state under oath as follows:

I am an officer and owner of Perfect Game Baseball Clubs, LLC and Worcester Professional Baseball, LLC and have personal knowledge of the facts set forth in this Affidavit

2. During February, 2005 we had negotiations with the Plaintiff to provide equipment and structures for the improvements at Fitton Field at The College of The Holy Cross. There were a number of proposals made by the Plaintiff which we considered. Each proposal we received from the Plaintiff was in writing and stated, clearly and unequivocally, that it was a "proposal" and that it was conditioned upon "the receipt of a signed proposal and deposit." We never accepted a proposal from the Plaintiff, we never signed a proposal from the Plaintiff and we never paid them a deposit.

3. At all times we made it absolutely clear to the Plaintiff that we were reviewing other proposals and that nothing was guaranteed until the appropriate documents were reviewed, approved and signed. We clearly and unequivocally advised

the Plaintiff that he should not assume he had the project and that he would not have the project until all of the negotiations were complete and the agreements were reviewed and signed. No representative of Worcester Baseball ever promised the Plaintiff that we had a deal.

4.    We eventually entered into a contract with Dant Clayton Corporation. work at Fitton Field pursuant to that contract was substantially completed in time for our opening day on June 6, 2005. To the best of our knowledge, the Plaintiff never undertook any actions in reliance upon a belief that he would be awarded the project. equipment or materials were ever purchased and no expenditures were made other than to prepare the proposals.

5.    While we do not have insurance to provide coverage for this breach of contract claim, in the event Plaintiff is successful, we do have assets to satisfy any reasonable judgment. We purchased our membership in the league with a deposit of Five Hundred Thousand Dollars ($500,000.00). We have substantial corporate sponsors, including Hanover Insurance, Commerce Bank, Unum Provident, TD Banknorth and WB Mason. We have received over Three Million Five Hundred Thousand Dollars ($3,500,000.00) of capital investment, have sold thousands of tickets, and have over twenty (20) players under contract While we are confident that the Plaintiff will not be successful in this case, in the event we are wrong there will be sufficient assets to satisfy any reasonable judgment that could be rendered in Plaintiff's favor.

6.    The agreement we reached with The College of The Holy Cross is to transfer to them the improvements being made at Fitton Field in exchange for their agreement to allow us to use the field in order to bring professional baseball to

Worcester. We agreed to provide these assets to the College free and clear of any liens or encumbrances. If this Court were to grant the attachment, we would be in breach of our agreement with The College of The Holy Cross. While the repercussions of such a breach are uncertain at this time, clearly it could disrupt the relationship as well as the potential ability to play baseball at the Fitton Field in the future

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 6TH___ DAY OF JUNE, 2005.

_____
Alan Stone