UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 05-CV-10365-JLT |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO THE GELLER DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.      PRELIMINARY STATEMENT

The plaintiff, RI, Inc., d/b/a Seating Solutions ("Plaintiff", "Seating", or "Seating Solutions") opposes the motion for summary judgment of defendants, Geller Sport, Inc. and Geller Devellis, Inc. (collectively, "Geller").  The issue presented is straightforward.  Plaintiff was negotiating with Worcester Baseball, LLC ("Worcester Baseball") to install seating areas at the team's new minor league stadium in Worcester, Massachusetts.  Geller, Worcester Baseball's consultant on the project, obtained design drawings from Plaintiff.  Plaintiff provided the drawings in confidence with the express limitation that Geller could not disclose them to third parties.  In manifest disregard of its confidentiality obligations, Geller sent copies of Seating's designs, along with its pricing, to a key competitor, the Dant Clayton Corporation ("Dant Clayton").  At a subsequent meeting with Geller and Worcester Baseball, Plaintiff exposed Geller's lack of knowledge and expertise, which engendered palpable hostility and ill will on Geller's part.  Later, Geller attended, and may have precipitated, a sales meeting between Dant Clayton and Worcester Baseball that took place two days after the team had given Plaintiff the seating contract.  Since Worcester Baseball ultimately reversed course and gave the contract to Dant Clayton, could a reasonable jury find that Geller acted improperly?

This is the major issue presented by Geller's motion for summary judgment. In this opposition, Plaintiff completes the factual picture presented by Geller, corrects several misstatements of law in Geller's brief, and discusses a number of issues of material fact that preclude summary judgment. Geller's motion, furthermore, is premature. Due to the Court's limited discovery order, Plaintiff has not deposed Patrick Maguire, Geller's chief consultant on the project. His motivations and actions are critically relevant to this case. Without Mr. Maguire's testimony the Court cannot determine that the record is devoid of disputed material facts. Plaintiff requests that the Court deny Geller's motion and permit the case to proceed.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.    Facts

#### 1.    The Parties

Seating Solutions is in the seating system design and construction industry and specializes in the sale, rental, and timely installation of custom-designed spectator seating at athletic and recreational facilities. Concise Statement of Undisputed Fact upon which the Defendants, Geller Sport, Inc., and Geller Devellis, Inc. Motion for Summary Judgment is Based, dated October 7, 2005 ("Geller Facts"), ¶ 1. Worcester Baseball is the owner and operator of the Worcester Tornadoes, a professional baseball franchise that plays in Worcester as part of the Canadian American Association of Professional Baseball. *See id.* at ¶ 2. The Tornadoes began playing in Worcester in the Spring of 2005, prior to which Worcester Baseball was attempting to find a place for its team's home games. *See id.* Geller provides recreation and athletic facility design consultant services. *See id*. at ¶ 3. Geller was Worcester Baseball's consultant in the effort find, and ultimately design and build, a home stadium. *See id.* Patrick Maguire was Worcester Baseball's primary contact at Geller. *See id*.

#### 2.    The design process

In December of 2005, Seating Solutions and Worcester Baseball began discussing the possibility that Seating Solutions would perform an extensive renovation of Fitton Field, which is located on the campus of the College of the Holy Cross ("Holy Cross"), so that Worcester

Baseball could base its team there.  *See id.* at ¶ 5.  Seating Solutions did exhaustive design work on the design of the seating areas at Fitton Field.  Geller, however, disputes Plaintiff's contentions concerning the originality of the designs.  Contrary to Geller's assertions, the Fitton Field drawings that Plaintiff prepared are not based upon compilations of drawings prepared by Geller and others.  *See* Plaintiff's Concise Statement of Facts in Opposition to Geller's Motion for Summary Judgment ("Pl. Facts"), which is submitted herewith, ¶ 18.  Scott Ruczaj did all of the drafting, modifications, and revisions on the drawings that Seating Solutions generated.  *See id*.  He did not base the design on drawings prepared by any third party and Geller did not draw any part of the stand.  *See id.*  Scott Suprina and Mr. Ruczaj decided the exact location and rotation of the seating.  *See id.*  Geller personnel reviewed the drawings and told Plaintiff what they wanted modified, and Mr. Ruczaj made the changes.  *See id.*

The designs, furthermore, required creativity.  There are numerous ways the Fitton Field stand could have been built.  *See id.* at ¶ 19.  For example, Plaintiff could have leveled the hill at the site and installed non-elevated stands, employed a traditional front walkway instead of a rear walkway, pushed the entire field forward to allow for more seating, or located concession stands and player locker rooms underneath the stand. *See id.*  The possibilities, in short, are endless and limited only by the creativity of the people who do the design work.  *See id.*

Seating Solutions closely guards the confidentiality of its design work.  The three design professionals at Seating Solutions and Scott Suprina are the only people who have access to AutoCAD designs prepared there.  *See id.*  The design files on the server at Seating Solutions are password-protected.  *See id.*  Only Mr. Suprina and the designers have passwords that enable them to access these files.  *See id.*  Seating Solutions keeps a limited number of paper design drawings on file in Mr. Suprina's office, to which access is limited.  *See id.*

### 3.    The contract between Seating Solutions and Worcester Baseball.

With the design process ongoing, Seating Solutions and Worcester Baseball discussed a series of proposals that ultimately resulted in the parties entering into an oral agreement on February 18, 2005.  *See* Pl. Facts, ¶¶ 6-8, 14.  The parties agreed upon a contract price of

approximately $1,519,880,90.  Pl. Facts, ¶ 13.  At this contract price, Seating Solutions would have realized a profit of almost $600,000.00.  *See id.*  Geller disputes Seating's contentions that it had a contract with Worcester Baseball.  Geller Facts, ¶ 13.  Geller correctly notes that Seating sent a number of proposals to Worcester Baseball.  Geller Facts, ¶¶ 6-9.  But Geller incorrectly claims that the proposals were rejected.  Geller Facts, ¶¶ 6-9.

