UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION |
| | )   NO. 05-CV-10365-JLT |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**AFFIDAVIT OF TERRY KLEIN IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT AND PURSUANT TO FED. R. CIV. P. 56(F)**

I, Terry Klein, do hereby depose and swear as follows:

1.      I am the attorney for RI, Inc. d/b/a Seating Solutions ("Plaintiff" or "Seating") in this action and I make this affidavit based upon personal knowledge.

**A.      Exhibits**

2.      Attached hereto in pertinent part at *Exhibit 1* is a copy of Scott Suprina's deposition transcript, dated July 29, 2005.

3.      Attached hereto in pertinent part at *Exhibit 2* is a copy of Theodore Tye's deposition transcript and deposition exhibits, dated August 24, 2005 ("Tye Depo.").

**B.      Statements Pursuant to Rule 56(f)**

4.      The parties came before the Court for a scheduling conference on July 5, 2005. At that conference, the Court ordered that no discovery would proceed with the exception of initial disclosures and the depositions of Scott Suprina, Theodore Tye, and Alan Stone.

5.      Though the Court has not yet allowed Seating Solutions to take the deposition of Mr. Maguire, Geller Sport, Inc. and Geller Devellis, Inc. (collectively "Geller") filed their motion for summary judgment on Friday, October 7, 2005.

6.    Geller filed its motion without conferring with counsel for Seating Solutions as is required by Local Rule 7.1.

7.    Counsel ultimately conferred on Thursday, October 13, 2005, and have since filed a stipulation with the Court stating the motion should be considered to have been filed on that date.

8.    Geller did not actually serve the motion on Seating Solutions until Thursday, October 20, 2005.

9.    Seating Solutions has five claims against Geller: (i) tortious interference with advantageous business relations; (ii) breach of contract; (iii) misappropriation of trade secrets; (iv) conversion; and (v) violation of Chapter 93A.

10.    For each of the five claims against Geller, the state of mind and motivations of Geller's key actors is extremely important to establish or eliminate the existence of disputed issues of material fact.

11.    Patrick Maguire was Geller's chief consultant on the project.  *See* Concise Statement of Undisputed Fact upon which the Defendants, Geller Sport, Inc., and Geller Devellis, Inc. Motion for Summary Judgment is Based, dated October 7, 2005 ("Geller Facts"), ¶ 4.

12.    Adhering to the Court's order, Seating Solutions has not noticed Mr. Maguire's deposition.

13.    There is evidence of ill will between Mr. Maguire and Scott Suprina, a Senior Vice President at Seating Solutions.  *See, e.g.,* Exhibit 2, Tye Depo., 68:2-4; Ex. 6.

14.    A deposition of Mr. Maguire will assist Seating Solutions in determining whether Mr. Maguire's conduct in this case was based upon ill will.

15.    The contract to install seating areas at Fitton Field was ultimately performed by the Dant Clayton Corporation.  Geller Facts, ¶ 12.

16.     There is evidence that Dant Clayton relied upon designs prepared by Seating Solutions that it improperly from Geller and Mr. Maguire in obtaining the contract. *See* Affidavit of Scott Ruczaj, dated October 26, 2005, ¶¶ 9, 10, 16.

17.     A subpoena pursuant to Fed. R. Civ. P. 45 issued to Dant Clayton would elicit documents and testimony that is relevant to and of great importance to all of Seating's claims. By way of example, Dant Clayton personnel will have knowledge and/or information concerning Mr. Maguire's awareness of the advantageous relationship that existed between Seating Solutions and Geller Sport.  Dant Clayton personnel will also be able to explain how they received Plaintiff's drawings from Geller Sport and what they did with the drawings.  Dant Clayton, finally, will be able to provide testimony on whether Plaintiff's designs were actually secrets, or if they were widely known within the seating industry.

18.     Additional paper and electronic discovery from Geller, furthermore, could illuminate the process by which Geller removed the confidentiality statement from Plaintiff's drawings and sent them to the Dant Clayton Corp.

19.     A deposition of Mr. Maguire, the issuance of a subpoena to Dant Clayton, and the completion of discovery of Geller's computer-aided design files can be completed within a reasonable time.

20.     I believe that I could complete these tasks by the end of this year, and in no event later than January 31, 2006.

Duly sworn under the pains and penalties of perjury:


/s/              Terry Klein
Terry Klein
Dated October 27, 2005

CERTIFICATE OF SERVICE

I, Terry Klein, hereby certify that on October 17, 2005, a true copy of the above document was served by first class mail upon counsel for each other party.

/s/              Terry Klein

1

## TRANSCRIPT MEMORANDUM

Date:    August 14, 2005


To:   TERRY KLEIN, ESQ.


Re:   RI, Inc. d/b/a Seating Solutions v.
Geller Sport, Inc., Worcester Professional
Baseball, et al


Deposition of:   SCOTT SUPRINA


Date taken:   July 29, 2005


Signature requirements:

  The original signature page is available
for deponent's signature.   If the deponent
wishes to make any corrections, the
correction sheet should be used listing the
page number, the line number, the
correction to be made, and the reason for
the correction.   Do not mark the
transcript itself.

  Please forward the signed transcript
and/or signature page with errata sheet, if
any, to:


LOUIS M. CIAVARRA, ESQ.


Cc:  Attys. Ciavarra, Korn

21

1 A. I create a spread sheet, but not on
2 computer. I mean I'll do some math, some
3 notes, and figure out what I need and put
4 it into columns and evaluate it.
5 Q. Have you provided those sheets to
6 your attorney in this case?
7 A. I provided, I think what I was asked
8 for was the facts of the cost, not the
9 estimates of the costs.
10 Q. Or the backup that went into
11 determining that cost?
12 A. I provided the backup to my attorney,
13 yes.
14 Q. Well, I have the stuff here. You can
15 show me later on when we get to that.
16      Are there documents like those
17 sheets and stuff that you haven't provided
18 yet?
19 A. No.
20 Q. So you think you have provided these
21 so-called "spread sheets?"
22 A. I either provided them or I don't
23 have them, I think.
24 Q. You think you may have destroyed

23

1 correct?
2 A. Correct.
3 Q. And it's been your position that you
4 had a contract to provide the seating for
5 Fitton Field?
6 A. Provide and install, correct.
7 Q. That's your position in this case?
8 A. Correct.
9 Q. Do you have any written agreement for
10 that?
11 A. I think we have many written
12 agreements.
13 Q. Signed by you and someone else?
14 A. I don't believe we have that.
15 Q. I just want to make sure. I think I
16 know what the position is, that there was
17 an oral agreement. But I want to take it
18 step by step.
19      It is not your position that
20 there is a signed, written contract by the
21 parties in this case, is there?
22      MR. KLEIN: Objection to the
23 form.
24 A. Yes, I have a position there is a

22

1 them?
2 A. I wouldn't save scratch paper, which
3 is what I'm talking about.
4 Q. Well, I'm thinking about accounting
5 paper that has lined rules and columns on
6 it.
7 A. You got the wrong guy. No, I don't.
8 Q. Whatever backup you have on the
9 contract price you provided me?
10 A. Yes.
11 Q. And to the best of your knowledge
12 it's been provided?
13 A. Correct.
14 Q. Now just focusing on this particular
15 project, do you call it Fitton Field or
16 Holy Cross?
17 A. Doesn't matter to me.
18 Q. Either one of those will be fine to
19 you?
20 A. I know what you're talking about.
21 Q. We are talking about Fitton Field.
22 Okay?
23 A. Okay.
24 Q. Your company has brought a lawsuit,

24

1 written contract.
2 Q. And you're referring to the documents
3 that you prepared. I think it's called a
4 proposal, is it not?
5 A. I'm referring to the compilation of
6 everything creating the written contract.
7 Q. You sent a number of documents to my
8 clients setting forth the terms of the
9 engagement, did you not?
10 A. That's a tough question to answer
11 really. I sent to your client documents
12 that led to the creation of other documents
13 that set forth the terms.
14 Q. All right. And you're familiar with
15 the format of a document that has on top of
16 it Proposal?
17 A. Sure.
18 Q. (Indicating.) And none of those were
19 ever signed by my clients, were they?
20 A. I don't believe so.
21 Q. You believe, is it your position that
22 there was an oral agreement?
23 A. Absolutely.
24 Q. And who were the individuals that are

**97**

1 agreement and ask Mr. Tye to sign them?
2 A.   Uh, no.
3 Q.   You could have?
4 A.   I think, as a matter of fact, Ted was
5 going on vacation and trying to get out of
6 the office.  So I was trying to accommodate
7 my client who was spending a million and a
8 half dollars.
9 Q.   Did he refuse to do that?  Did you
10 say, "Hey, Ted.  I'd like to get this
11 signed today.  Could you spend another
12 minute, let's edit it and get it signed
13 off?"  Did you say that to him?
14          MR. KLEIN:  Objection.
15 A.   No.  I said, "Ted, I need to know do
16 I have a deal, yes or no."
17          And he answered yes, and shook
18 my hand.
19 Q.   Why did you need to know?
20 A.   So I could get to work.  So I could
21 order materials, so I could plan my crews,
22 so I could commit to the project.
23 Q.   And this was on a Friday, correct?
24 A.   Yes.

**98**

1 Q.   There wasn't anything that you were
2 going to do on that Friday, was there?
3          MR. KLEIN:  Objection to form.
4 A.   There absolutely was.
5 Q.   What did you do on that Friday?
6 A.   I called the factory, told them we
7 had the deal and we needed to get the
8 steel.
9 Q.   Who did you call?
10 A.   Treddy Kilpatrick or Eddy Spears.
11 Q.   Sorry, you've got to help me with
12 names.  What was the first one?
13 A.   Kilpatrick.
14 Q.   What was the first name though?
15 A.   Treddy, T-R-E-D-D-Y.  Geneva,
16 Alabama.
17 Q.   Treddy?
18 A.   Kilpatrick.  Or Eddy Spears.  I don't
19 recall.  One is the owner.  The other is
20 the sales manager.
21 Q.   And you called them on that Friday?
22 A.   Absolutely.
23 Q.   Cell phone?
24 A.   To get them?

**99**

1 Q.   Yes.
2 A.   Probably my cell phone when I left
3 the meeting.
4 Q.   Do you recall did you use the land
5 line from Mr. Tye's office?
6 A.   No, I don't do that.
7 Q.   You're sure you called them by cell
8 phone?
9 A.   I would think so.  Could have been in
10 New York in the office on Saturday.  I
11 spoke to him immediately after the meeting
12 and got it going.
13 Q.   That's why I'm asking you.  Did you
14 call him on that Friday?  Did you do it
15 Saturday, or did you call him on Monday?
16 A.   I'll check my phone records.
17 Q.   Do you know as you sit here today?
18 A.   No, I don't know.
19 Q.   Did you send a Purchase Order?
20 A.   I don't believe so.
21          MR. KLEIN:  Objection.
22 Ambiguous.
23 Q.   Did you receive an invoice?
24          MR. KLEIN:  Objection.

**100**

1 Ambiguous.
2 Q.   For the -- do you understand my
3 question?
4 A.   For this particular?  Nothing was
5 shipped so I never get invoices prior to
6 shipping.
7 Q.   Do you communicate by Email with
8 Outdoor Aluminum?
9 A.   Myself, no.
10 Q.   Does your office?
11 A.   Yes.
12 Q.   Do you know if anybody from Seating
13 Solutions sent any Emails to Outdoor
14 Aluminum on this project?
15 A.   Probably.
16 Q.   Have you ever seen any?  Because I
17 know none have been produced.
18          MR. KLEIN:  Objection.
19 A.   I haven't seen any.
20 Q.   You can check that easy enough, can't
21 you?
22 A.   Sure.
23 Q.   Had prior copies of the proposal been
24 sent to Outdoor Aluminum?

107

1 the company.
2 **Q.** What division does he run?
3 A. BleachAir.
4 **Q.** What's that?
5 A. That's it, that side. (Indicating
6 shirt) It's a modular plastic seating
7 system that attaches to existing bleacher
8 seats to make them more comfortable.
9 Patented.
10 **Q.** Was Ross present during the whole
11 meeting?
12 A. Yes.
13 **Q.** Have you talked to Ross about his
14 memory of the meeting?
15 A. Yes.
16 **Q.** Was he present during the
17 conversation between you and Mr. Tye in
18 which Mr. Tye literally told you that you
19 had the project?
20 A. Yes.
21 **Q.** And is that his memory as well?
22 A. From his recollection to me, it is.
23 **Q.** He has told you "I recall Mr. Tye
24 saying that to you?"

1 A. For me to say it was a quote would be
2 a little crazy at this time.
3 **Q.** But it's your best memory of what was
4 said?
5 A. It's absolutely the thrust of the
6 conversation.
7 **Q.** Did you follow up with any E-mails or
8 communications thanking Mr. Tye or Mr.
9 Stone for the project?
10 A. Um, no, I don't believe so.
11 **Q.** Other than calling Outdoor Aluminum,
12 did you call--
13 A. I called my office.
14 **Q.** Who did you speak with?
15 A. I'm sure Cris.
16 **Q.** What did you tell Cris?
17 A. That it's a done deal. Actually we
18 called from Ted's office to tell them the
19 deal was done, to tell them to get ready
20 insurance certificates.
21     Ted was nice enough to give me
22 the name of who the insured had to be. He
23 was nice enough to give us the written
24 company name as to who it should be made

106

1 A. Without question.
2 **Q.** And again, since I wasn't there, I
3 need to rely upon you guys to tell me what
4 happened.
5     To the best of your abilities
6 can you tell me what it is that you said to
7 Mr. Tye and what he said to you with
8 respect to the commitment on this project?
9 A. I said, "Ted, this is probably
10 something that I haven't done before, but I
11 really need to ask you, do we have a deal,
12 because I'm leaving here and I'm calling OA
13 and I'm putting into motion, and I need to
14 get things going or you're not going to
15 make your your date. Do we have a deal?"
16     Stuck my hand out. And he
17 said, "Yes, we have a deal." Shook my hand
18 and we had a deal.
19 **Q.** Did he say anthing other than "yes"?
20 A. Um, he said to Alan, when Alan
21 walked in, "I just shook Scott's hand.
22 Gave the deal to Scott."
23 **Q.** And to the best of your ability
24 that's a quote?

108

1 out to from his office.
2 **Q.** On the land line?
3 A. I'm not sure if it was on my cell or
4 it was on his line. I think it was on his
5 line.
6     Actually Ross made, I believe,
7 the insurance call to Larry on his cell
8 phone. I'm pretty sure of that. He stood
9 up, walked outside the door and called the
10 insurance.
11 **Q.** Now you told me when we first started
12 that Alan Stone also made the agreement on
13 behalf of the baseball teams with you,
14 correct? Do you remember telling me that?
15 A. He confirmed the agreement, yes.
16 **Q.** How did he do that? What did he say?
17 A. He walked in and Ted said, "We have a
18 deal. I just gave the deal to Scott."
19     And I think then I walked out
20 the door with Alan. And Alan said to me,
21 "You know, I look forward to it. We can do
22 a lot of work together. This is a good
23 place to start." Full understanding of the
24 deal.

113

1 place to put them?

2 Q. Well-said.

3 A. Yes, I would agree to that. I would

believe that.

5         MR. KLEIN: Want to take a

6 break, Lou?

7         MR. CIAVARRA: I'm fine, but

8 why don't we take five minutes now.

9         (Recessed)

10 Q. Who's authorized at Seating Solutions

11 to sign contracts on behalf of the company?

12 A. Myself, Mark Ligator, Cris can. Right

13 now Larry Hickey is getting ready to.

