UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc., d/b/a SEATING SOLUTIONS,<br>Plaintiff<br><br>v.<br><br>GELLER SPORT, INC., GELLER DEVELLIS,<br>INC., WORCESTER PROFESSIONAL BASEBALL<br>LLC, and PERFECT GAME BASEBALL CLUBS,<br>LLC,<br>Defendants | CIVIL ACTION NO.<br>05-CV-10365-JLT |

**MEMORANDUM OF LAW OF DEFENDANTS, WORCESTER PROFESSIONAL BASEBALL, LLC, AND PERFECT GAME BASEBALL CLUBS, LLC, IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION

The law has long recognized that there is a fundamental difference between negotiations and binding contracts. Parties are free to exchange proposals, negotiate the terms, accepting some and rejecting others, without fear of being bound. That is why parties will often state in writing that in order for there to be a binding agreement, the written exchange must be signed and, sometimes, a deposit must be paid. By insisting on such terms, the parties attempt to protect themselves from later disputes. Here, the plaintiff expressly included such requirements, which admittedly were not met, and yet seeks to enforce an alleged oral agreement. As a matter of law, it cannot do so.

Defendants Worcester Professional Baseball, LLC ("Worcester Baseball") and Perfect Game Baseball Clubs, LLC ("Perfect Game") are Massachusetts limited liability companies. Worcester Baseball is the owner of the new Worcester minor league baseball franchise (the "Tornadoes"). Perfect Game is a member and the manager of Worcester Baseball. Worcester Baseball recently expanded and renovated the baseball stadium

known as Fitton Field (the "Project") located on the grounds of the College of the Holy Cross ("Holy Cross") where the Tornadoes play their home games. One of the contractors with whom Worcester Baseball had discussions and from whom Worcester Baseball received proposals for some of the expansion and renovation work is plaintiff RI, Inc. d/b/a Seating Solutions ("Seating Solutions"). It is undisputed that Worcester Baseball rejected each of Seating Solutions' written proposals. In the aftermath of Seating Solutions' failure to secure a contract for the Project, Seating Solutions initiated this action against Worcester Baseball, Perfect Game, Geller Sport, Inc., and Geller Devellis, Inc.

In spite of the fact that it never signed a contract with the defendants, Seating Solutions has asserted claims for breach of contract, breach of the covenant of good faith and fair dealing, and violations of G.L. c.93A against Worcester Baseball and Perfect Game[1] based on a purported oral contract. Summary judgment must enter because while Worcester Baseball and Seating Solutions were, in fact, involved in discussions concerning a potential contract and at least five different proposals were submitted by Seating Solutions, all were rejected and, as such, no contract arose.

## MATERIAL FACTS

Worcester Baseball is the owner and operator of the Tornadoes, an AA-level minor league baseball franchise that began playing in Worcester as part of the Canadian American Association of Professional Baseball during the Spring of 2005. (See Amended Complaint ¶11; Answer to Amended Complaint of Worcester Professional Baseball, LLC, and Perfect Game Baseball Clubs, LLC (hereinafter "Answer"), ¶ 11;

---

[1] In this action, without any basis in law or fact, Seating Solutions treats Worcester Baseball and Perfect Game as a single entity. (See Amended Complaint, Introduction.)

Deposition of Theodore R. Tye dated August 24, 2005 ("Tye Dep."), pp. 30-31, excerpts of which are attached to the Affidavit of James P. Hoban, Esquire, as Exhibit A.) The Chief Executive Officer of Worcester Baseball and Perfect Game is Alan Stone ("Stone").

Worcester Baseball considered and evaluated a number of possible venues in Worcester for its home field. (See Tye Dep., p. 33.) Theodore Tye ("Tye"), one of the investors in the team, was designated to take the lead on evaluating the improvements that would be needed to make the sites under consideration viable as the home field for a professional baseball franchise because of his extensive background in construction and property development. (See Deposition of Alan Stone dated August 26, 2005 ("Stone Dep."), pp. 28-29, excerpts of which are attached to the Affidavit of James P. Hoban, Esquire, as Exhibit B; see also Deposition of Scott Suprina dated July 29, 2005 ("Suprina Dep."), p. 75, excerpts of which are attached to the Affidavit of James P. Hoban, Esquire, as Exhibit C.) In this regard, Tye has a Bachelor of Arts from Tufts University and a Masters in Business Administration from Harvard University. (See Tye Dep., pp. 14-15.) Tye has been a partner in a real estate development, construction and management company called National Development since 1985. (See Tye Dep., pp. 15-17.) National Development has developed over 12 million square feet of space in that timeframe and handles a construction volume of $100 million in a typical year. (See Tye Dep., p. 16.) National Development has 4 partners and approximately 110 employees. (Id.) As a partner, Tye oversees all aspects of National Development's operations. (Id.)

