UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc., d/b/a SEATING SOLUTIONS,<br>Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | CIVIL ACTION NO. |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | 05-CV-10365-JLT |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, | ) | |
| LLC, | ) | |
| Defendants | ) | |

**CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT
TO LOCAL RULE 56.1 OF DEFENDANTS, WORCESTER PROFESSIONAL
BASEBALL, LLC, AND PERFECT GAME BASEBALL CLUBS, LLC,**

Defendants Worcester Professional Baseball, LLC ("Worcester Baseball")

and Perfect Game Baseball Clubs, LLC ("Perfect Game") respectfully submit this concise

statement of undisputed materials facts pursuant to Local Rule 56.1 in support of their

motion for summary judgment.

UNDISPUTED MATERIAL FACTS

1.    Worcester Baseball is the owner and operator of the Tornadoes, an AA-

level minor league baseball franchise that began playing in Worcester as part of the

Canadian American Association of Professional Baseball during the Spring of 2005.

(See Amended Complaint ¶11; Answer to Amended Complaint of Worcester

Professional Baseball, LLC, and Perfect Game Baseball Clubs, LLC (hereinafter

"Answer"), ¶ 11; Deposition of Theodore R. Tye dated August 24, 2005 ("Tye Dep."),

pp. 30-31, excerpts of which are attached to the Affidavit of James P. Hoban, Esquire

(the "Hoban Aff."), as Exhibit A.)  The Chief Executive Officer of Worcester Baseball and Perfect Game is Alan Stone ("Stone").

2.　　Worcester Baseball considered and evaluated a number of possible venues in Worcester for its home field.  (See Tye Dep., p. 33.)  Theodore Tye ("Tye"), one of the investors in the team, was designated to take the lead on evaluating the improvements that would be needed to make the sites under consideration viable as the home field for a professional baseball franchise because of his extensive background in construction and property development.  (See Deposition of Alan Stone dated August 26, 2005 ("Stone Dep."), pp. 28-29, excerpts of which are attached to the Hoban Aff. as Exhibit B; see also Deposition of Scott Suprina dated July 29, 2005 ("Suprina Dep."), p. 75, excerpts of which are attached to the Hoban Aff., as Exhibit C.)

3.　　In this regard, Tye has a Bachelor of Arts from Tufts University and a Masters in Business Administration from Harvard University.  (See Tye Dep., pp. 14-15.)  Tye has been a partner in a real estate development, construction and management company called National Development since 1985.  (See Tye Dep., pp. 15-17.)  National Development has developed over 12 million square feet of space in that timeframe and handles a construction volume of $100 million in a typical year.  (See Tye Dep., p. 16.)  National Development has 4 partners and approximately 110 employees.  (Id.)  As a partner, Tye oversees all aspects of National Development's operations.  (Id.)

4.　　Worcester Baseball decided that Holy Cross's Fitton Field was its first choice based on a number of factors including location and pre-existing parking and revived previous discussions with Holy Cross concerning the use of Fitton Field.  (Id., pp. 33-34.)  Although Worcester Baseball was not able to secure a lease with Holy Cross to

use Fitton Filed as its home park until March 2005, it was actively engaged in discussions with a number of contractors prior to successfully negotiating its lease agreement with Holy Cross. (See Stone Dep., pp. 33-34.)  This was necessitated by the need to have a location brought up to professional minor league baseball standards in time for the home opening of the Tornadoes in late May or early June. (See Tye Dep., p. 39.)  One such contractor was Seating Solutions. (Amended Complaint at ¶12.)

5.      Seating Solutions is a contractor that designs, sells, and installs seats and seating systems. (See Suprina Dep., p. 7.)  Seating Solutions has been in operation for approximately ten years. (See Suprina Dep., p. 7.)  The Vice President and Chief Executive Officer of Seating Solutions is Scott Suprina. (See Suprina Dep., p. 6.)

6.      Seating Solutions submitted its first proposal to Worcester Baseball on or about February 2, 2005. (See Suprina Dep., pp. 59-60, 65, Ex. 1.)  The word **"PROPOSAL"** appears at the top of the first page in bold capital letters. (See Suprina Dep., p. 64, Ex. 1.)  Seating Solutions quoted a contract price of $1,780,000, which, it is conceded, would have been a big contract for it.  (See Suprina Dep., p. 66, Ex. 1.)[1] Among other things, the Proposal requires that the customer initial each page, sign and return the Proposal to Seating Solutions, and provide a 10% deposit on or before February 7, 2005. (See Suprina Dep. p. 67, Ex. 1.) (See Suprina Dep., Ex. 1.)  It is undisputed that the first Proposal was not accepted.  (See Suprina Dep., p. 72.)

