Affidavit of James P. Hoban, Esquire
(pages 1-2)

{}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc., d/b/a SEATING SOLUTIONS,<br>Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | 05-CV-10365-JLT |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, | ) | |
| LLC, | ) | |
| Defendants | ) | |

## AFFIDAVIT OF JAMES P. HOBAN, ESQUIRE

I, James P. Hoban, on oath depose and state as follows:

1.      I am an attorney in good standing in the Commonwealth of Massachusetts and represent defendants Worcester Professional Baseball, LLC, and Perfect Game Baseball Clubs, LLC.

2.      True and accurate copies of excerpts from the deposition of Theodore Tye dated August 24, 2005, are attached hereto as Exhibit A, including pages 14-17, 30-33, 38-41, 150-169, and 174-177.

3.      True and accurate copies of excerpts from the deposition of Alan Stone dated August 26, 2005, are attached hereto as Exhibit B, including pages 28, 29, 33, and 34.

4.      True and accurate copies of excerpts from the deposition of Scott Suprina dated July 29, 2005, are attached hereto as Exhibit C, including pages 5-8, 21-24, 25-28, 41-88, 93-116, 121-136, and 145-176, and Exhibits 1, 2, 3, 5, 8, and 9.

5.      A true and accurate copy of the AIA contract that was actually executed with Dant Clayton Corporation is attached hereto as Exhibit D.

Signed under the pains and penalties of perjury this 31st day of October 2005.

_____

James P. Hoban

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party by *electronic service and*
mail/hand on _10/31/05_

**Exhibit A**
(pages 1-11)

{}

1

Volume 1, Pages 1-228                    Exhibits: 1-44

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - -

RI, INC D/B/A SEATING SOLUTIONS,
     Plaintiff


vs.                          Docket No. 05-CV-10365-JLT

GELLER SPORT, INC., GELLER DEVELLIS,
INC., WORCESTER PROFESSIONAL
BASEBALL, LLC AND PERFECT GAME
BASEBALL CLUBS, LLC,
     Defendants

- - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF THEODORE TYE

Wednesday, August 24, 2005

9:57 a.m. - 4:55 p.m.

HENSHON PARKER VYADRO, P.C.

84 State Street

Boston, Massachusetts


KACZYNSKI REPORTING

72 Chandler Street, Suite 3

Boston, Massachusetts

617.426.6060


- - - - - - - Reporter:  Amy L. Samara - - - - - - - -

14

1 litigation. To the best of my knowledge, that would
2 be slip and fall, workers' comp. type of situations
3 related to our real estate ownership and operations.
4    Q. Were you involved in any of those cases in
5 any way?
6    A. No.
7    Q. So you weren't a witness in any of those
8 cases?
9    A. No.
10    Q. The deposition that you took, or that was
11 taken of you a few years ago, did you ultimately
12 serve as a witness at a trial in that case?
13    A. No.
14    Q. Are you also employed by Worcester
15 Professional Baseball, LLC?
16    A. No.
17    Q. We'll get to that in a bit. If you could
18 just trace your education from college level to the
19 highest level of education you've obtained?
20    A. I have a Bachelor of Arts Degree from Tufts
21 University, and I have a Master's Degree in Business
22 Administration from Harvard.
23    Q. When did you get your BA?
24    A. 1979.

15

1    Q. How about the MBA?
2    A. 1983.
3    Q. Do you have any professional licenses or
4 certifications?
5    A. No.
6    Q. Could you trace your employment experience
7 for me from the present backward in time to when you
8 graduated from college?
9    A. I've been with National Development since
10 1985. Prior to that, I worked for Harvard Business
11 School for two years. Prior to getting my MBA, I
12 worked for Tufts University for two years.
13    Q. What did you do for Harvard Business
14 School?
15    A. I was responsible for various
16 administrative operations including construction
17 planning, buildings, things like that.
18    Q. And how about for Tufts? What did you do
19 for Tufts?
20    A. I was in the student services
21 administrative area.
22    Q. What were your duties there?
23    A. Management of student organizations,
24 events, things like that.

16

1    Q. As for your current employment, what would
2 you say your major duties are?
3    A. I'm a partner of a large real estate
4 company that includes development, construction, and
5 property management. It's developed over twelve
6 million square feet of space and constructs
7 construction volume that's typically a hundred
8 million dollars a year. As one of the partners, I
9 oversee all aspects of the operation.
10    Q. Do you report to anybody?
11    A. I do not.
12    Q. Do employees report to you?
13    A. They do.
14    Q. How many?
15    A. I have three partners and our firm has
16 about one hundred and ten employees, all of whom
17 report to the four partners.
18    Q. How long have you been a partner with
19 National Development?
20    A. In various forms, since I joined the
21 Company in 1985.
22    Q. Did it exist before you joined the Company,
23 National Development that is?
24    A. There was a predecessor company called

17

1 National Development Corporation, which was based in
2 Pittsburgh. We started as the Boston affiliate of
3 the Pittsburgh-based company.
4    Q. Is the Company still Pittsburgh based?
5    A. No. My partners and I purchased the
6 Company in, I believe, 1991. It may have been 1990.
7    Q. National Development is based in Newton?
8    A. Correct.
9    Q. Do you have other offices elsewhere?
10    A. We have several regional property
11 management offices around the State.
12    Q. Where are they?
13    A. In Charlestown, Medford, Woburn,
14 Framingham, I believe that's all.
15    Q. You have some duties associated with a
16 company called Worcester Professional Baseball, LLC;
17 isn't that right?
18    A. That's correct.
19        MR. KLEIN: Can we go off the record for
20 a second?
21        (Off-the-record discussion)
22        MR. CIAVARRA: Back on the record. I
23 would like the record to reflect that Alan Stone has
24 entered the room.

**30**

1 operation were there any other cities or towns
2 considered?
3    A. No.
4    Q. Do you have an understanding of why
5 Mr. Stone chose Worcester?
6    A. I do. I believe some of the reasons were
7 that Worcester was a large metropolitan area, the
8 second largest city in New England. It had a good
9 history of baseball, and it seemed to be a good
10 demographic market to locate a minor league team.
11    Q. Did you think Worcester was a good idea?
12 Did you think any other cities would be better?
13    A. I recall that I thought that Worcester was
14 a good idea.
15    Q. Did you think any other cities might work
16 better or no?
17    A. No. Excuse me, none that I considered.
18    Q. How did you get connected -- let me ask you
19 this.
20         Worcester Professional Baseball operates
21 a baseball team. Right?
22    A. Yes.
23    Q. What's the name of the team?
24    A. Worcester Tornadoes.

**31**

1    Q. They're part of a minor league association;
2 isn't that right?
3    A. That's correct.
4    Q. What's the name of that association?
5    A. It's commonly known as the Can-Am league.
6 It's the Canadian American association of
7 professional baseball.
8    Q. How did Worcester baseball get connected
9 with the Can-Am league?
10    A. To the best of my knowledge, prior to my
11 involvement, there had been some discussion by
12 Mr. Stone and possibly by Mr. Rosenfield with the
13 commissioner of the Can-Am league regarding the
14 availability of a franchise that could be purchased
15 from the Can-Am league.
16    Q. Who was the commissioner?
17    A. Miles Wolf.
18    Q. Was it Mr. Wolf last October, too, when the
19 discussion was first started?
20    A. I don't understand the question.
21    Q. How long has Miles Wolf served as
22 commissioner, do you know?
23         MR. CIAVARRA: Excuse me, Terry. Can I
24 ask you what this has to do with our case? And I

**32**

1 appreciate the fact that you can get background, but
2 the formation and the discussions with the league
3 does it have any relevance to this case at all?
4         MR. KLEIN: Well, what I'm trying to
5 determine is the degree of involvement that Mr. Tye
6 has with Worcester Baseball --
7         MR. CIAVARRA: And I appreciate that and
8 I understand why you would want to do that.
9         MR. KLEIN: -- in all capacities so
10 that --
11         MR. CIAVARRA: I'm not trying to deprive
12 you of that, but I don't even see -- and again,
13 asking his involvement, what he did, I think that's
14 all good stuff.
15         MR. KLEIN: For instance, if Mr. Tye was
16 the lead force in discussing --
17         MR. CIAVARRA: You don't have to go any
18 further because I understand those issues, and
19 that's why I haven't -- but it just seems to me at a
20 certain point who the commissioner was and it just
21 seems --
22         MR. KLEIN: Here's the issue: If there
23 was somebody else that he was talking to, I want to
24 know and that's it. So we're going to move on.

**33**

1 BY MR. KLEIN:
2    Q. Did you try to connect with any other
3 leagues?
4    A. Not that I'm aware of.
5    Q. Where do the Tornados play?
6    A. Hanover Insurance Park at Fitton Field.
7    Q. How did you decide on Fitton Field?
8    A. We considered a number of different
9 locations, evaluated each of them, determined which
10 were feasible and ultimately decided that Fitton
11 Field was the best place to play.
12    Q. How many other locations did you consider?
13    A. I would say three or four others.
14    Q. What were those locations?
15    A. Tivnan Field, also known as Lake Avenue
16 Field in Worcester, Clark University's baseball
17 field. We also looked at several other college and
18 university fields including WPI and Assumption.
19    Q. And when did you decide on Fitton?
20    A. Well, we looked early on at a number of
21 different fields, and we determined that Fitton was
22 our first choice based upon its location and based
23 upon some of the other amenities that were offered
24 nearby, such as parking. We really couldn't

38

1    A. I don't know the precise number. I would
2  guess probably somewhere in the range of five.
3    Q. And who signed them for Worcester Baseball?
4    A. To the best of my knowledge, Alan Stone.
5    Q. Did you sign any of them?
6    A. I did not.
7    Q. Do you remember who the five contracts were
8  with?
9    A. One was Dant Clayton.
10   Q. Let's do it this way. Let's just go by
11 contractor. I will ask you a couple of questions
12 about Dant. What did Dant do at Fitton Field?
13   A. Dant provided the aluminum seating,
14 concourses, press box, bathrooms, and related steel
15 and concrete work.
16   Q. And so that's Dant. Who else?
17   A. Marois Brothers.
18   Q. What work did Marois Brothers do?
19   A. Site work including grading, drainage,
20 sewer, water, underground utilities.
21   Q. Who else?
22   A. Electrical Dynamics.
23   Q. What did Electrical Dynamics do?
24   A. They provided all the power, both lighting

39

1  and electrical within the ballpark, as well as
2  bringing high voltage from the Holy Cross campus to
3  the ballpark.
4    Q. Who else?
5    A. Musco was a major contractor for lighting,
6  providing field lighting.
7    Q. Any others?
8    A. Immedia provided the sound system, and I
9  believe those were the major contracts.
10   Q. What was your original target date for
11 opening day?
12   A. Originally we targeted a date in late May
13 to coincide with the Can-Am league schedule, which
14 had a game scheduled for a date in late May, which I
15 believe was May 28, but I am not positive as to the
16 exact date.
17   Q. Did you make that date?
18   A. We actually revised our schedule with the
19 Can-Am league to have our opening game changed to
20 June 6, and we did make that date.
21   Q. This is a tough question. What would you
22 say was the principal cause of the move from the May
23 28 date to the June 6 date was?
24   A. We requested that the league change the

40

1  date because we wanted to be sure that we had our
2  improvements completed at the ballpark and that we
3  were able to open with the ballpark substantially in
4  place.
5    Q. Were the improvements ready by May 28?
6    A. I think our construction schedule
7  contemplated having them completed by June 6.
8    Q. Was that your final construction schedule?
9  Had there been versions of -- you can just answer
10 that question.
11   A. Yes, that was our final construction
12 schedule.
13   Q. Were there schedules that had been prepared
14 beforehand?
15   A. There may have been.
16   Q. Was it like a Primavera file, like a P3
17 that sort of thing?
18   A. There may have been.
19   Q. Was there ever a schedule that was prepared
20 that had May 28 as your final date?
21   A. There may have been.
22   Q. So what would you say caused the date to
23 move from May 28 to June 6?
24       MR. CIAVARRA: Objection. Asked and

41

1  answered. You can still answer.
2    A. It was the judgement of those who were
3  involved in running the team that were trying to
4  accomplish a project within a very tight time frame.
5  We wanted to be absolutely sure that when we opened
6  for the first game that we had a substantial amount
7  of our completions in place for our fans, and so
8  that caused us to talk to the front office of the
9  Can-Am league at an early point and see if we could
10 switch our opening day to June 6 to be absolutely
11 sure that we could have a substantial amount of our
12 improvements in place at that time.
13   Q. Was Dant Clayton done with its work on May
14 28?
15   A. I don't recall specifically if Dant Clayton
16 was done with their work.
17   Q. Do you know when the last time a Dant
18 Clayton person was on site?
19   A. I don't know the exact date.
20   Q. Let's get approximate then. Was Dant
21 Clayton done with its work say mid-May, May 15?
22   A. I don't believe so.
23   Q. Were they still working on the aluminum
24 seating areas say at the end of May, on May 30 or

---

150

1   Q. Was this a document that Mr. Suprina shared
2 with you at the February 15 meeting, do you
3 remember?
4   A. I believe so.
5   Q. And as of this proposal, what concerns
6 remained with respect to a deal with Seating
7 Solutions?
8   A. I'd have to look at the plan that was
9 reviewed at that meeting next to the proposal, but
10 there were clearly concerns related to the plan.
11 There were concerns related to the pricing, and
12 there were certainly some concerns about my feeling
13 in doing business with both Scott Suprina and
14 Seating Solutions.
15   Q. What do you mean by that latter statement?
16   A. I did not feel entirely comfortable in
17 doing business with Seating Solutions. I felt
18 having interviewed another contractor that the other
19 contractor had a better track record and was better
20 suited for our project. However, we had a tight
21 time frame. Seating Solutions was at the table, and
22 I was negotiating with them. It didn't mean I had
23 to like them.
24     MR. KLEIN: Now, let's take a quick peak

151

1 then Counsel, at tab 19. You don't have that yet,
2 Mr. Tye. Can you mark this?
3     (Exhibit 23, e-mail, marked)
4 BY MR. KLEIN:
5   Q. Feel free to take a look at what I've put
6 in front of you, which is Exhibit 23, and then look
7 up at me when you're done.
8   A. Okay.
9   Q. Could you identify this document for the
10 record?
11   A. It's an e-mail from Theo Kindermanns at
12 Geller Associates to me with a copy to Andy Truman.
13   Q. What role was Theo playing in this process?
14   A. Theo is a partner at Geller Associates.
15   Q. What was he doing?
16   A. He was assisting in the overview of the
17 project for Geller.
18   Q. Did he have any different tasks than
19 Patrick Maguire?
20   A. He was involved in supervising Geller's
21 Wellesley office, which produced a lot of the plans.
22 He was typically the person at Geller I deal with
23 the most, and we had asked Geller's group that does
24 renderings to produce a rendering of the ballpark

152

1 for us to use to help show Holy Cross what we were
2 working on. So Chuck is from Geller. He was
3 producing the rendering, and Theo would have been in
4 a supervisory position to Chuck.
5   Q. And have you known Theo longer than you've
6 known Patrick Maguire?
7   A. Yes.
8   Q. How long have you known Theo for?
9   A. I would say probably for ten to twelve
10 years.
11   Q. Apart from this document, what other
12 communications did you have with Mr. Kindermanns
13 about, if any, contract negotiations with Seating
14 Solutions?
15   A. He was in and out of the process by virtue
16 of his position as the partner who oversees the
17 Wellesley office of Geller, but I would say his
18 expertise is less in sport venues, and so he was
19 more involved in some of the site planning and
20 overview of plan production, less involved in
21 negotiations or review of any potential information
22 provided as part of the proposals.
23   Q. Did he respond to this e-mail, do you
24 recall?

153

1   A. I don't recall responding to it.
2   Q. I'd like to turn your attention to Exhibit
3 5 now, which is tab 20.
4   A. Okay.
5   Q. Is there a typo in that first sentence?
6   A. No. "Suprina is coming in tomorrow at
7 mid-May." I think what that means is that his
8 schedule that he was proposing in tomorrow's meeting
9 was to complete the project in mid-May.
10   Q. So it's not midday?
11   A. It could have been. I don't recall. It
12 could have been, but either one would be accurate.
13   Q. So tomorrow would have been February 18.
14 Correct?
15   A. That's right and he did come in at midday.
16   Q. Who scheduled that meeting?
17   A. Suprina called me and indicated that he
18 would be in town because he had a meeting at Boston
19 College, I believe, and asked if he could come by my
20 office.
21   Q. And you responded how?
22   A. Yes.
23   Q. What was the purpose of the meeting?
24   A. The purpose of the meeting, as I found out,

(Pages 154 to 157)

---

**154**

1  was that he brought in a revised proposal and we
2  discussed it.
3     Q.  Now, Patrick Maguire was not at this
4  meeting.  Correct?
5     A.  I don't believe so.
6     Q.  Could you look at Exhibit 6 for me, please?
7     A.  Sure, if I can find it.
8     Q.  Do you see in your e-mail you say, "See you
9  at 12:30"?
10    A.  Yes.
11    Q.  Do you know what that is referring to?
12    A.  That may have been -- I may have asked Pat
13 to attend the meeting with Suprina.  I would have to
14 check my schedule and see if I had a meeting with
15 him that Thursday at 12:30.  As I remember with
16 Suprina, he was going to come in sometime after
17 noontime and I asked him to call me to tell me
18 specifically when he would come to the office.
19    Q.  Do you remember today what time he
20 ultimately called you on that Friday?
21    A.  It was sometime in the afternoon.
22    Q.  What time did he show up, do you remember?
23    A.  I think around 2:00 o'clock.
24    Q.  Are there any sign-in logs at the building

---

**155**

1  where you work?
2     A.  No.
3     Q.  Where did that meeting take place?
4     A.  In a conference room in my office.
5     Q.  Who was in the room?
6     A.  I remember I was there, Suprina was there
7  and the other gentleman that you identified as Ross
8  Jacobs was there.  I don't remember who else was at
9  that meeting.
10    Q.  Did you have an assistant in the room
11 taking notes?
12    A.  Not that I remember, that would be not
13 typical.
14    Q.  Do you have one assistant that works for
15 you?
16    A.  I do.
17    Q.  What's her name?
18    A.  Eileen Malvesti.  She was on maternity
19 leave.
20    Q.  Could you spell her last name?
21    A.  M-a-l-v-e-s-t-i.
22    Q.  But she was on maternity leave?
23    A.  She never comes into meetings and take
24 notes.

---

**156**

1     Q.  Mr. Suprina came to this meeting with a
2  proposal?
3     A.  As I remember, he did.
4        MR. KLEIN:  If I could, Counsel, just
5  look at tab 22.  Can you mark this?
6        (Exhibit 24, February 18 proposal,
7  marked)
8  BY MR. KLEIN:
9     Q.  Mr. Tye, I'm showing you what's been marked
10 as Exhibit 24.  If you just want to take a quick
11 look at that.  Now, is this the proposal that
12 Mr. Suprina had with him at the February 18 meeting?
13    A.  I believe it is.
14    Q.  How long did this meeting last on February
15 18?
16    A.  Probably around an hour and a half.
17    Q.  I was hoping, if you could, I'll give you a
18 pen and just show me where people were sitting
19 around the conference table just by drawing it?
20    A.  I don't remember exactly where anyone was
21 sitting.  I remember which conference room we were
22 in, which was a very small conference room.  I'm not
23 sure where people were sitting.
24    Q.  Do you know why Ross Jacobs was with

---

**157**

1  Mr. Suprina?
2     A.  I think he introduced him as a marketing
3  person, and I assumed he was there because he was
4  involved in whatever they were doing over at BC.
5  I'd never heard his name before, never had any prior
6  involvement with him on the project.
7     Q.  Did he speak at all during the meeting?
8     A.  No.
9     Q.  And he wasn't operating an AutoCAD program
10 or anything like that?
11    A.  No.  He was on his telephone at least once
12 during the meeting.  That's all I remember, but he
13 was not actively engaged in the meeting.
14    Q.  Was this a meeting that you were in and out
15 of?
16    A.  No.
17    Q.  You were in the room for the entire time?
18    A.  Yes.
19    Q.  Now, we discussed a little bit earlier some
20 of the things that happened at the meeting.  What
21 else happened?
22    A.  I think I spent a good amount of the time
23 of the meeting reviewing this document with Suprina.
24 That was the major focus of the meeting.

---

40

158

1    Q. Did the two of you kind of mark that up?
2    A. I made notes on a copy of the document, on
3 my copy of the document.
4        MR. KLEIN: Counsel, this is tab 29.
5 Can you mark this?
6        (Exhibit 25, e-mail version of proposal,
7 marked)
8 BY MR. KLEIN:
9    Q. Now, if you could just take a look at what
10 I've shown you, which is Exhibit 25 and just look up
11 at me when you're done.
12    A. Okay.
13    Q. Just describe the process how the markups
14 came to happen?
15    A. There was some discussion in the meeting
16 between Suprina and me over this proposal. I
17 indicated to him again, as I said previously, that
18 we are not ready to sign a proposal, that I would
19 get back to them with some comments that I had from
20 the meeting, and I also wanted a chance to consider
21 and read it cold after the meeting. I told him
22 that, again, it was subject to the approval of our
23 Board, and that any agreement had to be signed by
24 Alan Stone and that we were still continuing to work

159

1 with Holy Cross. So I subsequent to the meeting on
2 Saturday took my notes and rewrote them, including
3 adding a few items, I believe, marked this up and
4 e-mailed it back to Scott.
5    Q. Is this document the version that you
6 e-mailed back to Scott?
7    A. Yes, it is.
8    Q. Do you have a copy with your original
9 notes?
10    A. No, I don't.
11    Q. What happened to that?
12    A. I destroyed it that day. I took my notes,
13 which were generally illegible I believe, and
14 created this document.
15    Q. So the proposal that you were marking up,
16 did Mr. Suprina make any notes on that document as
17 well?
18    A. No.
19    Q. It wasn't as if it was sitting in the
20 middle of the table and the two of you were making
21 notes?
22    A. No.
23    Q. Did these markups that you made and sent
24 back to Cristie Suprina, were there any provisions

160

1 that Mr. Suprina had decided to add?
2    A. First of all, almost all, if not all, of
3 Scott Suprina's e-mail went to Cristie Suprina, so
4 when I sent something to Cristie Suprina, I assumed
5 it was going to Scott Suprina. He and I each took
6 our own notes at the meeting, and I marked up this
7 document and sent it back to them on Saturday. I
8 never received any response to this document or any
9 additional comments from him.
10    Q. We'll talk about the response that you
11 received in a minute. But, as of the date when you
12 did this on the morning of February 19 or something
13 along those lines, when you marked this up --
14    A. That's correct.
15    Q. -- were there any terms that weren't in
16 this proposal that you would have wanted to have in
17 a final agreement?
18    A. I believe I added several terms in here
19 that had not been discussed the day before. I
20 think, as noted here, any final agreement would be
21 an AIA contract. I would never contract for a
22 project of this size based upon a signed proposal,
23 which is specifically why even in the unsigned
24 document I put subject to an AIA contract. This

161

1 document also did not include a schedule, which was
2 one of the most critical parts of the project so
3 that's why I included at the bottom, "Please provide
4 schedule." I never would have signed a document
5 like this without the inclusion of a detailed
6 schedule.
7    Q. With respect to schedule, there is a
8 liquidated damages clause. Correct?
9    A. There's a reference in this to damages if a
10 date is not met.
11    Q. There is a date listed there. Right?
12    A. Yes. But that is not enough for anyone
13 even expert in the construction business to
14 understand that someone can meet a schedule. It
15 really requires a line-by-line detailed schedule.
16    Q. Even a Primavera document or something like
17 that?
18    A. Correct.
19    Q. But there is a date by which substantial
20 completion must be accomplished. Correct?
21    A. There's a date reference in here, but until
22 an AIA contract is put in place the meaning of that
23 date is very unclear.
24    Q. What is that date just for the record?

(Pages 162 to 165)

---

162

1    MR. CIAVVARA: You're talking about the
2 date that liquidated damages would begin to accrue?
3    MR. KLEIN: That's correct.
4    A. May 15, 2005.
5 BY MR. KLEIN:
6    Q. So back to my original question: Are there
7 terms, for example, that are in an AIA contract that
8 are not in this document that you would have liked
9 to have seen in this document?
10    MR. CIAVARRA: Objection.
11    MS. MICHAELS KORN: Object also.
12    A. Yes.
13 BY MR. KLEIN:
14    Q. What terms?
15    A. An AIA document is a carefully-worded legal
16 document that is customarily used in the
17 construction business. I am not a lawyer and I
18 would not enter into any agreement for a
19 construction project anything close to this size
20 without relying on the AIA document, which has much
21 detail to it, more than I can describe here.
22    Q. So what I'm trying to figure out is when
23 you add your edits, your notes, were there any
24 terms, any contract or deal points if you will, that

---

163

1 you would have wanted to have in a final agreement?
2    MR. CIAVARRA: Objection. Asked and
3 answered.
4    MR. KLEIN: I agree about the asked
5 part.
6    MR. CIAVARRA: Well, it's been answered
7 too.
8    A. I added additional provisions in here after
9 the meeting with Suprina and I made very clear to
10 him that I would be meeting with my Board and that
11 they may also have additional provisions that they
12 wanted included in the agreement before they signed
13 off on it.
14 BY MR. KLEIN:
15    Q. So it could be that the Board might have
16 some additional terms that you might not have
17 identified?
18    A. Or that there may be additional terms that
19 would come out of the negotiation of an AIA
20 contract.
21    Q. So as of you sending this proposal out, was
22 there anything you still had to negotiate with
23 Seating Solutions?
24    A. I did not fully negotiate this for one

---

164

1 thing. For a second thing, I was about to meet with
2 my Board and I did not know what issues they would
3 bring up. For a third thing, I had not had full
4 input from Holy Cross in terms of their review of
5 the project so I did not know what issues they would
6 bring up. So all of those things had to be done
7 prior to us executing the unsigned proposal.
8    Q. So the terms that were not included in this
9 proposal, let's say remained open for negotiation,
10 were the terms that the Board would identify, that
11 Holy Cross would identify, and that you could
12 identify as the negotiation process moved forward;
13 is that your testimony?
14    A. Until there was a signed proposal, any
15 terms in my mind would be subject to change and
16 negotiation. This was a negotiation. It was never
17 an agreement. So until there was an agreement, in
18 my mind, and in industry practice, anything remains
19 open for discussion.
20    Q. So you never said to Scott, "We have a
21 deal"?
22    A. I never said to Scott, "We have a deal."
23    Q. You never said to Scott, "You have an
24 order"?

