UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION |
| | )    NO. 05-CV-10365-JLT |
| GELLER SPORT, INC. and GELLER DEVELLIS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## JOINT PRETRIAL MEMORANDUM

RI, Inc., d/b/a Seating Solutions ("Seating" or "Seating Solutions") and Geller Sport, Inc. and Geller Devellis, Inc. (collectively "Geller"), submit this Joint Pretrial Memorandum:[1]

### I.    Concise Statement of Evidence Offered

#### A.    Seating Solutions

Seating Solutions will present evidence that during February 2005 it was engaged in negotiations with Worcester Professional Baseball, LLC ("Worcester Baseball") to renovate Fitton Field, a baseball stadium on the campus of the College of the Holy Cross ("Holy Cross"), by May 15, 2005. Worcester Baseball planned to have the Worcester Tornadoes, a minor league baseball team, play its home games at Fitton Field. After reaching an oral agreement with Seating Solutions, however, Worcester Baseball entered into a contract with the Dant Clayton Corporation ("Dant Clayton"). Dant Clayton actually performed the work.

Dant Clayton obtained the order because of Geller's unlawful conduct. Seating Solutions provided Geller and Worcester Baseball with confidential custom design drawings. Geller

---

[1] Seating Solutions reached a settlement with Worcester Professional Baseball, LLC and Perfect Game Baseball Clubs, LLC (collectively "Worcester Baseball"). Worcester Baseball thus will not file a pretrial memorandum.

nonetheless disclosed the drawings, and Seating Solutions pricing, to Dant Clayton. Geller was at least partially motivated in making this disclosure by personal feelings of ill will on the part of Patrick Maguire, president of Geller Sport, Inc., against Scott Suprina, CEO of Seating Solutions. The evidence will establish that Seating Solutions' damages for Geller's wrongful conduct are the profits that it would have earned if it had performed the renovations. Seating Solutions will present evidence that those damages are at least $591,414.90.[2]

### B.     Geller

The defendants will offer the following factual evidence at trial concerning the allegations against Geller in the Plaintiff's Amended Complaint.

The plaintiff, RI, Inc. d/b/a Seating Solutions ("Seating Solutions"), is a company involved in the seating system design and construction industry that specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities. Scott Suprina ("Suprina") operates as the Chief Executive Officer for Seating Solutions.

Worcester Professional Baseball, LLC ("Worcester Baseball"), is the owner and operator of the Worcester Tornadoes, a professional baseball franchise that is a member of the Canadian American Association of Professional Baseball, which began playing in the Spring of 2005.

Alan Stone ("Stone") is the president and chief executive officer for Worcester Baseball. Stone is authorized to make decisions, enter into contracts, and hire and fire staff. Stone is the only person who signs contracts for Worcester Baseball. Theodore Tye ("Tye") is the Chairman of the Board of Directors for Worcester Baseball.

Geller provides recreation and athletic facility design consulting services. Geller was engaged by Worcester Baseball to act as a consultant to Worcester Baseball for the Project. As a consultant, Geller's roles were to assist Worcester Baseball in evaluating different locations for the baseball park, to provide master planning for the park, to provide the ultimate engineering

---

[2] Seating Solutions includes a comprehensive summary of what the evidence will show in its Trial Brief.

plans and site plans for the selected location, and to assist in evaluating firms for the seating installation on the Project. Worcester Baseball's primary contact at Geller, for the Project, was Patrick Maguire ("Maguire").

Beginning in early 2005, Seating Solutions began having discussions with Worcester Baseball regarding a potential contract to design, sell, and install seats at Fitton Field, located on the campus of Holy Cross, as part of the Project.

Seating Solutions submitted to Worcester Baseball a proposal and some preliminary drawings and design work in connection with these ongoing discussions. The initial proposal was rejected by Worcester Baseball.

A second revised proposal by Seating Solutions was submitted on or about February 15, 2005, and similarly was rejected.

A third revised proposal by Seating Solutions was submitted to Worcester Baseball on or about February 17, 2005, which was rejected and never signed by Worcester Baseball.

