UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS,<br><br>                  Plaintiff,<br><br>                  v.<br><br>GELLER SPORT, INC., GELLER DEVELLIS, INC., WORCESTER PROFESSIONAL BASEBALL LLC, and PERFECT GAME BASEBALL CLUBS, LLC,<br><br>                  Defendants. | CIVIL ACTION<br>NO. 05-CV-10365-JLT |

**MOTION OF DEFENDANTS GELLER SPORT, INC. AND GELLER DEVELLIS, INC. IN LIMINE TO EXCLUDE EVIDENCE CONTRARY TO THE ADMISSIONS OF PLAINTIFF THAT ESTABLISH NO "TRADE SECRETS"**

The defendants, Geller Sport, Inc. and Geller DeVellis, Inc. ("Geller"), hereby move to preclude the plaintiff, R/I , Inc. d/b/a Seating Solutions ("Seating Solutions") from introducing evidence contrary to the admissions of Scott Suprina ("Suprina"), principal of Seating Solutions, that establish no basis exists for recovery based on misappropriation of alleged "trade secrets."

In support of this Motion, Geller asserts that Seating Solutions, through its principal, Scott Suprina, has testified that there is no trade secret. Accordingly, Geller objects to the introduction of evidence contrary to the admissions that have already been made.

**I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

Seating Solutions is a company that specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities. Exhibit 10,

Amended Complaint, ¶9. Scott Suprina ("Suprina") operates as the Chief Executive Officer for Seating Solutions. Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 6, lines 21-24. Worcester Professional Baseball, LLC ("Worcester Baseball"), is the owner and operator of the Worcester Tornadoes, a professional baseball franchise that is a member of the Canadian American Association of Professional Baseball. Exhibit 10, Amended Complaint, ¶9. Theodore Tye ("Tye"), one of the investors in the team, was designated to take the lead on evaluating the improvements that would be needed to make the sites under consideration viable as the home field for a professional baseball franchise because of his extensive background in construction and property development. Exhibit 3, Deposition of Alan Stone, pp. 28-29; Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 75. Geller was engaged by Worcester Baseball to act as a consultant to Worcester Baseball for the Project. Exhibit 3, Deposition of Alan Stone, p. 90, lines 7-9. As a consultant, one of Geller's roles was to provide master planning for the park and assist Worcester Baseball in evaluating firms for the seating installation on the Project. Exhibit 2, Deposition of Ted Tye, p. 46, lines 6-8.

Beginning in or around December 2005, Seating Solutions began having discussions with Worcester Baseball regarding a potential contract to design, sell, and install seats at Fitton Field, located on the campus of Holy Cross, as part of the Project. Exhibit 10, Amended Complaint, ¶12. In connection with these ongoing discussions, Seating Solutions submitted to Worcester Baseball a series of proposals and preliminary drawings and design work. Exhibit 10, Amended Complaint, ¶¶ 17-18. Each of the first four proposals made prior to February 18, 2001 were rejected by Worcester Baseball. Exhibit 10, Amended Complaint, ¶¶ 21, 26-27, 30; Exhibit 2, Deposition of Ted Tye, p.

146, lines 1-24; Exhibit 4, February 17, 2005, revised proposal. On February 21, 2005, Seating Solutions sent Worcester Baseball another proposal which required a signature and deposit to be retuned for the contract to be binding between the two. Deposition of Scott Suprina, dated July 29, 2005, p. 130, lines 1-16; p. 156, lines 17-24, p. 157.

