UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS,<br><br>Plaintiff,<br><br>v.<br><br>GELLER SPORT, INC., GELLER DEVELLIS,<br>INC., WORCESTER PROFESSIONAL BASEBALL<br>LLC, and PERFECT GAME BASEBALL CLUBS, LLC,<br><br>Defendants. | ) <br> ) <br> ) <br> ) CIVIL ACTION <br> ) NO. 05-CV-10365-JLT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MOTION OF DEFENDANTS GELLER SPORT, INC. AND GELLER DEVELLIS, INC. IN LIMINE TO EXCLUDE EVIDENCE CONTRARY TO THE ADMISSIONS OF PLAINTIFF THAT ESTABLISH NO TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP BETWEEN SEATING SOLUTIONS AND WORCESTER BASEBALL**

The defendants, Geller Sport, Inc. and Geller DeVellis, Inc. ("Geller"), hereby move to preclude the plaintiff, R/I, Inc. d/b/a Seating Solutions ("Seating Solutions") from introducing evidence contrary to the admissions of Scott Suprina ("Suprina"), principal of Seating Solutions, that establish no basis for relief for tortious interference with an advantageous business relationship between Seating Solutions and Worcester Professional Baseball, LLC ("Worcester Baseball").

In support of this Motion, Geller asserts that Seating Solutions, through its principal, Scott Suprina, has established that no signed contract between Seating Solutions and Worcester Baseball exists. Additionally, Suprina has failed to identify any actions undertaken by Geller that constitute improper motives or means in support of its claim against Geller for tortious interference with a business relationship. Accordingly, Geller

objects to the introduction of evidence contrary to the admissions that have already been made that establish no basis for relief.

I. **RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

Seating Solutions is a company that specializes in the sale, rental, and installation of custom-designed spectator seating at athletic and recreational facilities. Exhibit 10, Amended Complaint, ¶9. Scott Suprina ("Suprina") operates as the Chief Executive Officer for Seating Solutions. Exhibit 1, Deposition of Scott Suprina, p. 6, lines 21-24. Worcester Professional Baseball, LLC ("Worcester Baseball"), is the owner and operator of the Worcester Tornadoes, a professional baseball franchise that is a member of the Canadian American Association of Professional Baseball. Exhibit 10, Amended Complaint, ¶9. Theodore Tye ("Tye"), one of the investors in the team, was designated to take the lead on evaluating the improvements that would be needed to make the sites under consideration viable as the home field for a professional baseball franchise because of his extensive background in construction and property development. Exhibit 3, Deposition of Alan Stone, pp. 28-29; Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 75. Geller was engaged by Worcester Baseball to act as a consultant to Worcester Baseball for the Project. Exhibit 3, Deposition of Alan Stone, p. 90, lines 7-9. As a consultant, one of Geller's roles was to provide master planning for the park and assist Worcester Baseball in evaluating firms for the seating installation on the Project. Exhibit 2, Deposition of Ted Tye, p. 46, lines 6-8.

Beginning in or around December 2005, Seating Solutions began having discussions with Worcester Baseball regarding a potential contract to design, sell, and install seats at Fitton Field, located on the campus of Holy Cross, as part of the Project.

Exhibit 10, Amended Complaint, ¶12. In connection with these ongoing discussions, Seating Solutions submitted to Worcester Baseball a series of proposals and preliminary drawings and design work. Exhibit 10, Amended Complaint, ¶¶ 17-18. Each of the first four proposals made prior to February 18, 2005 were rejected by Worcester Baseball. Exhibit 10, Amended Complaint, ¶¶ 21, 26-27, 30; Exhibit 2, Deposition of Ted Tye, p. 146, lines 1-24; Exhibit 4, February 17, 2005, revised proposal. On February 21, 2005, Seating Solutions sent Worcester Baseball the last proposal which required a signature and deposit to be retuned for the contract to be binding between the two. Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 130, lines 1-16; p. 156, lines 17-24, p. 157.

