UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS,<br><br>       Plaintiff,<br><br>    v.<br><br>GELLER SPORT, INC. and GELLER DEVELLIS, INC.,<br><br>       Defendants. | CIVIL ACTION<br>NO. 05-CV-10365-JLT |

**PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY**

RI, Inc., d/b/a Seating Solutions ("Plaintiff", "Seating", or "Seating Solutions") hereby designates the following portions of the deposition of Matthew Dougherty, dated January 31, 2006,[1] to be read in open court during the trial:

| **Start** | **Stop** |
|---|---|
| 7:3 | 7:18 |
| 9:6 | 9:13 |
| 13:15 | 13:24 |
| 14:19 | 15:4 |
| 15:15 | 15:24 |
| 17:16 | 18:17 |
| 46:14 | 47:21 |

A true copy of Mr. Dougherty's condensed deposition transcript is attached in pertinent part hereto as *Exhibit A*.

               Respectfully Submitted

               RI Inc. d/b/a SEATING SOLUTIONS

---

[1] The page and line citations refer to the *condensed* transcript.

- 2 -

By its attorneys

   /s/                  Terry Klein
HENSHON PARKER VYADRO, P.C.
Terry Klein, BBO# 652052
84 State Street, Suite 760
Boston, Massachusetts 02109
Telephone: (617) 367-1800
Facsimile: (617) 507-6454

Date: August 4, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on or before August 4, 2006.

   /s/                  Terry Klein

## Exhibit A

Case 1:05-cv-10365-JLT    Document 66-2    Filed 08/04/2006    Page 1 of 7

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


RI, Inc. d/b/a SEATING SOLUTIONS,


PLAINTIFF,

V.

CIVIL ACTION NO.   05-CV-10365-JLT


GELLER SPOT, INC., GELLER DEVELLIS,

INC., WORCESTER PROFESSIONAL BASEBALL

LLC, and PERFECT GAME BASEBALL CLUBS, LLC,


DEFENDANT(s).

---

DEPOSITION FOR THE PLAINTIFF,

RI, INC, d/b/a SEATING SOLUTIONS:


The Deposition of Matt Dougherty, taken in the above-styled matter at Wyatt, Tarrant & Combs, LLP, 500 West Jefferson Street, 2600 PNC Plaza, Louisville, Kentucky, on the 31st day of January, 2006, beginning at 11:45      a.m.

9376669b-1c49-4fef-ac48-6bf38e409f1a

Page 6

1  photographs.
2  Q. And you said you also went through your
3  e-mail records?
4  A. Yes.
5  Q. Did you look at any other electronic
6  records?
7  A. No.
8  Q. Did you speak with anyone at Dant Clayton
9  about this deposition before you came here today?
10 A. Mr. Merrick.
11 Q. Anybody else?
12 A. I'm not sure, but probably the vice
13 president of sales.
14 Q. And his name again?
15 A. Mike Guenthner.
16 Q. Did you discuss this with anybody else?
17 A. No. Well, my wife.
18 Q. What's your business address, Mr.
19 Dougherty?
20 A. My home address.
21 Q. Your business address?
22 A. What is my business address?
23 Q. Exactly.
24 A. It is my home address.
25 Q. Okay. And what's your home address?

Page 7

1  A. 2751 Graham Avenue, Louisville, Kentucky
2  40206.
3  Q. Who's your employer?
4  A. I'm sorry?
5  Q. Who is your employer?
6  A. I'm independent.
7  Q. So are you an independent contractor of
8  Dant Clayton's?
9  A. Yes.
10 Q. And you receive 1099 statements from
11 Dant Clayton?
12 A. Correct.
13 Q. Are you an independent contractor of
14 anybody else?
15 A. No.
16 Q. How long have you -- do you have a title?
17 A. Self-proclaimed district manager of New
18 England and New York.
19 Q. And how long have you been in that
20 position or how long have you had that self-
21 proclaimed title?
22 A. Approximately, two and a half years.
23 Q. And what did you do before that?
24 A. I was a consultant.
25 Q. Uh-huh. And who consulted you?

