UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 05-CV-10365-JLT |
| | ) | |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## EXHIBITS OF DEFENDANTS GELLER SPORT, INC. AND GELLER DEVELLIS, INC. TO MOTIONS IN LIMINE

The defendants, Geller Sport, Inc. and Geller Devellis, Inc. hereby submit a complete list of documents which have been listed as exhibits in the defendants' Motions in Limine.

Exhibit 1:   Deposition of Scott Suprina, dated July 29, 2005, pg 6, lines 21-24, pg 23, lines 3-14, pg 24, lines 5-23, pg 75, lines 1-24, pg 100, lines 2-6, pg 102, lines 1-22, pg 114, lines 22-24, pg 121, lines 18-21, pg 122, lines 1-19, page 123, lines 12-24, pg 128, lines 4-24, pg 129, lines 1-24, pg 130, lines 1-16, pg 156, lines 17-24, pg 157, lines 1-24, pg 160, lines 1-6, pg 233, lines 18-24, pg 234, lines 15-18, pg 241, lines 12-18, pg 244, lines 1-19, pg 246, lines 21-24, pg 247, lines 1-2, pg 251, lines 4-24, pg 252, lines 1-20, pg 253, lines 7-10, pg 254, lines 1-24, pg 255, lines 1-4, pg 258, lines 18-22, pg 259, lines 19-24, pg 263, lines 20-24, pg 264, lines 1-4, pg 269, lines 7-13, pg 270, lines 12-24, pg 271, lines 10-15, pg 272, pg 273, pg 274, lines 3-13, pg 295, lines 22-24, pg 296, lines 1-11, pg 297, lines 1-24;

Exhibit 2:   Deposition of Ted Tye, pg 19, lines 14-17, pg 44, lines 17-24, pg 45, lines 1-6, pg 46, lines 6-8, pg 49, lines 11-24, pg 50, line 1, pg 70, lines 9-12 , pg 102, lines 17-24, pg 103, lines 1-11, pg 106,

lines 3-17, pg 124, lines 8-16, pg 136, lines 5-24, pg 137, lines 1-18, pg 146, lines 1-24, pg 164, lines 20-24, pg 165, lines 1-6, pg 187, lines 10-18, pg 188, lines 17-24, pg 189, lines 1-5, pg 192, lines 14-16;

Exhibit 3:     Deposition of Alan Stone, pg 9, lines 13-19, pg 15, lines 15-22, pg 26, lines 5-8, pg 28, pg 29, pg 30, lines 14-18, pg 90, lines 7-9;

Exhibit 4:     February 17, 2005, revised Proposal;

Exhibit 5:     February 21, 2005, revised Proposal;

Exhibit 6:     Seating Solutions plans;

Exhibit 7:     Affidavit of Patrick Maguire; and

Exhibit 8:     Affidavit of Alan Stone;

Exhibit 9:     Initial Disclosure Statement of RI Inc. d/b/a Seating Solutions;

Exhibit 10:    Amended Complaint;

Exhibit 11:    30(b)(6) Deposition of Scott Suprina, dated March 31, 2006, pg 90, lines 4-18.

Exhibit 12:    Deposition of Matt Dougherty, pg 32, lines 5 – 23.

Exhibit 13:    Deposition of Ted Tye, Exhibit 6; E-mail from Ted Tye to Patrick Maguire, dated February 17, 2005.

1            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2

                    CIVIL ACTION NO. 05-CV-10365-JLT
3

4

5   ********************************
    RI, INC. d/b/a SEATING SOLUTIONS,  *
6        Plaintiff,                    *
                                       *
7   v.                                 *
                                       *
8   GELLER SPORT, INC., GELLER         *
    DeVELLIS, INC., WORCESTER          *
9   PROFESSIONAL BASEBALL LLC, and     *
    PERFECT GAME BASEBALL CLUBS LLC,   *
10       Defendants.                   *
    ********************************

11

12

13

14                    DEPOSITION OF ALAN R. STONE, taken
    pursuant to the applicable provisions of the Federal
15  Rules of Civil Procedure, before Michelle Kaczynski, a
    Registered Professional Reporter and Notary Public in
16  and for the Commonwealth of Massachusetts, at the
    offices of Henshon, Parker & Vyadro, P.C., 84 State
17  Street, Suite 360, Boston, Massachusetts, on Friday,
    August 26, 2005, at 9:55 a.m.

18

19

20

21

22

                    KACZYNSKI REPORTING
23             72 CHANDLER STREET, SUITE 3
             BOSTON, MASSACHUSETTS  02116
24                  (617) 426-6060

Page 6

1  question. Of course if you don't understand the
2  question, feel free to ask and I'll just rephrase it.
3  Of course if you need a break or if anybody in the room
4  needs a break at any time, just speak up and I will be
5  more than happy to go off the record.
6          Have you ever been deposed before,
7  Mr. Stone?
8      A.  No.
9      Q.  Okay. What did you do to prepare for this
10 deposition?
11     A.  Consult with my attorney.
12     Q.  And what documents did you look at in
13 preparation for the deposition?
14     A.  Could you maybe be a little more specific in
15 terms of --
16     Q.  Well, did you look at any documents in, as
17 you were preparing for this deposition today?
18     A.  I reviewed the transcript of Scott Suprina's
19 deposition and reviewed some e-mails in the attorney
20 binder.
21     Q.  Okay, and did you discuss the deposition with
22 anybody else apart from your attorney?
23     A.  No.
24     Q.  What's your residential address, Mr. Stone?

Page 7

1      A.  57 Lawrence Road, Weston, Mass., that's
2  W E S T O N.
3      Q.  And your business address?
4      A.  303 Main Street, Worcester, Mass.
5      Q.  Any other business addresses?
6      A.  No.
7      Q.  I --
8      A.  Let me qualify.
9      Q.  Sure.
10     A.  I still maintain a recruitment firm in
11 Boston, it's not active, but I have an address still
12 listed at 12 Post Office Square.
13     Q.  Okay. What's the name of that firm?
14     A.  Stone/Twining Legal Recruiting, Twining,
15 T W I N I N G.
16     Q.  Does -- is Mr. Twining still in the
17 recruiting business?
18     A.  Yes, he is.
19     Q.  And does he does business, do business as
20 Stone/Twining or --
21     A.  Yes, he does.
22     Q.  Okay, and that is right here in Boston?
23     A.  Yes, it is.
24     Q.  How many employees?

Page 8

1      A.  Just the two of us.
2      Q.  Okay, and how old are you?
3      A.  Fifty-four.
4      Q.  And your date of birth?
5      A.  June 28th, 1951.
6      Q.  Where were you born?
7      A.  Boston.
8      Q.  And your Social Security number?
9      A.  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.
10     Q.  Are you married?
11     A.  Yes, I am.
12     Q.  And what's your spouse's name?
13     A.  Marla, M A R L A, Stone.
14     Q.  How long have you been married?
15     A.  Since 1976, over twenty-nine years, I
16 believe.
17     Q.  Congratulations, and have you ever been
18 married before?
19     A.  No.
20     Q.  And do you have any kids?
21     A.  Four boys.
22     Q.  And what are their names?
23     A.  Jeffrey, Michael, James and Douglas.
24     Q.  And what are their ages?

Page 9

1      A.  Twenty-two, nineteen, seventeen and fourteen.
2      Q.  Where do they live?
3      A.  Well, my oldest resides in the
4  Allston-Brighton area. The other three reside at home.
5      Q.  And the twenty-two year old, is he employed?
6      A.  He is.
7      Q.  And where does he work?
8      A.  Works for a company called Yellow Pepper.
9      Q.  And what type of company is Yellow --
10     A.  It's a -- my VCR blinks on 12:00, so you'll
11 have to excuse me, but it's a cellular telephone
12 technology company.
13     Q.  Okay, and who is your current employer?
14     A.  Worcester Professional Baseball.
15     Q.  And what do you do for Worcester Baseball?
16     A.  I'm president and chief executive officer.
17     Q.  How long have you held that position?
18     A.  Since right at the end of 2004, December of
19 2004.
20     Q.  Okay. Have you ever been a party to any
21 litigation in the United States or elsewhere in the
22 world?
23     A.  Yes.
24     Q.  Could you just -- how many cases?

Page 14

1    A.  Took a year hiatus, because having left a
2 company that was acquired, had a noncompete, came back
3 to recruiting in 2002 until I moved into the Worcester
4 Professional Baseball arena in late 2004.
5    Q.  And what was the name of the PR firm in New
6 York?
7    A.  Michael W. Moynihan Public Affairs
8 Consultants.
9    Q.  Are they still in business?
10    A.  They're not.
11    Q.  And I was at Bingham Dana too, but what
12 caused you to leave Bingham?
13    A.  The quick answer was probably a desire to get
14 back dealing with people in an outside environment as
15 opposed to the perhaps back room life of a young
16 associate.
17    Q.  And were you on the corporate side or the
18 litigation side, or kind of a combination of the two?
19    A.  I actually had a rotation system.
20    Q.  I see.
21    A.  They did in place at the time, so I touched
22 on several areas of practice.
23    Q.  I see, and who did Stone Legal Resources,
24 there was a purchase or a sale of that business, is

Page 15

1 that what you said?
2    A.  Yes.
3    Q.  Who bought it?
4    A.  A company called Select Appointments North
5 America.
6    Q.  And are they still in business?
7    A.  They were acquired in late '98, I believe.
8    Q.  I see.  Was there a period during which you
9 worked for Stone Legal Resources while it was owned by
10 another company?
11    A.  Yes.
12    Q.  I see, and what was that period?
13    A.  In terms of a period of time, it was
14 approximately two years.
15    Q.  Okay, and as for your current employment,
16 what do you do on a daily basis?
17    A.  I serve as president and chief executive
18 officer, which means I make decisions in terms of the
19 general operation of the company.  I'm authorized to
20 make decisions, enter into contracts, hire and fire
21 staff, serve as a voice and a presence of the team in
22 the Worcester community.
23    Q.  And do you consider yourself to report to
24 anybody or any group of people or anything like that?

Page 16

1    A.  I think the board of directors of our firm.
2    Q.  And who is on that board at this time?
3    A.  Well, our chair is Ted Tye, I'm also a member
4 of the board.  We have Tom Alperin, Thomas Alperin,
5 Bradly Michals, Bruce Ginsberg, Peter Merrigan, Thomas
6 Maher, Robert Richards.
7    Q.  And is there any sort of logic behind having
8 you be the CO and having Mr. Tye be the chairman and
9 not having those positions be merged?
10       MR. CIAVARRA:  Objection.  You can
11 answer.
12    A.  I'm not sure I quite understand when you say
13 logic, I'm not trying to be difficult, but I'm trying
14 to be responsive --
15    Q.  Sure.  Is there any reason that the chairman
16 and CEO are not just a single position?
17       MR. CIAVARRA:  Objection.
18    A.  I think as much out of respect for Ted Tye
19 and his business background and acumen.
20    Q.  I see.
21    A.  And perhaps also the extent of my busy
22 schedule, to rely upon another seasoned person in that
23 chair is appropriate.
24    Q.  I see, and how many Worcester Baseball

Page 17

1 employees report to you?
2    A.  They all do.
3    Q.  And how many employees are there?
4    A.  Year-round employees right now approximately
5 eight or nine.  In season we have a very large game day
6 staff.
7    Q.  I see, and do you do any other work for
8 Worcester Baseball in any other capacity?
9    A.  Everything falls under my title --
10    Q.  Sure.
11    A.  -- as president and CEO, but I definitely
12 wear many hats.
13    Q.  Sure, and how is the season going?
14    A.  Very well.
15    Q.  From a financial prospective?
16    A.  For a start-up operation I think we're doing
17 fine financially.
18    Q.  And how is the team performing on the field?
19    A.  Very well.  We're in the playoffs in our
20 first year of operation, which is a very satisfying
21 achievement.
22    Q.  Excellent.  I'm just going to put a couple of
23 exhibits in front of you.  I'm showing you what's been
24 marked as Exhibit 1.  If you could just identify that

Page 26

1  tacit experience perhaps in leasing office space.
2      Q.  Yes.
3      A.  But neither of us would be regarded as
4  experts in construction.
5      Q.  Well, I guess I should back up.  You had to
6  figure out a place to play, right?
7      A.  Correct.
8      Q.  And let's say, let's start just mid-November.
9  What locations were on your wish list?
10     A.  My knowledge of Worcester was growing by the
11 day.
12     Q.  Mm-hmm.
13     A.  But we were relying on predominantly city
14 officials to tell us what locations might be on our
15 list, so early on it would probably be a combination of
16 fields that were controlled and operated by the city,
17 perhaps some colleges and universities, also
18 theoretically vacant land that could be developed.
19     Q.  Okay.  I'm going to try to focus us just a
20 little bit.  Was somewhere called Lake Park on the
21 list?
22     A.  Yes.
23     Q.  And Clark University?
24     A.  Clark as well.

Page 27

1      Q.  And Holy Cross?
2      A.  Yes.
3      Q.  And who -- when did Lake get on the wish
4  list?
5      A.  I believe it was already on Phil's list when
6  he and I spoke.
7      Q.  Sure, and how did Clark, how and when did
8  Clark get on the list?
9      A.  I'm not exactly sure when things arrived on
10 the list.
11     Q.  Sure.
12     A.  But Clark was on the list of the area
13 colleges and universities where we knew there were
14 baseball facilities.
15     Q.  And would you say that apart from, would you
16 say that Lake Park, Clark and Holy Cross were the three
17 principal sites, or were there others that were, that
18 you considered seriously?
19     A.  I'm not trying to be cute, but when you say
20 considered seriously --
21     Q.  Sure.
22     A.  -- at the beginning of our venture,
23 everything was under consideration.
24     Q.  Right.

Page 28

1      A.  There were a variety of fields, and as I
2  mentioned, possibilities from vacant land to already
3  developed fields.
4      Q.  Right.  Well, at a certain point, right, you
5  really sort of focused on Holy Cross, right?
6      A.  Well, there, I think it's fair to say the
7  list shrank to, you know, several possibilities.
8      Q.  And what were those, after the list shrank,
9  what were the possibilities?
10     A.  Once again, various universities, you
11 mentioned Clark, Holy Cross.  I viewed Assumption and
12 Worcester Polytech as two other possibilities that we
13 looked at.
14     Q.  Okay, and once you had sites, for these
15 sites, did all of them, were all of them going to
16 require some kind of improvements?
17     A.  It's fair to say, yes.
18     Q.  And did someone as part of your group, as
19 part of the team that was developing focus on those
20 improvements, being responsible for the logistics
21 associated with that?
22     A.  Yes, yes.
23     Q.  Who was that?
24     A.  At some point I asked Ted Tye to be the lead

Page 29

1  person on that.
2      Q.  Had Phil Rosenfield also been working on that
3  stuff too?
4      A.  Not in an -- yes, but not in a quote/unquote
5  expert capacity.
6      Q.  Sure, and how would you describe what he was
7  doing?
8      A.  Well, first, I don't mean to be asking the
9  questions, I apologize, but I want to make clear that
10 you had asked me about my early discussions with Phil
11 Rosenfield.
12     Q.  Yes.
13     A.  And by mid-November, the group had expanded
14 so that Ted was part of the group, and it was easy to
15 ask my colleague Ted Tye to run with this
16 responsibility based on his experience and expertise.
17     Q.  Yes, and his expertise, how would that
18 contrast with Mr. Rosenfield's experience?
19     A.  Ted Tye is an experienced real estate
20 businessman and entrepreneur, Philip is not.
21     Q.  When did Patrick Maguire get involved?
22     A.  This is early in, relatively early in the
23 process.
24     Q.  Who brought him in?

8 (Pages 26 to 29)

1    A.  Ted Tye's recommendation.
2    Q.  Okay, and how long have you known Mr.
3  Maguire?
4    A.  Only since the Worcester Baseball project.
5    Q.  I see, so you haven't worked with him on
6  anything?
7    A.  No, I'm not in the real estate industry.
8    Q.  Okay.  Now, let's talk just a little bit
9  about your authority in your current role as the CEO.
10  How would you describe your authority as the chief
11  executive officer?
12    A.  I guess the quick answer is the buck stops
13  here, I have ultimate authority in the company.
14    Q.  And do -- who signs contracts that Worcester
15  Baseball enters into?
16    A.  I do.
17    Q.  Does anybody else?
18    A.  No.
19    Q.  How about checks?
20    A.  I sign them.
21    Q.  Does anybody else sign them?
22    A.  My general manager has authority with respect
23  to payroll issues and so forth, but with respect to
24  vendors and contracts I would have that authority.

1    Q.  And what's your general manager's name?
2    A.  Michael Lieberman.
3    Q.  Okay.  Do certain contracts or deals need
4  board approval first?
5    A.  I would seek board approval when I deemed
6  appropriate.
7    Q.  Is it kind of a smell test?
8    A.  To some degree.  I mean, under advice of
9  counsel, I would not leave it merely to my whims.  You
10  know, if I felt a contract or a decision was of
11  sufficient magnitude, I would make sure I would err on
12  the side of bringing it to the board at least for
13  discussion.
14    Q.  Okay.  Now, Worcester Baseball ultimately
15  selected a site, correct, for the stake?
16    A.  Yes.
17    Q.  And what was that site?
18    A.  What is known as Fitton Field at Holy Cross.
19    Q.  And were there improvements that were needed?
20    A.  Yes.
21    Q.  Just what were the improvements that you had
22  to do?
23    A.  Fitton Field prior to any improvements was a
24  grass baseball field, not to repeat the information

1  that Mr. Tye provided, but we were dealing with
2  essentially some temporary bleachers on either base
3  line, a wooden press box facility, somewhat
4  dilapidated, and two wooden dugouts in similar
5  condition, and there was I believe a chain link fence
6  out in the outfield and very little else, certainly not
7  in a state of affairs for a professional baseball
8  operation.
9    Q.  Who opened the discussions with Holy Cross to
10  start playing there?
11    A.  As I recall, we started our journey, if you
12  will, with meetings with city officials.
13    Q.  Mm-hmm.
14    A.  And we relied heavily on their suggestions,
15  and at one of our early meetings with city officials
16  the Holy Cross site came up for consideration, and I
17  remember that we then met with Holy Cross officials; by
18  we, meaning Philip Rosenfield and I.
19    Q.  Just to the first meeting?
20    A.  First meeting, yes.
21    Q.  And late January is when things really jelled
22  with Holy Cross, is that right?
23    A.  Things really started to focus on Holy Cross.
24  Things didn't really jell until mid to late March.

1    Q.  And when did you start, do you know when kind
2  of the construction and design process on Fitton Field
3  got underway?
4    A.  I think it was not until we signed a lease
5  with Holy Cross, I believe in late March.
6    Q.  Were you looking at people to do improvements
7  on Fitton Field before then though?
8    A.  Yes.  When you say looking for, we were
9  engaging in discussions with a variety of vendors and
10  contractors to do improvements, yes.
11    Q.  And again, just the kind of the broad
12  category of the improvements that you were looking for,
13  what were the general categories?
14    A.  I would say in the rubric of fan amenities
15  and player amenities.  With respect to Fitton Field, it
16  would be seating, it would be access ways, concourses
17  and walkways, dugouts, press facilities, restroom
18  facilities, revamping some of the field, the condition,
19  looking at the condition of the infield and the
20  condition of the turf, and it's a lot of interrelated
21  developments.  I think I've just about exhausted my
22  construction experience in my answer, but a lot of
23  things had to be done to bring it up to grade.
24    Q.  And in bringing it up to grade, were there

Page 90

1    A.  Not, I don't recall anything meaningful
2  beyond what we've discussed.
3    Q.  What was your personal opinion as to who had
4  a superior product at this time?
5    A.  As to, quote/unquote, superior product, I was
6  relying on Ted Tye and our consultants.
7    Q.  And by your consultants, who are you
8  referring to?
9    A.  Geller Sport, Mr. Maguire specifically.
10   Q.  And did they, did Mr. Tye make, did he let
11  you know who he thought had a superior product?
12   A.  I'm sure he rendered an opinion as did Mr.
13  Maguire.
14   Q.  And what was their opinion; what was Mr.
15  Tye's opinion, first of all?
16   A.  The quick answer was that Ted appeared to go
17  with a feeling that Dant Clayton was a preferable
18  supplier.
19   Q.  Even at a higher price?
20      MR. CIAVARRA:  I object.
21   A.  That was not determined at that time.
22   Q.  Sure, okay, and Mr. Maguire, did he express
23  an opinion to you?
24   A.  I recall him expressing the same opinion,

Page 91

1  that Dant Clayton, that he preferred Dant Clayton and
2  their proposal.
3    Q.  And did he say what about Dant Clayton's
4  proposal he preferred?
5    A.  I recall nothing, less specific and more
6  banter, but it, clearly we touched on things like price
7  and the ability to perform.  In my mind, there were
8  still many questions to pursue and answer.
9    Q.  And what were those questions?
10   A.  Well, components of what would make the
11  project all in be one that we could go with.  Once
12  again, it wasn't just a function of selecting a seating
13  supplier.  There were other contractors that would be
14  part of this exercise in terms of the improvements at
15  Fitton Field, there was the big question of Holy Cross
16  approval that was still yet to be finalized.  There
17  were also other contingencies, a very real one being
18  that we might have been a travel team in 2005, and that
19  we would have elected not to go with any seating
20  supplier but would have deferred the decision to '06 or
21  beyond.
22   Q.  That's interesting.  What do you mean by a
23  travel team?
24   A.  If we were, if we determined as an entity

Page 92

1  that it was in our best interests not to play home
2  games in 2005, we would still be a member of the league
3  and in a sense underwrite travel expenses, and that was
4  an option that was being actively discussed.
5    Q.  And that was something that the league was
6  willing to consider?
7    A.  Yes.
8    Q.  Okay.  Interesting.  Were there any other
9  sites in Worcester that you had as a backup plan at
10  this point?
11   A.  Could you describe what point?
12   Q.  I mean, at this point when you say that there
13  are a lot of other things on your mind, if Holy Cross
14  falls through, is there another site in Worcester, or
15  is your next, is your escape hatch the traveling
16  option?
17   A.  I'm almost certain that at that stage if Holy
18  Cross had fallen through that we would have been
19  thinking travel team.
20   Q.  Okay.  Page two of the contract here, there's
21  a date, a little, just a notation, substantial
22  completion date, do you see that?
23   A.  Mm-hmm.
24   Q.  What's the date underneath there?

Page 93

1    A.  May 24th, 2005.
2    Q.  And was Dant, did Dant hit that substantial
3  completion date?
4    A.  I actually wouldn't be the one to give you an
5  appropriate answer because of the definition of
6  substantial completion, I don't know if it's subjective
7  or objective.
8    Q.  Right.
9    A.  I don't have the expertise.
10   Q.  But was the stadium done on May 24th, 2005?
11   A.  I would say there was still more work to be
12  done on May 24th.
13   Q.  Okay, and --
14   A.  But may I add, I'm not sure whether it was to
15  be done by Dant Clayton or other contractor.
16   Q.  The date on this contract, on this document
17  is, could you just look at the first page here, is
18  what?
19   A.  It says agreement made as to the 22nd day of
20  February.
21   Q.  Okay.  Did you actually affix your signature
22  on the 22nd of February?
23   A.  To the best of my recollection I did not.
24   Q.  Okay, so it was retroactive?

24 (Pages 90 to 93)



www.sitonthis.com

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470



## PROPOSAL

February 17, 2005

Mr. Ted Tye
Perfect Game
c/o 6 Draper Road
Wayland, MA 01778

*Worcester Professional Baseball, LLC*
*PO Box 2221*
*Worcester, MA 01613-2221*

Re: Perfect Game Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum
flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package
Two front field walls – plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and
contrasting aisle nosing. Complete front 10 rows aluminum square tube frame combo.
Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent,
comfortable and durable product that I strongly recommend.

Price delivered and assembled:        $1,519,880.90

Pricing excludes concrete, electric and water connections. Earthwork by others. Pricing does not include any applicable sales tax and is based on Seating Solutions standard levels of insurance. *Specify levels. Insurance certificate to be provided.*

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.

Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement. *Bathroom must be ADA compliant and meet MA plumbing code.*

We will provide stamped engineered drawings for your approval. We can design concrete footings if you give us soil information. *Design of concrete footings is included and must be provided by ~~our process~~. All plans (stands and footings) must be signed by a MA architect and MA structural engineer. All plans must conform with ADA requirements. oK*

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.

Note, to fast-track this project your contract and payments, with the exception of the deposit check, will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

*client RobaMtu provide so info*

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

### Terms and Conditions

All prices quoted are subject to the following terms and conditions.

All measurements are approximate.

Price does not include any permits or bonds required.

Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have. *Must meet ADA requirements.*

Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.

Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.

Price based on installation area being free of obstacles and clear for the crews to do the work outlined.

Should the buyer choose, for any reason, to delay installation or assembly when the product is fabricated and ready for delivery all money due on delivery will be immediately paid.

Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.

It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

Any and all liability on RI Inc./Seating Solutions under this agreement is limited to fees *and by Worcester Professional Baseball LLC* paid. *plus penalties outlined herein.*

Any controversy or claim arising out of this contract ~~shall~~ *may* be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in ~~the County of Suffolk or Nassau.~~ *Massachusetts.* ~~If RI, Inc./Seating Solutions retain an attorney to collect money due under this contract, it is entitled to its reasonable attorneys fees as well.~~ *Either party may also pursue a claim in a Massachusetts Court.*

Material Status: Materials Delivered and Assembled

Pricing is based on acceptance of offer no later than 5 days from date of proposal unless otherwise specified in the proposal. Additional charge may apply for orders signed later than 5 days from date of proposal issuance.

Please place your initials next to each line item on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.

Please fill in date of first use or substantial completion: _____

Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.

Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

Total Contract Amount: $1,519,880.90

I look forward to working with you. Thanks for the opportunity.

Sincerely,


Scott Suprina – Vice President


_____
Authorized Signature of Acceptance                           Date


_____
Print Name and Title

1. Penalties: There shall be a penalty of $50,000 per week for late delivery. Penalties shall begin to accrue if the material is not ~~as~~ installed and substantially complete and in compliance with plans and specifications by May 15, 2005.

2. Schedule — [please provide] ~~to follow~~ ~~by~~ ~~Parachut~~ Based on order + elevation

3. Subject to an AIA contract. 10 days to set 14 day complete 4-5 week fab + del

4. ~~At~~ Based on Rct of signed contract + deposit by Feb 22nd anytime only

# SEATING SOLUTIONS

**RI, Inc**

63 Oser Avenue
Hauppauge, NY 11788
Phone: 631-845-0449
Fax: 631-845-0470

www.sitonthis.com



# PROPOSAL

February 21, 2005

Mr. Ted Tye
Worcester Professional Baseball, LLC
PO Box 2221
Worcester, MA 01613-2221

Re: Fitton Field

Dear Ted,

Here is our final proposal based on the Fitton Field drawings dated 2/15/05.

Approximately 3187 seats delivered and assembled, includes 1706 Outdoor Aluminum
flip-up chairs numbered with arms.
512 each Bleachair seats at same price as aluminum backrest
969 each bench seat only.
Includes rear crosswalk and all stairways
Two ADA field level platforms with vomitory access
Two complete dug-outs/prefabricated with electric package
Two front field walls -- plastic lumber and aluminum
Two field wall entry gates
One each press box with photo platform
Drink rails around party deck with modesty panel
Elevated bleacher seating system

Note, complete system is Tredweld all aluminum deck with mounting channels and
contrasting aisle nosing.  Complete front 10 rows aluminum square tube frame combo.
Decking and hillside is galvanized I-Beam.

Please note that I have included Outdoor Aluminum flip-up chair, an excellent,
comfortable and durable product that I strongly recommend.

Price delivered and assembled:                    $1,519,880.90

Pricing excludes concrete, electric and water connections. Earthwork by others. Pricing does not include any applicable sales tax and is based on Seating Solutions standard levels of insurance. An insurance certificate will be provided. General Liability $1,000,000.00 per occurrence and $2,000,000.00 general aggregate; $1,000,000.00 Automobile Liability.

Note, if you would like to consider an Irwin Patriot chair I can offer it to you. I do not recommend it. Consider it is spring activated and requires maintenance and it is not engineered for this deck although I will supply an adaptor bracket. The most important part is that I would not guarantee Irwin's delivery time.
Add $44.00 per chair installed.

I want this project to be a showcase for Seating Solutions so I will offer you the following. With your order, if you would like us to do the upper deck bathrooms we will do it at our cost $50,000.00. This way we control the support and placement. Bathroom must be included and must be provided by March 15, 2006

We will provide stamped engineered drawings for your approval. We will design concrete footings and Worcester Professional Baseball, LLC is to provide soil information. All plans (stands and footings) must be signed by MA architect and MA Structural Engineer. All plans must conform with ADA requirements.

The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.
Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.
Note, to fast-track this project your contract and payments, with the exception of the deposit check, will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.

When the design is confirmed I will include a schedule of seat style values to allow for addition or subtraction of seats in final design and debit or credit of such.

Please keep in mind that we can easily add extra bleachers down the first and third base lines in the future. We could offer them as a rental even in the first or second season.

### Terms and Conditions

All prices quoted are subject to the following terms and conditions.
All measurements are approximate.
Price does not include any permits or bonds required.
Due to variations in local codes and safety criteria, it is the responsibility of customer to notify us in writing of any specific codes or safety requirements you may have. Plans must comply with ADA requirements.
Once delivery/installation times have been established any changes to the schedule due to inaccessibility to our equipment or elevator access will result in a charge of $50.00 per man, per hour.
Any changes to delivery, installation or removal of date or time should be in written notice to our office 24 hours prior.
Price based on installation area being free of obstacles and clear for the crews to do the work outlined.
Should the buyer choose, for any reason, to delay installation or assembly when the

product is fabricated and ready for delivery all money due on delivery will be immediately paid.

Should the buyer choose to delay installation or assembly of any part of the product, causing a split installation or assembly all money due on completion will be paid in full on completion of the first phase of the installation/assembly.

It is the policy of Seating Solutions to make no more than one visit to the site prior to delivery. Once on the site for installation of the product our crew foreperson will attend job site meetings on an "as needed" basis only.

Any and all liability on RI Inc./Seating Solutions and by Worcester Professional Baseball LLC under this agreement is limited to fees paid plus penalties outlined herein.

Any controversy or claim arising out of this contract may be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitration hearing is to be held in Massachusetts. Either party may also pursue a claim in a Massachusetts Court.

Penalties:
-There shall be a penalty of $50,000.00 per week for late delivery. Penalties shall begin to accrue if the material is not installed and substantially complete and in compliance with plans and specifications by May 15, 2005.
-Seating Solutions will provide a delivery and installation schedule by 2/24/05.
-This agreement is subject to an AIA Contract.

Material Status: Materials Delivered and Assembled
Please place your initials next to each page on this proposal, sign the terms page where appropriate and return the entire proposal to Seating Solutions.
Please fill in date of first use or substantial completion: May 15, 2005.

**The pricing and terms are based on receipt of a signed proposal and deposit by February 22, 2005 only.**

**Terms: 10% deposit; 25% on drawing approval; 25% on 1st delivery, 25% on last delivery and 15% on completion.**

**Note, to fast-track this project our contract and payments, with the exception of the deposit check will be made to Outdoor Aluminum, Inc. c/o Seating Solutions. Please make deposit check out to Seating Solutions.**

**Total Contract Amount: $1,519,880.90**

I look forward to working with you. Thanks for the opportunity.

Sincerely,



Scott Suprina – Vice President


_____     _____

Authorized Signature of Acceptance                          Date


_____

Print Name and Title



"FITTON FIELD"

TOTAL BENCH WITH BACKREST SEAT COUNT = 512 SEATS
TOTAL BENCH SEAT COUNT = 969 SEATS
TOTAL FLIP-UP SEAT COUNT = 1,706 SEATS
TOTAL SEAT COUNT = 3,187 SEATS

VIP PARTY DECK

BASEBALL DIAMOND

DUGOUT

1 STORY

BATTING CAGE

S 0056

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS,<br><br>     Plaintiff,<br><br>    v.<br><br>GELLER SPORT, INC., GELLER DEVELLIS,<br>INC., WORCESTER PROFESSIONAL BASEBALL<br>LLC, and PERFECT GAME BASEBALL CLUBS, LLC,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 05-CV-10365-JLT |

## AFFIDAVIT OF PATRICK MAGUIRE

I, Patrick Maguire, under oath, hereby depose and state as follows:

1. I am the President of Geller Sport, Inc., which is located at 77 North Washington St. Boston MA 02114. Geller Sport, Inc. is a division of Geller DeVellis, Inc. ("Geller").

2. Geller provides recreation and athletic facility design consulting services.

3. Geller was hired by Worcester Professional Baseball, LLC ("Worcester Baseball") to act as a consultant to aid in efforts to secure and improve on a location for its Baseball team to play ("the Project").

4. All of the advice given by Geller to Worcester Baseball was pursuant to its role as a consultant.

5. Seating Solutions sent a set of plans to Geller for its use on the Project.

6. The drawings ultimately produced by Seating Solutions were compilations of drawings from a couple of different parties and were worked on by employees of Seating Solutions and employees of Geller.

1

7. The layout of Fitton Field required a certain structural design and there were limited ways the seating could be installed.

8. The information provided by Seating Solutions on the drawings was not used in whole or in part to manufacture anything.

Signed under the pains and penalties of perjury this __7th__ day of October, 2005

_____
Patrick Maguire

00948053//24410.88

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

RI, Inc., d/b/a SEATING SOLUTIONS,         )
Plaintiff                                     )
                                          )
v.                                       )
                                        )     CIVIL ACTION NO.
GELLER SPORT, INC., GELLER DEVELLIS,  )     05-CV-10365-JLT
INC., WORCESTER PROFESSIONAL BASEBALL  )
LLC, and PERFECT GAME BASEBALL CLUBS,  )
LLC,                                    )
Defendants                          )

## AFFIDAVIT OF ALAN STONE

I, Alan Stone, do depose and state under oath as follows:

1.    I am an officer and owner of Perfect Game Baseball Clubs, LLC and Worcester Professional Baseball, LLC and have personal knowledge of the facts set forth in this Affidavit.

2.    During February, 2005 we had negotiations with the Plaintiff to provide equipment and structures for the improvements at Fitton Field at The College of The Holy Cross. There were a number of proposals made by the Plaintiff which we considered. Each proposal we received from the Plaintiff was in writing and stated, clearly and unequivocally, that it was a "proposal" and that it was conditioned upon "the receipt of a signed proposal and deposit." We never accepted a proposal from the Plaintiff, we never signed a proposal from the Plaintiff and we never paid them a deposit.

3.    At all times we made it absolutely clear to the Plaintiff that we were reviewing other proposals and that nothing was guaranteed until the appropriate documents were reviewed, approved and signed. We clearly and unequivocally advised

the Plaintiff that he should not assume he had the project and that he would not have the project until all of the negotiations were complete and the agreements were reviewed and signed. No representative of Worcester Baseball ever promised the Plaintiff that we had a deal.

4.    We eventually entered into a contract with Dant Clayton Corporation. The work at Fitton Field pursuant to that contract was substantially completed in time for our opening day on June 6, 2005. To the best of our knowledge, the Plaintiff never undertook any actions in reliance upon a belief that he would be awarded the project. No equipment or materials were ever purchased and no expenditures were made other than to prepare the proposals.

5.    While we do not have insurance to provide coverage for this breach of contract claim, in the event Plaintiff is successful, we do have assets to satisfy any reasonable judgment. We purchased our membership in the league with a deposit of Five Hundred Thousand Dollars ($500,000.00). We have substantial corporate sponsors, including Hanover Insurance, Commerce Bank, Unum Provident, TD Banknorth and WB Mason. We have received over Three Million Five Hundred Thousand Dollars ($3,500,000.00) of capital investment, have sold thousands of tickets, and have over twenty (20) players under contract. While we are confident that the Plaintiff will not be successful in this case, in the event we are wrong there will be sufficient assets to satisfy any reasonable judgment that could be rendered in Plaintiff's favor.

6.    The agreement we reached with The College of The Holy Cross is to transfer to them the improvements being made at Fitton Field in exchange for their agreement to allow us to use the field in order to bring professional baseball to

Worcester.  We agreed to provide these assets to the College free and clear of any liens or encumbrances.  If this Court were to grant the attachment, we would be in breach of our agreement with The College of The Holy Cross.  While the repercussions of such a breach are uncertain at this time, clearly it could disrupt the relationship as well as the potential ability to play baseball at the Fitton Field in the future.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 8TH DAY OF JUNE, 2005.

Alan Stone

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 05-CV-10365-JLT |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INITIAL DISCLOSURE STATEMENT OF RI INC. d/b/a SEATING SOLUTIONS

The plaintiff, RI, Inc., d/b/a Seating Solutions ("Seating Solutions"), submits the following initial disclosures to the defendants, Worcester Professional Baseball, LLC and Perfect Game Baseball Clubs, LLC (collectively, "Worcester Baseball") and Geller Sport, Inc. and Geller Devellis, Inc. (collectively "Geller"), pursuant to Fed. R. Civ. P. 26(a)(1) and based upon the information that is reasonably available to it at this time:

A.     **Individuals Likely to Have Discoverable Information**

The following individuals, all of whom have the address and telephone number of 63 Oser Avenue, Hauppauge, New York 11788, (631) 845-0449, are likely to have discoverable information that Seating Solutions may use to support its claims:

1.     Scott Suprina is likely to have information regarding: (i) the renovation of Fitton Field (the "Project"); (ii) negotiation and consummation of an agreement (the "Agreement") with Worcester Baseball concerning the Project; and (iii) Geller's tortious interference with the Agreement;

2.     Cristie Suprina is likely to have information regarding: (i) the Projects and (ii) the Agreement;

- 2 -

3.      Scott Ruczaj is likely to have information regarding (i) the Project; (ii) the negotiation of the Agreement; and (iii) Geller's tortious interference with the Agreement; and

4.      Ross Jacobs is likely to have information regarding (i) the Project; (ii) the negotiation and consummation of the Agreement; and (iii) Geller's tortious interference with the Agreement;

The following individuals, all of whom are believed to have an address of Worcester Professional Baseball, LLC, 303 Main Street, Worcester, Massachusetts 01615, have knowledge of the activities of Worcester Baseball:

1.      Theodore Tye;

2.      Alan Stone; and

3.      Philip Rosenfield.

Patrick Maguire, who is believed to have an address of Geller Sport, Inc., 77 North Washington Street, Boston, Massachusetts 02114, has knowledge of the activities of Geller.

**B.      Categories of Documents**

The following categories of documents are located either at the Law Office of Terry Klein, 1558 Dorchester Avenue, Ste. 202, Dorchester, Massachusetts 02122 or at Seating Solutions, 63 Oser Avenue, Hauppauge, New York 11788, and may be used by Seating Solutions to support its defenses in this action:

1.      Correspondence regarding the Projects;

2.      Drawings and

3.      Other documents relating to Seating Solutions' planned work on the Projects.

**C.      Computation of Damages**

1.      Seating Solutions seeks actual damages of at least $591,414.90 from Worcester Baseball.   The price that Worcester Baseball agreed to pay was $1,519,880.90.   Seating Solutions' conservative cost estimate of $928,466.00 breaks down as follows:

| Item | Cost |
|---|---|
| Seating materials (including bleacher and VIP flip-up chairs) from Outdoor Aluminum, our regular supplier. | $673,636.00 |
| Press Box | $59,230.00 |
| 2 dugouts (with cost of interior benches included) | $40,000.00 |
| Plastic lumber – includes a 3-4' high field wall and earth containment barrier at front of stand between dugouts | $20,000.00 |
| Installation budget -- $25.00 per seat | $95,600.00 |
| Dress up railing at back of crosswalk and stand sides, chain link rail on stairs. | $40,000.00 |
| Total costs | $928,466.00 |

In addition, Seating Solutions seeks multiple damages and its attorney's fees, interest, and costs from Worcester Baseball under Mass. Gen. Law ch. 93A, §§ 2, 11.

2.      Seating Solutions seeks damages of at least $591,414.90 from Geller, due to Geller's tortious interference with the agreement.  Seating Solutions also seeks damages of an undetermined amount due to Geller's misappropriation and dissemination of Seating Solutions' proprietary information.  Seating Solutions, finally, seeks multiple damages and its attorney's fees, interest, and costs from Geller under Mass. Gen. Law ch. 93A, §§ 2, 11.

**D.    Insurance Agreements**

Seating Solutions is aware of no insurance agreements under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment that may be entered in this action, other than the policy identified by Geller in its initial disclosures.

- 4 -

Respectfully Submitted,

RI, INC. d/b/a SEATING SOLUTIONS


/s/_____ Terry Klein
THE LAW OFFFICE OF TERRY KLEIN
Terry Klein, BBO# 652052
1558 Dorchester Avenue, Ste. 202
Dorchester, Massachusetts  02122
Telephone: (617) 825-8175
Facsimile: (617) 507-6454

Dated:  June 24, 2005


## CERTIFICATE OF SERVICE

I, Terry Klein, hereby certify that on June 24, 2005, a true copy of the above document was served by first class mail upon counsel for each other party.

/s/_____ Terry Klein_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 MAR 14 P 2: 27

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 05-CV-10365-JLT |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

This is an action by the plaintiff, RI, Inc., d/b/a Seating Solutions ("Seating Solutions"), against Geller Sport, Inc. and Geller Devellis, Inc. (collectively "Geller") for intentional interference with advantageous relations, misappropriation of trade secrets, conversion, breach of a confidentiality agreement, and violation of Mass. Gen. Law ch. 93A, §§ 2, 11 and against Worcester Professional Baseball, LLC and Perfect Game Baseball Clubs, LLC (collectively, "Worcester Baseball") for breach of contract, breach of the covenant of good faith and fair dealing, and violation of Mass. Gen. Law ch. 93A, §§ 2, 11. Geller intentionally and maliciously disclosed Seating Solutions' confidential design and pricing information to third parties and interfered with an agreement reached by Seating Solutions and Worcester Baseball that involved the construction and renovation of a minor league baseball stadium on the campus of the College of the Holy Cross ("Holy Cross"). Worcester Baseball breached its agreement with Seating Solutions based upon Geller's interference and took no steps whatsoever to prevent Geller from acting in a manner that was obviously contrary to the business interests of Seating Solutions.

## THE PARTIES

1.    Seating Solutions is a corporation organized under the laws of New York, with a principal place of business located at 63 Oser Avenue, Hauppauge, New York 11788.

2.    Geller Sport, Inc. is a corporation organized under the laws of Massachusetts, with a principal office located at 77 North Washington Street, Boston, Massachusetts 02114.

3.    Geller Devellis, Inc. is a corporation organized under the laws of Massachusetts, with a principal office located at 77 North Washington Street, Boston, Massachusetts 02114.

4.    Worcester Professional Baseball, LLC is a limited liability company organized under the laws of Massachusetts with a principal office located at 6 Draper Road, Wayland, Massachusetts 01778.

5.    Perfect Game Baseball Clubs, LLC is a limited liability company organized under the laws of Massachusetts with a principal office located at 6 Draper Road, Wayland, Massachusetts 01778.

## JURISDICTION AND VENUE

6.    This Court has personal jurisdiction over Geller and Worcester Baseball pursuant to Mass. Gen. Law ch. 223A, § 2 because their principal offices are each located in Massachusetts.

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Seating Solutions and Geller are citizens of different states and the amount in controversy exceeds $75,000.00.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Geller's principal office is located in Boston, Massachusetts.

## FACTS

**A.    The Project and the Parties**

9.    Seating Solutions is a leader in the seating system design and construction industry and specializes in the sale, rental, and timely installation of custom-designed spectator seating at athletic and recreational facilities.

10.    Geller provides recreation and athletic facility design consulting services.

11.    Worcester Professional Baseball, LLC is the owner and operator of the currently unnamed professional baseball franchise that will begin playing in Worcester as part of the Canadian American Association of Professional Baseball during the Spring of 2005.

12.    In or about December of 2005, Seating Solutions and Worcester Baseball began discussing the possibility that Seating Solutions would perform an extensive renovation of Fitton Field, which is located on the campus of Holy Cross, so that Worcester Baseball could base its team there.

13.    At several points during discussions concerning the renovation project, Worcester Baseball referred to itself as Perfect Game Baseball Clubs, LLC.

14.    Geller's President, Patrick Maguire ("Maguire"), has served as an outside consultant to Worcester Baseball's on this renovation project.

15.    Representatives of Geller Devellis, Inc. attended and participated in all meetings between Seating Solutions and Worcester Baseball concerning the renovations project.

16.    In or about late January 2005, Worcester Baseball entered into discussions with Holy Cross whereby Worcester Baseball would renovate Fitton Field and Holy Cross would allow the professional team to play baseball home games there.

**B.    Negotiations between Seating Solutions and Worcester Baseball in Early February**

17.    Discussions between Seating Solutions, through vice president Scott Suprina ("Suprina") and Worcester Baseball accelerated significantly in or about the beginning of February 2005 and included preliminary drawings and design work.

18.    At a meeting with both Theodore Tye, vice president of Worcester Baseball ("Tye") and Maguire, Suprina shared with Worcester Baseball and Geller the drawings prepared by Seating Solutions and during that meeting they were revised to their final proposed designs for the Fitton Field project.

19.    Suprina made this presentation using AutoCAD, a computer program that enables users to share architectural drawings in an electronic format rather than via traditional blueprints.

20.     Each drawing that Suprina shared with Tye and Maguire was prominently stamped with the notation that the drawing was confidential and proprietary information that belonged to Seating Solutions and was not to be shared with any third party for any purpose under any circumstances.

21.     Following this presentation, Tye told Suprina that when he shared Seating Solutions' initial bid proposal with Maguire, Maguire had "thrown up."

22.     Maguire stated that he believed that Seating Solutions' proposal, which worked out to approximately $500.00 per seat at the stadium, was needlessly high.

23.     Suprina asked Maguire to explain why he was skeptical of Seating Solutions' bid of $500.00 per seat, and Maguire explained that he thought that $300.00 per seat would be a better price.

24.     After listening to Maguire's analysis, Suprina explained several ways in which Maguire's knowledge and understanding of the project, the design of seating systems, and stadium construction generally, was incomplete, uninformed, and otherwise inadequate.

25.     Maguire was visibly upset by this discussion; he did not speak for the remainder of the meeting and thereafter treated Suprina in a dismissive and hostile manner.

C.      **Seating Solutions and Worcester Baseball Reach an Agreement.**

26.     Suprina and his draftsman, Scott Ruczaj ("Ruczaj"), met again with Tye and Maguire on or about February 15, 2005 and revised the drawings. Seating Solutions modified its proposal based on the new drawings, and reduced the pricing to $1,519,880.90. Both the proposal and the drawings were left with Tye and Maguire.

27.     On or about Thursday, February 17, 2005, Worcester Baseball received a revised proposal from Seating Solutions.

28.     Suprina advised Tye that he would be in the Boston area on February 18, 2005 and arranged to meet with Tye so that an order could be placed as Tye was leaving town for a vacation.

29.    On or about Friday, February 18, 2005 Suprina and his associate Ross Jacobs flew to Boston and met with Tye.

30.    At this meeting, Tye and Suprina, with Jacobs looking on, walked through each facet of Seating Solutions' February 17 Proposal and made revisions to the Proposal to satisfy certain of Worcester Baseball's concerns. A true copy of the February 17, 2005 Proposal with Worcester Baseball's handwritten notations is attached hereto as *Exhibit A*.

31.    Suprina also shared Seating Solutions' plans for integrating I-Beam and angle frame construction on the project in a manner that would maximize quality while keeping costs lower than if the project had employed only I-Beam construction.

32.    Suprina then stated "Excuse me for being so blunt, but I must start work on Saturday to make your date. Do I have an order?"

33.    Tye responded "Yes. You have an order." At the close of this meeting, Tye shook hands with Suprina and confirmed that Worcester Baseball and Seating Solutions had an agreement concerning the renovations of Fitton Field.

34.    Tye, with Suprina and Jacobs present, then told Worcester Baseball's president and chief executive officer Alan Stone that Worcester Baseball and Seating Solutions had reached an agreement.

35.    On or about the morning of Monday, February 21, 2005, Seating Solutions sent Worcester Baseball a final version of the agreement that had been reached based upon the revisions to which Tye and Suprina had agreed on the previous Friday. A true copy of the final version of the agreement is attached hereto as *Exhibit B*.

36.    The total contract price was $1,519,880.90.

37.    Seating Solutions expected and anticipated that its profit under the contract would be approximately $650,000.00.

**D.    Worcester Baseball Terminates the Agreement due to Geller's Malicious Conduct.**

38.    On or about February 22, 2005, Worcester Baseball terminated its agreement with Seating Solutions.

39.    On or about February 23, 2005, Suprina learned that Worcester Baseball had entered into a separate agreement with Dant Clayton Corporation ("Dant Clayton"), a seating systems company based in Louisville, Kentucky.

40.    Upon information and belief, Maguire had worked extensively with the Dant Clayton in the past and he advised Worcester Baseball to terminate its agreement with Seating Solutions and enter into an agreement with Dant Clayton.

41.    After the agreement fell through, Suprina was reviewing electronic mail messages that he had received the previous week and noticed that he had received one concerning the Fitton Field project from a representative of a stadium lighting company located in Massachusetts.

42.    In the message, a true copy of which is attached hereto as *Exhibit C*, the lighting company representative described the Fitton Field project and stated that Geller, specifically Maguire, was the project's "designer." He urged Suprina to review a set of AutoCAD drawings that were attached to the message and to consider getting involved with the project.

