UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS,<br><br>       Plaintiff,<br><br>    v.<br><br>GELLER SPORT, INC. and GELLER DEVELLIS, INC.,<br><br>       Defendants. | CIVIL ACTION<br>NO. 05-CV-10365-JLT |

## OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE

The crux of the defendants' six motions in limine is transparent: they want to keep as much relevant evidence out of the jury's hands as possible. In light of the nature of their conduct and the evidence that documents it, this is understandable. Discovery revealed that under Patrick Maguire's direction, Geller Sport, Inc. and Geller Devellis, Inc.'s (collectively "Geller") disclosed RI, Inc., d/b/a Seating Solutions' ("Plaintiff", "Seating", or "Seating Solutions") custom design drawings and pricing information to one of Seating's competitors, the Dant Clayton Corporation. The evidence will show that Mr. Maguire was upset and embarrassed after an argument at a meeting with Seating CEO Scott Suprina. Two days later, Mr. Maguire, in a moment of profound indiscretion, sent an e-mail to Ted Tye, Chairman of the Worcester Tornadoes, urging him to "squeeze [Scott Suprina's] nuts until you see blood." This case is about a consultant, motivated by spite, who decided to deprive the plaintiff of an extremely valuable business opportunity and steer it to one of his friends. He succeeded, causing Seating to suffer hundreds of thousands of dollars in damages.

Geller's six motions in limine either rehash old arguments that didn't work or grasp for new arguments that are without merit. Only two of its motions seek the exclusion of evidence. Seating Solutions opposes all six of Geller's motions in limine for the reasons stated herein.[1]

**1.    Geller's motion to preclude the introduction of evidence of misappropriation damages (Document 56)[2] is without merit.**

A plaintiff succeeding on a misappropriation claim is entitled to its lost profits as damages. *Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc.*, 381 Mass. 1, 11-12, 407 N.E.2d 319, 326-27 (1980) ("This court has recognized three acceptable methods of measuring damages in cases involving business torts such as the misappropriation of trade secrets: the defendant's profits realized from his tortious conduct, the plaintiff's lost profits, or a reasonable royalty."). Seating Solutions is seeking its lost profits as damages in this case.

Geller has been on notice of Seating's claim to lost profit damages for more than a year. On June 24, 2006 Seating Solutions delivered its initial disclosures to Geller. In the disclosures, Seating provided a detailed itemization of its lost profit calculation. *See* Initial Disclosure Statement of RI, Inc. d/b/a Seating Solutions, 2-3. Geller has had two separate opportunities to ask depositions questions concerning the specifics of this calculation, on July 29, 2005 and March 31, 2006.

Though it has been on notice of Seating's damage claim, Geller now states that Seating cannot recover lost profit damages pursuant to Fed. R. Civ. P. 26(a)(2). The rule requires parties to disclose

> a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered[.]

---

[1] Seating has set forth the facts of the case exhaustively elsewhere. For a discussion of what Seating expects to prove at trial, please see its Trial Brief (Document No. 62).

[2] For ease of reference, Seating Solutions identifies the motions by their numbers on the Court's docket.

Fed. R. Civ. P. 26a)(1)(B). Seating's initial disclosures clearly sought its lost profit damages from Geller. Geller takes issue with Seating's statement that it "also seeks damages of an undetermined amount due to Geller's misappropriation and dissemination of Seating Solutions' proprietary information." *See* Initial Disclosures. But Geller knew that Seating was seeking its lost profits. It knew, presumably, that a jury could award a prevailing plaintiff its lost profits. *See Curtiss-Wright Corp., Inc.*, 381 Mass. at 11-12, 407 N.E.2d at 326-27. Geller's actual detailed knowledge of Seating's lost profit claim is fatal to any suggestion that it is now suffering any prejudice or surprise due to Seating's effort to flesh that claim out for the jury. Its motion should be denied.

**2.      Geller's motion to exclude evidence of its legal obligation to maintain the secrecy of Seating's drawings (Document 57) should be denied.**

Geller claims that Mr. Suprina did not believe that Geller had a contractual obligation to keep Seating's drawing secret. But this is inconsistent with Geller's own attorney's understanding of the basis of Seating's contract claim. Geller is correct that Mr. Suprina testified that there was not a "confidentiality agreement" in place. What followed this legal conclusion, however, was several minutes of questions and answers concerning Geller's contractual obligations based upon the proprietary information statement on Seating's custom design drawings.[3] *See id*. at 259:23-264:10. At the close of this portion of the questioning, Geller's counsel summarized Mr. Suprina's testimony:

>     5       Q. Okay. **Besides the drawings are**
>     6       **there any other written contracts that you**

---

[3] The statements reads as follows:

> Notice: Seating Solutions claims proprietary rights in the information disclosedon [sic] this drawing. It is issued in confidence for engineering information only and may not be used in whole or in part to manufacture anything whether or not shown herein reproduced or disclosed to anyone without direct written permission from Seating Solutions.

