UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, )<br><br>Plaintiff, )<br><br>v. )<br><br>GELLER SPORT, INC., GELLER DEVELLIS, )<br>INC., WORCESTER PROFESSIONAL BASEBALL )<br>LLC, and PERFECT GAME BASEBALL CLUBS, LLC, )<br><br>Defendants. ) | CIVIL ACTION<br>NO. 05-CV-10365-JLT |

## DEFENDANTS' DESIGNATION OF DEPOSITION TESTIMONY OF MATT DOUGHERTY

The defendants, Geller Sport, Inc. and Geller DeVellis, Inc. ("Geller"), hereby

designate the following portions of the deposition of Matt Dougherty dated January 31,

2006, to be read in open court during trial:

1.  Page 3, lines 3-6

2.  Page 6, lines 18-19

3.  Page 7, lines 1-8; 16-25

4.  Page 8, lines 1-4

5.  Page 9, lines 6-13

6.  Page 10, lines 11-18

7.  Page 12, lines 6-9

8.  Page 13, lines 10-24

9.  Page 14, lines 19; 24-25

10.  Page 15, lines 1-4; 25

11.    Page 16, lines 1-2

12.    Page 17, lines 13-22

13.    Page 18, lines 1-6

14.    Page 20, lines 22-25

15.    Page 21, lines 1-7

16.    Page 23, lines 9-12; 19-25

17.    Page 24, lines 1-14; 21-24

18.    Page 25, lines 10-25

19.    Page 26, lines 1-25

20.    Page 27, lines 1-2; 13-17

21.    Page 28, lines 5-7; 12-19

22.    Page 39, lines 12-23

23.    Page 40, lines 18-23

24.    Page 41, lines 2-25

25.    Page 42, lines 1-25

26.    Page 43, lines 1-10

27.    Page 49, lines 4-25

28.    Page 50, lines 14-25

29.    Page 51, lines 1-20; 24-25

30.    Page 52, lines 1-6

31.    Page 54, lines 20-25

32.    Page 55, lines 1-25

33.    Page 56, lines 1-5

34.    Page 57, lines 12-18

35.    Page 58, lines 7-9; 12-15; 17; 19-24

36.    Page 59, lines 1-5; 19-24

37.    Page 60, lines 14-15

38.    Page 61, lines 17-24

39.    Page 63, lines 23-24

40.    Page 64, lines 1-12; 21-25

41.    Page 65, lines 1-10

42.    Page 66, lines 21-25

43.    Page 67, lines 1-5

44.    Page 68, lines 7-15

45.    Page 69, lines 19-25

46.    Page 70, lines 2; 16-22; 24

47.    Page 71, lines 1-13

48.    Page 72, lines 1-20

49.    Page 73, lines 2-5

A true copy of Mr. Dougherty's condensed deposition transcript is attached

hereto as Exhibit A.

Respectfully submitted,

GELLER SPORT, INC. and GELLER
DEVELLIS, INC.
By their attorneys,

/s/ Warren D. Hutchison
_____
David J. Hatem PC, BBO #225700
Warren D. Hutchison, BBO # 246150
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Date: August 7, 2006
01024201//24410.88

## CERTIFICATE OF SERVICE

I, Warren D. Hutchison, hereby certify that on this 7th day of August, 2006, a copy of the foregoing was served on the attorneys for the other parties who are registered ECF users by electronic means pursuant to Local Rule 5.4(c) and by first class mail, postage prepaid to the attorneys who are not registered ECF users.

/s/ Warren D. Hutchison
Warren D. Hutchison

# Matt Dougherty
# January 31, 2006

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


RI, Inc. d/b/a SEATING SOLUTIONS,


PLAINTIFF,

v.

CIVIL ACTION NO.   05-CV-10365-JLT


GELLER SPOT, INC., GELLER DEVELLIS,

INC., WORCESTER PROFESSIONAL BASEBALL

LLC, and PERFECT GAME BASEBALL CLUBS, LLC,


DEFENDANT(s).

_____


DEPOSITION FOR THE PLAINTIFF,

RI, INC, d/b/a SEATING SOLUTIONS:


The Deposition of Matt Dougherty, taken in the

above-styled matter at Wyatt, Tarrant & Combs, LLP, 500

West Jefferson Street, 2600 PNC Plaza, Louisville,

Kentucky, on the 31st day of January, 2006, beginning at

11:45          a.m.

# Matt Dougherty
## January 31, 2006

---

**Page 2**

1                A P P E A R A N C E S
2    FOR THE PLAINTIFF, RJ, INC. d/b/a SEATING
     SOLUTIONS:
3        TERRY KEIN, ESQUIRE
         HENSHON, PARKER & VYADRO, PC
4        84 State Street
         Suite 760
5        BOSTON, MASSACHUSETTS 02109
6    FOR THE DEFENDANT, DANT CLAYTON
     CORPORATION:
7        JOSHUA T. ROSE, ESQUIRE
         FROST, BROWN & TODD
8        120 West Spring Street
         Suite 400
9        NEW ALBANY, INDIANA 47150-3655
10   FOR THE DEFENDANT(s), WORCESTER BASEBALL &
     PERFECT GAME BASEBALL CLUBS, LLC:
11       LOUIS CIAVARRA, ESQUIRE
         BOWDITCH & DEWEY
12       311 Main Street
         WORCESTER, MASSACHUSETTS 01615
13
14               A P P E A R A N C E S (CONT.)
15   FOR THE DEFENDANT(s), GELLER SPORTS & GELLER
     DEVELLIS:
16       LAUREN KORN, ESQUIRE
         DONOVAN & HATEM, LLP
17       Two Seaport Lane
         BOSTON, MASSACHUSETTS 02210
18
     ALSO PRESENT:
19       MATT DOUGHERTY, DANT CLAYTON
20
21
22
23
24
25

---

**Page 3**

1            DEPOSITION OF MATT DOUGHERTY
2                  JANUARY 31, 2006
3        MATT DOUGHERTY, called on behalf of the
4    Plaintiff, RJ, Inc. d/b/a Seating Solutions, after
5    being first duly sworn, is examined and testifies as
6    follows:
7    DIRECT EXAMINATION
8    BY MR. KLEIN:
9        Q.  Mr. Dougherty, as you heard earlier, my
10   name is Terry Klein and I'm representing Seating
11   Solutions.  And did you hear my instructions and
12   general sort of parameters for Mr. Merrick or would
13   you like me to repeat them?
14       A.  Would you repeat them, please.
15       Q.  Sure.
16       If you don't hear a question that I have for
17   you, I'm happy to rephrase it so that -- so that you
18   can hear it and answer it.  If you don't understand
19   a question -- the substance of the question -- I'm
20   happy to rephrase it as well so that you can
21   provide an answer.
22       The court reporter can only record one person
23   speaking at a time, so wait for me to finish my
24   question and then you can answer.  We're looking
25   for clear, verbal answers, so a shake -- a nod of

---

**Page 4**

1    the head, for example, can't be picked up.  It's
2    very difficult to decipher what an "uh-huh" is when
3    you read a transcript.  So if you could say "yes" or
4    "no" in response to a question instead of that type
5    of response, that would be fantastic.
6        At times during this -- during this deposition,
7    your attorney might object.  If he does so, I would
8    ask that you answer the question unless he
9    explicitly instructs you not to do so.  If you need
10   break at any time, please let me know.
11       MR. KLEIN:  And same stipulations, Mr.
12   Rose?
13       MR. ROSE:  I'll only object to form or the
14   scope of the deposition.
15       MR. KLEIN:  And is that acceptable to the
16   people in Boston and Worcester?
17       MR. CIAVARRA:  Fine by me.
18       MR. ROSE:  And I'm not waiving any other
19   objections.
20       MR. KLEIN:  Absolutely.
21       MS. KORN:  That's fine.
22   BY MR. KLEIN:
23       Q.  Mr. Dougherty, unless I state otherwise,
24   everything that I talk about today relates to the
25   period between January 15th, 2005 and February

---

**Page 5**

1    21st, 2005.  Everything that I ask you about is going
2    to relate to the Fit and Field project.  Do you know
3    what I mean by that?
4        A.  Yes, I do.
5        Q.  Okay.  Mr. Dougherty, have you ever been
6    deposed before?
7        A.  No.
8        Q.  You have not.
9        Did you prepare for this deposition?
10       A.  Yes.
11       Q.  And what did you do to prepare?
12       A.  Went through my records and pulled the
13   requested materials.
14       Q.  What records did you go through?
15       A.  I went through my file.  I have a project
16   file that I keep all of the pertinent project records
17   in, and I also went through my e-mail records.
18       Q.  So is your project file a paper file?
19       A.  Yes.
20       Q.  And what is in your paper project file?
21       A.  There will be project descriptions, concept
22   drawings, pricing spreadsheets, communications
23   with clients.
24       Q.  Anything else?
25       A.  I can't think of anything.  Perhaps

---

# Matt Dougherty
## January 31, 2006

1   photographs.
2   Q.   And you said you also went through your
3   e-mail records?
4   A.   Yes.
5   Q.   Did you look at any other electronic
6   records?
7   A.   No.
8   Q.   Did you speak with anyone at Dant Clayton
9   about this deposition before you came here today?
10  A.   Mr. Merrick.
11  Q.   Anybody else?
12  A.   I'm not sure, but probably the vice
13  president of sales.
14  Q.   And his name again?
15  A.   Mike Guenthner.
16  Q.   Did you discuss this with anybody else?
17  A.   No.  Well, my wife.
18  Q.   What's your business address, Mr.
19  Dougherty?
20  A.   My home address.
21  Q.   Your business address?
22  A.   What is my business address?
23  Q.   Exactly.
24  A.   It is my home address.
25  Q.   Okay.  And what's your home address?