Geller seizes upon language in one of the proposals that requested a signature and a deposit.  Geller Facts, ¶ 10.  For Seating Solutions, though, the deal was not changing; the deposit was not important to Mr. Suprina because Worcester Baseball was in the middle of what appeared to be a problematic situation.  Pl. Facts, ¶ 10.  Geller also misconstrues the record and claims that Seating Solutions thought that Alan Stone would have to sign any contract entered into by the team.  Geller Facts, ¶ 13.  The record reveals, though, that Mr. Suprina expected Mr. Stone to enter into the deal that he orally confirmed on Friday, February 18.  Pl. Facts, ¶ 13.  For its part, Worcester Baseball also believed that it had a contractual relationship with Seating Solutions.  When it decided to drop Seating Solutions and hire Dant Clayton, Mr. Tye wrote to colleagues that Worcester Baseball was "going to attempt to switch suppliers."  Pl. Facts, ¶ 13.

### 4.    Geller improperly interferes with the relationship between Worcester Baseball and Seating Solutions.

This motion concerns Geller's relationship with Seating Solutions and its competitor, Dant Clayton.  It was Dant Clayton that ultimately installed the seating areas at Fitton Field for a higher price than Plaintiff had agreed to.  Geller Facts, ¶ 12; Pl. Facts, ¶ 12.  In presenting its competing proposal, Dant Clayton relied on information in the drawings that Geller had misappropriated from Seating Solutions.  Pl. Facts, ¶ 12.  Geller predictably disagrees with this assessment.[1]  In late January or early February of 2005, at Worcester Baseball's request, Seating

---

[1] Geller claims that "Seating Solutions has no evidence that Maguire said anything to Worcester Baseball to cause it to 'cancel' any perceived 'deal'."  Geller Facts, ¶ 16.  As an initial matter, Geller's counsel introduced at least <u>eighteen</u> questions at Mr. Suprina's deposition with the phrase "Do you have any evidence?"  Counsel asked this question even though Geller had not yet complied with any of its initial disclosure obligations.  Pl Facts, ¶ 16.

electronically mailed designs in AutoCAD format to Geller Sport.  Pl. Facts, ¶ 16.  Seating understood Geller was a consultant to Worcester Baseball on the Fitton Field project.  *See id*.  Seating sent other AutoCAD drawings to Geller via e-mail over the next few weeks.  *See id.*  Every AutoCAD drawing that Seating sent to Geller included the Seating Solutions title block and proprietary information statement.  *See id*.  The statement reads:

> **Notice: Seating Solutions claims proprietary rights in the information disclosed on this drawing.  It is <u>issued</u> <u>in</u> <u>confidence</u> for engineering information only and may not be used in whole or in part to manufacture anything whether or not shown herein reproduced <u>or</u> <u>disclosed</u> <u>to</u> <u>anyone</u> without direct written permission from Seating Solutions.**

*See id*. (emphasis supplied).  Seating never authorized Geller to disclose its drawings to any third parties.[2]  *See id*.  Geller nonetheless removed the title block and sent copies of Plaintiff's plans to a direct competitor, Dant Clayton, and to a lighting company that was also working on the project.  *See id*.  At a meeting in the middle of February, Mr. Maguire admitted that he had "been shopping the drawings around and getting way cheaper prices."  Pl. Facts*,* ¶ 17.

By February 16, 2005, Geller knew that Plaintiff and Worcester Baseball were in the process of finalizing their contract.  Pl. Facts, ¶¶ 16, 17.  There is conflicting evidence in the record, however, concerning whether Mr. Maguire expressed opinions regarding Seating Solutions and Mr. Suprina with Worcester Baseball.  Mr. Tye could not recall whether Mr. Maguire had expressed opinions regarding Mr. Suprina personally.  Pl. Facts ¶ 16.  Geller admits, though, that Mr. Maguire shared his opinions regarding Seating's written proposals.  Geller Facts, ¶ 16.  The record is also clear that:

- Mr. Maguire wrote to Mr. Tye that Plaintiff's price was "ridiculous. There is a word that could go before ridiculous but company policy prohibits its use in email."

---

[2]  Geller claims that the title block created no contractual relationship with Seating Solutions.  This is incorrect.  In exchange for its promise to abide by the terms set forth the confidentiality statement on Plaintiff's drawings, Geller gained access to the drawings.  Pl. Facts, ¶ 24.  If Geller had not agreed to the terms set forth on the title block of the drawings, it should have sent the drawings back to Seating Solutions.  *See id*.

- Geller disclosed Seating's pricing to Dant Clayton at some point during the week of February 15, 2005.

- On Thursday, February 17, 2005, Mr. Maguire told Mr. Tye that he was "going to forward [Dant Clayton] the plan w[e] developed the other day."

- Mr. Maguire attended, and may have precipitated, a meeting between Worcester Baseball and Dant Clayton two days after Plaintiff and Worcester Baseball finalized the terms of their agreement.