14 Depends on the timeline.

15 Q. Today.

16 A. Larry Hickey, Mark, myself, Cris.

17 Q. What was Mr. Tye's position with the

18 baseball teams?

19 A. I have no idea.

20 Q. What was his title?

21 A. No clue.

22 Q. Do you know if he was a president?

23 A. I don't know.

24 Q. Do you know if he had an ownership

114

1 interest?

2 A. I was told by him he had an ownership

3 interest.

4 Q. Do you know how much?

5 A. No.

6 Q. Do you know what Mr. Stone's position

7 was?

8 A. Didn't meet Mr. Stone until that

9 afternoon on Friday. I believe he's, I

10 don't know what his title is, but according

11 he's the head guy.

12 Q. According to him or according to Mr.

13 Tye?

14 A. According to Ted and him.

15 Q. That's the first time you had met

16 him, physically met him?

17 A. Correct, or spoke to him, I believe.

18 Q. And you learned he was, to use your

19 term, "the head guy?"

20 A. Yes.

21 Q. Had you learned that any contracts

22 would have to be signed by him?

23 A. I believe I was told the contract

24 would be executed by him, yes.

115

1 Q. And you understood, did you not, that

2 the entities also had a Board of Directors?

3 A. I was told they did.

4 Q. And weren't you told that any deal

5 had to be approved by the Board?

6 A. I don't know if I was told, or if I

7 was told the Board was meeting. I don't

8 believe I was told any deal had to be

9 approved by the Board.

10         I was told there was a Board

11 meeting, I believe, Saturday. I had a

12 deal. I didn't have any deal to be

13 approved as far as I was concerned.

14 Q. What made you think that Mr. Tye had

15 the authority to make a deal on behalf of

16 the Board of Directors and the owner?

17 A. I had asked him if we had a deal and

18 then he told the head guy that he gave the

19 deal to me.

20         And the head guy said, "I look

21 forward to doing work with you. I hope

22 it's the beginning of a long relationship."

23 That's the head guy.

24 Q. Take it one step at a time. Mr. Tye

116

1 also told you that there was a Board

2 meeting the next day, didn't he?

3 A. For what purpose?

4 Q. For the purpose of discussing the

5 project. Didn't he tell you that?

6         MR. KLEIN: Objection to form.

7 A. He told me there was a Board meeting.

8 Q. And in your mind it had nothing to do

9 with you? He was just volunteering that to

10 you for the heck of it?

11         MR. KLEIN: Objection.

12 Argumentative.

13 A. From what I understood it had to do

14 with the school.

15 Q. You're having a conversation with Mr.

16 Tye about this project, correct?

17 A. Yes.

18 Q. You weren't talking about what the

19 name of the team was going to be, were you?

20 A. No.

21 Q. You weren't talking about the

22 business raising money, were you?

23 A. On occasion we were, about seats and

24 profits.

1  Q.  But at this time, at this
2  conversation it was about the project and
3  about the seats, was it not?
4  A.  It was about the project, yes.
5  Q.  And he told you during that
6  conversation that there was a Board meeting
7  the next day, isn't that correct?
8  A.  Yes, that's correct.  The next day or
9  Sunday.  I don't recall which one he said.
10  Q.  Over the weekend?
11  A.  Yes.
12  Q.  And he told you that was for the
13  purpose of considering this project, didn't
14  he?
15  A.  No.
16  Q.  In your mind he just volunteered it
17  for no apparent reason?  Is that what your
18  testimony is?
19  A.  As a matter of fact, I think it came
20  up that he wanted to conclude the deal
21  because there was a Board meeting.
22  Q.  And they would have to submit it to
23  the Board for approval?
24  A.  That was nothing I was privy to.

118

1  Q.  Is it fair to say that you understood
2  that?
3  A.  Absolutely not.
4  Q.  Does your company have a Board of
5  Directors?
6  A.  No.
7  Q.  Okay.  That's interesting.  Is it a
8  New York corporation?
9  A.  Yes, it is.
10  Q.  Is it your understanding that New
11  York corporations don't require Boards of
12  Directors.
13  A.  We may have a Board of Directors on
14  paper.  Have we ever met?  The answer would
15  be no.  That would be the answer.
16        (Exhibit 5, Email from Cris
17        2/21/05 and Revised Proposal,
18        marked)
19  Q.  I'm going to show you a document that
20  I will mark as Exhibit 5.  It's an Email
21  from Cris to Ted Tye dated February 21.
22  A.  Yes.
23  Q.  Have you seen that before?
24  A.  The top page, probably not, not that

1  I recall.
2  Q.  Were you aware of the fact that on
3  that Monday at about quarter of ten in the
4  morning Cris sent a revised proposal to Mr.
5  Tye?
6  A.  I'm not aware of the date, but I know
7  she sent him a revised proposal.
8  Q.  Well, is there any doubt in your mind
9  that it was sent on Monday?
10  A.  No.  No, not if that's the date on
11  it, no.
12  Q.  You have no reason to believe this
13  Email wasn't sent, do you?
14  A.  No.
15  Q.  Did you review this revised proposal
16  before it went out?
17  A.  Um, I don't believe so.
18  Q.  Well, did Cris have the authority to
19  make changes to contracts?
20  A.  Yes.
21  Q.  That was part of her job?
22  A.  Yes.
23  Q.  And if she made a change, that would
24  be acceptable to you?

120

1  A.  Excuse me?
2  Q.  If she made a change in the document
3  and sent it out to a customer, that's okay,
4  that's acceptable to you?
5        MR. KLEIN:  Objection to form.
6  A.  Depends on what the change is.
7  Q.  I asked you if she had the authority
8  to make changes.  Did it depend on what the
9  change was?
10  A.  Well, she could make a mistake.
11  Q.  No, I'm talking about an intentional
12  change, not a mistake.  Did she have the
13  authority to do that?
14  A.  She could make a change that I would
15  deem a mistake.  So would it be acceptable?
16  No.
17  Q.  Did she have the authority to change
18  the contract amount?
19  A.  Not without me telling her what to
20  change it to, no.
21  Q.  Did she have the authority to make
22  the language changes between the February
23  21st proposal and the February 17th
24  proposal?

125

1  Q.  Had you discussed the terms of what
2  the AIA contract would say?
3  A.  They would duplicate the terms we
    agreed to.
5  Q.  Are you familiar with AIA contracts?
6  A.  A little bit.
7  Q.  You've used them from time to time?
8  A.  Yes.
9  Q.  And they contain terms and provisions
10  in addition to those that are set forth in
11  this three-page document, don't they?
12  A.  They don't have to.
13  Q.  Do they typically, sir?
14  A.  I guess I don't have the education.
15  Q.  Well, you've read AIA contracts
16  because you've signed them, is that a
17  correct statement?
18  A.  I'm not making a clear distinction
19  between what's on here and what's on an AIA
20  off the top of my head.
21  Q.  Have you reviewed AIA contracts in
22  the past?
23  A.  Yes.
24  Q.  Have you signed AIA contracts in the

126

1  past?
2  A.  Sure.
3  Q.  In your experience are they always
4  longer than three pages?
5  A.  I would say yes.
6  Q.  And in your experience, without
7  asking you specifically what, do they
8  contain terms in addition to those which
9  you see in your proposal?
10  A.  Well, "terms" is a tough word.  Do
11  they contain --
12  Q.  Provisions?
13  A.  Do they contain better descriptions
14  of the specifics of what's going to go on
15  or the rules of how things are going to be
16  handled, yes.
17  Q.  Okay.  And every time you sign an AIA
18  contract have you simply signed it without
19  making any changes or comments to it?
    A.  The majority of the time.
21  Q.  Sometimes you've made changes?
22  A.  Not to the body of the contract. Very
23  few times.
24  Q.  The question was ever, have you ever

127

1  made changes to the form of an AIA
2  contract?
3  A.  Probably.
4  Q.  And have your customers made edits
5  and changes to the AIA contract?
6  A.  They usually send it to me.  So --
7  Q.  They've already made their changes?
8  A.  Not normal. I don't see changes, so
9  no I would say.
10  Q.  So you understood at the time that
11  this document was sent that there was still
12  going to be further discussion, could be
13  further discussion about the terms of the
14  AIA contract?
15        MR. KLEIN:  Object to the
16  form.
17  Q.  Could be?
18  A.  That's not the way I understood it,
19  no.
20  Q.  What's wrong about what I said?
21  A.  It says here that the pricing and
22  terms are based on receipt of signed
23  proposal and deposit by February 22.
24        And then it says back here that

128

1  there's going to be an AIA contract.
2        I don't think it means -- I
3  already have a deal of prior to this.
4        So if it's not signed, I think
5  that affects the terms and the price,
6  meaning it could cost more money if they
7  delay in the signing of it.
8        If I can't get the money in the
9  bank, if they don't give me the deposit, it
10  could cost more money. So the price could
11  change. Okay? Maybe I would have to
12  accelerate the payment. But the order is
13  the order.
14  Q.  Let me be sure I understand that.
15  Let's assume that you didn't get your
16  deposit by February 22?
17  A.  Okay.
18  Q.  Are you telling me that you could
19  have increased the price and the baseball
20  teams would still be bound to a contract
21  with you?  Can you answer that question?
22  A.  Go ahead. Say it again.
23  Q.  Okay. In following what you just
24  said to me, that if the baseball team

**129**

1 didn't provide you with a deposit by
2 February 22 it could affect the price.  Do
3 you remember saying that to me?
4 A.   Yes.
5 Q.   That's a yes?
6 A.   That's what it says in writing.
7 Q.   I'm asking you what the deal was.
8 A.   Yes.
9 Q.   And the deal was in your mind that if
10 you didn't get your deposit by the 22nd the
11 price could go up?
12 A.   If I had additional expenses they
13 would be passed on.
14 Q.   And they would have to pay it?
15 A.   Yes.
16 Q.   Regardless of how much it was?
17 A.   Or they could take the delay in time.
18 Q.   So there were were a variety of ways
19 in which the deal could change if you
20 didn't get a deposit by the 22nd?
21 A.   The deal wasn't changing.
22 Q.   You don't know that.
23 A.   The deal wasn't changing.  I agreed
24 to take an order on a Friday and deliver on

**131**

1 form.
2 A.   You did.
3 Q.   And that's language created by
4 Seating Solutions?
5 A.   That's correct.
6 Q.   And you didn't receive the deposit by
7 the next day?
8 A.   Yes.
9 Q.   Okay.  So February 23 comes and you
10 don't have your $150,000, okay?
11 A.   Yes.
12 Q.   Is it your testimony there's still a
13 binding agreement between the parties?
14       MR. KLEIN:  Object to the
15 form.
16 Q.   Yes or no?
17 A.   Yes.
18 Q.   And you could on your own change the
19 price or the terms if you chose to, is that
20 your testimony?
21       MR. KLEIN:  Object to the
22 form.
23 A.   I could take --  if it delayed, I
24 could relieve myself I'm sure of partial --

**130**

1 this date.  I guaranteed that.
2       If they didn't give me the
3 money by the date they promised, then I
4 could extend their delivery date.
5       The terms of what I agreed as
6 far as their functionality, it could
7 change.
8 Q.   So this document, Exhibit 5, dated
9 and sent on the 21st of February requires a
10 deposit the next day?  Do you see that?
11       MR. KLEIN:  Objection to form.
12 Q.   February 22 it says.
13 A.   The document, let's say the document
14 has a penalty --  has a possibility of a
15 penalty for not giving the deposit the next
16 day.  I don't know that it requires it.
17 Q.   Again, I didn't create the language,
18 your office did.  So let's look again at
19 what it says.
20       It says:  "The pricing and
21 terms are based on receipt of a signed
22 proposal and deposit by February 22, 2005
23 only."  I read it correctly, right?
24       MR. KLEIN:  Object to the

**132**

1 of the requirement to give them $50,000
2 back a week as they're holding up the
3 project.  That's a term.
4       If they don't initiate the cash
5 deposit, I have the right not to initiate
6 my risk.  But the contract is still in
7 force.
8 Q.   In your mind here in this deal you
9 could pick and choose the terms and the
10 price that would continue on if you didn't
11 get your deposit?
12       MR. KLEIN:  Object to the
13 form.
14 Q.   Is that correct?
15 A.   In my mind I could pick and choose
16 the terms.
17 Q.   Like, for example, you said you could
18 extend the date of or eliminate the penalty
19 provision, is that your testimony?
20 A.   I could do what's right.  My
21 testimony was if there's extra cost to me
22 based on them not delivering the deposit in
23 a timely fashion, then I would expect to be
24 able to recoup that, yes.

157

1          (Exhibit 8, Email and Revised
2            Proposal, marked)
3  Q.   I'll show you a document marked as
Exhibit 8. Have you seen that before?
5  A.   I don't recall. There's so many
6  proposals, I don't know.
7  Q.   Do you know why Cris sent this Email
8  on the 22nd?
9  A.   I'm not sure sitting here. I'm sure
10 there was a reason and I'm not sure what it
11 was.
12 Q.   Do you recall discussing it with her?
13 A.   I recall discussing that we wanted to
14 send it out. But sitting here now I don't
15 recall what the motivation was.
16 Q.   No idea?
17 A.   No.
18 Q.   And we can agree, can't we, that this
19 proposal was never signed by my clients?
20 A.   Yes, we can agree.
21 Q.   And that you never received a
22 deposit?
23 A.   Correct.
24        (Exhibit 9, Email 2/22/05,

158

1          marked)
2  Q.   Let me show you a document marked as
3  Exhibit 9, February 22 Email from Cris to
4  Ted Tye and Alan Stone. It purports to be,
5  though, from you on her Email address?
6  A.   Yes.
7  Q.   Did you create this Email? And I
8  don't mean type it. I mean write it.
9  A.   Yes, probably. (Reading document.)
10 Yes.
11 Q.   You wrote this, right?
12 A.   Yes.
13 Q.   And you sent it?
14 A.   Mm-hm.
15 Q.   Yes?
16 A.   Yes.
17 Q.   And you understood at this time that
18 there were were difficulties with Holy
19 Cross?
   A.   I was being told there were were
21 difficulties.
22 Q.   By whom?
23 A.   Alan Stone.
24 Q.   Was that during the conversations on

159

1  Monday and Tuesday?
2  A.   Yes.
3  Q.   Now did you have further
4  conversations with Mr. Stone on Tuesday the
5  22nd?
6  A.   I believe they went all the way until
7  Thursday.
8  Q.   Tell me what you recall about the
9  conversations by telephone on Tuesday.
10 A.   Just very evasive. And we're looking
11 at this and we're looking at that, and no
12 decisions have been made on the final
13 decision or how we want to go forward, but
14 you know, relax, that type of thing. Ted
15 is not here. It's hard to communicate.
16 You know.
17 Q.   So would it be fair to say that by
18 the end of the day on the 22nd that Mr.
19 Stone had still not committed to going
20 forward during these conversations?
21 A.   No, that wouldn't be fair to say.
22 Q.   Okay. During any of these
23 conversations did he commit to going
24 forward with you?

160

1          MR. KLEIN: Objection.
2  Ambiguous.
3  A.   He was already committed to going
4  forward.
5  Q.   But it wasn't resaid in the
6  conversations?
7  A.   No. It was said, "But we're not
8  walking away." That was said.
9  Q.   Those were the words he used?
10 A.   Something to that effect.
11 Q.   Do you recall the words he used?
12 A.   No, it's too long ago.
13 Q.   Did Mr. Stone provide you with any
14 further detail about what was holding up
15 the project?
16 A.   Yes, very -- nothing of substance.
17 Nothing I can put my hands on, no.
18 Q.   Were you trying to press him for
19 details?
20 A.   I was, yes, I was trying to find out
21 what the issue was, yes.
22 Q.   And were you pressing him for the
23 deposit and the signed proposal?
24 A.   Not at all.