Worcester Baseball decided that Holy Cross's Fitton Field was its first choice based on a number of factors including location and pre-existing parking and revived

previous discussions with Holy Cross concerning the use of Fitton Field. (Id., pp. 33-34.) Although Worcester Baseball was not able to secure a lease with Holy Cross to use Fitton Filed as its home park until March 2005, it was actively engaged in discussions with a number of contractors prior to successfully negotiating its lease agreement with Holy Cross. (See Stone Dep., pp. 33-34.) This was necessitated by the need to have a location brought up to professional minor league baseball standards in time for the home opening of the Tornadoes in late May or early June. (See Tye Dep., p. 39.) One such contractor was Seating Solutions. (Amended Complaint at ¶12.)

Seating Solutions is a contractor that designs, sells, and installs seats and seating systems. (See Suprina Dep., p. 7.) Seating Solutions has been in operation for approximately ten years. (See Suprina Dep., p. 7.) The Vice President and Chief Executive Officer of Seating Solutions is Scott Suprina. (See Suprina Dep., p. 6.)

Seating Solutions submitted its first proposal to Worcester Baseball on or about February 2, 2005. (See Suprina Dep., pp. 59-60, 65, Ex. 1.) The word "**PROPOSAL**" appears at the top of the first page in bold capital letters. (See Suprina Dep., p. 64, Ex. 1.) Seating Solutions quoted a contract price of $1,780,000, which, it is conceded, would have been a big contract for it. (See Suprina Dep., p. 66, Ex. 1.)[2] Among other things, the Proposal requires that the customer initial each page, sign and return the Proposal to Seating Solutions, and provide a 10% deposit on or before February 7, 2005. (See Suprina Dep. p. 67, Ex. 1.) (See Suprina Dep., Ex. 1.) It is undisputed that the first Proposal was not accepted. (See Suprina Dep., p. 72.)

The first Proposal was based upon a form which is on Seating Solutions' computer system. (See Suprina Dep., p. 60.) All proposals start out with the word

---

[2] The largest contract ever awarded Seating Solutions was for $2.2 Million. (See Suprina Dep., p. 66.)

"PROPOSAL" in capital and bold across the top. (Id. at 64.) The Proposal form is used from job to job. (Id. at p. 60.) The form contains some boilerplate language and the substantive terms are modified with the specifics of a job. (Id.) The requirements of initialing each page, signing, and returning the entire proposal to Seating Solutions, however, are standard, boilerplate terms. (See Suprina Dep., pp. 71-72.) Suprina testified that Seating Solutions' purpose in requesting that the customer initial each line item was to provide notice of the terms the customer did not agree to. (See Suprina Dep., p. 86.)

After the first Proposal was rejected, on or about February 8, 2005, Seating Solutions submitted a second Proposal. (See Suprina Dep., p. 64.) It is not disputed that the second Proposal was also not accepted by Worcester Baseball. (See Suprina Dep., pp. 23-24.)

On or about February 15, 2005, Seating Solutions submitted a third Proposal to Worcester Baseball. (See Suprina Dep., p. 64.) There is no dispute that the terms of the third Proposal were likewise not agreed to. (See Suprina Dep., pp. 23-24.)

On or about February 17, 2005, a fourth Proposal was submitted to Worcester Baseball. (See Suprina Dep., p. 64.) In connection with its fourth Proposal, Seating Solutions also requested a meeting with Worcester Baseball to discuss the Project. (See Suprina Dep., pp. 46, 74, 94; Tye Dep., pp. 153-57.) That meeting took place at the offices of National Development in Newton, Massachusetts, on or about Friday, February 18, 2005. (See Suprina Dep., pp. 46, 74; Tye Dep., pp. 153-55.)