7.      The first Proposal was based upon a form which is on Seating Solutions' computer system. (See Suprina Dep., p. 60.)  All proposals start out with the word **"PROPOSAL"** in capital and bold across the top. (Id. at 64.)  The Proposal form is used from job to job. (Id. at p. 60.)  The form contains some boilerplate language and the

---

[1] The largest contract ever awarded Seating Solutions was for $2.2 Million. (See Suprina Dep., p. 66.)

substantive terms are modified with the specifics of a job. (Id.) The requirements of initialing each page, signing, and returning the entire proposal to Seating Solutions, however, are standard, boilerplate terms. (See Suprina Dep., pp. 71-72.) Suprina testified that Seating Solutions' purpose in requesting that the customer initial each line item was to provide notice of the terms the customer did not agree to. (See Suprina Dep., p. 86.)

8.    After the first Proposal was rejected, on or about February 8, 2005, Seating Solutions submitted a second Proposal. (See Suprina Dep., p. 64.) It is not disputed that the second Proposal was also not accepted by Worcester Baseball. (See Suprina Dep., pp. 23-24.)

9.    On or about February 15, 2005, Seating Solutions submitted a third Proposal to Worcester Baseball. (See Suprina Dep., p. 64.) There is no dispute that the terms of the third Proposal were likewise not agreed to. (See Suprina Dep., pp. 23-24.)

10.    On or about February 17, 2005, a fourth Proposal was submitted to Worcester Baseball. (See Suprina Dep., p. 64.) In connection with its fourth Proposal, Seating Solutions also requested a meeting with Worcester Baseball to discuss the Project. (See Suprina Dep., pp. 46, 74, 94; Tye Dep., pp. 153-57.) That meeting took place at the offices of National Development in Newton, Massachusetts, on or about Friday, February 18, 2005. (See Suprina Dep., pp. 46, 74; Tye Dep., pp. 153-55.)

11.    In attendance were Suprina, Ross Jacobs of Seating Solutions, and Tye. (See Suprina Dep., pp. 95, 104-05; Tye Dep., pp. 153-57.) Stone, the only officer with authority to sign contracts on behalf of Worcester Baseball, did not participate in that meeting. (See Suprina Dep., pp. 95, 104-05, 114; Tye Dep., p. 166.)

12.    During that meeting, among other things, material changes to the February 17th Proposal were discussed.  (See Suprina Dep., pp. 94-95; Tye Dep., pp. 153-57.) Suprina personally took notes concerning their changes.  (See Suprina Dep., p. 94.)  It is undisputed that Worcester Baseball did not agree to the February 17th Proposal at that meeting, did not sign that Proposal or the notated copy created by Suprina at the meeting. (See Suprina Dep., pp. 82-83.)

13.    Recognizing, as it must, that agreement was not reached on the February 17th Proposal and that it was not signed by the parties, Seating Solutions takes another tact and now alleges that an oral agreement was reached at the February 18th meeting. (See Suprina Dep., pp. 23-24, 93-94, 97, 233.)  Specifically, Seating Solutions contends that during the course of that meeting, Suprina indicated that he needed to be blunt because of the timeframes involved and asked "Do we have a deal?" (See Suprina Dep., pp. 24-27, 104-07.)  It is alleged that Tye responded, "Yes, we have a deal," and shook Suprina's hand.  (Id.)

14.    While Tye denies that such a conversation occurred, given the undisputable facts that plaintiff's own documents made it clear that there would be no contract until the Proposal was signed, initialed and a deposit was paid, even if it did occur, it would not have been a substitute for the written agreement.  At most, it was a cordial statement by a person known to be without authority to bind the team and was not intended or understood to a binding contract.[2]

15.    Moreover, even if it did occur, a number of material terms remained open at the conclusion of that meeting even viewing the evidence in the light most favorable to

---

[2] It is important to note that plaintiff does not claim that it actually did anything.  Instead, it sent defendants two more draft Proposals, neither of which was signed.

Seating Solutions.  In this regard, even Seating Solutions concedes that the contract price was not fixed but rather subject to change unless and until a signed proposal and timely 10% deposit were received.  (See Suprina Dep., pp. 127-28, 130-32, 135-36.)  In this regard, Suprina testified:

> It says here that the pricing and terms are based on receipt of signed proposal and deposit by February 22.
> And then it says back here that there's going to be an AIA contract.
>
> I don't think it means -- I already have a deal prior to this.
>
> So if it's not signed, I think that affects the terms and the price, meaning it could cost more money if they delay in the signing of it.
>
> If I can't get the money in the bank, if they don't give me the deposit, it could cost more money, so the price could change.  Okay?  Maybe I would have to accelerate the payment. But the order is the order.