---

165

1    A. I never said to Scott, "We have an order."
2    Q. And at a certain point during the meeting
3 on February 18, did Scott ask you to confirm that
4 Worcester Baseball and Seating Solutions had a
5 contract?
6    A. No.
7    Q. At a certain point, did he ask Worcester
8 Baseball to hire Seating Solutions to install the
9 seating system at Fitton Field?
10    A. He was there with a proposal in hand. He
11 asked us to -- he was there to get a signature on
12 his proposal and get a deposit check, and I did not
13 give it to him.
14    Q. Did Scott Suprina ever say that he wouldn't
15 begin work until you gave him a deposit?
16    A. Yes.
17    Q. Did he ever tell you that he wasn't going
18 to begin work until you signed the proposal?
19    A. Yes.
20    Q. Did he place any other conditions on
21 starting work?
22    A. He told me he needed to order -- he wanted
23 to begin the process of ordering materials and that
24 he couldn't do that until he had a deposit and a

42

(Pages 166 to 169)

---

**166**

1 signed proposal.
2 Q. So during this meeting was there ever any
3 point where you thought to yourself we've got a
4 contract with these guys?
5 A. No, none. Not even remotely. That doesn't
6 mean that I wasn't courteous to him, and it doesn't
7 mean that I wasn't considering working with him, but
8 there was no, not even a remote chance, that I told
9 him that in any way he had a contract.
10 Q. So in your mind what else had to happen
11 before Seating Solutions and Worcester Baseball had
12 a deal?
13       MR. CIAVARRA: Objection. Asked and
14 answered.
15 A. In order to have a deal I needed to
16 complete the negotiation of a proposal, present it
17 to the Board for their additional comment and final
18 approval, get approval from Holy Cross, and have
19 Alan Stone, as the authorized signator, sign the
20 proposal and provide a deposit check. All of that
21 subject to an AIA contract and execution by both
22 parties. In fact, Mr. Suprina never even signed the
23 proposal that he gave me.
24 Q. Right. So complete negotiations of

---

**167**

1 proposal, provide it for initial comment to the
2 Board of Directors, final approval by your Board of
3 Directors, Holy Cross approval, Alan Stone signs it,
4 you provide a deposit check, and you guys execute an
5 AIA contract, and that's when you have a deal?
6 A. I will just stand by what I said.
7 Q. You did, and it might be over at this
8 point, or you do have a contract with Dant Clayton
9 for Fitton Field. Right?
10 A. That's correct.
11 Q. Do you remember what date you entered into
12 that contract?
13 A. Probably the middle of March.
14 Q. That contract, just in your opinion, only
15 came into being when the AIA contract was signed.
16 Right?
17 A. That's correct.
18 Q. So that was one of the many things in your
19 mind that distinguishes your dealings with Dant from
20 your dealing with Seating Solutions. Right?
21       MS. MICHAELS KORN: Objection.
22 A. I think my dealings with Seating Solutions
23 were -- Seating Solutions was proposing -- like many
24 people do to me, they were making a proposal. Their

---

**168**

1 proposal was never accepted. Dant made a proposal
2 that was ultimately accepted. That's the
3 difference.
4 BY MR. KLEIN:
5 Q. Now, when this February 18 meeting with
6 Scott Suprina happened, did you have a meeting with
7 Dant Clayton that was scheduled at that point?
8 A. I believe the meeting with Dant Clayton was
9 scheduled later that afternoon, after I met with
10 Suprina.
11 Q. Now, I just want to look at a couple of
12 exhibits before we move on. The first is Exhibit
13 14. Again, the key thing here is going to be the
14 Sunday, February 20 e-mail from you that starts on
15 the second page and ends on the third page.
16 A. Yes.
17 Q. You say in that e-mail that you're going to
18 switch suppliers?
19 A. Yes.
20 Q. First of all, to whom were you going to
21 switch suppliers?
22 A. I kept our Board of Directors -- we met
23 during this time every weekend, and I kept them
24 involved or at least updated on a week-to-week basis

---

**169**

1 in terms of where we were going, and I think it's
2 fair to say that at the prior meeting it appeared more
3 likely that we were going to make a deal with
4 Seating Solutions than we were with Dant. So what
5 I'm simply telling them here is that we appeared to
6 be more likely to go with Dant than with Seating
7 Solutions.
8 Q. Okay. But it says you're going to attempt
9 to switch supplier. Correct?
10 A. That's what it says.
11 Q. And the new supplier is Dant Clayton.
12 Correct?
13 A. That's correct.
14 Q. The old supplier would have been Seating
15 Solutions. Right?
16 A. That's correct.
17 Q. I want to go down to the differences or the
18 major changes as they're described in the e-mail.
19 Do you see where it says, "major changes?"
20 A. I do.
21 Q. The extra four inches on seat dimension.
22 What does that mean?
23 A. I don't recall exactly, but I think it
24 means we were using a wider seat. I know that the

---

(Pages 174 to 177)

174

1    A. Alan Stone was in our office for a
2 different meeting that afternoon.
3.   Q. Meeting with who?
4    A. I don't know.
5    Q. Do you recall running into him in the hall
6 after?
7    A. I do.
8    Q. What did you say to Mr. Stone?
9    A. I don't recall the exact words that I said
10 at that time, but I think I introduced him to Scott.
11 I told him that we had a productive meeting and I
12 probably said something along the lines that we were
13 making progress. He and Scott shook hands. I had
14 mentioned Alan's name and I don't recall whether the
15 two of them had met earlier, but I had mentioned
16 Alan's name in the meeting and I had told Scott
17 again that Alan was the person who ultimately would
18 sign off on the deal.
19    Q. Do you remember what Mr. Stone said to
20 Scott, if anything?
21    A. I don't, not exactly. I remember Alan
22 being very cordial and smiling and the chemistry was
23 all very good.
24    Q. Was it more than pleasantries at all? Did

175

1 they talk business at all?
2    A. No. Alan wouldn't have talked business.
3    Q. Why not?
4    A. Because the group was anticipating hearing
5 from me over the weekend. I was in the meeting, he
6 wasn't. He wouldn't have said anything beyond that,
7 beyond pleasantries.
8    Q. So Mr. Stone never congratulated you and
9 Scott on reaching a deal on that afternoon?
10    A. No, I don't believe he did.
11    MR. KLEIN: Tab 26, Counsel. Can you
12 mark this?
13        (Exhibit 27, insurance certificate,
14 marked)
15 BY MR. KLEIN:
16    Q. Mr. Tye, if you could just take a look at
17 what's been marked as Exhibit 27. I don't think you
18 have to look at it in a whole lot of detail and look
19 back up at me when you're done.
20    A. (Witness complies).
21    Q. Did Seating Solutions send you an insurance
22 certificate?
23    A. They may have.
24    Q. You don't recall?

176

1    A. I believe they sent it to me. I don't
2 recall when it was received.
3    Q. Did you ask them to send you an insurance
4 certificate?
5    A. Well, it would be a standard practice to
6 provide an insurance certificate, although, this was
7 clearly premature in the process. I would not
8 expect an insurance certificate until a contract was
9 signed.
10    Q. Okay. So just again, unpack this a little
11 bit for me. It was "clearly premature." Why?
12    A. No one would ever -- I shouldn't say that
13 because someone did. Practice is that you do not
14 send an insurance certificate until you have a
15 contract in place. The contract ultimately would
16 dictate the level of insurance that would be
17 required. Until that contract was in place, I would
18 have no need for an insurance certificate, nor would
19 it be typical for anyone to provide one.
20    Q. Did you ask for an insurance --
21    A. No.
22    Q. They just sent this?
23    A. I don't see any transmittal here, so I have
24 no reason to believe they did or they didn't.

177

1        MR. KLEIN: Tab 28. Can you mark this?
2        (Exhibit 28, fax from Seating Solutions,
3 marked)
4 BY MR. KLEIN:
5    Q. Mr. Tye, I'm showing you what has been
6 marked as Exhibit 28. If you take a quick look at
7 that and then look back up at me when you're done.
8    A. Okay.
9    Q. Could you identify that document for the
10 record?
11    A. This appears to be a fax from Seating
12 Solutions to Perfect Game Baseball, but I don't see
13 any evidence that it's gone through a fax machine.
14    Q. Do you remember receiving it or no?
15    A. I don't remember receiving it.
16    Q. So you didn't ask Seating Solutions to
17 provide you with wiring information?
18    A. I may have asked them.
19    Q. Would that have happened on February 18?
20    A. It could have.
21    Q. Why are the wiring information and the
22 insurance certificates made out to Perfect Game
23 Baseball?
24    A. I don't know.

(Pages 226 to 228)

226

1    CERTIFICATE OF COURT REPORTER
2        I, Amy L. Samara, do certify that the
3    deposition of THEODORE TYE on August 24, 2005, was
4    stenographically recorded by me; that the witness
5    provided satisfactory evidence of identification by
6    means of a Massachusetts Driver's License, as
7    prescribed by Executive Order 455 (03-13) issued by
8    the Governor of the Commonwealth of Massachusetts,
9    before being sworn by me, a Notary Public in and for
10   the Commonwealth of Massachusetts; that the
11   transcript produced by me is a true and accurate
12   record of the proceedings to the best of my ability;
13   that I am neither counsel for, related to, nor
14   employed by any of the parties to the above action;
15   and further that I am not a relative or employee of
16   any attorney or counsel employed by the parties
17   thereto, nor financially or otherwise interested in
18   the outcome of the action.
19
20   _____   _____
21   Amy L. Samara         Date
22
23   My commission expires:  July 28, 2011.
24

227

THEODORE TYE
SIGNATURE PAGE/ERRATA SHEET
PAGE    LINE        CHANGE OR CORRECTION AND REASON

I have read the transcript of my deposition taken on

August 24, 2005.  Except for any corrections or

changes noted above, I hereby subscribe to the

transcript as an accurate record of the statements

made by me.

Signed under the pains and penalties of perjury.

_____   DATE

228

THEODORE TYE
SIGNATURE PAGE/ERRATA SHEET INFORMATION
For deposition taken on:  August 24, 2005

SIGNATURE INFORMATION FOR COUNSEL
The original signature page/errata sheet has been
sent to Louis M. Ciavarra, Esq. to obtain signature
from the deponent.  When complete, please send
original to Terry Klein, Esq.  A copy of any errata
should be sent to each party of record present at
the deposition.
WITNESS INSTRUCTIONS
After reading the transcript of your deposition,
please note any change or correction and the reason
on the errata/signature page.  DO NOT make any
notations on the transcript itself.  If necessary,
continue the format on a separate page.
PLEASE SIGN AND DATE the errata/signature page and
return it to your counsel.

58

**Exhibit B**
(pages 1-6)

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-CV-10365-JLT

```
************************************
RI, INC. d/b/a SEATING SOLUTIONS,  *
        Plaintiff,                 *
                                   *
v.                                 *
                                   *
GELLER SPORT, INC., GELLER         *
DeVELLIS, INC., WORCESTER          *
PROFESSIONAL BASEBALL LLC, and     *
PERFECT GAME BASEBALL CLUBS LLC,   *
        Defendants.                *
************************************
```

                DEPOSITION OF ALAN R. STONE, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Michelle Kaczynski, a
Registered Professional Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Henshon, Parker & Vyadro, P.C., 84 State
Street, Suite 360, Boston, Massachusetts, on Friday,
August 26, 2005, at 9:55 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS  02116
(617) 426-6060

2671a040-e930-4213-82df-3f66b60cc131

1      A.    There were a variety of fields, and as I

2  mentioned, possibilities from vacant land to already

3  developed fields.

4      Q.    Right.  Well, at a certain point, right, you

5  really sort of focused on Holy Cross, right?

6      A.    Well, there, I think it's fair to say the

7  list shrank to, you know, several possibilities.

8      Q.    And what were those, after the list shrank,

9  what were the possibilities?

10     A.    Once again, various universities, you

11  mentioned Clark, Holy Cross.  I viewed Assumption and

12  Worcester Polytech as two other possibilities that we

13  looked at.

14     Q.    Okay, and once you had sites, for these

15  sites, did all of them, were all of them going to

16  require some kind of improvements?

17     A.    It's fair to say, yes.

18     Q.    And did someone as part of your group, as

19  part of the team that was developing focus on those

20  improvements, being responsible for the logistics

21  associated with that?

22     A.    Yes, yes.

23     Q.    Who was that?

24     A.    At some point I asked Ted Tye to be the lead

KACZYNSKI REPORTING

Page 29

1  person on that.

2      Q.   Had Phil Rosenfield also been working on that

3  stuff too?

4      A.   Not in an -- yes, but not in a quote/unquote

5  expert capacity.

6      Q.   Sure, and how would you describe what he was

7  doing?

8      A.   Well, first, I don't mean to be asking the

9  questions, I apologize, but I want to make clear that

10  you had asked me about my early discussions with Phil

11  Rosenfield.

12     Q.   Yes.

13     A.   And by mid-November, the group had expanded

14  so that Ted was part of the group, and it was easy to

15  ask my colleague Ted Tye to run with this

16  responsibility based on his experience and expertise.

17     Q.   Yes, and his expertise, how would that

18  contrast with Mr. Rosenfield's experience?

19     A.   Ted Tye is an experienced real estate

20  businessman and entrepreneur, Philip is not.

21     Q.   When did Patrick Maguire get involved?

22     A.   This is early in, relatively early in the

23  process.

24     Q.   Who brought him in?

2671a040-e930-4213-82df-3f66b60cc131

1       Q.   And when did you start, do you know when kind

2   of the construction and design process on Fitton Field

3   got underway?

4       A.   I think it was not until we signed a lease

5   with Holy Cross, I believe in late March.

6       Q.   Were you looking at people to do improvements

7   on Fitton Field before then though?

8       A.   Yes.  When you say looking for, we were

9   engaging in discussions with a variety of vendors and

10  contractors to do improvements, yes.

11      Q.   And again, just the kind of the broad

12  category of the improvements that you were looking for,

13  what were the general categories?

14      A.   I would say in the rubric of fan amenities

15  and player amenities.  With respect to Fitton Field, it

16  would be seating, it would be access ways, concourses

17  and walkways, dugouts, press facilities, restroom

18  facilities, revamping some of the field, the condition,

19  looking at the condition of the infield and the

20  condition of the turf, and it's a lot of interrelated

21  developments.  I think I've just about exhausted my

22  construction experience in my answer, but a lot of

23  things had to be done to bring it up to grade.

24      Q.   And in bringing it up to grade, were there

2671a040-e930-4213-82df-3f66b60cc131

Page 34

1    contracts you had to sign?

2        A.    Yes.

3        Q.    And who signed those contracts?

4        A.    I did.

5        Q.    Did anybody else sign any of them?

6        A.    No.

7        Q.    And were there any oral agreements with any

8    of the contractors where no contract actually ever came

9    into being, a written contract?

10       A.    To my knowledge, no.

11       Q.    Okay, okay.  Obviously you're focusing on the

12   seating aspects of things, and I want to start talking

13   about Seating Solutions and Scott Suprina.  How many

14   times have you personally met Mr. Suprina?

15       A.    Including Mr. Suprina's appearance at his

16   deposition which I attended, I believe three.

17       Q.    Okay.

18       A.    Three occasions.

19       Q.    And so excluding the deposition, is that two

20   meetings or three?

21       A.    Two meetings.

22       Q.    And we've discussed one in the, at National

23   Development?

24       A.    Correct.

2671a040-e930-4213-82df-3f66b60cc131

Page 122

1    COMMONWEALTH OF MASSACHUSETTS

2    COUNTY OF SUFFOLK

3         I, Michelle Kaczynski, a Registered Professional
     Reporter and Notary Public duly commissioned in and for
4    the Commonwealth of Massachusetts, do hereby certify
     that there came before me on the 26th day of August,
5    2005 at 84 State Street, Alan R. Stone, who was by me
     duly sworn to testify to the truth and nothing but the
6    truth of his knowledge touching and concerning the
     matters in controversy in this cause; that he was
7    thereupon examined under oath and his examination
     reduced to typewriting under my direction; and that the
8    deposition is a true record of the testimony given by
     the witness.

9

10        I further certify that I am neither attorney or
     counsel for, nor related to or employed by, any of the
11   parties to the action in which this deposition was
     taken, and further that I am not a relative or employee
12   of any attorney or counsel employed by the parties
     hereto or financially interested in this action.

13

14        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my notarial seal this 11th day of
15   September, 2005.

16

17

18                    _____

19                    MICHELLE KACZYNSKI
                      NOTARY PUBLIC
                      MY COMMISSION EXPIRES ON
20                    JUNE 28, 2007

21

22

23

24

KACZYNSKI REPORTING

2671a040-e930-4213-82df-3f66b60cc131

**<u>Exhibit C</u>**
(pages 1-19)

{}

**1**

Exhibits: 1-10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA. NO. 05-CV-10365-JLT

RI, Inc. d/b/a
SEATING SOLUTIONS,

        Plaintiff

VS.

GELLER SPORT, INC.,
GELLER DEVELLIS, INC.,
WORCESTER PROFESSIONAL BASEBALL LLC,
and PERFECT GAME BASEBALL CLUBS, LLC,

        Defendants

        DEPOSITION OF SCOTT SUPRINA, taken
at the request of the Defendants, pursuant
to Rule 30 of the Massachusetts Rules of
Civil Procedure before
Kathleen H. Bradley, Notary Public and
Registered Professional Reporter in and for
the Commonwealth of Massachusetts, on
Friday, July 29, 2005, commencing at
10 a.m. at the offices of Bowditch & Dewey,
311 Main Street, Worcester, Massachusetts.

        BAY STATE REPORTING AGENCY
        76 MILL STREET (At Park Avenue)
        WORCESTER, MASSACHUSETTS  01603
        (508) 753-4121

---

**3**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SCOTT SUPRINA | | | | |
| MR. CIAVARRA: | 4 | | 275 | |
| MS. KORN: | | 225 | | 294 |

EXHIBITS

| 1 | Proposal 2/2/05 | 59 |
|---|---|---|
| 2 | Email & Proposal 2/17/05 | 73 |
| 3 | Email & Edited 2/17/05 Proposal 2/19/05 | 89 |
| 4 | Email 2/21/05 | 91 |
| 5 | Email from Cris 2/21/05 and Revised Proposal | 118 |
| 6 | Emails 2/21/05 | 139 |
| 7 | Email 2/21/05 from S. Suprina to Ted | 146 |
| 8 | Email & Revised Proposal 2/22/05 | 157 |
| 9 | Email 2/22/05 | 157 |
| 10 | 2/23/05 Email Exchange | 165 |

---

**2**

A P P E A R A N C E S :

FOR THE PLAINTIFF:

THE LAW OFFICE OF TERRY KLEIN
84 State Street
Suite 760
Boston, Massachusetts 02109
    BY: Terry Klein, Esq.

FOR THE DEFENDANTS WORCESTER BASEBALL AND PERFECT GAME BASEBALL CLUBS:

BOWDITCH & DEWEY
311 Main Street
Worcester, Massachusetts 01615
    BY: LOUIS M. CIAVARRA, ESQ.

FOR THE DEFENDANTS GELLER:

DONOVAN HATEM, LLP
Two Seaport Lane
Boston, Massachusetts 02210
    BY: LAUREN M. KORN, ESQ.

ALSO PRESENT: Ted Tye, Alan Stone

---

**4**

1          P R O C E E D I N G S
2          SCOTT F. SUPRINA, having been
3    satisfactorily identified by the production
4    of his driver's license, and duly sworn,
5    was examined and testified as follows:
6          (Stipulated by and between
7    counsel that all objections except as to
8    form are reserved until the time of the
9    hearing. Witness will read and sign the
10   deposition transcript within 30 days of
11   receipt)
12          DIRECT EXAMINATION
13   BY MR. CIAVARRA:
14   Q.   Sir, would you please state your full
15   name for the record?
16   A.   Scott Frank Suprina.
17   Q.   You understand you're here for your
18   deposition today?
19   A.   Yes.
20   Q.   And you understand you've been placed
21   under oath?
22   A.   Yes.
23   Q.   And you told me before you've had
24   your deposition taken before?

1  A.  Yes.

2  Q.  How many times?

3  A.  Fifteen or so.

    Q.  A lot of lawyers. How old are you?

5  A.  I'm 46.

6  Q.  That's a good age. I am, too.  And

7  where do you live?

8  A.  26 Parkway Drive South, Commack, New

9  York.

10  Q.  And are you currently employed?

11  A.  Yes.

12  Q.  By whom?

13  A.  RI, Incorporated.

14  Q.  What does RI stand for?

15  A.  Just initials.

16  Q.  It's not Rhode Island, is it?

17  A.  No.

18  Q.  We were in court and the judge kept

19  referring to it as Rhode Island, Inc.  So

20  it's just RI?

21  A.  RI.

22  Q.  And you have a business name that you

23  go by as well?

24  A.  A d/b/a, Seating Solutions.

---

6

1  Q.  Do you typically refer to your

2  company as Seating Solutions or RI?

3  A.  Both.  Depends upon the application.

4  Q.  What's your position with the

5  company?

6  A.  Vice President.

7  Q.  Are you also an owner?

8  A.  Yes.

9  Q.  What percentage of ownership?

10  A.  Actually, technically, no, my wife

11  owns 90 percent.

12  Q.  Who's the President of the company?

13  A.  My wife.

14  Q.  What's her name?

15  A.  Lisa Suprina.

16  Q.  Does she have any operating

17  responsibilities at the company?

18  A.  To take care of the kids --  no.

19  Q.  She doesn't have a day-to-day?

    A.  No, she doesn't.

21  Q.  Would it be fair to say that you

22  operate as the Chief Executive Officer of

23  the company?

24  A.  Yes.

---

1  Q.  For how long have you operated

2  Seating Solutions?

3  A.  Somewhere in the neighborhood of ten

4  years.

5  Q.  Mid-'90s?

6  A.  Yah.

7  Q.  What would you describe Seating

8  Solutions as a business, what does it do?

9  A.  We design, sell and install sports

10  and spectator seating systems and we also

11  have a rental division.

12  Q.  And has that been its business since

13  inception?

14  A.  Yes.

15  Q.  Were you involved in that business

16  before forming Seating Solutions?

17  Personally were you involved in this line

18  of business?

19  A.  I was involved in the park and

20  recreation equipment business, which

21  included some seating.

22  Q.  Is that a company you owned or did

23  you work for someone else?

24  A.  No, I owned the company.

---

8

1  Q.  What was the name of that company?

2  A.  I don't know -- it was Scott Suprina

3  Sports, Inc.

4  Q.  And for how many years had you

5  operated that approximately?

6  A.  Eight or so, ten.

7  Q.  Did that company stop doing business

8  at some point?

9  A.  Yes.

10  Q.  Why did you switch from that company

11  to Seating Solutions?

12  A.  It wasn't switched.  That company, we

13  closed down that company.  That company did

14  a lot of playground equipment.  And my

15  previous depositions were mostly spent in

16  the playground business.  And it just

17  became a business that was impossible to

18  make money at.

19  Q.  Personal injuries?

20  A.  Yah, for no apparent reason.

21  Q.  And Seating Solutions was the next

22  generation of your business activities

23  after Scott Suprina Sports?

24  A.  Yes.

7 A. I provided, I think what I was asked
8 for was the facts of the cost, not the
9 estimates of the costs.
10 Q. Or the backup that went into
11 determining that cost?
12 A. I provided the backup to my attorney,
13 yes.
14 Q. Well, I have the stuff here. You can
15 show me later on when we get to that.
16 Are there documents like those
17 sheets and stuff that you haven't provided
18 yet?
19 A. No.
20 Q. So you think you have provided these
21 so-called "spread sheets?"
22 A. I either provided them or I don't
23 have them, I think.
24 Q. You think you may have destroyed

7 Q. That's your position in this case?
8 A. Correct.
9 Q. Do you have any written agreement for
10 that?
11 A. I think we have many written
12 agreements.
13 Q. Signed by you and someone else?
14 A. I don't believe we have that.
15 Q. I just want to make sure. I think I
16 know what the position is, that there was
17 an oral agreement. But I want to take it
18 step by step.
19 It is not your position that
20 there is a signed, written contract by the
21 parties in this case, is there?
22 MR. KLEIN: Objection to the
23 form.
24 A. Yes, I have a position there is a

22

1 them?
2 A. I wouldn't save scratch paper, which
3 is what I'm talking about.
4 Q. Well, I'm thinking about accounting
5 paper that has lined rules and columns on
6 it.
7 A. You got the wrong guy. No, I don't.
8 Q. Whatever backup you have on the
9 contract price you provided me?
10 A. Yes.
11 Q. And to the best of your knowledge
12 it's been provided?
13 A. Correct.
14 Q. Now just focusing on this particular
15 project, do you call it Fitton Field or
16 Holy Cross?
17 A. Doesn't matter to me.
18 Q. Either one of those will be fine to
19 you?
20 A. I know what you're talking about.
21 Q. We are talking about Fitton Field.
22 Okay?
23 A. Okay.
24 Q. Your company has brought a lawsuit,

24

1 written contract.
2 Q. And you're referring to the documents
3 that you prepared. I think it's called a
4 proposal, is it not?
5 A. I'm referring to the compilation of
6 everything creating the written contract.
7 Q. You sent a number of documents to my
8 clients setting forth the terms of the
9 engagement, did you not?
10 A. That's a tough question to answer
11 really. I sent to your client documents
12 that led to the creation of other documents
13 that set forth the terms.
14 Q. All right. And you're familiar with
15 the format of a document that has on top of
16 it Proposal?
17 A. Sure.
18 Q. (Indicating.) And none of those were
19 ever signed by my clients, were they?
20 A. I don't believe so.
21 Q. You believe, is it your position that
22 there was an oral agreement?
23 A. Absolutely.
24 Q. And who were the individuals that are

**25**

1  the parties to that oral agreement?
2        MR. KLEIN: Objection.
3  Ambiguous.
4  A.   Ted Tye and Alan Stone.
5  Q.   And you, yourself?
6  A.   Me and my company, yes.
7  Q.   I know it's not you individually, but
8  the person who had these oral discussions
9  would be you on behalf of Seating
10  Solutions?
11  A.   Ted Tye, Alan Stone, myself, and Ross
12  Jacobs and numerous secretaries.
13  Q.   Okay.  I'm just going to take it
14  apart.  Your position is that there was an
15  oral agreement, correct?
16  A.   That there is one, yes.
17  Q.   That there is an oral agreement?
18  A.   Correct.
19  Q.   And the people, the individuals that
20  had the discussions that led to that oral
21  agreement on the one side are Mr. Stone and
22  Mr. Tye, is that your testimony on the
23  Baseball side?
24  A.   Let me think about it.

**26**

1  Q.   Sure.
2  A.   Again, I have to say that during the
3  discussions there were other people that
4  heard relevant information to the
5  discussions that you're not naming and I
6  don't know the name of.
7  Q.   I want to be clear about this so
8  there is no confusion.  You understand, do
9  you not, that companies only act through
10  people, right?
11  A.   Yes.
12  Q.   I mean Seating Solutions can't act if
13  someone doesn't act on its behalf, correct?
14  A.   Correct.
15  Q.   And you understand you've brought a
16  suit against a company, two companies, one
17  called Worcester Professional Baseball, LLC
18  and the other called Perfect Game Baseball
19  Clubs, LLC, right?
    A.   Correct.
21  Q.   And you understand those two are my
22  clients.  You understand that?
23  A.   Yes.
24  Q.   Now what I want to have you do is

**27**

1  identify the people who you claim made an
2  agreement with your company on behalf of
3  those two companies?
4  A.   Alan Stone, Ted Tye.
5  Q.   No one else?
6  A.   Made the agreement, no.
7  Q.   That's what I'm talking about.  I'm
8  not talking about witnesses to it, just who
9  made the agreement.
10  A.   Just to avoid confusion, I want to
11  clarify "made the agreement," correct.
12  Q.   Absolutely.  And on behalf of your
13  company, Seating Solutions, who was the
14  individual who made the agreement?
15  A.   Myself.
16  Q.   Do you have a written contract with
17  Outdoor Aluminum?
18  A.   No.
19  Q.   How do you engage them for a project,
20  what is the paperwork?
21        MR.  KLEIN: Objection.
22  Compound.
23  A.   Many ways.
24  Q.   Tell me.

**28**

1  A.   Call them up, tell them to ship me
2  this.
3  Q.   Sometimes it's done by phone?
4  A.   Absolutely.
5  Q.   No order, no invoice?
6  A.   Not necessarily.
7  Q.   Was it like that from the beginning
8  or has that developed more over time that
9  you've developed some relationship
10  together?
11  A.   We've developed a relationship.
12  Q.   Do they require payment from you in
13  advance of shipment?
14  A.   No.
15  Q.   Do they issue you invoices or do you
16  send them, or are there purchase orders?
17  A.   There are purchases orders and they
18  do invoice.
19  Q.   And a Purchase Order is something
20  created by you, your company?  When I say
21  "you" I mean  Seating Solutions.
22  A.   Correct.
23  Q.   And I'll keep doing that.  But
24  Seating Solutions?

41

1 baseball project at many different sites.
2 Q.  Because there were other sites that
3 you had looked at for the baseball team
4 stadium correct?
5 A.  Correct.
6 Q.  Do you remember where those other
7 sites were other than Fitton Field?
8 A.  Yes.  There was one at a park.  There
9 was one at Clark College I believe it is.
10 Q.  Clark University here in Worcester?
11 A.  Yes.
12 Q.  And something called Lake Park?
13 A.  That's correct.
14 Q.  Had you visited both of those sites?
15 A.  Yes.
16 Q.  And had you provided proposals for
17 both of those sites?
18 A.  Yes, I believe I did.
19 Q.  Did you have a contract with Mr.
20 Tye's company for either of those two
21 sites?
22 A.  No.  Just so you're aware, when they
23 gave those proposals, I proposed some of
24 that prior to even meeting Ted Tye.

42

1 Q.  Were there any other individuals that
2 you were working with on the baseball team?
3        MR. KLEIN:  Objection.
4 Ambiguous.
5 A.  Well, on the baseball team it's tough
6 because I don't know that.  I don't know if
7 they were or they weren't.  For this
8 project?
9 Q.  Yes.
10 A.  Yes.  I think his name was Al.
11 Q.  Was it Phil?
12 A.  Phil, yes.
13 Q.  Phil Rosenfeld?
14 A.  Rosenfeld, that's the guy.
15 Q.  And was he the first individual that
16 you met representing the baseball team to
17 the best of your knowledge?
18 A.  I was asked by Nick Lopardo to call
19 Phil.
20 Q.  Is that how you came in contact with
21 the "Worcester project?
22 A.  Yes.
23 Q.  And who's Mr. Lopardo?
24 A.  He runs another team in Lynn.

43

1 Q.  That you did some work for?
2 A.  Yes.
3 Q.  Now who are your competitors out
4 there?
5 A.  In my opinion?
6 Q.  Yes.
7 A.  Nobody.
8 Q.  Who have you seen during the past two
9 years bidding on projects that you were
10 also bidding on?
11 A.  Dan Clayton, Southern Bleacher and
12 E & D Specialty Stands.
13 Q.  E & B?
14 A.  D, as in David.
15 Q.  Specialty--
16 A.  Stands.  That's about it.
17 Q.  There's not a lot of people in this
18 market?
19 A.  Well, that's about it for this type
20 of project.
21 Q.  Did there come a time when you
22 learned that any of these other companies
23 were involved or looking to be involved in
24 the Worcester Baseball project?

44

1 A.  Yes.
2 Q.  Who was that?
3 A.  I believe Dan Clayton.
4 Q.  Do you know if Southern Bleacher or
5 E & D were involved?
6 A.  Don't know.
7 Q.  You don't know one way or the other?
8 A.  No.
9 Q.  Do you know if Dan Clayton was
10 involved in the Lake Park or Clark
11 University sites?
12 A.  I don't know specifically by site.
13 Q.  Do you know if they were involved
14 prior to discussions of locating the field
15 at Fitton Field?
16 A.  I don't know that, no.
17 Q.  You definitely were talking though to
18 the Worcester Baseball Team about Lake Park
19 and Clark University prior to Fitton Field,
20 were you not?
21 A.  Correct.
22 Q.  I just want to get my chronology
23 straight.  Actually when you say prior to,
24 I think Clark and Fitton were considered at

## 45

1 the same time.
2 Q. Lake Park was first though?
3 A. Yes.
4 Q. And that never got to the point of a
5 contract though?
6 A. That never got to the point of --
7 well, never got to? I shouldn't use that
8 phrase. What never got to? I'm not sure.
9 Q. You never got to the point of having
10 a contract with anybody for the Lake Park
11 Field?
12 A. That's correct.
13 Q. And you never got to the point of
14 having a contract for the Clark University
15 field?
16 A. That's correct.
17 Q. Did anyone ever promise you that you
18 would receive a contract for Lake Park or
19 Clark University?
20 A. Just to have said it, there was a
21 mention that if at the last minute there
22 was a problem with Fitton Field, they would
23 have to go somewhere else.
24     At that point I had been given

## 46

1 the contract for Fitton Field and it was
2 agreed that if they had to go somewhere
3 else, that contract would go to the new
4 site.
5     So quite possibly one of those
6 two could have been the new site.
7 Q. And that conversation was with whom?
8 A. Ted Tye.
9 Q. And do you recall when that was?
10 A. That was that Friday I went to close
11 the deal.
12 Q. It was an in-person discussion?
13 A. Yes.
14 Q. And where did that take place?
15 A. In Ted's office, in the building that
16 Ted's office is in. I don't believe it was
17 Ted's office.
18 Q. And the discussion, let me make sure
19 I understand. And the discussion was if we
20 don't go forward on Fitton Field we will
21 need to go forward somewhere else, and if
22 we do, you will get the contract?
23 A. No, that wasn't the discussion.
24 Q. Then tell me what the discussion was.