A fourth revised proposal by Seating Solutions was submitted to Worcester Baseball on or about February 21, 2005, and was also rejected. The February 21, 2005 revised proposal was never signed by anyone.

The February 21, 2005 revised proposal required a signature by Worcester Baseball and deposit by February 22, 2005 to lock in the pricing and other terms of the agreement. Seating Solutions never received a deposit by February 22, 2005. The effect of Seating Solutions not having a signed proposal and not having the deposit is that the price or the terms of the contract could change at Seating Solutions' discretion.

Eventually Worcester Baseball accepted a proposal from another contractor, Dant Clayton Corporation ("Dant Clayton").

Worcester Baseball never entered into a contract with Seating Solutions. Tye did not tell Suprina on February 18, 2005 that they had a "deal" or an "order." Suprina knew that any contract with Worcester Baseball would have to be signed by Stone.

Maguire was not at the February 18, 2005 meeting where Seating Solutions claims a "deal" was reached.

Seating Solutions admits that it has no evidence that Maguire said anything to Worcester Baseball to cause it to "cancel" any perceived "deal". Maguire never shared with Worcester Baseball his opinion regarding the quality of Seating Solutions' work or Suprina personally. Maguire did, consistent with his contractual obligations, share his opinion of Seating Solutions proposals with Worcester Baseball.

All of the advice given by Geller to Worcester Baseball was pursuant to its role as a consultant. Geller acted as a consultant and it was paid to provide opinions, but Geller was not a decisionmaker. Worcester Baseball's position is that Maguire expressed "good professional opinions," which were objective and based upon the information that was put in front of him. Ultimately Worcester Baseball, and not Geller, made the decision regarding what contractor Worcester Baseball would hire for the Project.

The drawings produced by Seating Solutions during its negotiations with Worcester Baseball were compilations of drawings from different parties and were worked on by employees of Seating Solutions and employees of Geller. The drawings were based on originals from an architectural firm called Sink Combs Dethleff, which developed a basic plan for the site. The Sink Combs Dethleff plan was then given to Geller who created its own version of the plan. The Sink Combs Dethleff plan and the Geller plan were both given to Seating Solutions and Dant Clayton for their use.

Seating Solutions sent the compiled plans to Geller for its use on the Project. Seating Solutions did not verbally inform Geller that Geller was not allowed to share these plans with other parties. When Seating Solutions sent the drawings to Geller, Seating Solutions did not have Geller sign a nondisclosure agreement. Seating Solutions admits that it did not have a confidentiality agreement with Geller.

Worcester Baseball ultimately entered into a contract with Dant Clayton to build and install the seating for the Project. From the first meetings with both Dant Clayton and Seating Solutions, Worcester Baseball's independent opinion was that it was very impressed with Dant Clayton's proposal and organization and wanted to work with it.

The information provided by Seating Solutions on the drawings given to Geller was not used in whole or in part by Dant Clayton to manufacture or build anything.

## II.    Facts Established by Pleadings, Stipulations & Admissions

The parties agree that the following facts are established by pleadings, stipulations, and admissions:

1.    RI, Inc. d/b/a Seating Solutions ("Seating" or "Seating Solutions") is a corporation organized under the laws of New York, with a principal place of business located at 63 Oser Avenue, Hauppauge, New York 11788.

2.    Seating Solutions is in the seating system design and construction industry and specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities.

3.    Worcester Professional Baseball LLC ("Worcester Baseball") is a limited liability company organized under the laws of Massachusetts with a principal office located at 303 Main Street, Worcester, Massachusetts 01613.

4.    Worcester Baseball operates the Worcester Tornadoes, a minor league baseball team that plays in the Canadian American League.

5.    The Worcester Tornadoes play their home games Hanover Insurance Park at Fitton Field ("Fitton Field"), which is located on the campus of the College of the Holy Cross ("Holy Cross").

6.    Geller Sport, Inc. is a corporation organized under the laws of Massachusetts, with a principal office located at 77 North Washington Street, Boston, Massachusetts 02114.