Worcester Baseball subsequently rejected the February 21, 2005 revised proposal and did not execute and return a deposit to Seating Solutions by February 22, 2005, as required. Exhibit 5, February 21, 2005, revised proposal; Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 114, lines 22-24, p. 121, lines 18-21, p. 122, lines 1-19, p. 123 lines 12-24; p. 157, lines 18-24. The effect of Seating Solutions not having signed the proposal and not having provided the deposit is that the price or the terms of the contract could change at Seating Solutions discretion. Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 128, lines 4-24, p. 129, lines 1-24, p. 130, lines 1-16. Furthermore, Worcester Baseball denies it ever verbally agreed to a contract with Seating Solutions on February 18, 2005, as Seating Solutions claims. Exhibit 8, Affidavit of Alan Stone, ¶¶ 2-3; Exhibit 2, Deposition of Ted Tye, p. 136, lines 5-24, p. 137, lines 1-18, p. 164, lines 20-24, p. 165, lines 1-6.

The drawings for the Project which were ultimately produced by Seating Solutions were compilations of drawings from different parties and were worked on by employees of Seating Solutions and employees of Geller. Exhibit 7, Affidavit of Patrick Maguire, ¶ 6. Originally, an architectural firm called Sink Combs Dethleff developed a basic plan for the site and these plans were then given to Geller, who created its own version of the plans. Exhibit 2, Deposition of Ted Tye, p. 106, lines 3-17. The Sink Combs Dethleff plan and

the Geller plans were both given to Seating Solutions and Dant Clayton for their use. Exhibit 2, Deposition of Ted Tye, p. 106, lines 3-17.

After receiving the plans from Tye and scanning them into its computer to use as a basis for its seating proposal, Seating Solutions added a title-block and language claiming proprietary rights in the document.

Seating Solutions did not have Geller sign a nondisclosure agreement, nor did it have a confidentiality agreement with Geller as evidenced by the deposition testimony of Suprina:

> Q. Well, when [Ted] got it in AutoCad, did you tell him don't send this to anyone else?
> A. It had the block on it that it's private and proprietary and it shouldn't be shared. It has a statement on it.
> Q. But besides that, did you tell him you can't send this out to anyone else?
> A. No.
> Q. Did you tell Patrick don't send this out to anyone else?
> A. Nope.

Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 251, lines 10-12.

> Q. When the AutoCad drawings were Emailed to Patrick, did you have him sign a nondisclosure agreement?
> A. No.

Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 254, lines 7-10.

> Q. Did you have a Confidentiality Agreement with Geller?
> A. No.

Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 258, lines 18-20.

In addition, Seating Solutions does not claim it has a copyright in the drawings submitted by Geller to both Seating Solutions and Dant Clayton, , nor does it state that it registered its drawings for copyright protection.

> A. Do I have a copyright? I don't believe so.

> Q. You haven't registered this document for copyright protection through an agency to your knowledge?
> A. No.

Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 246, lines 21-24, p. 247, lines 1-2.

With respect to whether Seating Solutions drawings contained "trade secrets", Suprina states the following in his deposition testimony:

> Q. What information do you claim is protected by trade secret?
> A. It's not – I didn't, you know, "trade secret" is a term I'm unfamiliar with.
> Q. So you don't have any background or knowledge about what a trade secret is?
> A. No.

Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 251, lines 17-21.

In fact, Geller never took credit for any information supplied by Seating Solutions. Dant Clayton, the recipient of the information, knew it was created by Seating Solutions or its vendor, Outdoor Aluminum. Exhibit 12, Deposition of Matt Dougherty, p. 32, lines 5-23. Furthermore, the information provided by Seating Solutions on the drawings was not used in whole or in part to manufacture or build anything. Exhibit 7, Affidavit of Patrick Maguire, ¶ 8.

**II.   ARGUMENT**

Misappropriation of trade secrets require a breach of the duty not to disclose or to make unauthorized use of trade secrets or confidential information. <u>Jet Spray Cooler, Inc. v. Crampton</u>, 377 Mass. 159, 165, 385 N.E.2d 1349, 1354 (1979). The plaintiff specifically bases its claim on Mass. Gen. Laws ch. 93, §42, which requires "[w]hoever embezzles, steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secrets, regardless of value, shall be liable in tort to such person . . . ."