Worcester Baseball rejected the February 21, 2005 revised proposal and did not execute and return a deposit to Seating Solutions by February 22, 2005, as required. Exhibit 5, February 21, 2005 revised proposal; Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 114, lines 22-24, p. 121, lines 18-21, p. 122, lines 1-19, p. 123 lines 12-24; p. 157, lines 18-24. The effect of Seating Solutions not having signed the proposal and not having provided the deposit is that the price or the terms of the contract could change at Seating Solutions discretion. Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 128, lines 4-24, p. 129, lines 1-24, p. 130, lines 1-16. Furthermore, Worcester Baseball denies it ever verbally agreed to a contract with Seating Solutions on February 18, 2005, as Seating Solutions claims. Exhibit 8, Affidavit of Alan Stone, ¶¶ 2-3; Exhibit 2, Deposition of Ted Tye, p. 136, lines 5-24, p. 137, lines 1-18, p. 164, lines 20-24, p. 165, lines 1-6.

At various times throughout Worcester Baseball's discussions with Seating Solutions, Tye had directed Geller to contact Dant Clayton to inquire if they were interested in bidding on the Project. Exhibit 2, Deposition of Ted Tye, p. 124, lines 8-16. Worcester Baseball ultimately did enter into a contract with Dant Clayton to build and install the seating for the Project. Exhibit 2, Deposition of Ted Tye, p. 192, lines 14-16 From the first meetings with both Dant Clayton and Seating Solutions, Worcester Baseball's independent opinion was that it was very impressed with Dant Clayton's proposal and organization and wanted to work with it. Exhibit 2, Deposition of Ted Tye, p. 188, lines 17-24, p. 189, lines 1-5.

As is evidenced by Suprina's deposition testimony below, Seating Solutions has no evidence that Maguire said anything to Worcester Baseball to cause it to "cancel" any perceived "deal" with Seating Solutions:

> Q. Do you have any evidence that Patrick [Maguire] said anything to Ted or Alan to cause them to cancel your contract?
>
> A. No.
>
> * * *
>
> Q. Okay. Do you have any evidence that Patrick knowingly caused Worcester Baseball to end their relationship with you?
>
> A. I think "proof" is a better word. I don't have proof that he did that.

Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 234, lines 15-18, p. 241, lines 12-18.

## II.    ARGUMENT

To sustain a claim against Geller for tortious interference with an advantageous business relationship between Worcester Baseball and Seating Solutions, Seating Solutions must prove: (1) Worcester Baseball and Seating Solutions contemplated

4

entering a business relationship or contemplated entering a contract of economic benefit; (2) Geller knew of such relationship; (3) Geller intentionally and improperly interfered with it; and (4) Seating Solutions' loss of advantage directly resulted from Geller's conduct.  See United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815, (1990); Comey v. Hill, 387 Mass. 11, 19 (1982) (citing J.R. Nolan, Tort Law 72, at 87 (1979)).

In this matter, the facts show that there was no business relationship between Worcester Baseball and Seating Solutions in which Geller could have interfered.  After Seating Solutions purportedly reached what it considered to be a verbal "agreement" with Worcester Baseball on February 18, 2005, it prepared yet another written proposal and submitted it to Worcester Baseball on February 21, 2005.  This new proposal stated that Worcester Baseball had to sign the contract and return it along with a deposit by February 22, 2005 to effectuate an agreement between the parties.  Exhibit 4, February 21, 2005 revised proposal; Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 114, lines 22-24, p. 121, lines 18-21, p. 122, lines 1-19, p. 123 lines 12-24; p. 157, lines 18-24.  The fact that Seating Solutions demanded a deposit and signature to effectuate the agreement precludes a finding that it had reached a verbal agreement with Worcester Baseball on February 18, 2005.  See Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F.Supp. 404, 415  (D. Mass.1995) ("'When parties contemplate the execution of a final written agreement,' a strong inference is made that they "'do not intend to be bound by earlier negotiations or agreements until the final terms are settled'") (quoting Rosenfield v. United States Trust Co., 290 Mass. 210, 216 (1935) ); Wasserman v. Roach, 336 Mass. 564, 568 (1958); Goren v. Royal Invs. Inc., 25 Mass. App. Ct. 137, 140 (1987).

Furthermore, Worcester Baseball denies it ever verbally agreed to a contract with Seating Solutions on February 18, 2005, as Seating Solutions claims. Exhibit 8, Affidavit of Alan Stone, ¶¶ 2-3; Exhibit 2, Deposition of Ted Tye, p. 136, lines 5-24, p. 137, lines 1-18, p. 164, lines 20-24, p. 165, lines 1-6.