Page 8

1  A. Who consulted me?
2  Q. Yeah. What type of consultant were you?
3  A. The -- the Dant Clayton Corporation was
4  one of my clients.
5  Q. Uh-huh. And who else?
6  A. I don't recall at the moment.
7  Q. Has Seating Solutions ever been a client
8  of yours?
9  A. No.
10 Q. Did you attend college, Mr. Dougherty?
11 A. Yes.
12 Q. And where did you attend college?
13 A. I have a degree of Loyola University.
14 Q. Which Loyola?
15 A. In New Orleans.
16 Q. Okay. Do you have any degrees beyond
17 college?
18 A. I have a master's degree from Indiana
19 University.
20 Q. And what's that master's degree in?
21 A. Business administration.
22 Q. I'm sorry. And your degree from in an
23 Loyola was what date?
24 A. The date?
25 Q. Yes. Year.

Page 9

1  A. 1983. No. '82.
2  Q. And your master's is what year?
3  A. '85.
4  Q. Do you have any professional licenses?
5  A. No.
6  Q. When did you become aware of the Fit and
7  Field project?
8  A. Sometime in late January.
9  Q. Of 2005?
10 A. Correct.
11 Q. And do you remember how you became
12 aware of it?
13 A. Patrick Maguire called me.
14 Q. And have we exhausted your recollection
15 as to what date we're talking about here?
16 A. Yes.
17 Q. Let's do this actually --
18 A. When I first became aware of it?
19 Q. Yeah.
20 A. I don't recall the specific date.
21 Q. If I could, I'm going to show you what's
22 been marked as Exhibit 3. If you could take a look
23 at that and then look up at me when you're done,
24 specifically the lower e-mail on that document.
25 A. Here?

Page 10

1  Q. Yes.
2  Q. Yes.
3  Mr. Dougherty, is your -- is your recollection
4  refreshed as to when you had -- when you first
5  learned of this project?
6  A. No.
7  Q. Okay. Could you just quickly identify this
8  document for the record, looking specifically at the
9  number in the lower right-hand corner?
10 A. 1600.
11 Q. Okay. Had you -- do you know if you had
12 knowledge of this project before January 26th,
13 2005?
14 A. I don't know that.
15 Q. Okay. Do you know, did you have a
16 conversation with Mr. Maguire on January 26th,
17 2005?
18 A. I don't recall that.
19 Q. Okay. This communication with Mr.
20 Maguire that I believe you testified was in late
21 January, where were you when that communication
22 happened?
23 A. I don't recall that.
24 Q. Okay. Do you remember how that
25 communication took place? Was it e-mail or

Page 11

1  telephone or in person?
2  A. I don't recall that either. But I believe I
3  would have -- well, if there was an e-mail
4  communication, that would have appeared in the
5  deposition documents submitted.
6  Q. Okay.
7  A. So it was probably a phone conversation.
8  Q. Okay. Anybody else party to that
9  conversation apart from you and Mr. Maguire?
10 A. I don't recall.
11 Q. And about how long was that
12 conversation?
13 A. I don't recall.
14 Q. Tell me everything that you can remember
15 about that conversation, Mr. -- Mr. Dougherty. And
16 I'd ask that you just refer to this e-mail, perhaps,
17 to assist you in refreshing your recollection.
18 A. Okay. Yeah. Specifically, I have almost
19 no recollection of a conversation with Mr. Maguire.
20 In general, what probably happened was he would
21 call me -- would have called me and said there is a
22 project that I would like you to take a look at; I
23 think it could be of interest to your firm. And --
24 and then we may have had some specific
25 conversation about the particulars of the site such

Page 12

1  as where it was, what particular challenges may --
2  may be present on the site, what the time frame
3  was. These are -- these are normal, customary
4  type of discovery type questions that I would
5  normally ask.
6  Q. Uh-huh. And looking at this e-mail, do
7  you recall asking for an aerial site plan?
8  A. No, I don't recall saying anything about an
9  aerial site plan. I usually ask for a site plan.
10 Q. Okay. And just so we're on the same
11 page, what do you mean by "aerial site plan"?
12 A. A photograph of a site --
13 Q. Okay.
14 A. -- from the air.
15 Q. So a photograph, not a survey?
16 A. That's not what I would mean by "an aerial
17 site plan."
18 Q. Okay. And in -- at this point, in early
19 January, were you able to locate any similar
20 custom designs that -- that Dant could use to
21 expedite?
22 A. No.
23 Q. Okay. Very good.
24 Do you recall receiving the attachments of this
25 e-mail?