43.    Suprina opened the message, and discovered that the attached AutoCAD drawings were the exact drawings that he had shared with Worcester Baseball and Geller, though Geller had intentionally removed the confidentiality stamp on the documents, which had stated that the drawings were proprietary information belonging to Seating Solutions.

44.    Upon information and belief, Geller (Maguire) impermissibly and maliciously used the AutoCAD drawings that Seating Solutions had provided during the contract negotiations and shared those with other potential contractors on the Fitton Field project and requested other pricing.

45.    Worcester Baseball took no reasonable steps to prevent Geller from acting in a manner contrary to the legitimate business interests of Seating Solutions, even though Worcester Baseball could have done so.

46.    Renderings of the Fitton Field project released to the public in early March 2005 reveal that Worcester Baseball settled upon a design approach that is strikingly similar to the approach outlined by Seating Solutions during contract negotiations.

47.    Upon information and belief, Geller (Maguire) knowingly caused or induced Worcester Baseball to end its agreement with Seating Solutions.

48.    Upon information and belief, in causing or inducing Worcester Baseball to end its agreement with Seating Solutions, Geller (Maguire) acted with actual malice, out of an improper motive, or employed improper means.

49.    Geller generally failed to adhere to the requirement that it conduct its business affairs fairly, in good faith, and in a fundamentally honest manner.

### COUNT I (Breach of Contract)
### (Worcester Baseball)

50.    Seating Solutions incorporates by reference the allegations of all of the preceding paragraphs of the Complaint as if set forth fully herein.

51.    Worcester Baseball and Seating Solutions entered into an agreement pursuant to which Seating Solutions promised to perform certain renovation work at Fitton Field and Worcester Baseball promised to pay Seating Solutions for performing that work.

52.    Seating Solutions is not in default in any respect under the agreement.

53.    Worcester Baseball is in material breach of the agreement in that it terminated the agreement with Seating Solutions with no justification whatsoever.

54.    As a direct and proximate result of Worcester Baseball's breach of its contractual obligations under the agreement, Seating Solutions has suffered and will suffer damages of at least $650,000.00.

### COUNT II (Breach of the Covenant of Good Faith and Fair Dealing)
### (Worcester Baseball)

55.    Seating Solutions incorporates by reference the allegations of all of the preceding paragraphs of the Complaint as if set forth fully herein.

56.    By its conduct, Worcester Baseball has breached the covenant of good faith and fair dealing implied in its agreement with Seating Solutions.

57.    As a result of these breaches, Seating Solutions has suffered substantial damages in an amount that is to be determined at trial.

### COUNT III (Tortious Interference with Advantageous Relationship)
### (Geller)

58.    Seating Solutions incorporates by reference the allegations of all of the preceding paragraphs of the Complaint as if set forth fully herein.

59.    Seating Solutions was in an advantageous relationship with Worcester Baseball.

60.    Geller knowingly caused or induced Worcester Baseball to end its advantageous relationship with Seating Solutions.

61.    In causing or inducing Worcester Baseball to end its advantageous relationship with Seating Solutions, Geller acted with actual malice, out of an improper motive, or employed improper means.

62.    Geller's conduct directly and proximately caused Seating Solutions actual pecuniary harm in an amount to be determined at trial that is no less than $650,000.00.

### COUNT IV (Conversion)
### (Geller)

63.    Seating Solutions incorporates by reference the allegations of all of the preceding paragraphs of the Complaint as if set forth fully herein.

64.    The AutoCAD designs and plans related to the Fitton Field project presented by Seating Solutions to Worcester Baseball and Geller are and were at all times material hereto the property of Seating Solutions.

65.    Geller has wrongfully exercised dominion and control over the AutoCAD designs provided by Seating Solutions although it has never had a right to do so.

66.    Geller's conduct directly and proximately caused Seating Solutions actual pecuniary harm in an amount to be determined at trial that is not less than $650,000.00.

**COUNT V (Misappropriation of Trade Secrets; Mass. Gen. Laws ch. 93, § 42)**
**(Geller)**

67.    Seating Solutions incorporates by reference the allegations of all of the preceding paragraphs of the Complaint as if set forth fully herein.

68.    Geller misappropriated trade secrets and other confidential and proprietary information of Seating Solutions of which it learned during the negotiations between Seating Solutions and Worcester Baseball.

69.    As a result of Geller's misappropriation of trade secrets, Seating Solutions has suffered damages in an amount to be determined at trial that is not less than $650,000.00.

**COUNT VI (Breach of Confidentiality Agreement)**
**(Geller)**

70.    Seating Solutions incorporates by reference the allegations of all of the preceding paragraphs of the Complaint as if set forth fully herein.

71.    In exchange for adequate and valuable consideration, Geller agreed to abide by the terms and conditions that Seating Solutions placed on the AutoCAD drawings that Seating Solutions shared with Geller and Worcester Baseball.

72.    Seating Solutions has complied with all material terms of the confidentiality agreement.

73.    By improper appropriation, use and disclosure to third parties of the AutoCAD drawings, pricing, and scope information prepared by Seating Solutions, Geller is in breach of its agreement with Seating Solutions.

74.    As a result of Geller's breaches of the confidentiality agreement, Seating Solutions has suffered damages in an amount to be determined at trial that is not less than $650,000.00.

**COUNT VII (Violation of Mass. Gen. Laws ch. 93A, §§ 2, 11)**
**(Worcester Baseball & Geller)**

75.    Seating Solutions incorporates by reference the allegations of all of the preceding paragraphs of the Complaint as if set forth fully herein.

76.     Worcester Baseball, Geller, and Seating Solutions engage in the conduct of trade or commerce.

77.     Worcester Baseball and Geller's actions, the transactions as described above, and the resulting damages to Seating Solutions occurred primarily and substantially in Massachusetts.

78.     The statements, acts, and conduct of Geller and Worcester Baseball set forth above constitute unfair and deceptive acts or practices in conduct of trade or commerce in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11.

79.     Said statements, acts, and conduct have caused injury to Seating Solutions in that Worcester Baseball and Geller's conduct has deprived Seating Solutions of $650,000.00 in profits that Seating Solutions anticipated that it would realize under its agreement with Worcester Baseball.

80.     Said conduct of Worcester Baseball and Geller was a willful and knowing violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11, and a deliberate breach of its known obligations to Seating Solutions.

81.     As a direct and proximate result of Worcester Baseball and Geller's knowing and willful unfair or deceptive acts or practices, Seating Solutions has suffered substantial damages in an amount to be determined at trial that is not less than $650,000.00.

WHEREFORE, Seating Solutions hereby requests that the Court:

(a)     Enter judgment in favor of Seating Solutions on each of its claims;

(b)     Award Seating Solutions compensatory damages in an amount that is at least $650,000.00;

(c)     Treble said damages pursuant to Mass. Gen. Laws ch. 93A, §§ 2, 11 and award Seating Solutions its reasonable attorneys fees and costs;

(d)     Impose a constructive trust upon all amounts obtained by Geller as a result of its wrongful conduct as set forth herein; and

(e)     Enter such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Seating Solutions hereby demands a jury trial on all counts so triable.

Respectfully Submitted,

RI, INC. d/b/a SEATING SOLUTIONS

THE LAW OFFICE OF TERRY KLEIN
Terry Klein, BBO# 652052
1558 Dorchester Avenue, Ste. 202
Dorchester, Massachusetts  02122
Telephone: (617) 825-8175
Facsimile: (617) 507-6454

Dated:  March ___, 2005

1

1          Volume: I

2          Pages: 1-94

3          Exhibits: 1-8

4

5          UNITED STATES DISTRICT COURT

6          DISTRICT OF MASSACHUSETTS

7          CA No. 05-CV-10365-JLT

8    - - - - - - - - - - - - - - - - - - - -x

9    RI, INC., d/b/a SEATING SOLUTIONS,

10                        Plaintiff,

11   vs.

12   GELLER SPORT, INC., GELLER DEVELLIS, INC.,

13   WORCESTER PROFESSIONAL BASEBALL, LLC, and

14   PERFECT GAME BASEBALL CLUBS, LLC,

15                        Defendants.

16   - - - - - - - - - - - - - - - - - - - - x

17          30(b)(6) DEPOSITION OF RI, INC.

18          BY SCOTT SUPRINA, DESIGNEE

19          March 31, 2006

20          10:10 a.m.

21          Bowditch & Dewey

22          One International Place

23          Boston, Massachusetts

24          Reporter:  Nancy L. Russo

Scott Suprina                                                    03/31/2006

90

1   and dissemination of Seating Solutions proprietary

2   information."  Did I read that correctly?

3       A.   Yes.

4       Q.   Have you determined an amount of damages due

5   to Geller's alleged misappropriation and dissemination

6   of information?

7               MR. KLEIN:   Objection.  Calls for a

8   legal conclusion.

9       A.   I don't believe so.

10      Q.   So there is no dollar amount you can

11  attribute to that?

12              MR. KLEIN:   Objection.  Ambiguous.

13      A.   I have not determined the dollar amount.

14      Q.   Do you know if any of the documents that I

15  have here could guide us in any way as to what these

16  damages might be?

17              MR. KLEIN:   Objection.  Ambiguous.

18      A.   No.

19              MS. KORN:   Okay.  That's all I have.

20              MR. KLEIN:   I have one brief question

21  for Mr. Suprina on the record.

22                   CROSS-EXAMINATION

23  BY MR. KLEIN:

24      Q.   In discussing a portion of your affidavit,

# Matt Dougherty
## January 31, 2006

Page 26

1   Seating Solutions. I believe it was Seating
2   Solutions; I don't know that that was identified in
3   my conversation regarding the meeting. But I knew
4   that they had a meeting with a competitor and --
5   and I wanted to have one more opportunity to see if
6   we could find an agreement.
7       Q. Okay. And is that approximately what you
8   said when you first picked up the phone?
9       A. I'm sorry. Is what I -- what I said?
10      Q. Just how you just summarized it.
11      A. No, I don't recall.
12      Q. Okay. Do you remember how Mr. Tye
13  responded?
14      A. He was -- his initial response was that he
15  didn't have time --
16      Q. Uh-huh.
17      A. -- that he was on his way to a vacation.
18      Q. Okay. What else?
19      A. Well, specifically, I don't know. But I was
20  able to convenience him that he needed to meet
21  with us.
22      Q. And how did the meeting get set up for the
23  20th?
24      A. He had a flight on Monday the 21st --
25      Q. Uh-huh.

Page 27

1       A. -- and the 20th was the only time that we
2   could all get together.
3       Q. Okay. Did you propose the 20th or did Mr.
4   Tye?
5       A. I'm not sure, but I believe I was -- I did.
6       Q. Okay. And do you recall how you knew
7   that there was a meeting with either Seating
8   Solutions, or a competitor generally, on that date?
9       A. No, I don't recall exactly.
10      Q. Okay. Okay. What else can you
11  remember about that telephone call?
12      A. That's it.
13      Q. Okay. All right. Now, Chris Sgarzi, apart
14  from that first meeting that we've talked about, you
15  mentioned that there might have been one other --
16  one other call with him; is that right?
17      A. I believe so.
18      Q. And approximately when would that call
19  have happened?
20      A. I don't remember.
21      Q. Okay. Do you remember where you were?
22      A. No.
23      Q. Okay. And was it a telephone call?
24      A. Yes.
25      Q. Okay. About -- who else was party to it,

Page 28

1   just the two of you?
2       A. Just the two of us.
3       Q. And how long did it last?
4       A. Perhaps, ten minutes.
5       Q. Okay. Do you remember who called who?
6       A. No, I don't.
7       Q. Okay. Had you worked with Mr. Sgarzi
8   before?
9       A. No, I had not.
10      Q. Okay. Have you worked with him since?
11      A. I don't believe so.
12      Q. Okay. Tell me what you can remember
13  about that phone call.
14      A. That it was not substantial. There was --
15  Chris was a -- he was an architect that was hired
16  as a consultant. At that point, the project concept
17  was only the details that -- that we had to work
18  from. I don't recall anything more specifically -- a
19  general discussion about the project.
20      Q. Okay. Seating Solutions come up?
21      A. No.
22      Q. Okay. And, all right, let's look at Exhibit
23  2A here, Mr. Dougherty. Can you identify that for
24  the record?
25      A. Exhibit 2A?

Page 29

1       Q. Uh-huh. And what is that document?
2       A. It's an e-mail from Rebecca Bachand to
3   me.
4       Q. Uh-huh. And -- and what does the e-mail
5   say, just for the record?
6       A. It's -- the subject matter is Worcester
7   Professional Baseball Field.
8       Q. Uh-huh.
9       A. And the body of the e-mail says, "Matt,
10  Pat Maguire asked me to send you the attached
11  CAD files for the baseball field that we met on this
12  week."
13      Q. Uh-huh.
14      A. "Please feel free to call if you have any
15  questions or problems with the file. Thank you,
16  Rebecca."
17      Q. Okay. What did you do with that when you
18  got it?
19      A. I looked at it.
20      Q. And when -- when would that have
21  happened?
22      A. Sometime after 6:30, 6 p.m. on February
23  3rd --
24      Q. Okay.
25      A. -- whenever I received it.

# Matt Dougherty
## January 31, 2006

**Page 30**

1  Q. And when you looked at the attached CAD
2  file, who did you -- what was your understanding of
3  what it was?
4  A. It's a conceptual plan.
5  Q. Uh-huh. What do you mean by "conceptual
6  plan"?
7  A. I mean that it's -- there's very little
8  detail.
9  Q. Uh-huh. And who did you believe had
10  prepared that conceptual plan? What was your
11  understanding, Mr. Dougherty, of who had prepared
12  the conceptual plan?
13  A. I don't recall.
14  Q. Uh-huh.
15  A. It could have been that -- that it was
16  communicated to me that this was proposed by a
17  competitor; I don't recall. This is -- this is the --
18  the level of general lack of detail, I'll say, that an
19  architect may have in his files. So is it possible
20  that -- that Pat Maguire's office had a drawing like
21  this that they've used many times to create a -- a
22  bookmark, so to speak, on the site to show
23  approximately what the concept should be.
24  Q. Okay. So when you received this e-mail,
25  to the best of your recollection, there wasn't a title

**Page 31**

1  block on it?
2  A. There was not.
3  Q. Okay. And you know what I mean by a
4  "title block;" right?
5  A. Yes, I do. We work with title blocks all
6  the time.
7  Q. And so it wasn't a Seating Solutions title
8  block? There was no Seating Solutions title block?
9  A. That's correct.
10  Q. And there was no notice stating that the
11  drawing was proprietary information belonging to
12  anybody; right?
13  A. That's correct.
14  Q. Okay. So you never would have removed
15  the title block from that e-mail attachment; would
16  you?
17  A. No.
18  Q. Okay.
19  A. I would not.
20  Q. And what did you do, after you got the
21  e-mail, with it? Did you send it to anybody at Dant
22  Clayton? Well, actually, I don't -- again, I don't
23  want to make this a memory test. What I'm going
24  to show you has been marked as Exhibit 2B. And if
25  you could look that over for the record and also 2C

**Page 32**

1  as well so we can just have the -- everything that
2  was going on in that time frame. And look up at me
3  when you're done.
4  A. Okay.
5  Q. Can you identify, for the record and for
6  the folks on the phone, what Exhibit 2B is?
7  A. It's an e-mail from me to four individuals
8  within Dant Clayton.
9  Q. Uh-huh. And what's the date?
10  A. February 4th.
11  Q. And what is Exhibit 2C?
12  A. It's an e-mail from Patrick Maguire to me
13  on February 7th.
14  Q. Okay. What does that -- what does
15  Exhibit 2B say about Outdoor -- Outdoor Aluminum?
16  A. It says this that this is a drawing that
17  Outdoor gave to the architect.
18  Q. Uh-huh. And how did you know that
19  Outdoor had given it or what was the source of your
20  understanding that Outdoor had given it to the
21  architect?
22  A. I believe that Patrick Maguire led me to
23  believe that.
24  Q. Okay. And when did -- how did he do that,
25  was it a telephone conversation or an e-mail?

**Page 33**

1  A. It must have been a phone conversation.
2  Q. Do you remember that call at all?
3  A. Not specifically.
4  Q. Okay. Do you remember where you were
5  when you had --
6  A. No, I do not.
7  Q. Okay. Or was it just -- would it have been
8  just you and Mr. Maguire on the phone?
9  A. Probably.
10  Q. Okay. And about how long did the call
11  last? Don't know?
12  A. I don't recall.
13  Q. Okay. What else can you remember about
14  that call?
15  A. I don't recall anything about it, so it must
16  have been very short.
17  Q. Uh-huh. And what relationship did you
18  understand at the time Outdoor Aluminum had with
19  Seating Solutions, if you had any understanding at
20  all?
21  A. I knew that Outdoor -- that Seating
22  Solutions represented Outdoor Aluminum.
23  Q. Okay.
24  A. I knew that.
25  Q. Okay. So when you say "Outdoor" there,

9376669b-1c49-4fef-ac48-6bf38e409f1a

# Matt Dougherty
## January 31, 2006

Page 34

1 does that -- is there a connection between Outdoor
2 and Seating Solutions when you -- did you
3 understand there to be a connection when you sent
4 that e-mail?
5    A.  No.  I'm not sure -- I'm not sure exactly
6 what answer you're looking for.  But it's possible
7 that Outdoor could have been involved in this
8 project directly without Seating Solutions.
9    Q.  Okay.  And did you have an understanding
10 when you sent that e-mail on the 3rd as to whether
11 Seating Solutions was involved?  I'm sorry the
12 e-mail on the -- on the --
13    A.  4th?
14    Q.  The 4th, exactly.
15    A.  The one I sent internally?
16    Q.  Yes.
17    A.  No, I don't recall that I had that specific
18 knowledge.
19    Q.  Okay.  How about the -- the one on the 7th
20 -- the exchange happening on the 7th?
21    A.  Would you ask the question again, please?
22    Q.  What was your understanding about the
23 involvement of Seating Solutions?
24    A.  Well, I refer to Seating Solutions in this
25 e-mail.

Page 35

1    Q.  Uh-huh.  Okay.  So how -- how -- if -- if
2 you recall, do you -- do you -- did you know that
3 Seating Solutions was involved?
4    A.  How did I know?
5    Q.  Yeah.  And if you don't recall, that's a
6 perfectly acceptable answer.
7    A.  I -- you know, I don't recall how I learned
8 that information.
9    Q.  Okay.  But, at this point, you -- you
10 understood that Seating Solutions was also
11 attempting to obtain the Fit and Field contract;
12 right?
13    A.  That appears to be the case from this
14 e-mail.
15    Q.  Okay.  So let's go back to 2B.  That is
16 February 4th; right?
17    A.  Yes.
18    Q.  And -- and tell me what -- what you were
19 trying to accomplish by sending that e-mail.
20    A.  I was trying to get some answers to
21 specifics related to the site and the proposed
22 conceptual plan.
23    Q.  Okay.  And Henry Nichols is who?
24    A.  He's an engineer.
25    Q.  Okay.  Mike Guenthner?

Page 36

1    A.  Vice president of sales.
2    Q.  And Mr. Merrick is in the room.
3 Mr. Willinger is who?
4    A.  He is a technical advisor.
5    Q.  Okay.  And, let's see.  What -- how did
6 these folks respond to this e-mail?
7    A.  We had an informal meeting --
8    Q.  Uh-huh.
9    A.  -- and we discussed the lack of specificity
10 with the plan and how difficult it was to make
11 judgments based on this particular plan.
12    Q.  Okay.
13    A.  I believe we developed a list of questions.
14 That's all I recall.
15    Q.  And who was at that meeting?
16    A.  I don't recall.
17    Q.  Okay.  Do you remember where it took
18 place?
19    A.  It would have been at the Dant Clayton
20 office.
21    Q.  Okay.  About how long did it last?
22    A.  I'm not sure, but I would guess maybe half
23 an hour -- 30 minutes.
24    Q.  Anything else you can recall about that
25 meeting?

Page 37

1    A.  No.
2    Q.  Okay.  All right.  Now, the list of
3 questions, did you subsequently communicate that
4 to Mr. Maguire -- or comments?
5    A.  Yes.
6    Q.  And is that -- is that e-mail on Exhibit 2C?
7    A.  Yes.
8    Q.  And is that the e-mail that you sent on
9 February 7th, at 3:01 p.m.?
10    A.  Yes.
11    Q.  All right.  Now, did -- let me ask you about
12 this:  Do you see at the bottom where you're talking
13 about Manchester?
14    A.  Yes.
15    Q.  Manchester -- what state are we talking
16 about there?
17    A.  New Hampshire.
18    Q.  Okay.  And when you want Seating
19 Solutions to explain what happened at Manchester,
20 what's your understanding of what happened at
21 Manchester?
22    A.  Seating Solutions had a -- a contract with
23 Payton Construction and that there was some
24 performance issue and Payton Construction
25 terminated the contract.

$Ex\ 6$

**Tara Hurley**

| | |
|---|---|
| From: | Ted Tye [Tye@NatDev.com] |
| Sent: | Thursday, February 17, 2005 11:30 AM |
| To: | Patrick Maguire |
| Subject: | RE: Ted Fire Update |

Agree, except that he is the one doing the squeezing. See you at 12:30.


Ted Tye

Managing Partner

National Development

2310 Washington Street

Newton Lower Falls, MA 02462

617-559-5050

e-mail: tye@natdev.com

www.natdev.com

_____

**From:** Patrick Maguire [mailto:pmaguire@gellersport.com]
**Sent:** Thursday, February 17, 2005 11:30 AM
**To:** Ted Tye
**Subject:** RE: Ted Fire Update


I'd still squeeze his nuts until you see blood.....He's probably a Met's fan. He deserves no mercy.



_____

**From:** Ted Tye [mailto:Tye@NatDev.com]
**Sent:** Thursday, February 17, 2005 11:26 AM
**To:** Patrick Maguire
**Subject:** FW: Ted Fire Update



FYI


_____
**From:** Joe Gallagher
**Sent:** Thursday, February 17, 2005 9:16 AM
**To:** Ted Tye
**Subject:** Ted Fire Update

01273

Ted says seating solutions is their go to guy. He is great at meeting very difficult deadlines. He assured me that despite all the New York wiseguy stuff that Scott makes things happen. They are the New England Patriot's favorite vendor.

Joseph R. Gallagher

Director of Business Development

Cranshaw Construction

2310 Washington Street

Newton Lower Falls, MA 02462

Tel:  617-559-5226

Fax: 617-527-1977

jgallagher@cranshaw.com

www.cranshaw.com

01274

**Panel 1 (page 1)**

1

Exhibits: 1-10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA. NO. 05-CV-10365-JLT

RI, Inc. d/b/a
SEATING SOLUTIONS,

    Plaintiff

vs.

GELLER SPORT, INC.,
GELLER DEVELLIS, INC.,
WORCESTER PROFESSIONAL BASEBALL LLC,
and PERFECT GAME BASEBALL CLUBS, LLC,

    Defendants

DEPOSITION OF SCOTT SUPRINA, taken
at the request of the Defendants, pursuant
to Rule 30 of the Massachusetts Rules of
Civil Procedure before
Kathleen M. Bradley, Notary Public and
Registered Professional Reporter in and for
the Commonwealth of Massachusetts, on
Friday, July 29, 2005, commencing at
10 a.m. at the offices of Bowditch & Dewey,
311 Main Street, Worcester, Massachusetts.

BAY STATE REPORTING AGENCY
76 MILL STREET (At Park Avenue)
WORCESTER, MASSACHUSETTS 01603
(508)753-4121

---

**Panel 2 (page 3)**

3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SCOTT SUPRINA | | | | |
| MR. CIAVARRA: | 4 | | 275 | |
| MS. KORN: | | 225 | | 294 |

EXHIBITS

| 1 | Proposal 2/2/05 | 59 |
|---|---|---|
| 2 | Email & Proposal 2/17/05 | 73 |
| 3 | Email & Edited 2/17/05 Proposal 2/19/05 | 89 |
| 4 | Email 2/21/05 | 91 |
| 5 | Email from Cris 2/21/05 and Revised Proposal | 118 |
| 6 | Emails 2/21/05 | 139 |
| 7 | Email 2/21/05 from S. Suprina to Ted | 146 |
| 8 | Email & Revised Proposal 2/22/05 | 157 |
| 9 | Email 2/22/05 | 157 |
| 10 | 2/23/05 Email Exchange | 165 |

---

**Panel 3 (page 2)**

2

A P P E A R A N C E S :

FOR THE PLAINTIFF:

THE LAW OFFICE OF TERRY KLEIN
84 State Street
Suite 760
Boston, Massachusetts 02109
    BY: Terry Klein, Esq.