*E.g.*, Plaintiff's Trial Exhibit 3.

|    |    |
|----|----|
| 7  | **believe were between Geller and Seating** |
| 8  | **Solutions?** |
| 9  | A.  I explained -- no, the answer to the |
| 10 | question is no. |

*See id*. at 264:5-10 (*emphasis supplied*).  Importantly, proprietary statements like the one at issue here can create contractual obligations.  *See DB Riley, Inc. v. AB. Eng'g Corp*., 977 F. Supp. 84, 89 (D. Mass. 1997) (holding that small print terms limiting drawing disclosure on reverse of purchase order and similar terms on shop drawings created contractual obligations).

Geller's argument for exclusion based on Mr. Suprina's testimony regarding the existence of a "confidentiality agreement" is flawed.  If Mr. Suprina makes statements at trial that are inconsistent with statements that he made at his deposition, Geller is free to attempt to impeach him.  *See* Fed. R. Evid. 801(d)(1)(A), 801(d)(2).  The jury can then assess Mr. Suprina's credibility in its own right.  *See Heller Financial Leasing, Inc. v. Gordon*, N.D. Ill. Civil Action No. No. 03 C 6326, 2006 WL 1650339, *3 (June 13, 2006) (denying a motion similar to Geller's and stating that "[i]f [the witness] strays from his deposition testimony during the trial, [the plaintiff] will be able to impeach him").

3. **Geller's thinly veiled motion to reconsider the court's denial of motion for summary judgment on the misappropriation claim (Document 58) lacks merit.**

In both Document 58 (and Document 60, as noted *supra*), Geller attempts to reargue its motion for summary judgment on the trade secrets claim.  The court correctly denied that motion on November 2, 2006.  Seating incorporates its opposition papers (Documents 34-37) to Geller's summary judgment motion herein.  Generally, Geller is employing its motion in limine for a disfavored purpose.  *See B.H.G., Inc. v. F.A.F., Inc*., 784 A.2d 884, 886 (R.I. 2001) ("[W]hen a non-dispositive motion seeks to dismiss a substantial portion of the case, we see clear to strip the motion of its creative labeling and re-characterize it to conform to its true nature."); *Ory v. Liberski*, 40 Md. App. 151, 165, 389 A.2d 922, 931 (1978) ("A motion in limine may not perform the function of a motion for a directed verdict."), *cert. denied*, 283 Md. 737 (1978);

*Lewis v. Buena Vista Mut. Ins. Ass'n*, 183 N.W.2d 198, 200 (Iowa 1971) ("The motion in limine is a useful tool, but care must exercised to avoid indiscriminate application of it lest parties be prevented from even trying to prove their contentions.").

One fact that was not on the record at the time of the summary judgment motion bears mentioning, though. On Thursday, February 17, 2005, Scott Ruczaj sent Geller the latest version of the Seating plan he and Mr. Suprina had developed for Fitton Field. *See* Plaintiff's Trial Exhibit ("Pl. Ex.") 17. He sent the drawing by e-mail at 3:57 p.m., and it included Seating's proprietary information statement when he sent it. At 4:01 p.m. Mr. Maguire received the plan from one of his coworkers. *See id.* At 4:36 p.m., Mr. Maguire forwarded the same plan to the Dant Clayton Corporation, but the plan that he sent did not include Seating's title block or proprietary information statement. *See* Pl. Ex. 20.[4] Seating Solutions will argue that the drawings that it sent to Geller were trade secrets. "[T]rade secret status is a question of fact properly left to the jury." *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*, D. Mass. No. 02-12102-RWZ, 2006 WL 1766434, *9 (June 28, 2006) (Zobel, J.). Since Geller indisputably disclosed the contents of the drawings, the question of whether disclosure caused Seating to suffer damages, and the amount of those damages are also best left for the jury. *See Correia v. Fitzgerald*, 354 F.3d 47, 56 (1st Cir. 2003) ("We have said before that causation questions are normally grist for the jury's mill."); *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 58, 449 N.E.2d 331, 338 (1983) ("The question of causation is generally one of fact for the jury.").