1   A.   2751 Graham Avenue, Louisville, Kentucky
2   40206.
3   Q.   Who's your employer?
4   A.   I'm sorry?
5   Q.   Who is your employer?
6   A.   I'm independent.
7   Q.   So are you an independent contractor of
8   Dant Clayton's?
9   A.   Yes.
10  Q.   And you receive 1099 statements from
11  Dant Clayton?
12  A.   Correct.
13  Q.   Are you an independent contractor of
14  anybody else?
15  A.   No.
16  Q.   How long have you -- do you have a title?
17  A.   Self-proclaimed district manager of New
18  England and New York.
19  Q.   And how long have you been in that
20  position or how long have you had that self-
21  proclaimed title?
22  A.   Approximately, two and a half years.
23  Q.   And what did you do before that?
24  A.   I was a consultant.
25  Q.   Uh-huh.  And who consulted you?

1   A.   Who consulted me?
2   Q.   Yeah.  What type of consultant were you?
3   A.   The -- the Dant Clayton Corporation was
4   one of my clients.
5   Q.   Uh-huh.  And who else?
6   A.   I don't recall at the moment.
7   Q.   Has Seating Solutions ever been a client
8   of yours?
9   A.   No.
10  Q.   Did you attend college, Mr. Dougherty?
11  A.   Yes.
12  Q.   And where did you attend college?
13  A.   I have a degree of Loyola University.
14  Q.   Which Loyola?
15  A.   In New Orleans.
16  Q.   Okay.  Do you have any degrees beyond
17  college?
18  A.   I have a master's degree from Indiana
19  University.
20  Q.   And what's that master's degree in?
21  A.   Business administration.
22  Q.   I'm sorry.  And your degree from in an
23  Loyola was what date?
24  A.   The date?
25  Q.   Yes.  Year.

1   A.   1983.  No. '82.
2   Q.   And your master's is what year?
3   A.   '85.
4   Q.   Do you have any professional licenses?
5   A.   No.
6   Q.   When did you become aware of the Fit and
7   Field project?
8   A.   Sometime in late January.
9   Q.   Of 2005?
10  A.   Correct.
11  Q.   And do you remember how you became
12  aware of it?
13  A.   Patrick Maguire called me.
14  Q.   And have we exhausted your recollection
15  as to what date we're talking about here?
16  A.   Yes.
17  Q.   Let's do this actually --
18  A.   When I first became aware of it?
19  Q.   Yeah.
20  A.   I don't recall the specific date.
21  Q.   If I could, I'm going to show you what's
22  been marked as Exhibit 3.  If you could take a look
23  at that and then look up at me when you're done,
24  specifically the lower e-mail on that document.
25  A.   Here?

Matt Dougherty
January 31, 2006

---

Page 10

1    Q. Yes.
2    Q. Yes.
3    Mr. Dougherty, is your -- is your recollection
4    refreshed as to when you had -- when you first
5    learned of this project?
6    A. No.
7    Q. Okay. Could you just quickly identify this
8    document for the record, looking specifically at the
9    number in the lower right-hand corner?
10   A. 1600.
11   Q. Okay. Had you -- do you know if you had
12   knowledge of this project before January 26th,
13   2005?
14   A. I don't know that.
15   Q. Okay. Do you know, did you have a
16   conversation with Mr. Maguire on January 26th,
17   2005?
18   A. I don't recall that.
19   Q. Okay. This communication with Mr.
20   Maguire that I believe you testified was in late
21   January, where were you when that communication
22   happened?
23   A. I don't recall that.
24   Q. Okay. Do you remember how that
25   communication took place? Was it e-mail or

---

Page 11

1    telephone or in person?
2    A. I don't recall that either. But I believe I
3    would have -- well, if there was an e-mail
4    communication, that would have appeared in the
5    deposition documents submitted.
6    Q. Okay.
7    A. So it was probably a phone conversation.
8    Q. Okay. Anybody else party to that
9    conversation apart from you and Mr. Maguire?
10   A. I don't recall.
11   Q. And about how long was that
12   conversation?
13   A. I don't recall.
14   Q. Tell me everything that you can remember
15   about that conversation, Mr. -- Mr. Dougherty. And
16   I'd ask that you just refer to this e-mail, perhaps,
17   to assist you in refreshing your recollection.
18   A. Okay. Yeah. Specifically, I have almost
19   no recollection of a conversation with Mr. Maguire.
20   In general, what probably happened was he would
21   call me -- would have called me and said there is a
22   project that I would like you to take a look at; I
23   think it could be of interest to your firm. And --
24   and then we may have had some specific
25   conversation about the particulars of the site such

---

Page 12

1    as where it was, what particular challenges may --
2    may be present on the site, what the time frame
3    was. These are -- these are normal, customary
4    type of discovery type questions that I would
5    normally ask.
6    Q. Uh-huh. And looking at this e-mail, do
7    you recall asking for an aerial site plan?
8    A. No, I don't recall saying anything about an
9    aerial site plan. I usually ask for a site plan.
10   Q. Okay. And just so we're on the same
11   page, what do you mean by "aerial site plan"?
12   A. A photograph of a site --
13   Q. Okay.
14   A. -- from the air.
15   Q. So a photograph, not a survey?
16   A. That's not what I would mean by "an aerial
17   site plan."
18   Q. Okay. And in -- at this point, in early
19   January, were you able to locate any similar
20   custom designs that -- that Dant could use to
21   expedite?
22   A. No.
23   Q. Okay. Very good.
24   Do you recall receiving the attachments of this
25   e-mail?

---

Page 13

1    A. Do I recall receiving them?
2    Q. Yes.
3    A. Yes.
4    Q. You do. And what did you do with them
5    when you received them?
6    A. I printed them off --
7    Q. Okay.
8    A. -- and I examined them. And beyond that,
9    I can't recall specifically what I did next.
10   Q. Okay. Do you know, did Seating Solutions
11   come up during your conversation with Mr. Maguire
12   on or around the 26th of January?
13   A. No.
14   Q. Did not. Okay.
15   At what point, if ever, did you become aware
16   that Seating Solutions was also attempting to
17   obtain the Fit and Field project contract?
18   A. I don't recall specifically, but it would
19   have been sometime around when we had our first
20   meeting.
21   Q. First meeting with whom?
22   A. With Worcester Professional Baseball.
23   I'm not sure if they were even identified at that
24   point as that group.
25   Q. Uh-huh. And when did that meeting take

---

Matt Dougherty
January 31, 2006

Page 14

1 place?
2    A.  I don't have the exact date.
3    Q.  Okay.  Was it in the same approximate
4 time period of that telephone call with Mr.
5 Maguire?
6    A.  It would have been within a week or two
7 after that, I believe.
8    Q.  Okay.  And where did that meeting take
9 place?
10    A.  National Development offices.
11    Q.  Which is where, just for the record?
12    A.  I believe it's in Newton --
13    Q.  Okay.
14    A.  -- Lower Falls.
15       THE REPORTER:  In where?
16       THE WITNESS:  Newton Lower Falls, in
17 Massachusetts.
18 BY MR. KLEIN:
19    Q.  And who was present for that meeting?
20 And just for the record, and for the duration of this
21 deposition, this isn't a memory test.  So if you
22 don't recall an answer, just -- that's an absolutely
23 acceptable response.
24    A.  Well, the people I recall were Ted Tye.  I
25 believe Mr. Rosenfield -- I believe that's his

Page 15

1 name -- the general manager of the baseball team
2 was there.  Allen Stone may have been there, but
3 I'm not sure; I think he came later.  I believe Pat
4 Maguire came a little later.
5    Q.  Can I show you -- can I show you what's
6 been marked as Exhibit 2A and ask if that
7 refreshes your recollection as to maybe one other
8 person who attended the meeting?
9    A.  No.  This name doesn't -- if you're asking
10 me if Rebecca Bachand was three, I don't recall.
11    Q.  Okay.  Approximately how long did that
12 meeting last?
13    A.  Hour and a half.
14    Q.  So about 90 minutes.
15    What do you recall happened during that
16 meeting?
17    A.  We discussed the project concept; we
18 discussed and looked at some photographs of the
19 site; we discussed scheduling.  I gave them
20 customary or average Dant Clayton performance
21 information related to the schedule, typical
22 scheduling information.  I'm sure that there was an
23 introductory period where we discussed background
24 and -- and relevant projects.
25    Q.  And did Seating Solutions come up during

Page 16

1 that meeting?
2    A.  No, not that I recall.
3    Q.  I want to flesh out just quickly the
4 performance information issue.  Is that the sort of
5 thing where you would talk about what your initial
6 projected completion date was and how close or far
7 you would -- you would hue to that date?  Is that
8 the kind of thing we're talking about?
9    A.  Relevant to this project?
10    Q.  Or just in general.  I'm just trying to
11 figure out --
12    A.  In general?
13    Q.  -- what you mean by "performance
14 information."
15    A.  In general, it would have -- I would have
16 conveyed to them typical schedule time frames.
17    Q.  Okay.  And do you remember, did you say
18 anything at this meeting about how long you
19 anticipated it would take to -- to do the work on the
20 Fit and project [sic]?
21    A.  No.
22    Q.  Okay.  Did you look at any CAD files
23 during that meeting?
24    A.  I don't believe so.
25    Q.  Okay.  Can you recall what the aerial

Page 17

1 photographs you looked at -- can you describe them
2 for the record?
3    A.  They were actually a little older.  They did
4 not show the new parking structure that had
5 actually been built for, I think, two and a half
6 years.  But it was a -- you know, probably a single-
7 engine plane flying overhead taking a picture down
8 of the field and we talked -- it showed the adjoining
9 road and we talked a little bit about the site, the
10 particulars of the site.
11    Q.  Did price come up at all?
12    A.  No.
13    Q.  And so it looks like you were the only
14 Dant Clayton representative there?
15    A.  That's correct.
16    Q.  And is there anything else you can recall
17 about this meeting?
18    A.  I believe that they had given me what their
19 time frame was.
20    Q.  Uh-huh.  And what do you recall of that?
21    A.  It was late May.  29th, I think.  It was very
22 specific.
23    Q.  Uh-huh.
24    A.  They had an opening game that they had
25 to be complete and ready for.