Pl. Facts, ¶ 17.

Based on the limited record, Geller's motivations appear to be less than charitable. Mr. Maguire and Mr. Suprina exchanged angry words at a meeting on February 15, 2005 concerning the project. At the meeting, Mr. Maguire said that Plaintiff's prices were ridiculous. Pl. Facts, ¶ 17. Mr. Suprina asked Mr. Maguire if he based his assessment on net or gross seat count. *See id.* Mr. Maguire's answer was ambiguous and indecisive, but he did confirm that he had compared the Fitton Field seating system with high school bleacher pricing. *See id.* Mr. Suprina told Mr. Maguire that high school bleachers are semi-closed 24 inch tread bench seats. *See id.* Seating Solutions' plan involved a fully closed welded deck with flip seats, which is quite different. *See id.* Mr. Maguire was upset by this, which is understandable; nobody likes to appear the fool in front of an important client. *See id.* His face reddened and it was clear that Mr. Maguire and Mr. Suprina did not like each other. *See id.* A day before the critical meeting at which Worcester Baseball and Seating Solutions finalized their contract, furthermore, Mr. Maguire brought the possibility of another meeting with Dant Clayton to Mr. Tye's attention. Pl. Facts, ¶ 16. A few minutes later, for no apparent reason, Mr. Maguire wrote to Mr. Tye that he should "squeeze [Scott Suprina's] nuts until you see blood." Pl. Facts, ¶ 17. A reasonable jury could conclude that Mr. Maguire acted with an improper motive.

**B.    Procedural History**

Seating Solutions filed its complaint against Geller on February 24, 2005. Seating amended its complaint to add claims against Worcester Baseball on March 14, 2005. Geller answered the Amended Complaint (the "Complaint" or "Compl."). Worcester Baseball moved to dismiss on April 13, 2005. On June 6, 2005, The Court denied Worcester Baseball's motion

without a hearing.  The parties came before the Court for a scheduling conference on July 5, 2005.  At that conference, the Court ordered that no discovery would proceed with the exception of the depositions of Scott Suprina, Theodore Tye, and Alan Stone.  Though the Court has not yet allowed Seating Solutions to take the deposition of Mr. Maguire, Geller filed its motion for summary judgment on Friday, October 7, 2005.[3]

### III.    DISCUSSION

**A.    Standard of Review:  Summary Judgment**

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218 (1st Cir. 2004) (same).  A genuine issue exists when "the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party."  *Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996).  A factual issue is "material" if it "has the potential to alter the outcome of the suit under the governing law."  *Id.* at 721.  The burden initially rests with the party seeking summary judgment to demonstrate that "no genuine issue of material fact exists."  *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995), *cert. denied*, 515 U.S. 1103 (1995).  The nonmovant must then put forth "specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Ind., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999).  Factual disputes must be resolved in a "light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995), *cert. denied*, 516 U.S. 1113 (1996).  "[S]ummary judgment is particularly inappropriate in

---

[3] Geller filed its motion without conferring with Seating Solutions as is required by Local Rule 7.1.  Affidavit of Terry Klein in Opposition to Motion for Summary Judgment and Pursuant to Fed. R. Civ. P. 56(f), dated October 27, 2005, ¶ 6.  The parties ultimately conferred on Thursday, October 13, 2005.  *See id.* at ¶ 7.  Geller did not actually serve a copy of its papers on Seating Solutions until a week later on Thursday, October 20, 2005.  *See id.* at ¶ 8.

cases where motive, intent and justification are important." *Computer Sys. of America, Inc. v. International Bus. Mach. Corp.*, 578 F. Supp. 558, 563 (1983), *rev'd on other grounds*, 795 F.2d 1086 (1st Cir. 1986). *See also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) ("[S]ummary procedures should be used sparingly . . . where motive and intent play leading roles . . . .").

**B.     A reasonable jury could find in Plaintiff's favor on all of its claims against Geller.**

   **1.     The tortious interference claim against Geller survives because there is evidence that Geller employed improper means and acted with an improper motive in interfering with Seating Solutions' business relationship with Worcester Baseball.**

   A reasonable jury could conclude that Geller tortiously interfered with Plaintiff's relationship with Worcester Baseball.  To succeed on this claim, a plaintiff must establish (i) the existence of a prospective business relationship; (ii) the defendant's knowledge of the business relationship; (iii) the defendant's intentional interference with the relationship for an improper purpose or by improper means; and (iv) damages.  *See Pure Distribs., Inc. v. Baker*, 285 F.3d 150, 157 (1st Cir. 2002) (stating that elements of tortious interference claim are "(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendant's knowledge of the contract or business relationship; (3) the defendant's intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages") (internal punctuation marks omitted); *Holmes Prods. Corp. v. Dana Lighting, Inc*., 958 F. Supp. 27, 32 (D. Mass. 1997) (same); *Draghetti v. Chmielewski*, 416 Mass. 808, 816, 626 N.E.2d 862, 869 (1994) (same).

   Proof of malice is not required; the plaintiff need only establish that the defendant acted with an improper motive <u>or</u> improper means.  *Lemire v. Silva*, 104 F. Supp. 2d. 80, 95 (D. Mass. 2000) ("Malicious interference is not required in a claim for interference with an advantageous relationship; improper interference is sufficient."); *Addamax Corp. v. Open Software Foundation, Inc*., 888 F. Supp. 274, 286 (D. Mass. 1995) ("[P]laintiff need not establish that the defendant's actions were motivated by malice toward the plaintiff.") (Tauro, J.); *Draghetti*, 416

Mass. at 818, 626 N.E.2d at 870 n.14 ("Malice is no longer an element of either tort; it has been replaced by the concept of improper motive or means."); *Kurker v. Hill*, 44 Mass. App. Ct. 184, 191, 689 N.E.2d 833, 838 (1998) ("The standard . . . is interference accompanied by improper motive *or* improper means; the plaintiff need not prove both.").