161

1  Q.  In your Email, Exhibit 9, at the end
2  of the day you say, "Please let us know
3  when you anticipate having these documents
4  signed and we can anticipate our deposit."
   A.  Yes.
6  Q.  So you were asking for the signed
7  document?
8  A.  You said was I pressing.  I don't
9  consider that pressing.
10  Q.  You were still asking?
11  A.  Was I inquiring?  Yes, I was
12  inquiring.
13  Q.  Did you inquire during your telephone
14  conversations as well?
15  A.  Absolutely not.  It wasn't an issue.
16  Q.  Getting the deposit wasn't an issue?
17  A.  No, it wasn't an issue.  They were in
18  the middle of what they considered to be a
19  problematic situation.
20  Q.  Did you tell Mr. Stone, Hey, the
21  proposal says I need to have my deposit by
22  the 22nd.  If I don't get it, the price and
23  terms may change?
24  A.  As a matter of fact, I believe I told

162

1  Mr. Stone that I wasn't too concerned with
2  the deposit and the date.
3          And that's exactly what the
4  letter says, we're committed to the
5  project, we have to go forward because we
6  have a timeline.  I can not move forward.
7  Q.  Did you have any conversations on
8  that day, the 22nd, with anyone from
9  Outdoor Aluminum?
10  A.  Sometime during the week I did.  I
11  think it was actually Thursday when I
12  called them and told them that we needed to
13  discontinue with the drafting when I was
14  told that we were out of the game.
15  Q.  At any time during the 22nd were you
16  told by Mr. Stone or anybody that they were
17  not going to go forward with you?
18  A.  Absolutely not.
19  Q.  Were you told that the next day on
   the 23rd?
21  A.  I believe I was told that on the
22  Thursday.
23  Q.  There were further communications on
24  the 23rd?

163

1  A.  All the way up to Thursday.
2  Q.  Were there telephone conversations
3  with Mr. Stone?
4  A.  Oh yah.  "Sit tight."  Blah-blah-blah,
5  blah-blah-blah.  No information, nothing.
6  Q.  The telephone conversations you had
7  with Mr. Stone on the 23rd?
8  A.  23 is what day, a Wednesday?
9  Q.  Yes.  In substance were they any
10  different than the conversations you had
11  with him on the 22nd?
12  A.  Um, they got, towards the end,
13  whether it was Wednesday or Thursday, they
14  got to, "Well, you know, we're looking at
15  this Dan Clayton thing."
16          And my conversation was, "Well,
17  we have a deal.  I'm moving forward.  What
18  are you doing?"
19          "Well, we haven't made a
20  decision, but there are -- what's the word
21  -- there are differences."  I can't remember
22  the word --  saying there were were
23  differences between the companies and why
24  he might choose to go to Dan Clayton, but

164

1  they were still looking at it.
2  Q.  And that was a telephone
3  conversation?
4  A.  Yes.
5  Q.  With Mr. Stone?
6  A.  Yes.
7  Q.  Can you tell us today whether that
8  was on Wednesday or Thursday?
9  A.  I think it was on both, but I'm not
10  sure.
11  Q.  Okay.  It may be both, but --
12  A.  I think it was both.  I know that I
13  was never told that they wanted to stop the
14  deal I believe until Thursday.
15  Q.  Now do you recall an Email exchange
16  that you had with Mr. Tye at this time?
17  A.  No.
18  Q.  Do you remember Mr. Tye telling you
19  that we don't have a signed agreement yet,
20  and if you do anything, you're proceeding
21  at your own peril?
22  A.  I don't recall it, but I'll look at
23  the Email.
24  Q.  Sure.

165

1  MR. CIAVARRA: I will mark an
2  exchange dated the 23rd as Exhibit 10.
3        (Exhibit 10, 2/23/05 Emails,
   ·     marked)
5  Q.  The bottom part of this, sir, is an
6  Email from you to Mr. Tye and the top part
7  is his response.
8  A.  Correct.
9        MR. KLEIN: If you could just
10 give us one moment to review it.
11       MR. CIAVARRA: Of course.
12 A.  Um, I don't remember it in this form,
13 but I remember having communication with
14 Ted where he said that if we go forward, at
15 our own peril.  It could have been
16 Wednesday at noon -- yes, it could have
17 been.
18 Q.  In your Email to Mr. Tye you state in
19 the second paragraph:  "I'm sorry to hear
20 Dan is crying" -- it says "our" --
21 A.  "Sour grapes."
22 Q.  It's "sour grapes."  What did you
23 mean by that?
24 A.  That the deal had already been given

1  indicated previously by both Alan and me,
2  we have not signed an agreement and have
3  not authorized you to proceed."  He said
4  that to you, right?
5  A.  Um, I'm not sure I got the Email, but
6  the gist of that conversation I got during
7  the day.  Whether I saw this or not, there
8  was a time and it could have been Wednesday
9  where he said we don't have a deal.
10 Q.  Okay.  When you got that message that
11 we don't have a deal, what did you do?
12 A.  I don't recall.  I probably tried to
13 call Alan and clarify what went on.
14 Q.  Did you have a conversation with Alan
15 about that?
16 A.  I don't know if it was that day or
17 the next day.
18 Q.  At some point did the conversation
19 become less than pleasant?
20 A.  Um, eventually.  And I think it was
21 late Thursday, yes.
22 Q.  Tell me about that conversation.
23 A.  I guess I started to recognize that
24 during the week when Alan was telling me

166

1  out and Dan was coming back after the fact,
2  after the contract had been cut and saying,
3  Wait, wait, wait.  Why didn't you pick me?
4  Why didn't you pick me?"
5  Q.  And you were asking Mr. Tye for an
6  opportunity to respond, right?  Keep on
7  that same paragraph.
8  A.  Payton Construction is the name, yes,
9  correct.
10 Q.  You wanted the opportunity to respond
11 to any comments Dan was making?
12 A.  Mm-hm
13 Q.  Could you say yes?
14 A.  Yes.
15 Q.  And you tell him you're going to be
16 in Alabama the following Tuesday, correct?
17 A.  Yes.
18 Q.  And then you receive a response from
19 Mr. Tye who you understood was still on
   vacation, right?
21 A.  I don't know that, but okay.
22 Q.  But you understood that, didn't you?
23 A.  I don't know any of it.
24 Q.  Okay.  And he states to you:  "As

168

1  very little about what was going on, in
2  fact, he was sitting behind the scenes
3  trying to negotiate a deal with Dan before
4  he cancelled the deal with me because he
5  knew he had a timeline problem.
6        And it didn't sit well with me.
7  I don't do business like that.
8  Q.  So what did you say?
9  A.  I told him I thought he was a
10 cockroach.
11 Q.  Were there any other language
12 associated with that?
13 A.  No.
14 Q.  Were there any, no other accusations,
15 no other --
16 A.  I told him I thought he was a liar.
17 Q.  What else did you tell him?
18 A.  I think that was enough.
19 Q.  Whether it was enough or too much,
20 what else did you say to him?
21 A.  Basically that.  That I thought it
22 was unbelievable that they have me put this
23 much time and effort, solve their problem,
24 come up, take an order, service them the

197

1  A.  Yes.
2  Q.  So there is no further detail to
3  support that number other than what I just
4  described?
5          MR. KLEIN:  Object to the
6  form.
7  Q.  Is that correct?
8  A.  There is a per seat/per hour expected
9  in the industry by installers.
10  Q.  Who has that?
11  A.  Every company, Dan Clayton, Outdoor
12  Aluminum, every one.
13  Q.  Would you expect your costs to do
14  this project to be substantially different
15  than Dan Clayton's?
16  A.  I don't know what they pay to people.
17  Q.  Would you have any reason to think
18  they're any different?
19  A.  Yes.
20  Q.  What?
21  A.  They're out of Kentucky.
22  Q.  So they pay them less?
23  A.  I have no idea.  I don't know what
24  that means.  I just know I have reason to

198

1  think it's different.
2  Q.  So you don't know?
3  A.  And you know, candidly, I don't think
4  they brought people here from Kentucky to
5  do the work, so I don't know what their
6  costs.
7  Q.  What was your plan?  How were you
8  going to staff people?
9  A.  My people.
10  Q.  From New York?
11  A.  Yes.  My people, trained installers
12  who can get the job done.
13  Q.  The line below that is:  Dress up
14  railing, etcetera.  Is that a cost to third
15  parties?
16  A.  It's a little of both.  If we had the
17  opportunity and time we might build that in
18  my shop or we might sub it.  $40,000 is the
19  worst case.
20  Q.  This is a calculation that you made
21  after the lawsuit was started, correct?
22  A.  This, yes.
23  Q.  When you had the meeting with Mr. Tye
24  on the 18th did you know what your profit

199

1  was going to be on this job?
2  A.  Well, you don't know.  You have a
3  guestimate or basis, yes.
4  Q.  Did you think it was in the $600,000
5  range?
6  A.  I hoped it was.
7  Q.  Is that a typical margin you have?
8          MR. KLEIN:  Object to the
9  form.
10  A.  For a project of this nature, yes.
11  For a typical project or a more normal
12  project, no.
13  Q.  When you say that you mean because of
14  the size of it?
15  A.  Because of the timeline.
16  Q.  How does the timeline affect your
17  profit?
18  A.  I guarantee the $50,000-credit back
19  to Mr. Tye if I was late from the first
20  week to if I was late four weeks, he's got
21  a $200,000 credit.  I don't think there's
22  anybody who would do that.
23          That obviously had value to
24  him.  It had risk for me.  It generates a

200

1  higher price.
2  Q.  Was there any negotiation with Mr.
3  Tye over that contract amount, $1 million
4  519?
5          MR. KLEIN:  Objection.
6  Ambiguous.
7  A.  I believe there was previous
8  negotiation over amounts, but I believe he
9  agreed to that amount.  In the end he
10  agreed to that amount and said, "We're
11  there."
12  Q.  The first version we see was about
13  $1 million 8?
14  A.  7-something or other.  780 or
15  something.
16  Q.  Yes, $1 million 780.
17  A.  Yes.
18  Q.  And that was, there was discussion --
19  sometimes we resist negotiations, there was
20  discussion over that price?
21  A.  There was interesting discussion over
22  that price.
23  Q.  What do you mean?
24  A.  Well, Patrick -- Ted made the comment

201

1  that his consultant said that it was
2  virtually criminal to charge that kind of
3  money for this project.
4  Q.  His consultant being Geller?
5  A.  Yes.  With Patrick sitting right
6  there by the way?
7  Q.  Did he say that when you were sitting
8  there?
9  A.  When I was sitting there.
10  Q.  He said it was virtually criminal to
11  charge that price?
12  A.  "My consultant has advised me that
13  this kind of pricing on this kind of
14  product is virtually criminal."
15  Q.  And what did you say?
16  A.  I said, "And what familiarity does
17  your consultant have with the bleachers?"
18      And his consultant spoke up and
19  said something to the fact of, what I'm
20  saying is -- "criminal" is not the right
21  word, but exorbitant or something like
22  that.
23      And he said that I've done a
24  lot of high school bleachers recently.

202

1      And I said, Pat, let's start
2  with -- he says, And I can do high school
3  bleachers at $250 a seat.
4      And I said to him, Net or
5  gross?  And he said net.  And then he
6  said, No, gross.
7      And I said, Well, let's say you
8  don't know the difference between net and
9  gross, so there's a 20 percent swing.
10      I went on to explain to him the
11  differences between a minor league baseball
12  park, quality and price and cost, and a
13  high school grandstand.
14      And in the end my math, as it
15  will, makes sense.
16  Q.  Are you out of pocket any amount of
17  money as a result of not obtaining this
18  contract?
19      MR. KLEIN:  Objection.
   Ambiguous.
21  A.  Yes.
22  Q.  What?
23  A.  All my travel time, all my design
24  time.  You know, as far as booking a job

203

1  for a million and a half dollars and
2  cancelling it, what that does to one's
3  reputation with their factory and primary
4  source.  Yes, I'm out of pocket.
5  Q.  Do you know how much?
6  A.  No.
7  Q.  Have you ever calculated it?
8  A.  No.
9  Q.  You know the Complaint that was filed
10  in this case, right?  The Complaint is the
11  document that started the case.
12  A.  Yes.
13  Q.  Did you review it before it was
14  filed?
15  A.  I'm not sure if I did or not.
16      MR. KLEIN:  What number was
17  the affidavit?
18      MR. CIAVARRA:  I did not mark
19  it.  I'm not going to.  There's only one
20  affidavit in the case.
21  Q.  I'm just going to go through some of
22  the documents that your lawyer sent us in
23  this case.
24      There was a document, and I'm

204

1  not going to mark these as exhibits, just
2  refer to them by a Bates stamp number that
3  was put on by your attorney, all of which
4  begin with S00 and then there's a number
5  following it.
6      The first one I'm going to show
7  you is S0006 through 8.  Let me see if you
8  recognize the handwriting on that.
9  A.  Yes, that's mine.
10  Q.  Do you remember when you put that on?
11  A.  No.
12  Q.  Do you know was it in connection with
13  a discussion or the circumstances under
14  which you put that on?
15  A.  (Reading document) Um, yes.  That I
16  wrote a note to Cris and told her that I
17  was going to be at Boston College Friday
18  and that would be a good time to come in
19  and confirm with Ted and let him know.
20  Q.  Were you doing a project at B.C.?
21  A.  Yes, we were proposing putting in new
22  seating in the basketball and BleachAir on
23  the football field, that new product.
24  Q.  Did you obtain that contract?

253

1 credited to himself.
2 Q. Besides crediting the design to
3 himself, I'm just trying to get at the
4 specific piece of paper or other
5 information that he --
6 A. I'm sure there will be more.
7 Q. Okay. Right now I'm just trying to
8 get at what information you claim that
9 Geller misappropriated.
10 A. This drawing.
11 Q. Okay. Are you claiming any other
12 information that he misappropriated besides
13 this drawing, that Geller misappropriated
14 besides that drawing?
15 A. At this point?
16 Q. Yes.
17 A. Am I claiming that he misappropriated
18 other information? Yes, I think I'm
19 claiming that.
20 Q. Well, what other information?
21 A. That will be found out.
22 Q. So at this moment you don't have any
23 other -- at this moment you can't tell me
24 what other information you claim that

254

1 Geller misappropriated?
2 A. That would be correct.
3 Q. Okay. When you gave these drawings
4 to Ted, did you have him sign a
5 nondisclosure agreement?
6 A. No.
7 Q. When the AutoCad drawings were
8 Emailed to Patrick, did you have him sign a
9 nondisclosure agreement?
10 A. No.
11 Q. Is your claim that Geller disclosed
12 your proprietary information by sending
13 them off to subcontractors?
14 A. Is that my whole claim? What's the
15 question?
16 Q. How did Geller misappropriate your
17 proprietary information?
18 A. He took our title-block acknowledging
19 that we were the designers of the system
20 off of the paperwork and then circulated it
21 --
22 Q. So the circulation --
23 A. --as his.
24 Q. So circulating these plans are the

255

1 means that you claim that Geller
2 misappropriated this proprietary
3 information?
4 A. At this time.
5 Q. Okay. I know you said earlier you
6 could tell the future, but I don't know
7 about --
8 A. I didn't say that. He said that.
9 Q. I don't think so, but -- but at this
10 time circulation is how he misappropriated
11 the information?
12 A. That's what I can prove at this time.
13 Q. The information contained in these
14 drawings, is it fair to say that everyone
15 at your company would have access to these
16 drawings?
17 A. No.
18 Q. How many people would have access to
19 these drawings?
20 A. Three
21 Q. Three?
22 A. If that.
23 Q. And who would those people be?
24 A. The people in AutoCad.