In attendance were Suprina, Ross Jacobs of Seating Solutions, and Tye. (See Suprina Dep., pp. 95, 104-05; Tye Dep., pp. 153-57.) Stone, the only officer with

authority to sign contracts on behalf of Worcester Baseball, did not participate in that meeting. (See Suprina Dep., pp. 95, 104-05, 114; Tye Dep., p. 166.) During that meeting, among other things, material changes to the February 17th Proposal were discussed. (See Suprina Dep., pp. 94-95; Tye Dep., pp. 153-57.) Suprina personally took notes concerning their changes. (See Suprina Dep., p. 94.) It is undisputed that Worcester Baseball did not agree to the February 17th Proposal at that meeting, did not sign that Proposal or the notated copy created by Suprina at the meeting. (See Suprina Dep., pp. 82-83.)

Recognizing, as it must, that agreement was not reached on the February 17th Proposal and that it was not signed by the parties, Seating Solutions takes another tact and now alleges that an oral agreement was reached at the February 18th meeting. (See Suprina Dep., pp. 23-24, 93-94, 97, 233.) Specifically, Seating Solutions contends that during the course of that meeting, Suprina indicated that he needed to be blunt because of the timeframes involved and asked "Do we have a deal?" (See Suprina Dep., pp. 24-27, 104-07.) It is alleged that Tye responded, "Yes, we have a deal," and shook Suprina's hand. (Id.) While Tye denies that such a conversation occurred, given the undisputable facts that plaintiff's own documents made it clear that there would be no contract until the Proposal was signed, initialed and a deposit was paid, even if it did occur, it would not have been a substitute for the written agreement. At most, it was a cordial statement by a person known to be without authority to bind the team and was not intended or understood to a binding contract.[3] Moreover, even if it did occur, a number of material terms remained open at the conclusion of that meeting even viewing the evidence in the

---

[3] It is important to note that plaintiff does not claim that it actually did anything. Instead, it sent defendants two more draft Proposals, neither of which was signed.

light most favorable to Seating Solutions. In this regard, even Seating Solutions concedes that the contract price was not fixed but rather subject to change unless and until a signed proposal and timely 10% deposit were received. (See Suprina Dep., pp. 127-28, 130-32, 135-36.) In this regard, Suprina testified:

> It says here that the pricing and terms are based on receipt of signed proposal and deposit by February 22.
> And then it says back here that there's going to be an AIA contract.
>
> I don't think it means – I already have a deal prior to this.
>
> So if it's not signed, I think that affects the terms and the price, meaning it could cost more money if they delay in the signing of it.
>
> If I can't get the money in the bank, if they don't give me the deposit, it could cost more money, so the price could change. Okay? Maybe I would have to accelerate the payment. But the order is the order.

Suprina testified that in the absence of a deposit, "[i]n my mind I could pick and choose the terms." (See Suprina Dep., p. 132.) Suprina further testified that in the absence of a deposit the only limitation on the amount that Seating Solutions could raise the contract price was "how unreasonable do you want to be." (See Suprina Dep., p. 136.)

In this admittedly time-sensitive project, no design and construction schedule had been discussed or agreed to at the meeting. (See Suprina Dep., p. 66, Exs. 1-3; Tye Dep., pp. 160-62.)[4] In fact, the "Terms and Conditions" portion of the last Proposal submitted prior to the meeting on February 18th acknowledges that no schedule had yet been agreed to, stating in pertinent part "[o]nce delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will

---

[4] The ordering of work is an important part of any project, and clearly so in this instance, where Seating Solutions portion of the Project, which does not do concrete work, would be time dependent in part on another contractor's completion of the concrete footings required to support the seating structure. (See Suprina Dep., Exs. 1-2, 5.)

result in a charge of $50.00 per man, per hour." (See Suprina Dep., Ex. 2.) In addition, Tye's written comments forwarded to Suprina on February 19, 2005 _after_ the February 18th meeting include "2. Schedule – [please provide]," which demonstrates that no construction schedule had been orally agreed to at the meeting.

There had been no discussion of insurance. (See Suprina Dep., Exs. 1-2.) Rather, the Proposals submitted by Seating Solutions prior to the February 18th meeting merely state that "pricing ... is based upon Seating Solutions standard levels of insurance" (Tye Dep., pp. 175-76.) After the February 18th meeting, Tye asked Seating Solutions to specify what its standard levels were. (See Suprina Dep., Ex. 3; Tye Dep., pp. 175-76.) However, there is no record evidence that Worcester Baseball indicated that that coverage was adequate or acceptable.