Suprina testified that in the absence of a deposit, "[i]n my mind I could pick and choose the terms."  (See Suprina Dep., p. 132.)  Suprina further testified that in the absence of a deposit the only limitation on the amount that Seating Solutions could raise the contract price was "how unreasonable do you want to be."  (See Suprina Dep., p. 136.)

16.    In this admittedly time-sensitive project, no design and construction schedule had been discussed or agreed to at the meeting.  (See Suprina Dep., p. 66, Exs. 1-3; Tye Dep., pp. 160-62.)[3]  In fact, the "Terms and Conditions" portion of the last Proposal submitted prior to the meeting on February 18th acknowledges that no schedule had yet been agreed to, stating in pertinent part "[o]nce delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or

---

[3] The ordering of work is an important part of any project, and clearly so in this instance, where Seating Solutions portion of the Project, which does not do concrete work, would be time dependent in part on another contractor's completion of the concrete footings required to support the seating structure. (See Suprina Dep., Exs. 1-2, 5.)

elevator access will result in a charge of $50.00 per man, per hour." (See Suprina Dep., Ex. 2.) In addition, Tye's written comments forwarded to Suprina on February 19, 2005 after the February 18th meeting include "2. Schedule – [please provide]," which demonstrates that no construction schedule had been orally agreed to at the meeting.

17.    There had been no discussion of insurance. (See Suprina Dep., Exs. 1-2.) Rather, the Proposals submitted by Seating Solutions prior to the February 18th meeting merely state that "pricing  ... is based upon Seating Solutions standard levels of insurance" (Tye Dep., pp. 175-76.) After the February 18th meeting, Tye asked Seating Solutions to specify what its standard levels were. (See Suprina Dep., Ex. 3; Tye Dep., pp. 175-76.) However, there is no record evidence that Worcester Baseball indicated that that coverage was adequate or acceptable.

18.    Similarly, there had been no discussion of or agreement on indemnification on a Project with an alleged contract price in excess of $1.5 Million. (See Suprina Dep., Exs. 1-2.)

19.    No drawings had been approved, and, indeed, final agreement had not even been reached on the specific number of seats. (See Suprina Dep., pp. 78-79, 81, Ex. 2 ("[a]pproximately 3187 seats ....)) In this regard, Suprina testified: "[w]ould I say this is a completely, totally, fully developed product? No." (See Suprina Dep., p. 78.) Rather, Suprina testified that: "[a] fully developed product in this would have been during the plan approval stage," but that they had not gotten to that stage. (See Suprina Dep., p. 79.)

20.    Moreover, it is not disputed that Tye had insisted at the February 18th meeting and in his written comments forwarded the following day confirm that any deal

would be subject to an American Institute of Architects ("AIA") contract, the terms of which had not been agreed to or even discussed as of August 18, 2005.[4] (See Suprina Dep., pp. 124-26.)  In this regard, a standard AIA contract has a number of material terms, including *inter alia* warranty provisions, notice provisions, a claims adjustment process, and termination provisions, which had never even been broached as of February 18th. (See copy of the AIA contract that was actually executed with Dant Clayton Corporation ("Dant Clayton"), attached to the Hoban Aff. as Exhibit D.)

21.    In addition, some of the standard AIA terms, such as monthly progress payments, conflict directly with the terms of the last submitted Proposal, which set forth fixed events as the triggering mechanism for pre-set installment payments.  (See Suprina Dep. Ex. 2, 5; Hoban Aff., Ex D.)  As such, Worcester Baseball's last comments on this subject directly conflict with the provisions of both the last Proposal circulated prior to the meeting and the Proposal forwarded after the meeting. (Id.) Thus, there had not yet been agreement on a payment schedule at the time of the alleged oral contract and there would clearly have been additional discussion and negotiation on the conflicting terms. (Id.)

22.    Although Seating Solutions dealt with Tye, it knew that Stone was the "head guy." (See Suprina Dep., p. 114.)  Seating Solutions was aware that any contract would have to be approved and signed by Stone.  (See Suprina Dep., p. 114.)  ("I believe I was told the contract would be executed by him [Stone], yes.")  Moreover, although Seating Solutions denies that it was aware that Board approval would be required to enter into such a contract, it concedes that it was advised that there would be a Board meeting

---

[4] Tye, a person with twenty years of experience in real estate development and construction, testified that he would never have agreed to a Project of this magnitude merely based upon a proposal.  (See Tye Dep., pp. 160-61.)

over the weekend at the February 18th meeting. (See Suprina Dep., p. 115; Tye Dep., pp. 163, 166.)[5] The reasonable inference from these facts is that Suprina knew that Tye did not have the authority to bind the team.