## 47

1 A. The discussion was that I could,
2 after agreeing that I had a contract, after
3 Ted agreeing with me I had a contract, if
4 the school for some unforseen reason were
5 to back out at the last minute, they would
6 need to go to another location, which I
7 told them I would apply the contract to any
8 location.
9 Q. But the contract would have to be
10 different, wouldn't it, in another
11 location? The site determines --
12 A. Are you telling me?
13 Q. Yes. Do you disagree with that?
14 A. Yes, I disagree with that.
15 Q. You're telling me you could have
16 taken the plans, the pricing and the plans
17 that backed up the contract that you claim
18 you had and just take it and apply it the
19 same way to Clark University or Lake Park,
20 is that what you're telling us?
21 A. Yes.
22 Q. There was nothing unique about the
23 configuration of any of those three
24 facilities?

## 48

1 A. I had no responsibility for site
2 work, so my site was flat and level or
3 whatever I wanted it to be. I was building
4 from the concrete up.
5 Q. And the same number of seats that you
6 were going to put into Fitton Field, you
7 could have put into Lake Park?
8 A. Absolutely, with the right
9 rearrangement of the tree line or whatever.
10 Q. So there would be no change of
11 pricing?
12 A. I'm not responsible for that work.
13 Q. No, there would be no change in your
14 contract price regardless of the location
15 of the field, is that what you're telling
16 us?
17 A. Yes, that's what I'm telling you.
18 Q. Okay. This meeting that took place
19 with Mr. Tye, was anybody else present for
20 that specific part of the conversation?
21 A. I believe there was a young woman in
22 the room, and I don't know, Alan was in the
23 vicinity of that conversation.
24 Q. When you say "in the vicinity,"

1  describe that.
2  A.   Either in or out of the office.  It
3  was like being in here with that door open
4  and him either being outside in the hall or
5  in the room when it was said or when it was
6  not.
7  Q.   Sorry, I wasn't there.  So I need to
8  ask what your memory is.  When this took
9  place, this conversation you're telling us
10  about with Mr. Tye,  do you recall
11  physically where Mr. Stone was?
12  A.   I don't believe he was in the room.
13  Q.   Do you recall physically where this
14  young unnamed woman was?
15  A.   I believe she was in the room.
16  Q.   Was she within five feet, ten feet,
17  20 feet?
18  A.   It was only a ten by ten room.
19  Q.   So your belief is that she would have
20  heard the conversation?
21  A.   Yes.
22  Q.   You don't recall her name?
23  A.   No, I don't think I ever had her
24  name.

1  telling us about was there a written lease
2  between Holy Cross and the Baseball team?
3  A.   I wouldn't know that.
4  Q.   Is it your testimony that neither Mr.
5  Stone nor Mr. Tye told you that they didn't
6  have a lease yet?
7  A.   I believe they told me they were
8  finalizing it, but that they had the
9  approval.
10  Q.   They told you they didn't have a
11  signed lease yet, didn't they?
12        MR. KLEIN:  Object to the
13  form.
14  A.   I don't recall that they told me
15  that.
16  Q.   Well, let me ask you.  You're sitting
17  there on, I think you said February 18th.
18        Was it your understanding that
19  there was a  signed lease between Holy
20  Cross and the baseball teams for the use of
21  Fitton Field?
22  A.   No, it wasn't my understanding either
23  way, signed or unsigned
24  Q.   Had you seen one?

1  Q.   Do you know what her position was or
2  her role was?
3  A.   No idea.  Secretary of some kind.
4  Q.   She was never introduced to you?
5  A.   No.
6  Q.   Now at the time of that discussion
7  you obviously knew that Holy Cross hadn't
8  committed to Mr. Tye's use of the facility,
9  isn't that correct?
10        MR. KLEIN:  Objection to form.
11  A.   No, that's not correct.
12  Q.   Well, you just told us that if Holy
13  Cross decided not to allow them to use the
14  field --
15  A.   That's not what I said.
16  Q.   Let me finish. What you said to us
17  was that if Holy Cross determined not to
18  allow them to use the field that the
19  contract could be applied to the other
20  sites, isn't that what you just told us?
21  A.   No, it's not.
22        MR. KLEIN:  Object to the
23  form.
24  Q.   At the time of the discussion you're

1  A.   Wouldn't be my business.
2  Q.   Didn't ask you that.  I said had you
3  seen one.
4  A.   No.
5  Q.   Did you ask for one?
6  A.   No.
7  Q.   All right.  You understood that Mr.
8  Stone and Mr. Tye's organizations didn't
9  own the field, you knew that?
10        MR. KLEIN:  Object to the
11  form.
12  A.   Um, yes, I knew of that.
13  Q.   Had you been to the field?
14  A.   As I said before, yes.
15  Q.   And you understood that the field was
16  on the campus of Holy Cross, didn't you?
17  A.   Yes.
18  Q.   And you knew they had to obtain the
19  approval of Holy Cross to use it.  You knew
20  that?
21  A.   Yes.
22        MR. KLEIN:  Object to the
23  form.
24  Q.   Let me make sure I follow up with

**Page 53**

1 something either Mr. Stone or Mr. Tye told you on
2 this meeting on the 18th that they had the
3 approval of Holy Cross?
5 A.   Yes.
6 Q.   And who said that?
7 A.   Ted and I believe Alan said the same
8 thing, or at least alluded to that.
9 Q.   What does that mean, "alluded to?"
10 What do you mean by that?
11 A.   We're going to be at Holy Cross.
12 Holy Cross is where we're playing.
13 Everything's a green light.  Whatever,
14 something to that nature.
15 Q.   Did you have any direct contact with
16 anyone from Holy Cross?
17 A.   Not at all.
18 Q.   Did anybody on behalf of my client
19 ask to you assist them with their
20 discussions with Holy Cross?
21 A.   Um, no.  I had offered, if they
22 needed any help early on, for me to talk to
23 the school about the product, I'd be
24 willing to do it.  Apparently they didn't

**Page 54**

1 need it.
2 Q.   Do you remember when that occurred
3 when you made that offer?
4 A.   During that week.  Early in the week.
5 Q.   But that never happened?
6 A.   Correct.
7 Q.   Had you done any work at Holy Cross?
8 A.   No.
9 Q.   You had no contact or relationship
10 with the school?
11 A.   No.
12 Q.   Is a typical job that you enter into
13 with the owner of the site where the stands
14 are going to go?
15 A.   No, not necessarily.
16 Q.   It could be with somebody who's just
17 going to lease the site?
18 A.   Yes.
19 Q.   And so does it happen both ways,
20 directly with owners and with lessees?
21 A.   Yes.
22 Q.   Does that relationship affect you in
23 any way?
24        MR. KLEIN:  Objection.

**Page 55**

2 A.   No.
3 Q.   You don't go about your business in
4 any different way depending whether you're
5 working with an owner of a site as opposed
6 to somebody who's leasing it?
7 A.   I contact the person who's leasing
8 it, if that's who I'm working through.  And
9 if it were differently, I would contact the
10 owner if I was working for the owner.
11 Q.   Same proposal, same contract, same
12 forms of documents you used though
13 regardless?
14 A.   If both are agreeable, yes.
15 Q.   You don't have separate documentation
16 if you work with a lessee as opposed to an
17 owner?
18 A.   No.
19 Q.   On the Fitton Field site were there
20 any other parties involved in the
21 discussions other than the baseball teams?
22 Were there any architects, any other
23 professionals involved?
24 A.   There was a consulting group I

**Page 56**

1 believe.
2 Q.   And who was that?
3 A.   That was-- I've forgotten the man's
4 name.  The other name in the suit.
5 Q.   Geller?
6 A.   Yes.
7 Q.   Had you worked with them before?
8 A.   No.
9 Q.   Had you ever heard of them before?
10 A.   Nope.  Actually that's not true.
11 Actually yes, I have heard the name.
12 Q.   What had you, what did you know?
13 A.   Off of a bid document or off of
14 something.  I've heard the name.
15 Q.   Did you have an understanding as to
16 what they did, what their business was?
17 A.   At what time?
18 Q.   At the time you were having the
19 discussions in February of this year with
20 Mr. Tye and Mr. Stone.
21 A.   Then I knew what they did.
22 Q.   What did Geller do?
23 A.   Let me back up.  I knew what they
24 claimed to do.

57

```
1   Q.   What did they claim to do?
2   A.   Consult on sports layouts and setup
3   of facilities.
    Q.   Are there other people out there that
    do similar things that Geller claimed to do
6   that you've worked with?
7   A.   Yes.
8   Q.   For example, who?
9   A.   Oh, by name?  I just think that
10  generally that's what sports architects do.
11  Everyone from HOK to Rosetti Architects to
12  --
13  Q.   Are these people in that profession
14  with whom you have kind of a repeat or
15  ongoing relationships with and work with
16  with some frequency?
17  A.   Yes.
18  Q.   Who's that?
19  A.   HOK.  I'm sure there's a number of
20  others.  The names aren't coming to me
21  right now.  There's a Sports Outfit.
22  Q.   Where are they?
23  A.   Kansas City.
24  Q.   And you've done a number of projects
```

59

```
1   Q.   I want to make sure that your answers
2   are clear, and I appreciate the fact that
3   you distinguish what you have done, that
4   you haven't personally worked with Geller.
5   A.   Well, for example, you asked me if,
6   for example, did I ever work at Holy Cross.
7   Q.   Right.
8   A.   We could have sold Holy Cross a 5 or
9   15-foot bleacher and I would have no
10  knowledge of it.
11       I personally, however, have
12  never worked at Holy Cross.
13  Q.   Do you know if Seating Solutions has
14  ever done business with Holy Cross?
15  A.   No, I don't.
16  Q.   Do you know if Seating Solutions has
17  ever done business with Geller Sport?
18  A.   I don't believe so.
19  Q.   There are some documents I want to
20  show you.  I'll show you a document which
21  I'll mark as Exhibit 1.  It's a document
22  dated February 2, 2005 entitled Proposal.
23       (Exhibit 1, Proposal 2/2/05,
24       marked)
```

58

```
1   with them?
2   A.   Yes.
3   Q.   But you had never worked with Geller?
4   A.   Not to my recollection.  Can I
5   clarify something here?
6   Q.   Sure.
7   A.   When you're asking me you have never
8   worked with Geller, I'm answering as me.
9   You understand that, right?  Because I
10  can't possibly answer for who my company
11  worked with.
12  Q.   Well --
13  A.   I don't know every contract that
14  comes into my place, so I want to clarify
15  that.
16  Q.   Who signs the contracts at Seating
17  Solutions?
18  A.   On most, the municipal contracts,
19  stuff like that, it would be Mark Ligator.
    On stuff for private jobs or larger
21  projects, it would be myself or Chris.
22  Q.   Okay.
23  A.   A lot of the work is also purchase
24  orders, just so you understand.
```

60

```
1   Q.   Are you all set, sir?
2   A.   Yes.
3   Q.   My question is:  Are you familiar
4   with that document?
5   A.   Yah.
6   Q.   Is that a document created by Seating
7   Solutions?
8   A.   Yes.
9   Q.   Is that a document that exists in
10  your word processor system at the company?
11  A.   I'm sure it does.
12  Q.   And it's a document not in terms of
13  the substance, because I assume it changes
14  obviously from job to job, but that form of
15  a proposal is something that you use from
16  project to project, is that correct?
17  A.   Yes.
18  Q.   And there's some boiler plate
19  language in that, is there not?
20  A.   Correct.
21  Q.   And you'll customize it according to
22  each job?
23  A.   Yes.
24  Q.   Is there a different document that
```

**61**

1 you utilize if you're submitting a bid on a
2 municipal job or would you also use this
3 format?
4 A.   No, on a bid you use the bid proposal
5 form.
6 Q.   Would you also send a proposal or is
7 it a whole different set of documents?
8 A.   When you're bidding to a school or a
9 County, they'll supply you their bid form
10 so everybody is on the same form.
11 Q.   Okay.  And then oftentimes there will
12 be another contract signed if the bid is
13 accepted?
14 A.   Or a purchase order.
15 Q.   And you typically won't utilize your
16 form document?
17 A.   Correct.
18 Q.   So in your business this form that
19 we're looking at marked as Exhibit 1 is
20 used in private jobs as opposed to public
21 jobs, is that fair to say?
22        MR. KLEIN:  Objection.
23 A.   No, that's not fair to say.  I can
24 put a proposal out to a public job to, you

**63**

1 Q.   So who created the first version of
2 it?
3 A.   The Proposal?  I wouldn't be able to
4 answer that.
5 Q.   Did you?
6 A.   Probably -- yah, probably sketched
7 one out.
8 Q.   Have you utilized a lawyer to create
9 this document or any of its later
10 amendments?
11 A.   They've looked at it.
12 Q.   What lawyers have looked at it?
13 A.   Lawrence Feldman with Ferrell Fritz.
14 Q.   Sorry.  We have to take that in bits.
15 Lawrence Feldman.  What's the name of his
16 firm?
17 A.   Ferrell Fritz.
18 Q.   Could you spell that?
19 A.   F-E-R-R-E-L-L, I believe.  Fritz.
20 Q.   And where are they located?
21 A.   Long Island.
22 Q.   And are they your typical company's
23 outside counsel?
24 A.   When I'm not in Boston, yes.

**62**

1 know, to confirm the discussion and then
2 they can respond with a Purchase Order if
3 it's not a bid situation.  So proposals are
4 used across the board, not segregated by
5 ownership.
6 Q.   On a private job though you'll
7 utilize this form, correct?
8 A.   Correct.
9 Q.   Do you have any other form of written
10 contracts that the company uses other than
11 this form?
12 A.   Occasionally I'll use an AIA.
13 Q.   When you say "occasionally," out of
14 the 150 jobs you did last year
15 approximately how many also included AIA
16 contracts?
17 A.   Two, three.
18 Q.   So the vast majority of your
19 relationships utilize this form, Exhibit 1?
20 A.   Correct.
21 Q.   Do you remember who created this
22 document in its infancy when it first
23 started?
24 A.   It's an ever-changing document.

**64**

1 Q.   Anybody else review this for you,
2 Exhibit 1?
3 A.   My accountants probably have seen it.
4 Q.   Do you utilize lawyers to review it
5 on a project by project basis?
6 A.   Rarely.
7 Q.   You're familiar with the document,
8 are you not?
9 A.   Yes, I'm familiar with the generic
10 document, yes.
11 Q.   Sure.  And they all start out in
12 capitals and bolded with the word PROPOSAL
13 on top?
14 A.   Normally, yes.
15 Q.   Now there are a number of later
16 versions of this document that were sent to
17 my clients, correct?
18 A.   Yes.
19 Q.   You've seen them on February 8,
20 February 15, February 17, February 25,
21 you've seen those documents, correct?
22 A.   Yes.
23 Q.   And you've read them to prepare for
24 your deposition here today?

1   A.   No.
2   Q.   You haven't looked at anything?
3   A.   No.
    Q.   Do you know who prepared this
    document, this first one, February 2?
6        MR. KLEIN:  Objection.
7   A.   No, I don't.  Unless it's initialled,
8   no, I don't.
9   Q.   All right.  None of the documents
10  that have been produced to us in this case
11  by your counsel are any of the proposals
12  signed by you, is that correct?
13  A.   Um, you mean provided to you, is that
14  correct?
15  Q.   Right.
16  A.   Or that went out that way?
17  Q.   I'll do either way with you.  First,
18  do you know if any of the ones provided to
19  me were signed by you?  Do you know?
20  A.   No, I don't know.
21  Q.   Have you ever seen a proposal signed
22  by you?
23  A.   To the guys at Perfect Game?
24  Q.   Yes.

1   Q.   If you take a look at the second page
2   of that document, it requires a ten percent
3   deposit.  Do you see that?
4   A.   (Reading document.)  Yes.
5   Q.   So as of February 2 the company was
6   looking for a ten percent deposit on or
7   before February 7, is that correct?
8   A.   By "looking for," you mean?
9   Q.   Requesting.  This document requests a
10  ten percent deposit be paid on or before
11  February 7?
12  A.   Correct.
13  Q.   Now do you see the paragraph that has
14  several numbers associated with it
15  beginning with the word TERMS?
16  A.   Yes.
17  Q.   There's a sentence below it that
18  says:  "Note:  To fast-track this project
19  your contract and payments will be made to
20  Outdoor Aluminum, Inc. care of Seating
21  Solutions."  What does that mean?
22  A.   It means a lot of things.  I can get
23  the factory to jump faster with a
24  pre-payment sometimes.  And it just helps

1   A.   I don't really recall.  I could have
2   signed them.
3   Q.   You don't recall one way or the
4   other?
5   A.   No.
6   Q.   Do you know if these were mailed or
7   sent by Email or FAXed, or how provided?
8   A.   Along the line, every way.  From what
9   I recall, Email was big, FAX was big.  Both
10  probably.  On a job of this nature every
11  way you can.
12  Q.   Time was moving quickly on this
13  project?
14  A.   Time is moving quickly, it's a lot of
15  money and you gotta get it done.
16  Q.   This particular document, Exhibit 1,
17  has a contract price of $1,780,000.  Do you
18  see that?
19  A.   Yes.
    Q.   Is that a big contract for you?
21  A.   Yes.
22  Q.   What's the largest contract you've
23  ever had?
24  A.   Something like $2.2.

1   helps things go.
2        I can either do that or I can
3   get the check to the factory and ask for it
4   back and help my own cash flow.
5   Q.   What did it mean here?  I don't
6   understand this Proposal.  Were you asking
7   to have the contract signed directly with
8   Outdoor Aluminum?  Is it a contract to be
9   signed with you as their agent?  What was
10  this proposing?
11  A.   This was proposing that the
12  contracting payments would be made out to
13  Outdoor Aluminum, Incorporated in care of
14  Seating Solutions which really gave me the
15  freedom to manage it any way I wanted to.
16  Q.   Who would the check be payable to?
17  A.   Outdoor Aluminum Incorporated C/O
18  Seating Solutions.  Both.
19  Q.   So you anticipated a two-party check?
20  A.   Correct, at this time.
21  Q.   At this time.  And again, I'm just
22  focusing on this proposal.
23  A.   Yes.
24  Q.   And this was proposing a contract

**Page 69**

1  signed by contractor Aluminum?
2  A.  The contract would have been signed
3  by both of us.
   Q.  Is that typical that you have
5  Outdoor Aluminum sign your contract with
6  your customer?
7  A.  I have that ability, certainly.
8  Q.  So it's happened before?
9  A.  Yes, sure.
10  Q.  Well, you say that kind of like -- I
11  mean has it happened?
12  A.  No, I say it like, "Yes, sure, a
13  thousand times."  I don't know how you read
14  it, but that's how I said it.
15  Q.  So you've had a thousand contracts
16  that Outdoor Aluminum has signed with you
17  and your customers?
18  A.  More and more every year.
19  Q.  This proposal was not going to be
20  signed by Outdoor Aluminum, was it?
21  A.  No.
22  Q.  So this anticipated another contract
23  to be signed?
24  A.  That was up to the clients.  If

**Page 71**

2  A.  No.
3  Q.  What's the difference?
4  A.  Well, in my opinion a bid is a
5  situation where they're looking for a
6  competitive pricing and they're looking for
7  competitive pricing on a specific product.
8       In a proposal you're proposing
9  the way that you recommend they do the
10  project to your criteria, to your level of
11  sophistication, to your quality, and
12  attaching the price under the terms you're
13  willing to work, not under terms that
14  people say this is the only way I'm willing
15  to work, bid this.
16  Q.  Are you familiar with the term "an
17  offer?"  Does that mean anything to you?
18  A.  Yes.
19  Q.  Is a proposal the same as an offer?
20  You're offering to do it in a certain way?
21  A.  Yes, I would say proposal is akin to
22  an offer, yes.
23  Q.  Could you turn to the third page,
24  sir.  On the top line it says, "Please

**Page 70**

1  they'll operate on the proposal, I'll
2  operate on the proposal.
3  Q.  Well, this is your document that your
4  company created, right?
5  A.  Mm-hm.
6  Q.  You have to say yes or no for her.
7  A.  Yes.
8  Q.  And you're proposing that a contract
9  be signed between you, Aluminum and the
10  baseball teams, correct?
11       MR. KLEIN:  Objection.
12  Ambiguous.
13  A.  I was proposing that if they want to
14  write a contract, that's who they write it
15  to.  A signed proposal is good enough for
16  me to run with it.  It's a proposal.
17  Q.  What does that mean?
18  A.  That means it's what I propose.  And
19  if somebody wants to come to an agreed
20  settlement, working around some of the
21  terms in that, and we agree on it, then I
22  have the liberty to agree to that.
23  Q.  In your business does a proposal
24  operate the same way as a bid would in a

**Page 72**

1  place your initials next to each line item
2  on this proposal."
3  A.  Yes.
4  Q.  Sign the TERMS page where appropriate
5  and return the entire proposal to Seating
6  Solutions.  You see that, right?
7  A.  Yes.
8  Q.  And that's standard language in all
9  of your proposals, is it not?
10  A.  To say all of them would be tough.
11  Q.  Most of them?
12  A.  Yes.
13  Q.  This is not a unique term placed on
14  this document?
15  A.  No.
16  Q.  To the best of your knowledge was
17  this proposal accepted by the baseball
18  teams?
19  A.  This specific proposal?
20  Q.  Yes, Exhibit 1.
21  A.  No.
22  Q.  There were additional proposals
23  provided during the next several weeks,
24  were there not?

**73**

1  A.  Yes.
2  Q.  Let me show you an Email with an
3  attached proposal to it dated February 17
4  and ask if you recognize that.
5  A.  (Reading document.)  Yes.
6  Q.  Okay.  Now so you recognize Exhibit
7  2?
8  A.  Yes.
9          (Exhibit 2, Email and Proposal
10         2/17/05, marked)
11  Q.  In the first page it's an Email from
12  Seating Solutions to Mr. Tye?
13  A.  Mm-hm
14  Q.  I'm sorry, it's a yes, right? I know
15  you're saying yes.
16  A.  Sorry.  Yes.
17  Q.  And Cris is your sister?
18  A.  Correct.
19  Q.  And she is working on behalf of
20  Seating Solutions?
21  A.  Correct.
22  Q.  Now the 17th, that's the day before
23  you met with Mr. Tye?
24  A.  I don't recall.

**74**

1  Q.  You told me before you met on the
2  18th.
3  A.  Was the 18th a Friday?
4  Q.  I believe so.
5  A.  It was a Friday.
6  Q.  I don't know to tell anybody, but I
7  believe so. Yes, this says 17th.  There we
8  go.
9  A.  It was a Friday.
10  Q.  All we've got to do is read and we
11  will figure it out.
12  A.  No problem.
13  Q.  So this is now --  were there
14  discussions between you and anyone on
15  behalf of the baseball teams that led to
16  this revised proposal?
17  A.  I'm sure.
18  Q.  Do you remember them?
19  A.  Not particularly.
20  Q.  All right.  Was there any individual
21  that you were talking with between Exhibit
22  1, the February 2 proposal, and this
23  document?
24      MR. KLEIN:  Objection.

**75**

1  Ambiguous.
2  Q.  Was there a key person you were
3  working with at the baseball teams?
4  A.  Yes, Ted.
5  Q.  Prior to the 18th that was not in
6  person, correct, that was either by
7  telephone or by Email?
8  A.  I'm not sure.  Oh, prior to the 18th?
9  Q.  Prior to the 18th.
10  A.  No, I had met him in person a number
11  of times.
12  Q.  And during those in-person meetings
13  were there discussions about the proposal
14  and the terms of the deal?
15  A.  Sure.
16  Q.  When the revised proposal was sent on
17  the 17th, did it reflect your understanding
18  as to the needs of the team?
19  A.  As they were conveyed to me prior to
20  that date, yes --  yah.
21      You are aware that there were
22  proposals in between these, right?
23  Q.  I do.  And we're going to get to
24  them.  It was a work in process, was it

**76**

1  not?
2  A.  Yah, but we're jumping from a first
3  one to a fifth one.
4  Q.  Right.  But the way it worked was
5  there were exchanges of information, right?
6      MR. KLEIN:  Object to the
7  form.
8  Q.  That led to revisions in your
9  proposal?
10  A.  Correct.
11  Q.  I guess the term there were
12  negotiations going on, is that correct?
13  A.  No.  There was the development of an
14  end product.  Can't negotiate until you
15  have an end product.
16  Q.  When you say "an end product," what
17  are you referring to, a design?
18  A.  Something you want to buy.
19  Q.  When did you get to that point?
20  A.  I believe I'd have to see the final
21  proposal, but I believe that it didn't
22  change from this one.
23      I believe that this was when we
24  were at the point of the concept and

**Page 77**

1 understand what they wanted
2 Q. To the best of your memory, as of the
3 17th you had a product to sell, a final
4 product to sell that you believe met the
5 needs of the baseball team?
6 A. We had a better description of what
7 they wanted within a few slight changes.
8 Q. And that allowed you to set a
9 contract price, correct?
10 A. For the product they wanted, yes.
11 Q. Sure. And for that described in
12 Exhibit 2?
13 A. Yes.
14 Q. And let me make sure I understand
15 your business. Is it at that point where
16 the negotiations start?
17 A. Again, I don't -- to call it
18 negotiations before you'd nailed down what
19 the customer wants to buy, it's not
20 negotiations. It's design. It's
21 consulting.
22 Q. That's why I'm trying to tie it in.
23 And I heard you the first time you said
24 that.

**Page 78**

1 A. There doesn't have to be any
2 negotiation at that point. They can sign
3 it and give you a check.
4 Q. But that didn't happen, did it?
5 A. But you asked me is that the point
6 the negotiations start. And I'm saying
7 there doesn't have to be negotiations.
8 Q. I know, but we are talking about this
9 specific project. What I heard you say to
10 me is as of the 17th, Exhibit 2, you felt
11 that there was a final product to be sold?
12 A. I felt that we were close enough
13 together where we could reach an agreement
14 and get a deal done. That's what I felt.
15 Q. I'm going to use your words, which
16 is you can't have negotiations until
17 there's a fully developed product.
18        MR. KLEIN: Object to the
19 form.
20 A. Would I say this is a completely,
21 totally, fully developed product? No.
22 Q. Well, don't you remember I asked you
23 at what point did you have that, if ever.
24        And I thought you said "as of

**Page 79**

1 this time?
2 A. As of this time I had a product that
3 I felt had a few enough changes left in it
4 that I could close the deal.
5 Q. When did you get, just to use your
6 terms, "a fully developed product," if
7 ever?
8 A. A fully developed product in this
9 would have been during the plan approval
10 stage.
11 Q. But it hadn't gotten there yet?
12 A. We had gotten there enough to
13 understand the project. Is it going to be
14 exactly what we wrote down on this thing?
15        This actually has a term in it
16 for the credit of seats if they're not
17 designed into the product and things like
18 that.
19        Fast-tracking, you can't nail
20 it down. If you wait to nail it down,
21 you'd be late.
22 Q. I'm not trying to -- I'm really just
23 trying to refer back to your testimony so I
24 understand it.

**Page 80**

1 A. My testimony was in general and
2 you're trying to apply it to this product.
3 Q. I really want to talk specifically
4 about this project. Okay?
5 A. Well, my testimony when I said you
6 have to know the product before you
7 negotiate was in general.
8 Q. And you're saying this doesn't apply
9 to this project?
10 A. You have to have an understanding of
11 the scope of work. Is that going to be a
12 literal translation to what exists in the
13 field when you're done? Not in this case.
14 Q. You have to an understanding of the
15 project to do what, to begin negotiations?
16 A. To negotiate what?
17 Q. I don't know. You're the one who
18 originally told me that.
19 A. I asking you.
20 Q. Let's take you back to what your
21 testimony was. I asked you whether there
22 were negotiations. And you said to me you
23 can't have negotiations until you have a
24 fully developed product?

1   A.   Right. And it was more
2 consultation, discussion, correct.
3   Q.   So I'm taking you back to that. This
4 project, as of February 17, was there a
5 fully developed product that allowed for
6 negotiations?
7   A.   The answer is no, there wasn't a
8 fully developed product. But their answer
9 was I had the scope understood enough and
10 criteria in the deal enough to close the
11 deal.
12       "Negotiations" is your word.
13   Q.   Is it your testimony that there were
14 were no negotiations with the baseball
15 team?
16   A.   Clarify "negotiations."
17   Q.   A discussion over terms.
18   A.   Is it a discussion or is it finding a
19 level ground, or bargaining mode in terms
20 of negotiations?
21       Is it a discussion or a
22 bargaining? The way I understand
23 "negotiations" it's more akin to
24 bargaining.

1   Q.   Was there any bargaining?
2   A.   No, there was a discussion.
3   Q.   You made a proposal, correct?
4   A.   Correct.
5   Q.   And there were were counter-proposals
6 made by the baseball team?
7   A.   There wasn't even that. There were
8 were things that Ted said, "Scott, I'm
9 uncomfortable with this. " I said, "Cross
10 it out." "Scott, I'm uncomfortable with
11 this." "Cross it out."
12       I don't see that as a
13 negotiation. If it is, I'm terrible at it.
14   Q.   We can agree that Exhibit 2 was never
15 signed by anyone on behalf of the baseball
16 team, isn't that correct?
17   A.   Yes, signed via pen, yes, I agree to
18 that.
19   Q.   In pencil or any other form?
    A.   Yes, I agree to that.
21   Q.   Is it your testimony that this
22 document, Exhibit 2, this proposal, was
23 accepted by the baseball team, by my
24 clients?