7.      Geller Devellis, Inc. is a corporation organized under the laws of Massachusetts, with a principal office located at 77 North Washington Street, Boston, Massachusetts 02114.

8.      Geller Sport, Inc. and Geller Devellis, Inc. (collectively, "Geller") provide recreation and athletic facility design consulting services.

9.      During the fall of 2004, Stone and Rosenfield began a venture aimed at locating a minor league baseball team in Worcester, Massachusetts.

10.     Among their many tasks was to find a location for the team to play its home games beginning in the spring of 2005.

11.     By the end of January 2005, Worcester Baseball had decided that the best possible location to play its home games would be Fitton Field.

12.     Worcester Baseball received tentative approval from Holy Cross to locate the team at Fitton Field; much negotiation of the particulars remained.

13.     Worcester Baseball had to make improvements to Fitton Field, including the installation of a new spectator seating system.

14.     The target date for the completion of these improvements was the last week of May, 2005.

15.     On February 15, Suprina, Ruczaj, Tye, Maguire, and others met at Tye's office in Newton.

16.     Suprina and Maguire had a discussion regarding the merits of Seating's proposed pricing at the meeting.

17.     Dant Clayton entered into an agreement with Worcester Baseball to construct the spectator seating system at Fitton Field for a price of $1,895,000.00.

**III.    Contested Issues of Fact**

**A.      Seating Solutions**

Seating Solutions believes that the parties contest the following facts:

1.    Whether Geller interfered with Seating Solutions' advantageous business relationship and/or contract with Worcester Baseball.

2.    Whether Geller acted with an improper motive or improper means in interfering with Seating Solutions' advantageous business relationship and/or contract with Worcester Baseball.

3.    Whether Geller caused Seating Solutions to lose its advantageous business relationship and/or contract with Worcester Baseball.

4.    Whether the drawings and pricing that Seating Solutions disclosed to Geller were trade secrets.

5.    Whether Seating Solutions took reasonable measures to protect the trade secrets at issue.

6.    Whether a confidentiality agreement existed between Geller and Seating Solutions.

7.    If a confidentiality agreement existed between Geller and Seating Solutions, whether Geller breached that agreement.

8.    If Geller is liable to Seating Solutions for any of the claims against it, the amount of Seating Solutions' damages resulting from Geller's wrongful conduct.

**B.    Geller**

1.    Whether Worcester Baseball and Seating Solutions entered into a binding agreement on or about February 18, 2005.

2.    Whether Geller unlawfully interfered with advantageous business relationship between Worcester Baseball and Seating Solutions.

3.    Whether Geller and Seating Solutions entered into a confidentiality agreement .

4.    Whether Geller violated a trade secret of Seating Solutions under Mass. Gen. Laws ch. 93, § 42.

5.    What damages, if any, Seating Solutions suffered as a result of the alleged wrongful conduct of Geller.

6.    Whether Geller used deceptive and unfair acts as those terms are defined in Chapter 93A of the Massachusetts General Laws causing compensable loss to Seating Solutions.

## IV.    Jurisdictional Questions

The parties agree that there are no jurisdictional questions.

## V.    Questions Raised by Pending Motions

Geller plans to file motions in limine, and Seating Solutions will oppose those motions.