5

Under common law, a trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970) (quoting Restatement of Torts § 757 cmt. B (1939); see also Eastern Marble Prod. Corp. v. Roman Marble, Inc., 372 Mass. 835, 838-39, 364 N.E.2d 799, 801-802 (1977). Seating Solutions does not posses a valid trade secret in its seating design.

Massachusetts courts examine these six factors in determining whether particular information constitutes a trade secret: (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to its competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840, 282 N.E.2d 921, 925 (1972) (citing Restatement of Torts ¶ 757 cmt. b); Matter of Yankee Milk Inc., 372 Mass. 353, 360, 362 N.E.2d 207, 211 (1977); Campbell Soup Co. v. Giles, 47 F.3d 467, 469-470 (1st Cir.1995) (denial of motion for preliminary injunction regarding misappropriation of trade secrets affirmed; lower court found that marketing information at issue was no longer confidential, having been disclosed to customers and the public).

There is nothing secret about the seating plans developed by Seating Solutions for the Project. The information of its seating components and designs can be ascertained by

6

visiting other stadiums where it has worked. Further, Seating Solutions ideas for the Project were based on original drawings by Sink Combs Dethleff and drawings by Geller. Exhibit 2, Deposition of Ted Tye, p. 106, lines 3-17. Seating Solutions' drawings were actually compilations of drawings from different parties and were worked on by employees of Seating Solutions and employees of Geller. Exhibit 7, Affidavit of Patrick Maguire, ¶ 6. By virtue of Seating Solutions adding the "title-block" and its logo to plans, it does not automatically turn the plans into its sole proprietary information. The information contained in these drawings could very easily be duplicated by others, as the layout of the Fitton Field required a certain structural design and limited the ways in which seating could be installed. Exhibit7, Affidavit of Patrick Maguire, ¶ 7. By application of the above factors, the information contained in Seating Solutions plans cannot be considered a trade secret.

Section 42 of Chapter 93 of the Massachusetts General Laws identifies the elements that Seating Solutions must prove to establish a trade secret. That statute also requires the "intent to convert" by the person who copies or unlawful takes the trade secret. Seating Solutions bears the burden of proving that Geller misappropriated and wrongfully used Seating Solutions' trade secret. USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 352 n. 17, 467 N.E.2d 1271, 1284 n. 17 (1984).

As stated above, Seating Solutions does not possess a trade secret in the plans for the Project. Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 251, lines 17-24, p. 252, lines 1-20. Equally important is the fact that Geller did not breach a duty not to disclose or use the trade secret as there was no confidentiality agreement between Geller and Seating Solutions. Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 254,

lines 7-10, p. 258, lines 18-20.  Furthermore, there is no proof of any intent on the part of Geller to convert the drawings for its <u>own</u> use.  Exhibit 12, Deposition of Matt Dougherty, p. 32, lines 5-23.

### III. <u>CONCLUSION</u>

For the foregoing reasons, this Court should preclude Seating Solutions from introducing evidence contrary to Suprina's deposition testimony that establishes no basis for relief for misappropriation of trade secrets.

    Respectfully submitted,

    GELLER SPORT, INC. and GELLER
    DEVELLIS, INC.
    By their attorneys,

    /s/ Warren D. Hutchison
    _____
    David J. Hatem PC, BBO #225700
    Warren D. Hutchison, BBO # 246150
    DONOVAN HATEM LLP
    Two Seaport Lane
    Boston, MA 02210
    (617) 406-4500

Date: August 4, 2006
01020969.DOC

**CERTIFICATE OF SERVICE**

      I, Warren D. Hutchison, hereby certify that on this 4th day of August, 2006, a copy of the foregoing was served on the attorneys for the other parties who are registered ECF users by electronic means pursuant to Local Rule 5.4(c) and by first class mail, postage prepaid to the attorneys who are not registered ECF users.

                                  /s/ Warren D. Hutchison
                                  Warren D. Hutchison