The law has long recognized that there is a fundamental difference between negotiations and binding contracts. Parties are free to exchange proposals, negotiate terms, accepting some and rejecting others, without fear of being bound. See, e.g., Mass Cash Register, Inc., 901 F.Supp. at 415 ("Where it is mutually understood that a promise is not binding, but rather intended to express a present intention, it is not a contract") (citing Rhode Island Hospital Trust Bank v. Varadian, 419 Mass. 841, 850 (1995)); Cronin v. Nat'l Shawmut Bank, 306 Mass. 202, 210 (1940); Tull v. Mister Donut Dev. Corp., 7 Mass. App. Ct. 626, 632 (1979). This is why parties will often state in writing that in order for there to be a binding agreement, the written exchange must be signed and sometimes a deposit must be paid. By insisting on such terms, the parties attempt to protect themselves from future disputes.

Here, the plaintiff expressly included such requirements in its proposals yet it now seeks to enforce an alleged contract even when its own terms were not met. As a matter of law, it cannot do so. See Mass Cash Register, Inc., 901 F.Supp. at 416 (an agreement sent to another party indicating that it is not effective until accepted and signed by that party "is unenforceable" if there is a failure to comply with those terms). See also Laprade v. Fitchburg & L. St. Ry. Co., 205 Mass. 77, 79 (1910) (a written agreement is ineffective if it remains unaccepted by one of the parties). It is an axiomatic principle in contract law that

> [p]arties do not become contractually bound until they assent to bind themselves to an agreement. Courts determine that mutual assent, not on the basis of what goes on inside the parties' head, but rather on the basis of what they say and do . . . . Parties can agree on every term in a contract, yet not be bound until they sign a written agreement, if they so indicate."

Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F.Supp. at 416 (quoting Salem Laundry Co. v. New England Teamsters and Trucking Ind. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987)). Therefore, when Worcester Baseball rejected Seating Solutions' February 21, 2005 written proposal, any potential agreement was terminated. Accordingly, Geller could not have interfered with a business relationship between Worcester Baseball and Seating Solution when none existed.

In addition, Geller's conduct relative to Seating Solutions and Worcester Baseball does not amount to an improper motive or means. Pursuant to its obligations as a consultant to Worcester Baseball, Geller was paid to provide opinions, but it was not a decisionmaker. Exhibit 2, Deposition of Ted Tye, p. 44, lines 17-24, p. 45, lines 1-6, p. 46, lines 6-8, p. 102, lines 17-24, p. 103, lines 1-2. When asked what evidence Suprina had of Geller's improper motive, Suprina could only come up with the fact that Geller attended a meeting with Seating Solutions' competitor Dant Clayton, who eventually was awarded the contract. Exhibit 1, Deposition of Scott Suprina, dated July 29, 2005, p. 274, lines 3-13.

According to the Supreme Judicial Court in Massachusetts, improper motives or means is synonymous with "actual malice". Harrison v. NetCentric Corp., 433 Mass. 465, 744 N.E.2d 622 (2001). And, actual malice has been defined as any "spiteful, malignant purpose, unrelated to the legitimate corporate interest". Shea v. Emmanuel College, 425 Mass. 761, 682 N.E.2d 1348 (1997); See also Bennett v. City of Holyoke, 230 F.Supp.2d

7

207 (D. Mass. 2002), aff'd 362 F.3d 1 (1st Cir. 2004) (applying Massachusetts law). Evidence of personal dislike will not satisfy the actual malice requirement. See, e.g., King v. Driscoll, 418 Mass. 576, 587 (1994) (citing Boothby v Texan, Inc., 414 Mass. 468, 487 (1993)). Likewise, derogatory comments and uncivil behavior will not warrant the inference that the defendant acted with malice. See Alba v. Sampson, 44 Mass. App. Ct. 311, 316 (1998). Nor will any evidence of personal financial gains. See United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990) (holding that a consultant who advised client not to do business with the plaintiff's firm, and who acted only out of economic self-interest, did not employ improper means nor have improper motive and, thus, was not liable when client, acting on the consultant's advice, ceased to do business with the plaintiff); King v. Driscoll, 418 Mass. 576, 587 (1994) ("[t]he motivation of personal gain, including financial gain . . . generally is not enough to satisfy the improper interference requirement"). Accordingly, the mere fact that an employee of Geller attended a meeting would not amount to evidence of improper motive.