Page 13

1  A. Do I recall receiving them?
2  Q. Yes.
3  A. Yes.
4  Q. You do. And what did you do with them
5  when you received them?
6  A. I printed them off --
7  Q. Okay.
8  A. -- and I examined them. And beyond that,
9  I can't recall specifically what I did next.
10 Q. Okay. Do you know, did Seating Solutions
11 come up during your conversation with Mr. Maguire
12 on or around the 26th of January?
13 A. No.
14 Q. Did not. Okay.
15 At what point, if ever, did you become aware
16 that Seating Solutions was also attempting to
17 obtain the Fit and Field project contract?
18 A. I don't recall specifically, but it would
19 have been sometime around when we had our first
20 meeting.
21 Q. First meeting with whom?
22 A. With Worcester Professional Baseball.
23 I'm not sure if they were even identified at that
24 point as that group.
25 Q. Uh-huh. And when did that meeting take

Page 14

1  place?
2  A. I don't have the exact date.
3  Q. Okay. Was it in the same approximate
4  time period of that telephone call with Mr.
5  Maguire?
6  A. It would have been within a week or two
7  after that, I believe.
8  Q. Okay. And where did that meeting take
9  place?
10 A. National Development offices.
11 Q. Which is where, just for the record?
12 A. I believe it's in Newton --
13 Q. Okay.
14 A. -- Lower Falls.
15    THE REPORTER: In where?
16    THE WITNESS: Newton Lower Falls, in
17 Massachusetts.
18 BY MR. KLEIN:
19 Q. And who was present for that meeting?
20 And just for the record, and for the duration of this
21 deposition, this isn't a memory test. So if you
22 don't recall an answer, just -- that's an absolutely
23 acceptable response.
24 A. Well, the people I recall were Ted Tye. I
25 believe Mr. Rosenfield -- I believe that's his

Page 15

1  name -- the general manager of the baseball team
2  was there. Allen Stone may have been there, but
3  I'm not sure; I think he came later. I believe Pat
4  Maguire came a little later.
5  Q. Can I show you -- can I show you what's
6  been marked as Exhibit 2A and ask if that
7  refreshes your recollection as to maybe one other
8  person who attended the meeting?
9  A. No. This name doesn't -- if you're asking
10 me if Rebecca Bachand was three, I don't recall.
11 Q. Okay. Approximately how long did that
12 meeting last?
13 A. Hour and a half.
14 Q. So about 90 minutes.
15 What do you recall happened during that
16 meeting?
17 A. We discussed the project concept; we
18 discussed and looked at some photographs of the
19 site; we discussed scheduling. I gave them
20 customary or average Dant Clayton performance
21 information related to the schedule, typical
22 scheduling information. I'm sure that there was an
23 introductory period where we discussed background
24 and -- and relevant projects.
25 Q. And did Seating Solutions come up during

Page 16

1  that meeting?
2  A. No, not that I recall.
3  Q. I want to flesh out just quickly the
4  performance information issue. Is that the sort of
5  thing where you would talk about what your initial
6  projected completion date was and how close or far
7  you would -- you would hue to that date? Is that
8  the kind of thing we're talking about?
9  A. Relevant to this project?
10 Q. Or just in general. I'm just trying to
11 figure out --
12 A. In general?
13 Q. -- what you mean by "performance
14 information."
15 A. In general, it would have -- I would have
16 conveyed to them typical schedule time frames.
17 Q. Okay. And do you remember, did you say
18 anything at this meeting about how long you
19 anticipated it would take to -- to do the work on the
20 Fit and project [sic]?
21 A. No.
22 Q. Okay. Did you look at any CAD files
23 during that meeting?
24 A. I don't believe so.
25 Q. Okay. Can you recall what the aerial