FOR THE DEFENDANTS WORCESTER BASEBALL AND
PERFECT GAME BASEBALL CLUBS:

BOWDITCH & DEWEY
311 Main Street
Worcester, Massachusetts 01615
    BY: LOUIS M. CIAVARRA, ESQ.

FOR THE DEFENDANTS GELLER:

DONOVAN HATEM, LLP
Two Seaport Lane
Boston, Massachusetts 02210
    BY: LAUREN M. KORN, ESQ.

ALSO PRESENT: Ted Tye, Alan Stone

---

**Panel 4 (page 4)**

4

1     P R O C E E D I N G S

2     SCOTT F. SUPRINA, having been

3 satisfactorily identified by the production

4 of his driver's license, and duly sworn,

5 was examined and testified as follows:

6     (Stipulated by and between

7 counsel that all objections except as to

8 form are reserved until the time of

9 hearing. Witness will read and sign the

10 deposition transcript within 30 days of

11 receipt)

12     DIRECT EXAMINATION

13 BY MR. CIAVARRA:

14 Q.   Sir, would you please state your full

15 name for the record?

16 A.   Scott Frank Suprina.

17 Q.   You understand you're here for your

18 deposition today?

19 A.   Yes.

20 Q.   And you understand you've been placed

21 under oath?

22 A.   Yes.

23 Q.   And you told me before you've had

24 your deposition taken before?

1  A.   Yes.

2  Q.   How many times?

3  A.   Fifteen or so.

Q.   A lot of lawyers. How old are you?

A.   I'm 46.

6  Q.   That's a good age. I am, too.  And

7  where do you live?

8  A.   26 Parkway Drive South, Commack, New

9  York.

10  Q.   And are you currently employed?

11  A.   Yes.

12  Q.   By whom?

13  A.   RI, Incorporated.

14  Q.   What does RI stand for?

15  A.   Just initials.

16  Q.   It's not Rhode Island, is it?

17  A.   No.

18  Q.   We were in court and the judge kept

19  referring to it as Rhode Island, Inc.  So

20  it's just RI?

21  A.   RI.

22  Q.   And you have a business name that you

23  go by as well?

24  A.   A d/b/a, Seating Solutions.

1  Q.   Do you typically refer to your

2  company as Seating Solutions or RI?

3  A.   Both.  Depends upon the application.

4  Q.   What's your position with the

5  company?

6  A.   Vice President.

7  Q.   Are you also an owner?

8  A.   Yes.

9  Q.   What percentage of ownership?

10  A.   Actually, technically, no, my wife

11  owns 90 percent.

12  Q.   Who's the President of the company?

13  A.   My wife.

14  Q.   What's her name?

15  A.   Lisa Suprina.

16  Q.   Does she have any operating

17  responsibilities at the company?

18  A.   To take care of the kids -- no.

19  Q.   She doesn't have a day-to-day?

A.   No, she doesn't.

21  Q.   Would it be fair to say that you

22  operate as the Chief Executive Officer of

23  the company?

24  A.   Yes.

1  Q.   For how long have you operated

2  Seating Solutions?

3  A.   Somewhere in the neighborhood of ten

4  years.

5  Q.   Mid-'90s?

6  A.   Yah.

7  Q.   What would you describe Seating

8  Solutions as a business, what does it do?

9  A.   We design, sell and install sports

10  and spectator seating systems and we also

11  have a rental division.

12  Q.   And has that been its business since

13  inception?

14  A.   Yes.

15  Q.   Were you involved in that business

16  before forming Seating Solutions?

17  Personally were you involved in this line

18  of business?

19  A.   I was involved in the park and

20  recreation equipment business, which

21  included some seating.

22  Q.   Is that a company you owned or did

23  you work for someone else?

24  A.   No, I owned the company.

1  Q.   What was the name of that company?

2  A.   I don't know -- it was Scott Suprina

3  Sports, Inc.

4  Q.   And for how many years had you

5  operated that approximately?

6  A.   Eight or so, ten.

7  Q.   Did that company stop doing business

8  at some point?

9  A.   Yes.

10  Q.   Why did you switch from that company

11  to Seating Solutions?

12  A.   It wasn't switched.  That company, we

13  closed down that company.  That company did

14  a lot of playground equipment.  And my

15  previous depositions were mostly spent in

16  the playground business.  And it just

17  became a business that was impossible to

18  make money at.

19  Q.   Personal injuries?

20  A.   Yah, for no apparent reason.

21  Q.   And Seating Solutions was the next

22  generation of your business activities

23  after Scott Suprina Sports?

24  A.   Yes.

21

1  A.  I create a spread sheet, but not on
2  computer.  I mean I'll do some math, some
3  notes, and figure out what I need and put
   it into columns and evaluate it.
   Q.  Have you provided those sheets to
6  your attorney in this case?
7  A.  I provided, I think what I was asked
8  for was the facts of the cost, not the
9  estimates of the costs.
10 Q.  Or the backup that went into
11 determining that cost?
12 A.  I provided the backup to my attorney,
13 yes.
14 Q.  Well, I have the stuff here.  You can
15 show me later on when we get to that.
16         Are there documents like those
17 sheets and stuff that you haven't provided
18 yet?
19 A.  No.
20 Q.  So you think you have provided these
21 so-called "spread sheets?"
22 A.  I either provided them or I don't
23 have them, I think.
24 Q.  You think you may have destroyed

22

1  them?
2  A.  I wouldn't save scratch paper, which
3  is what I'm talking about.
4  Q.  Well, I'm thinking about accounting
5  paper that has lined rules and columns on
6  it.
7  A.  You got the wrong guy.  No, I don't.
8  Q.  Whatever backup you have on the
9  contract price you provided me?
10 A.  Yes.
11 Q.  And to the best of your knowledge
12 it's been provided?
13 A.  Correct.
14 Q.  Now just focusing on this particular
15 project, do you call it Fitton Field or
16 Holy Cross?
17 A.  Doesn't matter to me.
18 Q.  Either one of those will be fine to
19 you?
   A.  I know what you're talking about.
21 Q.  We are talking about Fitton Field.
22 Okay?
23 A.  Okay.

23

1  correct?
2  A.  Correct.
3  Q.  And it's been your position that you
4  had a contract to provide the seating for
5  Fitton Field?
6  A.  Provide and install, correct.
7  Q.  That's your position in this case?
8  A.  Correct.
9  Q.  Do you have any written agreement for
10 that?
11 A.  I think we have many written
12 agreements.
13 Q.  Signed by you and someone else?
14 A.  I don't believe we have that.
15 Q.  I just want to make sure.  I think I
16 know what the position is, that there was
17 an oral agreement.  But I want to take it
18 step by step.
19         It is not your position that
20 there is a signed, written contract by the
21 parties in this case, is there?
22         MR. KLEIN:  Objection to the
23 form.
24 A.  Yes, I have a position there is a

24

1  written contract.
2  Q.  And you're referring to the documents
3  that you prepared.  I think it's called a
4  proposal, is it not?
5  A.  I'm referring to the compilation of
6  everything creating the written contract.
7  Q.  You sent a number of documents to my
8  clients setting forth the terms of the
9  engagement, did you not?
10 A.  That's a tough question to answer
11 really.  I sent to your client documents
12 that led to the creation of other documents
13 that set forth the terms.
14 Q.  All right.  And you're familiar with
15 the format of a document that has on top of
16 it Proposal?
17 A.  Sure.
18 Q.  (Indicating.)  And none of those were
19 ever signed by my clients, were they?
20 A.  I don't believe so.
21 Q.  You believe, is it your position that
22 there was an oral agreement?
23 A.  Absolutely.

**73**

1  A.   Yes.
2  Q.   Let me show you an Email with an
3  attached proposal to it dated February 17
4  and ask if you recognize that.
5  A.   (Reading document.)  Yes.
6  Q.   Okay.  Now so you recognize Exhibit
7  2?
8  A.   Yes.
9        (Exhibit 2, Email and Proposal
10        2/17/05, marked)
11  Q.   In the first page it's an Email from
12  Seating Solutions to Mr. Tye?
13  A.   Mm-hm
14  Q.   I'm sorry, it's a yes, right? I know
15  you're saying yes.
16  A.   Sorry.  Yes.
17  Q.   And Cris is your sister?
18  A.   Correct.
19  Q.   And she is working on behalf of
20  Seating Solutions?
21  A.   Correct.
22  Q.   Now the 17th, that's the day before
23  you met with Mr. Tye?
24  A.   I don't recall.

**75**

1  Ambiguous.
2  Q.   Was there a key person you were
3  working with at the baseball teams?
4  A.   Yes, Ted.
5  Q.   Prior to the 18th that was not in
6  person, correct, that was either by
7  telephone or by Email?
8  A.   I'm not sure.  Oh, prior to the 18th?
9  Q:   Prior to the 18th.
10  A.   No, I had met him in person a number
11  of times.
12  Q.   And during those in-person meetings
13  were there discussions about the proposal
14  and the terms of the deal?
15  A.   Sure.
16  Q.   When the revised proposal was sent on
17  the 17th, did it reflect your understanding
18  as to the needs of the team?
19  A.   As they were conveyed to me prior to
20  that date, yes -- yah.
21        You are aware that there were
22  proposals in between these, right?
23  Q.   I do.  And we're going to get to
24  them.  It was a work in process, was it

**74**

1  Q.   You told me before you met on the
2  18th.
3  A.   Was the 18th a Friday?
4  Q.   I believe so.
5  A.   It was a Friday.
6  Q.   I don't know to tell anybody, but I
7  believe so.  Yes, this says 17th.  There we
8  go.
9  A.   It was a Friday.
10  Q.   All we've got to do is read and we
11  will figure it out.
12  A.   No problem.
13  Q.   So this is now --  were there
14  discussions between you and anyone on
15  behalf of the baseball teams that led to
16  this revised proposal?
17  A.   I'm sure.
18  Q.   Do you remember them?
19  A.   Not particularly.
20  Q.   All right.  Was there any individual
21  that you were talking with between Exhibit
22  1, the February 2 proposal, and this
23  document?
24        MR. KLEIN:  Objection.

**76**

1  not?
2  A.   Yah, but we're jumping from a first
3  one to a fifth one.
4  Q.   Right.  But the way it worked was
5  there were exchanges of information, right?
6        MR. KLEIN:  Object to the
7  form.
8  Q.   That led to revisions in your
9  proposal?
10  A.   Correct.
11  Q.   I guess the term there were
12  negotiations going on, is that correct?
13  A.   No.  There was the development of an
14  end product.  Can't negotiate until you
15  have an end product.
16  Q.   When you say "an end product," what
17  are you referring to, a design?
18  A.   Something you want to buy.
19  Q.   When did you get to that point?
20  A.   I believe I'd have to see the final
21  proposal, but I believe that it didn't
22  change from this one.
23        I believe that this was when we
24  were at the point of the concept and

1 agreement and ask Mr. Tye to sign them?
2 A. Uh, no.
3 Q. You could have?
4 A. I think, as a matter of fact, Ted was
5 going on vacation and trying to get out of
6 the office. So I was trying to accommodate
7 my client who was spending a million and a
8 half dollars.
9 Q. Did he refuse to do that? Did you
10 say, "Hey, Ted. I'd like to get this
11 signed today. Could you spend another
12 minute, let's edit it and get it signed
13 off?" Did you say that to him?
14      MR. KLEIN: Objection.
15 A. No. I said, "Ted, I need to know do
16 I have a deal, yes or no."
17      And he answered yes, and shook
18 my hand.
19 Q. Why did you need to know?
20 A. So I could get to work. So I could
21 order materials, so I could plan my crews,
22 so I could commit to the project.
23 Q. And this was on a Friday, correct?
24 A. Yes.

1 Q. There wasn't anything that you were
2 going to do on that Friday, was there?
3      MR. KLEIN: Objection to form.
4 A. There absolutely was.
5 Q. What did you do on that Friday?
6 A. I called the factory, told them we
7 had the deal and we needed to get the
8 steel.
9 Q. Who did you call?
10 A. Treddy Kilpatrick or Eddy Spears.
11 Q. Sorry, you've got to help me with
12 names. What was the first one?
13 A. Kilpatrick.
14 Q. What was the first name though?
15 A. Treddy, T-R-E-D-D-Y. Geneva,
16 Alabama.
17 Q. Treddy?
18 A. Kilpatrick. Or Eddy Spears. I don't
19 recall. One is the owner. The other is
20 the sales manager.
21 Q. And you called them on that Friday?
22 A. Absolutely.
23 Q. Cell phone?
24 A. To get them?

1 Q. Yes.
2 A. Probably my cell phone when I left
3 the meeting.
4 Q. Do you recall did you use the land
5 line from Mr. Tye's office?
6 A. No, I don't do that.
7 Q. You're sure you called them by cell
8 phone?
9 A. I would think so. Could have been in
10 New York in the office on Saturday. I
11 spoke to him immediately after the meeting
12 and got it going.
13 Q. That's why I'm asking you. Did you
14 call him on that Friday? Did you do it
15 Saturday, or did you call him on Monday?
16 A. I'll check my phone records.
17 Q. Do you know as you sit here today?
18 A. No, I don't know.
19 Q. Did you send a Purchase Order?
20 A. I don't believe so.
21      MR. KLEIN: Objection.
22 Ambiguous.
23 Q. Did you receive an invoice?
24      MR. KLEIN: Objection.

1 Ambiguous.
2 Q. For the -- do you understand my
3 question?
4 A. For this particular? Nothing was
5 shipped so I never get invoices prior to
6 shipping.
7 Q. Do you communicate by Email with
8 Outdoor Aluminum?
9 A. Myself, no.
10 Q. Does your office?
11 A. Yes.
12 Q. Do you know if anybody from Seating
13 Solutions sent any Emails to Outdoor
14 Aluminum on this project?
15 A. Probably.
16 Q. Have you ever seen any? Because I
17 know none have been produced.
18      MR. KLEIN: Objection.
19 A. I haven't seen any.
20 Q. You can check that easy enough, can't
21 you?
22 A. Sure.
23 Q. Had prior copies of the proposal been
24 sent to Outdoor Aluminum?

1  A.  No.

2  Q.  Did they know anything about this

3  project on the 18th?

A.  Yes.

5  Q.  Had you described to them generally

6  the volume of seats you were going to need?

7  A.  Sent them a drawing and got pricing.

8  Q.  That's how you were able to price out

9  the contract?

10 A.  There you go.

11 Q.  And you called them up and said,

12 Listen, it's a go.  We're going to do this?

13 A.  There was a timeline.

14 Q.  When did you call them and tell them

15 that it was off?

16 A.  Ten days later.

17 Q.  You knew it was off the next day,

18 didn't you?

19 A.  Absolutely not.

20 Q.  When did you know that you didn't get

21 the contract?

22 A.  A week later.

23 Q.  How did you learn?

24 A.  The next Thursday or Friday.

1  Q.  How did you find out?

2  A.  Alan Stone told me that we've decided

3  to go with someone else.

4  Q.  Did you ever have to pay Outdoor

5  Aluminum any money for this order?

6  A.  No.

7  Q.  And they never actually -- do they

8  manufacture the seats per order or is this

9  something they stock?

10 A.  They manufacture all the steel and

11 the framing products and all the hardware

12 and they cut to size of the planking and

13 the deck.

14 Q.  But they don't go through that effort

15 until they have an order, is that fair to

16 say?

17 A.  Yes.

18 Q.  And so they never did that here?

19 A.  I wouldn't know unless I checked.

   Q.  To the best of your knowledge?

21 A.  To the best of my knowledge I

22 wouldn't think they did, no.

23 Q.  Following your conversation that you

24 had with Mr. Tye did Seating Solutions do

1  anything else other than calling Outdoor

2  Aluminum for this project?

3        MR. KLEIN:  Objection.

4  Ambiguous.

5  A.  Yes.  Seating Solutions tried to

6  block out the time and make the schedule

7  available for the anticipated time of

8  delivery.  Started looking into where we'd

9  get our equipment to do, you know, the

10 construction.

11 Q.  Who did this?

12 A.  Probably myself and perhaps Ed Mark

13 helped me.  It didn't get that far along.

14 Q.  It didn't happen over the weekend,

15 did it?

16 A.  No.

17 Q.  And do you recall if you actually did

18 anything on Monday on the project?

19 A.  I don't recall.  Monday was a holiday

20 so I don't recall.  I don't even remember

21 what holiday it was.

22 Q.  Presidents Day, Martin Luther King

23 Day?

24        MR. KLEIN:  Presidents.

1        MR. CIAVARRA:  Thank you.  My

2  son was born the 20th so I should know

3  that.

4  A.  My son was born today.

5  Q.  Did you take that day off, Presidents

6  Day?

7  A.  Probably not.

8  Q.  Do you recall?

9  A.  No.

10 Q.  The meeting on the 18th, was Mr. Tye,

11 were you and Mr. Tye in the room together

12 the whole time?

13 A.  He went in and out of the room a

14 couple times.

15 Q.  When he wasn't in the room was there

16 anyone else you were talking to about the

17 project?

18 A.  Ross from my office.

19 Q.  What's Ross's last name?

20 A.  Jacobs.

21 Q.  And what was Ross's role in this?

22 A.  Ross was really coming into the

23 business at that time, relatively new to

24 the company.  And now he runs a division of

113

1  place to put them?
2  Q.  Well-said.
3  A.  Yes, I would agree to that.  I would
   believe that.
5       MR. KLEIN:  Want to take a
6  break, Lou?
7       MR. CIAVARRA:  I'm fine, but
8  why don't we take five minutes now.
9       (Recessed)
10  Q.  Who's authorized at Seating Solutions
11  to sign contracts on behalf of the company?
12  A.  Myself, Mark Ligator, Cris can.  Right
13  now Larry Hickey is getting ready to.
14  Depends on the timeline.
15  Q.  Today.
16  A.  Larry Hickey, Mark, myself, Cris.
17  Q.  What was Mr. Tye's position with the
18  baseball teams?
19  A.  I have no idea.
20  Q.  What was his title?
21  A.  No clue.
22  Q.  Do you know if he was a president?
23  A.  I don't know.
24  Q.  Do you know if he had an ownership

114

1  interest?
2  A.  I was told by him he had an ownership
3  interest.
4  Q.  Do you know how much?
5  A.  No.
6  Q.  Do you know what Mr. Stone's position
7  was?
8  A.  Didn't meet Mr. Stone until that
9  afternoon on Friday.  I believe he's, I
10  don't know what his title is, but according
11  he's the head guy.
12  Q.  According to him or according to Mr.
13  Tye?
14  A.  According to Ted and him.
15  Q.  That's the first time you had met
16  him, physically met him?
17  A.  Correct, or spoke to him, I believe.
18  Q.  And you learned he was, to use your
19  term, "the head guy?"
   A.  Yes.
21  Q.  Had you learned that any contracts
22  would have to be signed by him?
23  A.  I believe I was told the contract

115

1  Q.  And you understood, did you not, that
2  the entities also had a Board of Directors?
3  A.  I was told they did.
4  Q.  And weren't you told that any deal
5  had to be approved by the Board?
6  A.  I don't know if I was told, or if I
7  was told the Board was meeting.  I don't
8  believe I was told any deal had to be
9  approved by the Board.
10      I was told there was a Board
11  meeting, I believe, Saturday.  I had a
12  deal.  I didn't have any deal to be
13  approved as far as I was concerned.
14  Q.  What made you think that Mr. Tye had
15  the authority to make a deal on behalf of
16  the Board of Directors and the owner?
17  A.  I had asked him if we had a deal and
18  then he told the head guy that he gave the
19  deal to me.
20      And the head guy said, "I look
21  forward to doing work with you.  I hope
22  it's the beginning of a long relationship."
23  That's the head guy.
24  Q.  Take it one step at a time.  Mr. Tye

116

1  also told you that there was a Board
2  meeting the next day, didn't he?
3  A.  For what purpose?
4  Q.  For the purpose of discussing the
5  project.  Didn't he tell you that?
6       MR. KLEIN:  Objection to form.
7  A.  He told me there was a Board meeting.
8  Q.  And in your mind it had nothing to do
9  with you?  He was just volunteering that to
10  you for the heck of it?
11      MR. KLEIN:  Objection.
12  Argumentative.
13  A.  From what I understood it had to do
14  with the school.
15  Q.  You're having a conversation with Mr.
16  Tye about this project, correct?
17  A.  Yes.
18  Q.  You weren't talking about what the
19  name of the team was going to be, were you?
20  A.  No.
21  Q.  You weren't talking about the
22  business raising money, were you?
23  A.  On occasion we were, about seats and

121

1 A.   As agreed between Ted and I, yes.
2 Q.   Have you ever compared this revised
3 proposal with what you understood the deal
4 to be?
. A.   I compared Ted's notes that he said
6 that he would agree to with what I
7 understood the deal to be.
8 Q.   I'm talking about the document that
9 was then sent by your office?
10 A.   Did I ever review that?  I don't
11 believe so.
12 Q.   So you don't know if this accurately
13 represents what you understood the deal to
14 be?  When I say "this,"  Exhibit 5.
15 A.   Correct.
16 Q.   It might not?
17 A.   Correct.
18 Q.   We can agree that this document,
19 Exhibit 5, was never signed by anyone,
20 correct?
21 A.   Yes, we can agree with that.
22 Q.   Let me, if I can, sir, ask you to
23 turn, it's the second page of the letter,
24 the third page of the exhibit.

122

1        In approximately the middle
2 part of it you'll see that there's a line
3 that says:  "The pricing and terms are
4 based on receipt of a signed proposal and
5 deposit by February 22, 2005 only."
6 A.   Mm-hm.
7 Q.   You have to say yes.
8 A.   Yes.
9 Q.   That's language that your office
10 created?
11 A.   Correct.
12 Q.   And we disagreed that you never
13 received a signed proposal, right?
14 A.   We disagreed?
15 Q.   Or we agreed?
16 A.   Correct.
17 Q.   And you never received a deposit by
18 February 22nd?
19 A.   That's correct.
20 Q.   So two of the conditions in Exhibit 5
21 were not met by the baseball team, isn't
22 that correct?
23        MR. KLEIN:  Object to the
24 form.

123

1 A.   This is really an effort to do what
2 you said before, which is to iron out what
3 you said and what I said we agreed to.
4        The first part of the FAX
5 starts with "Thanks for the order."
6 Q.   I don't think you answered my
7 question, sir.
8 A.   I probably didn't.
9 Q.   Do you want to try and answer it this
10 time?
11 A.   What was it?
12 Q.   Two of the conditions you sent in the
13 letter, receipt of a signed proposal and a
14 deposit by February 22nd, did not occur,
15 isn't that correct?
16 A.   Which two conditions are you talking
17 about?
18 Q.   A signed proposal and a deposit by
19 February 22.
20        MR. KLEIN:  Object to the
21 form.
22 A.   Yes, okay, I'll agree with that.
23 Q.   It didn't happen?
24 A.   Correct.

124

1 Q.   On the last page you see the word
2 Penalties, the section on Penalties?
3 A.   Yes, sure.
4 Q.   There's a line that says:  "This
5 agreement is subject to an AIA contract."
6 Do you see that?
7 A.   Yes.
8 Q.   And that was new in this proposal,
9 wasn't it?
10 A.   I believe that was part of the terms
11 that Ted wanted.
12 Q.   He wanted an AIA contract signed,
13 right?
14 A.   Yes.
15 Q.   And you didn't have an AIA contract
16 prepared at this time, did you?
17 A.   I believe Ted was going to prepare
18 the AIA contract.
19 Q.   But my question was did you have one
20 prepared at this time?
21 A.   No.
22 Q.   Had you seen one for this project at
23 this time?
24 A.   No.