**4.    Geller's attempt to exclude relevant evidence of Seating's anticipated costs (Document 59) should be denied.**

In calculating his pricing for the work, Mr. Suprina relied upon a price quotation prepared by his materials supplier, Outdoor Aluminum, Inc. This quote is admissible pursuant to Fed. R. Evid. 803(6).[5] The quote was (i) prepared at the time it was transmitted to Seating Solutions by

---

[4] Interestingly, Geller did not include Mr. Maguire's 4:36 p.m. e-mail in its original document production. Seating Solutions only received the document in response to a subpoena that it served on the Dant Clayton Corporation.

an individual with knowledge; (ii) kept as part of regular business practice of Outdoor Aluminum; and (iii) prepared in the course of Outdoor Aluminum's regularly conducted business activities. Seating Solutions has obtained a certification from Outdoor Aluminum that complies with Fed. R. Evid. 902(11)[6] and otherwise acted consistently with the rule's requirements. A

---

[5] The rule reads as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \*\*\*
>
> **(6) Records of Regularly Conducted Activity.**--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed. R. Evid. 803(6).

[6] The rules states:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
>
> \*\*\*
>
> (11) Certified Domestic Records of Regularly Conducted Activity.--The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record--
>
>> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
>>
>> (B) was kept in the course of the regularly conducted activity; and

copy of that certification is filed herewith.  As such, Seating Solutions has complied with the requirements of Fed. R. Evid. 803(6) and the quote is admissible.

Price quotations are admissible business records.  *See Uniroyal Goodrich Tire Co. v. Mutual Trading Corp*., 63 F.3d 516, 522 (7th Cir. 1995) (admitting price quotations for billboard advertising as business records).[7]  Contrary to Geller's assertion, moreover, the certification accompanying the price quote states that "it is a regularly conducted activity of Outdoor Aluminum to provide price quotations to customers and to Mr. Suprina in particular." Certification of Eddie Spears, dated July 31, 2006, ¶ 4.  Geller also misunderstands the purpose for which Seating offers the price quote; the quote is offered to prove the price that Mr. Suprina would have paid for the Fitton Field seating system as it was configured on February 2, 2005.  Mr. Suprina then took the price quotation, examined the changes made to the bleacher between February 2 and February 17, and estimated what it would cost to purchase the modified bleacher from Outdoor Aluminum.  Based upon those changes, Mr. Suprina estimated his material costs as he was preparing his proposal on February 17, 2005.[8]

---

(C) was made by the regularly conducted activity as a regular practice.

A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Fed. R. Evid. 902.

[7] Geller relies upon a single case to support its argument: *Hiram Wicker & Sons v. Students Int'l Meditation Soc'y*, 501 F.2d 550 (1st Cir. 1974).  This case, however, did not assess admissibility of a price quotation.  It considered admissibility of a record that was – unlike the Outdoor Aluminum quote – not made as part of a regular activity and was not made at or near the time of the activity.  *See id*. at 554.

[8] From one perspective, then, the quote may not be hearsay at all.  Seating Solutions does not offer the quote for its truth.  The quote is offered to show its effect on Mr. Suprina and his price calculations.  "[T]he hearsay rule does not apply to statements that are offered to show what effect they produced on the actions of a listener."  *United States v. Meserve*, 271 F.3d 314, 320 (1st Cir. 2001); *United States v. DeVincent*, 632 F.2d 147, 151 (1st Cir. 1980) ("[A] familiar

This is relevant evidence, and not prejudicial or confusing in any respect. Seating Solutions is claiming its damages are the lost profits on the Fitton Field project. Before the jury can determine profits, it must understand Seating's costs. Seating obtained a quotation from Outdoor Aluminum for this very project. Mr. Suprina used that quotation to determine his costs and his pricing. Mr. Suprina's reliance upon the quote from Outdoor would provide an additional "rational basis" for his lost profits claim. *See Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1166 (1st Cir. 1992) ("Damages for lost profits need not be proved with mathematical certainty, provided an award has a rational basis in the evidence.").