## Matt Dougherty
## January 31, 2006

1    Q. And did you communicate with them
2  about -- at this meeting specifically about whether
3  Dant could meet that date?
4    A. I told them that I thought it was highly
5  unlikely that any manufacturer could meet that date
6  with a customized plan.
7    Q. Okay. And "customized plan," again, just
8  for the record, is what?
9    A. A customized plan in this business is
10  probably 90 percent of the projects that we build.
11    Q. Uh-huh. And what does it entail?
12    A. It entails having a -- a complete
13  understanding of all of the site issues so that when
14  you build the structure you don't have conflicts
15  that you discover midway through the construction
16  period and that those have been designed into the
17  structure and fabricated accordingly.
18    Q. All right. So anything else you can
19  remember about that meeting?
20    A. No.
21    Q. Do you remember how they responded to
22  your statement that it was unlikely they'd hit that
23  date?
24    A. They weren't very happy about it.
25    Q. When you say "they weren't very happy,"

1  do you know -- can you tell me who?
2    A. The general mood. I mean, it's one of
3  those -- there were probably four or five people in
4  the room. It was just the, you know, the general
5  expression on their face of obvious
6  disappointment.
7    Q. All right. And let's just -- I want to flesh
8  out who exactly you did communicate with on this --
9  on this job, generally, now that we've talked about
10  that meeting. And again, we're talking previous to
11  February 21st, 2005.
12    You had communications with Pat Maguire;
13  right?
14    A. Yes.
15    Q. Did you communicate with Mr. Tye as
16  well?
17    A. Yes.
18    Q. Chris Sgarzi?
19    A. Yes.
20    Q. Allen Stone?
21    A. Prior to what date?
22    Q. 21st. This is the day after, I believe, a
23  meeting in Newton with Mr. Merrick and Dant
24  Clayton.
25    A. I don't believe so, not with Mr. Stone.

1    Q. Did you meet with anybody at Seating
2  Solutions during that period?
3    A. No.
4    Q. Did you communicate with anybody else at
5  Geller other than Mr. Maguire?
6    A. Yes.
7    Q. Who?
8    A. Well, Rebecca Bachand forwarded an
9  e-mail to me.
10    Q. Okay. Did you communicate -- is --
11  anybody else?
12    A. Not that I recall.
13    Q. And did you communicate with anybody
14  else at either Worcester Pro Baseball or Perfect
15  Game Baseball?
16    A. I don't recall.
17    Q. Okay. Now, do you know, did anybody
18  else at Dant, other than you and Mr. Merrick,
19  communicate with -- with any of these individuals
20  I've just talked about?
21    A. I don't believe so.
22    Q. Okay. And do you, as you sit here today,
23  have an independent -- do you recall the dates on
24  which you communicated with Mr. Maguire?
25    A. No, I do not.

1    Q. How about Mr. Tye?
2    A. The only date that I recall speaking to Mr.
3  Tye on the phone was the Friday before our
4  meeting.
5    Q. If I were to say February 18th, would that
6  strike you as approximately correct?
7    A. I think that's correct.
8    Q. And so with Mr. Tye, that means we've got
9  the meeting at the end of January beginning of
10  February, the telephone conference on or around
11  February 18th, and the in-person meeting on the
12  20th. Any other communications that you can recall
13  just before the 21st?
14    A. With Mr. Tye?
15    Q. Yes.
16    A. There may have been one other phone
17  call.
18    Q. Okay. About when would that have
19  happened?
20    A. I think I'm recalling that it was
21  approximately a week after. I'm not sure of this,
22  but I think it was about a week after our first
23  meeting.
24    Q. Uh-huh. Let's talk about -- we'll talk
25  about that in just a second. Chris Sgarzi, do you

Matt Dougherty
January 31, 2006

Page 22

1  remember the approximate date you would have
2  communicated with him?
3      A.  No, I don't.
4      Q.  And how many times would you say you did
5  communicate with him between the 15th of January
6  and 21st of February?
7      A.  Outside of the meeting that he was -- he
8  was attending, the first meeting?
9      Q.  Uh-huh.
10     A.  Actually, I recall that now.  Outside of
11 that meeting, one conversation.
12     Q.  Okay.  Was that before or after that
13 meeting?
14     A.  I don't recall.
15     Q.  Okay.  And, Mr. Stone, would your only
16 communication with him have been on the 20th of
17 February, if at all?
18     A.  Yes.  I believe that he came to that first
19 meeting late.
20     Q.  Okay.  But no telephone calls?
21     A.  Don't believe so.
22     Q.  Okay.  And Rebecca Bachand, just this
23 February 3rd e-mail, to the best of your
24 recollection?
25     A.  Yes, to the best of my recollection.

Page 23

1      Q.  Okay.  Let's -- about how many times
2  would you say between the 15th of January and the
3  21st of February you talked with Pat Maguire or
4  communicated with him in any way?
5      A.  Four.
6      Q.  Okay.  Can you give me approximate dates
7  on those or no?
8      A.  No, I don't recall.
9      Q.  The conversation with Mr. Tye that -- that
10 you think you can recall that was about the week
11 after the meeting in Newton -- the first meeting --
12     A.  Uh-huh.
13     Q.  -- about when would you say that
14 conversation took place, what time?
15     A.  I don't recall.
16     Q.  Don't recall.  Okay.
17     Do you remember where you were?
18     A.  No.
19     Q.  Okay.  And was it -- was it a telephone
20 call?  Is that right?
21     A.  I believe so.
22     Q.  And just you and Mr. Tye on the phone?
23     A.  I believe so.
24     Q.  About how long would you say it lasted?
25     A.  Maybe -- maybe two or three minutes.

Page 24

1      Q.  And tell me everything you can recall
2  about what was said during that telephone call.
3      A.  I recall very little specifically.
4      Q.  Uh-huh.
5      A.  I believe that I called him to get some
6  followup from the meeting, the period before, and
7  to find out if there was any additional information
8  that was available on the project.
9      Q.  And what did he tell you?
10     A.  He said that they were still committed to
11 that completion date and -- and that he asked me
12 to continue to try to find a solution.
13     Q.  And what did you say to that?
14     A.  I said I would do that.
15     Q.  And what did he say next?
16     A.  "Good-bye."
17     Q.  Okay.  And that's all you can recall about
18 that conversation?
19     A.  That's all I can recall.
20     Q.  Very good.
21     The 18th, or thereabout, that telephone call
22 with Mr. Tye, where were you when that call or that
23 communication took place?
24     A.  I was in the office.
25     Q.  Okay.  Which office?

Page 25

1      A.  At Dant Clayton.
2      Q.  Okay.  And how, approximately, do you --
3  do you divide your time between your home and
4  Dant?
5      A.  I work daylight hours at the office and I
6  work evening hours at home.
7      Q.  Okay.  And this was a telephone call;
8  right?
9      A.  Yes.
10     Q.  Just you and Mr. Tye on the phone?
11     A.  Yes.
12     Q.  And about how long did that call last?
13     A.  Three minutes, approximately.
14     Q.  Do you remember what time of day it
15 would have been?
16     A.  Late afternoon.
17     Q.  Late afternoon.
18     How do you remember that?
19     A.  Because it was right before I had to track
20 down Bruce and B.J. Nichols and try to coordinate
21 a meeting two days later in Boston.
22     Q.  Okay.  And tell me everything you can
23 recall about that telephone call.
24     A.  I called him to -- I knew that they had a
25 meeting.  I had heard that they had a meeting with

Matt Dougherty
January 31, 2006

Page 26

1   Seating Solutions. I believe it was Seating
2   Solutions; I don't know that that was identified in
3   my conversation regarding the meeting. But I knew
4   that they had a meeting with a competitor and --
5   and I wanted to have one more opportunity to see if
6   we could find an agreement.
7       Q. Okay. And is that approximately what you
8   said when you first picked up the phone?
9       A. I'm sorry. Is what I -- what I said?
10      Q.  Just how you just summarized it.
11      A. No, I don't recall.
12      Q. Okay. Do you remember how Mr. Tye
13  responded?
14      A. He was -- his initial response was that he
15  didn't have time --
16      Q. Uh-huh.
17      A. -- that he was on his way to a vacation.
18      Q. Okay. What else?
19      A. Well, specifically, I don't know. But I was
20  able to convenience him that he needed to meet
21  with us.
22      Q. And how did the meeting get set up for the
23  20th?
24      A. He had a flight on Monday the 21st --
25      Q. Uh-huh.