Geller's assertion that malice is an essential element of this claim is simply wrong. The recent cases[4] that it cites in support of this proposition all involved employment claims. As Judge Ponsor stated in *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 229 (D. Mass. 2002), *aff'd*, 362 F.3d 1 (2004), helpfully cited by Geller in its brief, "Under Massachusetts law, corporate officials, in particular, defendant-supervisors, are entitled to a qualified privilege *in an employment-based tortious interference case*. This qualified privilege may be overcome only by a showing of actual malice." (emphasis supplied). This is not an employment case, so there is no actual malice requirement.[5]

Geller, moreover, does not dispute by affidavit or otherwise that Seating Solutions had an advantageous relationship with Seating Solutions. Nor does Geller dispute that it had knowledge of that relationship. *E.g.*, Pl. Facts, ¶¶ 16, 17. Geller, finally, does not appear to dispute that Seating Solutions suffered damages in this case. *E.g.*, Pl. Facts, ¶ 13. The major issue here is

---

[4] *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207 (D. Mass. 2002) (claim against coworkers), *Harrison v NetCentric Corp.*, 433 Mass. 465, 744 N.E.2d 622 (2001) (claim against superior), *Shea v. Emmanuel College*, 425 Mass. 761, 682 N.E.2d 1348 (1997) (claim against supervisor), *King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488 (1994) (employment termination by competing shareholders), *Boothby v. Texan, Inc.*, 414 Mass. 468, 608 N.E.2d 1028 (1993) (claim against supervisor), *Alba v. Sampson*, 44 Mass. App. Ct. 311, 690 N.E.2d 1240 (1998) (claim against supervisor).

[5] Plaintiff is unable to find any declaration in *Owen v. Williams*, 322 Mass. 356, 77 N.E.2d 318 (1948), supporting Geller's citation to it that malice is an element of the tort. Regardless, the Supreme Judicial Court has definitively stated that malice is no longer required. *See United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815, 551 N.E.2d 20, 23 (1990) ("[W]e now abandon the word malicious in the description of any element of these torts . . . ."). Geller's reliance on the *United Truck* case, however, is misplaced. There was no evidence there that the defendant consultant had misappropriated the plaintiff's trade secrets or said of the plaintiff that its client should "squeeze [the plaintiff's] nuts until you see blood." Pl. Facts, ¶ 17.

whether Geller acted with an improper motive or improper means and caused Worcester Baseball to switch to Dant Clayton. This is a "context sensitive inquiry." *Pure Distribs., Inc.*, 285 F.3d at 157 ("Determining whether the alleged tortfeasor's interference with a contract is improper is a context sensitive inquiry that must be evaluated on a case-by-case basis."); *GS Enters., Inc. v. Falmouth Marine, Inc*., 410 Mass. 262, 273, 571 N.E.2d 1363, 1370 (1991) ("The propriety of an actor's motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis."), *Adcom Prods., Inc. v. Konica Bus. Mach. USA, Inc*., 41 Mass. App. Ct. 101, 105, 668 N.E.2d 866, 869 (1996) (same), *rev. denied*, 423 Mass. 1111, 672 N.E.2d 539 (1996).

A rational jury could determine that Geller employed improper means and caused Worcester Baseball to use Dant Clayton on the Fitton Field project instead of Seating Solutions. "For purposes of this cause of action, improper means may consist of a violation of a statute or common law precept." *Kurker*, 44 Mass. App. Ct. at 191, 689 N.E.2d at 838.[6] The evidence of improper means is extensive. Geller decided to strip the title block from Plaintiff's drawings and send them to Dant Clayton. Pl. Facts, ¶ 16. This constitutes a breach of contract, *see infra* at Section III.B.2, misappropriation of Seating's trade secrets, *see infra* at Section III.B.3, and conversion. *See infra* at Section III.B.4. Geller also disclosed Plaintiff's pricing structure to Dant. Pl. Facts. ¶¶ 16-17. Mr. Maguire told Worcester Baseball that Plaintiff's pricing was "ridiculous. There is a word that could go before ridiculous but company policy prohibits its use

---

[6] The Restatement of Torts states that the following factors are important in determining whether a defendant has employed improper means:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Dowd v. Iantosca*, 27 Mass. App. Ct. 325, 334, 538 N.E.2d 33, 38 (1989), *rev. denied*, 405 Mass. 1202, 542 N.E.2d 48 (1989).

in email." *See id.* And the day before Worcester Baseball finalized its deal with Seating Solutions, Mr. Maguire wrote that the team "should see what [Dant Clayton] has to say before you sign on with Scott." *See id.* A rational jury, finally, could infer from the record that Geller engineered the meeting between Dant Clayton and Worcester Baseball that occurred two days <u>after</u> the team had given the contract to the Plaintiff. *See id.* The suggestion that there is no evidence that Geller caused Worcester Baseball to cancel its contract with Seating Solutions, *see* Geller Facts, ¶ 16 & Memorandum of Law of the Defendants Geller Sport, Inc. and Geller Devellis, Inc. Motion for Summary Judgment ("Geller Memo."), at 9, is without merit.