256

1 Q. Those are the other designers that
2 you previously identified?
3 A. Correct.
4 Q. And would you have access to that?
5 A. Yes.
6 Q. Would your sister have access to
7 that?
8 A. Through them. Through them, I mean,
9 yes.
10 Q. Did you do anything to actively
11 protect these drawings in your company?
12     MR. KLEIN: Object.
13 A. Yes, we put the block on it that
14 clearly says it's our property.
15 Q. Did you do anything to protect
16 against anyone seeing the drawings?
17 A. Yes, they were kept in the file at
18 the AutoCad guy or in the server that only
19 those three guys look at.
20 Q. Is that password-protected?
21 A. Yes.
22 Q. How many people know that password?
23 A. They each have an individual one.
24 Q. Were there photocopies of these plans

257

1   in your office?
2   A.   Not normally.
3   Q.   And didn't you say that at the
4   February 12 meeting you brought printouts?
5   A.   Yes.
6   Q.   So at some point those printouts were
7   left at your office I assume?
8   A.   With the title-block on them with
9   credit to us, yes.  Not as that sits there.
10  Q.   I'm not saying anything about the
11  title-block now.  I'm just saying --
12  A.   I am.
13  Q.   Okay.  I understand, and it's
14  definitely on the record.
15  A.   Okay.
16  Q.   Were there photocopies of these plans
17  with the title-block in your office?
18  A.   The day before I went to see Ted,
19  yes, probably.
20  Q.   Were these protected in any way
21  against other people viewing them?
22          MR. KLEIN:  Objection.
23  Ambiguous.
24  A.   Yes, when the business was closed,

258

1   the office was locked.
2   Q.   But during the day could one of your
3   employees come and walk around and see
4   these plans?
5   A.   Probably not.  If it's my sale, it's
6   in my office in a file, so probably not.
7   Q.   Who else has access to your file?
8   A.   To my office, no one.
9   Q.   No one has access to --
10  A.   To my office.  To the files?  We
11  don't file drawings.  We keep them in
12  AutoCad.
13          So the paper drawing would be
14  in a file in my office.  I would go see the
15  client, give it to him, and that would be
16  the end of it.  Paper doesn't lay around in
17  my office.
18  Q.   Did you have a confidentiality
19  agreement with Geller?
20  A.   No.
21  Q.   No?
22  A.   No.
23  Q.   Did you assume that when you Emailed
24  Geller the AutoCad drawings that he would

259

1   abide by the conditions placed in your
2   title-block?
3   A.   Absolutely.
4   Q.   Why did you assume that?
5   A.   Because I've never had anyone do what
6   he did before.
7   Q.   Didn't you say earlier that you very
8   rarely Email AutoCad drawings?
9   A.   Mm-hm.
10  Q.   Just if you would say yes or no.
11  A.   Yes.
12  Q.   How many times have you Emailed
13  AutoCad drawings before?
14  A.   Couple of hundred.
15  Q.   But that's rare?
16  A.   In proportion to the length of time
17  and volume I've done in this business, it's
18  rare.
19  Q.   Would Geller get any benefit, did
20  Geller get anything by agreeing to abide by
21  those terms and conditions in the
22  title-block?
23  A.   Can you ask the question again?
24  Q.   Did Geller receive anything in

260

1   exchange for agreeing to abide by the terms
2   and conditions in the title-block?
3   A.   Yes.
4   Q.   What?
5   A.   He got use and the ability to see the
6   plan.
7   Q.   Wasn't it Patrick's idea to use more
8   -- I might not understand this exactly,
9   but wasn't it Patrick's idea to use more
10  aluminum angles to reduce the cost of your
11  design?
12  A.   We went through a discussion with
13  Patrick where Patrick said aluminum angles
14  is less than I-beam.  I-beam is more
15  expensive.
16          I said, Well, I can use a
17  combination frame and use aluminum angle in
18  the front and that will save us some money.
19          So Patrick was the one who
20  keyed in on the fact that aluminum angle is
21  less than I-beam.
22          Patrick knew nothing about a
23  combination design in a bleacher being
24  possible.

261

1  Was he party to coming up with
2  the idea that aluminum is less money in the
3  steel understructure as far as building it
4  and putting up, yes, he was party to that.
5  Did he have anything to do with
6  the design of the end product that utilized
7  that aluminum? No, he didn't.
8  Q.  Going back to the title-block, are
9  there any terms of the title-block that
10  Seating Solutions has to comply with?
11  A.  Without reading it, I couldn't tell
12  you.
13  MR. CIAVARRA: For the record,
14  Document 57. For the record, I think it's
15  a pretty standard one from what I've seen.
16  A.  (Studying document.) What was the
17  question?
18  Q.  My question was in that title-block
19  are there any terms that Seating Solutions
20  has to comply with?
21  A.  Not as far as I can tell.
22  Q.  Okay. So your reading of that
23  title-block, there's nothing that Seating
24  Solutions has to do?

262

1  A.  Seating Solutions has to share the
2  information with you in order for you to be
3  subject to that title-block.
4  Q.  Where does it say that?
5  A.  You wouldn't see the title-block
6  unless I shared it with you.
7  Q.  But it doesn't say that in the
8  title-block?
9  A.  To me it does.
10  Q.  Read me the part where it says that.
11  A.  If I don't have it, I can't.
12  Q.  So is it written in the title-block?
13  A.  By virtue of the title-block being
14  there, it's written, to me. I can only
15  answer you for me.
16  Q.  I understand that that's what you are
17  extrapolating from this. Does it say that
18  in the title-block?
19  A.  I'm not extrapolating it. Now I
20  don't have it. Now ask me your question.
21  Q.  Let's start this again. This
22  title-block here, does it direct Seating
23  Solutions to do anything? The
24  How about this? The

263

1  title-block --
2  A.  It directs Seating Solutions to
3  provide information.
4  Q.  Where are you getting that from?
5  A.  "Seating Solutions claims proprietary
6  rights in the information disclosed."
7  It directs Seating Solutions to
8  disclose information.
9  Q.  And you claim that title-block is
10  placing limits on parties who receive these
11  drawings?
12  A.  "May not be used in whole or in part
13  to manufacture anything, whether or not
14  shown hereon, reproduced or disclosed to
15  anyone without direct written permission
16  from Seating Solutions."
17  I think there's clearly limits.
18  Q.  Okay. So the answer?
19  A.  Yes.
20  Q.  Okay. So Seating Solutions didn't
21  have a written contract with Geller,
22  correct?
23  A.  Other than that, no.
24  Q.  You take that to be a written

264

1  contract?
2  A.  If he doesn't agree to it, he should
3  send it back. It's the professional thing
4  to do.
5  Q.  Okay. Besides in the drawings are
6  there any other written contracts that you
7  believe were between Geller and Seating
8  Solutions?
9  A.  I explained -- no, the answer to the
10  question is no.
11  Q.  Okay. Were there any oral agreements
12  between Geller and Seating Solutions?
13  A.  I explained to both Ted Tye and
14  Geller that I don't go design bleachers as
15  a hobby.
16  Q.  What does that mean?
17  A.  That means what I do I expect to be
18  treated with the respect, that it's our
19  design, our creation, and they won't go
20  shop it at the last minute and expect
21  somebody to beat my price who invested no
22  time.
23  Q.  I'm going to repeat my question. Did
24  Seating Solutions have an oral contract

273

1  A.  No.
2  Q.  Would you say that Geller has the
3  right to add items to your AutoCad
4  drawings?
5  A.  I would say no.  He could have
6  overlaid them.  Kept them separate, split
7  from my drawings.
8  Q.  Okay.  So did Geller have the right
9  to overlay items on your drawings?
10 A.  Geller had the right, Ted Tye
11 specifically said he may want to add the
12 concessions, he may want to add a beer
13 cart.  He may want to do that.  I said,
14 Okay.  Let him add.
15 Q.  I'm just clarifying, Geller could
16 have added on top of your AutoCad?
17 A.  That's the only reason to send
18 AutoCad.  The other purpose is he may want
19 to check dimensions so he can tell the size
20 of something.  And if you don't give it to
21 him in AutoCad, he can't measure it.
22 Q.  Were there any other uses that would
23 have been improper for Geller to do with
24 those AutoCad drawings besides those two

274

1  things?
2  A.  No.
3  Q.  Do you have any evidence that Geller
4  disclosed pricing information -- pricing
5  information prepared by Seating Solutions
6  to any third party?
7  A.  The fact that there was a Sunday
8  meeting.
9  Q.  Besides that, the fact that there was
10 a Sunday meeting, do you have any evidence
11 that Geller provided pricing to a third
12 party?
13 A.  No.
14      MS. KORN:  Okay.  I think
15 that's it for me.
16      BY MR. CIAVARRA: I've got a
17 couple more.  I'm sure he warned you it's
18 inevitable.
19      MR. KLEIN:  At the conclusion
20 of Ms. Korn's questioning I just want to
21 add one brief statement for the record.
22      Ms. Korn asked Mr. Suprina
23 questions that started with the phrase:
24 "Do you have any evidence."

275

1       I just want to note for the
2  record that Ms. Korn's clients, Geller
3  Devellis, Inc. and Geller Sport, Inc., have
4  not yet provided the documents that they
5  identified in their initial disclosures.
6       And thus, that may provide the
7  reason that we do not have any evidence
8  because they have not provided the evidence
9  to us as they are obligated to do under the
10 Rules of Civil Procedure.
11      (Discussion off the record)
12      REDIRECT EXAMINATION
13 BY MR. CIAVARRA:
14 Q.  Back on the record.  A couple
15 questions.  You know this Email that we've
16 been talking about which was stamped S0205,
17 etcetera.  The AutoCad plan that you've
18 been talking about, there's no question
19 that Mr. Tye, it was okay for Mr. Tye to
20 share that with Geller, correct?  That was
21 the idea?
22 A.  Correct, that's his consultant.  He
23 really needs to share it.
24 Q.  Vis a vis that design, my clients did

276

1  nothing wrong with it?
2  A.  Right, your clients did nothing wrong
3  with it, no.
4  Q.  When you guys were talking before, I
5  was trying to just put some of the plans in
6  order to see if I can figure out where this
7  one fits in the chronology.
8       And the first one I think is a
9  document that was stamped Number 71.  And
10 this was like a February 10 plan.  Do you
11 recognize that?
12 A.  You know, if you show them to me in
13 order, I can give you a better.
14 Q.  They're all dated actually in the
15 box.
16 A.  Okay.  This was the first run at it,
17 saying this will work, and then there were
18 comments and then it came back.
19 Q.  Do you see in your title-block
20 there's a date?
21 A.  Yes.
22 Q.  And that would be the date it's
23 created?
24 A.  Yes.

1

Volume 1, Pages 1-228          Exhibits: 1-44

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

RI, INC D/B/A SEATING SOLUTIONS,
     Plaintiff


vs.                    Docket No. 05-CV-10365-JLT

GELLER SPORT, INC., GELLER DEVELLIS,
INC., WORCESTER PROFESSIONAL
BASEBALL, LLC AND PERFECT GAME
BASEBALL CLUBS, LLC,
     Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF THEODORE TYE

Wednesday, August 24, 2005

9:57 a.m. - 4:55 p.m.

HENSHON PARKER VYADRO, P.C.

84 State Street

Boston, Massachusetts


KACZYNSKI REPORTING

72 Chandler Street, Suite 3

Boston, Massachusetts

617.426.6060


- - - - - - -Reporter:  Amy L. Samara- - - - - - - -

Theodore Tye
August 24, 2005

(Pages 46 to 49)

46

1  roles differ?
2      A.  Geller's role was focused on site planning
3  issues.  Sgarzi is an architect and was more
4  concerned on building and design of the building and
5  structural design issues.
6      Q.  Who was Worcester Baseball's primary
7  contact at Geller?
8      A.  For this project it was Patrick Maguire.
9      Q.  Who else did you work with at Geller on
10  this project?  When I say "you" I mean Worcester
11  Baseball.
12      A.  Andy Truman, Theo Kindermanns, maybe at an
13  early stage Rebecca Bachand.
14      Q.  But would you say it's fair to say that
15  Maguire was kind of your lead contact?
16      A.  Yes.
17      Q.  When did you first meet Mr. Maguire?
18      A.  I would say approximately five to seven
19  years ago.
20      Q.  How did you meet him?
21      A.  Through a project that my firm worked on
22  with Geller.
23      Q.  Which project, do you remember?
24      A.  It was a project in Southerton,

47

1  Connecticut.
2      Q.  What type of project was it?
3      A.  It was a housing project.
4      Q.  How many other projects had you worked on
5  with Mr. Maguire before this Fitton Field project?
6      A.  I was involved in one other project that I
7  was working directly with Mr. Maguire.
8      Q.  What was that project?
9      A.  That was a project for the City of Newton.
10      Q.  What type of project was it?
11      A.  Sports fields.
12      Q.  What sports?
13      A.  Baseball, soccer, lacrosse, and football.
14      Q.  Is that project complete at this point?
15      A.  No.
16      Q.  When did you start working with Mr. Maguire
17  on that?
18      A.  August of 2004.
19      Q.  What's your target completion date?
20      A.  September of 2007.
21      Q.  And the owner on that project is the City
22  of Newton?
23      A.  Yes.
24      Q.  Where are these sports fields going to be

48

1  located?
2      A.  Various fields in the City of Newton.
3      Q.  At different locations?
4      A.  Yes.
5      Q.  And will these projects have seating
6  elements?
7      A.  Yes.
8      Q.  Who is going to provide the seating?
9      A.  It's not determined.
10      Q.  Do you know if, prior to the Fitton Field
11  project, Mr. Maguire had ever worked on a minor
12  league baseball stadium before?
13      A.  I don't know.
14      Q.  Do you know if he had any experience with
15  other types of professional sports facilities?
16      A.  I don't know.
17      Q.  How about high school sports?
18      A.  Yes.
19      Q.  What's your understanding of the experience
20  he had with high school sports facilities?
21      A.  I know that Mr. Maguire has been involved
22  in the development of several high school sports
23  fields, as well as collegiate fields.
24      Q.  Do you know which high schools he's worked

49

1  for?
2      A.  I've seen a list but I don't recall them.
3      Q.  How about college fields?
4      A.  Again, I have seen a list, but I don't
5  recall exactly which ones.
6      Q.  Any baseball stadiums on those lists?
7      A.  I don't know.
8      Q.  Have you generally been happy with
9  Mr. Maguire's work?
10      A.  Yes.
11      Q.  Let's talk about Mr. Maguire on this
12  particular project.  Did Mr. Maguire ever talk to
13  you about Seating Solutions?
14      A.  Yes.
15      Q.  Did he ever share his opinion regarding
16  Scott Suprina personally, not to the quality of his
17  work, but personally?
18      A.  Not that I recall.
19      Q.  Did he ever share an opinion with you
20  regarding the quality of Seating Solutions' work as
21  a general matter?
22      A.  As a general matter, no.
23      Q.  Did he ever share an opinion regarding any
24  of Seating Solutions' specific proposals?