Similarly, there had been no discussion of or agreement on indemnification on a Project with an alleged contract price in excess of $1.5 Million. (See Suprina Dep., Exs. 1-2.)

No drawings had been approved, and, indeed, final agreement had not even been reached on the specific number of seats. (See Suprina Dep., pp. 78-79, 81, Ex. 2 ("[a]pproximately 3187 seats ....)) In this regard, Suprina testified: "[w]ould I say this is a completely, totally, fully developed product? No." (See Suprina Dep., p. 78.) Rather, Suprina testified that: "[a] fully developed product in this would have been during the plan approval stage," but that they had not gotten to that stage. (See Suprina Dep., p. 79.)

Moreover, it is not disputed that Tye had insisted at the February 18th meeting and in his written comments forwarded the following day confirm that any deal would be subject to an American Institute of Architects ("AIA") contract, the terms of which had

not been agreed to or even discussed as of August 18, 2005.[5] (See Suprina Dep., pp. 124-26.) In this regard, a standard AIA contract has a number of material terms, including *inter alia* warranty provisions, notice provisions, a claims adjustment process, and termination provisions, which had never even been broached as of February 18th. (See copy of the AIA contract that was actually executed with Dant Clayton Corporation ("Dant Clayton"), attached to the Affidavit of James P. Hoban, Esquire, as Exhibit D.) In addition, some of the standard AIA terms, such as monthly progress payments, conflict directly with the terms of the last submitted Proposal, which set forth fixed events as the triggering mechanism for pre-set installment payments. As such, Worcester Baseball's last comments on this subject directly conflict with the provisions of both the last Proposal circulated prior to the meeting and the Proposal forwarded after the meeting. Thus, there had not yet been agreement on a payment schedule at the time of the alleged oral contract and there would clearly have been additional discussion and negotiation on the conflicting terms.

Although Seating Solutions dealt with Tye, it knew that Stone was the "head guy." (See Suprina Dep., p. 114.) Seating Solutions was aware that any contract would have to be approved and signed by Stone. (See Suprina Dep., p. 114.) ("I believe I was told the contract would be executed by him [Stone], yes.") Moreover, although Seating Solutions denies that it was aware that Board approval would be required to enter into such a contract, it concedes that it was advised that there would be a Board meeting over the weekend at the February 18th meeting. (See Suprina Dep., p. 115; Tye Dep., pp. 163,

---

[5] Tye, a person with twenty years of experience in real estate development and construction, testified that he would never have agreed to a Project of this magnitude merely based upon a proposal. (See Tye Dep., pp. 160-61.)

166.)[6] The reasonable inference from these facts is that Suprina knew that Tye did not have the authority to bind the team.

It is undisputed that none of the four proposals submitted prior to the February 18th meeting or the two submitted after were ever accepted or signed by either Worcester Baseball or Perfect Game. (See Suprina Dep., pp. 23-24, 71, 82, 121-23, 156-57, 233.) Rather, Seating Solutions contends it had an oral agreement at the conclusion of the February 18th meeting. (See Suprina Dep., pp. 23-24, 93-94, 233.) It is undisputed that no deposit was ever made. (See Suprina Dep., p. 122.) It is interesting to note that Suprina would not even characterize the parties' interactions prior to February 17th as a negotiation. Rather, in his view, they were engaged in discussions or consultations. (See Suprina Dep., pp. 76-81.) Moreover, it bears noting that Seating Solutions made various changes to its Proposal during the course of February 2005, both before and after the February 18th meeting, and kept sending the changed Proposal to Worcester Baseball to be signed and returned with a deposit. (See Suprina Dep., p. 96.)

At the time it claims an oral contract was struck, Seating Solutions was aware that Holy Cross could still decline to let the Tornadoes play at Fitton Field. (See Suprina Dep., pp. 52, 109.)[7] Indeed, Seating Solutions had no knowledge of any obligation on the part of any of the prospective home field sites which had been investigated by Worcester

---

[6] In this regard, Suprina testified:

> I don't know if I was told, or if I was told the Board was meeting. I don't believe I was told any deal had to be approved by the Board.
>
> I was told there was a Board meeting, I believe, Saturday. I had a deal. I didn't have any deal to be approved as far as I was concerned.