23.    It is undisputed that none of the four proposals submitted prior to the February 18th meeting or the two submitted after were ever accepted or signed by either Worcester Baseball or Perfect Game. (See Suprina Dep., pp. 23-24, 71, 82, 121-23, 156-57, 233.) Rather, Seating Solutions contends it had an oral agreement at the conclusion of the February 18th meeting. (See Suprina Dep., pp. 23-24, 93-94, 233.)

24.    It is undisputed that no deposit was ever made. (See Suprina Dep., p. 122.)

25.    It is interesting to note that Suprina would not even characterize the parties' interactions prior to February 17th as a negotiation. Rather, in his view, they were engaged in discussions or consultations. (See Suprina Dep., pp. 76-81.)

26.    Moreover, it bears noting that Seating Solutions made various changes to its Proposal during the course of February 2005, both before and after the February 18th meeting, and kept sending the changed Proposal to Worcester Baseball to be signed and returned with a deposit. (See Suprina Dep., p. 96.)

27.    At the time it claims an oral contract was struck, Seating Solutions was aware that Holy Cross could still decline to let the Tornadoes play at Fitton Field. (See

---

[5] In this regard, Suprina testified:

> I don't know if I was told, or if I was told the Board was meeting. I don't believe I was told any deal had to be approved by the Board.

> I was told there was a Board meeting, I believe, Saturday. I had a deal. I didn't have any deal to be approved as far as I was concerned.

(See Suprina Dep., p. 115.)

Suprina Dep., pp. 52, 109.)[6]  Indeed, Seating Solutions had no knowledge of any obligation on the part of any of the prospective home field sites which had been investigated by Worcester Baseball (Holy Cross, Clark University, and Lake Avenue Park) to allow the team to play their games there.  (See Suprina Dep., pp. 41, 44, 46-48, 109-11.)  Despite this, it is Seating Solutions' position that Worcester Baseball voluntarily obligated itself to purchase seats from it at the February 18th meeting, and had an obligation to buy those seats even if there was no place to put them.  (See Suprina Dep., pp. 111-13.)

28.    Seating Solutions concedes that it was aware that Dant Clayton Corporation ("Dant Clayton") was also pursuing the Project as of early February.  (See Suprina Dep., pp. 149, 172-74.)

29.    It is undisputed that the February 21st Proposal was never signed by Worcester Baseball or Seating Solutions. (See Suprina Dep., p. 121, Ex. 5.

30.    It is undisputed that two of the express terms of the February 21st Proposal inserted by Seating Solutions were not satisfied – receipt of a signed proposal by February 22nd and receipt of a 10% deposit by February 22nd.  (See Suprina Dep., pp. 122-23.)  Even after Seating Solutions was aware of some "stall[ing]" on the part of Worcester Baseball, it continued to include receipt of a signed proposal and deposit as a required term of acceptance.  (See Suprina Dep., pp. 145-46, 159-61.)  In this regard, as of February 22, 2005, Seating Solutions was still forwarding emails requesting the return of a signed Proposal and a 10% deposit.  (See Suprina Dep., pp. 59-161, Ex. 9.)  Specifically, on that date Seating Solutions forwarded email correspondence stating, in

---

[6] Indeed, in first iteration of the proposal, Seating Solutions stated that the required deposit "would go against this [Fitton Field] or any other location you choose. (See Suprina Dep., Ex. 1.)

part: "[p]lease let us know when you anticipate having these documents signed and when

we can anticipate our deposit." (See Suprina Dep., pp. 145, 157-58, 160-61, Ex. 9.)

31.    It also cannot be disputed that two terms requested by Worcester Baseball

– a schedule and a signed AIA contract – were never satisfied.  (See Suprina Dep., pp.

124-26, Ex. 3; Tye Dep., pp. 160-61.)

> WORCESTER PROFESSIONAL BASEBALL,
> LLC and PERFECT GAME BASEBALL CLUBS,
> LLC
> By their attorneys,
>
> _____
> Louis M. Ciavarra (BBO #546481)
> James P. Hoban (BBO #633929)
> Bowditch & Dewey, LLP
> 311 Main Street, P.O. Box 15156
> Worcester, MA 01615-0156
> (508) 791-3511

Date:   October 31, 2005

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party by electronic service
mail(hand)on  10/31/05                and

_____