1   Um, aspects of that proposal were
2 accepted and slight changes to the terms
3 was accepted. It was accepted.
4   Q.   I'm talking about -- let me make sure
5 you understand my question. This documen
6 in this form as created by Seating
7 Solutions, were these terms in their
8 entirety accepted by my clients?
9   A.   No.
10   Q.   If you turn to the last page of this
11 document and the middle paragraph. Like
12 the prior document it continues to require
13 the payment of a deposit, isn't that
14 correct?
15   A.   (Reading document) Where are you
16 referring to?
17   Q.   Under "TERMS: 10 percent deposit."
18   A.   Yes.
19   Q.   Okay. You put that in, Seating
20 Solutions put that in there, right?
21   A.   We just said this wasn't accepted.
22   Q.   No, I'm talking about this proposal.
23   A.   We just said it wasn't accepted so I
24 don't understand why that's relevant.

1   Q.   We'll do a lot better if you just
2 answer my questions. If you don't
3 understand the questions, you tell me.
4   A.   All right.
5   Q.   In your proposal, Seating Solutions'
6 proposal, you required a ten percent
7 deposit?
8   A.   "Required" is a strong word. I asked
9 for it.
10   Q.   Did you tell them that was, you know,
11 Take it or leave it, if you don't want to
12 pay, that's okay? Did you tell that to Mr.
13 Tye?
14   A.   Did I tell him what?
15   Q.   If you don't want to pay the 10
16 percent deposit, that's okay, don't worry
17 about it.
18   A.   In fact, in the end, yes, actually I
19 said to him, You know, if you can't have it
20 by Monday, if you can't have it by Tuesday,
21 as long as I know I have a deal and I'm
22 going to get it, that that is okay. Yes, I
23 said that.
24   Q.   And that was at the meeting on the

1   18th?

2   A.    That was at the Friday meeting when

3   it was found out that it was probably too

4   late in the day to get a deposit and the

5   banks I believe were not open Monday.

6   Q.    This document also requires that --

7   the initials beside each item, that you put

8   the initials beside each item and sign the

9   TERMS page. The document requires that?

10  A.    Requires that? I'm having a hard

11  time with the word "requires."

12  Q.    Why? Do you not understand what the

13  word means?

14  A.    I don't understand what the word

15  means when described by "this document

16  requires."

17        I don't know that the document

18  has a voice to require anything. So I'm

19  confused by the use of the term.

20  Q.    Well, let's read it.

21  A.    This documents requests.

22  Q.    Well, let's read it. Is this a

23  document created by your company?

24  A.    Yes.

1   Q.    Answer my question. Isn't that the

2   reason that people put things in writing,

3   to avoid confusion later?

4         MR. KLEIN: Object to the

5   form.

6   A.    No, I don't believe that's the

7   reason.

8   Q.    Why do you put these proposals in

9   writing? Why don't you just do it all by

10  phone?

11  A.    Why do I?

12  Q.    Yes. Why does Seating Solutions?

13  A.    Because when I'm dealing with people

14  who have no honor or integrity, the only

15  way you can nail them to the wall most of

16  the time is in writing.

17  Q.    You find that a problem in your

18  business?

19  A.    Less and less. I'm getting better

20  and better at picking them out.

21  Q.    And you want to make sure because you

22  don't always know who those people are in

23  advance, do you?

24  A.    Not always.

1   Q.    And it says: "Please place your

2   initials next to each line item on this

3   proposal, sign the TERMS page where

4   appropriate and return the entire proposal

5   to Seating Solutions." I've read that

6   correctly, right?

7   A.    Yes.

8   Q.    Is it your position that that is

9   optional?

10  A.    That is absolutely put there so that

11  if you are the subject of my proposed sale

12  and you do not agree to any change to

13  delivery, installation or removal or date

14  or time should be written in notice 24

15  hours prior, you would not initial that

16  telling me you did not agree to it. That's

17  the purpose of it.

18  Q.    And you put it in there so there's no

19  later confusion in the event there's a

20  dispute, isn't that correct?

21  A.    That is correct.

22  Q.    And that's the reason people put

23  things in writing, isn't it?

24  A.    You asked if it required.

1   Q.    And if you knew somebody was like

2   that, you wouldn't do business with them,

3   would you?

4   A.    Um, that would depend.

5   Q.    On what? How much profit you could

6   make?

7   A.    What the risk was.

8   Q.    Okay. So you may do business with

9   people who you don't think are honorable?

10  A.    Apparently.

11  Q.    Well, did you think that Mr. Stone

12  and Mr. Tye were not honorable business

13  people when you were talking with them?

14        MR. KLEIN: Objection.

15  Compound.

16  A.    At that time -- what was the question

17  again?

18  Q.    On February 18 did you believe that

19  Mr. Tye and Mr. Stone were not honorable

20  business people?

21        MR. KLEIN: Objection.

22  Compound.

23  A.    I believe Mr. Tye was an honorable

24  business person. I didn't know Alan very

93

1  A.   No.
2  Q.   You knew that the February 17 version
3  hadn't been signed, correct?
4  A.   Correct.
5  Q.   And you knew that Mr. Tye had made
6  comments and changes to the February 17,
7  correct?
8  A.   We had agreed to the details.
9  Q.   I didn't ask you that.  You've got to
10  focus on the question.
11       The question was you were aware
12  that Mr. Tye had made comments and edits to
13  the February 17 proposal.  You knew that?
14  A.   Yes.
15  Q.   And he had made those in writing?
16  A.   Yes.
17  Q.   And you knew your sister was going to
18  be making some changes to the proposal to
19  incorporate those changes, you knew that?
20  A.   No.
21  Q.   Well, did you reject Mr. Tye's
22  proposals, his changes?
23  A.   No, I accepted them.
24  Q.   When did you see them?

94

1  A.   I went over there with him that
2  Friday word for word, item by item.
3  Q.   At the meeting?
4  A.   That's correct.
5  Q.   But we know that the written document
6  was not amended that date, was it?
7  A.   The written document was amended that
8  date by verbal commitment.
9  Q.   Was it changed in writing?
10       MR. KLEIN: Objection.
11  Ambiguous.
12  Q.   Do you understand my question?
13  A.   That date was it changed in writing?
14  I scratched out my copy, I'm sure, and made
15  a couple of notes, yes.
16  Q.   On the meeting on the 18th you had
17  the February 17 version in front of you,
18  right?
19  A.   Yes.
20  Q.   And then Mr. Tye made changes to it,
21  correct?
22  A.   Yes.
23  Q.   And your testimony I think is that
24  you agreed to those changes, is that your

95

1  testimony?
2  A.   That is my testimony.
3  Q.   On the 18th?
4  A.   That is correct.
5  Q.   Do you know as you sit here today
6  whether or not the written changes that Mr.
7  Tye made following the 18th are the same or
8  different from the oral ones you discussed
9  on the 18th?
10  A.   They're the same.
11  Q.   How do you know that?
12  A.   Because I saw the final document that
13  was issued that was issued as per our
14  discussion and agreed to.
15  Q.   What time of day was the meeting on
16  the 18th?
17  A.   I want to say from memory about 1
18  o'clock.
19  Q.   How long did it last?
20  A.   Couple hours.
21  Q.   And would it be fair to say that this
22  project had a need to get going to meet
23  certain deadlines?
24  A.   Fair to say when?  Now or then?

96

1  Q.   Then.  That there was some urgency to
2  the project?
3  A.   Yes.
4  Q.   And you kept submitting written
5  proposals we know over the month of
6  February.  You, Seating Solutions.
7  A.   As the product changed, yes.
8  Q.   And it was important to you to get
9  that document signed, was it not?
10  A.   It was important to me to get the
11  deal done.
12  Q.   Well, you kept sending them documents
13  to be signed?
14  A.   I'm not standing in front of him.
15  We're talking to him.
16  Q.   But you did keep sending documents to
17  get signed?
18  A.   Yes.
19  Q.   And we know that after the meeting on
20  the 18th you sent another document to get
21  signed, didn't you?
22  A.   Yes.
23  Q.   On the meeting on the 18th did you
24  make written changes to the February 17

1   agreement and ask Ted yet to sign them
2   A.   Uh, no.
3   Q.   You could have?
4   A.   I think, as a matter of fact, Ted was
5   going on vacation and trying to get out of
6   the office.  So I was trying to accommodate
7   my client who was spending a million and a
8   half dollars.
9   Q.   Did he refuse to do that?  Did you
10  say, "Hey, Ted.  I'd like to get this
11  signed today.  Could you spend another
12  minute, let's edit it and get it signed
13  off?"  Did you say that to him?
14       MR. KLEIN:  Objection.
15  A.   No.  I said, "Ted, I need to know do
16  I have a deal, yes or no."
17       And he answered yes, and shook
18  my hand.
19  Q.   Why did you need to know?
20  A.   So I could get to work.  So I could
21  order materials, so I could plan my crews,
22  so I could commit to the project.
23  Q.   And this was on a Friday, correct?
24  A.   Yes.

1   Q.   There wasn't anything that you were
2   going to do on that Friday, was there?
3       MR. KLEIN:  Objection to form.
4   A.   There absolutely was.
5   Q.   What did you do on that Friday?
6   A.   I called the factory, told them we
7   had the deal and we needed to get the
8   steel.
9   Q.   Who did you call?
10  A.   Treddy Kilpatrick or Eddy Spears.
11  Q.   Sorry, you've got to help me with
12  names.  What was the first one?
13  A.   Kilpatrick.
14  Q.   What was the first name though?
15  A.   Treddy, T-R-E-D-D-Y.  Geneva,
16  Alabama.
17  Q.   Treddy?
18  A.   Kilpatrick.  Or Eddy Spears.  I don't
19  recall.  One is the owner.  The other is
    the sales manager.
20  Q.   And you called them on that Friday?
21  A.   Absolutely.
22  Q.   Cell phone?
23  A.   To get them?

1   A.   Yes.
2   A.   Probably my cell phone when I left
3   the meeting.
4   Q.   Do you recall did you use the land
5   line from Mr. Tye's office?
6   A.   No, I don't do that.
7   Q.   You're sure you called them by cell
8   phone?
9   A.   I would think so.  Could have been in
10  New York in the office on Saturday.  I
11  spoke to him immediately after the meeting
12  and got it going.
13  Q.   That's why I'm asking you.  Did you
14  call him on that Friday?  Did you do it
15  Saturday, or did you call him on Monday?
16  A.   I'll check my phone records.
17  Q.   Do you know as you sit here today?
18  A.   No, I don't know.
19  Q.   Did you send a Purchase Order?
20  A.   I don't believe so.
21       MR. KLEIN:  Objection.
22  Ambiguous.
23  Q.   Did you receive an invoice?
24       MR. KLEIN:  Objection.

1   Ambiguous.
2   Q.   For the -- do you understand my
3   question?
4   A.   For this particular?  Nothing was
5   shipped so I never get invoices prior to
6   shipping.
7   Q.   Do you communicate by Email with
8   Outdoor Aluminum?
9   A.   Myself, no.
10  Q.   Does your office?
11  A.   Yes.
12  Q.   Do you know if anybody from Seating
13  Solutions sent any Emails to Outdoor
14  Aluminum on this project?
15  A.   Probably.
16  Q.   Have you ever seen any?  Because I
17  know none have been produced.
18       MR. KLEIN:  Objection.
19  A.   I haven't seen any.
20  Q.   You can check that easy enough, can't
21  you?
22  A.   Sure.
23  Q.   Had prior copies of the proposal been
24  sent to Outdoor Aluminum?

No. Case 1:05-cv-10365-JLT    Document 43-4    Filed 10/31/2005    Page 20 of 30

1  A.   No.
2  Q.   Did they know anything about this
3  project on the 18th?
   A.   Yes.
5  Q.   Had you described to them generally
6  the volume of seats you were going to need?
7  A.   Sent them a drawing and got pricing.
8  Q.   That's how you were able to price out
9  the contract?
10 A.   There you go.
11 Q.   And you called them up and said,
12 Listen, it's a go.  We're going to do this?
13 A.   There was a timeline.
14 Q.   When did you call them and tell them
15 that it was off?
16 A.   Ten days later.
17 Q.   You knew it was off the next day,
18 didn't you?
19 A.   Absolutely not.
20 Q.   When did you know that you didn't get
21 the contract?
22 A.   A week later.
23 Q.   How did you learn?
24 A.   The next Thursday or Friday.

1  Q.   How did you find out?
2  A.   Alan Stone told me that we've decided
3  to go with someone else.
4  Q.   Did you ever have to pay Outdoor
5  Aluminum any money for this order?
6  A.   No.
7  Q.   And they never actually -- do they
8  manufacture the seats per order or is this
9  something they stock?
10 A.   They manufacture all the steel and
11 the framing products and all the hardware
12 and they cut to size of the planking and
13 the deck.
14 Q.   But they don't go through that effort
15 until they have an order, is that fair to
16 say?
17 A.   Yes.
18 Q.   And so they never did that here?
19 A.   I wouldn't know unless I checked.
   Q.   To the best of your knowledge?
21 A.   To the best of my knowledge I
22 wouldn't think they did, no.
23 Q.   Following your conversation that you
24 had with Mr. Tye did Seating Solutions do

1  anything else other than calling Outdoor
2  Aluminum for this project?
3         MR. KLEIN:  Objection.
4  Ambiguous.
5  A.   Yes.  Seating Solutions tried to
6  block out the time and make the schedule
7  available for the anticipated time of
8  delivery.  Started looking into where we'd
9  get our equipment to do, you know, the
10 construction.
11 Q.   Who did this?
12 A.   Probably myself and perhaps Ed Mark
13 helped me.  It didn't get that far along.
14 Q.   It didn't happen over the weekend,
15 did it?
16 A.   No.
17 Q.   And do you recall if you actually did
18 anything on Monday on the project?
19 A.   I don't recall.  Monday was a holiday
20 so I don't recall.  I don't even remember
21 what holiday it was.
22 Q.   Presidents Day, Martin Luther King
23 Day?
24        MR. KLEIN:  Presidents.

1         MR. CIAVARRA:  Thank you. My
2  son was born the 20th so I should know
3  that.
4  A.   My son was born today.
5  Q.   Did you take that day off, Presidents
6  Day?
7  A.   Probably not.
8  Q.   Do you recall?
9  A.   No.
10 Q.   The meeting on the 18th, was Mr. Tye,
11 were you and Mr. Tye in the room together
12 the whole time?
13 A.   He went in and out of the room a
14 couple times.
15 Q.   When he wasn't in the room was there
16 anyone else you were talking to about the
17 project?
18 A.   Ross from my office.
19 Q.   What's Ross's last name?
20 A.   Jacobs.
21 Q.   And what was Ross's role in this?
22 A.   Ross was really coming into the
23 business at that time, relatively new to
24 the company.  And now he runs a division of

**<u>Exhibit C</u>**
(pages 20-34)

{}

**Column 105:**

1  the company.
2  Q.  What division does he run?
3  A.  BleachAir.
  Q.  What's that?
5  A.  That's it, that side. (Indicating
6  shirt)  It's a modular plastic seating
7  system that attaches to existing bleacher
8  seats to make them more comfortable.
9  Patented.
10 Q.  Was Ross present during the whole
11 meeting?
12 A.  Yes.
13 Q.  Have you talked to Ross about his
14 memory of the meeting?
15 A.  Yes.
16 Q.  Was he present during the
17 conversation between you and Mr. Tye in
18 which Mr. Tye literally told you that you
19 had the project?
20 A.  Yes.
21 Q.  And is that his memory as well?
22 A.  From his recollection to me, it is.
23 Q.  He has told you "I recall Mr. Tye
24 saying that to you?"

**Column 107:**

1  would be
2  a little crazy at this time.
3  Q.  But it's your best memory of what was
4  said?
5  A.  It's absolutely the thrust of the
6  conversation.
7  Q.  Did you follow up with any E-mails or
8  communications thanking Mr. Tye or Mr.
9  Stone for the project?
10 A.  Um, no, I don't believe so.
11 Q.  Other than calling Outdoor Aluminum,
12 did you call--
13 A.  I called my office.
14 Q.  Who did you speak with?
15 A.  I'm sure Cris.
16 Q.  What did you tell Cris?
17 A.  That it's a done deal.  Actually we
18 called from Ted's office to tell them the
19 deal was done, to tell them to get ready
20 insurance certificates.
21      Ted was nice enough to give me
22 the name of who the insured had to be.  He
23 was nice enough to give us the written
24 company name as to who it should be made

**Column 106:**

1  A.  Without question.
2  Q.  And again, since I wasn't there, I
3  need to rely upon you guys to tell me what
4  happened.
5       To the best of your abilities
6  can you tell me what it is that you said to
7  Mr. Tye and what he said to you with
8  respect to the commitment on this project?
9  A.  I said, "Ted, this is probably
10 something that I haven't done before, but I
11 really need to ask you, do we have a deal,
12 because I'm leaving here and I'm calling OA
13 and I'm putting into motion, and I need to
14 get things going or you're not going to
15 make your your date.  Do we have a deal?"
16      Stuck my hand out.  And he
17 said, "Yes, we have a deal."  Shook my hand
18 and we had a deal.
19 Q.  Did he say anthing other than "yes?"
20 A.  Um, he said to Alan, when Alan
21 walked in, "I just shook Scott's hand.
22 Gave the deal to Scott."
23 Q.  And to the best of your ability
24 that's a quote?

**Column 108:**

1  out to from his office.
2  Q.  On the land line?
3  A.  I'm not sure if it was on my cell or
4  it was on his line.  I think it was on his
5  line.
6       Actually Ross made, I believe,
7  the insurance call to Larry on his cell
8  phone.  I'm pretty sure of that.  He stood
9  up, walked outside the door and called the
10 insurance.
11 Q.  Now you told me when we first started
12 that Alan Stone also made the agreement on
13 behalf of the baseball teams with you,
14 correct?  Do you remember telling me that?
15 A.  He confirmed the agreement, yes.
16 Q.  How did he do that?  What did he say?
17 A.  He walked in and Ted said, "We have a
18 deal.  I just gave the deal to Scott."
19      And I think then I walked out
20 the door with Alan.  And Alan said to me,
21 "You know, I look forward to it.  We can do
22 a lot of work together.  This is a good
23 place to start."  Full understanding of the
24 deal.

## 109

1  **Q.** Were there any contingencies
2  discussed with Mr. Tye or Mr. Stone that
3  might prevent it from going forward?
4  **A.** No.
5  **Q.** There was a discussion that perhaps
6  Holy Cross might not allow it to go
7  forward?
8  **A.** No.
9  **Q.** Tell me about the conversation that
10 you had with Mr. Tye or Mr. Stone at that
11 time about Holy Cross.
12 **A.** Ted said to me that the only thing he
13 was a little concerned with was out of left
14 field if something were to happen at Holy
15 Cross, and they were deciding they couldn't
16 play there, what would happen.
17        And I said, "Ted, I will apply
18 this contract to anyplace you decide to
19 play." And he said, "You know what,
20 that's fine."
21 **Q.** Now did anyone tell you that they had
22 a lease at Lake Park?
23 **A.** Excuse me?
24 **Q.** Did anyone tell you they had a lease

## 110

1  to use Lake Park?
2  **A.** What's Lake Park?
3  **Q.** Remember the very first field you
4  looked at?
5  **A.** Did they tell me they had a lease?
6  **Q.** Right.
7  **A.** No.
8  **Q.** Did anybody tell you they had a lease
9  or agreement with Clark University?
10 **A.** They told me they could make one.
11 They didn't tell me they had one.
12 **Q.** None of these schools, neither of
13 these schools had any obligation to the
14 best that you knew to allow the baseball
15 team to use their space, did they? There
16 was no requirement?
17 **A.** I think they were far enough along at
18 Holy Cross where Holy Cross had some --
19        (Witness phone interruption)
20        MR. CIAVARRA: We can take a
21 five-minute break.
22        THE WITNESS: I'm hanging up.
23 Sorry. Go ahead.
24 **Q.** I'll rephrase it. As of February 18

## 111

1  you knew that neither Clark nor Holy Cross
2  nor Lake Park had an obligation, were
3  required to allow the baseball teams to use
4  the space?
5  **A.** I don't know what obligations they
6  had.
7  **Q.** Did you know of any obligation?
8  **A.** In my opinion if you have that
9  lengthy a discussion and you're saying you
10 can use property, you have an obligation,
11 yes. Do I know of one? No.
12 **Q.** And when you're not dealing with an
13 owner of a site, you know there's always a
14 risk that the person may not get to use it.
15 You know that just from your experience of
16 doing this?
17 **A.** It's not a risk to me.
18 **Q.** Well, it would be a risk to you if
19 they had no place to put the seats,
20 wouldn't it?
21 **A.** No.
22 **Q.** So you're suggesting even if they
23 never had a field they would have been
24 required to buy these seats from you, is

## 112

1  that your testimony?
2  **A.** They would be required to honor the
3  contract. And if they didn't have a field
4  and they wanted to wait until they found
5  one, I probably would have, just to help
6  them out, agreed to wait until they found
7  one and made it fit or made sure it fit.
8  **Q.** But assume you didn't want to help
9  them out. Is it your testimony that you
10 had a binding agreement to buy these seats
11 even if they didn't get a field?
12        MR. KLEIN: Objection to the
13 form.
14 **A.** Say it again.
15 **Q.** Yes. If the baseball teams didn't
16 get to use any field, Holy Cross said no,
17 Clark said no, Lake Park said no, and they
18 couldn't find another place, is it your
19 testimony that you still had a binding
20 contract with them to buy the seats?
21        MR. KLEIN: Objection to the
22 form.
23 **A.** Do I believe that I had a contract to
24 buy the seats whether or not they had a

**113**

1  place to put them.
2  Q.   Well-said.
3  A.   Yes, I would agree to that. I would
   believe that.
5        MR. KLEIN:  Want to take a
6  break, Lou?
7        MR. CIAVARRA:  I'm fine, but
8  why don't we take five minutes now.
9        (Recessed)
10  Q.   Who's authorized at Seating Solutions
11  to sign contracts on behalf of the company?
12  A.   Myself, Mark Ligator, Cris can. Right
13  now Larry Hickey is getting ready to.
14  Depends on the timeline.
15  Q.   Today.
16  A.   Larry Hickey, Mark, myself, Cris.
17  Q.   What was Mr. Tye's position with the
18  baseball teams?
19  A.   I have no idea.
20  Q.   What was his title?
21  A.   No clue.
22  Q.   Do you know if he was a president?
23  A.   I don't know.
24  Q.   Do you know if he had an ownership

**115**

1  Q.   And you understood, did you not, that
2  the entities also had a Board of Directors?
3  A.   I was told they did.
4  Q.   And weren't you told that any deal
5  had to be approved by the Board?
6  A.   I don't know if I was told, or if I
7  was told the Board was meeting. I don't
8  believe I was told any deal had to be
9  approved by the Board.
10        I was told there was a Board
11  meeting, I believe, Saturday. I had a
12  deal. I didn't have any deal to be
13  approved as far as I was concerned.
14  Q.   What made you think that Mr. Tye had
15  the authority to make a deal on behalf of
16  the Board of Directors and the owner?
17  A.   I had asked him if we had a deal and
18  then he told the head guy that he gave the
19  deal to me.
20        And the head guy said, "I look
21  forward to doing work with you. I hope
22  it's the beginning of a long relationship."
23  That's the head guy.
24  Q.   Take it one step at a time. Mr. Tye

**114**

1  interest?
2  A.   I was told by him he had an ownership
3  interest.
4  Q.   Do you know how much?
5  A.   No.
6  Q.   Do you know what Mr. Stone's position
7  was?
8  A.   Didn't meet Mr. Stone until that
9  afternoon on Friday. I believe he's, I
10  don't know what his title is, but according
11  he's the head guy.
12  Q.   According to him or according to Mr.
13  Tye?
14  A.   According to Ted and him.
15  Q.   That's the first time you had met
16  him, physically met him?
17  A.   Correct, or spoke to him, I believe.
18  Q.   And you learned he was, to use your
19  term, "the head guy?"
20  A.   Yes.
21  Q.   Had you learned that any contracts
22  would have to be signed by him?
23  A.   I believe I was told the contract
24  would be executed by him, yes.

**116**

1  also told you that there was a Board
2  meeting the next day, didn't he?
3  A.   For what purpose?
4  Q.   For the purpose of discussing the
5  project. Didn't he tell you that?
6        MR. KLEIN:  Objection to form.
7  A.   He told me there was a Board meeting.
8  Q.   And in your mind it had nothing to do
9  with you? He was just volunteering that to
10  you for the heck of it?
11        MR. KLEIN:  Objection.
12  Argumentative.
13  A.   From what I understood it had to do
14  with the school.
15  Q.   You're having a conversation with Mr.
16  Tye about this project, correct?
17  A.   Yes.
18  Q.   You weren't talking about what the
19  name of the team was going to be, were you?
20  A.   No.
21  Q.   You weren't talking about the
22  business raising money, were you?
23  A.   On occasion we were, about seats and
24  profits.

1 A. As agreed between Ted and I, yes.
2 Q. Have you ever compared this revised
3 proposal with what you understood the deal
4 to be?
5 A. I compared Ted's notes that he said
6 that he would agree to with what I
7 understood the deal to be.
8 Q. I'm talking about the document that
9 was then sent by your office?
10 A. Did I ever review that? I don't
11 believe so.
12 Q. So you don't know if this accurately
13 represents what you understood the deal to
14 be? When I say "this," Exhibit 5.
15 A. Correct.
16 Q. It might not?
17 A. Correct.
18 Q. We can agree that this document,
19 Exhibit 5, was never signed by anyone,
20 correct?
21 A. Yes, we can agree with that.
22 Q. Let me, if I can, sir, ask you to
23 turn, it's the second page of the letter,
24 the third page of the exhibit.

1 In approximately the middle
2 part of it you'll see that there's a line
3 that says: "The pricing and terms are
4 based on receipt of a signed proposal and
5 deposit by February 22, 2005 only."
6 A. Mm-hm.
7 Q. You have to say yes.
8 A. Yes.
9 Q. That's language that your office
10 created?
11 A. Correct.
12 Q. And we disagreed that you never
13 received a signed proposal, right?
14 A. We disagreed?
15 Q. Or we agreed?
16 A. Correct.
17 Q. And you never received a deposit by
18 February 22nd?
19 A. That's correct.
20 Q. So two of the conditions in Exhibit 5
21 were not met by the baseball team, isn't
22 that correct?
23 MR. KLEIN: Object to the
24 form.

1 A. This is really an effort to do what
2 you said before, which is to iron out what
3 you said and what I said we agreed to.
4 The first part of the FAX
5 starts with "Thanks for the order."
6 Q. I don't think you answered my
7 question, sir.
8 A. I probably didn't.
9 Q. Do you want to try and answer it this
10 time?
11 A. What was it?
12 Q. Two of the conditions you sent in the
13 letter, receipt of a signed proposal and a
14 deposit by February 22nd, did not occur,
15 isn't that correct?
16 A. Which two conditions are you talking
17 about?
18 Q. A signed proposal and a deposit by
19 February 22.
20 MR. KLEIN: Object to the
21 form.
22 A. Yes, okay, I'll agree with that.
23 Q. It didn't happen?
24 A. Correct.

1 Q. On the last page you see the word
2 Penalties, the section on Penalties?
3 A. Yes, sure.
4 Q. There's a line that says: "This
5 agreement is subject to an AIA contract."
6 Do you see that?
7 A. Yes.
8 Q. And that was new in this proposal,
9 wasn't it?
10 A. I believe that was part of the terms
11 that Ted wanted.
12 Q. He wanted an AIA contract signed,
13 right?
14 A. Yes.
15 Q. And you didn't have an AIA contract
16 prepared at this time, did you?
17 A. I believe Ted was going to prepare
18 the AIA contract.
19 Q. But my question was did you have one
20 prepared at this time?
21 A. No.
22 Q. Had you seen one for this project at
23 this time?
24 A. No.