## VI.    Issues of Law and Evidence

### A.    Seating Solutions

#### 1.    Issues of Law

**a.    Did Geller engage in unfair conduct and, if so, what damages resulted?**   "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a Chapter 93A violation is a question of law." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 54 (1st Cir. 1998) (internal punctuation marks omitted).   Tortious interference with an advantageous business relationship and trade secret misappropriation, if proven, each can constitute violations of Chapter 93A.   *See Brandon Assocs. LLC v. Failsafe Air Safety Sys. Corp.,* 384 F. Supp. 2d 442, 446 (D. Mass. 2005) (finding that facts forming basis for tortious interference claim can also form the basis for Chapter 93A claim); *Dowd v. Iantosca*, 27 Mass. App. Ct. 325, 334, 538 N.E.2d 33, 38 (1989) (finding that real estate broker's tortious interference with sale of private home provided basis for buyer's Chapter 93A claim), *rev. denied*, 405 Mass. 1202, 542 N.E.2d 48 (1989).; *Moore v. Marty Gilman, Inc*., 965 F. Supp. 203, 220 (D. Mass. 1997) ("[D]eceptively induc[ing] plaintiffs to impart valuable commercial information without charge . . . alleges conduct that is sufficiently unscrupulous to constitute a violation of 93A."); *Prescott v. Morton*

*Int'l, Inc.*, 769 F. Supp. 404, 407 (D. Mass. 1990) ("The standards for finding misappropriation of a trade secret provide the criteria for finding an unfair or deceptive act.").

Chapter 93A "allow[s] plaintiffs to recover double or treble damages if the violations were willful or knowing . . . ." *Smilow v. Southwestern Bell Mobile Sys., Inc*., 323 F.3d 32, 43 n. 11 (1st Cir. 2003). *See also Polycarbon Indus., Inc. v. Advantage Eng'g, Inc*., 260 F. Supp. 2d 296, 307 (D. Mass. 2003) ("Chapter 93A provides for up to three, but not less than two times, the amount of damages where the court determines that the defendant's violation was knowing or willful, or that refusal to grant relief was made in bad faith with knowledge or reason to know that that the defendant had engaged in an unfair or deceptive act or practice.") (internal quotation marks omitted). The presence of "callous intentional conduct . . . directs multiple damages." *Arthur D. Little Int'l, Inc. v. Dooyang Corp*., 979 F. Supp. 919, 927 (D. Mass.,1997), *aff'd*, 147 F.3d 47 (1998). Seating and Geller have agreed to postpone consideration of Geller's potential Chapter 93A liability until after the jury reaches its verdict on the claims for tortious interference, misappropriation, and breach of contract. Seating and Geller will then provide the Court with proposed findings of fact and conclusions of law concerning the Chapter 93A claim on whatever timetable the Court wishes.

**b.    Can Seating's fixed costs be deducted from its claimed damages?** Seating Solutions is seeking the profit that it lost due to Geller's wrongful conduct. It is not appropriate to consider fixed costs when assessing lost profit damages. *See King Instrument Corp. v. Perego*, 737 F. Supp. 1227, 1242 (D. Mass. 1990) (excluding evidence of fixed costs in assessing lost profits). *See also Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 382 (7th Cir. 1998) ("Courts only subtract fixed costs when calculating lost profits due to a breach that ends an ongoing business."); *P.C. Data Centers of Pa., Inc. v. Federal Express Corp.*, 113 F.Supp.2d 709, 718 (M.D.Pa., 2000) ("[F]ixed costs of doing business are not to be deducted in computing damages for "lost profits" in the context of a services contract."); *Alesayi Beverage Corp. v. Canada Dry Corp*., 947 F. Supp. 658, 672 n. 28 (S.D.N.Y.

1996) ("Courts generally do not include fixed costs in the calculation of lost profits."), *aff'd*, 122 F.3d 1055 (1997). Evidence of those fixed costs is thus irrelevant in this case.

### 2. Issues of Evidence

Seating anticipates that three issues of evidence will arise during the trial. Seating Solutions will file its oppositions to Geller's motions in limine separately.

### a. Can Scott Suprina, Seating's CEO, testify as to its lost profits?

Seating Solutions is seeking as its damages the profit that it lost due to Geller's wrongful conduct. Mr. Suprina will provide detailed testimony concerning the costs that Seating Solutions would have incurred had it installed the seating system. The Advisory Committee Notes to Fed. R. Evid. 701 explicitly state that this testimony is admissible:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). **Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.** The amendment does not purport to change this analysis.