In addition, although there is generally a duty to refrain from interfering with the contractual relationships of others, a design professional, i.e., Geller, is conditionally privileged to interfere with contractual relations when its interference is in the best interest of its principal. Waldinger Corp. v. CRS Group Engineers, Inc., Clark Dietz Div., 775 F.2d 781, 790 (7th Cir. 1985); Ballou v. Basic Construction Co., 407 F.2d 1137 (4th Cir. 1979); Dehnert v. Arrow Sprinklers, Inc., 705 P.2d 846, 850 (Wyo. 1985); Santucci Constr. Co. v. Baxter & Woodman, Inc., 502 N.E.2d 1134, 1139 (Ill. App. 1986). See Riblet Tramway Co. v. Erickson Assocs., Inc., 655 F. Supp. 81, 87 (D.N.H. 1987) (architect privileged where it gave honest advice to its client). Here, all of the advice

proffered by Geller to Worcester Baseball was pursuant to its role as a consultant. Exhibit 7, Affidavit of Patrick Maguire, ¶ 4. As such, even if Maguire had advised Worcester Baseball to reject Seating Solutions' bid and to accept Dant Clayton's (which it did not do), Geller still would not be liable for tortious interference with an advantageous business relationship as Geller's consulting opinions to Worcester Baseball were conditionally privileged. Eastern Contractors, Inc. v. Earl R. Flansburgh & Associates, 1993 Mass. Super. LEXIS 205, at * 14 (Oct. 27, 2003) ("The conditional privilege [from defamation] likewise protects the publisher from claims for interference in advantageous business relationships") (quoting Catrone v. Thoroughbred Racing Assoc., 929 F.2d 881, 887 (1st Cir.1991), in turn citing Gram v. Liberty Mut. Ins. Co., 384 Mass 659 (1981)); A.F.M. Corp. v. Corporate Aircraft Management, 626 F.Supp. 1533, 1551-52 (D.Mass.1985)); Kecko Piping Co., Inc. v. Town of Monroe, 374 A.2d 179 (Conn. 1977).

> Interference is not wrongful if it is privileged. . . . Privilege can be created by the relationship between the owner and the design professional. . . . The privilege is granted to enable the owner to be advised honestly without the risk of the person giving advice being taken to court.

Justin Sweet, LEGAL ASPECTS OF ARCHITECTURE, ENGINEERING AND THE CONSTRUCTION PROCESS, Sec. 27.10, pp. 536-37. See also Restatement of Torts, § 772.

Given the foregoing, Seating Solutions cannot prove at least two elements of its claim against Geller for tortious interference with an advantageous business relationship. That is, Seating Solution has not provided evidence: (1) that there was a business relationship between Seating Solutions and Worcester baseball and, (2) even if there was an existing business relationship between Seating Solutions and Worcester Baseball, that Geller improperly interfered with that relationship. In addition, even should Seating Solutions be able to prove that Geller interfered with Seating Solutions alleged business

relationship with Worcester Baseball, Geller, as a consultant to Worcester Baseball, enjoys a conditional privilege and thus cannot be held liable.

**III.    CONCLUSION**

For the foregoing reasons, this Court should preclude Seating Solutions from introducing evidence contrary to Suprina's deposition testimony that no basis exists for relief for tortious interference with an advantageous business relationship between Seating Solutions and Worcester Baseball.

        Respectfully submitted,

        GELLER SPORT, INC. and GELLER
        DEVELLIS, INC.
        By their attorneys,

        /s/ Warren D. Hutchison

        David J. Hatem PC, BBO #225700
        Warren D. Hutchison, BBO # 246150
        DONOVAN HATEM LLP
        Two Seaport Lane
        Boston, MA 02210
        (617) 406-4500

Date: August 4, 2006
01020824.DOC

**CERTIFICATE OF SERVICE**

      I, Warren D. Hutchison, hereby certify that on this 4th day of August, 2006, a copy of the foregoing was served on the attorneys for the other parties who are registered ECF users by electronic means pursuant to Local Rule 5.4(c) and by first class mail, postage prepaid to the attorneys who are not registered ECF users.

                                    /s/ Warren D. Hutchison
                                    Warren D. Hutchison