Page 17

1  photographs you looked at -- can you describe them
2  for the record?
3  A. They were actually a little older. They did
4  not show the new parking structure that had
5  actually been built for, I think, two and a half
6  years. But it was a -- you know, probably a single-
7  engine plane flying overhead taking a picture down
8  of the field and we talked -- it showed the adjoining
9  road and we talked a little bit about the site, the
10 particulars of the site.
11 Q. Did price come up at all?
12 A. No.
13 Q. And so it looks like you were the only
14 Dant Clayton representative there?
15 A. That's correct.
16 Q. And is there anything else you can recall
17 about this meeting?
18 A. I believe that they had given me what their
19 time frame was.
20 Q. Uh-huh. And what do you recall of that?
21 A. It was late May. 29th, I think. It was very
22 specific.
23 Q. Uh-huh.
24 A. They had an opening game that they had
25 to be complete and ready for.

Page 18

1   Q. And did you communicate with them
2   about -- at this meeting specifically about whether
3   Dant could meet that date?
4   A. I told them that I thought it was highly
5   unlikely that any manufacturer could meet that date
6   with a customized plan.
7   Q. Okay. And "customized plan," again, just
8   for the record, is what?
9   A. A customized plan in this business is
10  probably 90 percent of the projects that we build.
11  Q. Uh-huh. And what does it entail?
12  A. It entails having a -- a complete
13  understanding of all of the site issues so that when
14  you build the structure you don't have conflicts
15  that you discover midway through the construction
16  period and that those have been designed into the
17  structure and fabricated accordingly.
18  Q. All right. So anything else you can
19  remember about that meeting?
20  A. No.
21  Q. Do you remember how they responded to
22  your statement that it was unlikely they'd hit that
23  date?
24  A. They weren't very happy about it.
25  Q. When you say "they weren't very happy,"

Page 19

1   do you know -- can you tell me who?
2   A. The general mood. I mean, it's one of
3   those -- there were probably four or five people in
4   the room. It was just the, you know, the general
5   expression on their face of obvious
6   disappointment.
7   Q. All right. And let's just -- I want to flesh
8   out who exactly you did communicate with on this --
9   on this job, generally, now that we've talked about
10  that meeting. And again, we're talking previous to
11  February 21st, 2005.
12  You had communications with Pat Maguire;
13  right?
14  A. Yes.
15  Q. Did you communicate with Mr. Tye as
16  well?
17  A. Yes.
18  Q. Chris Sgarzi?
19  A. Yes.
20  Q. Allen Stone?
21  A. Prior to what date?
22  Q. 21st. This is the day after, I believe, a
23  meeting in Newton with Mr. Merrick and Dant
24  Clayton.
25  A. I don't believe so, not with Mr. Stone.

Page 20

1   Q. Did you meet with anybody at Seating
2   Solutions during that period?
3   A. No.
4   Q. Did you communicate with anybody else at
5   Geller other than Mr. Maguire?
6   A. Yes.
7   Q. Who?
8   A. Well, Rebecca Bachand forwarded an
9   e-mail to me.
10  Q. Okay. Did you communicate -- is --
11  anybody else?
12  A. Not that I recall.
13  Q. And did you communicate with anybody
14  else at either Worcester Pro Baseball or Perfect
15  Game Baseball?
16  A. I don't recall.
17  Q. Okay. Now, do you know, did anybody
18  else at Dant, other than you and Mr. Merrick,
19  communicate with -- with any of these individuals
20  I've just talked about?
21  A. I don't believe so.
22  Q. Okay. And do you, as you sit here today,
23  have an independent -- do you recall the dates on
24  which you communicated with Mr. Maguire?
25  A. No, I do not.