1  **Q.**  Had you discussed the terms of what
2  the AIA contract would say?
3  **A.**  They would duplicate the terms we
   agreed to.
5  **Q.**  Are you familiar with AIA contracts?
6  **A.**  A little bit.
7  **Q.**  You've used them from time to time?
8  **A.**  Yes.
9  **Q.**  And they contain terms and provisions
10 in addition to those that are set forth in
11 this three-page document, don't they?
12 **A.**  They don't have to.
13 **Q.**  Do they typically, sir?
14 **A.**  I guess I don't have the education.
15 **Q.**  Well, you've read AIA contracts
16 because you've signed them, is that a
17 correct statement?
18 **A.**  I'm not making a clear distinction
19 between what's on here and what's on an AIA
20 off the top of my head.
21 **Q.**  Have you reviewed AIA contracts in
22 the past?
23 **A.**  Yes.
24 **Q.**  Have you signed AIA contracts in the

1  past?
2  **A.**  Sure.
3  **Q.**  In your experience are they always
4  longer than three pages?
5  **A.**  I would say yes.
6  **Q.**  And in your experience, without
7  asking you specifically what, do they
8  contain terms in addition to those which
9  you see in your proposal?
10 **A.**  Well, "terms" is a tough word.  Do
11 they contain --
12 **Q.**  Provisions?
13 **A.**  Do they contain better descriptions
14 of the specifics of what's going to go on
15 or the rules of how things are going to be
16 handled, yes.
17 **Q.**  Okay.  And every time you sign an AIA
18 contract have you simply signed it without
19 making any changes or comments to it?
   **A.**  The majority of the time.
21 **Q.**  Sometimes you've made changes?
22 **A.**  Not to the body of the contract.  Very
23 few times.
24 **Q.**  The question was ever, have you ever

1  made changes to the form of an AIA
2  contract?
3  **A.**  Probably.
4  **Q.**  And have your customers made edits
5  and changes to the AIA contract?
6  **A.**  They usually send it to me.  So --
7  **Q.**  They've already made their changes?
8  **A.**  Not normal.  I don't see changes, so
9  no I would say.
10 **Q.**  So you understood at the time that
11 this document was sent that there was still
12 going to be further discussion, could be
13 further discussion about the terms of the
14 AIA contract?
15       MR. KLEIN:  Object to the
16 form.
17 **Q.**  Could be?
18 **A.**  That's not the way I understood it,
19 no.
20 **Q.**  What's wrong about what I said?
21 **A.**  It says here that the pricing and
22 terms are based on receipt of signed
23 proposal and deposit by February 22.
24       And then it says back here that

1  there's going to be an AIA contract.
2       I don't think it means -- I
3  already have a deal of prior to this.
4       So if it's not signed, I think
5  that affects the terms and the price,
6  meaning it could cost more money if they
7  delay in the signing of it.
8       If I can't get the money in the
9  bank, if they don't give me the deposit, it
10 could cost more money.  So the price could
11 change.  Okay?  Maybe I would have to
12 accelerate the payment.  But the order is
13 the order.
14 **Q.**  Let me be sure I understand that.
15 Let's assume that you didn't get your
16 deposit by February 22?
17 **A.**  Okay.
18 **Q.**  Are you telling me that you could
19 have increased the price and the baseball
20 teams would still be bound to a contract
21 with you?  Can you answer that question?
22 **A.**  Go ahead.  Say it again.
23 **Q.**  Okay.  In following what you just
24 said to me, that if the baseball team

129

1 didn't provide you with a deposit by
2 February 22 it could affect the price. Do
3 you remember saying that to me?
· A. Yes.
, Q. That's a yes?
6 A. That's what it says in writing.
7 Q. I'm asking you what the deal was.
8 A. Yes.
9 Q. And the deal was in your mind that if
10 you didn't get your deposit by the 22nd the
11 price could go up?
12 A. If I had additional expenses they
13 would be passed on.
14 Q. And they would have to pay it?
15 A. Yes.
16 Q. Regardless of how much it was?
17 A. Or they could take the delay in time.
18 Q. So there were were a variety of ways
19 in which the deal could change if you
20 didn't get a deposit by the 22nd?
21 A. The deal wasn't changing.
22 Q. You don't know that.
23 A. The deal wasn't changing. I agreed
24 to take an order on a Friday and deliver on

130

1 this date. I guaranteed that.
2 If they didn't give me the
3 money by the date they promised, then I
4 could extend their delivery date.
5 The terms of what I agreed as
6 far as their functionality, it could
7 change.
8 Q. So this document, Exhibit 5, dated
9 and sent on the 21st of February requires a
10 deposit the next day? Do you see that?
11 MR. KLEIN: Objection to form.
12 Q. February 22 it says.
13 A. The document, let's say the document
14 has a penalty -- has a possibility of a
15 penalty for not giving the deposit the next
16 day. I don't know that it requires it.
17 Q. Again, I didn't create the language,
18 your office did. So let's look again at
19 what it says.
20 It says: "The pricing and
21 terms are based on receipt of a signed
22 proposal and deposit by February 22, 2005
23 only." I read it correctly, right?
24 MR. KLEIN: Object to the

131

1 form.
2 A. You did.
3 Q. And that's language created by
4 Seating Solutions?
5 A. That's correct.
6 Q. And you didn't receive the deposit by
7 the next day?
8 A. Yes.
9 Q. Okay. So February 23 comes and you
10 don't have your $150,000, okay?
11 A. Yes.
12 Q. Is it your testimony there's still a
13 binding agreement between the parties?
14 MR. KLEIN: Object to the
15 form.
16 Q. Yes or no?
17 A. Yes.
18 Q. And you could on your own change the
19 price or the terms if you chose to, is that
20 your testimony?
21 MR. KLEIN: Object to the
22 form.
23 A. I could take -- if it delayed, I
24 could relieve myself I'm sure of partial --

132

1 of the requirement to give them $50,000
2 back a week as they're holding up the
3 project. That's a term.
4 If they don't initiate the cash
5 deposit, I have the right not to initiate
6 my risk. But the contract is still in
7 force.
8 Q. In your mind here in this deal you
9 could pick and choose the terms and the
10 price that would continue on if you didn't
11 get your deposit?
12 MR. KLEIN: Object to the
13 form.
14 Q. Is that correct?
15 A. In my mind I could pick and choose
16 the terms.
17 Q. Like, for example, you said you could
18 extend the date of or eliminate the penalty
19 provision, is that your testimony?
20 A. I could do what's right. My
21 testimony was if there's extra cost to me
22 based on them not delivering the deposit in
23 a timely fashion, then I would expect to be
24 able to recoup that, yes.

1 would you give the job to someone who
2 couldn't get it done.
3 Q. And you're telling my clients to be
4 concerned about somebody who on one day
5 tells you they can't do it, and the next
6 day they say they can?
7 A. That's correct.
8 Q. And then you go on to say, "Dan
9 Clayton won't get it done?" That's what
10 you said?
11 A. That's correct?
12 Q. How did you know that Dan Clayton
13 couldn't get it done?
14 A. I guess I'm psychic because they
15 didn't get it done.
16 Q. Is that your testimony, you're
17 psychic?
18 A. That's okay with me. They didn't get
19 it done.
20 Q. Like I said, this is being taken
21 down, and we're going to read it to a jury
22 some day.
23 A. That's okay.
24 Q. And do you have these psychic

1 experiences frequently?
2 A. When I'm lucky.
3 Q. So you're telling my client not to do
4 business with Dan Clayton because they
5 won't get the job done? Isn't that what
6 you're saying?
7 A. I'm telling them that in my
8 experience when someone tells you they
9 can't get it done and then comes backs and
10 all of a sudden says they can, you need to
11 look at it really closely.
12 Q. You thought you could get it done in
13 time, didn't you?
14 A. I knew I could get it done on time.
15 Q. Do you know if you're a larger or
16 smaller company than Dan Clayton?
17 A. I'm probably a smaller company.
18 Q. But you were pretty certain that Dan
19 Clayton couldn't get it done, weren't you?
I mean you said that.
21 A. Based on experience, yes.
22 Q. And then you said that you could
23 provide my clients with references on jobs
24 that Dan Clayton didn't get done that you

1 had to then supply for?
2        MR. KLEIN: Objection to form.
3 Q. Is that what you said?
4 A. That's correct.
5 Q. Tell me some of those jobs.
6 A. I don't know the names of those jobs.
7 We have the information in our office.
8 Q. When you wrote this, what did you
9 have in front of you that told you that
10 that was a true statement?
11 A. The knowledge that we rented to a GC
12 who couldn't get the delivery of product
13 from Dan Clayton and put the product in so
14 they could have their event.
15 Q. So you knew that then, but you don't
16 know it now? Is that your testimony?
17 A. The name of the job. I didn't know
18 the name of the job then. It's irrelevant.
19 Q. So you knew it happened?
20 A. Absolutely.
21 Q. How many times did that happen?
22 A. I don't know. I'd have to consult
23 with Mark Ligator in my office.
24 Q. He didn't write the Email. You did,

1 right?
2 A. I knew that there was one recent one.
3 Q. In your Email you said, "If you want
4 references on rental jobs," and you did
5 plural.
6        So I'd like to know what jobs
7 there were that you were referencing.
8 A. Well, I'll look it up and get it to
9 you.
10 Q. You don't know?
11 A. Off the top of my head?
12 Q. Or based on any source of information
13 you have. Do you know?
14 A. Can I get you the information, yes.
15 Do I know sitting here now? No.
16        (Witness phone interruption)
17 Q. By the end of that Monday you still
18 didn't have a signed proposal or a deposit?
19 A. Correct.
20 Q. That's a correct statement?
21 A. Yes.
22 Q. Your office then sent another
23 proposal on the 22nd, correct?
24 A. I wouldn't know unless I saw it.

157

1    (Exhibit 8, Email and Revised
2         Proposal, marked)
3  Q.  I'll show you a document marked as
4  Exhibit 8.  Have you seen that before?
5  A.    I don't recall.  There's so many
6  proposals, I don't know.
7  Q.  Do you know why Cris sent this Email
8  on the 22nd?
9  A.    I'm not sure sitting here.  I'm sure
10 there was a reason and I'm not sure what it
11 was.
12 Q.  Do you recall discussing it with her?
13 A.    I recall discussing that we wanted to
14 send it out.  But sitting here now I don't
15 recall what the motivation was.
16 Q.  No idea?
17 A.    No.
18 Q.  And we can agree, can't we, that this
19 proposal was never signed by my clients?
20 A.    Yes, we can agree.
21 Q.  And that you never received a
22 deposit?
23 A.   Correct.
24        (Exhibit 9, Email 2/22/05,

158

1         marked)
2  Q.  Let me show you a document marked as
3  Exhibit 9, February 22 Email from Cris to
4  Ted Tye and Alan Stone.  It purports to be,
5  though, from you on her Email address?
6  A.    Yes.
7  Q.  Did you create this Email?  And I
8  don't mean type it.  I mean write it.
9  A.    Yes, probably.  (Reading document.)
10 Yes.
11 Q.  You wrote this, right?
12 A.    Yes.
13 Q.  And you sent it?
14 A.    Mm-hm.
15 Q.  Yes?
16 A.    Yes.
17 Q.  And you understood at this time that
18 there were were difficulties with Holy
19 Cross?
   A.    I was being told there were were
21 difficulties.
22 Q.  By whom?
23 A.    Alan Stone.
24 Q.  Was that during the conversations on

159

1  Monday and Tuesday?
2  A.    Yes.
3  Q.  Now did you have further
4  conversations with Mr. Stone on Tuesday the
5  22nd?
6  A.    I believe they went all the way until
7  Thursday.
8  Q.  Tell me what you recall about the
9  conversations by telephone on Tuesday.
10 A.    Just very evasive.  And we're looking
11 at this and we're looking at that, and no
12 decisions have been made on the final
13 decision or how we want to go forward, but
14 you know, relax, that type of thing.  Ted
15 is not here.  It's hard to communicate.
16 You know.
17 Q.  So would it be fair to say that by
18 the end of the day on the 22nd that Mr.
19 Stone had still not committed to going
20 forward during these conversations?
21 A.    No, that wouldn't be fair to say.
22 Q.  Okay.  During any of these
23 conversations did he commit to going
24 forward with you?

160

1         MR. KLEIN:  Objection.
2  Ambiguous.
3  A.    He was already committed to going
4  forward.
5  Q.  But it wasn't resaid in the
6  conversations?
7  A.    No.  It was said, "But we're not
8  walking away."  That was said.
9  Q.  Those were the words he used?
10 A.    Something to that effect.
11 Q.  Do you recall the words he used?
12 A.    No, it's too long ago.
13 Q.  Did Mr. Stone provide you with any
14 further detail about what was holding up
15 the project?
16 A.    Yes, very -- nothing of substance.
17 Nothing I can put my hands on, no.
18 Q.  Were you trying to press him for
19 details?
20 A.    I was, yes, I was trying to find out
21 what the issue was, yes.
22 Q.  And were you pressing him for the
23 deposit and the signed proposal?
24 A.    Not at all.

233

1  that it would save money and save time and
2  help us make the timeline, and Patrick
3  concurred.
4  Q.   And it's your testimony that you came
5  up with the idea to change the design in
6  the way you just explained?
7  A.   I explained to Patrick that --
8  Q.   Can you just say yes or no for that?
9  Is it your testimony that you came up with
10 the idea to change the design and in the
11 way you just explained?
12 A.   It's my testimony, yes -- yes, that
13 I came up with that, yes.
14 Q.   After this second meeting where
15 Patrick was at, did you have any other
16 meetings where Patrick was at?
17 A.   No.
18 Q.   Was Patrick at the February 18th
19 meeting?
20 A.   No.
21 Q.   And it's your testimony that when you
22 left the February 18th meeting you had a
23 deal?
24 A.   Absolutely.

234

1  Q.   Do you have any evidence that Patrick
2  had contact with Ted or Alan after that
3  meeting before they cancelled your
4  contract?
5  A.   Um, Ted's statement.
6  Q.   Which was?
7  A.   That he was meeting with Patrick.
8  Q.   Ted said he was meeting with Patrick
9  when?
10 A.   Ted said he was going to tell
11 Patrick about the closing of the deal.
12 Q.   Did he say when he was going to be
13 meeting with him?
14 A.   No, he didn't say.
15 Q.   Do you have any evidence that Patrick
16 said anything to Ted or Alan to cause them
17 to cancel your contract?
18 A.   No.
19 Q.   Do you have any evidence that Patrick
20 did anything to cause Alan or Ted to cancel
21 your contract?
22 A.   I have evidence of the Email being
23 sent with my title-blocking removed and

235

1  Q.   And you're referring to the February
2  15th Email?
3  A.   Yes.
4  Q.   Let's stop for a second.  You said on
5  February 18 you had a deal?
6  A.   Yes.
7  Q.   After February 18th do you have any
8  evidence that Patrick did anything to cause
9  Ted or Alan to cancel your contract?
10 A.   The evidence that I would say is an
11 ability to do stuff that's not kosher shown
12 to me earlier.
13 Q.   Do you have any evidence that he did
14 anything after February 18?  This Email is
15 February 15.
16 A.   And I'm telling you my evidence would
17 be that he had done it before.  For me that
18 would be evidence.
19 Q.   That's you extrapolating from things
20 that happened prior to February 18,
21 correct?
22       MR. KLEIN:  Objection.
23 Argumentative.
24 A.   I would do that on the 18th.  I would

236

1  derive my conclusion from previous
2  experience on the 18th.
3  Q.   Do you have any evidence that Patrick
4  did anything after the 18th?
5  A.   No.
6  Q.   And regardless of what Patrick had
7  done prior to February 18, anything that he
8  had done, your position is that you had a
9  contract on February 18?
10 A.   Yes.
11 Q.   And earlier in the day you had made a
12 couple references to that Patrick preferred
13 Dan Clayton, is that correct?
14 A.   Correct.
15 Q.   Do you have any evidence that Patrick
16 preferred Dan Clayton?
17 A.   Patrick had pleaded, from what I
18 understand, in his own words, with Dan
19 Clayton to supply the job and do the job,
20 but they couldn't fit it in.  And that's
21 why he volunteered the information that
22 they couldn't make the date.
23 Q.   Is it your position that Patrick

241

1  away.
2  Q.  Do you have any evidence that Patrick
3  or Geller interfered with your business
   relations?
4  A.  Um, yes.
6  Q.  What is that evidence?
7  A.  He circulated my proprietary product
8  with his name on it.
9  Q.  Besides that, do you have any other
10 evidence?
11 A.  No.
12 Q.  Okay.  Do you have any evidence that
13 Patrick knowingly caused Worcester Baseball
14 to end their relationship with you?
15        MR. KLEIN:  Object to the
16 form.
17 A.  I think "proof" is a better word.  I
18 don't have proof that he did that.
19 Q.  Do you have any evidence that Patrick
20 acted with malice in affecting your
21 relationship with Worcester Baseball?
22 A.  Yes.  And I go back to sending my
23 proprietary work and calling it his own.
24 Q.  Besides that incident, do you have

242

1  any other evidence?
2  A.  So you're asking me do I have any
3  evidence beside my evidence?
4  Q.  Besides that Email.
5  A.  I'm just clarifying the question.
6  Q.  Do you have any evidence besides the
7  Email?
8  A.  Yes.  That he attended a meeting for
9  a project that the contract was given out
10 already with the intent of evaluating who
11 to give the contract to.
12 Q.  How do you know what his intent was
13 in attending that meeting?
14 A.  There's no other purpose for the
15 meeting.
16 Q.  So you're assuming that that was his
17 intention in attending the meeting?
18 A.  No, I'm saying there's no other
19 purpose for the meeting.  You're buying a
   product you already bought.  It was bought
21 on Friday.  They met on Sunday to buy it
22 again.
23 Q.  All right.  Let's talk about--

243

1  your --
2        MR. CIAVARRA:  Absolutely.
3  Q.  This is Bates Number 205 to 208.
4  This is the Email and the documents that
5  you keep referring to that Patrick
6  improperly used, correct?
7  A.  Correct.  Let's say Geller improperly
8  used.
9  Q.  Okay.  How did that plan come about?
10 Who was the first one who drafted that from
11 a blank piece of paper?
12 A.  Scott Ruczaj and myself.
13 Q.  So you started with nothing, you
14 weren't basing that off of any other
15 previous design or --
16 A.  No.
17 Q.  You weren't basing that off of any --
18 A.  It was designed to fit the lay of the
19 land.
20 Q.  Do you have any documents that
21 illustrated the lay of the land that you
22 were using?
23 A.  Yes.
24 Q.  Where did you get those documents

244

1  from?
2  A.  Ted Tye.
3  Q.  So you sat looking at the documents
4  from Ted Tye and then you incorporated
5  those pieces from that document into your
6  document that you then created?
7  A.  I actually overlaid or joined,
8  shadowed it so you could get the sizing
9  correct, and then drew my drawing.
10 Q.  So how do you overlay something?  Did
11 you have it on the computer?
12 A.  Either scanned it or received an
13 Email.  I don't remember which one.
14 Q.  So you took the drawings that you had
15 from Ted?
16 A.  Yes.
17 Q.  And then you overlaid where the
18 seating would be?
19 A.  Correct.
20 Q.  Now these drawings here, were these
21 the ones that were printed at the first
22 meeting that Patrick was at that we think
23 it's like February 12, or was that the

245

1  16?
2  A.  I'm pretty sure this was the first
3  meeting.
·  Q.  The first meeting?
,  A.  Yes, because this is early on.  But
6  I'm not sure.
7  Q.  So at the first meeting there were
8  some drawings that you presented.  And then
9  there were discussions about how to change
10  certain things.  And then did you go back
11  and change those initial drawings?
12  A.  We did it right there.  That's why I
13  brought my AutoCad operator.  The timeline
14  was such that I flew him up also.
15       And he sat there, and they gave
16  us four hours to revise our drawings,
17  printed them out and said here you go.
18  Q.  While he was revising those drawings
19  who was in the room?
20  A.  Me.
21  A.  You were the only other person in the
22  room?
23  A.  That's correct.
24  Q.  And at that February 12, I know that

246

1  might not be the exact date, but the
2  February 12 meeting -- not Scott.
3  A.  No, it's Scott.
4  Q.  After he revised the drawings, was
5  that the drawings in the final form or were
6  they revised again?
7  A.  I believe the way we constructed it,
8  it was revised again as far as what it was
9  fabricated out of, but the layout was kept
10  pretty much the same.
11  Q.  And so who came up with the layout?
12  A.  Me and Scott.
13  Q.  Who was the author of this plan?
14       MR. KLEIN:  Objection.
15  Ambiguous.
16  A.  Scott Ruczaj and myself.
17  Q.  Do you have a copyright in this plan?
18  A.  Do I have a copyright?
19       MR. KLEIN:  Objection.
   Ambiguous.
21  A.  Do I have copyright?  I don't believe
22  so.
23  Q.  You haven't registered this document
24  for copyright protection through an agency

247

1  to your knowledge?
2  A.  No.
3  Q.  So it's your testimony that the only
4  people who collaborated on the design of
5  the seats was yourself and Scott, is that
6  correct?
7  A.  It's my testimony that Scott and I
8  designed systems, spoke to them about what
9  they liked and didn't like, and then
10  designed any changes into it.
11       As far as the designs, it's
12  Scott and I.
13       As far as increased capacity,
14  "I need to get more people off in this
15  direction," that was input I would receive
16  from the client.
17       As far as how to do that and
18  engineer it so it complies with code and
19  everything, it was Scott and I.
20  Q.  As far as size, increasing the amount
21  of seating, is there any other requirements
22  or suggestions that Ted or anyone else had
23  that you then had to change in the
24  drawings?

248

1  A.  Yes, there was an issue with ADA
2  compliance.  That's people in wheelchairs.
3  Q.  Okay.  And so what did you change
4  then?
5  A.  We put some decks next to the dugout
6  so not only could they get into the stand,
7  but also into the field if they wanted to.
8  Q.  When did you put your logo on the
9  plan?
10  A.  We do it every time before we set it
11  up.  It's not a logo.  It's a title-block.
12  Q.  It's a title-block?
13  A.  With a boiler plate of "property
14  proprietary."
15  Q.  And there's not a copyright notation
16  in that boiler plate?
17       MR. KLEIN:  Objection.
18  Ambiguous.
19  A.  I don't know.  Unless I read it, no,
20  I wouldn't know.
21  Q.  So every time prior to sending out
22  any plans you put in -- what did you call
23  it?
24  A.  A title-block.

249

1  **Q.** You put the title-block on?
2  **A.** Yes.
3  **Q.** So when you came to the February 12
·  meeting did you have that on?
,  **A.** Yes.
6  **Q.** It was already up there?
7  **A.** It's always on there.
8  **Q.** It's always on there.
9  **A.** Nothing leaves us without it on.
10 **Q.** Is it possible for someone else to
11 remove that?
12 **A.** Only if they ask for the plan in
13 AutoCad. You can get it as a PDF. If you
14 get it as a PDF, you can't remove it. If
15 you get it in AutoCad, you can remove it.
16 **Q.** And you gave AutoCad?
17 **A.** At the request of Ted Tye we gave
18 AutoCad.
19 **Q.** Do you normally do that?
20 **A.** Rarely.
21 **Q.** Did you put any limitations on Ted on
22 how he could view these plans?
23 **A.** The purpose of him having AutoCad was
24 to add to the drawing, add a concession

250

1  cart, add a beer service station.
2  **Q.** But did you put any limitations on
3  him?
4  **A.** Yes, I told him he can't change the
5  drawing.
6  **Q.** You told him he can't change the
7  drawing?
8  **A.** Can't change our drawing.
9  **Q.** Did you tell him that he couldn't
10 send it out to anyone?
11 **A.** The only person that we authorized
12 him to send it to was Geller.
13 **Q.** And you authorized that how?
14 **A.** We called up and said, "Do you want
15 us to send it to Geller? If you want us
16 to, we'll send it to him. There can't be
17 changes to the bleacher parts, but if he
18 want to add stuff like concession carts,
19 knock yourself out."
20 **Q.** But when you first gave them to Ted
21 did you tell him don't send this out to
22 anybody else?
23 **A.** He didn't have it in AutoCad at that
24 time. It was just a piece of paper.

251

1  **Q.** Well, when he got it in AutoCad, did
2  you tell him don't send this to anyone
3  else?
4  **A.** It had the block on it that it's
5  private and proprietary and it shouldn't be
6  shared. It has a statement on it.
7  **Q.** But besides that, did you tell him
8  you can't send this out to anyone else?
9  **A.** No.
10 **Q.** Did you tell Patrick don't send this
11 out to anyone else?
12 **A.** Nope.
13 **Q.** Who puts the title-block on the plan?
14 **A.** Scott.
15 **Q.** Scott does?
16 **A.** Scott Ruczaj.
17 **Q.** What information do you claim is
18 protected by trade secret?
19 **A.** It's not -- I didn't, you know,
20 "trade secret" is a term I'm unfamiliar
21 with.
22 **Q.** So you don't have any background or
23 knowledge about what a trade secret is?
24 **A.** No.