5.   **Geller's *other* thinly veiled motion to reconsider the court's denial of its motion for summary judgment on the tortious interference claim (Document 60) *also* lacks merit.**

Geller also attempts to have the Court reconsider the denial of summary judgment on the tortious interference claim. Seating, again, incorporates by reference its opposition papers to Geller's summary judgment motion. *See* Documents 34-37.

Geller deftly claims Scott Suprina could not identify any "evidence" of tortious interference during his deposition. This argument is clever, but it lacks merit. At Mr. Suprina's deposition, Geller's counsel introduced at least eighteen questions at Mr. Suprina's deposition with the phrase "Do you have any evidence?" Counsel asked this question even though Geller had not yet complied with its initial disclosure obligations under Fed. R. Civ. P. 26. As of the date of the deposition, Seating Solutions had not reviewed any of the approximately 3,500 pages of documents that Geller produced three weeks later. From those documents, Seating Solutions discovered evidence that Geller had shared Seating's confidential custom design drawings with

---

category of non-hearsay [is] statements offered, not for their truth, but for their effect on the hearer.") (citations omitted), *cert. denied*, 449 U.S. 986 (1980). *See also United States v. Flemmi*, 402 F.3d 79, 93 n.21 (1st Cir. 2005) (noting that statements offered for their effect on the listener are not hearsay); *United States v. Murphy,* 193 F.3d 1, 6 n.2 (1st Cir. 1999) ("[A]n out-of-court statement might be offered to show that the declarant had certain information, or entertained a specific belief, or spoke a particular language; or it might be offered to show the effect of the words spoken on the listener . . . .").

Dant Clayton and that Mr. Maguire made crass and malicious statements regarding Mr. Suprina via electronic mail. Geller should not be permitted to benefit from its nondisclosure at trial.

Less clever is Geller's contention that Seating did not have a business relationship with Worcester Baseball because it did not have a contract. *See* Doc. 60 at 9. That inaccurately relates the governing law. *Fafard Real Estate & Dev. Corp. v. Metro-Boston Broad., Inc.*, 345 F. Supp. 2d 147, 154 (D. Mass. 2004) ("A probable future business relationship from which there is a reasonable expectancy of financial benefit is . . . enough."); *Owen v. Williams*, 322 Mass. 356, 361-62, 77 N.E.2d 318, 322 (1948) ("[I]n order to maintain the action it was not necessary that the plaintiff prove that she had a binding contract . . . . It is well settled that an existing or even a probable future business relationship from which there is a reasonable expectancy of financial benefit is enough."); *Powers v. Leno*, 24 Mass. App. Ct. 381, 385, 509 N.E.2d 46, 49 (1987) ("The plaintiffs did not have to prove a binding contract. A probable future business relationship from which there is a reasonable expectancy of financial benefit is enough.") (internal quotation marks omitted).

Geller also repeats the canard from its summary judgment brief that malice is an element of the tort. This is incorrect. Proof of malice is not required; the plaintiff need only establish that the defendant acted with an improper motive <u>or</u> improper means. *Lemire v. Silva*, 104 F. Supp. 2d. 80, 95 (D. Mass. 2000) ("Malicious interference is not required in a claim for interference with an advantageous relationship; improper interference is sufficient."); *Addamax Corp. v. Open Software Foundation, Inc*., 888 F. Supp. 274, 286 (D. Mass. 1995) ("[P]laintiff need not establish that the defendant's actions were motivated by malice toward the plaintiff.") (Tauro, J.); *Draghetti*, 416 Mass. at 818, 626 N.E.2d at 870 n.14 ("Malice is no longer an element of either tort; it has been replaced by the concept of improper motive or means."); *Kurker v. Hill*, 44 Mass. App. Ct. 184, 191, 689 N.E.2d 833, 838 (1998) ("The standard . . . is interference accompanied by improper motive *or* improper means; the plaintiff need not prove both.").

Geller's assertion that malice is an essential element of this claim is simply wrong. The recent cases[9] that it cites in support of this proposition all involved employment claims. As Judge Ponsor stated in *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 229 (D. Mass. 2002), *aff'd*, 362 F.3d 1 (2004), helpfully cited by Geller in its brief, "Under Massachusetts law, corporate officials, in particular, defendant-supervisors, are entitled to a qualified privilege *in an employment-based tortious interference case*. This qualified privilege may be overcome only by a showing of actual malice." (emphasis supplied). This is not an employment case, so there is no actual malice requirement.[10]

Geller raises one new argument that deserves discussion: Geller claims its conduct was conditionally privileged because it was an architect advising a client.[11] In presenting the conditional privilege argument, Geller is asking this Court to make new law in Massachusetts. It does not cite any Massachusetts case holding that architects, engineers, or consultants have a conditional privilege to tortiously interfere with third party business relationships or misappropriate trade secrets. Seating Solutions has not located such a case, either.