Page 27

1       A. -- and the 20th was the only time that we
2   could all get together.
3       Q. Okay. Did you propose the 20th or did Mr.
4   Tye?
5       A. I'm not sure, but I believe I was -- I did.
6       Q. Okay. And do you recall how you knew
7   that there was a meeting with either Seating
8   Solutions, or a competitor generally, on that date?
9       A. No, I don't recall exactly.
10      Q. Okay. What else can you
11  remember about that telephone call?
12      A. That's it.
13      Q. Okay. All right. Now, Chris Sgarzi, apart
14  from that first meeting that we've talked about, you
15  mentioned that there might have been one other --
16  one other call with him; is that right?
17      A. I believe so.
18      Q. And approximately when would that call
19  have happened?
20      A. I don't remember.
21      Q. Okay. Do you remember where you were?
22      A. No.
23      Q. Okay. And was it a telephone call?
24      A. Yes.
25      Q. Okay. About -- who else was party to it,

Page 28

1   just the two of you?
2       A. Just the two of us.
3       Q. And how long did it last?
4       A. Perhaps, ten minutes.
5       Q. Okay. Do you remember who called who?
6       A. No, I don't.
7       Q. Okay. Had you worked with Mr. Sgarzi
8   before?
9       A. No, I had not.
10      Q. Okay. Have you worked with him since?
11      A. I don't believe so.
12      Q. Okay. Tell me what you can remember
13  about that phone call.
14      A. That it was not substantial. There was --
15  Chris was a -- he was an architect that was hired
16  as a consultant. At that point, the project concept
17  was only the details that -- that we had to work
18  from. I don't recall anything more specifically -- a
19  general discussion about the project.
20      Q. Okay. Seating Solutions come up?
21      A. No.
22      Q. Okay. And, all right, let's look at Exhibit
23  2A here, Mr. Dougherty. Can you identify that for
24  the record?
25      A. Exhibit 2A?

Page 29

1       Q. Uh-huh. And what is that document?
2       A. It's an e-mail from Rebecca Bachand to
3   me.
4       Q. Uh-huh. And -- and what does the e-mail
5   say, just for the record?
6       A. It's -- the subject matter is Worcester
7   Professional Baseball Field.
8       Q. Uh-huh.
9       A. And the body of the e-mail says, "Matt,
10  Pat Maguire asked me to send you the attached
11  CAD files for the baseball field that we met on this
12  week."
13      Q. Uh-huh.
14      A. "Please feel free to call if you have any
15  questions or problems with the file. Thank you,
16  Rebecca."
17      Q. Okay. What did you do with that when you
18  got it?
19      A. I looked at it.
20      Q. And when -- when would that have
21  happened?
22      A. Sometime after 6:30, 6 p.m. on February
23  3rd --
24      Q. Okay.
25      A. -- whenever I received it.

# Matt Dougherty
## January 31, 2006

---

Page 30

1    Q.  And when you looked at the attached CAD
2    file, who did you -- what was your understanding of
3    what it was?
4    A.  It's a conceptual plan.
5    Q.  Uh-huh.  What do you mean by "conceptual
6    plan"?
7    A.  I mean that it's -- there's very little
8    detail.
9    Q.  Uh-huh.  And who did you believe had
10   prepared that conceptual plan?  What was your
11   understanding, Mr. Dougherty, of who had prepared
12   the conceptual plan?
13   A.  I don't recall.
14   Q.  Uh-huh.
15   A.  It could have been that -- that it was
16   communicated to me that this was proposed by a
17   competitor; I don't recall.  This is -- this is the --
18   the level of general lack of detail, I'll say, that an
19   architect may have in his files.  So is it possible
20   that -- that Pat Maguire's office had a drawing like
21   this that they've used many times to create a -- a
22   bookmark, so to speak, on the site to show
23   approximately what the concept should be.
24   Q.  Okay.  So when you received this e-mail,
25   to the best of your recollection, there wasn't a title

---

Page 31

1    block on it?
2    A.  There was not.
3    Q.  Okay.  And you know what I mean by a
4    "title block;" right?
5    A.  Yes, I do.  We work with title blocks all
6    the time.
7    Q.  And so it wasn't a Seating Solutions title
8    block?  There was no Seating Solutions title block?
9    A.  That's correct.
10   Q.  And there was no notice stating that the
11   drawing was proprietary information belonging to
12   anybody; right?
13   A.  That's correct.
14   Q.  Okay.  So you never would have removed
15   the title block from that e-mail attachment; would
16   you?
17   A.  No.
18   Q.  Okay.
19   A.  I would not.
20   Q.  And what did you do, after you got the
21   e-mail, with it?  Did you send it to anybody at Dant
22   Clayton?  Well, actually, I don't -- again, I don't
23   want to make this a memory test.  What I'm going
24   to show you has been marked as Exhibit 2B.  And if
25   you could look that over for the record and also 2C

---

Page 32

1    as well so we can just have the -- everything that
2    was going on in that time frame.  And look up at me
3    when you're done.
4    A.  Okay.
5    Q.  Can you identify, for the record and for
6    the folks on the phone, what Exhibit 2B is?
7    A.  It's an e-mail from me to four individuals
8    within Dant Clayton.
9    Q.  Uh-huh.  And what's the date?
10   A.  February 4th.
11   Q.  And what is Exhibit 2C?
12   A.  It's an e-mail from Patrick Maguire to me
13   on February 7th.
14   Q.  Okay.  What does that -- what does
15   Exhibit 2B say about Outdoor -- Outdoor Aluminum?
16   A.  It says this that this is a drawing that
17   Outdoor gave to the architect.
18   Q.  Uh-huh.  And how did you know that
19   Outdoor had given it or what was the source of your
20   understanding that Outdoor had given it to the
21   architect?
22   A.  I believe that Patrick Maguire led me to
23   believe that.
24   Q.  Okay.  And when did -- how did he do that,
25   was it a telephone conversation or an e-mail?

---

Page 33

1    A.  It must have been a phone conversation.
2    Q.  Do you remember that call at all?
3    A.  Not specifically.
4    Q.  Okay.  Do you remember where you were
5    when you had --
6    A.  No, I do not.
7    Q.  Okay.  Or was it just -- would it have been
8    just you and Mr. Maguire on the phone?
9    A.  Probably.
10   Q.  Okay.  And about how long did the call
11   last?  Don't know?
12   A.  I don't recall.
13   Q.  Okay.  What else can you remember about
14   that call?
15   A.  I don't recall anything about it, so it must
16   have been very short.
17   Q.  Uh-huh.  And what relationship did you
18   understand at the time Outdoor Aluminum had with
19   Seating Solutions, if you had any understanding at
20   all?
21   A.  I knew that Outdoor -- that Seating
22   Solutions represented Outdoor Aluminum.
23   Q.  Okay.
24   A.  I knew that.
25   Q.  Okay.  So when you say "Outdoor" there,

---

Matt Dougherty
January 31, 2006

Page 34

1  does that -- is there a connection between Outdoor
2  and Seating Solutions when you -- did you
3  understand there to be a connection when you sent
4  that e-mail?
5    A.  No.  I'm not sure -- I'm not sure exactly
6  what answer you're looking for.  But it's possible
7  that Outdoor could have been involved in this
8  project directly without Seating Solutions.
9    Q.  Okay.  And did you have an understanding
10  when you sent that e-mail on the 3rd as to whether
11  Seating Solutions was involved?  I'm sorry the
12  e-mail on the -- on the --
13    A.  4th?
14    Q.  The 4th, exactly.
15    A.  The one I sent internally?
16    Q.  Yes.
17    A.  No, I don't recall that I had that specific
18  knowledge.
19    Q.  Okay.  How about the -- the one on the 7th
20  -- the exchange happening on the 7th?
21    A.  Would you ask the question again, please?
22    Q.  What was your understanding about the
23  involvement of Seating Solutions?
24    A.  Well, I refer to Seating Solutions in this
25  e-mail.

Page 35

1    Q.  Uh-huh.  Okay.  So how -- how -- if -- if
2  you recall, do you -- do you -- did you know that
3  Seating Solutions was involved?
4    A.  How did I know?
5    Q.  Yeah.  And if you don't recall, that's a
6  perfectly acceptable answer.
7    A.  I -- you know, I don't recall how I learned
8  that information.
9    Q.  Okay.  But, at this point, you -- you
10  understood that Seating Solutions was also
11  attempting to obtain the Fit and Field contract;
12  right?
13    A.  That appears to be the case from this
14  e-mail.
15    Q.  Okay.  So let's go back to 2B.  That is
16  February 4th; right?
17    A.  Yes.
18    Q.  And -- and tell me what -- what you were
19  trying to accomplish by sending that e-mail.
20    A.  I was trying to get some answers to
21  specifics related to the site and the proposed
22  conceptual plan.
23    Q.  Okay.  And Henry Nichols is who?
24    A.  He's an engineer.
25    Q.  Okay.  Mike Guenthner?

Page 36

1    A.  Vice president of sales.
2    Q.  And Mr. Merrick is in the room.
3  Mr. Willinger is who?
4    A.  He is a technical advisor.
5    Q.  Okay.  And, let's see.  What -- how did
6  these folks respond to this e-mail?
7    A.  We had an informal meeting --
8    Q.  Uh-huh.
9    A.  -- and we discussed the lack of specificity
10  with the plan and how difficult it was to make
11  judgments based on this particular plan.
12    Q.  Okay.
13    A.  I believe we developed a list of questions.
14  That's all I recall.
15    Q.  And who was at that meeting?
16    A.  I don't recall.
17    Q.  Okay.  Do you remember where it took
18  place?
19    A.  It would have been at the Dant Clayton
20  office.
21    Q.  Okay.  About how long did it last?
22    A.  I'm not sure, but I would guess maybe half
23  an hour -- 30 minutes.
24    Q.  Anything else you can recall about that
25  meeting?