Though the record as to motive is sparse as this time, a rational jury could also conclude that Geller and Maguire acted with an improper motive. Contrary to Geller's assertion, *see* Geller Memo. at 8, evidence of "ill will" <u>does</u> support the determination that a defendant's "conduct was based on an improper motive." *Draghetti*, 416 Mass. at 817, 626 N.E.2d at 869. *See also Holmes Prods. Corp.*, 958 F. Supp. at 31 ("[A] motive to harm or a desire to hurt qualifies as an improper motive."); *Adcom Prods., Inc.*, 41 Mass. App. Ct. at 105, 668 N.E.2d at 869 (holding that "retaliation or ill will" can constitute improper motive). There is evidence of ill will in the record. Mr. Suprina and Mr. Maguire traded barbs at a meeting with Mr. Tye, which could have left Mr. Maguire concerned that Geller's reputation had suffered. Pl. Facts, ¶ 17. Just two days later, moreover, Mr. Maguire wrote to Mr. Tye regarding the possibility of another meeting with Dant Clayton. Pl. Facts ¶ 16. More colorfully, he wrote minutes later that Mr. Tye should "squeeze [Scott Suprina's] nuts until you see blood."[7] Pl. Facts, ¶ 17. Mr. Maguire's repeated attempts to ripen Worcester Baseball's relationship with Dant thus appear to be based on spitefulness, not a desire to impart good advice. A rational jury could find that Geller acted with an improper motive and summary judgment is therefore inappropriate.

---

[7] The existence of this email undercuts Geller's claim that "Seating Solutions has <u>*no evidence*</u> that will support the necessary claim that Geller acted with actual malice or with an improper motive." Geller Memo. at 8 (emphasis supplied).

**2.    Geller breached its valid obligation not to disclose Seating's drawings to third parties.**

A claim for breach of contract will succeed where the defendant fails to perform its obligations under the contract with no legal excuse. *Realty Developing Co. v. Wakefield Ready-Mixed Concrete Co.*, 327 Mass. 535, 537, 100 N.E.2d 28, 30 (1951) ("[B]reach of contract is a failure to perform for which legal excuse is lacking."). The plaintiff must also establish that it was damaged by the breach. *See Doyle v. Hasbro*, 103 F.3d 186, 194 (1st Cir. 1996) ("In order to sustain [a] breach of contract claim, plaintiffs must plead . . . that [they] were damaged.").

Geller had a contractual duty not to disclose Plaintiff's drawings to third parties. Geller disputes that it had any such obligation. The existence of a contract is a question of fact. *See Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 540 -541 (1st Cir. 1986) ("Under Massachusetts law . . . where there is conflicting testimony on the question of whether a contract has been created, the issue is one for the jury."); *Agri-Mark, Inc. v. Niro, Inc*., 214 F. Supp. 2d 33, 43 (D. Mass. 2002) ("[O]rdinarily the question of whether a contract has been made is one of fact and if the evidence does not consist only of writings or is uncontradicted, the question is for the jury."); *Kinchla v. Welsh*, 8 Mass. App. Ct. 367, 370, 394 N.E.2d 978, 981 (1979) ("In circumstances where there is conflicting testimony on the question of whether a contract has been created, the issue is one for the jury.").

Geller is correct that its confidentiality obligations arose from the "title block" on the drawings that Plaintiff disclosed. Geller Memo. at 10; Pl. Facts, ¶ 16. Once Geller accepted delivery of the drawings, reviewed them, and began working with them, it accepted the terms contained in the title block. *See DB Riley, Inc. v. AB. Eng'g Corp*., 977 F. Supp. 84, 89 (D. Mass. 1997) (holding that small print terms limiting drawing disclosure on reverse of purchase order and similar terms on shop drawings created contractual obligations). Though "it would have been advisable for [Plaintiff] to obtain a signed contract recognizing the confidentiality of the drawings, . . . the drawings themselves . . . restricted their disclosure." *Id.* There is certainly a sufficient evidentiary foundation upon which a rational jury could conclude that Geller and Seating Solutions had a contract.

There was also adequate consideration to support Plaintiff's contract claim. The amount of consideration necessary to establish a valid contract is minimal. *See Barnett v. Rosen*, 235 Mass. 244, 249, 126 N.E. 386, 388 (1920) ("It is enough that the consideration is valuable; it need not be adequate."); *V. & F. W. Filoon Co. v. Whittaker Corp.*, 12 Mass. App. Ct. 932, 933, 425 N.E.2d 399, 400 (1981) (same). *See also Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*, 357 Mass. 40, 43, 255 N.E.2d 793, 796 (1970) (same). In exchange for its promise to respect the terms set forth the confidentiality statement on Plaintiff's drawings, Geller obtained access to the drawings. Pl. Facts, ¶ 24. If Geller had not agreed to the terms set forth on the drawings' title block, it should have sent them back to Seating Solutions. *See id.*

Instead, Geller ignored the contract's terms and disclosed Plaintiff's drawings to Dant Clayton and at least one other third party. Pl. Facts ¶ 16. The confidentiality statement expressly prohibited disclosure of the drawing to anyone without Plaintiff's permission. *See id.* Geller never obtained Plaintiff's permission to disclose its drawings to Dant Clayton or anybody else. *See id.* That Geller now claims the drawings were not used to manufacture anything, Geller Facts, ¶ 23, is immaterial. Geller had an obligation to Seating Solutions. It breached that obligation, and Dant Clayton took a $1.5 million dollar contract away from Seating Solutions. If anything, summary judgment on this claim should enter in Seating's favor.[8]

### 3.    Geller misappropriated trade secrets owned by Seating Solutions when it disclosed confidential design drawings to Dant Clayton.