(Pages 58 to 61)

---

**58**

1 Mr. Dougherty's skepticism about Seating Solutions'
2 ability to meet this schedule, did you have any
3 response to that?
4    A. Not that I recall.
5    Q. How about, "They have had issues of late
6 promising and not delivering." Did you have an
7 internal reaction to that?
8    A. I suppose I had some concern at the time,
9 but, since the claim came from a competitor, I
10 wasn't particularly concerned with it.
11    Q. A competitor, Matt Dougherty works for
12 whom?
13    A. Dant Clayton.
14    Q. Is Dant Clayton a competitor of Seating
15 Solutions then?
16    A. I believe so.
17    Q. Let's go up to your response. When you
18 say, "Tell him to stop spinning for the moment."
19 What did you mean by that?
20    A. I meant that I did not want him to provide
21 us with a proposal unless he could meet our
22 schedule.
23    Q. And did Patrick call you in response to
24 receiving this message?

---

**59**

1    A. Not that I remember.
2    Q. Did he send you any e-mail in response, do
3 you remember?
4    A. Not that I remember.
5    MR. KLEIN: Moving on to tab 14 in
6 Counsel's binders. Can you mark this?
7    (Exhibit 3, e-mail dated February 8,
8 marked)
9 BY MR. KLEIN:
10    Q. Mr. Tye, I am showing you what has been
11 marked as Exhibit 3. If you could just take a look
12 at that and look up at me when you're done.
13    A. (Witness complies)
14    Q. So is this one of the instances in which
15 Mr. Maguire expressed an opinion regarding pricing
16 to you? Seating Solutions' pricing that is.
17    A. Yes.
18    Q. And have you seen this document before
19 today?
20    A. Yes.
21    Q. If you could, just identify it for the
22 record?
23    A. This is an e-mail from Cristie Suprina to
24 me dated February 8, and it is below an e-mail from

---

**60**

1 Patrick Maguire to me and others dated February 9.
2    Q. So how many times have you looked at this
3 document before today, before this deposition?
4    A. Before today, once.
5    Q. Was that when you received it?
6    A. Yes.
7    Q. Did you do anything after you received this
8 e-mail in response to it?
9    A. Not that I recall.
10    Q. Mr. Maguire writes, "I notice that concrete
11 is excluded." Excluded from what?
12    A. Seating Solutions provided a proposal that
13 excluded all of the concrete work for the stadium,
14 so that's what Mr. Maguire is pointing out here,
15 which is a considerable part of the seating job.
16    Q. He also says, "This makes his price
17 ridiculous." And then goes on to say, "There's a
18 word that goes over. Forwarding." Did he ever use
19 that word with you in the context of this pricing
20 discussion?
21    A. Not that I recall.
22    Q. So there was no phone call associated with
23 this e-mail?
24    A. No, not that I recall.

---

**61**

1    Q. When you received this e-mail, what was
2 your reaction?
3    A. Well, I was concerned about the price, and
4 I was concerned about the scope because the concrete
5 was not included and that was an assumption that I
6 had had was that the concrete would be included as
7 part of the project.
8    Q. Describe again just for the record what you
9 mean by the "concrete".
10    A. In order to build a seating bowl for a
11 baseball park, it requires putting in foundations
12 and footings to support the structure. That's what
13 we're talking about.
14    Q. Was it your understanding at this time that
15 concrete would not part of what Seating was going to
16 be providing?
17    A. I did not know.
18    MR. KLEIN: Just for Counsel, looking at
19 tab 18. Can you mark this?
20    (Exhibit 4, e-mail dated February 15,
21 marked)
22 BY MR. KLEIN:
23    Q. If you could just take a look at that and
24 when you're done, look up at me.

---

16

---

**62**

1    A. (Witness complies)
2    Q. If you could identify this document for the
3 record?
4    A. This is an e-mail from Patrick Maguire to
5 me copied to others February 15, 2005, and a
6 response to that from Chris Sgarzi to Patrick
7 Maguire, me, copied to others on February 15.
8    Q. When was the last time you looked at this
9 document?
10    A. Probably on February 15.
11    Q. And I assume you looked at it on that date
12 because you received it in your e-mail box?
13    A. I assume I did.
14    Q. Let's skip down to the second e-mail here.
15 The e-mail from Patrick Maguire to you and others.
16 Do you have any idea why Patrick sent this
17 particular e-mail?
18    A. I would guess because he was serving in a
19 role as my consultant and trying to assist me in
20 making the best decisions that our organization
21 could in deciding what to do with our need for
22 seating.
23    Q. Do you know what he meant by in the second
24 or third sentence, "bad detailing"?

---

**63**

1    A. Yes. The way that stadium seating or any
2 construction detail goes together is very important,
3 and one of Patrick's roles in looking out for me was
4 to make sure that our detailing, the way both the
5 structural steel and the concrete and some of the
6 other details of the stadium go together are done
7 correctly, and that's typically done in the
8 design-phase project.
9    Q. Do you see where he requests "a few fields
10 from him which we should visit." Did you do that?
11    A. I recall that I did ask Mr. Suprina for
12 some information on other projects that he had
13 constructed.
14    Q. Did you do that in response to this
15 particular e-mail?
16    A. I may have or I may have done it prior.
17    Q. Do you know if you requested that before
18 you received this e-mail or after?
19    A. I don't remember exactly.
20    MR. KLEIN: Moving on. Counsel we're
21 looking now at tab 20. Can you mark this please?
22    (Exhibit 5, e-mail dated February 17,
23 marked)
24 BY MR. KLEIN:

---

**64**

1    Q. Mr. Tye, if you could just take a look at
2 that and look up at me when you're done.
3    A. (Witness complies)
4    Q. Could you identify this document for the
5 record?
6    A. This is an e-mail from Patrick Maguire to
7 me dated February 17 and a response from me to
8 Patrick Maguire also dated February 17.
9    Q. How many times have you looked at this
10 document before this deposition?
11    A. I did earlier this morning and, prior to
12 that, I assume on February 17.
13    Q. Let's start with Mr. Maguire's e-mail to
14 you. Do you know what precipitated Mr. Maguire to
15 be speaking with Matt Dougherty of Dant Clayton on
16 the morning of February 17?
17    A. I don't, but, if I read the e-mail, it says
18 that Matt Dougherty called to see the status of the
19 project.
20    Q. Below that it says that Mr. Maguire was
21 going to forward him "the plan W developed the other
22 day." What plan is he referring to there?
23    A. Well, there were a number of plans that
24 were developed during the process, and typically

---

**65**

1 Mr. Maguire's firm took plans -- Mr. Maguire took
2 plans that his firm had done and incorporated, I
3 think, at some point the plan that Seating Solutions
4 had done onto his plan to combine all of the work
5 that was being done on the project. I don't know if
6 that's the plan that was provided. I have no way to
7 know what that is.
8    Q. These are CAD files; is that right?
9    A. They typically are CAD files, yes.
10    Q. It says next, "I told him there were no
11 boxes in the lower bowl." What does that mean? I'm
12 sorry. "No boxes," what does that mean?
13    A. I don't know exactly. I would assume he
14 was referring to luxury boxes perhaps.
15    Q. Was there a point where you had hoped to
16 have luxury boxes included in the initial plan?
17    A. Our very early plan showed some luxury
18 boxes, yes.
19    Q. It also says, "The lower bowl could be
20 angle-framed." What does that refer to?
21    A. It's a type of steel construction.
22    Q. How would that affect the construction
23 process, if at all, do you know?
24    A. I don't know.

(Pages 66 to 69)

66

1    Q. Do you know if it would affect pricing?
2    A. It likely would affect pricing. It may
3 make the pricing less expensive.
4    Q. Could it also affect scheduling?
5    A. It could.
6    Q. Quicker? Slower?
7    A. Likely it would be quicker, but it depends
8 upon who is providing the proposal in terms of what
9 their schedule might be for different types of
10 construction.
11    Q. This is angle-frame as opposed to what?
12    A. Structural steel.
13    Q. Is that also referred to as I-beam?
14    A. Correct.
15    Q. So angle-frame at this point in
16 mid-February you thought could be quicker and less
17 expensive than I-beam?
18    A. I didn't think. I think that was
19 Mr. Suprina's proposal.
20    Q. Again, "He almost choked when I told him
21 that the price was in excess of $500 per seat."
22 When you read that, did you have a reaction?
23    A. I was very concerned about the pricing that
24 was being provided by Mr. Suprina.

67

1    Q. Were you concerned at all that Mr. Maguire
2 was sharing plans and pricing that Seating Solutions
3 had provided you to Dant Clayton?
4        MS. MICHAELS KORN: Objection.
5        MR. KLEIN: You can answer.
6    A. No. If he called Dant Clayton and got some
7 input on a price -- one of things I asked Mr.
8 Maguire to do was to serve as a consultant and help
9 me negotiate the best price or at least provide me
10 with guidance and that's what he was doing.
11        MR. KLEIN: Moving on now to tab 21.
12 Can you mark this as Exhibit 6?
13        (Exhibit 6, series of e-mails dated
14 February 17, marked)
15 BY MR. KLEIN:
16    Q. If you could take a look at that, Mr. Tye.
17 If you could identify this document for the record
18 please?
19    A. This is a series of e-mails beginning with
20 one from Joe Gallagher dated February 17. I then
21 forwarded that e-mail on to Patrick Maguire who
22 commented and sent it back to me, and then I
23 provided the final comment on February 17.
24    Q. If you could just read Mr. Maguire's

68

1 comments into the record, please?
2    A. "I'd still squeeze his nuts until you see
3 blood. He's probably a Met's fan. He deserves no
4 mercy."
5    Q. And "his" refers to who?
6        MS. MICHAELS KORN: Objection.
7    A. I would assume Mr. Suprina.
8 BY MR. KLEIN:
9    Q. What do you base that assumption?
10    A. That his response comes on top of an e-mail
11 referencing Mr. Suprina.
12    Q. Did you think he was referring to Joe
13 Gallagher when you read this e-mail?
14    A. I probably did not.
15    Q. Did you think he was referring to
16 Mr. Suprina?
17    A. I probably did.
18    Q. What do you think he meant by that?
19    A. I think he meant that he felt that Mr.
20 Suprina's price was excessively high for what was
21 being provided and that I should negotiate as hard
22 as I can.
23    Q. Your response is, "Agree except he is the
24 one doing the squeezing." Is that correct?

69

1    A. That is correct.
2    Q. What did you mean by that?
3    A. I meant that I felt that Mr. Suprina was
4 squeezing us, and that his price was very high and
5 that I was concerned about it.
6    Q. Did you have any concerns at this point
7 that maybe there was an unequal bargaining position
8 due to the scheduling constraints? Is that what you
9 might have been referring to?
10    A. I'm not sure I understand the question.
11    Q. "Except that he is the one doing the
12 squeezing." Do you mean to say in this e-mail,
13 based on your interpretation today, that you weren't
14 in a position to do squeezing?
15    A. I think I probably was referring to the
16 fact that Mr. Suprina, because he indicated to us
17 that he could perform and meet our schedule, felt
18 that he had leverage on us by providing an
19 exceptionally high price.
20    Q. And did you agree that this was an
21 exceptionally high price?
22    A. I believed that it was a high price, and,
23 as I would with any negotiation, my goal would be to
24 bring in whatever contract I ended up signing at the

18

Theodore Tye
August 24, 2005

70

1  lowest possible price.
2      Q.  So now that you've had a chance to review
3  some of these e-mail messages, do you now recall any
4  other opinions that Mr. Maguire might have shared
5  with you regarding Seating's proposals or drawings?
6      A.  Consistent with what I said earlier, I do
7  remember that the pricing was very high that we were
8  being provided.
9      Q.  So just to close the loop again, did he
10  ever share any opinions regarding Mr. Suprina
11  personally?
12     A.  Not that I remember.
13     Q.  Did you attend any meetings where both Pat
14  Maguire and Scott Suprina were present?
15     A.  Yes.
16     Q.  How many meetings?
17     A.  At least one.
18     Q.  But it could have been more?
19     A.  It could have been more, but I do
20  specifically remember one meeting.
21     Q.  Do you remember what the date was on that
22  meeting?
23     A.  I don't remember the exact date.
24     Q.  If I was to say February 15, would that

71

1  strike you as horribly incorrect?
2      A.  No, that sounds just about correct.
3      Q.  Who was present?
4      A.  I remember Patrick Maguire being there,
5  myself, Scott Suprina, I believe Scott Ruczaj from
6  Mr. Suprina's office, and I don't recall if anyone
7  else was there for that meeting.
8      Q.  How about Joe Gallagher?
9      A.  He may have been.
10     Q.  And just for the record, who is Joe
11  Gallagher?
12     A.  Joe Gallagher was formerly employed as the
13  Director of Business Development at Cranshaw
14  Construction, which is a subsidiary of my company.
15     Q.  And was he involved in the selection of a
16  seating contractor?
17     A.  He at that time was assisting me with some
18  project management tasks.
19     Q.  I'm going to ask the question again.  Was
20  he involved in the selection of the seating
21  contractor?
22     A.  He wasn't involved in the selection, but he
23  was involved in assisting me in meeting with some of
24  the people involved in the process.

72

1      Q.  Did he assist you with assessing various
2  seating contractors?
3      A.  No.
4      Q.  Did he attend any meetings?
5      A.  Yes, he did.
6      Q.  Did he attend any meetings with potential
7  seating contractors?
8      A.  Yes, he did.
9      Q.  Why did you have him at those meetings?
10     A.  To provide me with some project management
11  services, to help me administratively because I was
12  extremely busy at the time.
13     Q.  What do you mean by "project management
14  services"?
15     A.  He sat through the meeting.  I know I asked
16  him to check at least one reference, and he provided
17  some help with any follow-up items that I needed as
18  a result of the meetings that he sat through, which
19  were relatively few because he left the Company
20  shortly thereafter.
21     Q.  And when you say that "he sat through the
22  meeting," are we talking about the February 15
23  meeting or just some other meeting that you might
24  recall?

73

1      A.  I believe he sat through the February 15
2  meeting, but I don't recall exactly if he was there.
3      Q.  What administrative tasks would he assist
4  you with?
5      A.  I actually planned for him to play a
6  greater project management role if he had not left
7  the Company, and I wanted him to have background on
8  the process so that he would be able to play a
9  stronger role later on.
10     Q.  Where was this meeting?
11     A.  It was at my office.
12     Q.  In Newton?
13     A.  Yes.
14     Q.  How long did it last?
15     A.  I don't remember exactly.  I would guess
16  somewhere between one and two hours.
17     Q.  Who called it?  Do you know who called the
18  meeting?
19     A.  I would suspect that I did, but I don't
20  remember exactly.
21     Q.  What generally happened at the meeting?
22     A.  I believe at that meeting we provided
23  Mr. Suprina with some input on a proposal that he
24  had provided to us and worked on a plan proposal

(Pages 74 to 77)

74

1 that he had given us, and provided some input. We
2 also may have discussed various parts of his written
3 proposal.
4    Q. Did Patrick Maguire and Scott have any
5 conversations at all during this meeting?
6    A. They did.
7    Q. Is this the only time that you can recall
8 today that they discussed that project, the two of
9 them, within your presence?
10    A. That's the only time that I can recall.
11    Q. Describe that conversation for me.
12    A. Between the two of them?
13    Q. Yes.
14    A. I do remember that there was some tension
15 between the two of them. As I frequently do, I was
16 in and out of the room several times during the
17 meeting as I attended to other business. I do
18 remember coming back in the room at one point when
19 the two of them clearly had some words, but I don't
20 recall witnessing exactly what was said or hearing
21 any of what happened.
22    Q. I want to back up just logistically. When
23 you say it was at your office, was it in a
24 conference room?