(See Suprina Dep., p. 115.)

[7] Indeed, in first iteration of the proposal, Seating Solutions stated that the required deposit "would go against this [Fitton Field] or any other location you choose. (See Suprina Dep., Ex. 1.)

Baseball (Holy Cross, Clark University, and Lake Avenue Park) to allow the team to play their games there. (See Suprina Dep., pp. 41, 44, 46-48, 109-11.) Despite this, it is Seating Solutions' position that Worcester Baseball voluntarily obligated itself to purchase seats from it at the February 18th meeting, and had an obligation to buy those seats even if there was no place to put them. (See Suprina Dep., pp. 111-13.) Seating Solutions concedes that it was aware that Dant Clayton Corporation ("Dant Clayton") was also pursuing the Project as of early February. (See Suprina Dep., pp. 149, 172-74.)

It is undisputed that the February 21st Proposal was never signed by Worcester Baseball or Seating Solutions. (See Suprina Dep., p. 121, Ex. 5.) It is undisputed that two of the express terms of the February 21st Proposal inserted by Seating Solutions were not satisfied – receipt of a signed proposal by February 22nd and receipt of a 10% deposit by February 22nd. (See Suprina Dep., pp. 122-23.) Even after Seating Solutions was aware of some "stall[ing]" on the part of Worcester Baseball, it continued to include receipt of a signed proposal and deposit as a required term of acceptance. (See Suprina Dep., pp. 145-46, 159-61.) In this regard, as of February 22, 2005, Seating Solutions was still forwarding emails requesting the return of a signed Proposal and a 10% deposit. (See Suprina Dep., pp. 59-161, Ex. 9.) Specifically, on that date Seating Solutions forwarded email correspondence stating, in part: "[p]lease let us know when you anticipate having these documents signed and when we can anticipate our deposit." (See Suprina Dep., pp. 145, 157-58, 160-61, Ex. 9.) It also cannot be disputed that two terms requested by Worcester Baseball – a schedule and a signed AIA contract – were never satisfied. (See Suprina Dep., pp. 124-26, Ex. 3; Tye Dep., pp. 160-61.)

## ARGUMENT

I.  **Seating Solutions Fails To State A Viable Claim For Breach Of Contract Under Massachusetts Law.**

    A.  **Seating Solutions Cannot Meet The Elements Of A Breach Of Contract Claim On This Record.**

In order to have an enforceable contract, there must be an agreement on all the essential terms of the transaction in order that the nature and extent of the parties' obligations can be ascertained and enforced. See Novel Iron Works, Inc. v. Wexler Construction Co., 26 Mass. App. Ct. 401, 408 (1988); see also Simons v. American Dry Ginger Ale Co., Inc., 335 Mass. 521, 523 (1957). In order to state a claim for the breach of an enforceable contract under Massachusetts law, the plaintiff must demonstrate: (1) that the parties reached a valid and binding agreement; (2) that one party breached[8] the terms of the agreement; and (3) that the non-breaching party suffered damages as a result of the breach. See Michelson v. Digital Financial Services, 167 F.3d 715, 720 (1st Cir. 1999); Guckenberger v. Boston Univ., 957 F.Supp. 306, 316 (D.Mass. 1997); Yellin & Hyman, P.C. v. James N. Ellis & Associates, P.C., 2001 WL 755851*3 (Mass. Super. 2001).

    1.  **There Was No Oral Agreement On The Essential Terms At The February 18th Meeting And Therefore No Valid And Binding Contract.**

It is undisputed that there is no written contract. (See Suprina Dep., p. 24.) Rather, Seating Solutions contends that an oral contract was entered into at the February 18th meeting involving Suprina and Tye. (Id.) As plaintiff, Seating Solutions had the burden of proving the existence of the alleged oral contract and its terms. See, e.g.,

---

[8] Under Massachusetts law, a breach is a failure to perform for which there is no legal excuse. See Sterilite Corp. v. Continental Cas. Co., 20 Mass. App. Ct. 215, 220 (1985), *rev'd on other grounds*, 397 Mass. 837 (1986); Yellin & Hyman, P.C. v. James N. Ellis & Associates, P.C., 2001 WL 755851*4 (Mass. Super. 2001).