Case 1:05-cv-10365-JLT   Document 43-51   Filed 10/31/2005   Page 6 of 16

1 **Q.** Had you discussed the terms of what
2 the AIA contract would say?
3 **A.** They would duplicate the terms we
agreed to.
5 **Q.** Are you familiar with AIA contracts?
6 **A.** A little bit.
7 **Q.** You've used them from time to time?
8 **A.** Yes.
9 **Q.** And they contain terms and provisions
10 in addition to those that are set forth in
11 this three-page document, don't they?
12 **A.** They don't have to.
13 **Q.** Do they typically, sir?
14 **A.** I guess I don't have the education.
15 **Q.** Well, you've read AIA contracts
16 because you've signed them, is that a
17 correct statement?
18 **A.** I'm not making a clear distinction
19 between what's on here and what's on an AIA
20 off the top of my head.
21 **Q.** Have you reviewed AIA contracts in
22 the past?
23 **A.** Yes.
24 **Q.** Have you signed AIA contracts in the

1 past?
2 **A.** Sure.
3 **Q.** In your experience are they always
4 longer than three pages?
5 **A.** I would say yes.
6 **Q.** And in your experience, without
7 asking you specifically what, do they
8 contain terms in addition to those which
9 you see in your proposal?
10 **A.** Well, "terms" is a tough word. Do
11 they contain --
12 **Q.** Provisions?
13 **A.** Do they contain better descriptions
14 of the specifics of what's going to go on
15 or the rules of how things are going to be
16 handled, yes.
17 **Q.** Okay. And every time you sign an AIA
18 contract have you simply signed it without
19 making any changes or comments to it?
20 **A.** The majority of the time.
21 **Q.** Sometimes you've made changes?
22 **A.** Not to the body of the contract. Very
23 few times.
24 **Q.** The question was ever, have you ever

1 made changes to the form of an AIA
2 contract?
3 **A.** Probably.
4 **Q.** And have your customers made edits
5 and changes to the AIA contract?
6 **A.** They usually send it to me. So --
7 **Q.** They've already made their changes?
8 **A.** Not normal. I don't see changes, so
9 no I would say.
10 **Q.** So you understood at the time that
11 this document was sent that there was still
12 going to be further discussion, could be
13 further discussion about the terms of the
14 AIA contract?
15 MR. KLEIN: Object to the
16 form.
17 **Q.** Could be?
18 **A.** That's not the way I understood it,
19 no.
20 **Q.** What's wrong about what I said?
21 **A.** It says here that the pricing and
22 terms are based on receipt of signed
23 proposal and deposit by February 22.
24 And then it says back here that

1 there's going to be an AIA contract.
2 I don't think it means -- I
3 already have a deal of prior to this.
4 So if it's not signed, I think
5 that affects the terms and the price,
6 meaning it could cost more money if they
7 delay in the signing of it.
8 If I can't get the money in the
9 bank, if they don't give me the deposit, it
10 could cost more money. So the price could
11 change. Okay? Maybe I would have to
12 accelerate the payment. But the order is
13 the order.
14 **Q.** Let me be sure I understand that.
15 Let's assume that you didn't get your
16 deposit by February 22?
17 **A.** Okay.
18 **Q.** Are you telling me that you could
19 have increased the price and the baseball
20 teams would still be bound to a contract
21 with you? Can you answer that question?
22 **A.** Go ahead. Say it again.
23 **Q.** Okay. In following what you just
24 said to me, that if the baseball team

## 129

1  didn't provide you with a 385 deposit by
2  February 22 it could affect the price.  Do
3  you remember saying that to me?
4  A.   Yes.
5  Q.   That's a yes?
6  A.   That's what it says in writing.
7  Q.   I'm asking you what the deal was.
8  A.   Yes.
9  Q.   And the deal was in your mind that if
10  you didn't get your deposit by the 22nd the
11  price could go up?
12  A.   If I had additional expenses they
13  would be passed on.
14  Q.   And they would have to pay it?
15  A.   Yes.
16  Q.   Regardless of how much it was?
17  A.   Or they could take the delay in time.
18  Q.   So there were were a variety of ways
19  in which the deal could change if you
20  didn't get a deposit by the 22nd?
21  A.   The deal wasn't changing.
22  Q.   You don't know that.
23  A.   The deal wasn't changing.  I agreed
24  to take an order on a Friday and deliver on

## 130

1  this date.  I guaranteed that.
2       If they didn't give me the
3  money by the date they promised, then I
4  could extend their delivery date.
5       The terms of what I agreed as
6  far as their functionality, it could
7  change.
8  Q.   So this document, Exhibit 5, dated
9  and sent on the 21st of February requires a
10  deposit the next day?  Do you see that?
11       MR. KLEIN:  Objection to form.
12  Q.   February 22 it says.
13  A.   The document, let's say the document
14  has a penalty -- has a possibility of a
15  penalty for not giving the deposit the next
16  day.  I don't know that it requires it.
17  Q.   Again, I didn't create the language,
18  your office did.  So let's look again at
19  what it says.
20       It says:  "The pricing and
21  terms are based on receipt of a signed
22  proposal and deposit by February 22, 2005
23  only."  I read it correctly, right?
24       MR. KLEIN:  Object to the

## 131

1  form.
2  A.   You did.
3  Q.   And that's language created by
4  Seating Solutions?
5  A.   That's correct.
6  Q.   And you didn't receive the deposit by
7  the next day?
8  A.   Yes.
9  Q.   Okay.  So February 23 comes and you
10  don't have your $150,000, okay?
11  A.   Yes.
12  Q.   Is it your testimony there's still a
13  binding agreement between the parties?
14       MR. KLEIN:  Object to the
15  form.
16  Q.   Yes or no?
17  A.   Yes.
18  Q.   And you could on your own change the
19  price or the terms if you chose to, is that
20  your testimony?
21       MR. KLEIN:  Object to the
22  form.
23  A.   I could take -- if it delayed, I
24  could relieve myself I'm sure of partial --

## 132

1  of the requirement to give them $50,000
2  back a week as they're holding up the
3  project.  That's a term.
4       If they don't initiate the cash
5  deposit, I have the right not to initiate
6  my risk.  But the contract is still in
7  force.
8  Q.   In your mind here in this deal you
9  could pick and choose the terms and the
10  price that would continue on if you didn't
11  get your deposit?
12       MR. KLEIN:  Object to the
13  form.
14  Q.   Is that correct?
15  A.   In my mind I could pick and choose
16  the terms.
17  Q.   Like, for example, you said you could
18  extend the date of or eliminate the penalty
19  provision, is that your testimony?
20  A.   I could do what's right.  My
21  testimony was if there's extra cost to me
22  based on them not delivering the deposit in
23  a timely fashion, then I would expect to be
24  able to recoup that, yes.

Case 1:05-cv-10365-JLT    Document 43-5    Filed 10/31/2005    Page 8 of 16

1 Q. Where does it say that? You know
2 A. Where doesn't it say that? You know
3 -- where doesn't it?
      It says "the pricing and terms
5 are based on receipt of the signed
6 proposal."
7      In other words, if you don't
8 get the signed proposal and the deposit in
9 the time that it was agreed to, February 22
10 was already agreed to by Ted as the latest
11 date I would have the money.
12 Q. When did that happen?
13 A. Friday.
14 Q. I asked you already once to tell me
15 everything he said to you about that and
16 you didn't mention that.
17      Is there a reason you didn't
18 mention that?
19 A. I did mention that. I told you the
20 bank was too late on Friday, and Monday was
21 a holiday, so what was the best he could
22 do. I did mention that.
23 Q. He said that to you, "I will get you
24 the check by Tuesday the 22nd?"

1 A. I said, "So the latest I would
2 anticipate it." And he said yes.
3 Q. On February 18 Mr. Tye told you that
4 you will have your 10 percent deposit by
5 Tuesday the 22nd, is that your testimony?
6 A. I believe he told me that's the
7 latest I would have it and he would even
8 try for Monday.
9 Q. Okay. So that we know you didn't get
10 a deposit on the 22nd, did you?
11 A. No.
12 Q. You didn't get one on the 23rd
13 either, right?
14 A. No, that's correct.
15 Q. So what I'm trying to understand is
16 what this language means to you in your
17 company, the author of it, if you didn't
18 get the deposit on the 22nd, which you
19 didn't get?
   A. Mm-hm.
21 Q. Was there any limit on how you could
22 increase the contract price?
23      MR. KLEIN: Objection.
24 Ambiguous.

1 Q. Yes or no? Was there a limit on how
2 much you could increase the contract price?
3 A. No one said I was going to increase
4 the contract price.
5 Q. Could. Is there any limit on how
6 much you could increase the price?
7 A. I don't know. I'm not an attorney.
8 Q. Well, I'm asking you. You made the
9 deal, not me. Was it your understanding
10 you could increase the contract price?
11 A. It wasn't my intent to increase the
12 contract price, so --
13 Q. What does it mean then that the
14 pricing and terms are based on receipt of a
15 deposit?
16 A. It means if I get a client who's
17 sitting there and he's holding back the
18 deposit money and it gets to be Friday that
19 week, that I will probably go back to him
20 and say, "You know what, holding me hostage
21 for the $50,000 for the first week of
22 delays is unfair. Let's look at that."
23 And then proceed from there.
24 Q. And there would be further

1 negotiations?
2 A. No, there wouldn't be negotiations.
3 There's already a contract. It would be an
4 attempt from me to be treated fairly by my
5 client who had delayed me on what he had
6 promised and agreed to.
7 Q. Who decides what's fair?
8      MR. KLEIN: Objection to form.
9 A. With any luck, the two people
10 involved.
11 Q. What if they don't?
12 A. Then we sit here.
13 Q. So there is no limit in this contract
14 as to how much you could have increased the
15 contract price. Is that your testimony?
16 A. Oh, I think the limit would be how
17 unreasonable do you want to be.
18 Q. Okay. How about other terms? Could
19 you change any of the other terms or were
20 there only certain terms that you could
21 change if you didn't get your deposit?
22      MR. KLEIN: Object to the
23 form.
24 A. I think it would have to be mutually

**145**

1   **Q.**   Did you ask him that?

2   A.   Yes.

3   **Q.**   You said to him, "Are you cancelling

4   the order?"

5   A.   Yes.

6   **Q.**   And Alan Stone said no?

7   A.   "No. I'll let you know."

8   **Q.**   Were you at all nervous or

9   uncomfortable with the situation?

10   A.   Yes. It's no way to do a job that

11   you gotta get done in a rush or a $50,000 a

12   week penalty.

13   **Q.**   Did you do anything else to follow

14   up?

15   A.   I kept calling and kept calling.

16   **Q.**   Did you ask them, "Hey, guys, can you

17   send me back the proposal anyways?"

18   A.   Um, I think we probably asked him to

19   sign it and what was going on with the

20   money. And they were told, "Well, hang on.

21   We got to get this straightened out."

22         It was a stall, looking back at

23   it. I don't know what the stall was for,

24   but it was a stall.

**146**

1   **Q.**   Did you have any angry words with Mr.

2   Stone on that phone conversation?

3   A.   For the first two and a half days,

4   probably not.

5   **Q.**   Okay. Let me show you a document

6   I'll mark as Exhibit 7.

7         (Exhibit 7, Email 2/21/05 from

8         Scott Suprina to Ted)

9   A.   Yes.

10   **Q.**   Did you send that Email to Mr. Tye?

11   A.   Cris did, yes. Probably at my

12   direction, yes.

13   **Q.**   It's under your signature, correct,

14   or your name anyways?

15   A.   Yes, I wrote it probably.

16   **Q.**   Does that indicate to you that you

17   probably weren't in the office and you had

18   her send it for you?

19   A.   I probably was in the office and

20   wrote it and handed it to her. I'm not a

21   typer.

22   **Q.**   So it's not unusual for you to write

23   out an Email and give it to her to send?

24   A.   Correct.

**147**

1   **Q.**   You don't utilize Email yourself?

2   A.   Very, very little.

3   **Q.**   Now at this time did you become aware

4   that Dan Clayton was in the game?

5   A.   Somehow I think Alan told me that

6   they were, that the consultants brought Dan

7   Clayton back to the table.

8         Somehow I learned there was an

9   emergency Sunday meeting, and I don't know

10   when that happened, but I learned there was

11   a Sunday meeting involving Dan and they

12   were looking into some things.

13   **Q.**   Well, clearly you knew by this date

14   because you referred to Dan Clayton in the

15   Email?

16   A.   Yes.

17   **Q.**   Well, you said "sometime you

18   learned." You knew of it on Monday by

19   1 o'clock in the afternoon?

20   A.   Okay.

21   **Q.**   Is that a yes?

22   A.   Yes.

23   **Q.**   So by Monday at 1 o'clock you knew

24   that my clients had met with Dan Clayton

**148**

1   over the weekend?

2   A.   Yes.

3   **Q.**   And you knew that wasn't just a

4   social meeting, they were talking to them

5   about doing the project?

6   A.   I don't know that because they had

7   already given out the deal, so that would

8   be a stretch for me.

9   **Q.**   Your testimony here, sir, which some

10   day may be read back to a jury, is that you

11   did not understand at this time that my

12   clients were meeting with Dan Clayton on

13   the project? Is that your testimony?

14         MR. KLEIN: Object to the

15   form.

16   A.   I understand your clients met with

17   Dan Clayton. Do I think it was on the

18   project? Probably.

19   **Q.**   Is there any doubt in your mind of

20   what it was over?

21   A.   It was probably on the project, to

22   get the project, or to talk about me. I

23   don't know which one.

24   **Q.**   Now you know Dan Clayton had been out

Case 1:05-cv-10365-JLT   Document 43-5   Filed 10/31/2005   Page 10 of 16

1  there any ways prior to this as somebody who
2  was interested in the project?
3  A.   No.
4  Q.   You never heard Dan Clayton was
5  involved in this before?
6  A.   I heard Dan Clayton was no longer
7  interest in the project.
8  Q.   Who told you that?
9  A.   The consultant.
10 Q.   Mr. Maguire?
11 A.   Yes.
12 Q.   When did he tell you that?
13 A.   At the meeting when I met with Ted.
14 Q.   On the 18th?
15 A.   No, it was a couple days before that.
16 Q.   Prior to that meeting did you know
17 that Dan Clayton was being considered as
18 another source?
19 A.   I knew that they were talking with
20 Dan Clayton.  I don't know who they were
21 considering.
22 Q.   Did you receive some information that
23 somebody had provided my clients with some
24 information about you that wasn't

1  flattering?
2  A.   Dan Clayton had a habit of that.
3  Q.   Did you have any specific information
4  that somebody at Dan Clayton said something
5  negative to my clients?
6  A.   They had done it before.
7  Q.   But did you know anything about it
8  this time?
9  A.   I think between Alan and myself, the
10 conversations that we had led me to believe
11 that.
12 Q.   And do you know specifically what
13 they said?
14 A.   No.
15 Q.   What had they said about you in the
16 past?
17 A.   They had said there was a contract
18 that we didn't perform on.
19 Q.   Where was that contract?
   A.   Some GC in the area for a minor
21 league baseball park.
22 Q.   Where?
23 A.   In Massachusetts.  I don't remember
   the town.

1  Q.   Do you remember the contractor?
2  A.   No.  I can find it though.
3  Q.   Was there a dispute with that
4  contractor?
5  A.   There was a -- we had quoted them.
6  And then they --  what the hell happened --
7  we sent them some material and the project
8  changed, and we had to up our price.  And
9  they didn't like the upped price, so they
10 didn't go with us.
11 Q.   Did it result in a lawsuit?
12 A.   No.
13 Q.   At this time were you concerned that
14 Dan Clayton was saying something about you
15 that would affect my clients' opinion of
16 you?
17 A.   Not really.
18 Q.   Well, you took the time to send an
19 Email on that topic, didn't you?
20 A.   Yes.
21 Q.   So there was something you had to be
22 a little concerned about it?
23 A.   What did I say?  Let me see.
24 (Reading document.)  What number is that?

1  Q.   It's Number 7.  You have it in front
2  of you.
3  A.   (Reading document.)  What did you just
4  ask me?
5  Q.   Let's take it apart.  Was it your
6  understanding at this time that at one time
7  Dan Clayton told my clients that they
8  couldn't get the job done on time?
9  A.   I just suspected they might.
10 Q.   They said that they couldn't get it
11 done on time?
12 A.   Oh, that Dan told them that they
13 couldn't do the job?
14 Q.   That they couldn't do it on time.
15 A.   I was told that.
16 Q.   By who?
17 A.   By her client.
18 Q.   By Geller?
19 A.   Yes.
20 Q.   It's your understanding that now they
21 were coming back and saying they could get
22 it done on time?
23 A.   I didn't know if they said that or
24 not.  I assume they said that because why

Case 1:05-cv-10365-JLT   Document 43-5   Filed 10/31/2005   Page 11 of 16

1   would you give the job to someone who
2   couldn't get it done.
3   Q.   And you're telling my clients to be
    concerned about somebody who on one day
5   tells you they can't do it, and the next
6   day they say they can?
7   A.   That's correct.
8   Q.   And then you go on to say, "Dan
9   Clayton won't get it done?"  That's what
10  you said?
11  A.   That's correct?
12  Q.   How did you know that Dan Clayton
13  couldn't get it done?
14  A.   I guess I'm psychic because they
15  didn't get it done.
16  Q.   Is that your testimony, you're
17  psychic?
18  A.   That's okay with me.  They didn't get
19  it done.
20  Q.   Like I said, this is being taken
21  down, and we're going to read it to a jury
22  some day.
23  A.   That's okay.
24  Q.   And do you have these psychic

1   experiences frequently?
2   A.   When I'm lucky.
3   Q.   So you're telling my client not to do
4   business with Dan Clayton because they
5   won't get the job done?  Isn't that what
6   you're saying?
7   A.   I'm telling them that in my
8   experience when someone tells you they
9   can't get it done and then comes backs and
10  all of a sudden says they can, you need to
11  look at it really closely.
12  Q.   You thought you could get it done in
13  time, didn't you?
14  A.   I knew I could get it done on time.
15  Q.   Do you know if you're a larger or
16  smaller company than Dan Clayton?
17  A.   I'm probably a smaller company.
18  Q.   But you were pretty certain that Dan
19  Clayton couldn't get it done, weren't you?
    I mean you said that.
21  A.   Based on experience, yes.
22  Q.   And then you said that you could
23  provide my clients with references on jobs
24  that Dan Clayton didn't get done that you

Case 1:05-cv-10365-JLT   Document 43-5   Filed 10/31/2005   Page 11 of 16

1   had to then supply for?
2        MR.  KLEIN:  Objection to form.
3   Q.   Is that what you said?
4   A.   That's correct.
5   Q.   Tell me some of those jobs.
6   A.   I don't know the names of those jobs.
7   We have the information in our office.
8   Q.   When you wrote this, what did you
9   have in front of you that told you that
10  that was a true statement?
11  A.   The knowledge that we rented to a GC
12  who couldn't get the delivery of product
13  from Dan Clayton and put the product in so
14  they could have their event.
15  Q.   So you knew that then, but you don't
16  know it now?  Is that your testimony?
17  A.   The name of the job.  I didn't know
18  the name of the job then.  It's irrelevant.
19  Q.   So you knew it happened?
20  A.   Absolutely.
21  Q.   How many times did that happen?
22  A.   I don't know.  I'd have to consult
23  with Mark Ligator in my office.
24  Q.   He didn't write the Email.  You did,

1   right?
2   A.   I knew that there was one recent one.
3   Q.   In your Email you said, "If you want
4   references on rental jobs," and you did
5   plural.
6        So I'd like to know what jobs
7   there were that you were referencing.
8   A.   Well, I'll look it up and get it to
9   you.
10  Q.   You don't know?
11  A.   Off the top of my head?
12  Q.   Or based on any source of information
13  you have.  Do you know?
14  A.   Can I get you the information, yes.
15  Do I know sitting here now?  No.
16        (Witness phone interruption)
17  Q.   By the end of that Monday you still
18  didn't have a signed proposal or a deposit?
19  A.   Correct.
20  Q.   That's a correct statement?
21  A.   Yes.
22  Q.   Your office then sent another
23  proposal on the 22nd, correct?
24  A.   I wouldn't know unless I saw it.

1 (Exhibit 8, Email and Revised
2 Proposal, marked)
3 Q. I'll show you a document marked as
4 Exhibit 8. Have you seen that before?
5 A. I don't recall. There's so many
6 proposals, I don't know.
7 Q. Do you know why Cris sent this Email
8 on the 22nd?
9 A. I'm not sure sitting here. I'm sure
10 there was a reason and I'm not sure what it
11 was.
12 Q. Do you recall discussing it with her?
13 A. I recall discussing that we wanted to
14 send it out. But sitting here now I don't
15 recall what the motivation was.
16 Q. No idea?
17 A. No.
18 Q. And we can agree, can't we, that this
19 proposal was never signed by my clients?
20 A. Yes, we can agree.
21 Q. And that you never received a
22 deposit?
23 A. Correct.
24 (Exhibit 9, Email 2/22/05,

1 marked)
2 Q. Let me show you a document marked as
3 Exhibit 9, February 22 Email from Cris to
4 Ted Tye and Alan Stone. It purports to be,
5 though, from you on her Email address?
6 A. Yes.
7 Q. Did you create this Email? And I
8 don't mean type it. I mean write it.
9 A. Yes, probably. (Reading document.)
10 Yes.
11 Q. You wrote this, right?
12 A. Yes.
13 Q. And you sent it?
14 A. Mm-hm.
15 Q. Yes?
16 A. Yes.
17 Q. And you understood at this time that
18 there were were difficulties with Holy
19 Cross?
20 A. I was being told there were were
21 difficulties.
22 Q. By whom?
23 A. Alan Stone.
24 Q. Was that during the conversations on

1 Monday 3/21/2005 Tuesday?
2 A. Yes.
3 Q. Now did you have further
4 conversations with Mr. Stone on Tuesday the
5 22nd?
6 A. I believe they went all the way until
7 Thursday.
8 Q. Tell me what you recall about the
9 conversations by telephone on Tuesday.
10 A. Just very evasive. And we're looking
11 at this and we're looking at that, and no
12 decisions have been made on the final
13 decision or how we want to go forward, but
14 you know, relax, that type of thing. Ted
15 is not here. It's hard to communicate.
16 You know.
17 Q. So would it be fair to say that by
18 the end of the day on the 22nd that Mr.
19 Stone had still not committed to going
20 forward during these conversations?
21 A. No, that wouldn't be fair to say.
22 Q. Okay. During any of these
23 conversations did he commit to going
24 forward with you?

1 MR. KLEIN: Objection.
2 Ambiguous.
3 A. He was already committed to going
4 forward.
5 Q. But it wasn't resaid in the
6 conversations?
7 A. No. It was said, "But we're not
8 walking away." That was said.
9 Q. Those were the words he used?
10 A. Something to that effect.
11 Q. Do you recall the words he used?
12 A. No, it's too long ago.
13 Q. Did Mr. Stone provide you with any
14 further detail about what was holding up
15 the project?
16 A. Yes, very -- nothing of substance.
17 Nothing I can put my hands on, no.
18 Q. Were you trying to press him for
19 details?
20 A. I was, yes, I was trying to find out
21 what the issue was, yes.
22 Q. And were you pressing him for the
23 deposit and the signed proposal?
24 A. Not at all.

Case 1:01-cv-XXXXX-T Document 43-5 Filed 10/31/2005 Page 13 of 16

1 Q. In your Email, Exhibit 9, at the end
2 of the day you say, "Please let us know
3 when you anticipate having these documents
4 signed and we can anticipate our deposit."
5 A. Yes.
6 Q. So you were asking for the signed
7 document?
8 A. You said was I pressing. I don't
9 consider that pressing.
10 Q. You were still asking?
11 A. Was I inquiring? Yes, I was
12 inquiring.
13 Q. Did you inquire during your telephone
14 conversations as well?
15 A. Absolutely not. It wasn't an issue.
16 Q. Getting the deposit wasn't an issue?
17 A. No, it wasn't an issue. They were in
18 the middle of what they considered to be a
19 problematic situation.
20 Q. Did you tell Mr. Stone, Hey, the
21 proposal says I need to have my deposit by
22 the 22nd. If I don't get it, the price and
23 terms may change?
24 A. As a matter of fact, I believe I told

1 Mr. Stone that I wasn't too concerned with
2 the deposit and the date.
3 And that's exactly what the
4 letter says, we're committed to the
5 project, we have to go forward because we
6 have a timeline. I can't not move forward.
7 Q. Did you have any conversations on
8 that day, the 22nd, with anyone from
9 Outdoor Aluminum?
10 A. Sometime during the week I did. I
11 think it was actually Thursday when I
12 called them and told them that we needed to
13 discontinue with the drafting when I was
14 told that we were out of the game.
15 Q. At any time during the 22nd were you
16 told by Mr. Stone or anybody that they were
17 not going to go forward with you?
18 A. Absolutely not.
19 Q. Were you told that the next day on
20 the 23rd?
21 A. I believe I was told that on the
22 Thursday.
23 Q. There were further communications on
24 the 23rd?

1 A. All the way up to Thursday.
2 Q. Were there telephone conversations
3 with Mr. Stone?
4 A. Oh yah. "Sit tight." Blah-blah-blah,
5 blah-blah-blah. No information, nothing.
6 Q. The telephone conversations you had
7 with Mr. Stone on the 23rd?
8 A. 23 is what day, a Wednesday?
9 Q. Yes. In substance were they any
10 different than the conversations you had
11 with him on the 22nd?
12 A. Um, they got, towards the end,
13 whether it was Wednesday or Thursday, they
14 got to, "Well, you know, we're looking at
15 this Dan Clayton thing."
16 And my conversation was, "Well,
17 we have a deal. I'm moving forward. What
18 are you doing?"
19 "Well, we haven't made a
20 decision, but there are -- what's the word
21 -- there are differences." I can't remember
22 the word -- saying there were were
23 differences between the companies and why
24 he might choose to go to Dan Clayton, but

1 they were still looking at it.
2 Q. And that was a telephone
3 conversation?
4 A. Yes.
5 Q. With Mr. Stone?
6 A. Yes.
7 Q. Can you tell us today whether that
8 was on Wednesday or Thursday?
9 A. I think it was on both, but I'm not
10 sure.
11 Q. Okay. It may be both, but --
12 A. I think it was both. I know that I
13 was never told that they wanted to stop the
14 deal I believe until Thursday.
15 Q. Now do you recall an Email exchange
16 that you had with Mr. Tye at this time?
17 A. No.
18 Q. Do you remember Mr. Tye telling you
19 that we don't have a signed agreement yet,
20 and if you do anything, you're proceeding
21 at your own peril?
22 A. I don't recall it, but I'll look at
23 the Email.
24 Q. Sure.

1 way I have been doing it, to let Dick being

2 stroked along for four or five more days

3 and then have, you know, a contract

4 cancelled on me.

5 Q. During this conversation did you tell

6 him, "You can't cancel it. We've get a

7 contract?"

8 A. I probably told you you can't cancel

9 it, right. I think I told them it was not

10 cancellable, yes.

11 Q. What did he say?

12 A. Probably something like, "We'll see,"

13 or whatever.

14 Q. Not probably. Do you recall what he

15 said?

16 A. No.

17 Q. Did you call your lawyer?

18 A. I don't know the day that I found

19 out. I am sure by Friday I called an

20 attorney.

21 Q. Did you contact Dan Clayton?

22 A. Not any time soon. I contacted Dan

23 in the following week.

24 Q. You personally directly did?

1 A. Yes.

2 Q. Who did you call?

3 A. Dave York.

4 Q. Do you know him?

5 A. Very well.

6 Q. And how did you know him?

7 A. He's a salesman.

8 Q. What did you say to Dave York?

9 A. I asked Dave if these people knew

10 there was a contract existing when they

11 went to get the job.

12 Q. And what did he say?

13 A. Yes.

14 Q. And what else did he say?

15 A. "I had nothing to do with it."

16 Q. Is he somebody that you're friendly

17 with?

18 A. Only through business. I only knew

19 him through business.

20 Q. Has he ever worked for you?

21 A. No.

22 Q. But he was not the salesman on this

23 job?

24 A. Not from what I understand.

1 Q. Did you tell him there was a

2 contract?

3 A. Absolutely not.

4 Q. Your testimony is that he knew there

5 was a contract?

6 A. Correct.

7 Q. Do you know how he knew that?

8 A. No.

9 Q. After you had that conversation did

10 you call back anybody representing my

11 client?

12 MR. KLEIN: Object to the

13 form. Ambiguous.

14 A. Not that I recall.

15 Q. The conversation that you described

16 that you had with Mr. Stone on late

17 Thursday, did you ever have any further

18 telephone conversations with he or with Mr.

19 Tye?

20 A. I tried to call Ted from the Tuesday

21 all the way through probably the middle of

22 the following week and never got a call

23 back.

24 Q. So you never spoke with them again?

1 A. With Ted I never spoke to again. I

2 don't know if I spoke to Alan maybe once or

3 twice on Friday to be sure that he had made

4 this decision.

5 Q. Do you recall whether you did?

6 A. No.

7 Q. When did you first learn that Dan

8 Clayton was competing for this project?

9 A. First time or second time?

10 Q. Let's take it apart. The first time.

11 A. After, whenever I met Ted and met the

12 consultant, I knew the consultant had

13 worked with Dan Clayton before and wanted

14 to work with him again.

15 Q. When we go back to the first

16 proposal, the one dated February 2, this

17 meeting we're talking about, was it before

18 or after that?

19 A. It was probably right after that.

20 Q. Okay. So sometime --

21 A. 5, 6, 7.

22 Q. So early February?

23 A. Probably.

24 Q. And you learned that Dan Clayton was

Case 1:05-cv-10365-JLT    Document 43-5    Filed 10/03/2006    Page 1 of 10

1 also looking to participate in this
2 project, correct?
3 A. Thinking about it, yes.
4 Q. When did you learn that they had
5 withdrawn?
6 A. Whatever date I met with Ted and the
7 consultant in Ted's office, by then it was
8 apparent that they had backed out because
9 they couldn't make the deadline.
10 Q. Is that the same meeting you just
11 told me about in the first week of February
12 or was this a later meeting?
13 A. No, it was two times that I've seen
14 the consultant. There was a first time and
15 there was a second time.
16 Q. When you say the "consultant," is
17 Patrick Maguire the guy?
18 A. Yes.
19 Q. At the first time you learned that
20 Dan Clayton was interested in the project
21 and might bid on it --
22 A. I think I actually learned that Dan
23 Clayton was going to bid on the project a
24 month or so previous.

1 And then by the time we sat
2 down to go over drawings, and I brought my
3 AutoCad operator up to the meeting to
4 finalize drawings, Patrick said they can't
5 make the timeline.
6 Q. And you think that's the second
7 meeting with Maguire?
8 A. Yes.
9 Q. Then when did you learn that they
10 were back in the game?
11 A. Not until Tuesday or Wednesday after
12 being awarded the contract.
13 Q. At some point did you learn that Dan
14 Clayton had been provided with any of your
15 drawings?
16 A. Um, no.
17 Q. You never heard that?
18 A. No.
19 Q. Do you believe that Dan Clayton has
20 ever received any of your drawings?
21 A. Yes.
22 Q. When did you first learn, when did
23 you first receive any information which
24 would indicate that to you?