Fed. R. Evid. 701 advisory committee's note (emphasis supplied). *See also Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) ("Other circuits that have addressed this question have allowed lost profit testimony by a layperson witness if the witness has direct knowledge of the business accounts underlying the profit calculation.") (collecting cases); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) ("A company president certainly is capable of projecting lost profits where the projection is based on evidence of decreased sales."), *cert. denied*, 516 U.S. 1114 (1996); *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963, 981 (D. Mass., 1981) ("[The owner had] adequate knowledge of his business to permit the admission of his opinion as to its value [to] leav[e] the issue of the weight to be accorded that testimony to the jury."). Scott Suprina has direct

knowledge of Seating's day-to-day operations. He has direct knowledge of what it would have cost Seating Solutions to perform work under its contract with the baseball team. As such, his testimony as to Seating's anticipated profit for its work on the project falls squarely within the ambit of Fed. R. 701. The Court should permit him to testify to that profit.

      **b.    Is an Outdoor Aluminum price quote admissible under the business records exception, Fed. R. Evid. 803(6)?** In calculating his pricing for the work, Mr. Suprina relied upon a price quotation prepared by his materials supplier, Outdoor Aluminum, Inc. This quote is admissible pursuant to Fed. R. Evid. 803(6).[3] The quote was (i) prepared at the time it was transmitted to Seating Solutions by an individual with knowledge; (ii) kept as part of regular business practice of Outdoor Aluminum; and (iii) prepared in the course of Outdoor Aluminum's regularly conducted business activities. Seating Solutions has obtained a certification from Outdoor Aluminum that complies with Fed. R. Evid. 902(11)[4] and otherwise

---

[3] The rule reads as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

             \*\*\*

**(6) Records of Regularly Conducted Activity.**--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed. R. Evid. 803(6).

[4] The rules states:

    Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

acted consistently with the rule's requirements.  A copy of that certification will be filed with the Court if the parties are not able to reach an agreement regarding the applicability of the business records exception to the quotation.

> **c.**    **Is evidence of Seating's settlement with Worcester Baseball admissible?**  Evidence of collateral source payments from third parties is usually inadmissible. *See England v. Reinauer Transp. Companies, L.P.*, 194 F.3d 265, 273 (1st Cir. 1999) ("Under the evidentiary strand of the collateral source rule, evidence of collateral benefits offered to show that [plaintiff] has already received compensation for his injuries is generally inadmissible."). Notwithstanding the evidentiary and substantive ramifications of the collateral source rule, Seating Solutions can conceive of no way in which its settlement with the baseball team is relevant to its case against Geller.  Evidence of the settlement does not have "any tendency to

---

***

(11) Certified Domestic Records of Regularly Conducted Activity.--The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record--

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

> (B) was kept in the course of the regularly conducted activity; and

> (C) was made by the regularly conducted activity as a regular practice.

A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Fed. R. Evid. 902.

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

**B    Geller**

1.    Whether Seating Solutions should be excluded from providing evidence of damages in connection with its claim against Geller alleging misappropriation of trade secrets and breach of a confidentiality agreement when Seating Solutions has stated in its Rule 26(a) disclosure that such damages are "undeterminable" and its principal has testified that no evidence of such damages exists.

2.    Whether Seating Solutions should be precluded from introducing evidence contrary to its principal's admissions during his deposition that there was no confidentiality agreement between Geller and Seating Solutions.

3.    Whether Seating Solutions should be precluded from introducing evidence contrary to the principal's admissions during his deposition that Seating Solutions was not bound to the terms of any contract with Worcester Baseball and thus, effectively, there was no contract existing between Seating Solutions and Worcester Baseball.

4.    Whether Seating Solutions should be precluded from offering evidence contrary to its principal's admissions during his deposition that no evidence exists of improper or malicious conduct by Geller in the course of its dealings with Seating Solutions for the purpose or result of interfering with an advantageous business relationship between Worcester Baseball and Seating Solutions.

5.    Whether Seating Solutions should be prohibited from offering evidence contrary to its principal's admissions during his deposition that the drawings submitted by Seating Solutions on which it bases its claim contained no "trade secrets".