Page 21

1   Q. How about Mr. Tye?
2   A. The only date that I recall speaking to Mr.
3   Tye on the phone was the Friday before our
4   meeting.
5   Q. If I were to say February 18th, would that
6   strike you as approximately correct?
7   A. I think that's correct.
8   Q. And so with Mr. Tye, that means we've got
9   the meeting at the end of January beginning of
10  February, the telephone conference on or around
11  February 18th, and the in-person meeting on the
12  20th. Any other communications that you can recall
13  just before the 21st?
14  A. With Mr. Tye?
15  Q. Yes.
16  A. There may have been one other phone
17  call.
18  Q. Okay. About when would that have
19  happened?
20  A. I think I'm recalling that it was
21  approximately a week after. I'm not sure of this,
22  but I think it was about a week after our first
23  meeting.
24  Q. Uh-huh. Let's talk about -- we'll talk
25  about that in just a second. Chris Sgarzi, do you

Page 46

1  Q. Okay. And tell me everything you can
2  recall about that specific communication where you
3  learned there was a meeting the week following
4  February 11th.
5  A. I don't remember anything specifically.
6  Q. Okay. Just that you somehow had learned
7  there was a meeting the following week?
8  A. Right.
9  Q. Okay.
10 A. And it's obvious that he also asked me for
11 some scheduling -- some typical scheduling
12 information, which is how I responded in this e-mail
13 about it.
14 Q. Okay. All right. Now, what I'd like to do
15 is show you what's been marked Exhibit 2D. Take a
16 look at that and then let me know when you're
17 done. And for the benefit of the folks in
18 Massachusetts, if you could, identify this document
19 for the record.
20 A. It's an e-mail that Patrick Maguire sent to
21 me on February 17th
22 Q. Okay. And is there an attachment to the
23 paper document in front of you?
24 A. Yes.
25 Q. And what is that attachment?

Page 47

1  A. It's the -- it's the more detailed site plan
2  with a conceptual seating plan overlaid.
3  Q. And who did -- when you received this
4  e-mail, did you have an understanding as to who
5  prepared the seating aspect of this design?
6  A. No, not specifically.
7  Q. Generally?
8  A. Well, generally, I knew that it could have
9  been Seating Solutions or Outdoor.
10 Q. Okay. And this document, the site plan,
11 was it an attachment to the e-mail?
12 A. Yes.
13 Q. It was?
14 A. I believe so.
15 Q. You believe so?
16 A. Yes.
17 Q. And why do you believe that?
18 A. Well, because I attached it to the e-mail.
19 Q. Okay. So you personally printed --
20 A. I printed off these documents and I
21 prepared this exhibit.
22 Q. Okay. And so the site plan was attached
23 to the e-mail dated February 17th, 2005?
24 A. Yes.
25 Q. And that would be reflected if I ever saw

Page 48

1  an electronic version of that e-mail?
2  A. Yes.
3  Q. Okay. And did you ask Mr. Maguire to
4  send you that site plan?
5  A. I may have.
6  Q. Okay. But do you have any specific
7  recollection of --
8  A. No.
9  Q. Okay. Were you -- do you have a
10 recollection of expecting to receive a site plan
11 around that time?
12 A. A recollection of expecting to receive it?
13 Q. Yeah. Were you waiting for it?
14 A. No, I don't recall that.
15 Q. Okay. On how many occasions did -- did
16 you receive information that you understood to be a
17 design prepared by Seating Solutions or Outdoor
18 Aluminum?
19 A. Would you repeat the question?
20 Q. On how many occasions did you, Pat
21 Maguire [sic] -- I'm sorry -- did you, Matt
22 Dougherty, receive -- receive information that you
23 believed to be designs prepared by Seating
24 Solutions or Outdoor Aluminum?
25   MR. ROSE: I'm going to object. It

Page 49

1  assumes a fact not in evidence.
2    MR. KLEIN: Sure.
3  BY MR. KLEIN:
4  Q. If ever?
5  A. I'm not sure.
6  Q. Okay.
7  A. I don't recall.
8  Q. Okay.
9  A. Specific, I guess, to offer the explanation,
10 I knew that Outdoor was one of the competitors
11 involved in competing for this project.
12 Q. Uh-huh.
13 A. But I did not believe that they were the
14 only competitor.
15 Q. Okay.
16 A. So, this drawing, I wasn't sure that this
17 came from Seating Solutions or Outdoor.
18 Q. Okay. And so just to clarify again for the
19 record, when you received that site plan, it didn't
20 have a Seating Solutions' title block on it?
21 A. That's correct.
22 Q. And didn't include any proprietary
23 information statement or anything of that nature?
24 A. This is exactly as it was printed off the
25 way I received it.