252

1  **Q.** Well, what information do you claim
2  is proprietary information?
3  **A.** The conceptual design of the seating
4  system and the area.
5  **Q.** So pretty much that plan?
6  **A.** Well, that plan, section view, the
7  connections, the pieces, the design. The
8  way that it is built to work.
9  **Q.** So which proprietary information
10 specifically do you claim that Geller
11 misappropriated?
12 **A.** Do we have that Email? Oh, it's on
13 there. "The designer of the new stadium is
14 Patrick Maguire of Geller Sports of
15 Boston." The whole thing. He's not the
16 designer of that stadium.
17 **Q.** I'm just clarifying. You claim that
18 Geller misappropriated every single piece
19 of paper you ever sent?
20 **A.** Design credit for that stadium.
21 **Q.** Do you claim that Geller
22 misappropriated credit for the stadium,
23 design credit is what you're saying?
24 **A.** Not only took it from us, but

253

1  credited to himself.
2  Q.  Besides crediting the design to
3  himself, I'm just trying to get at the
4  specific piece of paper or other
5  information that he --
6  A.  I'm sure there will be more.
7  Q.  Okay.  Right now I'm just trying to
8  get at what information you claim that
9  Geller misappropriated.
10  A.  This drawing.
11  Q.  Okay.  Are you claiming any other
12  information that he misappropriated besides
13  this drawing, that Geller misappropriated
14  besides that drawing?
15  A.  At this point?
16  Q.  Yes.
17  A.  Am I claiming that he misappropriated
18  other information?  Yes, I think I'm
19  claiming that.
20  Q.  Well, what other information?
21  A.  That will be found out.
22  Q.  So at this moment you don't have any
23  other -- at this moment you can't tell me
24  what other information you claim that

254

1  Geller misappropriated?
2  A.  That would be correct.
3  Q.  Okay.  When you gave these drawings
4  to Ted, did you have him sign a
5  nondisclosure agreement?
6  A.  No.
7  Q.  When the AutoCad drawings were
8  Emailed to Patrick, did you have him sign a
9  nondisclosure agreement?
10  A.  No.
11  Q.  Is your claim that Geller disclosed
12  your proprietary information by sending
13  them off to subcontractors?
14  A.  Is that my whole claim?  What's the
15  question?
16  Q.  How did Geller misappropriate your
17  proprietary information?
18  A.  He took our title-block acknowledging
19  that we were the designers of the system
20  off of the paperwork and then circulated it
21  --
22  Q.  So the circulation --
23  A.  --as his.
24  Q.  So circulating these plans are the

255

1  means that you claim that Geller
2  misappropriated this proprietary
3  information?
4  A.  At this time.
5  Q.  Okay.  I know you said earlier you
6  could tell the future, but I don't know
7  about --
8  A.  I didn't say that.  He said that.
9  Q.  I don't think so, but -- but at this
10  time circulation is how he misappropriated
11  the information?
12  A.  That's what I can prove at this time.
13  Q.  The information contained in these
14  drawings, is it fair to say that everyone
15  at your company would have access to these
16  drawings?
17  A.  No.
18  Q.  How many people would have access to
19  these drawings?
20  A.  Three
21  Q.  Three?
22  A.  If that.
23  Q.  And who would those people be?
24  A.  The people in AutoCad.

256

1  Q.  Those are the other designers that
2  you previously identified?
3  A.  Correct.
4  Q.  And would you have access to that?
5  A.  Yes.
6  Q.  Would your sister have access to
7  that?
8  A.  Through them.  Through them, I mean,
9  yes.
10  Q.  Did you do anything to actively
11  protect these drawings in your company?
12      MR. KLEIN:  Object.
13  A.  Yes, we put the block on it that
14  clearly says it's our property.
15  Q.  Did you do anything to protect
16  against anyone seeing the drawings?
17  A.  Yes, they were kept in the file at
18  the AutoCad guy or in the server that only
19  those three guys look at.
20  Q.  Is that password-protected?
21  A.  Yes.
22  Q.  How many people know that password?
23  A.  They each have an individual one.
24  Q.  Were there photocopies of these plans

257

1  in your office?
2  A.    Not normally.
3  Q.    And didn't you say that at the
February 12 meeting you brought printouts?
A.    Yes.
6  Q.    So at some point those printouts were
7  left at your office I assume?
8  A.    With the title-block on them with
9  credit to us, yes.  Not as that sits there.
10  Q.    I'm not saying anything about the
11  title-block now.  I'm just saying --
12  A.    I am.
13  Q.    Okay.  I understand, and it's
14  definitely on the record.
15  A.    Okay.
16  Q.    Were there photocopies of these plans
17  with the title-block in your office?
18  A.    The day before I went to see Ted,
19  yes, probably.
20  Q.    Were these protected in any way
21  against other people viewing them?
22         MR. KLEIN:  Objection.
23  Ambiguous.
24  A.    Yes, when the business was closed,

258

1  the office was locked.
2  Q.    But during the day could one of your
3  employees come and walk around and see
4  these plans?
5  A.    Probably not.  If it's my sale, it's
6  in my office in a file, so probably not.
7  Q.    Who else has access to your file?
8  A.    To my office, no one.
9  Q.    No one has access to --
10  A.    To my office.  To the files?  We
11  don't file drawings.  We keep them in
12  AutoCad.
13         So the paper drawing would be
14  in a file in my office.  I would go see the
15  client, give it to him, and that would be
16  the end of it.  Paper doesn't lay around in
17  my office.
18  Q.    Did you have a confidentiality
19  agreement with Geller?
20  A.    No.
21  Q.    No?
22  A.    No.
23  Q.    Did you assume that when you Emailed
24  Geller the AutoCad drawings that he would

259

1  abide by the conditions placed in your
2  title-block?
3  A.    Absolutely.
4  Q.    Why did you assume that?
5  A.    Because I've never had anyone do what
6  he did before.
7  Q.    Didn't you say earlier that you very
8  rarely Email AutoCad drawings?
9  A.    Mm-hm.
10  Q.    Just if you would say yes or no.
11  A.    Yes.
12  Q.    How many times have you Emailed
13  AutoCad drawings before?
14  A.    Couple of hundred.
15  Q.    But that's rare?
16  A.    In proportion to the length of time
17  and volume I've done in this business, it's
18  rare.
19  Q.    Would Geller get any benefit, did
20  Geller get anything by agreeing to abide by
21  those terms and conditions in the
22  title-block?
23  A.    Can you ask the question again?
24  Q.    Did Geller receive anything in

260

1  exchange for agreeing to abide by the terms
2  and conditions in the title-block?
3  A.    Yes.
4  Q.    What?
5  A.    He got use and the ability to see the
6  plan.
7  Q.    Wasn't it Patrick's idea to use more
8  -- I might not understand this exactly,
9  but wasn't it Patrick's idea to use more
10  aluminum angles to reduce the cost of your
11  design?
12  A.    We went through a discussion with
13  Patrick where Patrick said aluminum angles
14  is less than I-beam.  I-beam is more
15  expensive.
16         I said, Well, I can use a
17  combination frame and use aluminum angle in
18  the front and that will save us some money.
19         So Patrick was the one who
20  keyed in on the fact that aluminum angle is
21  less than I-beam.
22         Patrick knew nothing about a
23  combination design in a bleacher being
24  possible.

1    Was he party to coming up with
2 the idea that aluminum is less money in the
3 steel understructure as far as building it
4 and putting up, yes, he was party to that.
5    Did he have anything to do with
6 the design of the end product that utilized
7 that aluminum? No, he didn't.
8 **Q.** Going back to the title-block, are
9 there any terms of the title-block that
10 Seating Solutions has to comply with?
11 **A.** Without reading it, I couldn't tell
12 you.
13    MR. CIAVARRA: For the record,
14 Document 57. For the record, I think it's
15 a pretty standard one from what I've seen.
16 **A.** (Studying document.) What was the
17 question?
18 **Q.** My question was in that title-block
19 are there any terms that Seating Solutions
20 has to comply with?
21 **A.** Not as far as I can tell.
22 **Q.** Okay. So your reading of that
23 title-block, there's nothing that Seating
24 Solutions has to do?

1 **A.** Seating Solutions has to share the
2 information with you in order for you to be
3 subject to that title-block.
4 **Q.** Where does it say that?
5 **A.** You wouldn't see the title-block
6 unless I shared it with you.
7 **Q.** But it doesn't say that in the
8 title-block?
9 **A.** To me it does.
10 **Q.** Read me the part where it says that.
11 **A.** If I don't have it, I can't.
12 **Q.** So is it written in the title-block?
13 **A.** By virtue of the title-block being
14 there, it's written, to me. I can only
15 answer you for me.
16 **Q.** I understand that that's what you are
17 extrapolating from this. Does it say that
18 in the title-block?
19 **A.** I'm not extrapolating it. Now I
20 don't have it. Now ask me your question.
21 **Q.** Let's start this again. This
22 title-block here, does it direct Seating
23 Solutions to do anything?
24    How about this? The

1 title-block --
2 **A.** It directs Seating Solutions to
3 provide information.
4 **Q.** Where are you getting that from?
5 **A.** "Seating Solutions claims proprietary
6 rights in the information disclosed."
7    It directs Seating Solutions to
8 disclose information.
9 **Q.** And you claim that title-block is
10 placing limits on parties who receive these
11 drawings?
12 **A.** "May not be used in whole or in part
13 to manufacture anything, whether or not
14 shown hereon, reproduced or disclosed to
15 anyone without direct written permission
16 from Seating Solutions."
17    I think there's clearly limits.
18 **Q.** Okay. So the answer?
19 **A.** Yes.
20 **Q.** Okay. So Seating Solutions didn't
21 have a written contract with Geller,
22 correct?
23 **A.** Other than that, no.
24 **Q.** You take that to be a written

1 contract?
2 **A.** If he doesn't agree to it, he should
3 send it back. It's the professional thing
4 to do.
5 **Q.** Okay. Besides in the drawings are
6 there any other written contracts that you
7 believe were between Geller and Seating
8 Solutions?
9 **A.** I explained -- no, the answer to the
10 question is no.
11 **Q.** Okay. Were there any oral agreements
12 between Geller and Seating Solutions?
13 **A.** I explained to both Ted Tye and
14 Geller that I don't go design bleachers as
15 a hobby.
16 **Q.** What does that mean?
17 **A.** That means what I do I expect to be
18 treated with the respect, that it's our
19 design, our creation, and they won't go
20 shop it at the last minute and expect
21 somebody to beat my price who invested no
22 time.
23 **Q.** I'm going to repeat my question. Did
24 Seating Solutions have an oral contract

269

1 that it is? Not assuming, then what?
2 A.   Three years of education on how
3 people act and what they do, I have deduced
   that that's what went on.
5 Q.   Besides your deduction --
6 A.   Okay.
7 Q.   -- do you have any evidence that that
8 was Geller's purpose in attending the
9 meeting on Sunday with Dan Clayton, to get
10 the contract away from Seating Solutions?
11 A.   I would say I'd have a hard time
12 believing that Dan Clayton knew I had a
13 contract other than Mr. Geller telling him.
14 Q.   I understand that's your position. I
15 just want an answer to my question.
16 A.   To me, that's evidence. To me,
17 that's evidence. Do you want physical
18 evidence?
19 Q.   I want to know -- I'm going to repeat
20 my question.
21 A.   Go ahead.
22 Q.   Do you have any evidence besides your
23 deduction that it was Geller's intent in
24 going to the meeting on Sunday with Dan

270

1 Clayton to get the contract away from your
2 company?
3 A.   I believe the meeting is evidence.
4 Q.   The fact that they had a meeting?
5 A.   You bought it on Friday. What are
6 you doing on Sunday? Buying it again? You
7 only need one.
8 Q.   Okay. Besides having the meeting,
9 besides going to the meeting do you have
10 any other evidence?
11 A.   Not currently, no.
12 Q.   What improper means did Geller use to
13 interfere with your relationship with
14 Worcester Baseball, if any?
15 A.   He removed that title-block and sent
16 out our information.
17 Q.   So by removing your title-block and
18 sending out that information, that was
19 interfering with your relationship with
   Worcester Baseball?
21 A.   Absolutely possibly.
22 Q.   How?
23 A.   That he's claiming designer there and

271

1 that or whatever.
2 Q.   But you don't know that he is
3 claiming that to Worcester?
4 A.   No, I only know what I said, that he
5 sent the drawing out and claimed it was
6 his.
7 Q.   Okay.
8 A.   If you want to ask your question
9 again, I'll try again.
10 Q.   What improper means did Geller use to
11 interfere with your relationship with
12 Worcester Baseball, not with other subs or
13 other companies, but Worcester Baseball.
14 A.   He told them a nonfactual statement
15 about my pricing.
16 Q.   Okay. So it was the pricing
17 statement, I guess, prior to that meeting,
18 that your prices were too high?
19 A.   It's not only the pricing statements
20 being inaccurate, it's why anybody would
21 say the inaccurate statement.
22 Q.   Why do you think that he said the
23 inaccurate statement?
24 A.   He had a preference to Dan Clayton.

272

1 Q.   Okay. So the improper means -- were
2 there any other improper means that Geller
3 employed to interfere with your
4 relationship with Worcester Baseball
5 besides the comments about pricing?
6 A.   Besides telling my client I was a
7 crook, probably not.
8 Q.   Now, did Geller say that you were a
9 crook?
10 A.   Ted Tye said "that my consultant" --
11 I don't know if he said it to Ted Tye. I
12 can only tell you what Ted Tye said to me.
13         Ted Tye said "that my
14 consultant said that this price is
15 robbery," or "this is criminal," one of
16 those phrases. It that improper? Yes.
17 Q.   But you did not hear Patrick
18 specifically say that? I understand that
19 you said you heard Ted say that. But did
20 you hear Patrick say that, yes or no?
21 A.   Patrick defended his position on that
22 it would be criminal in his evaluation.
23 Q.   Did you hear Patrick say that it

273

1  A.   No.
2  Q.   Would you say that Geller has the
3  right to add items to your AutoCad
   drawings?
5  A.   I would say no.  He could have
6  overlaid them.  Kept them separate, split
7  from my drawings.
8  Q.   Okay.  So did Geller have the right
9  to overlay items on your drawings?
10 A.   Geller had the right, Ted Tye
11 specifically said he may want to add the
12 concessions, he may want to add a beer
13 cart.  He may want to do that.  I said,
14 Okay.  Let him add.
15 Q.   I'm just clarifying, Geller could
16 have added on top of your AutoCad?
17 A.   That's the only reason to send
18 AutoCad.  The other purpose is he may want
19 to check dimensions so he can tell the size
20 of something.  And if you don't give it to
21 him in AutoCad, he can't measure it.
22 Q.   Were there any other uses that would
23 have been improper for Geller to do with
24 those AutoCad drawings besides those two

274

1  things?
2  A.   No.
3  Q.   Do you have any evidence that Geller
4  disclosed pricing information -- pricing
5  information prepared by Seating Solutions
6  to any third party?
7  A.   The fact that there was a Sunday
8  meeting.
9  Q.   Besides that, the fact that there was
10 a Sunday meeting, do you have any evidence
11 that Geller provided pricing to a third
12 party?
13 A.   No.
14         MS. KORN:  Okay.  I think
15 that's it for me.
16         BY MR. CIAVARRA:  I've got a
17 couple more.  I'm sure he warned you it's
18 inevitable.
19         MR. KLEIN:  At the conclusion
   of Ms. Korn's questioning I just want to
21 add one brief statement for the record.
22         Ms. Korn asked Mr. Suprina
23 questions that started with the phrase:
24 "Do you have any evidence."

275

1         I just want to note for the
2  record that Ms. Korn's clients, Geller
3  Devellis, Inc. and Geller Sport, Inc., have
4  not yet provided the documents that they
5  identified in their initial disclosures.
6         And thus, that may provide the
7  reason that we do not have any evidence
8  because they have not provided the evidence
9  to us as they are obligated to do under the
10 Rules of Civil Procedure.
11         (Discussion off the record)
12         REDIRECT EXAMINATION
13 BY MR. CIAVARRA:
14 Q.   Back on the record.  A couple
15 questions.  You know this Email that we've
16 been talking about which was stamped S0205,
17 etcetera.  The AutoCad plan that you've
18 been talking about, there's no question
19 that Mr. Tye, it was okay for Mr. Tye to
20 share that with Geller, correct?  That was
21 the idea?
22 A.   Correct, that's his consultant.  He
23 really needs to share it.
24 Q.   Vis a vis that design, my clients did

276

1  nothing wrong with it?
2  A.   Right, your clients did nothing wrong
3  with it, no.
4  Q.   When you guys were talking before, I
5  was trying to just put some of the plans in
6  order to see if I can figure out where this
7  one fits in the chronology.
8         And the first one I think is a
9  document that was stamped Number 71.  And
10 this was like a February 10 plan.  Do you
11 recognize that?
12 A.   You know, if you show them to me in
13 order, I can give you a better.
14 Q.   They're all dated actually in the
15 box.
16 A.   Okay.  This was the first run at it,
17 saying this will work, and then there were
18 comments and then it came back.
19 Q.   Do you see in your title-block
20 there's a date?
21 A.   Yes.
22 Q.   And that would be the date it's
23 created?
24 A.   Yes.

293

1 specific crew assigned to it?
2 A. I knew who I was going to assign to
3 it.
4 Q. Like the project manager?
5 A. Yes.
6 Q. And who was that?
7 A. Vinnie Guzello.
8 Q. How do you spell Vinnie's last name?
9 A. G-U-Z-E-L-L-O.
10 Q. Is Vinnie one of your top guys?
11 A. Yes, he's a good guy.
12 Q. And when this didn't happen, did you
13 have him on another job?
14 A. Yes.
15 Q. He's been busy this year?
16 A. Yes.
17 Q. And the people that you contemplated
18 using to support Vinnie on this job, were
19 you able to get them work for that
20 three-week period of time?
21 A. I'd have to look at the calendar.
22 I'll have to look at the work schedule.
23 That's a fact. It either happened or it
24 didn't. It's not something I would keep in

294

1 my head.
2 Q. Have you had a lot of down time in
3 May?
4 A. I have -- I have -- you know,
5 anywhere from this time of year 50
6 employees up to 70 employees.
7      In May I probably had 40
8 employees. So I could have had 30 more.
9      You know, you can look at it.
10 We can see exactly how many people were
11 working. Could I have had more people
12 working? Certainly.
13 Q. Do you have a written work schedule
14 that we can look at to see how busy people
15 were at that time?
16 A. Yes, absolutely.
17 Q. All right. We'll take a look at
18 that.
19      MR. CIAVARRA: I have no
further questions.
21      REDIRECT EXAMINATION
22 BY MS. KORN:
23 Q. Two more things.
24 A. Then he's going to get another one.

295

1      MR. CIAVARRA: I don't think
2 so.
3 Q. Prior to Seating Solutions drafting
4 the first plan, did you get any drawings
5 from Geller?
6 A. I don't know the answer to that. I
7 know, I think we took drawings out of Ted's
8 office on one of the visits and digitized
9 them and then drew them. But I don't think
10 it was from Patrick. I think it was from
11 Ted.
12 Q. So you think you took paper drawings
13 from Ted's office?
14 A. Yes.
15 Q. And then scanned them in?
16 A. Correct.
17 Q. But you don't know where Ted had
18 gotten those drawings?
19 A. Correct. I just know they were in
20 the office when I got there. And I said I
21 needed a copy of that and got it.
22 Q. Do you remember what was on those
23 drawings?
24 A. Elevations.

296

1 Q. Elevations of the land?
2 A. Yes.
3 Q. Was there a baseball diamond on it?
4 A. Yes, I believe so.
5 Q. Was there a dugout?
6 A. No, those are ours.
7 Q. Were there any seating on those
8 drawings?
9 A. I think there was a players' bench on
10 the right and left side of the field, but I
11 don't recall.
12 Q. Do you have a copy of the drawing
13 that you took from Ted initially?
14 A. I'm sure we have it on AutoCad. Now
15 I'm sure we have it in AutoCad.
16 Q. Without the things that you then
17 added, you have like an initial scanned
18 version of that document?
19 A. I don't know if Scott would have kept
20 it as the initial scan or just kept it with
21 his work on it.
22 Q. Would there be a way to -- you might
23 not know this question-- but would there be
24 a way to remove the things that you added

297

1  to reveal the initial?

2  A.    It should be a layer.

3  Q.    Okay. So you think there probably

would be a way to remove the initial?

5  A.    It's like an overlay. I draw on this

6  sheet and peel it back.

7  Q.    So you think that there was a

8  baseball diamond, and maybe a players bench

9  on each side and elevations on the initial

10  drawings?

11  A.    I even think their old bleachers were

12  drawn in.

13  Q.    Their old bleachers were drawn in?

14  A.    Against the buildings and portables.

15  Q.    So there were bleachers before this

16  whole project started at this location?

17  A.    There were some horrendous bleachers

18  down there, old college -- should be thrown

19  away. And they're drawn in. It's their

20  site plan.

21  Q.    So it's the site plan from Holy

22  Cross?

23  A.    I believe.

24         MS. KORN: Okay. That's it.

298

1         MR. CIAVARRA: I'm done. I

2  promise.

3         THE WITNESS: Thank you.

4         (Whereupon the deposition was

5         concluded)

299

1  Excerpt from Rule 30 (e):

2    Submission to Witness; Changes; Signing.
3  When the testimony is fully transcribed,
   the deposition shall be submitted to the
4  witness for examination and shall be read
   to, or by him/her, unless such examination
5  and reading are waived by the witness and
   by the parties.   Any changes in form or
6  substance which the witness desires to make
   shall be entered upon the deposition by the
7  officer with a statement of the reasons
   given by the witness for making them.
8  This procedure must be accomplished within
   30 days of receipt of the transcript.

9  ******************************************
   I have read the foregoing, and it is a
10 true transcript of the testimony given by
11 me at the taking of the subject deposition.

12

13

14

      _____
15      Scott Suprina

16

17      DATE

18

19  CASE NAME:  RI, Inc. d/b/a Seating
    Solutions v. Geller Sport, Inc., et al
20
    DATE TAKEN:  July 29, 2005
21
22
23
24

300

1  ERRATA SHEET

2
   In accordance with the rules of procedure
3  governing depositions, you are entitled to
   read and correct your deposition.
4  Accordingly, please carefully read your
   deposition and, on this errata sheet, make
5  any changes or corrections in form or
   substance to your deposition that you feel
6  should be made.   PLEASE DO NOT MARK THE
   TRANSCRIPT.   After completing this
7  procedure, sign at the conclusion of such
   changes/corrections (if any) and return it
8  in accordance with your instructions.

9

10  PAGE  LINE  CHANGE          REASON

11

12

13

14

15

16

17

18

19

20

21

22

23      _____

24      Scott Suprina

1

Volume 1, Pages 1-228                    Exhibits: 1-44

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------

RI, INC D/B/A SEATING SOLUTIONS,
    Plaintiff


vs.                          Docket No. 05-CV-10365-JLT

GELLER SPORT, INC., GELLER DEVELLIS,
INC., WORCESTER PROFESSIONAL
BASEBALL, LLC AND PERFECT GAME
BASEBALL CLUBS, LLC,
    Defendants

------------------------------

DEPOSITION OF THEODORE TYE

Wednesday, August 24, 2005

9:57 a.m. - 4:55 p.m.

HENSHON PARKER VYADRO, P.C.

84 State Street

Boston, Massachusetts


KACZYNSKI REPORTING

72 Chandler Street, Suite 3

Boston, Massachusetts

617.426.6060


-------Reporter:  Amy L. Samara--------

**Theodore Tye**
**August 24, 2005**

(Pages 2 to 5)

<div style="page-break"></div>

2

APPEARANCES:

HENSHON PARKER VYADRO, P.C.
Terry Klein, Esq.
84 State Street, Suite 760
Boston, Massachusetts
617.367.1800      Fax 617.367.1877
for the Plaintiff

BOWDITCH & DEWEY, LLP
Louis M. Ciavarra, Esq.
311 Main Street
Worcester, Massachusetts 01615-0156
508.926.3408      Fax 508.929.3011
lciavarra@bowditch.com
for Worcester Baseball, LLC and Perfect Game
Baseball Clubs, LLC

---

3

APPEARANCES:
DONOVAN HATEM, LLP
Lauren Michaels Korn, Esq.
World Trade Center East
Two Seaport Lane
Boston, Massachusetts 02210
617.406.4635      Fax 617.406.4501
for Geller Sport, Inc., and Geller Devellis, Inc.