---

[9] *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207 (D. Mass. 2002) (claim against coworkers), *Harrison v NetCentric Corp.*, 433 Mass. 465, 744 N.E.2d 622 (2001) (claim against superior), *Shea v. Emmanuel College*, 425 Mass. 761, 682 N.E.2d 1348 (1997) (claim against supervisor), *King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488 (1994) (employment termination by competing shareholders), *Boothby v. Texan, Inc.*, 414 Mass. 468, 608 N.E.2d 1028 (1993) (claim against supervisor), *Alba v. Sampson*, 44 Mass. App. Ct. 311, 690 N.E.2d 1240 (1998) (claim against supervisor).

[10] The Supreme Judicial Court has definitively stated that malice is no longer required. *See United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815, 551 N.E.2d 20, 23 (1990) ("[W]e now abandon the word malicious in the description of any element of these torts . . . ."). Geller's reliance on the *United Truck* case, however, is misplaced. There was no evidence there that the defendant consultant had misappropriated the plaintiff's trade secrets or said of the plaintiff that its client should "squeeze [the plaintiff's] nuts until you see blood." Pl. Facts, ¶ 17.

[11] It is not clear how this argument warrants the exclusion of any evidence. If anything, it makes the issue of Mr. Maguire's motive that much <u>more</u> significant.

Instead, Geller cites five cases from the mid 1980s, but even those cases don't help it very much.[12]  In *Waldinger Corp. v. CRS Group Engineers, Inc.*, 775 F.2d 781 (7th Cir. 1985), the Seventh Circuit discussed the contours of a third party's conditional privilege to interfere with its principal's contract: "If an architect induces a breach of contract not to further its principal's best interests but with the intent to harm the other party to its principal's contract or to further its personal goals, the architect is liable for tortious interference with the contract." *See id*. at 790.  That Mr. Maguire disclosed Seating's pricing and drawings to Dant Clayton after a heated argument with Mr. Suprina and then sent an e-mail to the baseball team's chairman urging him "squeeze [Mr. Suprina's] nuts until you see blood" all support the inference that he acted "with intent to harm" Seating Solutions.  It is also important to note that "the third party's acts that bring about the breach must be ***legal acts*** and must not be unreasonable in the circumstances."  *Santucci Constr. Co. v. Baxter & Woodman, Inc*., 151 Ill. App. 3d 547, 555, 502 N.E.2d 1134, 1140 (1986) (emphasis supplied), appeal denied, 115 Ill. 2d 550, 511 N.E.2d 437 (1987).  Disclosure of Seating Solutions' trade secrets was not a lawful act.  A claim for misappropriation of trade secrets has three elements: that (i) the information is a trade secret; (ii) it took reasonable steps to preserve the secrecy of the information; and (iii) the defendant breached a confidential relationship and disclosed or used the trade secret.  *See DB Riley, Inc. v. AB. Eng'g Corp*., 977 F. Supp. 84, 89 (D. Mass. 1997); Mass. Gen. Law ch. 93, § 42 ("Whoever embezzles, steals or unlawfully takes, carries away, conceals or copies . . . from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom.").  "The essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to

---

[12] Nor is it clear how those cases affect the evidence to be offered at trial.  There is not very much disagreement about what Mr. Maguire and Geller did here; the issue is what motivated their actions.  That is up to the jury.  *McDonough v. City of Quincy*, 452 F.3d 8, 19 (1st Cir. 2006) ("Determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury."); *Mulero-Rodriguez v. Ponte*, 98 F.3d 670, 677 (1st Cir. 1996) (same).

use without permission confidential information acquired from another." *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 165, 385 N.E.2d 1349, 1354 (1979). Thus, even if the Court applies conditional privilege doctrine to this case, the jury is entitled to hear evidence of Mr. Maguire's wrongful conduct.

6. **Geller's attempt to prevent admission of highly probative evidence (Document 61) of Mr. Maguire's motives lacks merit.**

The cliché is tired, but Geller really is trying to have its cake and eat it, too. It argues that Seating must prove that Mr. Maguire acted with malice. *See* Doc. 60 at 7. At the same time, though, it argues that highly probative evidence of that malice should be excluded. This argument, predictably, falls flat.