Page 37

1    A.  No.
2    Q.  Okay.  All right.  Now, the list of
3  questions, did you subsequently communicate that
4  to Mr. Maguire -- or comments?
5    A.  Yes.
6    Q.  And is that -- is that e-mail on Exhibit 2C?
7    A.  Yes.
8    Q.  And is that the e-mail that you sent on
9  February 7th, at 3:01 p.m.?
10    A.  Yes.
11    Q.  All right.  Now, did -- let me ask you about
12  this:  Do you see at the bottom where you're talking
13  about Manchester?
14    A.  Yes.
15    Q.  Manchester -- what state are we talking
16  about there?
17    A.  New Hampshire.
18    Q.  Okay.  And when you want Seating
19  Solutions to explain what happened at Manchester,
20  what's your understanding of what happened at
21  Manchester?
22    A.  Seating Solutions had a -- a contract with
23  Payton Construction and that there was some
24  performance issue and Payton Construction
25  terminated the contract.

10  (Pages 34 to 37)

9376669b-1c49-4faf-ac48-6bf28a400f1a

## Matt Dougherty
## January 31, 2006

Page 38

1    Q.  And how did you know that?
2    A.  Because they subsequently came to Dant
3   Clayton and contracted with us.
4    Q.  Okay.  And "performance issues," what do
5   you mean by that?
6    A.  I don't know anything more specific than
7   that.  That's what I was told.
8    Q.  Okay.  And what was the nature of the
9   Manchester project?
10   A.  It was a minor league baseball stadium.
11   Q.  Okay.  How many seats?
12   A.  Approximately 6,000.
13   Q.  All flip-up, not partially flip-up, only if
14  you can recall?
15   A.  I don't recall if it was all chairs or if it
16  was a combination of chairs and benches.
17   Q.  Okay.  And -- very good.  Did Mr. Maguire
18  -- were there -- there's e-mails were.  Were there
19  telephone conversations happening with Mr.
20  Maguire as well during this time frame, February
21  7th?
22   A.  I don't recall --
23   Q.  Don't recall?
24   A.  -- on that particular day.
25   Q.  Okay.  But do you recall telephone

Page 39

1   conversations generally during that period?
2    A.  I believe I had two phone conversations
3   with Mr. Maguire between the initial time frame --
4    Q.  Uh-huh.
5    A.  -- of January, whatever it was, 15th.
6    What was the initial date that you were --
7   dates you
8   were --
9    Q.  I think January 26th.
10   A.  January 26 and February 21st.
11   Q.  Okay.  And let's -- let's talk about those.
12  The first one, do you remember how close -- you
13  know, approximately what date we're talking about?
14   A.  No.  It was a -- as I think I said earlier, it
15  was, I believe, a week or so before the first
16  meeting.
17   Q.  Okay.  And have we talked about that call
18  already today?
19   A.  I believe we did.
20   Q.  Okay.  The second call, then,
21  approximately when would you say that happened?
22   A.  Several days before my conversation with
23  Ted Tye on the 18th.
24   Q.  Okay.  To, again, prevent this from
25  becoming a memory test, I'm going to show you

Page 40

1   what's been marked as Exhibit 5.  If you could take
2   a look at that and tell me when you're done.  Could
3   you identify it for the record?
4    A.  This is a -- an e-mail that was sent from
5   Ted Tye to Patrick Maguire --
6    Q.  Uh-huh.
7    A.  -- on the 17th of February.
8    Q.  And can you id -- can you just let the folks
9   in Massachusetts know what the number in the
10  lower, right-hand corner is?
11   A.  2744.
12   Q.  Okay.  Is this -- does this e-mail below --
13  the February 17th e-mail from Mr. Maguire to Mr.
14  Tye -- does this reference the telephone call that --
15  that you're -- that you were just talking about or
16  was this a different call?
17   A.  It appears to.
18   Q.  Okay.  And can you recall where you were
19  when that phone call took place?
20   A.  No, I can not.
21   Q.  And who was a party to it, just yourself
22  and Mr. Maguire?
23   A.  I'm not sure, but I believe so.
24   Q.  Okay.  And about how long did the call
25  last?

Page 41

1    A.  Five or ten minutes, maybe.
2    Q.  Okay.  Tell me everything you can recall
3   about what was said during that telephone call.
4    A.  I believe that he indicated that -- that the
5   team -- I'll call them the team -- the owner's group
6   was in discussions with one of my competitors -- I
7   don't recall if this was identified who it was in that
8   conversation -- and that they were being given
9   indications that they could meet the project
10  schedule and that if we were going to be a player
11  on this project that we needed to respond very
12  soon because of the time frames for completion and
13  the need to make a decision.
14   Q.  And how did you respond?
15   A.  I told him that I would -- I would talk to
16  the principal parties of Dant Clayton and see if
17  there was anything we could -- we could do.
18   Q.  And how did he respond to that?
19   A.  I don't recall.
20   Q.  What else can you remember about that
21  telephone call?
22   A.  That it instilled a sense of urgency in me.
23   Q.  Uh-huh.  And can you tell me why?
24   A.  Because he indicated that there was a
25  decision that was -- that needed to be made.

Matt Dougherty
January 31, 2006

**Page 42**

1    Q.  Okay.  And do you remember Mr. Maguire
2  telling you anything about price during that phone
3  call?
4    A.  In general terms, I remember that he
5  indicated he felt the price that -- that my
6  competitor was proposing was high.
7    Q.  And did you express any opinion about
8  price during that call?
9    A.  No.
10    Q.  You did not.  Do you not recall expressing
11  an opinion about price or --
12    A.  I don't remember specifically what I would
13  have said.
14    Q.  Okay.
15    A.  At that point, the full scope of the project
16  was still undefined to me.
17    Q.  Okay.
18    A.  We could have been discussing general --
19  in general terms perceived costs --
20    Q.  Okay.
21    A.  -- and ranges of those numbers.
22    Q.  You could have been?
23    A.  We could have been.
24    Q.  Okay.
25    A.  I have those conversations all the time

**Page 43**

1  with architects.
2    Q.  Okay.  But do you have a recollection of
3  talking about perceived costs with Mr. Maguire on
4  the morning of February 17th?
5    A.  No.  Specifically, other than he -- all I
6  remember is that he indicated to me that he felt the
7  price was high and that he thought that we should
8  take a look at this one more time, if there was
9  anything that we could additionally do, perhaps, to
10  make the schedule work.
11    Q.  Do you have any independent recollection,
12  just apart from this e-mail, of him mentioning that
13  there was a price on the table in excess of $500
14  per seat?
15    A.  No.
16    Q.  You do not?
17    A.  Outside of this e-mail?
18    Q.  Yeah.
19    A.  No.  I mean, I remember that there was a -
20  - again, a general discussion about the high
21  number, and $500 per seat may have been
22  communicated.
23    Q.  Okay.  Anything else you can remember
24  about that call?
25    A.  No.

**Page 44**

1    Q.  All right.  And this was -- again, just --
2  you can only recall at this point that it was a
3  competitor, not that it was Seating Solutions?
4    A.  Yeah.  I don't remember any specific
5  reference to who it was.
6    Q.  All right.  Could we backtrack to Exhibit
7  4?  If you could, take a look at that and then let me
8  know when you're done.
9    A.  Okay.
10    Q.  Can you identify this document for the
11  record and for the benefit of the folks in
12  Massachusetts, please?
13    A.  It was an e-mail I sent to Patrick Maguire
14  on February 11th.
15    Q.  And -- and what does that e-mail include?
16    A.  It has some general schedule information.
17    Q.  Uh-huh.  And does it refer to a meeting
18  next week?
19    A.  Yes, it does.
20    Q.  And what meeting is that referring to?
21    A.  I believe that it was the meeting that my
22  competitor was having as a final proposal.
23    Q.  Okay.  And how did you know that that
24  meeting was happening?
25    A.  Mr. Maguire.

**Page 45**

1    Q.  And was this a -- have we talked about
2  that telephone call yet or have we talked about that
3  communication with Mr. Maguire?
4    A.  I don't know.
5    Q.  Okay.  Do you have a recollection of a
6  conversation with Mr. Maguire where he talked
7  about a meeting in the week following February 11th
8  between Worcester Baseball and Seating
9  Solutions?
10    A.  At that point, I believe I knew that they
11  were having a meeting on Friday the 18th.
12    Q.  And so when did you learn that?
13    A.  Sometime before February 11th.
14    Q.  Okay.  And do you remember where you
15  were when you -- when you learned?
16    A.  No.
17    Q.  How you learned?  Was it a phone call, e-
18  mail?
19    A.  Probably a phone call.
20    Q.  And do you remember who was party to
21  that telephone call?
22    A.  No, I don't remember.
23    Q.  About how long it lasted?
24    A.  Almost every conversation I had with Pat
25  Maguire is brief.  So I would say five minutes.