A claim for misappropriation of trade secrets has three elements: that (i) the information is a trade secret; (ii) it took reasonable steps to preserve the secrecy of the information; and (iii) the defendant breached a confidential relationship and disclosed or used the trade secret. *See DB Riley, Inc. v. AB. Eng'g Corp.*, 977 F. Supp. 84, 89 (D. Mass. 1997); Mass. Gen. Law ch. 93, § 42 ("Whoever embezzles, steals or unlawfully takes, carries away, conceals or copies . . . from

---

[8] Geller attempts to make hay from Mr. Suprina's deposition testimony regarding the existence of a "confidentiality agreement." Geller Memo. at ¶ 24. This is semantics. Geller had a contractual obligation not to disclose Plaintiff's drawings. If Geller had not wished to adhere to its confidentiality obligations, it should have returned the drawings. Pl. Facts, ¶¶ 16, 24.

any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom."). "The essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to use without permission confidential information acquired from another." *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 165, 385 N.E.2d 1349, 1354 (1979).

Architectural and design drawings qualify for trade secret protection. *See DB Riley, Inc. v. AB. Eng'g Corp.*, 977 F. Supp. 84, 89 (D. Mass. 1997) (holding that drawings of boiler parts were "considered to be a trade secret"); *USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 100, 393 N.E.2d 895, 901 (1979) ("[D]etailed manufacturing drawings are prima facie secrets.") (internal punctuation marks omitted). *See also Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991) ("Architectural plans . . . and design drawings may be trade secrets."), *aff'd*, 505 U.S. 763 (1992); *Ecolaire, Inc. v. Crissman*, 542 F. Supp. 196, 206 (E.D. Pa. 1982) ("Absent access to such drawings, competitors must resort to a costly, time consuming process of reverse engineering . . . .").

Application of the factors set forth in *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840, 282 N.E.2d 921, 925 (1972)[9], confirms that the drawings at issue are trade secrets. As noted above, Seating Solutions closely guards the confidentiality of its design work. Pl. Facts, ¶ 19. Access to the design work is extremely limited within Seating Solutions and to third parties. *See id.* The title block imposed strict limits on disclosure of the drawings. Geller Facts, ¶ 22.[10]

---

[9] The six factors of relevant inquiry are: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Jet Spray Cooler, Inc.*, 361 Mass. at 840, 282 N.E.2d at 925.

[10] Though these measures are comprehensive, "[i]t is not necessary . . . that an impenetrable fortress be erected to retain legal protection for a trade secret." *Picker Int'l Corp. v. Imaging Equip. Svcs., Inc.*, 931 F. Supp. 18, 23 (D. Mass. 1995). *See also USM Corp.*, 379

The drawings resulted from much effort and creativity and were of value to Dant Clayton in the preparation of its competing proposal. Pl. Facts, ¶ 12, 18. As noted elsewhere, "Absent access to such drawings, competitors must resort to a costly, time consuming process of reverse engineering . . . ." *Ecolaire, Inc.*, 542 F. Supp. at 206.

Recognizing the weakness of its position, Geller glosses over these factors in its brief. Geller makes conclusory statements regarding the contractual obligations created by the title block. Geller Memo. at 13-14. It questions whether the drawings were subject to copyright protection, which is immaterial. *See Picker Int'l Corp. v. Imaging Equip. Svcs.*, Inc., 931 F. Supp. 18, 37 (D. Mass. 1997) ("A copyright is not essential . . . to proof of a protected trade secret."), *aff'd*, 94 F.3d 640 (1996). It attempts to divert the Court from the major issue when it denies that incorporation of Seating's designs into its "master plans" was unlawful. *See id.* at 14. The issues here are simpler than that. If the drawings constituted trade secrets, and if Geller could not disclose them to third parties with Plaintiff's permission, then Geller is liable for misappropriation of trade secrets. The drawings <u>were</u> trade secrets. *E.g., DB Riley, Inc.*, 977 F. Supp. at 89. Geller <u>did</u> have an obligation to protect their confidentiality. *See id*. Geller breached that obligation. Pl. Facts, ¶ 16. Summary judgment on this count should be denied.

### 4.    Geller converted the proprietary information of Seating Solutions.

A jury could conclude that Geller was liable for conversion based upon the current factual record in this case. "The elements of conversion require that a defendant be proved to have intentionally or wrongfully exercised acts of ownership, control or dominion over personal property to which he has no right of possession at the time." *Bleicken v. Stark*, 61 Mass. App. Ct. 619, 622, 813 N.E.2d 572, 576 (2004), *rev. denied*, 442 Mass. 1110 (2004). *See also Kelley v. LaForce*, 288 F.3d 1, 11 (1st Cir. 2002) ("The tort of conversion requires an intentional or wrongful exercise of dominion or control over personal property of another by one with no right to immediate possession."); *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186

_____

Mass. at 101, 393 N.E.2d at 902 ("We do not require the possessor of a trade secret to take heroic measures to preserve its secrecy.").