75

1    A. It was in a conference room.
2    Q. So it wasn't in your personal office?
3    A. Correct. It was in a conference room.
4    Q. So tell me what was the manifestations of
5 this tension that you just described?
6    A. I just recall the two of them sitting at
7 one end of the table and Mr. Suprina being clearly
8 irritated and Mr. Maguire being clearly irritated
9 and it appeared to be with each other, and I wasn't
10 really concerned with finding out why, but it was
11 clear to me that the two of them didn't like each
12 other.
13    Q. And again, when you say "it was clear to
14 you that they didn't like each other," on what
15 specifically did you base that assessment?
16    A. I think there was a lot of body language.
17 I noticed both of them being a little bit red in the
18 face at various points in the meeting, and there may
19 have been some comments thrown back and forth. It
20 was nothing that I found particularly unusual.
21    Q. Because in the construction industry you
22 often deal with strong personalities. Right?
23    A. Well, I had a sense of Mr. Suprina's
24 personality.

76

1    Q. What do you mean by that?
2    A. That he could be difficult.
3    Q. Was it out of character for Mr. Maguire to
4 become visibly tense in a meeting like this based on
5 your experience with him?
6    A. Yes.
7    Q. Do you recall specifically what caused this
8 tension to arise?
9    A. I don't.
10    Q. Do you recall describing at this meeting to
11 Mr. Suprina Mr. Maguire's reaction to his proposals?
12    A. I may have. If I were to guess, the
13 reaction was over pricing and the cost that
14 Mr. Suprina had proposed in his contract -- excuse
15 me -- in his proposal.
16    Q. Do you remember the exact words that you
17 used when you conveyed that to Mr. Suprina?
18    A. I don't.
19    Q. Do you recall the gist of what you said to
20 him?
21    A. I think the gist that I conveyed to him was
22 that his pricing was extremely high and did not
23 conform to what our understanding was of what the
24 product should cost in the earlier understandings

77

1 that Mr. Suprina had given us regarding what would
2 be the likely cost of the product.
3    Q. When you described that, were you
4 describing it as your own opinion or as
5 Mr. Maguire's opinion?
6    A. I would have likely described it as my own
7 opinion. Although, I think I made no secret of
8 conveying that Mr. Maguire had provided me with
9 advice and that was his role in the project was to
10 provide me with advice.
11    Q. Did you state approximately to Mr. Suprina
12 that Mr. Maguire thinks your price is too high?
13    A. To the best of my knowledge, I conveyed
14 that I thought the price was too high, and I may
15 have indicated that Mr. Maguire also expressed that
16 opinion.
17    Q. How did Mr. Suprina respond?
18    A. He consistently defended his pricing.
19    Q. How did he go about doing that?
20    A. I don't recall exactly.
21    Q. How vigorously did he defend his pricing?
22    A. As I recall the meeting, he was vigorous in
23 his defense of the pricing. He appeared agitated
24 that anyone would question his pricing.

20

Theodore Tye
August 24, 2005

118

1  marked)
2  BY MR. KLEIN:
3    Q.  Mr. Tye, if you could look at what has been
4  marked as Exhibit 14 and look up at me when you're
5  done, and for this one you want to focus on the
6  e-mail that you sent on February 20 at 9:47 p.m.,
7  which is on the second page.  The second to last
8  sentence in the first paragraph reads, "They're
9  slightly more expensive, but the product differences
10  are worth the cost."  More expensive than what?
11    A.  What I meant here was they were more
12  expensive than the proposal provided to us by
13  Seating Solutions.
14    Q.  And the product differences are product
15  differences between the Dant Clayton product and the
16  Seating Solutions product?
17    A.  Correct.
18    Q.  Again, as you sat at that meeting, did you
19  have any idea as to how Dant Clayton was able to
20  distinguish between its product and Seating
21  Solutions' product?
22        MS. MICHAELS KORN:  Objection.
23  BY MR. KLEIN:
24    Q.  I'll start over.  How did Dant Clayton know

119

1  what Seating Solutions' product was, if you know?
2        MR. CIAVARRA:  I object as well.
3    A.  I don't specifically know, and I think some
4  of the comparison here is my comparison between two
5  proposals.
6  BY MR. KLEIN:
7    Q.  At that meeting though, do you recall if
8  Dant specifically differentiated its product from
9  the product of Seating Solutions?
10        MS. MICHAELS KORN:  Objection.
11    A.  I do remember that Dant Clayton came into
12  that meeting with a proposal with plans and that
13  they did really focus on the benefits of their plan
14  and talked in detail about some of the things I've
15  listed here in the e-mail, and why that was a
16  positive item for us in considering their proposal.
17    Q.  Well, let's focus on sight lines then for a
18  second.  The e-mail says that sight lines are
19  significantly improved.  Right?  What did you mean
20  by that?
21    A.  In stadium seating there is a concern for
22  designing good sight lines for fans that gives them
23  the best possible view of the field, and that's
24  determined based on that dimension that the stands

120

1  could be located in, the change in elevation, rise
2  of bleachers, so by trying to meet certain
3  standards, you improve the sight lines for your
4  customers.  That's what we were trying to do.
5    Q.  At that meeting, did it seem to you that
6  Dant Clayton knew what the sight lines would be in
7  the seating product?
8    A.  No.  I remember that Dant Clayton had a
9  plan showing their proposed sight lines, and we
10  spent a lot of time looking at that at the meeting.
11  They discussed with us why their sight lines were
12  better than a typical stadium, and one of the things
13  they showed us was that they increased the distance
14  from the plate beyond what Geller had previously
15  designed in order to increase and improve the sight
16  lines.  That was a benefit for us.
17    Q.  The distance from the plate you said was
18  designed by Geller?
19    A.  It was on Geller's plans, and it also was
20  on Seating Solutions' plans.
21    Q.  As you sit here today, do you know which of
22  the two of them was responsible for the distance
23  from the stand to home plate?
24    A.  I think both of them were, but it was

121

1  something that I was not particularly satisfied
2  with.
3    Q.  We'll look at this document a bit later on,
4  but I want to move on to tab 33, which has not yet
5  been marked.
6        If I could just move back to the exhibit
7  that we were just looking at, Exhibit 14.  Do you
8  see where it says "That we, Ted, Alan, Brad, and
9  Patrick met today with --
10    A.  Yes.
11    Q.  Brad is Brad Michaels?
12    A.  Yes.
13        MR. KLEIN:  Now, if you could mark this
14  please?
15        (Exhibit 15, e-mail dated February 20,
16  marked)
17  BY MR. KLEIN:
18    Q.  Mr. Tye, I'm showing you what has been
19  marked as Exhibit 15.  If you could take a look at
20  that, and just let me know when you're done.
21    A.  Okay.
22    Q.  The second sentence of this second
23  paragraph of the February 20 e-mail from Patrick
24  Maguire to Chris Sgarzi.  Do you see where it says,

Theodore Tye
August 24, 2005

(Pages 122 to 125)

122

1  "They brought some graphics to show that the Seating
2  Solutions plan," et cetera et cetera et cetera?
3      A. Yes.
4      Q. Describe those graphics for me.
5      A. I remember them showing us a graphic that
6  showed what we typically call a "cut section," which
7  would be a cut through of the stands with a typical
8  fan sitting on the stands and the view line that
9  that fan would have looking at the field.
10     Q. What Patrick's e-mail says, right, is "It
11 shows the Seating Solutions' plan blows from a sight
12 line standpoint"; do you see that?
13     A. Yes.
14     Q. How specifically did, if you recall, Dant
15 go about showing the shall we say "inadequacies" of
16 the seating plan?
17        MS. MICHAELS KORN:  Objection.
18     A. I remember them bringing in a plan that
19 showed their proposal.  Whether they actually had
20 anything that had been provided by Seating
21 Solutions, I don't recall.
22 BY MR. KLEIN:
23     Q. Did it seem to you at that meeting though
24 that they were basically familiar with the Seating

123

1  Solutions plan?
2        MS. MICHAELS KORN:  Objection.
3      A. They had -- I want to be careful about the
4  term "Seating Solutions' plan."
5  BY MR.KLEIN:
6      Q. Sure.
7      A. Geller had taken the Seating Solutions
8  layout and put it on the overall ballpark plan, and
9  they did seem familiar with the overall ballpark
10 plan.  So I don't know whether that was a plan from
11 Seating Solutions or a plan from Geller, but there
12 was a difference.  I just want to make sure I'm
13 clear on that.
14     Q. Understood.  Let's talk in terms of the
15 overall ballpark plan.  Did you have any
16 understanding on that date as to how Dant had become
17 familiar with what you just referred to as the
18 "overall ballpark plan"?
19     A. I believe the plan had been sent to them by
20 Geller.
21     Q. But you don't know that today?
22     A. I don't know that for a fact, but I believe
23 that's the case.
24     Q. So you weren't copied on e-mails from

124

1  Patrick or anybody who worked with that were sent to
2  Dant?
3      A. To Dant Clayton, no, not that I recall.
4      Q. Did you know at that February 20 meeting
5  and beforehand that Patrick was in discussion with
6  Dant?
7        MS. MICHAELS KORN:  Objection.
8      A. I had asked Pat several times to give Matt
9  Dougherty a call and see if we can get Dant
10 interested.  We liked Dant.  We thought they were
11 the right guys.  We wanted them involved in the
12 project, so I asked Pat to do that several times.
13 Obviously, before I met with them, I knew that they
14 were coming.  I knew that we were having a meeting,
15 and I knew that they had a renewed interested in
16 becoming involved with the project.
17 BY MR. KLEIN:
18     Q. Well, we'll come back to Dant in a little
19 bit.
20        Now, let's talk about Philip Rosenfield.
21 I think you testified earlier that Mr. Rosenfield
22 was not on the Board of Directors --
23     A. That's correct.
24     Q. -- of Worcester Baseball.  He was

125

1  previously or no?
2      A. He was never on the Board, no.
3      Q. Was he involved?
4      A. Yes.
5      Q. Is he now?
6      A. No.
7      Q. Why not?
8        MR. CIAVARRA:  I object and let me think
9  about it.  I'm going to instruct him not to answer
10 that.  There are ongoing negotiations between Mr.
11 Rosenfield and the team which are confidential and
12 involve counsel.  If there comes a time in which
13 that becomes relevant to this case, I'll certainly
14 make Mr. Tye available to answer those questions.
15 But at this point, I don't see any relevance to any
16 issues that are going on with Mr. Rosenfield today,
17 so I instruct him not to answer those.
18        MR. KLEIN:  You're instructing him not
19 to answer based on relevance, Lou.
20        Mr. CIAVARRA:  I just made my objection,
21 Terry, move on.
22        MR. KLEIN:  You're instructing him --
23        MR. CIAVARRA:  You just heard me, move
24 on.  I'm not going to explain it any further.  We're

32

Kaczynski Reporting
(617) 426-6060

**Theodore Tye**
**August 24, 2005**

(Pages 150 to 153)

150

1    Q.  Was this a document that Mr. Suprina shared
2  with you at the February 15 meeting, do you
3  remember?
4    A.  I believe so.
5    Q.  And as of this proposal, what concerns
6  remained with respect to a deal with Seating
7  Solutions?
8    A.  I'd have to look at the plan that was
9  reviewed at that meeting next to the proposal, but
10  there were clearly concerns related to the plan.
11  There were concerns related to the pricing, and
12  there were certainly some concerns about my feeling
13  in doing business with both Scott Suprina and
14  Seating Solutions.
15    Q.  What do you mean by that latter statement?
16    A.  I did not feel entirely comfortable in
17  doing business with Seating Solutions.  I felt
18  having interviewed another contractor that the other
19  contractor had a better track record and was better
20  suited for our project.  However, we had a tight
21  time frame.  Seating Solutions was at the table, and
22  I was negotiating with them.  It didn't mean I had
23  to like them.
24        MR. KLEIN:  Now, let's take a quick peak

151

1  then Counsel, at tab 19.  You don't have that yet,
2  Mr. Tye.  Can you mark this?
3        (Exhibit 23, e-mail, marked)
4  BY MR. KLEIN:
5    Q.  Feel free to take a look at what I've put
6  in front of you, which is Exhibit 23, and then look
7  up at me when you're done.
8    A.  Okay.
9    Q.  Could you identify this document for the
10  record?
11    A.  It's an e-mail from Theo Kindermanns at
12  Geller Associates to me with a copy to Andy Truman.
13    Q.  What role was Theo playing in this process?
14    A.  Theo is a partner at Geller Associates.
15    Q.  What was he doing?
16    A.  He was assisting in the overview of the
17  project for Geller.
18    Q.  Did he have any different tasks than
19  Patrick Maguire?
20    A.  He was involved in supervising Geller's
21  Wellesley office, which produced a lot of the plans.
22  He was typically the person at Geller I deal with
23  the most, and we had asked Geller's group that does
24  renderings to produce a rendering of the ballpark

152

1  for us to use to help show Holy Cross what we were
2  working on.  So Chuck is from Geller.  He was
3  producing the rendering, and Theo would have been in
4  a supervisory position to Chuck.
5    Q.  And have you known Theo longer than you've
6  known Patrick Maguire?
7    A.  Yes.
8    Q.  How long have you known Theo for?
9    A.  I would say probably for ten to twelve
10  years.
11    Q.  Apart from this document, what other
12  communications did you have with Mr. Kindermanns
13  about, if any, contract negotiations with Seating
14  Solutions?
15    A.  He was in and out of the process by virtue
16  of his position as the partner who oversees the
17  Wellesley office of Geller, but I would say his
18  expertise is less in sport venues, and so he was
19  more involved in some of the site planning and
20  overview of plan production, less involved in
21  negotiations or review of any potential information
22  provided as part of the proposals.
23    Q.  Did he respond to this e-mail, do you
24  recall?