Michelson, 167 F.3d at 720-24. This requires proof of agreement on all essential terms of the alleged oral contract. See, e.g., Novel Iron Works, Inc., 26 Mass. App. Ct. at 408. This is a burden Seating Solutions cannot meet.

While Ted Tye testified that the alleged oral agreement did not occur, even if he said what Suprina claims, no contract would be formed. There were just too many material terms left to agree on. See Tull v. Mister Donut Dev. Corp., 7 Mass. App. Ct. 626, 630-32 (1979) ("With final terms still to be hammered out, the parties could not be bound.") This was a time-sensitive project. It needed to be completed in time for the Tornadoes' home opener in late May or early June. Suprina agreed that "[t]ime is moving quickly," on the Project. (See Suprina Dep., p. 66.) However, there was no agreement as to a design schedule and construction schedule at the February 18th meeting. In this regard, the record evidence reflects that on February 19, 2005, after purportedly reaching a binding oral agreement, Tye was still looking for a proposed schedule from Seating Solutions. (See Suprina Dep., Ex. 3.) Indeed, it bears noting that Seating Solutions never provided the requested proposed schedule. (See Suprina Dep., Exs. 5, 8.)

As its various Proposals and Suprina's testimony make clear, although Seating Solutions' Proposals included the design work for the concrete footings necessary to support the seating structure, Seating Solutions does not do and would not do any site work or concrete work in connection with building those footings. As such, clearly other contractors would need to be scheduled between the approval of Seating Solutions' footing designs and the construction portion of Seating Solutions' work to perform any necessary site work and concrete work. Thus, scheduling, especially in light of the

relatively short Project timeframe, was a significant issue to be addressed. This failure of agreement alone is fatal in circumstances where all parties knew that time was of the essence.

There were, however, other unresolved material terms as of the date of the February 18th meeting which also preclude contract formation. In this regard, there had been no agreement on insurance and indemnification. There was no agreement on progress payments or payment schedule. There were no approved plans or drawings. Finally, by Seating Solutions' own admission, even the contract price was not fixed as of the date of the alleged oral agreement because no deposit was tendered. In such circumstances, there are simply too many indefinite terms to give rise to an enforceable contract. See Novel Iron Works, Inc., 26 Mass. App. Ct. at 408.

2. Seating Solutions Was Aware That Tye Had No Authority To Bind Worcester Baseball.

To the extent that Seating Solutions premises its contract claim on the alleged oral exchange between Suprina and Tye at the February 18th meeting, it fails because, as Seating Solutions was aware, Tye was not empowered to bind Worcester Baseball. Under settled law, Seating Solutions bears the burden of proving that Tye had authority, actual or apparent, to bind Worcester Baseball to the alleged oral contract or that Worcester Baseball ratified the oral contract with full knowledge of its provisions. See Lucey v. Hero International Corp., 361 Mass. 569, 572 (1972); James F. Monaghan Inc. v. M. Lowenstein & Sons, Inc., 290 Mass. 331, 333 (1935). This is a burden of proof that Seating Solutions simply cannot meet in light of its actual knowledge that the person with whom it purportedly "agreed" to terms was without authority to bind Worcester Baseball.

In this regard, Seating Solutions does not dispute that it was advised that Stone had to approve and sign contracts on behalf of Worcester Baseball. (See Suprina Dep., p. 114.) Seating Solutions cannot claim to have reasonably relied on any alleged apparent authority of Tye to bind Worcester Baseball to an oral contract in such circumstances. See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 745 (2000); Kansallis Fin. Ltd. v. Fern, 421 Mass. 659, 665 (1996).

It is also undisputed that Stone did not participate in the meeting in which the alleged oral contract was struck. At most, there was an alleged exchange in the hallway after the February 18th meeting where Tye purportedly told Stone that he had reached a deal with Suprina and Stone indicated that he was looking forward to working with Suprina. (See Suprina Dep., pp. 108-09.) It cannot be disputed that Stone, who did not participate in the meeting, was unaware of the terms of the alleged oral contract at the time of the alleged exchange. Nor can it be disputed that Stone, the only officer with authority to execute contracts, did not accept the terms of the alleged oral contract any time after the February 18th meeting or ratify any oral contract. As such, entry of summary judgment is appropriate, as even if there had been agreement on all essential terms between the negotiators, which there was not, it was known that one of the negotiators had to obtain approval of the terms to bind the team and the alleged terms were not ratified.