Filed 10/03/2006    Page 5 of 10

1 A. When I heard that Dan Clayton was
2 back in being reconsidered.
3 Q. How did you get that information?
4 A. I surmised it.
5 Q. How? Based upon what?
6 A. Based upon the belief that when
7 somebody walks away from the deal, the only
8 way they walk back is if they think there's
9 enough money.
10 Q. And this is after that Friday
11 meeting?
12 A. It was after I was given the job,
13 yes.
14 Q. Which was the Friday meeting, the
15 18th?
16 A. Yes.
17 Q. So sometime during that next week you
18 believed that Dan Clayton must have
19 received your drawings?
20 A. "My information" is a better word.
21 Q. From who?
22 A. I have no idea.
23 Q. I see what you're saying.
24 Information, because you're saying it could

1 be contract price, it could be not just
2 drawings?
3 A. Could be.
4 Q. And you don't know who told you that?
5 A. No one told me that.
6 Q. That was your assumption because they
7 were back trying to bid the job?
8 A. That's correct.
9 MR. CIAVARRA: Let's go off the
10 record a second.
11 (Recessed)
12 Q. Let me ask the question, sir. We've
13 now come back after our lunch break, about
14 35, 40 minutes.
15 Are there any changes or
16 corrections that you'd like to make to your
17 testimony from this morning?
18 A. I actually had the word that -- I
19 told you this was going to happen.
20 Q. What was the question? Maybe we
21 could --
22 A. No, it was the word, you asked me for
23 the description of how Alan was speaking to
24 me and what he specifically used, and I

301

1  COMMONWEALTH OF MASSACHUSETTS
2  WORCESTER, SS.

3   I, Kathleen M. Bradley, a Notary Public
   in and for the Commonwealth of
4  Massachusetts, do certify that pursuant to
   appropriate notice of deposition there came
   before me the following-named person, to
   wit: SCOTT SUPRINA, who was by me duly
6  sworn; that he was thereupon examined upon
   his oath and his examination reduced to
7  writing by me; and that the deposition is a
   true record of the testimony given by the
8  witness.

9

    I certify that I am not a relative or
10  employee or counsel of, or for, any of the
    parties, or a relative or employee of such
11  or attorney, nor am I otherwise interested
    in the outcome of the action.

12

13  Witness my hand and official seal at
    Worcester, Massachusetts this 13th day of
14  August 2005.

15

16  My Commission Expires
    December 3, 2010

17

18  _____
     Kathleen M. Bradley, Notary Public
19     Registered Professional Reporter

20

21

22  The foregoing certification of this
    transcript does not apply to reproduction
    of the same in any respect unless under the
23  direct control and/or supervision of the
    certifying reporter.

24

**Exhibit C**
(pages 35-54)

# SEATING SOLUTIONS

RI, Inc.

www.sitonthis.com

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470



EXHIBIT
S'uprime # 1
7/29/05 KB

## PROPOSAL

February 2, 2005

Mr. Philip Rosenfield & Ted Tye
Perfect Game
c/o 6 Draper Road
Wayland, MA 01778

Re: Perfect Game-Holy Cross

Dear Phil and Ted,

I have put sometime into your Seating Solution. Based on our drawing of 2/2/05 I will offer you the following Seating Solution.

One each Total Concept Baseball Stadium delivered and assembled excluding site preparation and concrete.

Front Five rows VIP flip-up with arm on a square tube angle frame (sitting on crushed concrete base for drainage by others). Wings are square tube aluminum angle frame on concrete slab. All decking is Tredweld upgradeable seating design with contrasting aisle nosing. Aisle handrails include in ground dug outs (catch basin and concrete receiver by others) including side modesty closures included to party deck.

Party deck platforms and drink rails included. Stairway access in Tredweld included. Panelized wire mesh rail panel's powder coated included at stairs sides of bleacher rear of party-decks and front and sides of access platform. No railing between rear crosswalk and roadway. Center section designed as hillside galvanized I-Beam with Tredweld deck with upgradeable seat design (excludes concrete). Plastic lumber front field wall included. Pricing includes our aluminum press box and camera deck unit with three separate rooms insulated with heat and air, complete. Electrical connection by others.

Delivered and Assembled:                        $1,780,000.00
Pricing based on Seating Solution's installers-non-union labor.

We will provide stamped engineered drawings for your approval. We can design concrete footings if you give us soil information.

We can supply quotes on the following when we determine what you need. These are not included in this pricing.

- Luxury sky boxes and support platform
- Rear wind screen closure on wings and platform areas

This should afford you an excellent starting point. I welcome the opportunity to work with you on tweaking the system to fit your application and timeline.

As I said to you I would like you to commit on Monday, 2/7/05, with a 10% deposit. I would be willing to dedicate our resources to meeting with you for a few days to square away layout and egress issues. This deposit would go against this or any other location you choose.

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.
Note, to fast-track this project your contract and payments will be made to Outdoor Aluminum, Inc. c/o Seating Solutions.

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

### Terms and Conditions

All prices quoted are subject to the following terms and conditions.
All measurements are approximate.
Price does not include any permits or bonds required.
Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have.
Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.
Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.
Price based on installation area being free of obstacles and clear for the crews to do the work outlined.
Should the buyer choose, for any reason, to delay installation or assembly when the product is fabricated and ready for delivery all money due on delivery will be immediately paid.
Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.
It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.
Any and all liability on RI Inc./Seating Solutions under this agreement is limited to fees paid.
Any controversy or claim arising out of this contract shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in the County of Suffolk or Nassau.
If RI, Inc./Seating Solutions retains an attorney to collect money due under this contract, it is entitled to its reasonable attorneys fees as well.

Material Status: Materials Delivered and Assembled
Pricing is based on acceptance of offer no later than 5 days from date of proposal unless otherwise specified in the proposal. Additional charge may apply for orders signed later than 5 days from date of proposal issuance.

appropriate and return the entire proposal to Seating Solutions.

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.

Note, to fast-track this project our contract and payments will be made to Outdoor Aluminum, Inc. c/o Seating Solutions.

Total Contract Amount: $1,780,000.00

I look forward to working with you. Please don't hesitate to call with any questions or comments you may have.  Thanks for the opportunity.

Sincerely,

Scott Suprina

Scott Suprina – Vice President
Print Name and Title

_____   _____
Authorized Signature of Acceptance            Date

_____
Print Name and Title

**Ted Tye**

| | |
|---|---|
| **From:** | Cristie Suprina [cris@SITONTHIS.com] |
| **Sent:** | Thursday, February 17, 2005 1:39 PM |
| **To:** | Ted Tye |
| **Subject:** | Proposal |

**Attachments:**     02-17-05 Revised proposal.DOC

EXHIBIT
Suprina # 2
7/29/05 KB

02-17-05 Revised
proposal.DOC ...

　　　　Ted, please see the attached proposal and call Scott to discuss upon receipt.
Thank you.


Cristie Suprina

Seating Solutions

63 Oser Avenue

Hauppauge, NY 11788

Phone: 631-845-0449

**SEATING SOLUTIONS**

RI, Inc.

www.sitonthis.com

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470

## PROPOSAL

February 17, 2005

Mr. Ted Tye
Perfect Game
c/o 6 Draper Road
Wayland, MA 01778

Re: Perfect Game-Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum
flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package·
Two front field walls – plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and
contrasting aisle nosing.  Complete front 10 rows aluminum square tube frame combo.
Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent,
comfortable and durable product that I strongly recommend.

Price delivered and assembled:            $1,519,880.90

does not include any applicable sales tax and is based on Seating Solutions standard levels of insurance.

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.
Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement.

We will provide stamped engineered drawings for your approval. We can design concrete footings if you give us soil information.

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.
Note, to fast-track this project your contract and payments, with the exception of the deposit check,  will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

### Terms and Conditions

All prices quoted are subject to the following terms and conditions.
All measurements are approximate.
Price does not include any permits or bonds required.
Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have.
Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.
Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.
Price based on installation area being free of obstacles and clear for the crews to do the work outlined.
Should the buyer choose, for any reason, to delay installation or assembly when the product is fabricated and ready for delivery all money due on delivery will be immediately paid.
Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.
It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

paid.

Any controversy or claim arising out of this contract shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.  The arbitration hearing is to be held in the County of Suffolk or Nassau. If RI, Inc./Seating Solutions retain an attorney to collect money due under this contract, it is entitled to its reasonable attorneys fees as well.

Material Status:  Materials Delivered and Assembled

Pricing is based on acceptance of offer no later than 5 days from date of proposal unless otherwise specified in the proposal.  Additional charge may apply for orders signed later than 5 days from date of proposal issuance.

Please place your initials next to each line item on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.

Please fill in date of first use or substantial completion: _____

**Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.**

**Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions.  Please make deposit check out to Seating Solutions.**

**Total Contract Amount: $1,519,880.90**

I look forward to working with you. Thanks for the opportunity.

Sincerely,


Scott Suprina – Vice President


_____    _____

Authorized Signature of Acceptance                           Date


_____

Print Name and Title

**From:** Ted Tye
**Sent:** Saturday, February 19, 2005 12:19 PM
**To:** 'Cristie Suprina'
**Cc:** Stone Alan (alan@worcesterprobaseball.com)
**Subject:** Proposal

**Attachments:** SDOC5676.pdf



EXHIBIT
Suprina #3
7/29/05 RB

SDOC5676.pdf
(377 KB)

     I have attached a marked-up version of your proposal. Our group met this morning and is reconvening tomorrow night to make a final decision on several. Please make the requested changes and return by e-mail to Alan Stone and me. I will either get back to you tomorrow night or you will hear from Alan. Thanks.

# SOLUTIONS

www.sitonthis.com

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470

## PROPOSAL

February 17, 2005

Mr. Ted Tye
Perfect Game
c/o 6 Draper Road
Wayland, MA 01778

*Worcester Professional Baseball, LLC
PO Box 2221
Worcester, MA 01613-2221*

Re: Perfect Game Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum
flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package
Two front field walls – plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and
contrasting aisle nosing. Complete front 10 rows aluminum square tube frame combo.
Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent,
comfortable and durable product that I strongly recommend.

Price delivered and assembled:          $1,519,880.90

Pricing excludes concrete, electric and water connections or earthwork by others. Pricing does not include any applicable sales tax and is based on Seating Solutions standard levels of insurance. *Specify levels. Insurance certificate to be provided.*

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.
Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement. *Bathroom must be ADA compliant and meet MA plumbing code.*

We will provide stamped engineered drawings for your approval. We can design concrete footings if you give us soil information. *Design of concrete footings is included and must be provided by March 15, 2005. All plans (stands and footings) must be signed by a MA architect and MA Structural engineer. All plans must conform with ADA requirements*

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.

Note, to fast-track this project your contract and payments, with the exception of the deposit check, will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

*Terms and Conditions*

All prices quoted are subject to the following terms and conditions.
All measurements are approximate.
Price does not include any permits or bonds required.
Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have. *Must meet ADA requirements.*
Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.
Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.
Price based on installation area being free of obstacles and clear for the crews to do the work outlined.
Should the buyer choose, for any reason, to delay installation or assembly when the product is fabricated and ready for delivery all money due on delivery will be immediately paid.
Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.
It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

Any and all liability in TRI Inc./Seating Solutions under this agreement is limited to fees ~~R~~ and by Worcester Professional Baseball LLC
paid. *plus penalties outlined herein.*

Any controversy or claim arising out of this contract ~~shall~~ *may* be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in ~~the County of Suffolk or Nassau.~~ *Massachusetts* ~~If RI, Inc./Seating Solutions retain an attorney to collect money due under this contract, it is entitled to its reasonable attorneys fees as well.~~ *Either party may also pursue a claim in a Massachusetts Court.*

Material Status: Materials Delivered and Assembled

Pricing is based on acceptance of offer no later than 5 days from date of proposal unless otherwise specified in the proposal. Additional charge may apply for orders signed later than 5 days from date of proposal issuance.

Please place your initials next to each line item on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.

Please fill in date of first use or substantial completion: _____

**Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.**

**Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.**

**Total Contract Amount: $1,519,880.90**

I look forward to working with you. Thanks for the opportunity.

Sincerely,



Scott Suprina – Vice President

_____     _____
Authorized Signature of Acceptance                                           Date


_____
Print Name and Title


1. Penalties. There shall be a penalty of $50,000. per week for late delivery. Penalties shall begin to acrue if the material is not ~~set~~ installed and substantially complete and in compliance with plans and specifications by May 15. 2005.

2. Schedule — [please provide]

3. Subject to an AIA contract.

4.

**Ted Tye**

| | |
|---|---|
| **From:** | Cristie Suprina [cris@SITONTHIS.com] |
| **Sent:** | Monday, February 21, 2005 9:41 AM |
| **To:** | Ted Tye |
| **Subject:** | Proposal |



**Attachments:** 02-21-05 Revised Proposal.DOC



02-21-05 Revised
Proposal.DOC ...

Ted, please see the revised proposal. If you have any questions please don't hesitate to contact me. We will need the name and address of any organization that you wish to have listed as additionally insured. Ted, Scott also has written in response to your 2/17 e-mail that at Seating Solutions we don't have a hook. He will always work with you in any way that he can to make sure we have a quality, durable and attractive result. Thanks for the order. When we are done Holy Cross will give me work direct.


Cristie Suprina

Seating Solutions

63 Oser Avenue

Hauppauge, NY 11788

Phone: 631-845-0449

1

**SEATING SOLUTIONS**

RI, Inc.

www.sitonthis.com

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470

## PROPOSAL

February 21, 2005

Mr. Ted Tye
Worcester Professional Baseball, LLC
PO Box 2221
Worcester, MA 01613-2221

Re: Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package
Two front field walls – plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and contrasting aisle nosing. Complete front 10 rows aluminum square tube frame combo. Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent, comfortable and durable product that I strongly recommend.

Price delivered and assembled:                  $1,519,880.90

does not include any applicable sales tax and is based on Seating Solutions standard terms of insurance. An insurance certificate will be provided. General Liability $1,000,000.00 per occurrence and $2,000,000.00 general aggregate; $1,000,000.00 Automobile Liability.

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.
Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement. Bathroom must be included and must be provided by March 15, 2006

We will provide stamped engineered drawings for your approval. We will design concrete footings and Worcester Professional Baseball, LLC is to provide soil information. All plans (stands and footings) must be signed by MA architect and MA Structural Engineer. All plans must conform with ADA requirements.

The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.
Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.
Note, to fast-track this project your contract and payments, with the exception of the deposit check, will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

### Terms and Conditions

All prices quoted are subject to the following terms and conditions.
All measurements are approximate.
Price does not include any permits or bonds required.
Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have. Plans must comply with ADA requirements.
Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.
Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.
Price based on installation area being free of obstacles and clear for the crews to do the work outlined.
Should the buyer choose, for any reason, to delay installation or assembly when the

immediately paid.

Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.

It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

Any and all liability on RI Inc./Seating Solutions and by Worcester Professional Baseball LLC under this agreement is limited to fees paid plus penalties outlined herein.

Any controversy or claim arising out of this contract may be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in Massachusetts. Either party may also pursue a claim in a Massachusetts Court.

Penalties:

-There shall be a penalty of $50,000.00 per week for late delivery. Penalties shall begin to accrue if the material is not installed and substantially complete and in compliance with plans and specifications by May 15, 2005.

-Seating Solutions will provide a delivery and installation schedule by 2/24/05.

-This agreement is subject to an AIA Contract.

Material Status: Materials Delivered and Assembled

Please place your initials next to each page on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.

Please fill in date of first use or substantial completion: May 15, 2005.

**The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.**

**Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.**

**Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.**

**Total Contract Amount: $1,519,880.90**

I look forward to working with you. Thanks for the opportunity.

Sincerely,


Scott Suprina – Vice President

_____     _____
Authorized Signature of Acceptance                              Date


_____
Print Name and Title

| | |
|---|---|
| **From:** | Cristie Suprina [cris@SITONTHIS.com] |
| **Sent:** | Tuesday, February 22, 2005 8:42 AM |
| **To:** | Ted Tye |
| **Subject:** | proposal |

**Attachments:** 02-21-05 Revised Proposal.DOC

EXHIBIT
Suprina # 8

7/29/05  KB



02-21-05 Revised
Proposal.DOC ...

    Here is our proposal.  Please call to discuss with Scott.

**SEATING SOLUTIONS**

RI, Inc.

www.sitonthis.com

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470

## PROPOSAL

February 21, 2005

Mr. Ted Tye
Worcester Professional Baseball, LLC
PO Box 2221
Worcester, MA 01613-2221

Re: Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package
Two front field walls – plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and contrasting aisle nosing.  Complete front 10 rows aluminum square tube frame combo. Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent, comfortable and durable product that I strongly recommend.

Price delivered and assembled:                     $1,519,880.90

does not include any applicable sales tax and is based on Seating Solutions standard does not include any applicable sales tax and is based on Seating Solutions standard terms of insurance. All insurance certificate will be provided. General Liability $1,000,000.00 per occurrence and $2,000,000.00 general aggregate; $1,000,000.00 Automobile Liability.

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.
Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement. Bathroom must be included and must be provided by March 15, 2006

We will provide stamped engineered drawings for your approval. We will design concrete footings and Worcester Professional Baseball, LLC is to provide soil information. All plans (stands and footings) must be signed by MA architect and MA Structural Engineer. All plans must conform with ADA requirements.

The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.
Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.
Note, to fast-track this project your contract and payments, with the exception of the deposit check, will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

## Terms and Conditions

All prices quoted are subject to the following terms and conditions.
All measurements are approximate.
Price does not include any permits or bonds required.
Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have. Plans must comply with ADA requirements.
Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.
Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.
Price based on installation area being free of obstacles and clear for the crews to do the work outlined.
Should the buyer choose, for any reason, to delay installation or assembly when the

immediately paid.

Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.

It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

Any and all liability on RI Inc./Seating Solutions and by Worcester Professional Baseball LLC under this agreement is limited to fees paid plus penalties outlined herein.

Any controversy or claim arising out of this contract may be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in Massachusetts. Either party may also pursue a claim in a Massachusetts Court.

Penalties:
-There shall be a penalty of $50,000.00 per week for late delivery. Penalties shall begin to accrue if the material is not installed and substantially complete and in compliance with plans and specifications by May 15, 2005.
-Seating Solutions will provide a delivery and installation schedule by 2/24/05.
-This agreement is subject to an AIA Contract.

Material Status: Materials Delivered and Assembled
Please place your initials next to each page on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.
Please fill in date of first use or substantial completion: May 15, 2005.

**The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.**

**Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.**
**Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.**
**Total Contract Amount: $1,519,880.90**

I look forward to working with you. Thanks for the opportunity.

Sincerely,



Scott Suprina – Vice President


_____     _____
Authorized Signature of Acceptance                              Date


_____
Print Name and Title

| | |
|---|---|
| From: | Cristie Suprina [cris@SITONTHIS.com] |
| Sent: | Tuesday, February 22, 2005 6:36 PM |
| To: | Ted Tye; Alan@worcesterprobaseball.com |
| Subject: | Fitton Field |

Ted and Alan, We understand you've had problems with Holy Cross in getting a written commitment. We value your order and we understand this difficulty. I would offer to make a visit to Holy Cross on your behalf to give them an assurance that this is a quality project. Please let us know when you anticipate having these documents signed and when we can anticipate our deposit. As I promised you when we made this deal Seating Solutions is committed to working with you through any obstacles and over any hurtles to have this order delivered and installed on time.

Scott Suprina

Seating Solutions

63 Oser Avenue

Hauppauge, NY 11788

Phone: 631-845-0449

EXHIBIT
Suprina #9

7/29/05  KLB

1

**<u>Exhibit D</u>**
(pages 1-19)

{}

PS 9

# ▆AIA® Document A101™ – 1997

## Standard Form of Agreement Between Owner and Contractor
*where the basis of payment is a STIPULATED SUM*

AGREEMENT made as of the  Twenty-second  day of February  in the year of  Two Thousand and Five
*(In words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, address and other information)*

Worcester Professional Baseball, LLC
303 Main Street
P.O. Box 2221
Worcester, MA 01613


and the Contractor:
*(Name, address and other information)*

Dant Clayton Corporation,
1500 Bernheim Lane
Louisville, KY 40210


The Project is:
*(Name and location)*

Worcester Professional Baseball, LLC
New Baseball Grandstand
Fitton Field

The Architect is:
*(Name, address and other information)*


N/A


The Owner and Contractor agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



EXHIBIT
II-29
8/24/05    PS

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1980, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:48:49 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                           (1749545831)

1

## ARTICLE 1   THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, General Conditions of the Contract. and other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

## ARTICLE 2   THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

§ 3.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.

*(Paragraph deleted)*

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

N/A

§ 3.2 The Contract Time shall be measured from the date of commencement.

§ 3.3 The Contractor shall achieve Substantial Completion of the entire Work not later than    days from the date of commencement, or as follows:

*(Paragraph deleted)*

| Portion of Work | Substantial Completion Date |
|---|---|
| Grandstand and Concourse Construction | 5/24/05 |

, subject to adjustments of this Contract Time as provided in the Contract Documents.
Liquidated damages are applicable in the amount of $50,000 for each completed week past substantial completion date, subject to the terms of the General Conditions and for adjustments of the completion date.

## ARTICLE 4   CONTRACT SUM

§ 4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be One Million Eight Hundred Ninety-five Thousand Dollars and Zero Cents ($ 1,895,000.00 ), subject to additions and deductions as provided in the Contract Documents.

§ 4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner: Refer to Memorandum of Understanding dated 2/21/05.

Final decisions covering Add or Deduct options must be closed by 3/15/05 or adjustments to contract time and amount may be required.

§ 4.3 Unit prices, if any, are as follows:

| Description | Units | Price ($ 0.00) |
|---|---|---|
| N/A | N/A | 0.00 |

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1980, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:48:49 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                                (1749545831)

2

## ARTICLE 5  PAYMENTS
### § 5.1 PROGRESS PAYMENTS
§ 5.1.1 Based upon Applications for Payment submitted to the Owner by the Contractor the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 5.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

N/A

§ 5.1.3 Provided that an Application for Payment is received by the Owner not later than the 1st day of a month, the Owner shall make payment to the Contractor not later than the 16th day of the same month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than Fifteenth ( 15 ) days after the Owner receives the Application for Payment.

§ 5.1.4 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

§ 5.1.5 Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

§ 5.1.6 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1  Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of ten ( 10% ). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.8 of AIA Document A201-1997;

.2  Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of ten ( 10% );

.3  Subtract the aggregate of previous payments made by the Owner; and

.4  Subtract amounts, if any, for which the Owner has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201-1997.

§ 5.1.7 The progress payment amount determined in accordance with Section 5.1.6 shall be further modified under the following circumstances:

.1  Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and
(Section 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)

.2  Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Section 9.10.3 of AIA Document A201-1997.

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1980, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:48:49 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                            (1749545831)

3

**§ 5.1.8** Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Sections 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

N/A

**§ 5.1.9** Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**§ 5.2 FINAL PAYMENT**
**§ 5.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

    .1    the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

    .2    a final Certificate for Payment has been issued by the Contractor.

**§ 5.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Contractor's final Certificate for Payment, or as follows:

**ARTICLE 6   TERMINATION OR SUSPENSION**
**§ 6.1** The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

**§ 6.2** The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

**ARTICLE 7   MISCELLANEOUS PROVISIONS**
**§ 7.1** Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**§ 7.2** Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

(   ) prime rate plus 2%

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**§ 7.3** The Owner's representative is:
*(Name, address and other information)*

Alan R. Stone
303 Main Street
P.O. Box 2221
Worcester, MA 01613

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1980, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:48:49 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                                (1749545831)

§ **7.4** The Contractor's representative is:
*(Name, address and other information)*

Bruce Merrick
1500 Bernheim Lane
Louisville, KY 40210

§ **7.5** Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

§ **7.6** Other provisions:

1. Contractor shall maintain general liability insurance in an amount not less than $5 million. College of the Holy Cross shall be named as an additional insured/
2. Contractor shall supply a payment and performance bond. College of Holy Cross shall be named in addition to the Owner on the bond.

## ARTICLE 8   ENUMERATION OF CONTRACT DOCUMENTS

§ **8.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:
Contract documents shall include the plans and specifications listed in Exhibit B. It is recognized that these will be updated with a final set issued by March 15, 2005. A permitting set shall be provided by March 21, 2005

§ **8.1.1** The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

§ **8.1.2** The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

§ **8.1.3** The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated , and are as follows

| Document | Title | Pages |
|----------|-------|-------|
| N/A | N/A | N/A |

§ **8.1.4** The Specifications are those contained in the Project Manual dated as in Section 8.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*
Title of Specifications exhibit:  N/A

§ **8.1.5** The Drawings are as follows, and are dated        unless a different date is shown below:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*
Title of Drawings exhibit:  N/A

§ **8.1.6** The Addenda, if any, are as follows:

| Number | Date | Pages |
|--------|------|-------|
| N/A | N/A | N/A |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

§ **8.1.7** Other documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

**AIA Document A101™ – 1997. Copyright** © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1980, 1987, 1991 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA**® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:48:49 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
**User Notes:**                                                                                                                         (1749545831)

Attachment "A" Memorandum of Understanding dated 2/21/05
Attachment "B"  Preliminary Plans & Specifications
Attachment "C"  Schedule of Values
Attachment "D"  Estimated Draw Schedule
Attachment "E"  Detailed Construction Schedule
Attachment "F"  General Conditions A 201-1997

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

_____          _____
OWNER *(Signature)*                                                       CONTRACTOR *(Signature)*

Alan R. Stone, Worcester Professional BB              Bruce Merrick
*(Printed name and title)*                                            *(Printed name and title)*

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1980, 1987, 1991 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 16:48:49 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                    (1749545831)

6

fax.tif (1728x2144x2 tiff) [2]

02/23/2005  08:54    17818943144           STONE HOME                    PAGE  02

Dant Clayton Corp. and Worcester Professional Baseball, LLC
Memorandum of Understanding
February 21, 2005

Dant Clayton Corp. (DCC) agrees to design, fabricate and construct for Worcester Professional
Baseball (WPB) a mitered I-beam grandstand at Fitton Field on the Holy Cross campus. The
grandstand will be a 14/34 rise/run seating bowl with 1605 flip-up chairs, press box, concrete
foundations, concourse, dugouts and stadium field wall. This design is based on drawings
reviewed and marked up in the meeting held in the National Development offices on February 20,
2005. This work will be substantially complete on May 21, 2005 with prices agreed as follows:

| | |
|---|---|
| Seating bowl with chairs (allowance for $75 each chair) | $1,135,000 |
| Concourse and 2 entryways with pan poured concrete floor | $400,000 |
| Concrete foundations based on 3000 psf soils | $195,000 allowance |
| Dugouts (concrete, covered) | $110,000 allowance |
| Press box (estimated at 9'x36' with 3 sm and 1 lg rooms) | $55,000 allowance |

Product features and options:
Galvanized steel finish
Welded aluminum deck
Aluminum guardrail system with black vinyl chain link fencing
Slip resistant deck finish
Powder coated risers – green
Anodized seat boards with green powder coated backrests

Add options:
| | |
|---|---|
| Changing out bench seats on the first and third baselines with 132 chairs | $10,200 |
| Change guard railing on grandstand (not concourse) to vertical picket | $18,000 |

Deduct options:
| | |
|---|---|
| Remove slip resistant deck finish | $25,000 |
| Change flip up chairs to Dant Clayton Colosseum One chairs | $50,000 |

Allowances – DCC cost plus 10%
Taxes excluded and will be added when known
Bonding and standard DCC insurance coverage included
Permits and local approvals to be handled and paid for by WPB
Non-prevailing wage rates
Liquidated damages will be included with language that considers weather, owner delays and
conditions that are beyond Dant Clayton control.
Standard AIA contract
It is understood and agreed that the project schedule is extremely tight and can only be
accomplished with no delays. WPB is committing necessary resources to ensuring all project
decisions will be made timely so as to avoid any delay.

_____                    _____
Dant Clayton Corp.                         Worcester Professional Baseball, LLC

Attachment A

# DANT CLAYTON CORP
## WORCESTER PROFESSIONAL BASEBALL

### SECTION 13125
### Permanent Grandstand Seating System

## PART 1        GENERAL INFORMATION

### 1.01    Scope of Work

Provide engineering, material, freight, installation and supervision to provide a new permanent grandstand structure in accordance with the following specifications and attached scope of work.

### 1.02    Related Work/Related Section

Concrete Section
Pressbox

### 1.03    Site Visitation

A visitation to the site seven (7) days prior to bid date by a qualified representative of the grandstand manufacturer is mandatory. No allowance will be made after the contract award for any problems encountered which would have been discovered during the pre-bid visitation.

### 1.04    Design Criteria

A.    All material and workmanship shall be in accordance with the following:

MASSACHUSETTS STATE CODE
ADA and Massachusetts Architectural Access Board
AISC Manual of Steel Construction, Load & Resistance factor Design, 2nd Edition
ACI Building Code for Reinforced Concrete
Aluminum Association of America
ASTM E985, standard specification for permanent metal railing systems and rails for buildings.
AWS D1.2, American Welding Society
All plans including seating, press box and toilet facility will meet Massachusetts codes and will be stamped by a MA architect and structural engineer.

B.    Design Loads:

| Dead Load | 6 psf | seat and footboards, risers, steel framing, etc. |
|---|---|---|
| Live Load | 100 psf | to structural members. All stringers and girders shall be limited to L/200 for maximum vertical live load deflection. |
| | 120 plf | Seatboards |
| | 120 plf | Footboards |
| Design Wind Speed | 40 mph | On projected vertical surface |
| Sway | 24 plf | Per lineal foot of seat, parallel to seat run |
| Sway | 10 plf | Per lineal foot of seat, perpendicular to seat |

1

*Attachment B 1/7*

C.    **Deflection:**  Structural elements shall be sized to limit the live load deflections to 1/200 of the span.  Calculation shall be submitted with shop details confirming 1/200 deflection criteria.

D.    **Foundations:**  Foundations have been sized by an engineer and are based on soil bearing capacity of 3000 p.s.f.  Soil bearing capacity to be verified by the Owner prior to placement of footings.