6.    Whether a preliminary "quote" by a third-party that was not binding and was not based on a defined scope of work is admissible as a business record under Fed. R. Evid. 803 (6).

7.     Whether Seating Solutions should be prohibited from offering a February, 17, 2005 e-mail exchange between Ted Tye and Patrick Maguire which contains irrelevant and potentially inflammatory language when the purpose of its introduction can only be to unfairly prejudice the jury against Maguire.

8.     Whether Seating Solutions can as a matter of law recover from Geller under by Mass. Gen. Law ch.39A, §§ 2 and 11, when the principal of Seating Solutions could not identify during his deposition testimony any improper motives or means, or malicious conduct by Geller to "cancel" any "deal" between Worcester Baseball and Seating Solutions.

The supporting authority for these issues is submitted by Geller in the form of motions in limine, which are submitted separately herewith.

**VII.    Requested Amendments to Pleadings**

The parties are not requesting any amendment of the pleadings.

**VIII.    Probable Length of Trial**

The parties agree that the trial should not last longer than four full days.

**IX.    Witnesses**

**A.    Seating Solutions**

Seating Solutions may call the following individuals as witness at trial, and reserves the right to supplement this witness list upon reasonable notice to the Court and Geller:

1.     Scott Suprina;

2.     Scott Ruczaj;

3.     Patrick Maguire;

4.     Rebecca Bachand

5.     Zhong Ye;

6.     Theodore Tye;

7.     Alan Stone; and

8.      Matthew Dougherty (via deposition transcript).[5]

**B.      Geller**

1.  Alan Stone, Worcester Profession Baseball, LLC

2.  Theodore Tye

3.  Patrick Maguire, President, Geller Sport, Inc.,

4.  Bruce Merrick, Owner, Dant Clayton Corporation (via deposition)

5.  Matt Dougherty, Dant Clayton Corporation (via deposition)

**XI.    Proposed Exhibits**

**A.      Seating Solutions**

| | | |
|---|---|---|
| 1. | Sink Combs plan (Ruczaj Dep. Ex. 1) | 11/1/04 |
| 2. | Email from A. Truman to Samiotes (Maguire Dep. Ex. 7) | 1/28/05 |
| 3. | E-mail from S. Ruczaj to T. Tye (w/ CAD attachment (Ex. 3A)) (Maguire Dep. Ex. 9) | 1/31/05 |
| 4. | Email from S. Ruczaj to T. Tye (w/ CAD attachments (Ex. 4A) (Maguire Dep. Ex. 10) | 2/1/05 |
| 5. | Email from P. Maguire to T. Tye (Maguire Dep. Ex. 11) | 2/1/05 |
| 6. | Outdoor Aluminum Quote (Seating 30(b)(6) Dep. Ex. 7) | 2/2/05 |
| 7. | Email from Rebecca Bachand to Matt Dougherty  (w/ CAD attachment (Ex. 6A) (Maguire Dep. Ex. 14) | 2/3/05 |
| 8. | Email from S. Ruczaj to T. Tye (w/ CAD attachment (Exs. 8A &8B) (Maguire Dep. Ex. 16A) | 2/4/05 |
| 9. | Email from Zhong Ye to Musco (w/ CAD attachment (Ex. 9A)) (Maguire Dep. Ex. 15) | 2/4/05 |

---

[5] Seating's designation of Mr. Dougherty's deposition testimony is filed herewith. Seating Solutions and Geller have agreed that, subject to Court approval, that counsel will read the designated deposition excerpts into the record.