IN ATTENDANCE:
Alan Stone

---

4

1                 I N D E X
2
3  WITNESS:              THEODORE TYE
4
5  EXAMINATION BY:              PAGE:
6  Mr. Klein                7
7
8  EXHIBITS:              PAGE:
9  Exhibit 1, deposition notice..............8
10 Exhibit 2, e-mails dated February 7........55
11 Exhibit 3, e-mail dated February 8.........59
12 Exhibit 4, e-mail dated February 15........61
13 Exhibit 5, e-mail dated February 17........63
14 Exhibit 6, series of e-mails dated
15       February 17....................67
16 Exhibit 7, e-mail with attachments.........93
17 Exhibit 8, CAD plan dated February 4.......94
18 Exhibit 9, e-mail.........................96
19 Exhibit 10, memo dated February 3..........99
20 Exhibit 11, e-mail dated February 3........108
21 Exhibit 12, e-mail.........................111
22 Exhibit 13, e-mail and attachments dated
23       February 15....................113
24 Exhibit 14, e-mail dated February 20.......117

---

5

1  EXHIBITS:(con't)              PAGE:
2  Exhibit 15, e-mail dated February 20.......121
3  Exhibit 16, e-mail.........................127
4  Exhibit 17, e-mail dated January 31........128
5  Exhibit 18, proposal from Seating Solutions
6       dated February 2, 2005.........128
7  Exhibit 19, Amended Complaint and Demand for
8       Jury Trial....................133
9  Exhibit 20, Answer to Amended Complaint....133
10 Exhibit 21, comments on proposal...........147
11 Exhibit 22, February 15 proposal...........149
12 Exhibit 23, e-mail.........................151
13 Exhibit 24, February 18 proposal...........156
14 Exhibit 25, e-mail version of proposal.....158
15 Exhibit 26, series of e-mails dated
16       February 21....................171
17 Exhibit 27, insurance certificate..........175
18 Exhibit 28, fax from Seating Solutions.....177
19 Exhibit 29, AIA document...................192
20 Exhibit 30, e-mail dated January 31........196
21 Exhibit 31, e-mail dated February 1........197
22 Exhibit 32, e-mail dated February 1........197
23 Exhibit 33, e-mail with attachment dated
24       February 1....................198

---

2

**Theodore Tye**
**August 24, 2005**

(Pages 18 to 21)

|  | 18 |
|---|---|

1        MR. KLEIN: Can we go off the record?
2        (Off-the-record discussion)
3        MR. KLEIN: Back on the record. Can you
4    read back that last question?
5        Q. (Question read back by reporter)
6    BY MR. KLEIN:
7        Q. How do you divide your time between
8    National Development and what I'll just refer to as
9    Worcester Baseball?
10       A. I spend the majority of my time with
11   National Development. Worcester Baseball is a
12   start-up operation, and I have devoted considerable
13   time to Worcester Baseball this year as an investor
14   and a member of the Board of Directors.
15       Q. How much money have you invested in
16   Worcester Baseball?
17       A. $250,000.
18       Q. Was that just a cash investment or was that
19   in some other form?
20       A. It was a cash investment.
21       Q. Say this week, about how much time will you
22   spend working on National Development matters, how
23   much will you spend working on Worcester Baseball
24   matters?

|  | 19 |
|---|---|

1        MR. CIAVARRA: Do you want to exclude
2    the deposition here?
3        MR. KLEIN: No.
4        MR. CIAVARRA: How long are you going to
5    be here today?
6        A. Well, it's a difficult question to answer
7    because it varies from week to week. I would
8    typically spend forty to fifty hours on National
9    Development and five hours on Worcester Baseball.
10   BY MR. KLEIN:
11       Q. When was Worcester Baseball established?
12       A. I'm not positive of the date it was legally
13   established.
14       Q. I think you mentioned it earlier but if you
15   could, just for the record, repeat what your title
16   is with Worcester Baseball?
17       A. Chairman of the Board of Directors.
18       Q. When did you take on that role?
19       A. From the formation of the Company I was a
20   member of the Board that formed the Company, and I
21   believe that I became Chairman of the Board upon the
22   legal establishment of the Company, and I've been
23   active in that role since December probably.
24       Q. Does Worcester Baseball have an office of

|  | 20 |
|---|---|

1    its own?
2        A. Yes, it does.
3        Q. Where is that office located?
4        A. It's in Worcester.
5        Q. Do you know the precise address?
6        A. 303 Main Street, I believe. That may not
7    be the correct number.
8        Q. How long has it been located at 303 Main
9    Street?
10       A. I would be guessing, but I would say
11   probably since somewhere in the neighborhood of
12   January.
13       Q. And what would you say your
14   responsibilities are as Chairman of the Board?
15       A. Currently my responsibility as Chairman of
16   the Board is to Chair Board meetings, which occur
17   every few weeks.
18       Q. And as Chairman, what other types of
19   activities do you engage in for Worcester Baseball?
20       A. Currently?
21       Q. Yes.
22       A. I work closely with our Chief Executive
23   Officer in helping to provide some guidance in terms
24   of the operation of the organization.

|  | 21 |
|---|---|

1        Q. And the CEO is Mr. Stone; is that correct?
2        A. That's correct.
3        Q. What type of guidance are we talking about?
4        A. Related to various business issues that may
5    come up for the Company.
6        Q. What types of business issues?
7        A. They may involve everything from operations
8    to work with our stadium to capital issues and
9    budget issues, anything that a normal business might
10   encounter.
11       Q. How did you get involved with Worcester
12   Baseball?
13       A. I was invited to join a group of people who
14   were putting a Worcester baseball team together.
15       Q. Who invited you?
16       A. Alan Stone.
17       Q. When did he extend that invitation?
18       A. I believe I first met with Alan to discuss
19   the baseball team in late October or early November
20   of 2004.
21       Q. Who else was part of the group of people?
22       A. Thomas Alperin, A-l-p-e-r-i-n, Philip
23   Rosenfield, and Brad Michaels.
24       Q. Are each of these three individuals

6

**Theodore Tye**
**August 24, 2005**

(Pages 42 to 45)

---

**42**

1  31?
2      A.  I don't believe so.
3      Q.  So do you have a notion as you sit here
4  today as to what date they achieved I guess the buzz
5  word is "substantial completion?"
6          MR. CIAVARRA:  Objection.
7      A.  Dant Clayton was one of several major
8  contractors who were involved, all of whom were
9  trying to meet a very difficult schedule.  As I
10  recall, I know that Dant Clayton had certainly
11  completed the majority of their work by June 6, and
12  there were a number of different contractors who
13  were racing to get to the completion date and that
14  included electrical work and site work, a sound
15  system, and field lighting.  What I do recall is
16  that the substantial completion by all of the
17  contractors was in place in order to allow us to
18  have opening day on June 6.
19  BY MR. KLEIN:
20      Q.  Did any of the contractors come to you when
21  May 28 was the operative date and say to you, "We
22  just can't make the date"?
23      A.  Not that I can recall.  I used a gentleman
24  to help supervise the construction.  I used my own

---

**43**

1  observations when I was out on the site.  I
2  recognized very early on in the project the
3  difficulty of the schedule.  We had some delays in
4  the project due to weather and having a very wet
5  spring, and I think it was my judgement that it was
6  a very difficult schedule to meet.
7      Q.  Do you remember when you decided to move
8  from May 28 to June 6 as the date?
9      A.  To the best of my memory, it was sometime
10  early in May.
11      Q.  Now, one of the things I noted is that
12  among the five contracts that we discussed earlier,
13  Geller Sport and Geller Devellis weren't mentioned.
14  Did Worcester Baseball have a contract of some kind
15  with I'll just call it Geller?
16      A.  Yes.
17      Q.  When did Worcester Baseball get connected
18  with Geller?
19      A.  I think sometime in January to the best of
20  my memory.
21      Q.  Do you know who was responsible for
22  bringing Geller and Worcester Baseball together?
23      A.  Yes, it was me.
24      Q.  Why did you decide to get Geller and

---

**44**

1  Worcester Baseball together?
2      A.  Because I felt that Worcester Baseball
3  needed a consultant with experience in the design of
4  athletic facilities.
5      Q.  Are there other companies that do
6  consulting work of this type other than Geller?
7      A.  I'm sure there are.
8      Q.  So why did you pick Geller over the other
9  ones?
10      A.  I had lots of experience in my business
11  with Geller.  I found them to be a very competent
12  firm, and I knew of them, and that's why I called
13  them.
14      Q.  How many projects had you worked on with
15  Geller before the Fitton project?
16      A.  I would guess over twenty.
17      Q.  So what was Geller's role as a consultant?
18  Describe what they did.
19      A.  Geller had several roles as a consultant.
20  One was to assist us in evaluating different
21  locations for the baseball park.  Another was to
22  provide master planning for the park that we
23  ultimately selected, and then a third role was to
24  provide the ultimate engineering plans and site

---

**45**

1  plans for the location that we selected.  And
2  another role was to assist in evaluating the firm
3  that we chose to work with for the seating selection
4  of the park.
5      Q.  Anything else?
6      A.  Not that I recall.
7      Q.  What do you mean by "master planning"?
8      A.  Master planning is taking what exists on
9  the ground when you find a particular site and
10  helping to determine how the improvements are
11  provided at the site.
12      Q.  In terms of the evaluation of the seating
13  supplier, what specifically was kind of Geller's
14  scope of work in that category?
15      A.  They sat with me at various meetings and
16  provided advice when requested.
17      Q.  Who is Chris Sgarzi?
18      A.  Chris Sgarzi is an architect.
19      Q.  What did he do on the Fitton Field project?
20      A.  Chris was someone who had worked with
21  Geller in the past and who had some experience in
22  athletic facility projects and served as an
23  architect and a consultant.
24      Q.  How, if at all, did Geller and Sgarzi's

---

12

46

1 roles differ?
2    A. Geller's role was focused on site planning
3 issues. Sgarzi is an architect and was more
4 concerned on building and design of the building and
5 structural design issues.
6    Q. Who was Worcester Baseball's primary
7 contact at Geller?
8    A. For this project it was Patrick Maguire.
9    Q. Who else did you work with at Geller on
10 this project? When I say "you" I mean Worcester
11 Baseball.
12    A. Andy Truman, Theo Kindermanns, maybe at an
13 early stage Rebecca Bachand.
14    Q. But would you say it's fair to say that
15 Maguire was kind of your lead contact?
16    A. Yes.
17    Q. When did you first meet Mr. Maguire?
18    A. I would say approximately five to seven
19 years ago.
20    Q. How did you meet him?
21    A. Through a project that my firm worked on
22 with Geller.
23    Q. Which project, do you remember?
24    A. It was a project in Southerton,

47

1 Connecticut.
2    Q. What type of project was it?
3    A. It was a housing project.
4    Q. How many other projects had you worked on
5 with Mr. Maguire before this Fitton Field project?
6    A. I was involved in one other project that I
7 was working directly with Mr. Maguire.
8    Q. What was that project?
9    A. That was a project for the City of Newton.
10    Q. What type of project was it?
11    A. Sports fields.
12    Q. What sports?
13    A. Baseball, soccer, lacrosse, and football.
14    Q. Is that project complete at this point?
15    A. No.
16    Q. When did you start working with Mr. Maguire
17 on that?
18    A. August of 2004.
19    Q. What's your target completion date?
20    A. September of 2007.
21    Q. And the owner on that project is the City
22 of Newton?
23    A. Yes.
24    Q. Where are these sports fields going to be

48

1 located?
2    A. Various fields in the City of Newton.
3    Q. At different locations?
4    A. Yes.
5    Q. And will these projects have seating
6 elements?
7    A. Yes.
8    Q. Who is going to provide the seating?
9    A. It's not determined.
10    Q. Do you know if, prior to the Fitton Field
11 project, Mr. Maguire had ever worked on a minor
12 league baseball stadium before?
13    A. I don't know.
14    Q. Do you know if he had any experience with
15 other types of professional sports facilities?
16    A. I don't know.
17    Q. How about high school sports?
18    A. Yes.
19    Q. What's your understanding of the experience
20 he had with high school sports facilities?
21    A. I know that Mr. Maguire has been involved
22 in the development of several high school sports
23 fields, as well as collegiate fields.
24    Q. Do you know which high schools he's worked

49

1 for?
2    A. I've seen a list but I don't recall them.
3    Q. How about college fields?
4    A. Again, I have seen a list, but I don't
5 recall exactly which ones.
6    Q. Any baseball stadiums on those lists?
7    A. I don't know.
8    Q. Have you generally been happy with
9 Mr. Maguire's work?
10    A. Yes.
11    Q. Let's talk about Mr. Maguire on this
12 particular project. Did Mr. Maguire ever talk to
13 you about Seating Solutions?
14    A. Yes.
15    Q. Did he ever share his opinion regarding
16 Scott Suprina personally, not to the quality of his
17 work, but personally?
18    A. Not that I recall.
19    Q. Did he ever share an opinion with you
20 regarding the quality of Seating Solutions' work as
21 a general matter?
22    A. As a general matter, no.
23    Q. Did he ever share an opinion regarding any
24 of Seating Solutions' specific proposals?

**Theodore Tye**
**August 24, 2005**

(Pages 50 to 53)

---

50

1　A. Yes.
2　Q. How many times would you say this happened?
3　A. Several.
4　Q. Let's just kind of start with the first
5　one. When was the first time that he shared an
6　opinion regarding a specific Seating Solutions
7　proposal?
8　A. I believe that I shared Seating Solutions
9　proposals with him in his role as my consultant and
10　asked for his advice.
11　Q. And when was the first time that you did
12　that, do you recall?
13　A. I don't specifically recall.
14　Q. How many of Seating's proposals did you
15　share with him?
16　A. I would say most of them, but I can't tell
17　you precisely.
18　Q. Do you know how many times you discussed
19　specific proposals with Mr. Maguire, Seating's
20　proposals?
21　A. I don't know how many times. I don't know
22　how many times.
23　Q. The first time you shared a proposal with
24　him and he shared his opinion with you, what did he

---

51

1　say?
2　A. I don't remember the specifics. I do
3　remember that we had several meetings to review
4　comments and that he provided some input.
5　Q. What input did he provide?
6　A. We talked about various aspects of the
7　plan, how it was oriented on the site, things like
8　dugouts and press box locations, and he was involved
9　in those discussions as were several others.
10　Q. How many discussions?
11　A. I don't know how many.
12　Q. Well, generally, then. Again, let's back
13　up to the first time you shared a proposal with him,
14　what opinion did he share with you about that
15　proposal?
16　A. When you say "proposal," are you referring
17　to -- why don't you tell me what you're referring
18　to.
19　Q. I'm using a word that you used. You said,
20　I believe earlier, and correct me if I'm wrong, that
21　you shared specific proposals that Seating Solutions
22　had provided to you with Mr. Maguire; is that right?
23　A. Yes, those proposals included plans. I
24　guess what I was referring to is that Mr. Maguire

---

52

1　was involved in the review of plans and written
2　materials.
3　Q. Starting with the first time he ever
4　expressed an opinion to you regarding any of the
5　plans or any of the proposals, what opinion did he
6　share with you?
7　A. I don't recall specifically what opinion he
8　shared. I do recall that we had several meetings
9　with various people involved. We reviewed plans and
10　we also reviewed written proposals. In terms of
11　what Mr. Maguire provided specifically on a first
12　review, I don't recall.
13　Q. Can you tell me was it a favorable opinion
14　at any point that he provided of Seating's
15　proposals?
16　A. I wouldn't call it either favorable or
17　unfavorable. He reacted to various aspects of the
18　proposal like other people on my team did.
19　Q. What aspects do you recall that Mr. Maguire
20　shared opinions about, and I'm talking now of
21　drawings or proposals, anything?
22　A. I don't recall any specific comments that
23　Mr. Maguire had. We were working, like is typical
24　in a project like this, where you review a set of

---

53

1　plans and various people make comments on them.
2　That happened in at least several meetings and
3　possibly several phone conversations. And there's
4　nothing that Mr. Maguire said that particularly
5　stands out in my mind as coming from him during that
6　process.
7　Q. Do you remember any opinions that
8　Mr. Maguire shared with you regarding any Seating
9　Solutions' -- let's start with proposals?
10　A. I do remember that at one point in the
11　process Mr. Maguire told me that he was reviewing a
12　Seating Solutions proposal and he thought that the
13　number, the price, was exceptionally high. I do
14　remember that.
15　Q. Do you remember the date of that
16　conversation?
17　A. I don't.
18　Q. Do you remember the precise words he used?
19　A. I don't remember the precise words.
20　Q. Do you have an approximate recollection?
21　A. Yes. I do remember him saying that, based
22　on a per seat calculation of what a project like
23　this should cost, he felt that the Seating Solutions
24　proposal was high.

---

14

**Theodore Tye**
**August 24, 2005**

70

1  lowest possible price.
2      Q.  So now that you've had a chance to review
3  some of these e-mail messages, do you now recall any
4  other opinions that Mr. Maguire might have shared
5  with you regarding Seating's proposals or drawings?
6      A.  Consistent with what I said earlier, I do
7  remember that the pricing was very high that we were
8  being provided.
9      Q.  So just to close the loop again, did he
10  ever share any opinions regarding Mr. Suprina
11  personally?
12      A.  Not that I remember.
13      Q.  Did you attend any meetings where both Pat
14  Maguire and Scott Suprina were present?
15      A.  Yes.
16      Q.  How many meetings?
17      A.  At least one.
18      Q.  But it could have been more?
19      A.  It could have been more, but I do
20  specifically remember one meeting.
21      Q.  Do you remember what the date was on that
22  meeting?
23      A.  I don't remember the exact date.
24      Q.  If I was to say February 15, would that

71

1  strike you as horribly incorrect?
2      A.  No, that sounds just about correct.
3      Q.  Who was present?
4      A.  I remember Patrick Maguire being there,
5  myself, Scott Suprina, I believe Scott Ruczaj from
6  Mr. Suprina's office, and I don't recall if anyone
7  else was there for that meeting.
8      Q.  How about Joe Gallagher?
9      A.  He may have been.
10      Q.  And just for the record, who is Joe
11  Gallagher?
12      A.  Joe Gallagher was formerly employed as the
13  Director of Business Development at Cranshaw
14  Construction, which is a subsidiary of my company.
15      Q.  And was he involved in the selection of a
16  seating contractor?
17      A.  He at that time was assisting me with some
18  project management tasks.
19      Q.  I'm going to ask the question again.  Was
20  he involved in the selection of the seating
21  contractor?
22      A.  He wasn't involved in the selection, but he
23  was involved in assisting me in meeting with some of
24  the people involved in the process.

72

1      Q.  Did he assist you with assessing various
2  seating contractors?
3      A.  No.
4      Q.  Did he attend any meetings?
5      A.  Yes, he did.
6      Q.  Did he attend any meetings with potential
7  seating contractors?
8      A.  Yes, he did.
9      Q.  Why did you have him at those meetings?
10      A.  To provide me with some project management
11  services, to help me administratively because I was
12  extremely busy at the time.
13      Q.  What do you mean by "project management
14  services"?
15      A.  He sat through the meeting.  I know I asked
16  him to check at least one reference, and he provided
17  some help with any follow-up items that I needed as
18  a result of the meetings that he sat through, which
19  were relatively few because he left the Company
20  shortly thereafter.
21      Q.  And when you say that "he sat through the
22  meeting," are we talking about the February 15
23  meeting or just some other meeting that you might
24  recall?

73

1      A.  I believe he sat through the February 15
2  meeting, but I don't recall exactly if he was there.
3      Q.  What administrative tasks would he assist
4  you with?
5      A.  I actually planned for him to play a
6  greater project management role if he had not left
7  the Company, and I wanted him to have background on
8  the process so that he would be able to play a
9  stronger role later on.
10      Q.  Where was this meeting?
11      A.  It was at my office.
12      Q.  In Newton?
13      A.  Yes.
14      Q.  How long did it last?
15      A.  I don't remember exactly.  I would guess
16  somewhere between one and two hours.
17      Q.  Who called it?  Do you know who called the
18  meeting?
19      A.  I would suspect that I did, but I don't
20  remember exactly.
21      Q.  What generally happened at the meeting?
22      A.  I believe at that meeting we provided
23  Mr. Suprina with some input on a proposal that he
24  had provided to us and worked on a plan proposal

**Theodore Tye**
**August 24, 2005**

102

1 that I described a minute ago.
2   Q.  Do you recall discussing at all at that
3 meeting whether it would be appropriate to send to
4 Dant Clayton Seating Solutions' layout plan?
5   A.  No.
6   Q.  Could it have been discussed?
7     MR. CIAVARRA:  I object.
8   A.  I don't remember it being discussed.
9 BY MR. KLEIN:
10   Q.  Did Patrick ever tell you that he wanted
11 Worcester Baseball to hire someone other than
12 Seating to do the work on the bleachers?
13   A.  No --
14   Q.  He didn't?
15   A.  -- not in those words.
16   Q.  What words did he use?
17   A.  As I mentioned earlier, he was employed as
18 a consultant by the baseball group to provide advice
19 on the project.  He had a very favorable experience
20 with another company and had urged us to consider
21 that company as part of our deliberations on who to
22 hire, based upon his positive experience with that
23 company.
24   Q.  And that other company was Dant Clayton.

103

1 Correct?
2   A.  Correct.
3   Q.  So what you're saying is:  It wasn't so
4 much that he was saying don't hire Seating
5 Solutions, it was that he was saying hire Dant
6 Clayton?
7   A.  That's correct, and Pat provided some
8 input.  Ultimately the baseball board was the one
9 making the decision on it, but Pat clearly had a
10 very positive experience with Dant Clayton and
11 expressed that to us.
12   Q.  Did you ever share any of the CAD files
13 that Seating Solutions sent you with anybody other
14 than Geller?
15   A.  No.
16   Q.  Did you personally, you Ted Tye, ever
17 authorize anybody at Geller to disclose the CAD
18 files to anybody else?
19   A.  No.
20   Q.  When you talked with Dant later in
21 February, did Dant say that they had seen Seating's
22 drawings?
23   A.  They had seen -- I don't know if they said
24 they saw Seating's drawings.  They had seen Geller's

104

1 drawings.
2   Q.  Do you know what drawings they were
3 referring to when they were talking about Geller's
4 drawings?
5   A.  Geller developed a series of plans that
6 showed again the whole area of the baseball field,
7 and I believe that they superimposed, by CAD, some
8 of the Seating Solutions' proposed layouts on their
9 own plan.
10   Q.  And so did you personally see some of these
11 Geller drawings?
12   A.  Yes, I did.
13   Q.  Did you recognize the seating plans as
14 Seating Solutions' plans?
15   A.  Yes, I did.  And, just to expand on that a
16 bit, those -- we had Geller plans earlier that had other
17 because we had Geller plans earlier that had other
18 designs superimposed on it not created by Seating
19 Solutions.
20   Q.  Was the design that was created beforehand
21 created by a seating contractor or no?
22   A.  It was created by a seating architect, a
23 stadium architect.
24   Q.  Who was that architect?

105

1   A.  It's an architectural firm called Sink
2 Combs Dethleff, which I believe is located in
3 Denver.
4   Q.  Would you then have used those designs to
5 go out and get a contractor to throw the seats in?
6 Was that an initial idea?
7   A.  We had two alternatives.  One would be to
8 -- if this was a more typical construction project,
9 we would have hired an architect like Sink Combs
10 Dethleff's to produce the plans and then the plans
11 would have been bid out to several different
12 contractors.  Because of the tight timing involved,
13 we chose to go the design-build route, which was to
14 discuss the project with design-build contractors
15 who would then provide us with a design and
16 proposal.
17   Q.  Did you ever share the Sink Combs drawings
18 with the Seating folks?
19   A.  Yes, I believe we did.
20   Q.  When you met with Dant later in February,
21 did Dant say that they were incorporating any of
22 Seating's design ideas?
23   A.  No.
24   Q.  Based on your review of the plans they

27

**Theodore Tye**
**August 24, 2005**

(Pages 106 to 109)

---

**106**

1  provided you, did it look like they were
2  incorporating any of Seating's designs in it?
3      A.  As I mentioned, we originally had Sink
4  Combs Dethleff involved.  That was even before my
5  involvement with the baseball group.  They developed
6  a basic plan for this site that probably if you gave
7  it to ten architects they would come up with a very
8  similar plan because the site had some constraints
9  to it that required a plan that looked like this.
10  That Sink Combs Dethleff plan we then gave to Geller
11  and Geller, with some additional comment, created
12  their own version of that plan.  That plan, the
13  Geller plan, was then given to both Dant and to
14  Seating Solutions and they used that to base their
15  plans upon.  So I would tell you that the Dant plan,
16  in the end, was very similar to the Sink Combs plan
17  in the beginning.
18      Q.  Did it seem apparent to you at the meeting
19  with Dant -- I think it was February 20, I'm not
20  sure what the date was at this point -- that they
21  were familiar with what Seating's design plans were?
22      A.  I think that they were generally familiar
23  with it, and I believe that they had a copy of the
24  Geller plan that showed the Seating Solutions'

---

**107**

1  seating on it.
2      Q.  So do you know how Dant came to know
3  whatever it did know about Seating Solutions' plans?
4      A.  Do I know, no.
5      Q.  Do you have any suspicions?
6          MR. CIAVARRA:  Objection.
7      A.  I suspect that the plan was probably
8  provided by Geller before the meeting.
9  BY MR. KLEIN:
10      Q.  Who do you think at Geller provided the
11  plan?
12      A.  I have no idea.
13      Q.  Do you have an understanding today as to
14  whether you or Geller could share those CAD files
15  with third parties?
16          MS. MICHAELS KORN:  Objection.
17          MR. CIAVARRA:  I'm going to caution the
18  witness.  If you can't answer that question without
19  revealing the advice you've received from counsel,
20  then you can't answer it, and I instruct you not to
21  answer.
22          MR. KLEIN:  Let's rewind to the dates in
23  question.
24          MR. CIAVARRA:  And that's not today.