Under Fed. R. Evid. 403, relevant "evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice." *United States v. Tse*, 375 F.3d 148, 162 (1st Cir. 2004) (emphasis supplied). Rule 403 protects only against <u>unfair</u> prejudice. *See United States v. Smith*, 292 F.3d 90, 99 (1st Cir. 2002) ("As Rule 403 makes explicit, the law shields a defendant "against unfair prejudice, not against all prejudice."), *cert. denied*, 538 U.S. 933 (2003); *United States v. Rodriguez-Estrada*, 877 F.2d 153, 156 (1st Cir.1989) ("[A]ll evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided."). Seating admits that the electronic mail message at issue is prejudicial, and the prejudice arises entirely from Mr. Maguire's own poor judgment. It is also highly relevant to this case. Mr. Maguire is responding to an e-mail from Ted Tye of the baseball team that praises Mr. Suprina's ability to work quickly and deliver a quality product. A few moments earlier, Mr. Maguire had heard from Mr. Tye that he would be meeting with Mr. Suprina the following day. It reads as follows:

> From: Patrick Maguire [mailto:pmaguire@gellersport.com]
> Sent: Thursday, February 17, 2005 11:30 AM
> To: Ted Tye
> Subject: RE: Ted Fire Update
>
> I'd still squeeze his nuts until you see blood.....He's probably a Met's fan. He deserves no mercy.

The elements of a claim for tortious interference are (i) the existence of a prospective business relationship; (ii) the defendant's knowledge of the business relationship; (iii) the defendant's intentional interference with the relationship for an improper purpose or by improper means; and (iv) damages. *See Pure Distribs., Inc. v. Baker*, 285 F.3d 150, 157 (1st Cir. 2002) (stating that elements of tortious interference claim are "(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendant's knowledge of the contract or business relationship; (3) the defendant's intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages") (internal punctuation marks omitted); *Holmes Prods. Corp. v. Dana Lighting, Inc.*, 958 F. Supp. 27, 32 (D. Mass. 1997) (same); *Draghetti v. Chmielewski*, 416 Mass. 808, 816, 626 N.E.2d 862, 869 (1994) (same).

Evidence of "ill will" supports the determination that a defendant's "conduct was based on an improper motive." *Draghetti*, 416 Mass. at 817, 626 N.E.2d at 869. *See also Holmes Prods. Corp.*, 958 F. Supp. at 31 ("[A] motive to harm or a desire to hurt qualifies as an improper motive."); *Adcom Prods., Inc. v. Konica Bus. Mach. USA, Inc.*, 41 Mass. App. Ct. 101, 105, 668 N.E.2d 866, 869 (1996) (holding that "retaliation or ill will" can constitute improper motive). One would hope that Mr. Maguire did not mean his statement in this e-mail literally,[13] but a jury could conclude that it is evidence that he personally disliked Mr. Suprina. Mr. Maguire sent the

---

[13] Geller contends the E-mail was "used as a joke to express the sports rivalry between Boston and New York baseball fans . . . ." Doc. 61 at 1. This is unlikely.

message two days after he and Mr. Suprina argued at a meeting with the baseball team. In this context, Mr. Maguire's personal dislike will help the jury understand what was motivating Mr. Maguire when he:

- Shared Seating's custom design drawings with the Dant Clayton Corporation, a competitor, even though they were clearly identified as Seating's proprietary information;
- Shared Seating's pricing with Dant Clayton;
- Generally, shared Seating's confidential business information with Dant Clayton but shared none of Dant Clayton's comments regarding the project with Mr. Suprina.

Mr. Maguire may regret sending this unprofessional e-mail message. It will provide the Court and the jury with an important insight into why Mr. Maguire acted as he did. The e-mail should be included in the evidentiary record.

### CONCLUSION

Seating Solutions respectfully requests that the Court deny all of Geller's motions in limine.

Respectfully Submitted

RI Inc. d/b/a SEATING SOLUTIONS

By its attorneys

   /s/                  Terry Klein
HENSHON PARKER VYADRO, P.C.
Terry Klein, BBO# 652052
84 State Street, Suite 760
Boston, Massachusetts 02109
Telephone: (617) 367-1800
Facsimile: (617) 507-6454

Date: August 7, 2006

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on or before August 7, 2006.

   /s/                  Terry Klein