Matt Dougherty
January 31, 2006

Page 46

1  Q.  Okay.  And tell me everything you can
2  recall about that specific communication where you
3  learned there was a meeting the week following
4  February 11th.
5  A.  I don't remember anything specifically.
6  Q.  Okay.  Just that you somehow had learned
7  there was a meeting the following week?
8  A.  Right.
9  Q.  Okay.
10  A.  And it's obvious that he also asked me for
11  some scheduling -- some typical scheduling
12  information, which is how I responded in this e-mail
13  about it.
14  Q.  Okay.  All right.  Now, what I'd like to do
15  is show you what's been marked Exhibit 2D.  Take a
16  look at that and then let me know when you're
17  done.  And for the benefit of the folks in
18  Massachusetts, if you could, identify this document
19  for the record.
20  A.  It's an e-mail that Patrick Maguire sent to
21  me on February 17th
22  Q.  Okay.  And is there an attachment to the
23  paper document in front of you?
24  A.  Yes.
25  Q.  And what is that attachment?

Page 47

1  A.  It's the -- it's the more detailed site plan
2  with a conceptual seating plan overlaid.
3  Q.  And who did -- when you received this
4  e-mail, did you have an understanding as to who
5  prepared the seating aspect of this design?
6  A.  No, not specifically.
7  Q.  Generally?
8  A.  Well, generally, I knew that it could have
9  been Seating Solutions or Outdoor.
10  Q.  Okay.  And this document, the site plan,
11  was it an attachment to the e-mail?
12  A.  Yes.
13  Q.  It was?
14  A.  I believe so.
15  Q.  You believe so?
16  A.  Yes.
17  Q.  And why do you believe that?
18  A.  Well, because I attached it to the e-mail.
19  Q.  Okay.  So you personally printed --
20  A.  I printed off these documents and I
21  prepared this exhibit.
22  Q.  Okay.  And so the site plan was attached
23  to the e-mail dated February 17th, 2005?
24  A.  Yes.
25  Q.  And that would be reflected if I ever saw

Page 48

1  an electronic version of that e-mail?
2  A.  Yes.
3  Q.  Okay.  And did you ask Mr. Maguire to
4  send you that site plan?
5  A.  I may have.
6  Q.  Okay.  But do you have any specific
7  recollection of --
8  A.  No.
9  Q.  Okay.  Were you -- do you have a
10  recollection of expecting to receive a site plan
11  around that time?
12  A.  A recollection of expecting to receive it?
13  Q.  Yeah.  Were you waiting for it?
14  A.  No, I don't recall that.
15  Q.  Okay.  On how many occasions did -- did
16  you receive information that you understood to be a
17  design prepared by Seating Solutions or Outdoor
18  Aluminum?
19  A.  Would you repeat the question?
20  Q.  On how many occasions did you, Pat
21  Maguire [sic] -- I'm sorry -- did you, Matt
22  Dougherty, receive -- receive information that you
23  believed to be designs prepared by Seating
24  Solutions or Outdoor Aluminum?
25  MR. ROSE:  I'm going to object.  It

Page 49

1  assumes a fact not in evidence.
2  MR. KLEIN:  Sure.
3  BY MR. KLEIN:
4  Q.  If ever?
5  A.  I'm not sure.
6  Q.  Okay.
7  A.  I don't recall.
8  Q.  Okay.
9  A.  Specific, I guess, to offer the explanation,
10  I knew that Outdoor was one of the competitors
11  involved in competing for this project.
12  Q.  Uh-huh.
13  A.  But I did not believe that they were the
14  only competitor.
15  Q.  Okay.
16  A.  So, this drawing, I wasn't sure that this
17  came from Seating Solutions or Outdoor.
18  Q.  Okay.  And so just to clarify again for the
19  record, when you received that site plan, it didn't
20  have a Seating Solutions' title block on it?
21  A.  That's correct.
22  Q.  And didn't include any proprietary
23  information statement or anything of that nature?
24  A.  This is exactly as it was printed off the
25  way I received it.

# Matt Dougherty
## January 31, 2006

---

**Page 50**

1  Q. Understood.
2  And other than the conversation with Mr.
3  Maguire on February 17th at which per-seat pricing
4  was discussed, did you discuss Seating Solutions'
5  pricing or -- I'm sorry -- just competitors' pricing in
6  general with Mr. Maguire on any other date for the
7  Fit and project [sic]?
8  A. Don't recall.
9  Q. Don't recall. Okay. All right.
10  And what did you do with that e-mail when you
11  got it? I'm looking -- I'm talking about 2D.
12  A. I printed it off and I don't recall exactly
13  what I did with it.
14  Q. Okay. Would that drawing give you
15  sufficient information to preparing a section
16  drawing?
17  A. One of several, perhaps.
18  Q. Okay. And just for the record, you know
19  what I mean by a "section;" right?
20  A. Yes. Do you know?
21  Q. Yes.
22  A. It could be -- it -- this could be
23  interpreted a number of ways.
24  Q. Uh-huh. Well, tell me how it could be
25  interpreted.

---

**Page 51**

1  A. Well, first of all, there's lack of
2  dimensions on this. So all estimates of what a
3  section might look like --
4  Q. Uh-huh.
5  A. -- would have to be assumed based on
6  what the rise run would be, what the evaluation in
7  the front of the stand would be, what the evaluation
8  at the back would be. And, subsequently, there's a
9  lot of information lacking from this plan.
10  Q. And would that information be apparent
11  electronically? Were you -- were you manipulating
12  it in the CAD format?
13  A. No.
14  Q. It would not be?
15  A. It would not be.
16  Q. Okay. So there would have to be
17  additional design work done to make that
18  information apparent; is that what you're -- is that
19  your testimony?
20  A. Yes.
21  Q. Okay. Did you prepare a section based
22  upon that drawing?
23  A. No.
24  Q. You did not. Did you prepare -- did you
25  show the folks at Worcester Baseball a section

---

**Page 52**

1  drawing based on any of the Seating Solutions'
2  designs?
3  A. No.
4  Q. Okay. Did you show them a section based
5  upon your UVA stadium?
6  A. Correct.
7  Q. Okay. So we've talked about how the
8  February 20th meeting came to be scheduled. And,
9  for the record, I just want you to take a look at
10  what's been marked as Exhibit 2E and then tell me
11  when you're done.
12  A. All right.
13  Q. And could you identify this document just
14  for the benefit of the folks in Massachusetts and
15  for the record, please?
16  A. This is an e-mail I sent on Friday,
17  February 18th to Ted Tye.
18  Q. Okay. And is this the e-mail that you
19  followed up with the telephone call that I think we
20  spoke of earlier?
21  A. Yes.
22  Q. And did you call Mr. Tye or did he contact
23  you after receiving this e-mail?
24  A. I don't recall.
25  Q. Okay. And you said that after you had

---

**Page 53**

1  that conversation you were looking for B.J. Nichols
2  and Mr. Merrick, is that right, on the 18th?
3  A. I believe that's correct.
4  Q. And why -- why those two folks?
5  A. Because the requirements of the project
6  made it necessary for me to get -- to have
7  executive exception made to --
8  Q. Uh-huh.
9  A. -- what I am familiar with as standard
10  performance parameters for the company.
11  Q. Okay. And B.J. Nichols, what's his job?
12  A. He's an engineer.
13  Q. Where is he in the hierarchy at Dant?
14  A. I'm not sure what you mean.
15  Q. I mean, is he a more senior engineer or --
16  or was he just along so that you would have
17  somebody who was an engineer in the room?
18  A. We have -- at that time, we had three
19  engineers working for the company.
20  Q. Okay. And why specifically did you pick
21  Mr. Nichols to come with you?
22  A. He is -- that's his role.
23  Q. Okay.
24  A. He is sales support.
25  Q. Understood. Okay.

---

9376669b-1c49-4fef-ac48-6bf38e409f1a

Matt Dougherty
January 31, 2006

Page 54

1    THE REPORTER: Can I get some paper?
2    MR. KLEIN: Yes. Absolutely.
3    [WHEREUPON, a brief recess is taken.]
4    BY MR. KLEIN:
5    Q. Is there something you need to clarify for
6    the record, Mr. Dougherty?
7    A. Yeah. I believe this Exhibit E --
8    Q. Uh-huh.
9    A. Is this 2E?
10   Q. That's correct.
11   A. 2E shows an attachment of a site plan
12   with a seating plan overlaid.
13   Q. Uh-huh.
14   A. I believe that this does not -- this seating
15   plan -- this site plan does not go with this e-mail.
16   Q. Okay.
17   A. I believe it was mixed up. I think this site
18   plan -- and this goes with 2B.
19   Q. Okay. Understood. Understand. Okay.
20   So what did you do to prepare for the February
21   20th meeting?
22   A. I had -- I worked all day Saturday,
23   communicated with B.J. Nichols a number of times.
24   We had a detailer at the company who worked to
25   help take the University of Virginia project and

Page 55

1    make the slight modifications that we needed to --
2    to meet the project goals, those being number of
3    seats and. . .
4    Q. Okay. And did you prepare a written
5    proposal that included a proposed price for the --
6    A. No.
7    Q. You did not. Okay. Did Mr. Merrick, to
8    your knowledge? Did anybody at Dant Clayton, to
9    your knowledge, prepare, like, a written price
10   proposal?
11   A. No.
12   Q. Okay. And, as you were preparing, were
13   you -- were you glancing or relying in any way on --
14   on the plans that you received from Mr. Maguire to
15   date?
16   A. No.
17   Q. You weren't?
18   A. No.
19   Q. Did you prepare a discussion of aspects of
20   those plans to share with -- with the Worcester
21   Baseball folks the following day?
22   A. Not at that time. We had already -- based
23   on the earlier plan that was forwarded, already
24   identified a number of issues which -- that were
25   potential conflicts.