F. Supp. 2d 1, 28 (D. Mass. 2002) ("In Massachusetts, conversion focuses on the wrongful possession of personal property of the owner, without the owner's consent."), aff'd, 322 F.3d 26 (1st Cir. 2003). Designs such as those at issue here may be the subject of a conversion action. *See John G. Danielson, Inc.*, 186 F. Supp. 2d at 28; *Curtis Mfg. Co., Inc. v. Plasticlip Corp.*, 888 F. Supp. 1212, 1234 (D.N.H. 1994) (finding that party had proprietary interest in design drawing that could be converted); *Northcraft v. Edward C. Michener Assocs.*, 319 Pa. Super. 432, 440-41, 466 A.2d 620, 625 (1983) (same).

Geller wrongfully exercised ownership of the design drawings. While, Geller is correct that it lawfully came into possession of the drawings, Geller Memo. at 14, Geller lost the right to possess the drawings, when it decided not to comply with the terms in the title block. And Geller <u>did</u> appear to know that this was wrongful conduct. Otherwise it would have had no reason to remove Seating's title block from the drawings before sending them out to Dant Clayton. Pl. Facts, ¶ 16. As noted, furthermore, "summary judgment is particularly inappropriate in cases where motive, intent and justification are important." *Computer Sys. of America, Inc.*, 578 F. Supp. at 563. Removal of the title block provides a sufficient basis upon which a jury could conclude that Geller intended to deprive Seating Solutions of its property.

Geller's argument also fails as to damages. Without any factual support, it implies that Plaintiff's drawings had no fair market value. Geller Memo. at 15. The designs' value would be a proper subject of expert testimony. This testimony would account for the fact that the drawings were the result of much time, effort, and creativity. Pl. Facts at ¶¶ 18-19. Additionally, it appears from the record that the drawings were valuable to Dant Clayton. Without them, Dant Clayton would not have obtained the Fitton Field contract.

5.    **Summary judgment is not appropriate on the Chapter 93A claim because Geller acted unfairly when it sent Plaintiff's drawings to Dant Clayton.**

The Supreme Judicial Court recently confirmed that conduct violates Mass. Gen. Law ch. 93A if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury

to competitors or other business people." *Morrison v. Toys "R" Us, Inc*., 441 Mass. 451, 457, 806 N.E.2d 388, 392 (2004). *See also* Michael C. Gilleran, *The Law of Chapter 93A* § 4.8 (Supp. 2004) (hereinafter "*Gilleran*") ("The test [is] disjunctive and therefore [does] not require that the higher second prong of immoral, unethical, oppressive or unscrupulous conduct ha[s] to be met.").[11]    The oft-cited standard of "rascality" and "raised eyebrows" has been disavowed by the Supreme Judicial Court. *See Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc*., 420 Mass. 39, 42, 648 N.E.2d 435, 438 (1995) ("We view as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness', in deciding questions of unfairness under G.L. c. 93A.") (citations omitted); *Gilleran* at § 4.8 ("The SJC clearly was signaling that both the eyebrow test and the rancid flavor of unfairness test were to be abandoned.").

Geller's conduct, if proven, constitutes a violation of Chapter 93A. *See Brandon Assocs. LLC v. Failsafe Air Safety Sys. Corp.,* 384 F. Supp. 2d 442, 446 (D. Mass. 2005) (finding that facts forming basis for tortious interference claim can also form the basis for Chapter 93A claim); *Dowd v. Iantosca*, 27 Mass. App. Ct. 325, 334, 538 N.E.2d 33, 38 (1989) (finding that real estate broker's tortious interference with sale of private home provided basis for buyer's Chapter 93A claim), *rev. denied*, 405 Mass. 1202, 542 N.E.2d 48 (1989).; *Moore v. Marty Gilman, Inc*., 965 F. Supp. 203, 220 (D. Mass. 1997) ("[D]eceptively induc[ing] plaintiffs to impart valuable commercial information without charge . . . alleges conduct that is sufficiently unscrupulous to constitute a violation of 93A."); *Prescott v. Morton Int'l, Inc*., 769 F. Supp. 404, 407 (D. Mass. 1990) ("The standards for finding misappropriation of a trade secret provide the criteria for finding an unfair or deceptive act.").    Seating Solutions sent design drawings to Geller for the Fitton Field project. Pl. Facts, ¶ 16.    Those drawings contained a title block prohibiting Geller from disclosing them to third parties. Geller Facts, ¶ 21.    Geller ignored and removed the title block and sent the drawings to Dant Clayton, one of Plaintiff's competitors. Pl. Facts, ¶ 16.    Geller also disclosed Seating's pricing to Dant Clayton. Pl. Facts, ¶ 17.    Using this

---

[11] Geller's implication to the contrary, *see* Geller Memo at 16, is therefore incorrect.

valuable information, Dant Clayton presented a competing proposal to Worcester Baseball, with Geller present, two days after Worcester Baseball consummated a deal with Seating Solutions. *See id.* Worcester Baseball then reneged on its deal with Seating Solutions. Pl. Facts, ¶ 12. "Reasonable minds can disagree about whether such conduct would be considered unfair, immoral, or unscrupulous in the rough and tumble business world, but, because there is room to differ . . . ," *Brandon Assocs. LLC,* 384 F. Supp. 2d at 446, summary judgment is inappropriate on the Chapter 93A claim.