153

1    A.  I don't recall responding to it.
2    Q.  I'd like to turn your attention to Exhibit
3  5 now, which is tab 20.
4    A.  Okay.
5    Q.  Is there a typo in that first sentence?
6    A.  No.  "Suprina is coming in tomorrow at
7  mid-May."  I think what that means is that his
8  schedule that he was proposing in tomorrow's meeting
9  was to complete the project in mid-May.
10    Q.  So it's not midday?
11    A.  It could have been.  I don't recall.  It
12  could have been, but either one would be accurate.
13    Q.  So tomorrow would have been February 18.
14  Correct?
15    A.  That's right and he did come in at midday.
16    Q.  Who scheduled that meeting?
17    A.  Suprina called me and indicated that he
18  would be in town because he had a meeting at Boston
19  College, I believe, and asked if he could come by my
20  office.
21    Q.  And you responded how?
22    A.  Yes.
23    Q.  What was the purpose of the meeting?
24    A.  The purpose of the meeting, as I found out,

Theodore Tye
August 24, 2005

(Pages 166 to 169)

166

1 signed proposal.
2    Q. So during this meeting was there ever any
3 point where you thought to yourself we've got a
4 contract with these guys?
5    A. No, none. Not even remotely. That doesn't
6 mean that I wasn't courteous to him, and it doesn't
7 mean that I wasn't considering working with him, but
8 there was no, not even a remote chance, that I told
9 him that in any way he had a contract.
10    Q. So in your mind what else had to happen
11 before Seating Solutions and Worcester Baseball had
12 a deal?
13       MR. CIAVARRA: Objection. Asked and
14 answered.
15    A. In order to have a deal I needed to
16 complete the negotiation of a proposal, present it
17 to the Board for their additional comment and final
18 approval, get approval from Holy Cross, and have
19 Alan Stone, as the authorized signator, sign the
20 proposal and provide a deposit check. All of that
21 subject to an AIA contract and execution by both
22 parties. In fact, Mr. Suprina never even signed the
23 proposal that he gave me.
24    Q. Right. So complete negotiations of

167

1 proposal, provide it for initial comment to the
2 Board of Directors, final approval by your Board of
3 Directors, Holy Cross approval, Alan Stone signs it,
4 you provide a deposit check, and you guys execute an
5 AIA contract, and that's when you have a deal?
6    A. I will just stand by what I said.
7    Q. You did, and it might be over at this
8 point, or you do have a contract with Dant Clayton
9 for Fitton Field. Right?
10    A. That's correct.
11    Q. Do you remember what date you entered into
12 that contract?
13    A. Probably the middle of March.
14    Q. That contract, just in your opinion, only
15 came into being when the AIA contract was signed.
16 Right?
17    A. That's correct.
18    Q. So that was one of the many things in your
19 mind that distinguishes your dealings with Dant from
20 your dealing with Seating Solutions. Right?
21       MS. MICHAELS KORN: Objection.
22    A. I think my dealings with Seating Solutions
23 were -- Seating Solutions was proposing -- like many
24 people do to me, they were making a proposal. Their

168

1 proposal was never accepted. Dant made a proposal
2 that was ultimately accepted. That's the
3 difference.
4 BY MR. KLEIN:
5    Q. Now, when this February 18 meeting with
6 Scott Suprina happened, did you have a meeting with
7 Dant Clayton that was scheduled at that point?
8    A. I believe the meeting with Dant Clayton was
9 scheduled later that afternoon, after I met with
10 Suprina.
11    Q. Now, I just want to look at a couple of
12 exhibits before we move on. The first is Exhibit
13 14. Again, the key thing here is going to be the
14 Sunday, February 20 e-mail from you that starts on
15 the second page and ends on the third page.
16    A. Yes.
17    Q. You say in that e-mail that you're going to
18 switch suppliers?
19    A. Yes.
20    Q. First of all, to whom were you going to
21 switch suppliers?
22    A. I kept our Board of Directors -- we met
23 during this time every weekend, and I kept them
24 involved or at least updated on a week-to-week basis

169

1 in terms of where we were going, and I think it's
2 fair to say at the prior meeting it appeared more
3 likely that we were going to make a deal with
4 Seating Solutions than we were with Dant. So what
5 I'm simply telling them here is that we appeared to
6 be more likely to go with Dant than with Seating
7 Solutions.
8    Q. Okay. But it says you're going to attempt
9 to switch supplier. Correct?
10    A. That's what it says.
11    Q. And the new supplier is Dant Clayton.
12 Correct?
13    A. That's correct.
14    Q. The old supplier would have been Seating
15 Solutions. Right?
16    A. That's correct.
17    Q. I want to go down to the differences or the
18 major changes as they're described in the e-mail.
19 Do you see where it says, "major changes?"
20    A. I do.
21    Q. The extra four inches on seat dimension.
22 What does that mean?
23    A. I don't recall exactly, but I think it
24 means we were using a wider seat. I know that the

(Pages 170 to 173)

---

170

1 seat that Dant Clayton proposed was, to our looks,
2 much superior to the one that Seating Solutions had
3 proposed.
4    Q. The actual seat?
5    A. The actual seat.
6    Q. And the next one down, "Structure will
7 accommodate phase II luxury boxes on roof."
8    A. Dant -- I'm sorry, sir. Ask your question.
9       MR. CIAVVARA: I know it's getting late,
10 just try to stick with the process.
11 BY MR. KLEIN:
12    Q. What did that mean?
13    A. That meant that Dant Clayton's proposal for
14 structural steel included the accomodation of a
15 future phase for the stadium, so that planning for
16 structural steel for phase I would allow us to
17 expand the stadium at a later date.
18    Q. Do you know today or did you know at that
19 point whether Seating Solutions' structural steel
20 would accommodate luxury boxes?
21    A. I did not believe that that was the case.
22    Q. Why not?
23    A. That's my recollection at the time.
24    Q. We've talked about sight lines. How is the

---

171

1 concrete concourse a change?
2    A. It's a very significant change between the
3 two proposals. The Seating Solutions' proposal was
4 for an aluminum concourse, which is a major part of
5 the ballpark located behind the seating and the
6 major area where we have concession stands, and
7 people would pass. The Dant Clayton proposal was
8 for concrete concourse, which would be much more
9 substantial and we felt far superior.
10    Q. Had you ever discussed the possibility of a
11 concrete concourse with Seating Solutions?
12    A. To my knowledge, it had never been
13 presented to us.
14    Q. The dimensions, that speaks for itself.
15 "Aisles are wider." What does that mean?
16    A. I think that speaks for itself as well.
17 The aisles were wider. It allowed people to pass
18 more comfortably through the stands.
19       Can we take a five-minute break?
20       MR. KLEIN: Sure. Off the record.
21       (Short recess taken)
22       MR. KLEIN: Back on the record.
23 Counsel, tab 36. Can you mark this?
24       (Exhibit 26, series of e-mails dated

---

172

1 February 21, marked)
2 BY MR. KLEIN:
3    Q. Mr. Tye, I'm showing you what's been marked
4 as Exhibit 26. Could you just identify that
5 document for the record for me?
6    A. It's a series of e-mails. The top one is
7 from Patrick Maguire dated Monday February 21.
8    Q. Do you see there's an e-mail from you to
9 some folks, I think Duncan Wood, Sanborn Head. Do
10 you see that?
11    A. Yes, I do.
12    Q. And again, do you see where it says, "It is
13 likely we are changing the seating supplier"?
14    A. No, I don't.
15    Q. With respect to your dealing with these
16 folks, what did you mean by changing the seating
17 supplier?
18    A. This would have been sent to the
19 geotechnical firm that we had engaged to work on the
20 project, and we had most likely sent them the Geller
21 plan that included the overlay of the Seating
22 Solutions' seating plan, and, by changing seating
23 suppliers, it meant that that plan was changing, but
24 as it says here, "The location of the footings was

---

173

1 similar." Typically, you would have a plan
2 finalized and then go out and do the borings so that
3 you make sure that the borings were in the locations
4 of structural steel. Because of the timing of the
5 project, we had to take it out of sequence and get a
6 geotechnical firm on board before we actually had
7 plans done.
8       So my guess is that they had been
9 supplied the Geller plan that was, at that point,
10 probably based upon the Seating Solutions' seating
11 chart. If we were going to use another seating
12 supplier, the plan would change, but what we're
13 telling them here is that the footing locations
14 would likely be similar. They would be the logical
15 place on the sideline of a baseball field.
16    Q. Now, if we back up a bit to the end of this
17 meeting on February 18 with Scott Suprina, about
18 what time did that meeting end in the afternoon?
19    A. I would guess around 3:30.
20    Q. Did you, Scott, and Ross all walk out of
21 the conference room together?
22    A. Probably.
23    Q. Did you see Alan Stone in the office in the
24 hall outside?

---

44

Theodore Tye
August 24, 2005

190

1  with us, and I think the actual scheduling of the
2  meeting took place sometime late on Friday
3  afternoon.
4      Q. So after the meeting with Scott Suprina?
5      A. That's correct.
6      Q. That meeting was held at your office.
7  Correct?
8      A. That's correct.
9      Q. What time did it start would you say?
10     A. 2:00 o'clock.
11     Q. And if you want to turn your attention to
12 Exhibit 14, it lasted until 7:00; is that right?
13     A. That's right.
14     Q. And the meeting with the Board about which
15 of these two seating suppliers to choose, was that
16 before or after 7:00 o'clock?
17     A. There were several points in the meeting
18 where we broke into groups and at the conclusion of
19 the meeting the team from Dant Clayton left and we
20 continued to meet, but we did break several times
21 from the meeting and go into a different room.
22     Q. Now, it was kind of as if there was a board
23 meeting going on, but then there was another sales
24 pitch going on at the same time. Right?

191

1      A. Well, there was a sales pitch and at the
2  conclusion of that the group met --
3      Q. The three of you?
4      A. -- without Dant Clayton there.
5      Q. You, Brad, and Alan?
6      A. Correct.
7      Q. Did you get anybody else on the phone at
8  this point?
9      A. No. Tom Alperin was away. It was a
10 holiday weekend. He was not available, although he
11 is my business partner, and I did speak with him at
12 some point, and that was the group. So we had three
13 out of the four. Phil Rosenfield was invited but
14 not active at that point.
15     Q. He was invited but not active at that
16 point. So he wasn't there?
17     A. He was not at the meeting.
18     Q. Was he on the Board at that point?
19     A. At that point --
20        MR. CIAVARRA: Which entity, Perfect
21 Game or Worcester Baseball?
22        MR. KLEIN: Either, both.
23        MR. CIAVARRA: You have to tell him what
24 you want him to answer. Was he on the Board of

192

1  either, is that the question?
2        MR. KLEIN: Yes.
3        MR. CIAVARRA: He's already said that he
4  was never on the Board of Perfect Game.
5      A. We need to check our dates in terms of when
6  the Board was actually constituted.
7        MR. CIAVARRA: It's okay to say you
8  don't know.
9      A. His active involvement in the group was
10 curtailed around that time, so that while he was
11 part of our organizing group, he ceased to be
12 actively involved in the activities of our Board.
13 BY MR. KLEIN:
14     Q. So ultimately you entered into a contract
15 with Dant Clayton. Right?
16     A. Right. Ultimately, we did.
17        MR. KLEIN: Can we mark that?
18        (Exhibit 29, AIA document, marked)
19 BY MR. KLEIN:
20     Q. This is our only copy of this, and I'm not
21 going to ask you to read the entire thing or we'll
22 be here until Mr. Stone arrives on Friday. I would
23 like to just ask you a couple of quick questions
24 about it.

193

1        Just identify that for the record, first
2  of all.
3      A. It's an AIA document A101 between Worcester
4  Professional Baseball LLC and Dant Clayton
5  Corporation.
6      Q. What was the contract price?
7      A. $1,895,000.
8      Q. Was that a higher price or a lower price
9  than Seating Solutions last proposal?
10     A. It was a higher price.
11     Q. What accounted for the price difference?
12     A. Difference in scope.
13     Q. How did the scope differ?
14     A. We already reviewed some of the ways it
15 differed. This was based on some plans, some
16 detailed plans and specifications that were
17 negotiated with Dant Clayton. Some of the items
18 that we outlined were a seating system, I-beam
19 structure, ability to accommodate future phases,
20 concrete concourse, different seating widths,
21 different seats, different aisle widths. I'm sure
22 there were many changes that I haven't noted.
23     Q. So would you call $1,895,000 an
24 exceptionally high price?

Theodore Tye
August 24, 2005

(Pages 218 to 221)

---

**218**

1  A. That's correct.
2  Q. Do you know where they live electronically?
3  A. It would be on my computer.
4  Q. Is that a computer at National Development?
5  A. Yes.
6  Q. Do you have a laptop too?
7  A. No.
8      MR. KLEIN: Now, I want to take just
9  five minutes to make sure that there's nothing
10 hugely missing if that's all right?
11     MR. CIAVARRA: Sure. Off the record.
12     (Short recess taken)
13     MR. KLEIN: Back on the record.
14 BY MR. KLEIN:
15 Q. Do you sync your blackberry with a
16 computer?
17 A. It is synced automatically.
18 Q. With a National Development computer?
19 A. Yes.
20     MR. KLEIN: One last issue on the Dant
21 Clayton meeting and how it was set up. We are
22 looking folks at tab 30. Can you mark this?
23     (Exhibit 43, e-mail dated February 19,
24 marked)

---

**219**

1 BY MR. KLEIN:
2  Q. I'm showing you a document that's been
3  marked Exhibit 43, and I think you've already had a
4  chance to look at it. Could you identify it for the
5  record, please?
6  A. It's an e-mail at the top from Patrick
7  Maguire to me dated Saturday, February 19.
8  Q. And it says, "Sorry for not getting the
9  call." Do you see the response from Patrick down
10 below?
11 A. Yes.
12 Q. What was the call about, do you recall?
13 A. I do recall. I called him on his cellphone
14 to invite him to the meeting on Sunday, and I
15 believe I left him a voice-mail message.
16 Q. Do we know who actually was kind of the
17 precipitating force that caused that meeting to
18 happen? Let me ask it a different way.
19     Who reached out first in this February
20 18 to 19 period? Who made the first call and said,
21 "Let's sit down."
22 A. The call to whom?
23 Q. To Dant Clayton or did Dant Clayton call
24 you, or did Patrick call you, or did Patrick call

---

**220**

1 Dant Clayton; do you know?
2  A. Patrick had been in touch on and off with
3  Dant Clayton through the entire process. I
4  encouraged Patrick at some point to make a call to
5  Dant Clayton to see, again, if we could get them
6  engaged in the process, and that resulted, I
7  believe, in a call from Matt Dougherty to me and
8  that's what caused the meeting.
9  Q. So Matt reached out to you directly and
10 then you assembled the team?
11 A. That's correct. Matt called me and asked
12 me if we could meet on Monday. I told him I was
13 going to be on vacation, and the meeting was then
14 set up for Sunday afternoon.
15 Q. What did you talk about during that call
16 with Matt?
17 A. Matt called to say that they had some type
18 of change in a project that had been scheduled, and
19 therefore, that they would be able to meet our
20 schedule, which they previously had not been able to
21 do, and told me that it would obviously require a
22 bumped commitment in order to make the schedule and
23 wanted to see if we could set up a meeting to
24 discuss it.

---

**221**

1  Q. Did he talk about Seating Solutions at all
2  during the call?
3  A. No.
4  Q. Did you talk to him about your ongoing chat
5  with Seating Solutions?
6  A. Not that I recall. I did tell him that it
7  was critical that I meet with him before Monday.
8      MR. KLEIN: This is tab 46. Can you
9  mark this?
10     (Exhibit 44, e-mail dated March 11,
11 marked)
12 BY MR. KLEIN:
13 Q. I'm showing you what's been marked as
14 Exhibit 44. If you could just take a quick look at
15 that, and let me know when you have completed
16 looking at it.
17 A. Okay.
18 Q. Could you identify this for the record?
19 A. It's an e-mail from Scott Merrill to me
20 dated March 11 that was forwarded on to several
21 other individuals by me.
22 Q. In the middle of the e-mail from Scott
23 Merrill it says, "I understand the seats were
24 released without an actual sample." Do you see

---

56

**Tara Hurley**

| | |
|---|---|
| From: | Patrick Maguire |
| Sent: | Wednesday, February 09, 2005 8:57 AM |
| To: | 'Ted Tye'; Theo Kindermans; 'csgarzi@sgarzi.net' |
| Subject: | RE: Perfect Game Information |

I notice that concrete is excluded. This makes his price ridiculous.
There is a word that could go before ridiculous but company policy
prohibits its use in email.

-----Original Message-----
From: Ted Tye [mailto:Tye@NatDev.com]
Sent: Tuesday, February 08, 2005 10:00 PM
To: Patrick Maguire; Theo Kindermans; csgarzi@sgarzi.net
Subject: FW: Perfect Game Information


Ted Tye
Managing Partner
National Development
2310 Washington Street
Newton Lower Falls, MA 02462
617-559-5050
e-mail: tye@natdev.com
www.natdev.com
-----Original Message-----
From: Cristie Suprina [mailto:cris@SITONTHIS.com]
Sent: Tuesday, February 08, 2005 3:47 PM
To: Ted Tye
Subject: Perfect Game Information

Tye, please see the attached information from Scott and let us know how
we can help.

Thanks for your time and interest.