### 3. Both Parties Expressly Indicated That They Did Not Intend To Be Bound Prior To The Execution Of A Written Agreement.

The course of the parties' dealing and the language employed by each of the parties to these discussions demonstrates that they did not intend to be bound prior to the execution of a written agreement containing all the essential terms. In this regard, each written document supplied by the plaintiff was entitled "Proposal." Each of its four Proposals prior to the February 18th meeting required initialing each page, signing and returning the entire Proposal, and providing a 10% deposit prior to Seating Solutions being bound to the terms of the Proposal. (See Suprina Dep., pp. 127-28, 130-32, Exs. 1-2, 5, 8.) Each of the Proposals expressly conditions acceptance and pricing on that signing and a deposit.[9] (See Suprina Dep., Exs. 1-2, 5, 8.) Language looking to the execution of a final written agreement, as present here, justifies a strong inference that the parties do not intend to be bound. See Rosenfield v. United States Trust Co., 290 Mass. 210, 216 (1935); Wasserman v. Roach, 336 Mass. 564, 568 (1958); Goren v. Royal Invs. Inc., 25 Mass. App Ct. 137, 140 (1987).

Moreover, Suprina testified that the price term and the schedule were not binding on Seating Solutions unless and until it received a signed Proposal with the required deposit. (See Suprina Dep., pp. 127-32, 135-36.) Seating Solutions continued to include terms required by the return of a signed Proposal and 10% deposit in each successive, revised Proposal. Indeed, even after the parties allegedly reached a binding oral agreement at the February 18th meeting, Seating Solutions continued to include such

---

[9] In this regard each of the proposals prepared prior to the February 18th meeting states: "Pricing is based on acceptance of offer no later than 5 days from date of proposal unless otherwise specified in the proposal. Additional charge may apply for orders <u>signed</u> later than five days from date of proposal issuance." (emphasis added) (See Suprina Dep., Exs. 1-2.) The proposal prepared after the February 18th meeting states: "[t]he pricing and terms are based upon receipt of a signed proposal and deposit by February 22, 2005 only." (Id., Ex. 5.)

terms in Proposals forwarded on February 21, 2005, and February 22, 2005, and even pressed for the return of the signed Proposal with a 10% deposit. (See Suprina Dep., Ex. 5, 8-9.) Thus, both the language employed by Seating Solutions and its conduct both before and after reaching the alleged oral agreement demonstrate that it did not intend to be or consider itself bound until a Proposal was signed and returned with the required deposit.

Moreover, Worcester Baseball's refusal to make a deposit or sign any of the Proposals, each of which conditioned acceptance of its terms on the returning of a signed Proposal with a 10% deposit, demonstrate that it did not agree to or intend to be bound to the terms of any of those Proposals or as a result of its discussions with Seating Solutions on February 18th. Indeed, Worcester Baseball should be free to rely on the express requirements for acceptance included in the Proposals and to negotiate without fear of having an unaccepted bid forced on it as a "contract" unless and until it voluntarily met those requirements for acceptance. Indeed, as the parties progressed in their discussions, Worcester Baseball actually added the execution of an additional written agreement – namely an AIA contract – as a condition of being bound. Thus, as discussions progressed, Worcester Baseball signaled even more emphatically that it did not intend to be bound until a final written agreement was executed. See e.g., Rosenfield, 290 Mass. at 216.

It is undisputed that no Proposal was ever signed, either before or after the February 18th meeting. As such, none of those Proposals were accepted by Worcester Baseball and, under the express terms of each of Seating Solutions' successive Proposals, both before and after the February 18th meeting, none were accepted. See Laprade v.

Fitchburg & L. St. Ry. Co., 205 Mass. 77, 79 (1910) (a written agreement is ineffective if it remains unaccepted by one of the parties). It is also undisputed that no AIA contract was ever negotiated and executed by Seating Solutions and Worcester Baseball. In such circumstances, there simply is no contract and summary judgment is appropriate. See Montgomery Ward & Co. v. Johnson, 209 Mass. 89, 91 (1911) (no contract is formed unless an offer is accepted and the claim must be dismissed as a matter of law).