1.05    **Quality Assurance**

A.    **Warranty:**  Product shall be guaranteed for five (5) years on the structure and one (1) year on the finish together with labor.  Damage resulting from abnormal use, vandalism, or incorrect installation (if done by other than authorized installer of the manufacturer) is not applicable. **Any exposed mill finish aluminum surface will become discolored due to oxidation which is a natural phenomenon.  The manufacturer will not be responsible or liable for oxidation of mill finish aluminum.**

1.06    **Form of Contract**

Contract shall be AIA Standard Form of Agreement

# PART 2    PRODUCTS

2.02    **Materials**

2.02.1    **Structural Steel**

A.    All detailing, fabrication, and erection shall be in accordance with AISC Specifications, Load & Resistance Factor Design, 2nd  Edition

B.    Structural steel shall be ASTM A572 multi-certified grade 50,  Miscellaneous steel shall be ASTM A36.

C.    All bolts 5/8" diameter and larger shall be  ASTM A325.  All bolts 1/2" and smaller shall be ASTM A307. Threaded rod shall be ASTM A36.

D.    All welds shall conform to ANSI/AWS D1.1, latest edition.  Electrodes shall be E70XX.

E.    Columns shall be wide flange shapes.

F.    Support beams shall be wide flange shapes.

G.    Stringer shall be wide flange shape.

H.    Steel Finish

Structural steel shall be coated with a minimum of 2 oz. hot dipped galvanized in accordance with ASTM 123-A with a minimum galvanized film thickness of 3.3 mils. Zinc shall be 98% purity, certified with written test results based on samples taken from the tank.

Attachment B 2/7

2.02.2 <u>Guardrail</u>

A.    Vertical guardrail structural supports shall be aluminum rectangular tube 2.8" x 2.0 x .1888" or aluminum angle of equivalent strength, and shall be 6061-T6 alloy.  Guardrail shall have structural support on each leg of the fencing at all 90° turns.  Tension bars do not meet this requirement.

B.    Guardrail horizontal and vertical framing members will be 1 5/8" O.D. aluminum pipe.

C.    Chain link fence shall be 2" mesh, 6 gauge vinyl-coated fabric.

D.    The open end of the stand below the concourse under the proposed restroom could be covered with windscreen and enclosed at some future date.

**OPTION**    <u>**Vertical Picket Guardrail**</u>

A.    Materials:

    1.    Top and bottom rail shall be 1 1/2" ASTM.A36 hot rolled steel channel.

    2.    Vertical ballasters shall be 1/2" ASTM A36 bar stock

    3.    Vertical support posts shall be ASTM A-53 steel 2" square tube seal welded top and bottom cap

B.    Fabrication:

    1.    Welds to be full seal welds around all joints in materials.

    2.    All welds shall be shop welded to top and bottom channel.  No partial or tack welding.

C.    Finish:

    Powder coated

2.02.3 <u>Handrail</u>

A.    Two line center aisle handrails shall be anodized extruded aluminum pipe of 6061-T6 alloy, with a 1 15/16" outside diameter and a wall thickness of .145".

B.    Handrails on all ramps and stairs shall provide 1-1/2" clearance from the guardrail material and shall extend 12" past the last riser with a return. Newel posts will not interrupt handrails. Handrails will not project more than 4.5" into the width of a stair or ramp.

2.02.4 <u>Seating</u>

A.    Seats shall be 6063-T6 extruded aluminum with a fluted surface and a minimum of 4 vertical legs. The exact size of seatboard is 2" x 10" x .080" wall thickened at the joints and weighing 1.9

Attachment B 3/7

lbs. per foot with 1" radius comfort curve front edge. Aluminum shall be cleaned, pre-treated and clear anodized.

B.    Mounting brackets: 3/16" thick A36 steel plate, plasma cut, bent and galvanized.

C.    Seatboards shall be attached to the system by riser mounted galvanized steel "L" brackets (deck mounted brackets not allowed).  The seatboards shall align with the intermediate steps at the aisles.  Seat brackets must have a positive connection to the steel frame of the bleacher.  Attachment to the riserboard is not allowed.

D.    The flip up chair will be the Hussey Legend in standard green.

## 2.02.4  Backrests

A.    Backrests shall be 6063-T6 extruded aluminum with a minimum wall thickness of 0.078".

B.    Backrest stanchion bars shall be 6061-T6 extruded aluminum, 204 R1 clear anodized spaced 6'-0" O-C max

C.    Aluminum for backrests shall be cleaned, pre-treated and powder coated.

## 2.02.5  Decking System

## 2.02.5.1    Fully Closed Welded Deck System

A.    The decking system has two components.  The first component is a one-piece welded deck panel constructed by welding multiple aluminum extensions together in the factory utilizing a fully automated, computer controlled, multi-head welding machine.  The welding machine will weld all extrusions together in a single pass with 0.040" diameter 4043 welded wire using Orlion Gas to insure uniform shape, dimension and appearance.  The decking system is fixed with a 1% slope to the front to enhance water drainage.  The decking system is attached by concealed clips and galvanized hardware.  The decking extrusions are 1 ¾" vertically with a .078" wall thickness and are interlocked horizontally prior to welding using a tongue and groove connection.

B.    The second component is a one-piece aluminum riser extension that has a male-female connection at the top with the welded deck panel and a shingled overlap connection at the bottom with the welded deck panel.  The riser is finished with a powder coated or anodized surface treatment, covering 100% of the riser surface.

C.    The decking system will run from raker beam to raker beam.  There will be a ½" gap at joint of the welded deck panels to allow for expansion and construction of the aluminum due to temperature variations.

D.    The joint of the welded deck panel is covered with a 4" wide aluminum extrusion joint cover.

E.    The joint of the welded deck panel is elevated ¼" by use of a ¼" steel plate that is installed below the welded deck panel and above the structural steel supports below.

F.    Riser height per row and tread depth per row is indicated on design drawings.

Attachment B  4/7

G.    The ends of decking system will be finished with a one-piece aluminum angle end cap.

2.02.5.2.    **Walking Surface Requirement**

A.    All aluminum decking intended for use as a walking surface, including walkways, aisles, walking surfaces in seating sections, stairs, ramps, platforms, handicap areas, and landings, will exhibit a slip resistant surface treatment intended to minimize the effects of wet conditions on pedestrian safety.

B.    This surface treatment will increase the slip resistance of mill finished aluminum to achieve a slip index (coefficient of friction) of 0.80 or higher in all directions of travel, including parallel to seating, as measured by the Variable Incidence Tribometer (VIT), **under wet conditions** as well as dry conditions.  This testing machine is referenced in ASTM F-1679, Standard Test Method for Using a Variable Incidence Tribometer.

C.    An independent test substantiating both the minimum required .80 coefficient of friction and the durability performance of the slip resistance feature must be provided with the bid.  One independent laboratory capable of performing this testing is Artech Testing LLC in Chantilly, Virginia (703-378-7263).

2.02.6   **Ramps, Stairs, Ramp Platforms and Stair Platforms**

Shall conform to local building codes.

2.02.7   **End Caps**

A.    Walkways, footboards, and aisle board end caps shall be one-piece mill finish aluminum angle design tumbled after fabrication to remove burrs and sharp edges.  End caps shall be riveted to the planks.

B.    Seatboard end caps shall be one-piece cast aluminum and shall be friction-fit to the plank without the use of mechanical fasteners.

C.    Guardrail posts shall be covered with cast aluminum top caps.

2.02.8   **Handicap Areas**

A.    Handicap areas will be per design drawings.

2.03    **Reinforced Concrete**

A.    All concrete work and materials shall be in accordance with ACI 318.

B.    Cast-in-place concrete shall have minimum compressive strength of 4,000 psi at 28 days.

C.    All exterior concrete shall be air-entrained to 6% ± 1%.

D.    Reinforcing steel shall be in accordance with ATM A615, grade 60.

5

E.    Embedment of reinforcing in concrete shall be as follows, unless otherwise noted on drawings:

3"       Placed directly against earth
2"       Concrete poured against forms and exposed to weather
1 ½"    Columns to ties

# PART 3    EXECUTION

## 3.01    Installation

3.01.1  Installation shall be handled directly by the manufacturer or by a factory-certified installation subcontractor.  Factory certification shall require three installations within the last two years within the state.

3.01.2  Structure shall be erected in accordance with plans, shop drawings, and specifications.

3.01.3  Site preparation is not included in this specification.

## 3.02    Cleaning

3.02.1  Clean all surfaces after erection, in accordance with manufacturer's recommendations.

3.02.2  Remove and properly dispose of all packaging and construction debris.

3.02.3  Do not use acid solution, steel wool or other harsh abrasives.

Attachment B 6/7



SEATING NOTES:
15 ROWS WELDED DECK
14/34 RISE/RUN

1,680 = BENCH SEATS WITH BACKRESTS
1,605 = CHAIR SEATS
34 = WHEELCHAIR SEATING CAPACITY
14 = COMPANION SEATING CAPACITY
3,353 = TOTAL SEATING CAPACITY

DANT CLAYTON
CORPORATION
P.O. Box 740008
1500 Bernheim Lane
Louisville, KY 40201-7408
Telephone (502) 636-3400
WWW.DANTCLAYTON.COM

4-0

"Attachment B"    7/7

# CONTINUATION SHEET

## AIA DOCUMENT G703

PAGE 1 OF 1 PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.: 00001
APPLICATION DATE:
PERIOD TO: 3/8/2005
ARCHITECT'S PROJECT NO.: C020163

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | WORK COMPLETED THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | (G÷C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE) RATE |
| 0001 | Detailling / Engineering | $47,835.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $47,835.00 | $0.00 |
| 0002 | Project Management | $50,480.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $50,480.00 | $0.00 |
| 0003 | Bonds | $23,506.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $23,506.00 | $0.00 |
| 0004 | Concrete Foundation Allowance | $195,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $195,000.00 | $0.00 |
| 0005 | Dugout Allowance | $110,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $110,000.00 | $0.00 |
| 0006 | Pressbox Allowance | $55,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $55,000.00 | $0.00 |
| 0007 | Chair Allowance | $120,375.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $120,375.00 | $0.00 |
| 0008 | Concourse Steel and Concrete | $285,323.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $285,323.00 | $0.00 |
| 0009 | Structural Steel Material & Fab | $331,070.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $331,070.00 | $0.00 |
| 0010 | Aluminum Material Material & Fab | $287,943.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $287,943.00 | $0.00 |
| 0011 | Powder Coat Finishing | $35,111.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $35,111.00 | $0.00 |
| 0012 | Galvanizing | $57,811.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $57,811.00 | $0.00 |
| 0013 | Fencing and Hardware | $65,547.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $65,547.00 | $0.00 |
| 0014 | Installation | $250,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $250,000.00 | $0.00 |
| | | $1,895,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $1,895,000.00 | $0.00 |

Attachment "C-1"

AIA DOCUMENT G703 • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.
This document has been reproduced electronically with the permission of The American Institute of Architects under License #7004 to Primavera Systems, Inc. Reproduction of this document without project-specific information is not permitted. Contact The American Institute of Architects to verify the current version of this document and license status."

G703-1992

105W8



C020163
Worcester Baseball Project
Worcester, MA
Billing Projection

| Work Projected through | Invoice Month | Payment Month | Gross Invoice Amount | Retainage | Net Invoice Amount |
|---|---|---|---|---|---|
| 03/31/05 | March | April | 458,653 | 45885.3 | 412,788 |
| 04/30/05 | April | May | 1,220,000 | 122000 | 1,098,000 |
| 05/31/05 | May | June | 216,347 | 21634.7 | 194,712 |
| 06/30/05 | June | July | 0 | 0 | 189,500 |
| | | TOTALS | 1,895,000 | | 1,895,000 |



Attachment E

# AIA® Document A201™ – 1997

## General Conditions of the Contract for Construction

for the following PROJECT:
*(Name and location or address):*
Worcester Professional Baseball, LLC
New Baseball Grandstand
Fitton Field

THE OWNER:
*(Name and address):*
Worcester Professional Baseball, LLC
303 Main Street
P.O. Box 2221
Worcester, MA 01613

THE ARCHITECT:
*(Name and address):*

N/A

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document has been approved and endorsed by The Associated General Contractors of America

TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    OWNER

3    CONTRACTOR

4    ADMINISTRATION OF THE CONTRACT

5    SUBCONTRACTORS

6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7    CHANGES IN THE WORK

8    TIME

9    PAYMENTS AND COMPLETION

10    PROTECTION OF PERSONS AND PROPERTY

11    INSURANCE AND BONDS

12    UNCOVERING AND CORRECTION OF WORK

13    MISCELLANEOUS PROVISIONS

14    TERMINATION OR SUSPENSION OF THE CONTRACT

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                        (2697848978)

# INDEX
(Numbers and Topics in Bold are Section Headings)

**Acceptance of Nonconforming Work**
9.6.6, 9.9.3, **12.3**
Acceptance of Work
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
**Access to Work**
**3.16, 6.2.1, 12.1**
Accident Prevention
4.2.3, 10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.8, 4.4.1, 8.3.1,
9.5.1, 10.2.5, 13.4.2, 13.7, 14.1
Addenda
1.1.1, 3.11
Additional Costs, Claims for
4.3.4, 4.3.5, 4.3.6, 6.1.1, 10.3
Additional Inspections and Testing
9.8.3, 12.2.1, 13.5
Additional Time, Claims for
4.3.4, 4.3.7, 8.3.2
**ADMINISTRATION OF THE CONTRACT**
3.1.3, **4**, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13, 4.5.1
**Allowances**
**3.8**
All-risk Insurance
11.4.1.1
**Applications for Payment**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10, 11.1.3, 14.2.4, 14.4.3
Approvals
2.4, 3.1.3, 3.5, 3.10.2, 3.12, 4.2.7, 9.3.2, 13.4.2, 13.5
**Arbitration**
4.3.3, 4.4, 4.5.1, 4.5.2, **4.6**, 8.3.1, 9.7.1, 11.4.9,
11.4.10
**Architect**
**4.1**
Architect, Definition of
4.1.1
Architect, Extent of Authority
2.4, 3.12.7, 4.2, 4.3.6, 4.4, 5.2, 6.3, 7.1.2, 7.3.6, 7.4,
9.2, 9.3.1, 9.4, 9.5, 9.8.3, 9.10.1,  9.10.3, 12.1, 12.2.1,
13.5.1, 13.5.2, 14.2.2, 14.2.4
Architect, Limitations of Authority and
Responsibility
2.1.1, 3.3.3, 3.12.4, 3.12.8, 3.12.10, 4.1.2, 4.2.1,
4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12, 4.2.13, 4.4,
5.2.1, 7.4, 9.4.2, 9.6.4, 9.6.6
Architect's Additional Services and Expenses
2.4, 11.4.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
**Architect's Administration of the Contract**

3.1.3, **4.2**, 4.3.4, 4.4, 9.4, 9.5
Architect's Approvals
2.4, 3.1.3, 3.5.1, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.6
Architect's Decisions
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5,
4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4,
9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
Architect's Inspections
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 13.5
Architect's Instructions
3.2.3, 3.3.1, 4.2.6, 4.2.7, 4.2.8, 7.4.1, 12.1, 13.5.2
Architect's Interpretations
4.2.11, 4.2.12, 4.3.6
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1,
3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2,
4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4,
9.5, 9.7, 9.8, 9.9,  10.2.6, 10.3, 11.3, 11.4.7, 12,
13.4.2, 13.5
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4, 11.4.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
4.2.2, 4.2.5, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1,
13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
**Award of Subcontracts and Other Contracts for
Portions of the Work**
**5.2**
**Basic Definitions**
**1.1**
Bidding Requirements
1.1.1, 1.1.7, 5.2.1, 11.5.1
**Boiler and Machinery Insurance**
11.4.2
Bonds, Lien
9.10.2
Bonds, Performance, and Payment
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Building Permit
3.7.1
**Capitalization**
**1.3**
Certificate of Substantial Completion

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The
American Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.
Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be
prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order
No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:
(2697848978)

**Exhibit D**
(pages 20-39)

{}

9.8.3, 9.8.4, 9.8.5
**Certificates for Payment**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
Certificates of Inspection, Testing or Approval
13.5.4
Certificates of Insurance
9.10.2, 11.1.3
**Change Orders**
1.1.1, 2.4.1, 3.4.2, 3.8.2.3, 3.11.1, 3.12.8, 4.2.8, 4.3.4,
4.3.9, 5.2.3, 7.1, **7.2**, 7.3, 8.3.1, 9.3.1.1, 9.10.3,
11.4.1.2, 11.4.4, 11.4.9, 12.1.2
Change Orders, Definition of
7.2.1
**CHANGES IN THE WORK**
3.11, 4.2.8, **7**, 8.3.1, 9.3 1.1, 11.4.9
Claim, **Definition of**
**4.3.1**
**Claims and Disputes**
3.2.3, **4.3**, 4.4, 4.5, 4.6, 6.1.1, 6.3, 7.3.8, 9.3.3, 9.10.4,
10.3.3
Claims and Timely Assertion of Claims
**4.6.5**
**Claims for Additional Cost**
3.2.3, 4.3.4, **4.3.5**, 4.3.6, 6.1.1, 7.3.8, 10.3.2
**Claims for Additional Time**
3.2.3, 4.3.4, **4.3.7**, 6.1.1, 8.3.2, 10.3.2
**Claims for Concealed or Unknown Conditions**
**4.3.4**
Claims for Damages
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3,
11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Claims Subject to Arbitration
4.4.1, 4.5.1, 4.6.1
**Cleaning Up**
**3.15, 6.3**
**Commencement of Statutory Limitation Period**
**13.7**
Commencement of the Work, Conditions Relating to
2.2.1, 3.2.1, 3.4.1, 3.7.1, 3.10.1, 3.12.6, 4.3.5, 5.2.1,
5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1, 11.1, 11.4.1, 11.4.6,
11.5.1
Commencement of the Work, Definition of
8.1.2
**Communications Facilitating Contract**
**Administration**
3.9.1, **4.2.4**
Completion, Conditions Relating to
1.6.1, 3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2, 9.4.2, 9.8,
9.9.1, 9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND**
**9**
Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3,
9.10.4.2, 12.2, 13.7
Compliance with Laws

1.6.1, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6.4,
4.6.6, 9.6.4, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14.1.1, 14.2.1.3
Concealed or Unknown Conditions
4.3.4, 8.3.1, 10.3
Conditions of the Contract
1.1.1, 1.1.7, 6.1.1, 6.1.4
Consent, Written
1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2,
9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2
**CONSTRUCTION BY OWNER OR BY**
**SEPARATE CONTRACTORS**
1.1.4, 6
Construction Change Directive, Definition of
7.3.1
**Construction Change Directives**
1.1.1, 3.12.8, 4.2.8, 4.3.9, 7.1, **7.3**, 9.3.1.1
Construction Schedules, Contractor's
1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
**Contingent Assignment of Subcontracts**
**5.4, 14.2.2.2**
**Continuing Contract Performance**
**4.3.3**
Contract, Definition of
1.1.2
**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE**
5.4.1.1, 11.4.9, 14
Contract Administration
3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating
to
3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.4.6, 11.5.1
**Contract Documents, The**
**1.1, 1.2**
Contract Documents, Copies Furnished and Use of
1.6, 2.2.5, 5.3
Contract Documents, Definition of
1.1.1
**Contract Sum**
3.8, 4.3.4, 4.3.5, 4.4.5, 5.2.3, 7.2, 7.3, 7.4, **9.1**, 9.4.2,
9.5.1.4, 9.6.7, 9.7, 10.3.2, 11.4.1, 14.2.4, 14.3.2
Contract Sum, Definition of
9.1
Contract Time
4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1.3, 7.3, 7.4, 8.1.1, 8.2,
8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1, 14.3.2
Contract Time, Definition of
8.1.1
**CONTRACTOR**
**3**
Contractor, Definition of
3.1, 6.1.2
**Contractor's Construction Schedules**
1.4.1.2, **3.10**, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contractor's Employees

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The
American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.
Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be
prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order
No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                           (2697848978)

3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3,
11.1.1, 11.4.7, 14.1, 14.2.1.1,
**Contractor's Liability Insurance**
**11.1**
Contractor's Relationship with Separate Contractors
and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.4.7, 12.1.2, 12.2.4
Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7, 9.10.2,
11.4.1.2, 11.4.7, 11.4.8
Contractor's Relationship with the Architect
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1,
3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2,
4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4,
9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
13.4.2, 13.5
Contractor's Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.8.2
Contractor's Responsibility for Those Performing the
Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1,
10
Contractor's Review of Contract Documents
1.5.2, 3.2, 3.7.3
Contractor's Right to Stop the Work
9.7
Contractor's Right to Terminate the Contract
4.3.10, 14.1
Contractor's Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3,
9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3, 11.1.3, 11.5.2
Contractor's Superintendent
3.9, 10.2.6
Contractor's Supervision and Construction
Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3,
6.2.4, 7.1.3, 7.3.4, 7.3.6, 8.2, 10, 12, 14
Contractual Liability Insurance
11.1.1.8, 11.2, 11.3
Coordination and Correlation
1.2, 1.5.2, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1
Copies Furnished of Drawings and Specifications
1.6, 2.2.5, 3.11
Copyrights
1.6, 3.17
Correction of Work
2.3, 2.4, 3.7.4, 4.2.1, 9.4.2, 9.8.2, 9.8.3, 9.9.1, 12.1.2,
12.2, 13.7.1.3
**Correlation and Intent of the Contract Documents**
**1.2**
Cost, Definition of
7.3.6
Costs
2.4, 3.2.3, 3.7.4, 3.8.2, 3.15.2, 4.3, 5.4.2, 6.1.1, 6.2.3,
7.3.3.3, 7.3.6, 7.3.7, 7.3.8, 9.10.2, 10.3.2, 10.5, 11.3,
11.4, 12.1, 12.2.1, 12.2.4, 13.5, 14
**Cutting and Patching**

6.2.5, **3.14**
Damage to Construction of Owner or Separate
Contractors
3.14.2, 6.2.4, 9.2.1.5, 10.2.1.2, 10.2.5, 10.6, 11.1,
11.4, 12.2.4
Damage to the Work
3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.6, 11.4, 12.2.4
Damages, Claims for
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3,
11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2
Date of Commencement of the Work, Definition of
8.1.2
Date of Substantial Completion, Definition of
8.1.3
Day, Definition of
8.1.4
Decisions of the Architect
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5,
4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4,
9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
**Decisions to Withhold Certification**
9.4.1, **9.5**, 9.7, 14.1.1.3
Defective or Nonconforming Work, Acceptance,
Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2,
9.9.3, 9.10.4, 12.2.1, 13.7.1.3
Defective Work, Definition of
3.5.1
Definitions
1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3, 4.1.1,
4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.6, 8.1, 9.1, 9.8.1
**Delays and Extensions of Time**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1,
7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
Disputes
4.1.4, 4.3, 4.4, 4.5, 4.6, 6.3, 7.3.8
**Documents and Samples at the Site**
**3.11**
Drawings, Definition of
1.1.5
Drawings and Specifications, Use and Ownership of
1.1.1, 1.3, 2.2.5, 3.11, 5.3
Effective Date of Insurance
8.2.2, 11.1.2
**Emergencies**
4.3.5, **10.6**, 14.1.1.2
Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3,
11.1.1, 11.4.7, 14.1, 14.2.1.1
Equipment, Labor, Materials and
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1,
4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3,
9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Execution and Progress of the Work

AIA Document A201™–1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The
American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.
Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be
prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order
No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                        (2697846978)

1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3, 3.4, 3.5, 3.7, 3.10, 3.12, 3.14, 4.2.2, 4.2.3, 4.3.3, 6.2.2, 7.1.3, 7.3.4, 8.2, 9.5, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3
**Extensions of Time**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3, 7.4.1, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
**Failure of Payment**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Faulty Work
(*See* Defective or Nonconforming Work)
**Final Completion and Final Payment**
4.2.1, 4.2.9, 4.3.2, 9.8.2 **9.10**, 11.1.2, 11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.5
Fire and Extended Coverage Insurance
11.4
**GENERAL PROVISIONS**
1
**Governing Law**
13.1
Guarantees (*See* Warranty)
Hazardous Materials
10.2.4, **10.3**, 10.5
Identification of Contract Documents
1.5.1
Identification of Subcontractors and Suppliers
5.2.1
**Indemnification**
3.17, **3.18**, 9.10.2, 10.3.3, 10.5, 11.4.1.2, 11.4.7
**Information and Services Required of the Owner**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
**Injury or Damage to Person or Property**
**4.3.8, 10.2, 10.6**
Inspections
3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.2, 9.8.3, 9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
1.1.1
Instructions to the Contractor
3.2.3, 3.8.1, 3.8.1, 4.2.8, 5.2.1, 7, 12, 8.2.2, 13.5.2
Insurance
3.18.1, 6.1.1, 7.3.6, 8.2.1, 9.3.2, 9.8.4, 9.9.1, 9.10.2, 9.10.5, 11
**Insurance, Boiler and Machinery**
11.4.2
**Insurance, Contractor's Liability**
11.1
Insurance, Effective Date of
8.2.2, 11.1.2
**Insurance, Loss of Use**
11.4.3
**Insurance, Owner's Liability**
11.2

**Insurance, Project Management Protective Liability**
11.3
**Insurance, Property**
10.2.5, **11.4**
Insurance, Stored Materials
9.3.2, 11.4.1.4
**INSURANCE AND BONDS**
11
Insurance Companies, Consent to Partial Occupancy
9.9.1, 11.4.1.5
Insurance Companies, Settlement with
11.4.10
Intent of the Contract Documents
1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
**Interest**
13.6
**Interpretation**
1.2.3, **1.4**, 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4
Interpretations, Written
4.2.11, 4.2.12, 4.3.6
Joinder and Consolidation of Claims Required
4.6.4
**Judgment on Final Award**
**4.6.6**
**Labor and Materials, Equipment**
1.1.3, 1.1.6, **3.4**, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 42.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Labor Disputes
8.3.1
Laws and Regulations
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14
Liens
2.1.2, 4.4.8, 8.2.2, 9.3.3, 9.10
**Limitation on Consolidation or Joinder**
**4.6.4**
Limitations, Statutes of
4.6.3, 12.2.6, 13.7
Limitations of Liability
2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.10, 3.17, 3.18, 4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.6.7, 9.10.4, 10.3.3, 10.2.5, 11.1.2, 11.2.1, 11.4.7, 12.2.5, 13.4.2
Limitations of Time
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1, 4.2.7, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5, 13.7, 14
**Loss of Use Insurance**
**11.4.3**
Material Suppliers
1.6, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2, 9.6, 9.10.5
Materials, Hazardous
10.2.4, 10.3, 10.5

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                          (2697848978)

Materials, Labor, Equipment and
1.1.3, 1.1.6, 1.6.1, 3.4, 3.5.1, 3.8.2, 3.8.23, 3.12, 3.13,
3.15.1, 4.2.6, 4.2.7, 5.2 1, 6.2.1, 7.3.6, 9.3.2, 9.3.3,
9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
4.4.8
**Mediation**
4.4.1, 4.4.5, 4.4.6, 4.4.8, **4.5**, 4.6.1, 4.6.2, 8.3.1, 10.5
**Minor Changes in the Work**
1.1.1, 3.12.8, 4.2.8, 4.3.6, 7.1, **7.4**
**MISCELLANEOUS PROVISIONS**
**13**
Modifications, Definition of
1.1.1
Modifications to the Contract
1.1.1, 1.1.2, 3.7.3, 3.11, 4.1.2, 4.2.1, 5.2.3, 7, 8.3.1,
9.7, 10.3.2, 11.4.1
**Mutual Responsibility**
**6.2**
**Nonconforming Work, Acceptance of**
9.6.6, 9.9.3, **12.3**
Nonconforming Work, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.8.2, 9.9.3, 9.10.4,
12.2.1, 13.7.1.3
Notice
2.2.1, 2.3, 2.4, 3.2.3, 3.3 1, 3.7.2, 3.7.4, 3.12.9, 4.3,
4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 11.1.3,
11.4.6, 12.2.2, 12.2.4, 13.3, 13.5.1, 13.5.2, 14.1, 14.2
**Notice, Written**
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5,
5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3,  11.1.3, 11.4.6,
12.2.2, 12.2.4, **13.3**, 14
Notice of Testing and Inspections
13.5.1, 13.5.2
Notice to Proceed
8.2.2
**Notices, Permits, Fees and**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
Observations, Contractor's
1.5.2, 3.2, 3.7.3, 4.3.4
Occupancy
2.2.2, 9.6.6, 9.8, 11.4.1.5
Orders, Written
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2,
13.5.2, 14.3.1
**OWNER**
**2**
Owner, Definition of
2.1
**Owner, Information and Services Required of the**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3,
6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3,
11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
Owner's Authority

1.6, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10, 3.14.2, 4.1.2,
4.1.3, 4.2.4, 4.2.9, 4.3.6, 4.4.7,  5.2.1, 5.2.4, 5.4.1,
6.1, 6.3, 7.2.1, 7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1,
9.9.1, 9.10.2,  10.3.2, 11.1.3, 11.3.1, 11.4.3, 11.4.10,
12.2.2, 12.3.1, 13.2.2, 14.3, 14.4
Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.5
**Owner's Liability Insurance**
**11.2**
Owner's Loss of Use Insurance
11.4.3
Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2
**Owner's Right to Carry Out the Work**
**2.4, 12.2.4. 14.2.2.2**
**Owner's Right to Clean Up**
**6.3**
**Owner's Right to Perform Construction and to**
**Award Separate Contracts**
**6.1**
**Owner's Right to Stop the Work**
**2.3**
Owner's Right to Suspend the Work
14.3
Owner's Right to Terminate the Contract
14.2
**Ownership and Use of Drawings, Specifications**
**and Other Instruments of Service**
1.1.1, **1.6**, 2.2.5, 3.2.1, 3.11.1, 3.17.1, 4.2.12, 5.3
**Partial Occupancy or Use**
9.6.6, **9.9**, 11.4.1.5
**Patching, Cutting and**
**3.14, 6.2.5**
Patents
3.17
**Payment, Applications for**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10.1, 9.10.3, 9.10.5, 11.1.3, 14.2.4, 14.4.3
**Payment, Certificates for**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
**Payment, Failure of**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Payment, Final
4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1,
11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
**Payment Bond, Performance Bond and**
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
Payments, Progress
4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3
**PAYMENTS AND COMPLETION**
**9**
Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7, 11.4.8,
14.2.1.2
PCB
10.3.1