| | | |
|---|---|---|
| 10. | Email from M. Dougherty to P. Maguire (w/ CAD attachment (Ex. 10A)) (Maguire. Dep. Ex. 18) | 2/7/05 |
| 11. | Emails from P. Maguire to T. Kindermans and others (Maguire Dep. Ex. 19) | 2/7/05 |
| 12. | Email from P. Maguire to T. Tye (Maguire Dep. Ex. 20) | 2/7/05 |
| 13. | Email from P. Maguire to T. Tye. (Maguire Dep. Ex. 21) | 2/9/05 |
| 14. | Email from T. Tye to P. Maguire (Maguire Dep. Ex. 23) | 2/9/05 |
| 15. | Email from M. Dougherty to P. Maguire (Maguire Dep. Ex. 26) | 2/11/05 |
| 16. | Maguire e-mail to team (Maguire Dep. Ex. 28) | 2/15/06 |
| 17. | Email from Z. Ye to T. Kindermans and others(w/ CAD attachment (Ex. 16A)) (Maguire Dep. Ex. 31) | 2/17/05 |
| 18. | Email from P. Maguire to T. Tye. (Maguire Dep. Ex. 29) | 2/17/05 |
| 19. | Email from P. Maguire to T. Tye (Maguire Dep. Ex. 30) | 2/17/05 |
| 20. | Email from P. Maguire to M. Dougherty (w/ CAD attachment Ex. 19A) (Maguire Dep. Ex. 33) | 2/17/05 |
| 21. | Email from P. Maguire to C. Sgarzi (Maguire Dep. Ex. 35) | 2/21/05 |
| 22. | Seating Solutions Proposal IV (Tye Dep. Ex. 38) | 2/21/05 |
| 23. | Email from A. Stone to P. Maguire (Maguire Dep. Ex. 37)) | 2/21/05 |
| 24. | Emails exchanged by Tye and Stone (Top e-mail from Tye to Stone sent at 4:02 p.m.)[6] | 2/17/05 |
| 25. | Email from T. Tye to team (Tye Dep. Ex. 14) | 2/20/05 |
| 26. | Email from T. Tye to team (Tye Dep. Ex. 26) | 2/20/05 |
| 27. | Emails exchanged by A. Stone and T. Tye (Maguire Dep. Ex. 36) | 2/21/05 |

---

[6] Worcester Baseball produced this document after the depositions of Messrs. Alan Stone and Ted Tye, Worcester Baseball's President and Chairman, respectively.  It was not an exhibit at any deposition.

**B.**     **Geller**

A     Seating Solutions Proposal I (Suprina Deposition Exhibit 1) 2/2/05

B     E-mail from Tye to Seating Solutions (Tye Deposition Exhibit 21) 2/7/05

C     Seating Solutions Proposal II (Tye Deposition Exhibit 22) 2/15/05

D     Seating Solutions Proposal III (Tye Deposition Exhibit 24) 2/17/05

E     E-mail from Alan Stone to Ted Tye at 1:32 p.m. 2/21/05

F     E-mail from Ted Tye to Alan Stone at 6:07 p.m. 2/22/05

G     E-mail from Alan Stone to Ted Tye at 6:40 p.m. 2/22/05

H     E-mail from Ted Tye to Alan Stone at 10:11 a.m. 2/23/05

I     E-mail from Ted Tye to Seating Solutions (Tye Deposition Exhibit 40) 2/23/05

J     Dant Clayton Fitton Field Plan

K     University of Virgina Field Plan from Dant Clayton

L     Overlay of Dant Clayton University of Virginia Plan over Fitton Field Plan

M     Geller DeVellis Fitton Field Plans with Seating Solutions additions.

N     E-mail from Zhong Ye to Scott Ruczaj, Geller Bates No. 2444 2/16/05

                                        Respectfully Submitted,

RI, Inc., d/b/a SEATING SOLUTIONS            GELLER SPORT, INC. and GELLER
By its attorneys,                            DEVELLIS, INC.
                                             By their attorneys,


*/s/ Terry Klein*                            */s/ Warren D. Hutchison*
Terry Klein (BBO #652052)                    David J. Hatem, P.C. (BBO #225700)
Henshon Parker Vyadro P.C.                   Warren D. Hutchison (BBO #246150)
84 State Street, Suite 760                   Donovan Hatem, LLP
Boston, MA 02109                             Two Seaport Lane
(617) 367-1800                               Boston, MA 02210
tklein@hpvpc.com                             (617) 406-4500
                                             whutchison@donovanhatem.com

August 4, 2006