---

**108**

1  BY MR. KLEIN:
2      Q.  At that time, did you have a belief as to
3  whether those CAD files could be or any CAD that
4  were disclosed to you by Seating Solutions could be
5  shared with third parties?
6          MR. CIAVARRA:  If you thought about it
7  at the time.
8      A.  I did not think about it at the time.
9  BY MR. KLEIN:
10      Q.  So you had, as far as you can recall, no
11  understanding as to whether you could disclose CAD
12  files provided by Seating Solutions to anybody other
13  than Geller?
14      A.  I did not think about that at the time.  I
15  provided them only to Geller.
16          MR. KLEIN:  Counsel, we're going to be
17  looking at tab 9.  Can you mark this?
18          (Exhibit 11, e-mail dated February 3,
19  marked)
20  BY MR. KLEIN:
21      Q.  Mr. Tye, if you could just take a look at
22  that and then let me know when you're done.
23          Just for the record, the second two
24  pages are actually an eleven-by-seventeen document,

---

**109**

1  and if you yank them apart you can kind of get a
2  sense of what the document would look like as an
3  eleven-by-seventeen.
4          Could you identify this document for the
5  record?
6      A.  There's an e-mail from Rebecca Bachand to
7  Matt Dougherty dated February 3, and on top of it an
8  e-mail from Matt Dougherty to Patrick Maguire with
9  copies to Rebecca Bachand and Chris Sgarzi dated
10  February 7.
11      Q.  Matt Dougherty works for Dant Clayton.
12  Correct?
13      A.  Correct.
14      Q.  In the attachment if you could just take a
15  quick look, do you see the seating plan that is
16  attached there?
17      A.  Yes.
18      Q.  Is that a CAD version of a seating plan
19  that was prepared by Seating Solutions?
20      A.  I don't see it labeled, but it appears to
21  be, but I can't be sure.
22          MR. CIAVARRA:  Don't guess.  If you
23  don't know, don't guess.
24  BY MR. KLEIN:

---

28

**Theodore Tye**
**August 24, 2005**

(Pages 122 to 125)

---

122

1  "They brought some graphics to show that the Seating
2  Solutions plan," et cetera et cetera et cetera?
3     A. Yes.
4     Q. Describe those graphics for me.
5     A. I remember them showing us a graphic that
6  showed what we typically call a "cut section," which
7  would be a cut through of the stands with a typical
8  fan sitting on the stands and the view line that
9  that fan would have looking at the field.
10    Q. What Patrick's e-mail says, right, is "It
11  shows the Seating Solutions' plan blows from a sight
12  line standpoint"; do you see that?
13    A. Yes.
14    Q. How specifically did, if you recall, Dant
15  go about showing the shall we say "inadequacies" of
16  the seating plan?
17        MS. MICHAELS KORN: Objection.
18    A. I remember them bringing in a plan that
19  showed their proposal. Whether they actually had
20  anything that had been provided by Seating
21  Solutions, I don't recall.
22  BY MR. KLEIN:
23    Q. Did it seem to you at that meeting though
24  that they were basically familiar with the Seating

---

123

1  Solutions plan?
2        MS. MICHAELS KORN: Objection.
3     A. They had -- I want to be careful about the
4  term "Seating Solutions' plan."
5  BY MR. KLEIN:
6     Q. Sure.
7     A. Geller had taken the Seating Solutions
8  layout and put it on the overall ballpark plan, and
9  they did seem familiar with the overall ballpark
10  plan. So I don't know whether that was a plan from
11  Seating Solutions or a plan from Geller, but there
12  was a difference. I just want to make sure I'm
13  clear on that.
14    Q. Understood. Let's talk in terms of the
15  overall ballpark plan. Did you have any
16  understanding on that date as to how Dant had become
17  familiar with what you just referred to as the
18  "overall ballpark plan"?
19    A. I believe the plan had been sent to them by
20  Geller.
21    Q. But you don't know that today?
22    A. I don't know that for a fact, but I believe
23  that's the case.
24    Q. So you weren't copied on e-mails from

---

124

1  Patrick or anybody who worked with that were sent to
2  Dant?
3     A. To Dant Clayton, no, not that I recall.
4     Q. Did you know at that February 20 meeting
5  and beforehand that Patrick was in discussion with
6  Dant?
7        MS. MICHAELS KORN: Objection.
8     A. I had asked Pat several times to give Matt
9  Dougherty a call and see if we can get Dant
10  interested. We liked Dant. We thought they were
11  the right guys. We wanted them involved in the
12  project, so I asked Pat to do that several times.
13  Obviously, before I met with them, I knew that they
14  were coming. I knew that we were having a meeting,
15  and I knew that they had a renewed interested in
16  becoming involved with the project.
17  BY MR. KLEIN:
18    Q. Well, we'll come back to Dant in a little
19  bit.
20        Now, let's talk about Philip Rosenfield.
21  I think you testified earlier that Mr. Rosenfield
22  was not on the Board of Directors --
23    A. That's correct.
24    Q. -- of Worcester Baseball. He was

---

125

1  previously or no?
2     A. He was never on the Board, no.
3     Q. Was he involved?
4     A. Yes.
5     Q. Is he now?
6     A. No.
7     Q. Why not?
8        MR. CIAVARRA: I object and let me think
9  about it. I'm going to instruct him not to answer
10  that. There are ongoing negotiations between Mr.
11  Rosenfield and the team which are confidential and
12  involve counsel. If there comes a time in which
13  that becomes relevant to this case, I'll certainly
14  make Mr. Tye available to answer those questions.
15  But at this point, I don't see any relevance to any
16  issues that are going on with Mr. Rosenfield today,
17  so I instruct him not to answer those.
18        MR. KLEIN: You're instructing him not
19  to answer based on relevance, Lou.
20        MR. CIAVARRA: I just made my objection,
21  Terry, move on.
22        MR. KLEIN: You're instructing him --
23        MR. CIAVARRA: You just heard me, move
24  on. I'm not going to explain it any further. We're

---

**Kaczynski Reporting**

Theodore Tye
August 24, 2005

(Pages 134 to 137)

134

1 please?
2    A. This is Answer to Amended Complaint.
3    Q. Whose Answer is that?
4    A. Worcester Professional Baseball, LLC and
5 Perfect Game Baseball Clubs, LLC.
6    Q. If you could take a look at your responses,
7 Worcester Baseball's responses, to paragraph 29
8 through 34.
9    A. Okay.
10    Q. Now, do you see in the answer paragraph 32
11 is denied?
12    A. Correct.
13    Q. If you could just for record, what does
14 paragraph 32 say?
15       MR. CIAVARRA: Of the Complaint?
16       MR. KLEIN: Yes.
17    A. The Complaint says, "Suprina then stated
18 excuse me for being so blunt, but I must start work
19 on Saturday to make your date. Do I have an order?"
20    Q. Do you know why paragraph 32 was denied?
21       MR. CIAVARRA: Objection. He can't
22 answer that without disclosing conversations with
23 Counsel. I instruct him not to answer.
24 BY MR. KLEIN:

135

1    Q. What about paragraph 32 is inaccurate?
2    A. The entire statement.
3    Q. The entire statement. So Scott Suprina, it
4 is your testimony today, never said, "Excuse me for
5 being so blunt, but I must start work on Saturday to
6 make your date. Do I have an order?"
7    A. Never said it.
8    Q. Did he say anything similar to that?
9    A. No.
10    Q. Paragraph 33. If you could just look at
11 that and tell me what is inaccurate about that
12 paragraph?
13    A. I never confirmed that there was an
14 agreement between Worcester Baseball and Seating
15 Solutions.
16    Q. Did you say anything similar to "Yes, you
17 have an order"?
18    A. I said nothing similar to that at all.
19    Q. So bringing it down to its smallest parts,
20 did you ever shake hands with Mr. Suprina during the
21 meeting?
22    A. I did.
23    Q. Did you, in the process of shaking hands,
24 ever confirm that there was a deal of any type

136

1 between Seating Solutions and Worcester Baseball?
2    A. I never confirmed there was any deal, quite
3 the contrary.
4    Q. What do you mean by "quite the contrary?"
5    A. Any discussions that I ever had with
6 Mr. Suprina were around his proposal. We reviewed
7 his proposal at the meeting. He was very clear that
8 until a proposal was signed and until a deposit
9 check was provided to him that there was no deal. I
10 had a number of points at that meeting that we
11 discussed that I was not comfortable with. I told
12 him that I would provide him with additional
13 comments after the meeting. I also told him at the
14 meeting that I was not authorized to make an
15 agreement, that any agreement would have to be
16 agreed upon by our entire Board.
17       Additionally, I told him that any
18 proposal be subject to an AIA construction contract,
19 and I also told him that any deal would be subject
20 to the approval of Holy Cross. So based on
21 everything that he was told, I find it just
22 unbelievable that he would go out of the room
23 thinking that he had a contract when he walked out
24 with an unsigned proposal with all of those

137

1 different issues remaining on the table.
2    Q. Moving on. We'll get into that with a
3 little bit more flesh in a couple of moments.
4    A. I hope so.
5    Q. Paragraph 34. Can you tell me what is
6 inaccurate about paragraph 34 of the Complaint?
7    A. I never stated that we had reached an
8 agreement.
9    Q. Did you say anything similar to that?
10    A. I may have said that we made progress on an
11 agreement. But, again, anything that I would have
12 said would have come with the caveat that was very
13 clearly stated that it was subject to -- and I think
14 I told him in the meeting that Alan Stone would sign
15 anything that needed to be signed because he was the
16 person who would sign things on behalf of the group.
17 I told him quite clearly that it was subject to a
18 meeting of our Board.
19    Q. All right. Let's rewind to the first time
20 that you ever met Scott Suprina. Do you remember
21 the date of that meeting?
22    A. I believe it was January 28, or
23 thereabouts.
24    Q. Where did that meeting happen?

**Theodore Tye**
**August 24, 2005**

(Pages 146 to 149)

---

**146**

1    Q. We're going to get to the February 18 in
2 more detail in a moment. Mr. Suprina, at the
3 February 18, specifically asked you to sign his
4 proposal. Correct?
5    A. He told me that he wanted to begin the
6 project. He wouldn't do that until he had a signed
7 proposal and a check, and I understood that very
8 clearly and I would have expected that he would have
9 made that request because that's standard industry
10 practice.
11    Q. So that's more of a statement. Did he ask
12 you to sign the proposal at the February 18 meeting?
13    A. We spoke on the phone prior to that
14 meeting, and he came to the meeting, I believe,
15 expecting that I would sign a proposal and give him
16 a check. It was made very clear by me at the
17 meeting that I was not ready to do that.
18    Q. How do you know that he was expecting that?
19    A. Well, his proposal said it for one thing.
20 It says in his proposal that it requires a signature
21 and a check, as did all of his proposals. So, as a
22 prudent businessman, I would believe, if I were
23 going to do business with him, I would be giving him
24 a signed proposal and a check.

---

**147**

1    Q. So just backing up to the February 15
2 meeting, apart from what we've discussed, do you
3 have any other recollections of the February 15
4 meeting?
5    A. No.
6       MR. KLEIN: Let's just take a look at
7 some of these proposals that predated the February
8 18 meeting, and I think we can start with --
9 Counsel, this is tab 6 and it is Exhibit 18.
10 BY MR. KLEIN:
11    Q. You can just take a look at that document
12 in a little more detail than you did before and let
13 me know when you're done.
14    A. Okay.
15       MR. KLEIN: Now, related to that
16 document, I believe, Counsel, if you take a look at
17 tab 12, which I'm going to have the court reporter
18 mark.
19       (Exhibit 21, comments on proposal,
20 marked)
21 BY MR. KLEIN:
22    Q. I'm showing you what has been marked as
23 Exhibit 21. If you just want to take a look at that
24 and look up at me when you're done.

---

**148**

1    A. Okay.
2    Q. Now, as you look back at Exhibit 18, which
3 is the proposal, and it looks like Exhibit 21 are
4 some of your comments on that proposal. What were
5 your major concerns about the proposal that was
6 submitted on February 2 and some of the drawings
7 that accompany them?
8    A. What were some of my major concerns. Well,
9 I do a lot of business in the construction area and
10 this is a very minimal proposal. That was a major
11 concern and I certainly wouldn't commit to a 1.8
12 million dollar contract based upon a three-page
13 memo. It's lacking in detail. The plans that went
14 with it we had been working with both Geller and
15 Holy Cross to get their comments, as noted in this.
16 We had a meeting with them that was coming up
17 afterwards. I provided a number of comments that
18 are noted in the e-mail based on some of my thoughts
19 and I requested additional detail from Seating
20 Solutions in this e-mail.
21    Q. Is it fair to say that of your concerns
22 price was the most significant?
23    A. No. There were a number of concerns, one
24 being price, and other concerns were that we put

---

**149**

1 together here the best possible stadium to meet the
2 needs of our business. As I said, we were in the
3 process of trying to understand that and make sure
4 we understood what we were getting in this proposal.
5    Q. Looking back at Exhibit 21, in your e-mail
6 addressed to Cristie, but also to Scott Suprina, the
7 last line of that is, "We look forward to working
8 with you on the project." What did you mean by
9 that?
10    A. I meant that if we were working with him on
11 the proposal and, like I would say to any potential
12 bidder, we hope we can work with you on the project.
13 Obviously, subject to having an agreement in place.
14 So it's more of a courtesy line. It does not have
15 any additional meaning to it than that.
16       MR. KLEIN: Counsel, we're looking at
17 tab 17. Can you mark this?
18       (Exhibit 22, February 15 proposal,
19 marked)
20 BY MR. KLEIN:
21    Q. If you could just take a quick look at
22 that, then I'm going to ask you a couple of
23 questions about this.
24    A. Okay. I've taken a quick look.

---

38

Theodore Tye
August 24, 2005

(Pages 162 to 165)

162

1      MR. CIAVVARA:  You're talking about the
2  date that liquidated damages would begin to accrue?
3      MR. KLEIN:  That's correct.
4    A.  May 15, 2005.
5  BY MR. KLEIN:
6    Q.  So back to my original question:  Are there
7  terms, for example, that are in an AIA contract that
8  are not in this document that you would have liked
9  to have seen in this document?
10      MR. CIAVARRA:  Objection.
11      MS. MICHAELS KORN:  Object also.
12    A.  Yes.
13  BY MR. KLEIN:
14    Q.  What terms?
15    A.  An AIA document is a carefully-worded legal
16  document that is customarily used in the
17  construction business.  I am not a lawyer and I
18  would not enter into any agreement for a
19  construction project anything close to this size
20  without relying on the AIA document, which has much
21  detail to it, more than I can describe here.
22    Q.  So what I'm trying to figure out is when
23  you add your edits, your notes, were there any
24  terms, any contract or deal points if you will, that

163

1  you would have wanted to have in a final agreement?
2      MR. CIAVARRA:  Objection.  Asked and
3  answered.
4      MR. KLEIN:  I agree about the asked
5  part.
6      MR. CIAVARRA:  Well, it's been answered
7  too.
8    A.  I added additional provisions in here after
9  the meeting with Suprina and I made very clear to
10  him that I would be meeting with my Board and that
11  they may also have additional provisions that they
12  wanted included in the agreement before they signed
13  off on it.
14  BY MR. KLEIN:
15    Q.  So it could be that the Board might have
16  some additional terms that you might not have
17  identified?
18    A.  Or that there may be additional terms that
19  would come out of the negotiation of an AIA
20  contract.
21    Q.  So as of you sending this proposal out, was
22  there anything you still had to negotiate with
23  Seating Solutions?
24    A.  I did not fully negotiate this for one

164

1  thing.  For a second thing, I was about to meet with
2  my Board and I did not know what issues they would
3  bring up.  For a third thing, I had not had full
4  input from Holy Cross in terms of their review of
5  the project so I did not know what issues they would
6  bring up.  So all of those things had to be done
7  prior to us executing the unsigned proposal.
8    Q.  So the terms that were not included in this
9  proposal, let's say remained open for negotiation,
10  were the terms that the Board would identify, that
11  Holy Cross would identify, and that you could
12  identify as the negotiation process moved forward;
13  is that your testimony?
14    A.  Until there was a signed proposal, any
15  terms in my mind would be subject to change and
16  negotiation.  This was a negotiation.  It was never
17  an agreement.  So until there was an agreement, in
18  my mind, and in industry practice, anything remains
19  open for discussion.
20    Q.  So you never said to Scott, "We have a
21  deal"?
22    A.  I never said to Scott, "We have a deal."
23    Q.  You never said to Scott, "You have an
24  order"?

165

1    A.  I never said to Scott, "We have an order."
2    Q.  And at a certain point during the meeting
3  on February 18, did Scott ask you to confirm that
4  Worcester Baseball and Seating Solutions had a
5  contract?
6    A.  No.
7    Q.  At a certain point, did he ask Worcester
8  Baseball to hire Seating Solutions to install the
9  seating system at Fitton Field?
10    A.  He was there with a proposal in hand.  He
11  asked us to -- he was there to get a signature on
12  his proposal and get a deposit check, and I did not
13  give it to him.
14    Q.  Did Scott Suprina ever say that he wouldn't
15  begin work until you gave him a deposit?
16    A.  Yes.
17    Q.  Did he ever tell you that he wasn't going
18  to begin work until you signed the proposal?
19    A.  Yes.
20    Q.  Did he place any other conditions on
21  starting work?
22    A.  He told me he needed to order -- he wanted
23  to begin the process of ordering materials and that
24  he couldn't do that until he had a deposit and a

42

**Theodore Tye**
**August 24, 2005**

(Pages 186 to 189)

---

186

1  was that we would be better off not accepting a
2  proposal from Seating Solutions and trying to
3  negotiate with Dant Clayton.
4      Q.  Was Patrick Maguire in the room, do you
5  remember?
6      A.  He was there for a good part of the day.
7  We had a very long meeting, and he was there for a
8  good part of it.
9      Q.  At this point, did you have a notion of how
10 Patrick Maguire felt about Scott Suprina and Seating
11 Solutions?
12          MS. MICHAELS KORN:  Objection.
13     A.  I think it was clear that Patrick had a
14 good deal of experience with Dant Clayton.  He
15 respected Dant Clayton, and he, as did we, felt they
16 were the superior firm based on their background and
17 experience and people who were sitting in front of
18 us.  We all had the same opinion that Pat did on
19 that.
20 BY MR. KLEIN:
21     Q.  He didn't express any negative opinions
22 about Seating Solutions' product?
23     A.  In his role as a consultant he helped us
24 consider what both firms were putting in front of

---

187

1  them.  And there were various aspects of both
2  proposals that he commented on.
3      Q.  I think you've stated this in response to a
4  number of different questions, but I just want to
5  get an answer in a single question.
6          How did Patrick Maguire affect your
7  decision to choose Dant Clayton versus Seating
8  Solutions?
9          MS. MICHAELS KORN:  Objection.
10     A.  He was a consultant.  Consultants are paid
11 to provide good opinions, but he's not a decision
12 maker.  The decision makers were the members of the
13 Board group.  He expressed opinions that I would
14 consider to be good professional opinions.  They
15 were objective and they were based upon the
16 information that was put in front of him.  Beyond
17 that, I think you're really looking for something
18 that isn't there.
19 BY MR. KLEIN:
20     Q.  So you don't think, for example, that Pat
21 Maguire just didn't like Scott Suprina and didn't
22 want him to get the deal?
23     A.  He may not have liked Scott Suprina.  You'd
24 have to ask him that question, but I think what he

---

188

1  was doing was providing good professional advice as
2  a consultant to try to help his client make the best
3  decision.
4      Q.  And that advice was to choose Dant Clayton.
5  Right?
6          MS. MICHAELS KORN:  Objection.
7      A.  He never told us nor would we expect him to
8  tell us to choose one consultant or the other, but
9  he provided some advice on various aspects of both
10 proposals.  Consultants don't choose contractors.
11 He didn't do it in this case.
12 BY MR. KLEIN:
13     Q.  So he didn't advise you that the Dant
14 Clayton proposal was better than the Seating
15 proposal?
16          MS. MICHAELS KORN:  Objection.
17     A.  He sat through the same meeting and looked
18 at the same proposal that we did, and it was very
19 clear to us that the Dant Clayton proposal, as well
20 as the Dant Clayton organization, were the people we
21 wanted to work with.  That was very clear to us from
22 the very first time we met both organizations when
23 Patrick Maguire wasn't even in the room.  We had
24 wished from that first meeting that Dant Clayton was

---

189

1  able to build the project for us, and that was our
2  independent judgment.  Pat helped us with some of
3  the technical aspects of the proposal.  Whether he
4  liked Scott Suprina or not was completely irrelevant
5  and never part of any consideration.
6  BY MR. KLEIN:
7      Q.  Had you ever worked with Dant before?
8      A.  Never.
9      Q.  We have talked in some detail about the
10 Dant Clayton meeting.  Do you remember when it was
11 scheduled?
12     A.  What was scheduled?
13     Q.  The Dant Clayton meeting.
14          MR. CIAVARRA:  The one on Sunday?
15     A.  Which Dant Clayton meeting?
16 BY MR. KLEIN:
17     Q.  February 20.
18     A.  When the meeting was scheduled?
19     Q.  Yes.
20     A.  When the time of the meeting was
21 determined?
22     Q.  Exactly.
23     A.  I believe that we knew late that week that
24 Dant Clayton was interested in coming in and meeting

---

48

**Kaczynski Reporting**

Theodore Tye
August 24, 2005

190

1  with us, and I think the actual scheduling of the
2  meeting took place sometime late on Friday
3  afternoon.
4      Q.  So after the meeting with Scott Suprina?
5      A.  That's correct.
6      Q.  That meeting was held at your office.
7  Correct?
8      A.  That's correct.
9      Q.  What time did it start would you say?
10     A.  2:00 o'clock.
11     Q.  And if you want to turn your attention to
12  Exhibit 14, it lasted until 7:00; is that right?
13     A.  That's right.
14     Q.  And the meeting with the Board about which
15  of these two seating suppliers to choose, was that
16  before or after 7:00 o'clock?
17     A.  There were several points in the meeting
18  where we broke into groups and at the conclusion of
19  the meeting the team from Dant Clayton left and we
20  continued to meet, but we did break several times
21  from the meeting and go into a different room.
22     Q.  Now, it was kind of as if there was a board
23  meeting going on, but then there was another sales
24  pitch going on at the same time.  Right?

191

1      A.  Well, there was a sales pitch and at the
2  conclusion of that the group met --
3      Q.  The three of you?
4      A.  -- without Dant Clayton there.
5      Q.  You, Brad, and Alan?
6      A.  Correct.
7      Q.  Did you get anybody else on the phone at
8  this point?
9      A.  No.  Tom Alperin was away.  It was a
10  holiday weekend.  He was not available, although he
11  is my business partner, and I did speak with him at
12  some point, and that was the group.  So we had three
13  out of the four.  Phil Rosenfield was invited but
14  not active at that point.
15     Q.  He was invited but not active at that
16  point.  So he wasn't there?
17     A.  He was not at the meeting.
18     Q.  Was he on the Board at that point?
19     A.  At that point --
20         MR. CIAVARRA:  Which entity, Perfect
21  Game or Worcester Baseball?
22         MR. KLEIN:  Either, both.
23         MR. CIAVARRA:  You have to tell him what
24  you want him to answer.  Was he on the Board of

192

1  either, is that the question?
2         MR. KLEIN:  Yes.
3         MR. CIAVARRA:  He's already said that he
4  was never on the Board of Perfect Game.
5      A.  We need to check our dates in terms of when
6  the Board was actually constituted.
7         MR. CIAVARRA:  It's okay to say you
8  don't know.
9      A.  His active involvement in the group was
10  curtailed around that time, so that while he was
11  part of our organizing group, he ceased to be
12  actively involved in the activities of our Board.
13  BY MR. KLEIN:
14     Q.  So ultimately you entered into a contract
15  with Dant Clayton.  Right?
16     A.  Right.  Ultimately, we did.
17         MR. KLEIN:  Can we mark that?
18         (Exhibit 29, AIA document, marked)
19  BY MR. KLEIN:
20     Q.  This is our only copy of this, and I'm not
21  going to ask you to read the entire thing or we'll
22  be here until Mr. Stone arrives on Friday.  I would
23  like to just ask you a couple of quick questions
24  about it.

193

1         Just identify that for the record, first
2  of all.
3      A.  It's an AIA document A101 between Worcester
4  Professional Baseball LLC and Dant Clayton
5  Corporation.
6      Q.  What was the contract price?
7      A.  $1,895,000.
8      Q.  Was that a higher price or a lower price
9  than Seating Solutions last proposal?
10     A.  It was a higher price.
11     Q.  What accounted for the price difference?
12     A.  Difference in scope.
13     Q.  How did the scope differ?
14     A.  We already reviewed some of the ways it
15  differed.  This was based on some plans, some
16  detailed plans and specifications that were
17  negotiated with Dant Clayton.  Some of the items
18  that we outlined were a seating system, I-beam
19  structure, ability to accommodate future phases,
20  concrete concourse, different seating widths,
21  different seats, different aisle widths.  I'm sure
22  there were many changes that I haven't noted.
23     Q.  So would you call $1,895,000 an
24  exceptionally high price?

49