Page 56

1    Q. Uh-huh.
2    A. Again, lack of information and specificity
3    on -- on the plan and lack of a section meant that
4    there was a lot of latitude in how this could be
5    interpreted.
6    Q. Okay. In any event, did you prepare some
7    aspect of -- some -- was there any content that you
8    prepared for the following day that would entail
9    some comment on the previous concepts that you
10   looked up?
11   A. Not other than what I just said to you.
12   Q. Okay. But that was -- you did do that
13   preparation?
14   A. We did -- at some point, I believe, during
15   the presentation or the discussions on the 20th --
16   Q. Uh-huh.
17   A. -- I believe we may have mentioned that
18   there are a number of issues with what has been
19   proposed by our competition.
20   Q. But that was sort of an aside? It wasn't a
21   centerpiece?
22   A. Oh, absolutely not, no. I mean, our
23   proposal was much more specific and detailed.
24   Q. Uh-huh.
25   A. And, I mean, it was what the owner was

Page 57

1    looking for.
2    Q. Okay. And as you -- were you -- did you
3    discuss with Mr. -- with Mr. Merrick what sort of
4    price neighborhood you'd be in for that February
5    20th meeting?
6    A. I don't believe so.
7    Q. Whose call was that?
8    A. Prior to the meeting?
9    Q. Yeah.
10   A. There would not have been that
11   discussion.
12   Q. Okay. There was not a discussion with
13   Mr. Merrick, or anyone, prior to the meeting about
14   what your initial price proposal was going to be?
15   A. No. No. You have to understand that
16   until we have a clearly-defined scope of work --
17   Q. Uh-huh.
18   A. -- it's impossible for us to put a number
19   on it.
20   Q. Okay.
21   A. So we may have been conceptually talking
22   about price ranges --
23   Q. Uh-huh.
24   A. -- but, no, there would not have been a
25   specific discussion of what a price might be for

9376669b-1c49-4fef-ac48-6bf38e409f1a

# Matt Dougherty
## January 31, 2006

---

**Page 58**

1 this project.
2 Q. Okay. The price range discussions you
3 were having, did you have -- do you recall having
4 those discussions with Mr. Merrick?
5 A. No, I don't.
6 Q. You don't. Okay.
7 At what point did scope become clear enough
8 that you could start talking about price?
9 A. In the meeting on the 20th.
10 Q. Okay. And when you -- when you were --
11 when you started talking about price, did you -- did
12 you utilize your knowledge of what your
13 competitors' pricing -- the range of your
14 competitors' perceived price when you started
15 that -- when you were having that discussion?
16 MS. KORN: Objection.
17 A. No, we did not.
18 BY MR. KLEIN:
19 Q. You didn't?
20 A. No. In preparing our number?
21 Q. Yes.
22 A. No.
23 Q. You didn't?
24 A. No.
25 Q. Okay. And Mr. Merrick commented about

---

**Page 59**

1 this earlier. But just in your experience, how
2 common is it for Dant to have a competitor's
3 designs as it makes its own proposal?
4 A. If we're going to make a proposal, we
5 have to have some conceptual plan.
6 Q. Uh-huh.
7 A. How common is it for use to have a
8 competitor's proposal?
9 Q. Yes.
10 A. It's not common --
11 Q. Okay.
12 A. -- because, typically --
13 Q. Uh-huh.
14 A. -- our competitors don't provide
15 proposals.
16 Q. Okay. Designs, though, I'm talking about.
17 A. They typically don't provide conceptual
18 plans and designs.
19 Q. Okay. And so -- so as you -- as you went
20 in to this meeting on February 20th, did you feel
21 like it was kind of unusual that you would have the
22 conceptual designs that you had before that
23 meeting?
24 A. No, I wouldn't say unusual.
25 Q. Okay.

---

**Page 60**

1 MR. CIAVARRA: Let me put an objection
2 in there. That assumes facts not in evidence.
3 MR. KLEIN: Okay. I -- understood.
4 BY MR. KLEIN:
5 Q. How common is it for you, Mr. Dougherty,
6 to have a knowledge of the range of a competitor's
7 perceived price as you prepare your own proposal?
8 A. It's not very common.
9 Q. Okay. Would you say in this case, as you
10 prepared for this February 20th meeting, that you
11 had a knowledge of a competitor's -- a range of
12 your competitor's perceived price?
13 A. Yes.
14 Q. All right. Let's talk about that February
15 20th meeting, and then we're -- we're very close to
16 done. Who do you recall was present at that
17 meeting?
18 A. Ted Tye.
19 Q. Uh-huh.
20 A. Allen Stone.
21 Q. Uh-huh.
22 A. The general manager for the team.
23 Q. Uh-huh.
24 A. Myself, Bruce Merrick, B.J. Nichols,
25 Patrick Maguire. I believe that's it.

---

**Page 61**

1 Q. Okay. And about how long did the meeting
2 last?
3 A. I think it was five or six hours.
4 Q. Okay. Is that pretty long?
5 A. It was -- it was a fairly long meeting.
6 Q. Okay. Five or six hours.
7 Tell me everything you can recall about the
8 meeting.
9 A. Well, we had an introductory period of 30,
10 45 minutes.
11 Q. Actually, you know what I'm going to do to
12 save us a little bit of grief here, was Seating
13 Solutions discussed during that meeting?
14 A. Not that I recall.
15 Q. Not that you recall?
16 A. No.
17 Q. Was the previously existing concept plan
18 discussed during the meeting?
19 A. Yes.
20 Q. And what do you remember about -- about
21 any of those discussions?
22 A. Nothing specific but, in general, the lack
23 of specificity on the conceptual proposal that was
24 submitted.
25 Q. Okay. Did you talk about site lines at all?

---

Matt Dougherty
January 31, 2006

Page 62

1    A. We did.
2    Q. Did you talk about site lines as they would
3    have been on the concept plan?
4    A. We -- I believe we discussed potential
5    problems with site lines on their plan.
6    Q. Okay. What do you remember about that?
7    A. Again, that it was all phrased and couched
8    within the lack of information and how we had to
9    make certain assumptions based on this very
10   schematic level plan and where there were
11   potential conflicts.
12   Q. Okay. What else about the concept plan
13   was discussed?
14   A. I believe it was identified at some point
15   that the proposal from our competitor included a
16   lower bowl that was an angle frame.
17   Q. Uh-huh.
18   A. And I don't remember how we addressed
19   that, but my general comments would have been I'd
20   say a very -- I'd call it a cheap way to do it.
21   Q. Okay. And so your ultimate proposals
22   didn't include any angle-frame aspects?
23   A. That's correct.
24   Q. It was all I-beam?
25   A. That's correct.

Page 63

1    THE REPORTER: It was all?
2    MR. KLEIN: I-beam.
3    BY MR. KLEIN:
4    Q. All right. When you -- when you got on
5    the plane or on the train or whatever to travel to
6    Boston for that February 20th meeting, did you have
7    any belief as to whether there was a deal in place
8    between Seating Solutions and Worcester
9    Baseball?
10   A. No.
11   Q. And, Mr. York -- did you have any
12   communication with Mr. York about the Fit and
13   Field project?
14   A. I don't recall.
15   Q. Okay. Do you know who at -- do you know
16   who at Dant is Mr. York's kind of primary contact,
17   who he talks to more than anybody else?
18   A. No, I don't know.
19   Q. Okay. To your knowledge, did anybody at
20   Dant tell Mr. York that Seating Solutions had
21   received the deal?
22   A. No.
23   Q. Okay. When did you think that Dant had
24   gotten this project?
25   A. It -- probably when we had a Memorandum

Page 64

1    of Understanding that was signed. But I knew that
2    there was still a major hurdle with the contract --
3    that the contract had to be ironed out.
4    Q. Okay. So Mr. Merrick talked about a cell
5    phone call you received, I believe, on the evening
6    of February 20th.
7    A. Uh-huh.
8    Q. Was -- who did you speak to during that
9    call?
10   A. Ted Tye.
11   Q. Just Mr. Tye?
12   A. Yes.
13   Q. Mr. Stone was not on the phone?
14   A. I don't believe so.
15   Q. Was Mr. Stone -- do you know, did Mr. Tye
16   say that Mr. Stone was in the room with him or
17   anything of that nature?
18   A. I don't remember that.
19   Q. And how long did that call last?
20   A. Five or ten minutes.
21   Q. Okay. And what did -- tell me everything
22   you can remember about that call.
23   A. He thanked us for coming up.
24   Q. Uh-huh.
25   A. He said they were all very impressed by

Page 65

1    what they saw; that they wanted to do a deal with
2    us but there were still some issues related to price
3    that we had to work through, and we discussed that
4    a little bit. We -- I think we may have negotiated a
5    little bit on the number.
6    Q. Uh-huh.
7    A. And -- and at the end of the conversation,
8    it was my understanding that -- that if we worked
9    out a Memorandum of Understanding that covered
10   all the issues that -- that we may have a deal.
11   Q. Okay. Anything else you can recall about
12   that telephone call?
13   A. No. It was -- it was noisy in the
14   restaurant and I wasn't able to hear him very
15   clearly, so it wasn't a very long conversation.
16   Q. All right. Do you know anything about this
17   case study that was discussed during Mr. Merrick's
18   deposition?
19   A. Case study of Fit and Field?
20   Q. Yes.
21   A. I have seen it.
22   Q. You have seen it. So it does exist?
23   A. I have.
24   Q. And does it refer to Seating Solutions?
25   A. No.