**C.    Geller's motion is premature.**

An independent basis for denying Geller's motion is that it is premature. Fed. R. Civ. P. 56(f) enables a party requiring additional discovery to delay submitting its opposition to a motion for summary judgment. *See Resolution Trust Corp. v. North Bridge Assocs.*, 22 F.3d 1198, 1203 (1st Cir. 1994) ("Fed. R. Civ. P. 56(f) describes a method of buying time for a party who, when confronted by a summary judgment motion, can demonstrate an authentic need for, and an entitlement to, an additional interval in which to marshal facts essential to mount an opposition."); *Commonwealth Aluminum Corp. v. Markowitz*, 164 F.R.D. 117, 119 (D. Mass. 1995) ("The Rule prevents a party from being railroaded by a premature motion for summary judgment."). As interpreted by the First Circuit, Rule 56(f) requires that a party seeking a continuance due to incomplete discovery (i) make an authoritative and timely proffer; (ii) show good cause for the failure to discovered essential facts; (iii) present a plausible basis for the belief that facts exist that would likely suffice to raise a genuine and material issue; and (iv) show that the demonstrated facts are discoverable within a reasonable time. *See Resolution Trust Corp.*, 22 F.3d at 1203; *Commonwealth Aluminum Corp.*, 164 F.R.D. at 119.

Assuming that the Court remains uncertain as to whether summary judgment is ultimately appropriate, there are ample grounds upon which to postpone that determination until Plaintiff has obtained discovery from Geller. Application of the four factors set forth in the *Resolution Trust Corp.* case supports this conclusion. First, Plaintiff's proffer is timely; counsel's Rule 56(f) affidavit is submitted concurrently with its opposition to Geller's motion for summary

judgment. *See* Affidavit of Terry Klein in Opposition to the Motion for Summary Judgment and Pursuant to Fed. R. Civ. P. 56(f), dated October 27, 2005 ("Klein Aff."), ¶¶ 4-7. Second, good cause exists for the failure to depose Mr. Maguire, to subpoena Dant Clayton, and to seek electronic discovery from Geller: on July 5, 2005 the Court ordered that no discovery other than the depositions of Messrs. Suprina, Tye, and Stone would be permitted. Klein Aff., ¶ 4. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (holding that allowance of summary judgment motion proper only "after adequate time for discovery"); *Information Handling Svcs., Inc. v. Defense Automated Printing Svcs.*, 338 F.3d 1024, 1032 (D.C. Cir. 2003) ("Summary judgment ordinarily is proper only after the plaintiff has been given adequate time for discovery.") (internal quotation marks omitted).

Third, additional facts exist that would make summary judgment improper. Seating Solutions has five claims against Geller: (i) tortious interference with advantageous business relations; (ii) breach of contract; (iii) misappropriation of trade secrets; (iv) conversion; and (v) violation of Chapter 93A. Klein Aff. ¶ 9. For each of the five claims against Geller, the state of mind and motivations of Geller's key actors is extremely important to establish or eliminate the existence of disputed issues of material fact. Klein Aff. ¶ 10. Patrick Maguire was Geller's chief consultant on the project. Klein Aff. ¶ 11. Adhering to the Court's order, Seating Solutions has not noticed Mr. Maguire's deposition. Klein Aff. ¶ 12. There is evidence of ill will between Mr. Maguire and Scott Suprina, a Senior Vice President at Seating Solutions. Klein Aff. ¶ 12. A deposition of Mr. Maguire will assist Seating Solutions in determining whether Geller's conduct was based upon this ill will. Klein Aff. ¶ 14. Geller's attempt to dispose of this case before Plaintiff has an opportunity to depose Mr. Maguire speaks volumes. Mr. Maguire, after all, has a demonstrated tendency to say just about <u>anything</u>.

Relatedly, the contract to install seating areas at Fitton Field was ultimately performed by the Dant Clayton Corporation. Klein Aff. ¶ 15. There is evidence that Dant Clayton relied upon designs prepared by Seating Solutions that it improperly received from Geller and Mr. Maguire in obtaining the contract. Klein Aff. ¶ 16. A subpoena issued to Dant Clayton pursuant to Fed.

R. Civ. P. 45 would elicit documents and testimony that is relevant to and of great importance to all of Seating's claims. By way of example, Dant Clayton personnel will have knowledge and information concerning Mr. Maguire's awareness of the advantageous relationship that existed between Seating Solutions and Geller Sport. Dant Clayton personnel will also be able to confirm how they received Plaintiff's drawings from Geller Sport and what they did with the drawings. Dant Clayton, finally, will be able to provide testimony on whether Plaintiff's designs were actually secrets, or if they were widely known within the seating industry. Klein Aff. ¶ 17. Additional paper and electronic discovery from Geller could also illuminate the process by which Geller removed the confidentiality statement from Plaintiff's drawings and sent them to the Dant Clayton Corp. Klein Aff. ¶ 18. As to the fourth factor, a deposition of Mr. Maguire, the issuance of a subpoena to Dant Clayton, and the completion of discovery of Geller's computer-aided design files can be completed within a reasonable time. Klein Aff. ¶¶ 19-20. Geller's summary judgment motion is premature.

## IV.    CONCLUSION

Plaintiff respectfully requests that the Court deny the motion for summary judgment.

RI Inc. d/b/a SEATING SOLUTIONS

By its attorneys

___/s/_____ Terry Klein
HENSHON PARKER VYADRO, P.C.
Terry Klein, BBO# 652052
84 State Street, Suite 760
Boston, Massachusetts 02109
Telephone: (617) 367-1800
Facsimile: (617) 507-6454

Date: October 27, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served by first class mail upon all counsel of record on October 27, 2005.

___/s/_____ Terry Klein