Cristie Suprina
Seating Solutions
63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449

 <<8 x 18 w deck.doc>>  <<02-08-05 response to e-mail.doc>>
 <<8 X 18 PDF.pdf>>

**EXHIBIT**

TT-3
8/24/05

1

02741

**Tara Hurley**

| | |
|---|---|
| **From:** | Ted Tye [Tye@NatDev.com] |
| **Sent:** | Thursday, February 17, 2005 11:19 AM |
| **To:** | Patrick Maguire |
| **Subject:** | RE: Worcester BB - Dant Clayton |

Suprina is coming in tomorrow at mid-may. A delay of any type is not an option. See if Matt can get me something today or at worst first thing tomorrow morning.


Ted Tye

Managing Partner

National Development

2310 Washington Street

Newton Lower Falls, MA 02462

617-559-5050

e-mail: tye@natdev.com

www.natdev.com

_____

**From:** Patrick Maguire [mailto:pmaguire@gellersport.com]
**Sent:** Thursday, February 17, 2005 11:05 AM
**To:** Ted Tye
**Subject:** Worcester BB - Dant Clayton


I talked to Matt Dougherty at Dan-Clayton this morning. He called to see what the status of the project is.:


I am going to forward him the plan w developed the other day. I told him there were no boxes and that the lower bowl could be angle frame. Based on this he may actually be able to fit it into his schedule. He almost choked when I old him the price was in excess of $500 per seat. It sounded a few hundred per seat high to him as well. The most expensive project they ever did was nowhere near that much per seat.


We should see what he has to say before you sign on with Scott. A two week delay on final completion could be worth hundreds of thousands to the bottom line budget for this year. Without Scott providing guarantees for delivery and completion I think his would be a shame.


Patrick Maguire



EXHIBIT

TT-5

8/24/05

1

02744

**Tara Hurley**

| | |
|---|---|
| **From:** | Ted Tye [Tye@NatDev.com] |
| **Sent:** | Thursday, February 17, 2005 11:30 AM |
| **To:** | Patrick Maguire |
| **Subject:** | RE: Ted Fire Update |

Agree, except that he is the one doing the squeezing.  See you at 12:30.

Ted Tye

Managing Partner

National Development

2310 Washington Street

Newton Lower Falls, MA 02462

617-559-5050

e-mail: tye@natdev.com

www.natdev.com

---

**From:** Patrick Maguire [mailto:pmaguire@gellersport.com]
**Sent:** Thursday, February 17, 2005 11:30 AM
**To:** Ted Tye
**Subject:** RE: Ted Fire Update

I'd still squeeze his nuts until you see blood.....He's probably a Met's fan. He deserves no mercy.

---

**From:** Ted Tye [mailto:Tye@NatDev.com]
**Sent:** Thursday, February 17, 2005 11:26 AM
**To:** Patrick Maguire
**Subject:** FW: Ted Fire Update

FYI

---

**From:** Joe Gallagher
**Sent:** Thursday, February 17, 2005 9:16 AM
**To:** Ted Tye
**Subject:** Ted Fire Update

14

EXHIBIT
TT-6
8/24/05    A.

01273

Ted says seating solutions is their go to guy. He is great at meeting very difficult deadlines. He assured me that despite all the New York wiseguy stuff that Scott makes things happen. They are the New England Patriot's favorite vendor.

Joseph R. Gallagher

Director of Business Development

Cranshaw Construction

2310 Washington Street

Newton Lower Falls, MA 02462

Tel:  617-559-5226

Fax: 617-527-1977

jgallagher@cranshaw.com

www.cranshaw.com

**01274**

**Tara Hurley**

| | |
|---|---|
| **From:** | Ted Tye [Tye@NatDev.com] |
| **Sent:** | Sunday, February 20, 2005 10:25 PM |
| **To:** | Theo Kindermans |
| **Subject:** | RE: Ballpark Update |

Yup.  He got about double what he was making with us, so I wished him well and meant it.  He is a good guy.


Ted Tye
Managing Partner
National Development
2310 Washington Street
Newton Lower Falls, MA 02462
617-559-5050
e-mail: tye@natdev.com <mailto:tye@natdev.com>
www.natdev.com <http://www.natdev.com>

---------------

**From:** Theo Kindermans [mailto:theo@gellerdevellis.com]
**Sent:** Sunday, February 20, 2005 10:11 PM
**To:** Ted Tye
**Subject:** RE: Ballpark Update


Wow! again.  That must have been a surprise.



---------------

**From:** Ted Tye [mailto:Tye@NatDev.com]
**Sent:** Sunday, February 20, 2005 10:09 PM
**To:** Theo Kindermans
**Subject:** RE: Ballpark Update


Joe left our company to go to Suffolk last week.


Ted Tye
Managing Partner
National Development
2310 Washington Street
Newton Lower Falls, MA 02462
617-559-5050
e-mail: tye@natdev.com <mailto:tye@natdev.com>
www.natdev.com <http://www.natdev.com>

---------------

7



01186

**From:** Theo Kindermans [mailto:theo@gellerdevellis.com]
**Sent:** Sunday, February 20, 2005 10:02 PM
**To:** Ted Tye
**Subject:** RE: Ballpark Update

Wow!

So they can work with the timeline?  Sounds like you get a better product.  I especially like the concrete concourse.

You didn't cc Joe Gallagher on the email?

Enjoy your vacation.

tk

_____

**From:** Ted Tye [mailto:Tye@NatDev.com]
**Sent:** Sunday, February 20, 2005 9:47 PM
**To:** Tom Alperin; Philip Rosenfield; brad@bsmagency.com; alan@worcesterprobaseball.com
**Cc:** Patrick Maguire; Theo Kindermans; Andy Truman
**Subject:** Ballpark Update

Dear Baseball Crew,

We (Ted, Alan, Brad and Patrick) met today from 2:00-7:00 with Dant Clayton.  The result of the meeting was that we are going to attempt to switch suppliers and document a deal with them.  We were impressed by the quality of their product, integrity of their team, excellence of their design input, and overall approach to the process.  I spoke with them tonight at 8:30 and agreed that we will try to document the deal with an LOI that they will send to Alan and me tomorrow.  Based on an agreeable LOI we will proceed with the project and use a standard AIA contract.  Dant will be responsible for concrete and the seating.  They have carried allowances for dugouts and the press box.  The entire seating area will be I-beam steel construction.  Seat count will be about 3100.  They are slightly more expensive, but the product differences are worth the cost.  A couple of the major changes are:

- Extra 4" on seat dimension
- Structure will accommodate Phase 2 luxury boxes and roof
- Site lines are significantly improved
- Concrete concourse
- Dimension from home plate to the stands is 48' instead of 30'
- Aisles are wider

Assuming that we document this tomorrow, Dant will begin working on plans and will get us something for our meeting with

01187

the handicapped group on 2/28 and for the site plan review filing.  Alan will not notify Suprina until the deal is signed with Dant.  Please keep this confidential until that time.

I am away but will occasionally check e-mail.  Please check with Alan if questions.

Thanks,

Ted

**Ted Tye**

*Managing Partner*

**National Development**

**2310 Washington Street**

**Newton Lower Falls, MA 02462**

**617-559-5050**

**e-mail: tye@natdev.com**

**www.natdev.com**

9

01188

**Tara Hurley**

| | |
|---|---|
| **From:** | Chris Sgarzi [csgarzi@sgarzi.net] |
| **Sent:** | Monday, February 21, 2005 9:18 AM |
| **To:** | Patrick Maguire |
| **Subject:** | RE: latest plan for Worcester baseball |

cool


Chris Sgarzi, AIA

SGARZI ASSOCIATES, INC.

*planning & architecture*


50 Beharrell Street

PO Box 1544

Concord, MA   01742

978-371-6400


csgarzi@sgarzi.net <mailto:csgarzi@sgarzi.net>

978-505-7720 (cell)


-----Original Message-----
**From:** Patrick Maguire [mailto:pmaguire@gellersport.com]
**Sent:** Sunday, February 20, 2005 8:45 PM
**To:** Chris Sgarzi
**Subject:** RE: latest plan for Worcester baseball


Just met with Ted, Alan and Dant Clayton. Looks like he is leaning in that direction even though the plan they developed is more expensive. May make his decision tonight.


The plan is not as good in some ways but significantly better in others. They brought some graphics that show the Seating Solutions plan blows from a sightlines standpoint and that many of the aspects simply do not work – particularly the sightlines over the dugouts. The DC plan will be much better/more comfortable from a sitting down and watching the game in comfort standpoint. The ancillary things need a bit of work though – the pinch point behind the press box is tighter than I would like to see but it may be a necessary evil. I'll fill you in tomorrow.

4



EXHIBIT
TT - 15
3/24/05   AS

01183

**From:** Chris Sgarzi [mailto:csgarzi@sgarzi.net]
**Sent:** Sunday, February 20, 2005 7:02 PM
**To:** Zhong Ye; Patrick Maguire
**Cc:** Theo Kindermans; Andy Truman
**Subject:** RE: latest plan for Worcester baseball


We probably need a walk-in freezer and a shed for ice makers as well...I will try to get more info this week.


Chris Sgarzi, AIA

SGARZI ASSOCIATES, INC.

*planning & architecture*


50 Beharrell Street

PO Box 1544

Concord, MA  01742

978-371-6400


csgarzi@sgarzi.net <mailto:csgarzi@sgarzi.net>

978-505-7720 (cell)


-----Original Message-----
**From:** Zhong Ye [mailto:zye@gellerdevellis.com]
**Sent:** Friday, February 18, 2005 5:23 PM
**To:** Patrick Maguire; csgarzi@sgarzi.net
**Cc:** Theo Kindermans; Andy Truman
**Subject:** latest plan for Worcester baseball


Please review the latest plan, thanks


**Zhong Ye**

**Geller DeVellis Inc.**

**29 Washington St.**

5

01184

Wellesley MA 02481

p 781.237.4111 x 29

f 781.237.4144

01185

**Tara Hurley**

| | |
|---|---|
| **From:** | Theo Kindermans |
| **Sent:** | Wednesday, February 16, 2005 3:30 PM |
| **To:** | 'Tye@NatDev.com' |
| **Cc:** | Andy Truman |
| **Subject:** | Worcester |

Ted,

You think we can get the updated seating from Seating Solutions, or should we wait for your contract to be finalized? I would like to have it for Chuck's rendering.

Theo Kindermans, RLA, LEED™

Partner

**Geller DeVellis Inc.**
29 Washington St.
Wellesley, MA 02481
781 237 4111 ext. 17
*fax 781* 237 4144
www.gellerdevellis.com <http://www.gellerdevellis.com/>

This e-mail and any attachments may contain confidential and privileged information thus protected from disclosure. If the reader of this message is not the intended recipient, an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be illegal. If you have received this communication in error, please notify sender immediately by replying to the message and deleting it.



1

**Tara Hurley**

| | |
|---|---|
| **From:** | Patrick Maguire |
| **Sent:** | Monday, February 21, 2005 1:12 PM |
| **To:** | 'mdipilato@sanbornhead.com'; 'Ted Tye'; 'Wood, Duncan'; 'chris.sankey@musco.com' |
| **Cc:** | 'Aldinger Brad (E-mail)'; 'alan@worcesterprobaseball.com'; Theo Kindermans; Andy Truman |
| **Subject:** | RE: Holy Cross |

Mat:


We will also need this info passed along to Musco for their light pole footings. The
general locations are shown on the site plan. Please let me know if you do not yet have
this and I will have it forwarded.


The contact at Musco is Chris Sankey.


(978) 623-5955

cell (603) 759-8085


chris.sankey@musco.com


pm

---

From: Mat DiPilato [mailto:mdipilato@sanbornhead.com]
Sent: Monday, February 21, 2005 11:15 AM
To: 'Ted Tye'; 'Wood, Duncan'
Cc: 'Aldinger Brad (E-mail)'; alan@worcesterprobaseball.com; Patrick Maguire; Theo
Kindermans
Subject: RE: Holy Cross


Thanks, Ted.  We will work with Pat, Theo and Alan to get this done.


Hope your weather is better than here.


*******************************************
Mathew A. DiPilato, P.E., LSP, LEP
Principal/Vice President
Sanborn, Head & Associates, Inc.
One Technology Park Drive
Westford, MA. 01886
978-392-0900 (oper)
978-577-1005 (direct)
978-392-0987 (fax)

2

EXHIBIT

TT-24

8/24/05  A

02395

508-254-5620 (cell)
mdipilato@sanbornhead.com
www.sanbornhead.com

This message is for the designated recipient only and may contain privileged or
confidential information.  If you have received this message in error, please notify the
sender immediately and delete the original.  Any other use of this email by you is
prohibited.

*******************************************

        -----Original Message-----
        From: Ted Tye [mailto:Tye@NatDev.com]
        Sent: Sunday, February 20, 2005 9:29 PM
        To: mdipilato@sanbornhead.com; Wood, Duncan
        Cc: Aldinger Brad (E-mail); alan@worcesterprobaseball.com; Patrick Maguire; Theo
Kindermans
        Subject: RE: Holy Cross

        Mat,


        Thanks.  The timing of getting this done is critical.  We have asked designers to
commit to design by 3/10.  It is likely that we are changing the seating supplier.  This
will be finalized tomorrow.  Pat can keep you updated on the plan, but the locations of
footings will be similar.


        BTW, Joe has moved to Suffolk so he is out of the mix.  I am away until Monday, but
Pat and Theo can provide direction as needed.  If you need to interact with Holy Cross of
have any problems with them contact Alan Stone who is the CEO of the baseball operation at
508-792-2288.


        Thanks,


        Ted


        Ted Tye
        Managing Partner
        National Development
        2310 Washington Street
        Newton Lower Falls, MA 02462
        617-559-5050
        e-mail: tye@natdev.com
        www.natdev.com

        _____

        From: Mat DiPilato [mailto:mdipilato@sanbornhead.com]
        Sent: Sunday, February 20, 2005 7:17 PM
        To: Ted Tye; 'Wood, Duncan'
        Cc: Aldinger Brad (E-mail)
        Subject: RE: Holy Cross


        Ted,

3

02396

Digsafing the site tomorrow.  Joe indicated HC has additional utility clearance requirements using a Worcester company.  We are trying to get them scheduled to go out there to clear the locations.  We have locations and requirements from lighting folks and limited info from seating guys, but enough to go.  Expect to be drilling by end of this week, beginning of next.  Anticipate input to designers by 3/7 or 3/8.  My sense from both lighting and seating folks is that will not hold them up.


Mat


*******************************************
Mathew A. DiPilato, P.E., LSP, LEP
Principal/Vice President
Sanborn, Head & Associates, Inc.
One Technology Park Drive
Westford, MA. 01886
978-392-0900 (oper)
978-577-1005 (direct)
978-392-0987 (fax)
508-254-5620 (cell)
mdipilato@sanbornhead.com
www.sanbornhead.com

    This message is for the designated recipient only and may contain privileged or confidential information.  If you have received this message in error, please notify the sender immediately and delete the original.  Any other use of this email by you is prohibited.

*******************************************
        -----Original Message-----
        From: Ted Tye [mailto:Tye@NatDev.com]
        Sent: Saturday, February 19, 2005 11:46 AM
        To: Wood, Duncan; Matt DiPilato
        Subject: Holy Cross

        Hi Guys,


    Could you e-mail me a quick update on progress at Holy Cross?  We need to start design next week to stay on schedule.  Joe Gallagher has left us, so for now I am the contact.  I am on vacation next week, but can respond to brief e-mails on my Blackberry.


        Thanks,


        Ted


        Ted Tye

        Managing Partner

        National Development

        2310 Washington Street

**02397**

Newton Lower Falls, MA 02462

617-559-5050

e-mail: tye@natdev.com

www.natdev.com <http://www.natdev.com/>

5

02398