II.   **In The Absence Of An Enforceable Contract With Worcester Baseball And Perfect Game, Seating Solutions' Claims For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Must Be Dismissed As A Matter Of Law.**

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. See, e.g., Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-73 (1991). The implied covenant of good faith and fair dealing requires that each party avoid doing "anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 471-72 (internal quotation and citation omitted). However, to prevail on such a claim, there must first be a binding contract. See Levenson v. LMI Realty Corp., 31 Mass. App. Ct. 127, 131 (1991). As such, the implied covenant of good faith and fair dealing does not attach to mere negotiations. See Levenson, 31 Mass. App. Ct. at 131. Moreover, in the absence of an express agreement between parties to negotiate in good faith, the courts will not imply one. See Schwanbeck v. Federal-Mogul Corp., 31 Mass. App. Ct. 390, 396 (1991), *rev'd on other grounds*, 412 Mass. 703 (1992). Thus, in light of Seating Solutions' failure to state a viable breach of contract claim, its implied covenant claim similarly fails and entry of summary judgment in favor of Worcester Baseball and Perfect Game is appropriate.

III. **Because Seating Solutions' Claims For Purported Violations of G.L. c. 93A Are Wholly Premised On And Derivative Of Its Claims For Breach Of Contract And Breach Of The Implied Covenant Of Good Faith And Fair Dealing, The Failure Of Those Claims Is Dispositive Of Its Claim Under G.L. c.93A.**

The outer boundaries for what acts or practices may constitute a Chapter 93A violation is a question of law for the Court. See Commercial Union Inc. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000); Schwanbeck v. Federal-Mogul Corp., 31 Mass. App. Ct. 390, 414 (1991), rev'd on other grounds, 412 Mass. 703 (1992). In order to state a viable claim for relief under Chapter 93A, the acts or practices complained of ordinarily must: (1) fall within the penumbra of some common law, statutory or other established concept of unfairness; (2) be immoral, unethical, oppressive or unscrupulous; and (3) cause substantial injury to consumers, competitors, or other businessmen. See, e.g., Commercial Union Ins. Co., 217 F.3d at 40. See also PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975); Atkinson v. Rosenthal, 33 Mass. App. Ct. 219, 226 (1992). However, "not every unlawful act is automatically an unfair (or deceptive) one under G.L. c. 93A." Mechanics Nat'l Bank of Worcester v. Killeen, 377 Mass. 100, 109 (1979).

A mere breach of contract, without more, does not constitute a violation of G.L.c. 93A. See Pepsi-Cola Bottling Co. v. Checkers, Inc., 754 F.2d 10 (1st Cir. 1985). "[A] good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c.93A claim is made." Duclersaint v. Federal Nat'l Mort. Assn., 427 Mass. 809, 814 (1998). Here, Seating Solutions' c.93A claims against Worcester Baseball and Perfect Game are premised on their purported breach of an oral contract and breach of the implied covenant of good faith and fair dealing. Because those claims fail as a matter of law on this record, Seating Solutions' c.93A claim, which is wholly

premised on and derivative of those claims, similarly fails. Moreover, even if there had been an oral contract with Worcester Baseball and that contract was breached, which is all that is alleged in the Amended Complaint, that in and of itself is inadequate to state a claim under G.L. c.93A, §§2 and 11 as a matter of law. See, e.g., Pepsi-Cola Bottling Co., supra. As such, entry of summary judgment on the G.L. c.93A claims as to Worcester Baseball and Perfect Game is appropriate.

## CONCLUSION

It is clear from the record evidence that although Seating Solutions and Worcester Baseball were engaged in discussions of a potential contract in connection with the Project, it went no further. By its own admission, Seating Solutions was still revising its Proposal as of its last meeting with Worcester Baseball, was free to change the price and terms in the absence of a signed Proposal and deposit, and its various Proposals, in the end, were never accepted. In such circumstances, Seating Solutions cannot state a viable breach of contract claim as a matter of law and, as such, summary judgment in favor of Worcester Baseball and Perfect Game on that claim, as well as the wholly derivative claims for breach of the implied covenant of good faith and fair dealing and purported violations of c.93A, is appropriate.

WORCESTER PROFESSIONAL BASEBALL,
LLC and PERFECT GAME BASEBALL CLUBS, LLC
By their attorneys,

Louis M. Ciavarra (BBO #546481)
James P. Hoban (BBO #633929)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Date: October 4, 2005

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by electronic service and mail/hand on 10/31/05