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                          (2697848978)

Performance Bond and Payment Bond
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
**Permits, Fees and Notices**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
**PERSONS AND PROPERTY, PROTECTION
OF
10**

Polychlorinated Biphenyl
10.3.1
Product Data, Definition of
3.12.2
**Product Data and Samples, Shop Drawings**
3.11, **3.12**, 4.2.7
**Progress and Completion**
4.2.2, 4.3.3, **8.2**, 9.8, 9.9.1, 14.1.4
**Progress Payments**
4.3.3, 9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3
Project, Definition of the
1.1.4
**Project Management Protective Liability
Insurance
11.3**
Project Manual, Definition of the
1.1.7
Project Manuals
2.2.5
Project Representatives
4.2.10
**Property Insurance**
10.2.5, **11.4**
**PROTECTION OF PERSONS AND PROPERTY
10**
Regulations and Laws
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6,
9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14
Rejection of Work
3.5.1, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1,
9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.10, 5.1.1, 5.1.2,
13.2.1
**Resolution of Claims and Disputes
4.4, 4.5, 4.6**
Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1,
10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
**Review of Contract Documents and Field
Conditions by Contractor**
1.5.2, **3.2**, 3.7.3, 3.12.7, 6.1.3

Review of Contractor's Submittals by Owner and
Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data and
Samples by Contractor
3.12
**Rights and Remedies**
1.1.2, 2.3, 2.4, 3.5.1, 3.15.2, 4.2.6, 4.3.4, 4.5, 4.6, 5.3,
5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1, 9.7, 10.2.5, 10.3,
12.2.2, 12.2.4, **13.4**, 14
**Royalties, Patents and Copyrights
3.17**
Rules and Notices for Arbitration
4.6.2
**Safety of Persons and Property
10.2, 10.6**
**Safety Precautions and Programs**
3.3.1, 4.2.2, 4.2.7, 5.3.1, **10.1**, 10.2, 10.6
Samples, Definition of
3.12.3
**Samples, Shop Drawings, Product Data and**
3.11, **3.12**, 4.2.7
**Samples at the Site, Documents and
3.11**
**Schedule of Values
9.2, 9.3.1**
Schedules,
1.4.1.2, 3.10, 3.Construction12.1, 3.12.2, 4.3.7.2,
6.1.3
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 4.6.4, 6, 8.3.1,
11.4.7, 12.1.2, 12.2.5
Shop Drawings, Definition of
3.12.1
**Shop Drawings, Product Data and Samples**
3.11, **3.12**, 4.2.7
**Site, Use of
3.13, 6.1.1, 6.2.1**
Site Inspections
1.2.2, 3.2.1, 3.3.3, 3.7.1, 4.2, 4.3.4, 9.4.2, 9.10.1, 13.5
Site Visits, Architect's
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
Specifications, Definition of the
1.1.6
**Specifications, The**
1.1.1, **1.1.6**, 1.1.7, 1.2.2, 1.6, 3.11, 3.12.10, 3.17
Statute of Limitations
4.6.3, 12.2.6, 13.7
Stopping the Work
2.3, 4.3.6, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
Subcontractor, Definition of
5.1.1
**SUBCONTRACTORS**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The
American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.
Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be
prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order
No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                        (2697848978)

5
Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4, 9.3.1.2,
9.6.7
**Subcontractual Relations**
**5.3, 5.4, 9.3.1.2, 9.6, 9.10 10.2.1, 11.4.7, 11.4.8, 14.1,**
**14.2.1, 14.3.2**
Submittals
1.6, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2,
9.3, 9.8, 9.9.1, 9.10.2, 9.10.3, 11.1.3
**Subrogation, Waivers of**
6.1.1, 11.4.5, **11.4.7**
**Substantial Completion**
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, **9.8**, 9.9.1, 9.10.3,
9.10.4.2, 12.2, 13.7
Substantial Completion, Definition of
9.8.1
Substitution of Subcontractors
5.2.3, 5.2.4
Substitution of Architect
4.1.3
Substitutions of Materials
3.4.2, 3.5.1, 7.3.7
Sub-subcontractor, Definition of
5.1.2
Subsurface Conditions
4.3.4
**Successors and Assigns**
**13.2**
**Superintendent**
**3.9, 10.2.6**
**Supervision and Construction Procedures**
1.2.2, **3.3**, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3,
6.2.4, 7.1.3, 7.3.6, 8.2, 8.3.1, 9.4.2, 10, 12, 14
Surety
4.4.7, 5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2
Surety, Consent of
9.10.2, 9.10.3
Surveys
2.2.3
**Suspension by the Owner for Convenience**
**14.4**
Suspension of the Work
5.4.2, 14.3
Suspension or Termination of the Contract
4.3.6, 5.4.1.1, 11.4.9, 14
**Taxes**
**3.6, 3.8.2.1, 7.3.6.4**
**Termination by the Contractor**
4.3.10, **14.1**
**Termination by the Owner for Cause**
4.3.10, 5.4.1.1, **14.2**
Termination of the Architect
4.1.3
Termination of the Contractor
14.2.2

**TERMINATION OR SUSPENSION OF THE**
**CONTRACT**
**14**
**Tests and Inspections**
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3, 9.9.2,
9.10.1, 10.3.2, 11.4.1.1, 12.2.1,**13.5**
**TIME**
**8**
**Time, Delays and Extensions of**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1,
7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
Time Limits
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1,
4.2, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4,
8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9,
9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5,
13.7, 14
**Time Limits on Claims**
**4.3.2, 4.3.4, 4.3.8, 4.4, 4.5, 4.6**
Title to Work
9.3.2, 9.3.3
**UNCOVERING AND CORRECTION OF**
**WORK**
**12**
**Uncovering of Work**
**12.1**
Unforeseen Conditions
4.3.4, 8.3.1, 10.3
Unit Prices
4.3.9, 7.3.3.2
Use of Documents
1.1.1, 1.6, 2.2.5, 3.12.6, 5.3
**Use of Site**
**3.13, 6.1.1, 6.2.1**
**Values, Schedule of**
**9.2, 9.3.1**
Waiver of Claims by the Architect
13.4.2
Waiver of Claims by the Contractor
4.3.10, 9.10.5, 11.4.7, 13.4.2
Waiver of Claims by the Owner
4.3.10, 9.9.3, 9.10.3, 9.10.4, 11.4.3, 11.4.5, 11.4.7,
12.2.2.1, 13.4.2, 14.2.4
**Waiver of Consequential Damages**
**4.3.10, 14.2.4**
Waiver of Liens
9.10.2, 9.10.4
**Waivers of Subrogation**
6.1.1, 11.4.5, **11.4.7**
**Warranty**
**3.5, 4.2.9, 4.3.5.3, 9.3.3, 9.8.4, 9.9.1, 9.10.4, 12.2.2,**
**13.7.1.3**
Weather Delays
4.3.7.2
Work, Definition of
1.1.3
Written Consent

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                (2697848978)

8

# ARTICLE 1  GENERAL PROVISIONS
## § 1.1 BASIC DEFINITIONS
### § 1.1.1 THE CONTRACT DOCUMENTS
The Contract Documents consist of the Agreement between Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Owner. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of Addenda relating to bidding requirements).

### § 1.1.2 THE CONTRACT
The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification.

### § 1.1.3 THE WORK
The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### § 1.1.4 THE PROJECT
The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### § 1.1.5 THE DRAWINGS
The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### § 1.1.6 THE SPECIFICATIONS
The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

### § 1.1.7 THE PROJECT MANUAL
The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

## § 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS
### § 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

### § 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

### § 1.2.3 Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

## § 1.3 CAPITALIZATION
### § 1.3.1 Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                (2697848978)

### § 1.4 INTERPRETATION

**§ 1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

### § 1.5 EXECUTION OF CONTRACT DOCUMENTS

**§ 1.5.1** The Contract Documents shall be signed by the Owner and Contractor.

**§ 1.5.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

*(Paragraphs deleted)*

## ARTICLE 2  OWNER

### § 2.1 GENERAL

**§ 2.1.1** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Section 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

**§ 2.1.2** The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### § 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER

**§ 2.2.1** The Owner shall, at the written request of the Contractor, prior to commencement of the Work and thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

**§ 2.2.2** Permits and fees, including those required under Section 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

**§ 2.2.3** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

**§ 2.2.4** Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

*(Paragraph deleted)*

### § 2.3 OWNER'S RIGHT TO STOP THE WORK

**§ 2.3.1** If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                              (2697848978)

## § 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK

**§ 2.4.1** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses . If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

## ARTICLE 3   CONTRACTOR
## § 3.1 GENERAL

**§ 3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**§ 3.1.2** The Contractor shall perform the Work in accordance with the Contract Documents.

**§ 3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Owner in the Owner's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

## § 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR

**§ 3.2.1** Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Owner as a request for information in such form as the Owner may require.

**§ 3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Owner, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents. The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Owner.

**§ 3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Owner in response to the Contractor's notices or requests for information pursuant to Sections 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Sections 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Sections 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.

## § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

**§ 3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such

**AIA Document A201™ – 1997.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                          (2697848978)

means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and shall not proceed with that portion of the Work without further written instructions from the Owner. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

§ 3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

§ 3.3.3 The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

§ 3.4 LABOR AND MATERIALS
§ 3.4.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery transportation, and other services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

§ 3.4.2 The Contractor may make substitutions only with the consent of the Owner.

§ 3.4.3 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

§ 3.5 WARRANTY
§ 3.5.1 The Contractor warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Owner, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

§ 3.6 TAXES
§ 3.6.1 The Contractor shall not pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

§ 3.7 PERMITS, FEES AND NOTICES
§ 3.7.1 Unless otherwise provided in the Contract Documents, the Owner shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

§ 3.7.2 The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

§ 3.7.3 It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                        (2697848978)

**§ 3.7.4** If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 3.8 ALLOWANCES

**§ 3.8.1** The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

**§ 3.8.2** Unless otherwise provided in the Contract Documents:

    **.1**    allowances shall cover the cost to the Contractor of materials and equipment delivered at the site , less applicable trade discounts;

    *(Paragraph deleted)*

    **.3**    whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's costs under Section 3.8.2.2., plus 10% overhead.

**§ 3.8.3** Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## § 3.9 SUPERINTENDENT

**§ 3.9.1** The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES

**§ 3.10.1** The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**§ 3.10.2** The Contractor shall prepare and keep current, for the Owner's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the Owner reasonable time to review submittals.

**§ 3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner.

## § 3.11 DOCUMENTS AND SAMPLES AT THE SITE

**§ 3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Owner and shall be delivered to the Owner upon completion of the Work.

## § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

**§ 3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:

(2697848978)

**§ 3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**§ 3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**§ 3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents.

**§ 3.12.5** The Contractor shall review for compliance with the Contract Documents, approve and submit to the  Owner Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors..

**§ 3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**§ 3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Owner.

**§ 3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Owner's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Owner in writing of such deviation at the time of submittal and (1) the Owner has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Owner's approval thereof.

**§ 3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Owner on previous submittals. In the absence of such written notice the Owner's approval of a resubmission shall not apply to such revisions.

**§ 3.12.10** The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Owner. The Owner shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the Owner will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                          (2697848978)

### § 3.13 USE OF SITE
§ 3.13.1 The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

### § 3.14 CUTTING AND PATCHING
§ 3.14.1 The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

§ 3.14.2 The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

### § 3.15 CLEANING UP
§ 3.15.1 The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

§ 3.15.2 If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

### § 3.16 ACCESS TO WORK
§ 3.16.1 The Contractor shall provide the Owner access to the Work in preparation and progress wherever located.

### § 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
§ 3.17.1 The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Owner.

### § 3.18 INDEMNIFICATION
§ 3.18.1 To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by Project Management Protective Liability insurance purchased by the Contractor in accordance with Section 11.3, the Contractor shall indemnify and hold harmless the Owner, and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18.

§ 3.18.2 In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                          (2697848978)

*(Paragraphs deleted)*

## § 4.3 CLAIMS AND DISPUTES
§ 4.3.1 Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

§ 4.3.2 Time Limits on Claims. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Owner.

§ 4.3.3 Continuing Contract Performance. Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Section 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

§ 4.3.4 Claims for Concealed or Unknown Conditions. If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Owner will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Owner determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Owner shall so notify the Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Owner for initial determination, subject to further proceedings pursuant to Section 4.4.

§ 4.3.5 Claims for Additional Cost. If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.6.

§ 4.3.6 If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Owner, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Owner, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Section 4.3.

§ 4.3.7 Claims for Additional Time
§ 4.3.7.1 If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

§ 4.3.7.2 If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

§ 4.3.8 Injury or Damage to Person or Property. If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                  (2697848978)

a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

§ 4.3.9 If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

§ 4.3.10 Claims for Consequential Damages.  The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

  .1    damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

  .2    damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

## § 4.4 RESOLUTION OF CLAIMS AND DISPUTES
§ 4.4.1 Decision of Owner.  Claims, including those alleging an error or omission by the Owner but excluding those arising under Sections 10.3 through 10.5, shall be referred initially to the Owner for decision. An initial decision by the Owner shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Owner with no decision having been rendered by the Owner. The Owner will not decide disputes between the Contractor and persons or entities other than the Owner.

§ 4.4.2 The Owner will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise

§ 4.4.3 In evaluating Claims, the Owner may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist in rendering a decision

*(Paragraph deleted)*

§ 4.4.5 The Owner will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or Contract Time or both. The approval or rejection of a Claim by the Owner shall be final and binding on the parties but subject to mediation and arbitration.

§ 4.4.6 When a written decision of the Owner states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Owner's decision becoming final and binding upon the Owner and Contractor. If the Owner renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

§ 4.4.7 Upon receipt of a Claim against the Contractor or at any time thereafter the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

AIA Document A201™ -- 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:

(2697848978)

**§ 4.4.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim by the Owner, by mediation or by arbitration.

**§ 4.5 MEDIATION**
**§ 4.5.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5 shall, after initial decision by the Owner or 30 days after submission of the Claim to the Owner, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

**§ 4.5.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**§ 4.5.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

**§ 4.6 ARBITRATION**
**§ 4.6.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Owner or 30 days after submission of the Claim to the Owner, be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

**§ 4.6.2** Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association

**§ 4.6.3** A demand for arbitration shall be made within the time limits specified in Sections 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

**§ 4.6.4** Limitation on Consolidation or Joinder. No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner by written consent containing specific reference to the Agreement and signed by the Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**§ 4.6.5** Claims and Timely Assertion of Claims. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**§ 4.6.6** Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

---

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No. 1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:

19

(2697848978)

## ARTICLE 5  SUBCONTRACTORS

### § 5.1 DEFINITIONS

§ 5.1.1 A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

§ 5.1.2 A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

### § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

§ 5.2.1 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Owner will promptly reply to the Contractor in writing stating whether or not the Owner, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner to reply promptly shall constitute notice of no reasonable objection.

§ 5.2.2 The Contractor shall not contract with a proposed person or entity to whom the Owner has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

§ 5.2.3 If the Owner has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

§ 5.2.4 The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner  makes reasonable objection to such substitute.

### § 5.3 SUBCONTRACTUAL RELATIONS

§ 5.3.1 By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner. Each subcontract agreement shall preserve and protect the rights of the Owner under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

### § 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS

§ 5.4.1 Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                    (2697848978)

.1    assignment is effective only after termination of the Contract by the Owner for cause pursuant to Section 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2    assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

**§ 5.4.2** Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

## ARTICLE 6  CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS
### § 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS
**§ 6.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Section 4.3.

**§ 6.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

**§ 6.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

**§ 6.1.4** Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

### § 6.2 MUTUAL RESPONSIBILITY
**§ 6.2.1** The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

**§ 6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Owner apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**§ 6.2.3** The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

**§ 6.2.4** The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

**§ 6.2.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Section 3.14.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                     (2697848978)

21

**§ 6.3 OWNER'S RIGHT TO CLEAN UP**
**§ 6.3.1** If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and will allocate the cost among those responsible.

**ARTICLE 7   CHANGES IN THE WORK**
**§ 7.1 GENERAL**
**§ 7.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

**§ 7.1.2** A Change Order shall be based upon agreement among the Owner and Contractor; a Construction Change Directive requires agreement by the Owner and Contractor and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Owner alone.

**§ 7.1.3** Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

**§ 7.2 CHANGE ORDERS**
**§ 7.2.1** A Change Order is a written instrument prepared by the Contractor and signed by the Owner, , stating their agreement upon all of the following:
.1    change in the Work;
.2    the amount of the adjustment, if any, in the Contract Sum; and
.3    the extent of the adjustment, if any, in the Contract Time.

**§ 7.2.2** Methods used in determining adjustments to the Contract Sum may include those listed in Section 7.3.3.

**§ 7.3 CONSTRUCTION CHANGE DIRECTIVES**
**§ 7.3.1** A Construction Change Directive is a written order prepared by the Contractor and signed by the Owner , directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

**§ 7.3.2** A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**§ 7.3.3** If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:
.1    mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;
.2    unit prices stated in the Contract Documents or subsequently agreed upon;
.3    cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or
.4    as provided in Section 7.3.6.

**§ 7.3.4** Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Owner of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

**§ 7.3.5** A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                          (2697848978)

§ 7.3.6 If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Owner on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Section 7.3.3.3, the Contractor shall keep and present, in such form as the Owner may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.6 shall be limited to the following:

.1    costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2    costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3    rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

.4    costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

.5    additional costs of supervision and field office personnel directly attributable to the change.

§ 7.3.7 The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Owner. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

§ 7.3.8 Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, the Owner will make an interim determination for purposes of monthly certification for payment for those costs. That determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a claim in accordance with Article 4.

*(Paragraph deleted)*

## § 7.4 MINOR CHANGES IN THE WORK
§ 7.4.1 The Owner will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

## ARTICLE 8  TIME
## § 8.1 DEFINITIONS
§ 8.1.1 Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

§ 8.1.2 The date of commencement of the Work is the date established in the Agreement.

§ 8.1.3 The date of Substantial Completion is the date certified by the Contractor in accordance with Section 9.8.

§ 8.1.4 The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

## § 8.2 PROGRESS AND COMPLETION
§ 8.2.1 Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

§ 8.2.2 The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                      (2697848978)

**<u>Exhibit D</u>**
(pages 40-52)

{}

notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

**§ 8.2.3** The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

## § 8.3 DELAYS AND EXTENSIONS OF TIME
**§ 8.3.1** If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner, or of an employee, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, weather conditions, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Contractor determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Contractor may determine. Also, contract time is contingent upon the following items: (1) Sign off of approval drawings within 72 hours of receipt (2) Receipt of geotechnical information within 5 days of contract date (3) No delays associated with permitting or government approvals (4) Owner providing proof of financial capabilities by 3/4/05.

**§ 8.3.2** Claims relating to time shall be made in accordance with applicable provisions of Section 4.3.

**§ 8.3.3** This Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

## ARTICLE 9   PAYMENTS AND COMPLETION
### § 9.1 CONTRACT SUM
**§ 9.1.1** The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### § 9.2 SCHEDULE OF VALUES
**§ 9.2.1** Before the first Application for Payment, the Contractor shall submit to the Owner a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

### § 9.3 APPLICATIONS FOR PAYMENT
**§ 9.3.1** At least ten days before the date established for each progress payment, the Contractor shall submit to the Owner an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents.

**§ 9.3.1.1** As provided in Section 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Owner, but not yet included in Change Orders.

**§ 9.3.1.2** Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

**§ 9.3.2** Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122651_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                                        (2697848978)

§ 9.3.3 The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

## § 9.4 CERTIFICATES FOR PAYMENT

§ 9.4.1 The Owner will, within seven days after receipt of the Contractor's Application for Payment, either issue a Certificate for Payment, with a copy to the Contractor, for such amount as the Owner determines is properly due, or notify the Contractor in writing of the Owner's reasons for withholding certification in whole or in part as provided in Section 9.5.1.

§ 9.4.2 The issuance of a Certificate for Payment will constitute a representation by the Owner, based on the Owner's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Owner's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Owner. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Owner has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## § 9.5 DECISIONS TO WITHHOLD CERTIFICATION

§ 9.5.1 The Owner may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Owner's opinion the representations required by Section 9.4.2 cannot be made. If the Owner is unable to certify payment in the amount of the Application, the Owner will notify the Contractor as provided in Section 9.4.1. If the Contractor and Owner cannot agree on a revised amount, the Owner will promptly issue a Certificate for Payment for the amount for which the Contractor is able to make such representations to the Owner. The Owner may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of:

   .1    defective Work not remedied;

   .2    third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

   .3    failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

   .4    reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

   .5    damage to the Owner or another contractor;

   .6    reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

   .7    persistent failure to carry out the Work in accordance with the Contract Documents.

§ 9.5.2 When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

## § 9.6 PROGRESS PAYMENTS

§ 9.6.1 After the Owner has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Contractor.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                             (2697848978)

**§ 9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**§ 9.6.3** The Owner will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Owner on account of portions of the Work done by such Subcontractor.

**§ 9.6.4** The Owner shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**§ 9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

**§ 9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

**§ 9.6.7** Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

**§ 9.7 FAILURE OF PAYMENT**
**§ 9.7.1** If the Owner does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Owner or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

**§ 9.8 SUBSTANTIAL COMPLETION**
**§ 9.8.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

**§ 9.8.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Owner a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

**§ 9.8.3** Upon receipt of the Contractor's list, the Owner will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Owner's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Owner. In such case, the Contractor shall then submit a request for another inspection by the Owner to determine Substantial Completion.

**§ 9.8.4** When the Work or designated portion thereof is substantially complete, the Owner will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                    (2697848978)

the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

**§ 9.8.5** The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

### § 9.9 PARTIAL OCCUPANCY OR USE
**§ 9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Owner as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor..

**§ 9.9.2** Immediately prior to such partial occupancy or use, the Owner and Contractor shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**§ 9.9.3** Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

### § 9.10 FINAL COMPLETION AND FINAL PAYMENT
**§ 9.10.1** Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Owner will promptly make such inspection and, when the Owner finds the Work acceptable under the Contract Documents and the Contract fully performed, the Owner will promptly issue a final Certificate for Payment stating that to the best of the Owner's knowledge, information and belief, and on the basis of the Owner's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Owner's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Owner (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**§ 9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Owner so confirms, the Owner shall, upon application by the Contractor and certification by the Owner, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                   (2697848978)

remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Owner prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**§ 9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:

.1    liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
.2    failure of the Work to comply with the requirements of the Contract Documents; or
.3    terms of special warranties required by the Contract Documents.

**§ 9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10  PROTECTION OF PERSONS AND PROPERTY
### § 10.1 SAFETY PRECAUTIONS AND PROGRAMS
**§ 10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

### § 10.2 SAFETY OF PERSONS AND PROPERTY
**§ 10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

.1    employees on the Work and other persons who may be affected thereby;
.2    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and
.3    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**§ 10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**§ 10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**§ 10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**§ 10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or anyone directly or indirectly employed by them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

**§ 10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner.

**§ 10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                        (2697848978)

## § 10.3 HAZARDOUS MATERIALS

**§ 10.3.1** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner in writing.

**§ 10.3.2** The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If the Contractor has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor has no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

**§ 10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

**§ 10.4** The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

**§ 10.5** If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

## § 10.6 EMERGENCIES

**§ 10.6.1** In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Section 4.3 and Article 7.

## ARTICLE 11   INSURANCE AND BONDS
## § 11.1 CONTRACTOR'S LIABILITY INSURANCE

**§ 11.1.1** The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1    claims under workers' compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;

.2    claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

.3    claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

.4    claims for damages insured by usual personal injury liability coverage;

.5    claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6    claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                    (2697848978)

.7    claims for bodily injury or property damage arising out of completed operations; and
.8    claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

**§ 11.1.2** The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

**§ 11.1.3** Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Section 9.10.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

## § 11.2 OWNER'S LIABILITY INSURANCE
**§ 11.2.1** The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

*(Paragraphs deleted)*

## § 11.4 PROPERTY INSURANCE
**§ 11.4.1** Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

**§ 11.4.1.1** Property insurance shall be on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation Contractor's services and expenses required as a result of such insured loss.

**§ 11.4.1.2** If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto.

**§ 11.4.1.3** If the property insurance requires deductibles, the Owner shall pay costs not covered because of such deductibles.

**§ 11.4.1.4** This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                  (2697848978)

§ 11.4.1.5 Partial occupancy or use in accordance with Section 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

§ 11.4.2 Boiler and Machinery Insurance. The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

§ 11.4.3 Loss of Use Insurance. The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

§ 11.4.4 If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

§ 11.4.5 If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

§ 11.4.6 Before an exposure to loss may occur, the Owner shall file with the Contractor a copy of each policy that includes insurance coverages required by this Section 11.4. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

§ 11.4.7 Waivers of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

§ 11.4.8 A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Section 11.4.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

§ 11.4.9 If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Section 4.6. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor after notification of a Change in the Work in accordance with Article 7.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                             (2697848978)

**§ 11.4.10** The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved as provided in Sections 4.5 and 4.6. The Owner as fiduciary shall, in the case of arbitration, make settlement with insurers in accordance with directions of the arbitrators. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

**§ 11.5 PERFORMANCE BOND AND PAYMENT BOND**
**§ 11.5.1** The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

**§ 11.5.2** Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

**ARTICLE 12   UNCOVERING AND CORRECTION OF WORK**
**§ 12.1 UNCOVERING OF WORK**
**§ 12.1.1** If a portion of the Work is covered contrary to the Owner's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Owner, be uncovered for the Owner's examination and be replaced at the Contractor's expense without change in the Contract Time.

**§ 12.1.2** If a portion of the Work has been covered which the Owner has not specifically requested to examine prior to its being covered, the Owner may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

**§ 12.2 CORRECTION OF WORK**
**§ 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION**
**§ 12.2.1.1** The Contractor shall promptly correct Work rejected by the Owner or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Owner's services and expenses made necessary thereby, shall be at the Contractor's expense.

**§ 12.2.2 AFTER SUBSTANTIAL COMPLETION**
**§ 12.2.2.1** In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner, the Owner may correct it in accordance with Section 2.4.

**§ 12.2.2.2** The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

**§ 12.2.2.3** The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                          (2697848978)

**§ 12.2.3** The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

**§ 12.2.4** The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

**§ 12.2.5** Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

**§ 12.3 ACCEPTANCE OF NONCONFORMING WORK**
**§ 12.3.1** If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

**ARTICLE 13  MISCELLANEOUS PROVISIONS**
**§ 13.1 GOVERNING LAW**
**§ 13.1.1** The Contract shall be governed by the law of the place where the Project is located.

**§ 13.2 SUCCESSORS AND ASSIGNS**
**§ 13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**§ 13.2.2** The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.

**§ 13.3 WRITTEN NOTICE**
**§ 13.3.1** Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

**§ 13.4 RIGHTS AND REMEDIES**
**§ 13.4.1** Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**§ 13.4.2** No action or failure to act by the Owner or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

**§ 13.5 TESTS AND INSPECTIONS**
**§ 13.5.1** Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Owner timely notice of when

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects.  All rights reserved.  WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.  This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                (2697848978)

and where tests and inspections are to be made so that the Owner may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

§ 13.5.2 If the Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the Owner will, upon written authorization , instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Owner of when and where tests and inspections are to be made so that the Owner may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

§ 13.5.3 If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure shall be at the Contractor's expense.

§ 13.5.4 Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Owner.

§ 13.5.5 If the Owner is to observe tests, inspections or approvals required by the Contract Documents, the Owner will do so promptly and, where practicable, at the normal place of testing.

§ 13.5.6 Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

## § 13.6 INTEREST
§ 13.6.1 Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

## § 13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD
§ 13.7.1 As between the Owner and Contractor:
.1    Before Substantial Completion. As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

.2    Between Substantial Completion and Final Certificate for Payment. As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment; and

.3    After Final Certificate for Payment. As to acts or failures to act occurring after the relevant date of issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

## ARTICLE 14   TERMINATION OR SUSPENSION OF THE CONTRACT
## § 14.1 TERMINATION BY THE CONTRACTOR
§ 14.1.1 The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:
.1    issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                          (2697848978)

.2    an act of government, such as a declaration of national emergency which requires all Work to be stopped;

.3    because the Owner has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Section 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents; or

.4    the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Section 2.2.1.

**§ 14.1.2** The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

**§ 14.1.3** If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

**§ 14.1.4** If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

**§ 14.2 TERMINATION BY THE OWNER FOR CAUSE**
**§ 14.2.1** The Owner may terminate the Contract if the Contractor:

.1    persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

.2    fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

.3    persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or

.4    otherwise is guilty of substantial breach of a provision of the Contract Documents.

**§ 14.2.2** When any of the above reasons exist, the Owner, , may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

.1    take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

.2    accept assignment of subcontracts pursuant to Section 5.4; and

.3    finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**§ 14.2.3** When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**§ 14.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Owner's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Owner, upon application, and this obligation for payment shall survive termination of the Contract.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                                    (2697848978)

## § 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE

§ 14.3.1 The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

§ 14.3.2 The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:

.1    that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

.2    that an equitable adjustment is made or denied under another provision of the Contract.

## § 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE

§ 14.4.1 The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

§ 14.4.2 Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

.1    cease operations as directed by the Owner in the notice;

.2    take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

.3    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

§ 14.4.3 In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:59:00 on 03/09/2005 under Order No.1000122851_1 which expires on 6/9/2005, and is not for resale.
User Notes:                                                                                                         (2697848976)