17 (Pages 62 to 65)

# Matt Dougherty
## January 31, 2006

Page 66

1    Q. Does it refer to the existing concept plan
2  that you saw when you went in on February 20th?
3    A. I don't believe so.
4    Q. Okay. Does it refer to anything prior to
5  your actual execution of their obligations under the
6  contract?
7    A. I'm sorry. Would you repeat the question?
8    Q. Does it refer to anything other than you
9  guys actually doing the work?
10    A. It -- I think it -- as most case studies do,
11  it had some background information about owner
12  requirements.
13    Q. Okay. Okay.
14    Do you have a recollection of what Dant's
15  profit was on this job?
16    A. No, I do not.
17    Q. Do you have a recollection of what its
18  targeted profit was?
19    A. No, I do not.
20    Q. Okay. One last thing.
21    You mentioned the specificity of your proposal
22  on that Sunday meeting; right?
23    A. [nods head]
24    Q. Was that -- when you meet with -- with --
25  with owner's usually -- when you have in your

Page 67

1  experience -- do you usually present such a
2  specific design, such a specific plan?
3    A. Absolutely.
4    Q. You do. So that's your practice?
5    A. Yes, it is.
6    Q. Okay. Have you understood all the
7  questions I have asked you today?
8    A. I believe I have. I'd have to ask Josh if I
9  haven't.
10    Q. And have you answered them all truthfully
11  and completely to the best of your knowledge?
12    A. Yes, I have.
13    Q. Would you like to supplement any of your
14  answers in any way?
15    A. No.
16    MR. KLEIN: All right. At this point, I
17  have no further questions for this witness. But I
18  would reserve the right to ask any additional
19  questions based upon questions of Mr. Ciavarra
20  and Ms. Korn.
21    MS. KORN: Is someone going?
22    MR. CIAVARRA: Sure. You can go on.
23    MS. KORN: Okay. I just can't -- I just
24  couldn't hear.
25  CROSS EXAMINATION

Page 68

1  BY MS. KORN:
2    Q. My name is Lauren Michaels Korn and I
3  represent co-defendants, Geller Sport, Inc. and
4  Geller Devellis, Inc. If you can't hear what I'm
5  saying, just let me know. Just a couple of
6  questions.
7    So the Exhibit 2A, the attachment to that, does
8  that contain any proprietary information?
9    A. Not what I would consider to be a
10  proprietary information.
11    Q. Okay. And then Exhibit -- what was the
12  other attachment to -- Exhibit 2D, that drawing,
13  does that contain any -- excuse me -- proprietary
14  information?
15    A. No.
16    Q. Okay. So prior to your meeting with
17  Worcester Baseball on February 20th, were you
18  aware of the exact design of the Seating Solutions'
19  proposal?
20    MR. KLEIN: Object to the form.
21    A. I'm sorry. Would you repeat the question?
22  BY MS. KORN:
23    Q. Yeah.
24    Prior to the February 20th meeting, were you
25  aware of the exact design of the Seating Solutions'

Page 69

1  proposal?
2    MR. KLEIN: Same objection.
3    A. I believe I answered this earlier. I wasn't
4  sure that the design that was forwarded to me came
5  from Seating Solutions.
6    MR. ROSE: And I'm also going to object
7  to the form.
8  BY MS. KORN:
9    Q. Okay. Was that -- was that -- that plan
10  that you did perceive from Patrick Maguire, did
11  that -- did that come with a scope of the work to be
12  done?
13    A. No.
14    Q. Okay. And did that come with the exact
15  price --
16    A. No.
17    Q. -- being proposed?
18    A. No.
19    Q. And so the Dant Clayton plans that were
20  presented at the February 20th meeting, were those
21  based off of the Dant Clayton University of Virginia
22  drawings?
23    A. Yes.
24    Q. Were those based off of any drawings that
25  you had received from anyone else?

Matt Dougherty
January 31, 2006

Page 70

1    MR. KLEIN: Object to the form.
2    A. No, they were not.
3    MS. KORN: That's all I have. Thank you.
4    CROSS EXAMINATION
5    BY MR. CIAVARRA:
6    Q. Mr. Dougherty, this is Lou Ciavarra. How
7    are you?
8    A. Hello, Lou.
9    Q. I apologize for the voice. When this is
10   over, I may just get the hell out of here.
11   I believe you, in response to Mr. Klein,
12   indicated that the -- I'll call them -- the designs
13   that you had received from Mr. Maguire lacked
14   some detail. Was that your testimony?
15   A. Yes, essentially.
16   Q. Okay. And whatever information you
17   received from Mr. Maguire, whether we call them
18   designs or proposals or whatever it was, was there
19   a sufficient amount of detail for you, just based
20   upon that information, to have set a certain price
21   or a specific schedule for the completion of this
22   project?
23   MR. KLEIN: Object to the form.
24   A. No, not specific to this project.
25   BY MR. CIAVARRA:

Page 71

1    Q. Okay. Putting aside the work that you had
2    done at Virginia and basing just upon the
3    information provided from Geller, was there
4    sufficient information provided to you with respect
5    to the Fit and Field project for Dant Clayton to
6    have bound itself to the baseball team with respect
7    to a certain price and a specific completion date?
8    A. No.
9    Q. In your meetings with either Geller or any
10   of the baseball representatives, was there any
11   discussion about the need for the approval of the
12   College of the Holy Cross officials?
13   A. Yes.
14   Q. All right. And what information did you
15   receive with respect to Holy Cross' involvement or
16   approval process in this project?
17   A. I don't recall whether it was conveyed to
18   me at that point that there was still a -- an
19   agreement that the team had to reach with the
20   school or whether that had already been
21   accomplished.
22   Q. Focus just a minute on the February 20th
23   meeting, okay, the one that you've been talking
24   about.
25   A. Right.

Page 72

1    Q. Do you have a memory, as you sit here
2    today, about whether there was any discussion
3    about having to still obtain Holy Cross' approval
4    prior to the project going forward?
5    A. No. Well, in my mind there are two
6    issues. One is that there was an agreement to use
7    the facility that the team had to obtain. And,
8    again, I don't recall whether at that meeting that
9    agreement had been reached.
10   Q. But --
11   A. There was also -- there was also an issue
12   related to specific approval of a plan -- I'll call it a
13   proposal plan.
14   Q. Okay. And I asked it in the timing
15   question. But was it your understanding, as a
16   representative of Dant Clayton, that both of those
17   two conditions had to be met prior to the entering
18   of a contract with a -- with the baseball guys for
19   this project?
20   A. I believe that's the case, yes.
21   MR. CIAVARRA: Okay. Thank you, sir.
22   I'm done.
23   MR. KLEIN: I have one final question for
24   you, Mr. Dougherty.
25   REDIRECT EXAMINATION

Page 73

1    BY MR. KLEIN:
2    Q. Did you, at any point, receive a copy of
3    any of Seating Solutions' written -- you know,
4    typewritten proposals for the Fit and Field project?
5    A. No.
6    MR. KLEIN: Okay. That's all I have for
7    this witness. And I thank him and Mr. Merrick for
8    their attendance today, and their patience.
9    MR. ROSE: I don't have any questions.
10   THE REPORTER: Okay. Would everybody
11   like a copy?
12   MR. CIAVARRA: This is Lou Ciavarra. I
13   do.
14   THE REPORTER: Okay.
15   MS. KORN: Yes, Lauren Korn would like
16   one as well.
17   MR. ROSE: Chris, do you want to pay for
18   a copy?
19   We don't need a copy.
20   THE REPORTER: Okay.
21   Is there any rush or anything?
22   MR. KLEIN: No. We're all set.
23   THE REPORTER: Okay. Thank you very
24   much. I guess I'll hang up on you now.
25   MR. KLEIN: Thank you.

19 (Pages 70 to 73)

Matt Dougherty
January 31, 2006

Page 74

1    MS. KORN:  Thanks.
2    [WHEREUPON, the Deposition of Matt Dougherty
3    concludes at 1:25 p.m.]
4    .
5    .
6    .
7    .
8    .
9    .
10   .
11   .
12   .
13   .
14   .
15   .
16   .
17   .
18   .
19   .
20   .
21   .
22   .
23   .
24   .
25   .

Page 76

1    CERTIFICATE OF REPORTER
2    STATE OF KENTUCKY AT LARGE:
3    I, BARBIE A. HENNESSEY, Notary Public
4    for the State of Kentucky at Large, do hereby
5    certify that the foregoing was reported by
6    stenographic and mechanical means, which matter
7    was held on the date, and at the time and place set
8    out in the caption hereof and that the foregoing
9    constitutes a true and accurate transcript of same.
10   I further certify that I am not related to any of
11   the parties, nor am I an employee of or related to
12   any of the attorneys representing the parties, and I
13   have no financial interest in the outcome of this
14   matter.
15   GIVEN under my hand and Notarial seal this
16        day of                    , 2006.
17   .
18   My Commission Expires:      Notary Public
19   .
20   JANUARY 11, 2009
21   .
22   .
23   .
24   .
25   .

Page 75

1         C A P T I O N
2    The Deposition of Matt Daugherty, taken
3    in the matter, on the date, and at the time and
4    place set out on the title page hereof.
5    It was requested that the deposition be
6    taken by the reporter and that same be reduced to
7    typewritten form.
8    It was agreed by and between counsel and
9    the parties that the reading and signing of the
10   transcript of said deposition be, and the same is
11   hereby, waived.
12   .
13   .
14   .
15   .
16   .
17   .
18   .
19   .
20   .
21   .
22   .
23   .
24   .
25   .