UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RI, Inc. d/b/a SEATING SOLUTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 05-CV-10365-JLT |
| | ) | |
| GELLER SPORT, INC., GELLER DEVELLIS, | ) | |
| INC., WORCESTER PROFESSIONAL BASEBALL | ) | |
| LLC, and PERFECT GAME BASEBALL CLUBS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' DESIGNATION OF DEPOSITION TESTIMONY OF BRUCE MERRICK

The defendants, Geller Sport, Inc. and Geller DeVellis, Inc. ("Geller"), hereby designate the following portions of the deposition of Bruce Merrick, dated January 31, 2006, to be read in open court during trial:

1.  Page 4, lines 3-5

2.  Page 13, lines 2-11; 16-25

3.  Page 15, line 25

4.  Page 16, lines 1-7

5.  Page 18, lines 23-25

6.  Page 19, lines 4-8

7.  Page 21, lines 9-17

8.  Page 27, lines 12-14; 17-19

9.  Page 31, lines 5-17

10. Page 33, lines 22-25

11.     Page 34, line 1

12.     Page 37, lines 9-11

13.     Page 39, lines 14-24

14.     Page 40, lines 2-16

15.     Page 41, lines 1-23

16.     Page 43, lines 3-11

17.     Page 44, lines 3-24

18.     Page 45, lines 3-5; 23-24

19.     Page 46, lines 4-25

20.     Page 47, lines 1-2

21.     Page 49, lines 3-7

22.     Page 50, lines 11-25

23.     Page 51, lines 1-12

24.     Page 53, lines 5-7; 11-14

25.     Page 55, lines 14-22

26.     Page 59, lines 17-25

27.     Page 65, lines 3-8; 22-25

28.     Page 66, lines 1-3; 7-19; 21-23

29.     Page 69, lines 14-25

30.     Page 70, lines 1-3; 15-24

31.     Page 71, lines 5-22

A true copy of Mr. Merrick's condensed deposition transcript is attached hereto as Exhibit A.

Respectfully submitted,

GELLER SPORT, INC. and GELLER
DEVELLIS, INC.
By their attorneys,

/s/ Warren D. Hutchison

David J. Hatem PC, BBO #225700
Warren D. Hutchison, BBO # 246150
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Date: August 7, 2006
01024203//24410.88

## CERTIFICATE OF SERVICE

I, Warren D. Hutchison, hereby certify that on this 7th day of August, 2006, a copy of the foregoing was served on the attorneys for the other parties who are registered ECF users by electronic means pursuant to Local Rule 5.4(c) and by first class mail, postage prepaid to the attorneys who are not registered ECF users.

/s/ Warren D. Hutchison
Warren D. Hutchison

# Bruce Merrick
## January 31, 2006

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


RI, Inc. d/b/a SEATING SOLUTIONS,

PLAINTIFF,

V.

CIVIL ACTION NO.   05-CV-10365-JLT


GELLER SPOT, INC., GELLER DEVELLIS,

INC., WORCESTER PROFESSIONAL BASEBALL

LLC, and PERFECT GAME BASEBALL CLUBS, LLC,


DEFENDANT(s).

_____


DEPOSITION FOR THE PLAINTIFF,

RI, INC, d/b/a SEATING SOLUTIONS:


The Deposition of Bruce Merrick, taken in the

above-styled matter at Wyatt, Tarrant & Combs, LLP, 500

West Jefferson Street, 2600 PNC Plaza, Louisville,

Kentucky, on the 31st day of January, 2006, beginning at

10:05               a.m.

# Bruce Merrick
## January 31, 2006

| Page 2 | Page 4 |
|---|---|

**Page 2**

1         A P P E A R A N C E S
2
3  FOR THE PLAINTIFF, RI, INC. d/b/a SEATING
4  SOLUTIONS:
5     TERRY KEIN, ESQUIRE
6     HENSHON, PARKER & VYADRO, PC
7     84 State Street
8     Suite 760
9     BOSTON, MASSACHUSETTS 02109
10
11  FOR THE DEFENDANT, DANT CLAYTON
12  CORPORATION:
13     JOSHUA T. ROSE, ESQUIRE
14     FROST, BROWN & TODD
15     120 West Spring Street
16     Suite 400
17     NEW ALBANY, INDIANA 47150-3655
18
19  FOR THE DEFENDANT(s), WORCESTER BASEBALL &
20  PERFECT GAME BASEBALL CLUBS, LLC:
21     LOUIS CIAVARRA, ESQUIRE
22     BOWDITCH & DEWEY
23     311 Main Street
24     WORCESTER, MASSACHUSETTS 01615
25

**Page 3**

1         A P P E A R A N C E S (CONT.)
2
3  FOR THE DEFENDANT(s), GELLER SPORTS & GELLER
4  DEVELLIS:
5     LAUREN KORN, ESQUIRE
6     DONOVAN & HATEM, LLP
7     Two Seaport Lane
8     BOSTON, MASSACHUSETTS 02210
9
10  ALSO PRESENT:
11     MATT DOUGHERTY, DANT CLAYTON
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1       DEPOSITION OF BRUCE MERRICK
2         JANUARY 31, 2006
3  BRUCE MERRICK, called on behalf of the Plaintiff,
4  RI, Inc. d/b/a Seating Solutions, after being first
5  duly sworn, is examined and testifies as follows:
6       MR. KLEIN:  Thank you.
7  [WHEREUPON, Notice of Deposition is marked
8  Exhibit 1 for identification.]
9  DIRECT EXAMINATION
10  MR. KLEIN:
11     Q.  Mr. Merrick, my name is Terry Klein, and I
12  am representing Seating Solutions in this suit.
13     Today I'm going to be asking you some
14  questions at this deposition.
15     I'm going to show you, first of all, what's been
16  marked as Exhibit 1, if you could take a quick look
17  at that document and then look up at me when
18  you're done.
19     A.  The entire document, or the --
20     Q.  You can just take a glance at it, and then
21  when you're -- when you're all set, you can look up
22  at me.
23     While you're reviewing that, I'd just like to put
24  a couple stipulations on the record, if I might.
25       MR. ROSE:  I don't know.  I'd have to

**Page 5**

1  hear what they are.
2       MR. KLEIN:  The first stipulation is that
3  all objections, expect those to form, are waived
4  until trial.  And -- except -- and motions to strike
5  and preserved and that sort of thing.  Is that
6  agreeable?
7       MS. KORN:  Yes.
8       MR. ROSE:  You'd have to talk to them.
9  I'm --
10       MR. KLEIN:  Okay.  Mr. Ciavarra?
11       MR. ROSE:  I think Ms. Korn said yes.
12       MR. KLEIN:  They represent different
13  parties.
14       MR. ROSE:  I know.
15       MR. KLEIN:  Mr. Ciavarra?
16       MR. CIAVARRA:  I'm just thinking out
17  loud.
18     You know, it's a little bit different situation,
19  whether or not we should make -- make sure we
20  create a clean record here.
21       MR. KLEIN:  Okay.
22       MR. CIAVARRA:  But whatever the --
23  whatever counsel for Dant Clayton would like to do
24  is fine.  If he would like to raise of all his
25  objections now, that's fine; or, if he wants to

# Bruce Merrick
# January 31, 2006

**Page 6**

1 reserve, that's fine with me, too.
2     MR. KLEIN: I think to get it over with as
3 quickly as possible, saving objections except as to
4 form would be preferable, but --
5     MR. ROSE: Right. But I'm not going to
6 waive any objections.
7     MR. KLEIN: Absolutely not.
8     MR. ROSE: Okay.
9     MR. KLEIN: And the second stipulation --
10     MR. ROSE: And with one caveat. I mean,
11 I had an objection to the Notice of Deposition and
12 other objections which -- you know, I'll give you
13 some leeway to get into different areas of the
14 project in general. But, you know, if you want to
15 beet down a path for an extended period of time
16 that I don't believe is relevant or -- you know, I'm
17 going to object and we can move on.
18     MR. KLEIN: Surely.
19 The only other stipulation is just that the
20 witness need not sign this in front of a notary. The
21 reading and signing is just -- outside of the
22 presence of a notary is perfectly acceptable.
23     MR. ROSE: I don't have a problem with
24 that.
25     MR. KLEIN: Any objections to that from

**Page 7**

1 Massachusetts?
2     MS. KORN: No.
3 BY MR. KLEIN:
4     Q. Okay. You've had a chance to take a look
5 at Exhibit 1. Could you just identify it for the
6 record, Mr. Merrick.
7     A. It's United States District Court, District
8 of Massachusetts, and it's the case of RI, Inc.
9 d/b/a Seating Solutions as the plaintiff, Geller
10 Sports, Geller Devellis, Inc., Worcester
11 Professional Baseball and Perfect Game Baseball,
12 LLC as the defendants.
13     Q. And are you here in response of this
14 Notice of Deposition and Subpoena?
15     A. Yes.
16     Q. Excellent.
17 I'm just going to give you a few quick
18 instructions and then we'll get into the meat of
19 things.
20 If you don't hear or if you just can't hear a
21 question and you need me to rephrase it, I be
22 happy to do so. If you don't understand a
23 question, the substance of a question, again, I'm
24 happy to rephrase it.
25 The court reporter can only record one person

**Page 8**

1 speaking at a time, so just wait for me to finish my
2 question before you begin to answer. And related
3 to that, a clear, verbal answer is required. It's
4 tough for the court reporter to pick up a gesture or
5 an "uh-huh"; it's very difficult to interpret the
6 transcript afterwards.
7 Again, objections -- if your attorney objects to
8 a question, unless he explicitly instructs you not to
9 answer that question, you'll have to go ahead and
10 answer. And if at any time you need a break during
11 the course of the deposition -- if anybody needs a
12 break -- feel free to let me know and I will
13 absolutely break the proceedings.
14 Is all that agreeable?
15     A. Yes.
16     Q. Excellent.
17 Have you ever been deposed before?
18     A. Yes.
19     Q. On how many occasions?
20     A. I couldn't give you an exact account.
21 Roughly a dozen.
22     Q. Okay. When was the most recent?
23     A. I'm not clear. It may have been in a civil
24 matter that involved my wife and her ex-husband.
25     Q. Excellent.

**Page 9**

1 The question -- when I say "you" during the
2 course of this deposition, unless it -- unless I
3 explicitly ask you otherwise, what I'm referring to
4 actually is Dant Clayton.
5 So, in your capacity as the whatever -- we'll
6 get to your capacity -- in your capacity as a
7 representative of Dant Clayton, on how many
8 occasions have you been deposed?
9     A. Two less than --
10     Q. Okay.
11     A. -- whatever the number is.
12     Q. And what was the most recent deposition?
13     A. I really can't remember.
14     Q. Okay. We may come back to that, but I
15 think the fact that you've been deposed before
16 should make things move more smoothly today.
17 A couple of other just general directions:
18 Everything that I'm going to ask you about is from
19 the period between January 15th, 2005 and
20 January -- and February 21st, 2005. Unless I
21 explicitly say otherwise, you should assume that
22 that is the time period in question.
23 Everything that I'm going to ask you about
24 today relates to the Fit and Field project. Do you
25 know what I mean by that?

# Bruce Merrick
# January 31, 2006

**Page 10**

1  A. Yes.
2  MR. KLEIN: And, if I could -- if I could,
3  just on the record, direct a statement to Mr. Rose.
4  And that is what I -- what I've asked for some type
5  of log, a privilege log, if you will, of every
6  document withheld on the basis of the claim that it
7  constitutes confidential or proprietary information.
8  Very similar to a privilege log. I would ask further
9  that counsel provide this log within 14 days of
10  today's date. And if counsel has an objection to
11  that request, if he could state so on the record.
12  MR. ROSE: I do have an objection to
13  that, you know, unless you can show some need.
14  And, you know, after you get into your questions
15  with Mr. Merrick, if he has a response that -- that
16  says, "Well, that's privileged," or I say, "That's
17  privileged," and you show a substantial need for
18  it --
19  MR. KLEIN: Uh-huh.
20  MR. ROSE: -- I'm not going to have my
21  clients go through the expense of creating a
22  privilege log for the whole project. I mean. . .
23  MR. KLEIN: Okay. I understand that.
24  What I'm actually just looking for are documents
25  withheld on the basis that they are confidential or

**Page 11**

1  proprietary; that's the only log
2  that -- that's the only type of -- I'm not looking for
3  a relevance log or something of that nature, just a
4  log of the, hopefully, small number of documents
5  that you withheld on the basis that they constitute
6  trade secrets or proprietary information of Dant
7  Clayton.
8  MR. ROSE: Again, if you -- if you -- if
9  your questions show a need, we can -- we can limit
10  any relevant confidential documents, I'd be happy
11  to produce a log for you.
12  MR. KLEIN: Great. Thank you.
13  BY MR. KLEIN:
14  Q. Mr. Merrick, what did you do to prepare
15  for this deposition?
16  A. Read the Notice of Deposition. I then
17  sent the Notice of Deposition to Frost, Brown,
18  Todd; it was assigned to Mr. Rose. And at that
19  point, we discussed the documents that were
20  requested in the deposition and --
21  MR. ROSE: And I'll object. I mean, he
22  doesn't have to go into anything further with
23  regards to his -- what he did with me.
24  MR. KLEIN: Absolutely not.
25  MR. ROSE: Okay.

**Page 12**

1  MR. KLEIN: And --
2  MR. ROSE: If you did anything
3  independently, go ahead and say so.
4  BY MR. KLEIN:
5  Q. I urge you not to disclose communications
6  between yourself and counsel.
7  A. I reviewed on the ultimate list that we
8  decided that we were going to deal with; I reviewed
9  my e-mail files to look for any documents that fell
10  in the category that we responded to.
11  Q. Okay. And other than e-mail files, did you
12  look at any other documents?
13  A. I looked at the documents that Mr.
14  Dougherty produced.
15  Q. And did you speak with anyone at Dant
16  Clayton, other than Mr. Dougherty, about this
17  deposition?
18  A. Yes, I spoke with Mike Guenthner, who is
19  our vice president of sales.
20  Q. Okay. And what was the nature of that
21  communication?
22  A. He was the one that was served and he
23  handed me the deposition.
24  Q. Did you discuss this deposition with
25  anyone other than the folks we've just mentioned?

**Page 13**

1  A. No.
2  Q. What's your business address, Mr.
3  Merrick?
4  A. 1500 Bernheim Way, Louisville, Kentucky.
5  Q. And who's your employer?
6  A. Dant Clayton Corporation.
7  Q. And what's your position there?
8  A. Chairman.
9  Q. How long have you been the chairman of
10  Dant Clayton?
11  A. 2001 or 2002, one of the two.
12  Q. Who preceded you in that position?
13  A. My father.
14  Q. What's his name?
15  A. Kenneth.
16  Q. And as Chairman, what do you do? What's
17  your job?
18  A. I consult on the strategic direction of the
19  company and have duties that are consistent with
20  being a principal shareholder of the business,
21  having to do with banking, charity, all the normal
22  functions that would be associated with being a
23  principal shareholder of a closely-held business.
24  And I spend the majority of my time outside of
25  those duties on the sales end of the business.

# Bruce Merrick
## January 31, 2006

**Page 14**

1    Q. So the majority of your time is spent on
2  sales? Is that what I just heard?
3    A. No.
4    Q. Oh, okay.
5    A. I said the time that is spent outside of
6  primary-shareholder responsibilities and the
7  strategic direction of the company.
8    Q. Understood. And, if you could, give me a
9  rundown of your education from college forward.
10    A. I went to -- I attended Western Kentucky
11  University from 1970 to 1975.
12    Q. Do have you a degree from there?
13    A. No.
14    Q. Do have you any professional licenses?
15    A. No.
16    Q. And do you know -- this might be a
17  question more properly addressed to your
18  counsel -- have you been designated to testify on
19  each of the subject matter areas that are noticed in
20  the deposition?
21      MR. ROSE: No. As I stated in my
22  objection to the Notice of Deposition --
23      MR. KLEIN: Uh-huh.
24      MR. ROSE: -- just the areas that were
25  listed in the Notice and my objection to the Notice.

**Page 15**

1      MR. KLEIN: Understood. Okay.
2  BY MR. KLEIN:
3    Q. So notwithstanding your counsel's
4  objections -- keeping in mind your counsel's
5  objections. . .
6      MR. KLEIN: Mr. Rose, I should ask you
7  this. Mr. Merrick has been designated to testify as
8  to all other matters?
9      MR. ROSE: He's been designated to
10  testify in the matters consistent with my objection
11  to the Notice of Deposition.
12      MR. KLEIN: And has Mr. Dougherty been
13  designated to testify in any of the matters?
14      MR. ROSE: He's not designated at all.
15  He's not a 30(b)(6) deponent.
16      MR. KLEIN: Okay.
17  BY MR. KLEIN:
18    Q. Mr. Merrick, how did Dant become aware
19  of the existence of the Fit and Field project?
20    A. I don't know.
21    Q. You don't know.
22  Do you know who at Dant Clayton would know
23  the answer to that question?
24    A. Matt Dougherty.
25    Q. And so, as of January of 2005, Mr.

**Page 16**

1  Merrick, how many minor-league ballparks had -- at
2  how many minor-league ballparks had Dant Clayton
3  installed -- let's just call them -- seating systems?
4    A. Approximately 16.
5    Q. How many college stadiums?
6    A. I wouldn't have any idea, but it's a number
7  significantly greater than that.
8    Q. Uh-huh. As you sit here today, do you
9  have a recollection of what the approximate seat
10  count was at Fit and Field?
11    A. Not very close.
12    Q. Okay. If I said around 3,000, would
13  that --
14    A. Yeah, that would be about --
15  approximately correct.
16    Q. And how did this compare with -- how
17  would the 3,000-seat count compare with work that
18  you had done in the past? Larger, smaller, about
19  average?
20    A. It's in -- it's in the range.
21    Q. Okay. Again, we're just talking about pre
22  February 21st, 2005 and post January 15th.
23  Can you tell me who at Dant Clayton
24  communicated with anybody who works at a
25  company called Geller Sport?

**Page 17**

1      MR. ROSE: Regarding the project?
2      MR. KLEIN: Yes. This is all regarding
3  the project.
4    A. Matt Dougherty.
5  BY MR. KLEIN:
6    Q. Anybody else?
7    A. If there was anybody else, Matt would
8  know. I would not know.
9    Q. Okay. Did you communicate with --
10    A. No.
11    Q. You did not?
12    A. Prior to what date?
13    Q. February 21st.
14    A. I'm having trouble with the sequence. I
15  met -- I met one person, I think, from there, but I
16  couldn't -- couldn't tell you for sure.
17    Q. Okay.
18    A. But I had no specific -- they may have
19  been in the same room with me, but I've had no
20  specific conversation with anybody from Geller
21  Sports on any occasion outside of, perhaps, one
22  group meeting.
23    Q. Okay. Would -- would that answer be the
24  same for Geller Devellis?
25    A. Yes.

# Bruce Merrick
## January 31, 2006

**Page 18**

1  Q.  Would that answer be the same for
2  Worcester Professional Baseball?
3  A.  I need some help with the date.  You're
4  referring to a February --
5  Q.  21st.
6  A.  -- 21st date?
7     MR. KLEIN:  And if I can just make a
8  representation to the record that will -- for the
9  record, that we'll tie up on, Counsel, there was a
10  meeting between Dant Clayton and Worcester
11  Professional Baseball on February 20th, 2005.
12  A.  Yes.  I attended that meeting.
13  BY MR. KLEIN:
14  Q.  Okay.  Perfect Game Baseball, same
15  answer?
16  A.  I don't know who Perfect Game Baseball
17  is.
18  Q.  Okay.  Who at Dant communicated with
19  Pat Maguire during this time period, again, only
20  related to the Fit and Field project?
21  A.  Matt Dougherty.  And I'm not sure if
22  anybody else, but Matt would know.
23  Q.  Okay.  Ted Tye?
24  A.  I met Ted Tye at that meeting that you
25  spoke of.

**Page 19**

1  Q.  Okay.  How about Chris Sgarzi?
2  A.  The name does not sound familiar with
3  me.
4  Q.  Allen Stone?
5  A.  Yes.  I met Allen Stone at that meeting.
6  Q.  And Seating Solutions?
7  A.  I had no conversation with Seating
8  Solutions about this project prior to that date.
9  Q.  Okay.  Have you had conversations with
10  anybody at Seating Solutions about this project
11  after that date?
12  A.  Yes.
13  Q.  Really?  Who?
14  A.  Scott Suprina.
15     THE REPORTER:  Scott Suprina?
16     THE WITNESS:  Suprina.
17     THE REPORTER:  Suprina.
18  BY MR. KLEIN:
19  Q.  And when did that communication take
20  place?
21  A.  I can't give you the exact date.  It was
22  probably a couple months after that in his office in
23  Long Island.
24  Q.  And what were you doing at his office?
25  A.  We were discussing business matters in

**Page 20**

1  the industry and I had known his dad from 25 years
2  ago.
3  Q.  Interesting.  And do you remember what --
4  what caused you to be at his office?
5  A.  He had a new product that he was
6  interested in showing me.
7  Q.  Do you remember what product that is?
8  A.  The product is called League chair.
9  Q.  Uh-huh.  And how long did that meeting
10  last?
11  A.  About three hours.
12  Q.  Who was at that meeting?
13  A.  Scott and two other men from his
14  company.  And I don't remember either one of their
15  names.
16  Q.  Can you tell me what was said about the
17  Fit and Field project at that meeting?
18  A.  It wasn't anything material, just the fact
19  that we had gotten the job and that he worked on
20  it.
21  Q.  Anything else?
22  A.  No, not that I remember.
23  Q.  Did the existence of a lawsuit come up
24  during that conversation?
25  A.  No.

**Page 21**

1  Q.  Did you know at that point that there was
2  a lawsuit?
3  A.  No.
4  Q.  All right.  Can you give me some idea of
5  the dates on which Mr. Dougherty communicated
6  with Geller Sport, or would that be a more
7  appropriate question for him?
8  A.  I have no idea who he talked to or when.
9  Q.  Okay.  And can you -- can you tell me on
10  what date that you communicated with Geller
11  Sport?
12  A.  They attended that meeting that you
13  talked about on -- I think you said the date was
14  February 20th.
15  Q.  Uh-huh.
16  A.  I had no communication with them before
17  or after that meeting.
18  Q.  Okay.  And would the -- would the answer
19  be the same for Geller Devellis?
20  A.  Yeah.  Again, I don't understand the
21  distinction between the two.
22  Q.  Okay.  And with Worcester Professional
23  Baseball?
24  A.  I had no contact with them prior to that
25  meeting on February 20th.

Bruce Merrick
January 31, 2006

## Page 22

1  Q. How about Pat Maguire? Just related to
2  this project?
3  A. I never met him before February 20th, and
4  I'm not even sure of the names of the people that
5  were there at that meeting. I don't know if he was
6  or wasn't.
7  Q. Okay. And Mr. Tye?
8  A. Mr. Tye I met for the first time on
9  February 20th --
10  Q. Uh-huh. And --
11  A. -- and hadn't spoken to him previously
12  either.
13  Q. Okay.
14  A. I had no communication with anybody at
15  Worcester Baseball prior to that meeting.
16  Q. Okay. And -- all right. Now, do you know
17  who at Geller Sport would have communicated with
18  Dant Clayton about this project between January
19  15th and the 21st of February?
20  A. I have no idea.
21  Q. Do you know who at Geller Devellis would
22  have communicated with Dant Clayton during that
23  time?
24  A. I have no idea.
25  MR. ROSE: Can we just stipulate that

## Page 23

1  Geller Sport is the same as Geller Devellis with
2  regard to his answers? He said he doesn't know
3  the distinction, so just to save time, I mean --
4  MR. KLEIN: That's -- that's all right with
5  me.
6  Is that all right with you, Lauren?
7  MS. KORN: That's fine.
8  MR. KLEIN: And can we make the same
9  stipulation, Lou, with respect to Worcester
10  Baseball and Perfect Game?
11  MR. CIAVARRA: No. Make sure you
12  separate the two entities because they are two
13  different companies.
14  MR. KLEIN: Okay.
15  BY MR. KLEIN:
16  Q. Do you know who at Geller Sport
17  communicated with Worcester Professional
18  Baseball between the 15th of January and the 21st of
19  February?
20  A. No.
21  Q. And do you know who at Perfect Game
22  communicated with Dant Clayton during that
23  period?
24  A. No, I do not.
25  Q. For each of these questions, do you know

## Page 24

1  who would be the person at Dant Clayton that had
2  that knowledge?
3  A. Matt Dougherty, if he has that knowledge.
4  I'm not even sure he's got that knowledge.
5  Q. All right. Okay.
6  What I'm going to ask you to do, Mr. Merrick,
7  at this point, is just -- I'm giving you Exhibit 2. If
8  you could, look at that for me and then just look up
9  at me when you're done. And I don't want you to
10  read every word of it, just take a quick look at it
11  and then let me know when you've finished.
12  MR. KLEIN: And, for the record, Counsel,
13  Exhibit 2 is the Frost Brown and Todd packet.
14  MR. CIAVARRA: The whole packet is one
15  exhibit?
16  MR. KLEIN: Yeah. And I'm going to
17  have -- I'm going to have Mr. Merrick mark the --
18  the documents produced separately by hand here.
19  [WHEREUPON, documents referred to are
20  marked Exhibit 2A, Exhibit 2B, Exhibit 2C,
21  Exhibit 2D, Exhibit 2E for identification.]
22  MR. KLEIN: I'm going to note for the
23  record, at this point, that Mr. Merrick is looking at
24  the documents that -- that Dant Clayton has
25  produced in response to the subpoena. What I'm

## Page 25

1  going to ask Mr. Merrick to do is take a pen and
2  note, beginning with the letter A. On each page of
3  that production, just write A, B, C, D, et cetera, so
4  that we can have, for the record, exactly what
5  documents Dant Clayton has produced in response
6  to the subpoena.
7  MR. CIAVARRA: Terry?
8  MR. KLEIN: Yes, sir.
9  MR. CIAVARRA: I apologize for the voice
10  today; I've been sick.
11  MR. KLEIN: Can we go off the record for
12  a sec?
13  MR. CIAVARRA: Sure.
14  [WHEREUPON, an off-the-record discussion is
15  held.]
16  BY MR. KLEIN:
17  Q. Mr. Merrick, if you could for the record,
18  identify the document that you have marked as A?
19  A. This is an e-mail from Rebecca Bachand --
20  Bachand at Geller Devellis to Matt Dougherty on
21  February 3rd.
22  Q. And does it have an attachment?
23  A. It does.
24  Q. And could you identify that attachment for
25  the record, please?

# Bruce Merrick
## January 31, 2006

### Page 26

1    A.   The attachment, according to the e-mail,
2    is a CAD file for the baseball field at Fit and Field.
3    Q.   Okay.  Could you identify the document
4    that has been marked "B"?
5    A.   It's an e-mail from Matt Dougherty to four
6    different individuals internally at Dant.
7    Would you like their names?
8    Q.   No, just the date.
9    A.   Yeah.  February 4th.
10   Q.   And does that have any attachments?
11   A.   No.
12   Q.   And could you tell me what the document
13   marked "C" is?  Identify that for the record, please.
14   A.   Document C is an e-mail from Pat Maguire
15   to Matt Dougherty dated February 7th.
16   Q.   And D, please?
17   A.   An e-mail from Pat Maguire to Matt
18   Dougherty dated February 17th.
19   Q.   And does that have an attachment?
20   A.   It does.
21   Q.   And what's that -- could you identify the
22   attach for the record?
23   A.   It appears to be a drawing of the field at
24   Fit and Field.
25   Q.   Okay.  And could -- could you identify the

### Page 27

1    document that's been marked as Exhibit E for me,
2    please?
3    A.   It's an e-mail from Matt Dougherty to Ted
4    Tye dated February 18th.
5    Q.   And is there an attachment to that e-mail?
6    A.   Yes, there is.
7    Q.   And could you identify that attachment for
8    the record, please?
9    A.   It appears to be a site plan of Fit and
10   Field.
11   Q.   Excellent.  Thank you, Mr. Merrick.
12   On how many occasions, Mr. Merrick, did Dant
13   receive information regarding Seating Solutions'
14   Fit and Field pricing?
15       MS. KORN:  Objection.
16   BY MR. KLEIN:
17   Q.   If ever?
18   A.   I don't ever remember hearing anything
19   about their pricing.
20   Q.   Okay.  Is there somebody at Dant Clayton
21   who would know the answer to that?
22   A.   If anybody knew, it would be Matt, but I
23   don't know that he does.
24   Q.   And on how many occasions, Mr. Merrick,
25   to your knowledge, did Dant receive information

### Page 28

1    regarding the designs that Seating Solutions had
2    prepared for the Fit and Field project?
3        MS. KORN:  Objection.
4    A.   I don't have any knowledge of that.
5        THE REPORTER:  I didn't hear your
6    answer.
7        THE WITNESS:  I don't have any
8    knowledge of that.
9    BY MR. KLEIN:
10   Q.   Do you have any knowledge, Mr. Merrick,
11   of a telephone conference between Mr. Maguire of
12   Geller Sport and Matt Dougherty on January 26th,
13   2005?
14   A.   No, I have no knowledge of that.
15   Q.   Okay.  I'm showing you what's been
16   marked as Exhibit 3.  If you could take a quick look
17   at that document and then look up at me when
18   you're done.
19   [WHEREUPON, document referred to is marked
20   Exhibit 3 for identification.]
21       MR. CIAVARRA:  Terry, what is it?
22       MR. KLEIN:  I'll have him identify it, but I
23   think it's 1600.
24   BY MR. KLEIN:
25   Q.   Is that correct, Mr. Merrick?

### Page 29

1    A.   Yes.
2    Q.   All right.  Could you identify this
3    document for the record?
4    A.   It is an e-mail from Phillip Rosenfield to
5    Pat Maguire on January 26th, 2005.
6    Q.   And does it have a little number in the
7    lower right-hand corner?
8    A.   1600.
9    Q.   Thank you, sir.
10   Having looked at this document, do you have
11   any refreshed recollection of a conversation
12   between Mr. Dougherty and Mr. Maguire on January
13   26, 2005?
14   A.   No.
15   Q.   Thank you, sir.
16   Did you, in late January or January -- or early
17   February of 2005, travel to Massachusetts to meet
18   with representatives of Worcester Baseball?
19   A.   I was there one time and it was for that
20   meeting we talked about earlier and I don't
21   remember the date.  I think you said it was
22   February 20th; is that right?
23   Q.   We'll get to that particular meeting.
24   A.   Okay.  That -- that was the -- no time
25   before that.

# Bruce Merrick
## January 31, 2006

1  Q. Do you know if anyone at Dant Clayton
2  met with people at Worcester Baseball before that
3  day in person?
4  A. I don't have any knowledge of that.
5  Q. All right. Do you know: Did Dant receive
6  some drawings related to the Fit and Field project
7  on February 3rd, 2005?
8  A. I don't have any knowledge of that either.
9  My first experience with this was, like, a day
10  before we went to Worcester.
11  Q. Okay. So who at Dant Clayton would have
12  more knowledge about communications --
13  A. Matt Dougherty.
14  Q. -- with Geller -- the Geller defendants,
15  Worcester Baseball, Perfect Game Baseball and
16  Seating Solutions for all dates before February
17  20th?
18  A. Matt Dougherty.
19  Q. Okay. Do you recall when you, Mr.
20  Merrick, first became aware of the existence of the
21  Fit and Field project?
22  A. No, I don't remember exactly. We have,
23  at any one time, in excess of 200 projects. And I
24  really don't even relate to the specifics of them.
25  I'm more looking at the -- you know, the number of

1  jobs that we're tracking and the relative value of
2  those jobs. And I'm really not aware of the details
3  of very many of the jobs unless I'm specifically
4  asked to get involved.
5  Q. And were you at some point specifically
6  asked to get involved with the sales aspects of the
7  Fit and Field project?
8  A. Yes, a couple days before we went to this
9  meeting on February 20th.
10  Q. And who asked you to get involved?
11  A. Matt Dougherty.
12  Q. Did he -- do you have an understanding as
13  to why he asked you to get involved?
14  A. It was a significant sales opportunity and
15  we knew that there was a very tight time frame and
16  would need corporate commitment that was beyond
17  his ability to commit.
18  Q. What was significant about it?
19  A. It was a very tight time frame.
20  Q. Uh-huh. And tell me a little bit more
21  about Mr. Dougherty's ability to commit. What do
22  you mean by that?
23  A. Well, they were looking -- my
24  understanding was that they had a very fixed date
25  that they had to commit to that would basically

1  need somebody to speak on behalf of committing
2  company resources. And who better to do that than
3  the principal shareholder of the business?
4  Q. Uh-huh. And what -- do you recall the
5  communication you had with Mr. Dougherty, that
6  first communication?
7  A. No.
8  Q. You don't have any recollection of it?
9  A. [nods head]
10  Q. Do you know how the -- this meeting we're
11  talking about, which we think is on about February
12  20th, how that came to be scheduled?
13  A. No, I don't.
14  Q. Okay. And do you know to what extent, if
15  any, did Dant rely on its knowledge of drawings
16  prepared by Seating Solutions as it prepared for
17  the February 20th meeting?
18  A. Would you restate the question?
19  Q. Well, let me ask you this: How did Dant
20  prepare for the February 20th meeting?
21  A. I really don't know how we got to the point
22  where I first became aware of it; you'll have to ask
23  Matt. And, basically, Matt -- his conversations with
24  me principally revolved around schedule.
25  Q. Uh-huh.

1  A. How do we make the schedule?
2  Q. Okay.
3  A. And that's what my thoughts were focused
4  on.
5  Q. Uh-huh.
6  A. The rest of the design issues would be
7  questions for Matt.
8  Q. Uh-huh. And did you know prior to that
9  February 20th meeting if Dant Clayton was in
10  possession of drawings that had been prepared by
11  Seating Solutions for the Fit and Field project?
12  A. No.
13  Q. You did not know that?
14  MS. KORN: Object to your restatement of
15  his testimony.
16  MR. KLEIN: I'm sorry. I didn't hear that.
17  MS. KORN: I objected to your
18  restatement of his testimony which was not his
19  answer.
20  MR. KLEIN: Okay.
21  BY MR. KLEIN:
22  Q. What -- what did Dant know -- what did
23  Dant know -- you specifically, I should say -- about
24  seating pricing as it prepared for the February 20th
25  meeting?

Bruce Merrick
January 31, 2006

Page 34

1    A.  Absolutely nothing.
2    Q.  And that -- that answer stands for Mr.
3  Dougherty as well?
4    A.  I can't speak for Mr. Dougherty.
5    Q.  Okay.  But, to your knowledge, as you sit
6  here today, Dant Clayton did not have information
7  about Seating Solutions' pricing for the Fit and
8  Field project before February 20th?
9    A.  I don't know.  You asked me -- the
10  question you asked me was did I have any
11  knowledge.
12    Q.  Certainly.
13    A.  I had no knowledge.
14    Q.  Okay.
15    A.  I can't speak for anyone else in the
16  company.
17    Q.  Okay.  To your knowledge, what did Dant
18  initially propose as a delivery date for the Fit and
19  Field project?
20    A.  I don't recall, but it satisfied the owner's
21  requirement.
22    Q.  Uh-huh.
23    A.  And that was the -- one of the main things
24  we were trying to do was trying to satisfy the
25  owner's delivery requirement.

Page 35

1    Q.  Okay.  Do you remember what the date
2  was in -- in the actual contract that Dant had with
3  Worcester Baseball?
4    A.  No, I do not.
5    Q.  Okay.  Do you know, did Dant meet that
6  initial set-up delivery date?
7    A.  As best I can remember, we did.  We --
8  the date, if I remember correctly -- and this might
9  be subject to a little interpretation here -- but
10  there were a number of issues revolving around
11  Holy Cross and approvals by the -- by the
12  university that -- that complicated the site and
13  there were some weather issues.  And I know we
14  made the opening date, but I can't speak to all the
15  things that may have influenced it from the time we
16  did the contract until the time the project was
17  complete.
18    Q.  Who at Dant Clayton would know that?
19    A.  The project manager on the project.
20    Q.  And who was the project manager?
21    A.  Jim Lewis.
22    Q.  Can you tell me were there any
23  amendments to the initial contract that Dant
24  Clayton signed with -- with Worcester Baseball?
25    A.  I'm not sure I understand what you're

Page 36

1  getting at.
2    Q.  What I'm attempting to get at is -- is -- is
3  this: Dant Clayton promised, and Worcester
4  Baseball accepted, a proposed delivery date in the
5  contract; is that right?
6    A.  Yes, that's correct.
7    Q.  And the ultimate delivery date was
8  different than what was actually in the black and
9  white of the contract; is that correct?
10    A.  I don't know if that's correct.
11    Q.  Okay.  You don't know if that's correct?
12    A.  But in construction language, a contract
13  date is a date that is -- you will make every effort
14  to meet.  And in construction law, there are a
15  variety of expectations that modify that date by
16  contract.
17    Q.  Absolutely.
18    A.  So if there were -- if there were changes
19  made in the date --
20    Q.  Uh-huh.
21    A.  -- it would have been within the context
22  of --
23    Q.  Uh-huh.
24    A.  -- you know, typical construction
25  extensions --

Page 37

1    Q.  Absolutely.
2    A.  -- due to weather and approval processes
3  and things of that nature.
4    Q.  And what I'm attempting to get at is
5  whether there was anything put in writing that made
6  that -- that effectuated the change in delivery date,
7  if any.
8    A.  I really couldn't tell you.
9    Q.  Okay.  What -- what did Dant know about
10  Seating Solutions' proposed delivery date?
11    A.  I don't know anything.
12    Q.  Okay.
13    A.  If your question was -- you asked me for
14  Dant Clayton.  I can't answer for Dant Clayton; I
15  can answer for myself.
16    MR. KLEIN:  Okay.  Can we go off the
17  record for just a second?
18  [WHEREUPON, a brief recess is taken.]
19  BY MR. KLEIN:
20    Q.  Mr. Merrick, did Dant Clayton propose a
21  contract price to Worcester Baseball on February
22  20th -- that meeting?
23    A.  Yes, we did.
24    Q.  And what was its first proposed price?
25    MR. ROSE:  I'm going to object.

# Bruce Merrick
## January 31, 2006

1    MR. KLEIN: Okay.
2    MR. ROSE: Irrelevant, confidential.
3    MR. KLEIN: Okay.
4    MR. KLEIN: Could you just state the
5    basis for the confidentiality objection on the record
6    for me, Josh?
7    MR. ROSE: It's -- it's information that
8    you wouldn't want your competitors to have.
9    MR. KLEIN: Excellent. Thank you.
10    BY MR. KLEIN:
11    Q. And can you tell me, Mr. Merrick, what
12    price Dant Clayton ultimately accepted for the Fit
13    and Field project?
14    MR. ROSE: I'm going to object to that
15    too.
16    MR. KLEIN: Okay. I believe, just for the
17    record -- and Lou and Lauren, please feel free to
18    pipe in -- that that has been disclosed in this case;
19    hasn't it?
20    MR. CIAVARRA: I believe so. And just
21    for the record, I'd like imposition that my clients do
22    not consider those numbers or prices to be
23    confidential.
24    MR. KLEIN: Okay. Thanks.
25    BY MR. KLEIN:

1    Q. Having -- having said that --
2    MR. ROSE: And also it's irrelevant to
3    your claims. If you want to ask him, you know, kind
4    of broad information about pricing, but --
5    MR. KLEIN: Uh-huh.
6    MR. ROSE: -- I just don't see the
7    relevance --
8    MR. KLEIN: Sure.
9    MR. ROSE: -- given -- given the
10    confidentiality or the potential confidentiality
11    according to the other party.
12    MR. KLEIN: Sure.
13    BY MR. KLEIN:
14    Q. Can you tell me how Dant Clayton went
15    about putting together its initial pricing proposal?
16    A. Yes. It's the same way we price every
17    job; we do a rough design of the project and
18    estimate the material requirements, estimate the
19    manufacturing requirements and take particular
20    consideration of the construction site
21    requirements, and then what we call general
22    conditions of the project where the site -- where
23    the project's specific requirements that are
24    stipulated in the contract or the proposed contract.
25    Q. Okay. Anything else?

1    A. No.
2    Q. Did -- and I think we've covered this. But,
3    to your knowledge, again, Dant Clayton did not
4    have any knowledge of what Seating Solutions'
5    pricing was for the Fit and Field project?
6    A. Not to my knowledge.
7    Q. Okay. And how involved were you, Mr.
8    Merrick, in putting together the pricing aspects of
9    the proposal that you presented on the 20th?
10    A. I had some involvement in a supervisory
11    capacity.
12    Q. Okay. What do you mean by that?
13    A. Well, I don't figure out how -- what the
14    quantities of the materials are and I don't actually
15    prepare the estimate for any portion of the job. I
16    look at it for reasonableness and. . .
17    Q. Okay. And, let's see here. How about
18    design, what involvement did you have in
19    preparing -- first of all, let me ask you this: Did
20    Dant show Worcester Baseball proposed designs at
21    the February 20th meeting?
22    A. It's my recollection that we did. I -- I
23    can't remember the specifics of the meeting, but it
24    would make sense that we did.
25    Q. Okay. And, let's see here. How involved

1    were you in the -- how involved were you in the
2    design process prior to the 20th?
3    A. I had made a recommendation that the
4    only way we could make the schedule would be to
5    copy what we did on a previous project. Because
6    the man hours involved to design and engineer a
7    job so extensive, I didn't think it could fit in the
8    schedule requirements on the project. So we went
9    through our archives and tried to find a job that
10    was similar or that we could copy and put on this
11    site that fit this application.
12    Q. Uh-huh. And what -- what project did you
13    select?
14    A. University of Virginia.
15    Q. We'll get into the February 20th meeting a
16    little bit later on. But did you -- at that meeting,
17    did Dant Clayton make any comments about the
18    quality or any aspects of the Seating Solutions'
19    design?
20    A. I don't know that -- that we knew at the
21    time that it was a Seating Solutions' design. It was
22    something that was just a concept that was put on
23    the table.
24    Q. Uh-huh. The -- did you make any
25    comments about the concept?

# Bruce Merrick
## January 31, 2006

**Page 42**

1  A.  I think we mostly talked about our
2  concept. It's possible that we talked about issues
3  that may be -- you know, that -- that may need to
4  be explored further about the project, that we don't
5  know that we necessarily agreed with them but
6  they're questions that they ought to ask.
7  Q.  And was it -- in your experience, how
8  common is it when you're -- when you're, let's say,
9  bidding on a project to know what your competitors'
10  pricing is?
11  MS. KORN:  Objection.
12  MR. ROSE:  And I'll let you ask a couple
13  questions like that.
14  MR. KLEIN:  Sure.
15  MR. ROSE:  But to the extent you're
16  asking for his opinions as a -- as a man in the
17  industry, you know, he's a -- he's here taking his
18  time out of his day to be -- to give you facts about
19  this particular project, not to give opinions -- or
20  expert opinions. If you want to retain him as an
21  expert, then he'll spend all day with you, but. . .
22  MR. KLEIN:  This is just a fact question
23  for Mr. Merrick.
24  MR. ROSE:  Okay.
25  BY MR. KLEIN:

**Page 43**

1  Q.  How common, in your experience?
2  A.  Restate the question.
3  Q.  How common, in your experience, is it to
4  have knowledge of a competitor's pricing as you
5  are bidding on a project?
6  A.  I would say it would be highly unusual to
7  have in the exact price with an exact scope of
8  work, and one without the other is useless. I would
9  say, on the other hand, that it is very common to
10  understand in general terms both the scope and
11  price of competitions' numbers.
12  Q.  Okay.
13  A.  And for the most part you could -- a lot of
14  those could be determined without even having any
15  dialogue; you just know by being in the industry.
16  For example, you know about what lawyer's fees
17  are. It's common knowledge.
18  Q.  Same question but for design.
19  A.  Design is a place that's rarely, if ever,
20  broken out in a proposal.
21  Q.  The question actually is:  How common is
22  it for you to have knowledge of a competitor's
23  design or proposed design as you prepare?
24  MR. ROSE:  And I'm going to object to the
25  form. If you're going to define "design" --

**Page 44**

1  MR. KLEIN:  Sure.
2  BY MR. KLEIN:
3  Q.  How about how common is it for you to
4  have CAD -- electronic or paper CAD files of a
5  competitor as you're bidding for a project?
6  A.  It happens every day.
7  Q.  Is that -- do you mean that metaphorically
8  or literally?
9  A.  Metaphorically, but pretty close to
10  literally.
11  Q.  Uh-huh.  And how, in the past, have you
12  obtained those designs?
13  A.  Oh, many times they're the basis of a --
14  you know, whoever the owner is, whoever the
15  architect is, if they want to get proposals that they
16  compare, have to have some kind of standard to
17  compare. You have to have some way to
18  communicate to the competitors on the project what
19  it is you're trying to accomplish.
20  Q.  Okay.  In your experience, Mr. Merrick --
21  again, this is before an actual contract is entered
22  into -- how common is it for you to send CAD files
23  to either a consultant or an owner for a project?
24  A.  Highly common.
25  THE REPORTER:  What was the answer?

**Page 45**

1  THE WITNESS:  Highly common.
2  BY MR. KLEIN:
3  Q.  And do you claim proprietary rights in
4  those drawings that you send?
5  A.  Very rarely.
6  Q.  But have you in the past?
7  MR. ROSE:  And I'm going to object that
8  you're not defining "drawings." And maybe if you
9  ask him what type of drawings. . .
10  BY MR. KLEIN:
11  Q.  Electronic Auto CAD files.
12  MR. ROSE:  Still, it's not -- that's very
13  broad.
14  MR. KLEIN:  Okay.
15  MR. ROSE:  There's -- there's drawings at
16  every stage and there's very detailed drawings and
17  very broad drawings.
18  MR. KLEIN:  Uh-huh.
19  MR. ROSE:  I think he can elaborate when
20  he says "very rarely."
21  MR. KLEIN:  Okay.
22  BY MR. KLEIN:
23  Q.  Well, could you elaborate what you mean
24  by "very rarely," then?
25  A.  Very rarely what?  I mean --

# Bruce Merrick
## January 31, 2006

1    MR. KLEIN: Claim confidential -- claim
2  proprietary --
3    A. Oh, yes. I believe that we have. I
4  couldn't name specific jobs. It's -- it is not our
5  normal practice to claim confidentiality.
6  BY MR. KLEIN:
7    Q. Can you tell me under what circumstances
8  you would -- you would claim a propriety right in
9  electronic CAD files that you sent to an owner or a
10  consultant?
11   A. I don't remember the last time we've done
12  it. It's -- I said very rarely. I mean, it may have
13  been years ago and it may have been for a specific
14  reason. I can't even tell you what it would be.
15   Q. Okay. Mr. Merrick, as you traveled to
16  Boston for that February 20th meeting, what did you
17  know about whether there was any type of deal in
18  place between Worcester Baseball and Seating
19  Solutions?
20   A. I didn't know of any deal that existed.
21  And, you know, typically you don't go to any
22  meeting where there's -- where it's already a done
23  deal.
24   Q. Okay.
25   A. I certainly wouldn't leave on a Sunday in

1  the middle of winter to go to Boston to talk to
2  somebody who just already had some other deal.
3    Q. Okay. Do you know, Mr. Merrick, did
4  anyone at Dant Clayton believe that Seating
5  Solutions and Worcester Baseball had a deal when
6  it walked in to that meeting on the 20th?
7    A. Not to my knowledge.
8    Q. Okay. Who's Dave York, Mr. Merrick?
9    A. Dave York represents Dant Clayton in the
10  State of Ohio.
11   Q. In what capacity?
12   A. Sales representative.
13   Q. Okay. Is he a Dant employee?
14   A. No.
15   Q. He's not. Okay.
16  Do you know -- can you tell me, Mr. Merrick,
17  who at Dant, if anyone, communicated with Mr.
18  York about the Fit and Field project?
19   A. No one, to my knowledge.
20   Q. Okay. So just to close the loop on this,
21  did anyone at Dant tell Mr. York that Seating [sic]
22  had reached an agreement with -- Seating Solutions
23  had reached an agreement with Worcester
24  Professional Baseball?
25   A. I'm not aware of any.

1    Q. Let's talk about this meeting on February
2  20th. Where -- where did it take place, Mr.
3  Merrick?
4    A. Ted Tye's office.
5    Q. And what time did it start?
6    A. I don't recall. After noon, I believe.
7    Q. And have you told me everything that you
8  can recall about how Dant Clayton prepared for
9  that meeting?
10   A. Yes.
11   Q. What materials did Dant Clayton bring to
12  that meeting?
13   A. I think that question's probably better
14  answered by Mr. Dougherty since he's the one that
15  did it. I just really don't recall.
16   Q. When you say "Mr. Dougherty did it," what
17  do you mean by that?
18   A. Well, he's our representative in the State
19  of Massachusetts and is responsible for the sales
20  activities in that state. And so, you know, he's
21  responsible for the communications and the sales
22  efforts and everything pertinent to acquiring
23  business on our behalf.
24   Q. So -- so do you have any recollection of --
25  of the -- the paper materials or electronic materials

1  that Mr. Dougherty had with him on that date?
2    A. No, I do not.
3    Q. Okay. Who, to the best of your
4  recollection, attended that meeting?
5    A. For Dant Clayton, there were three people
6  in attendance: Myself, Matt Dougherty and B.J.
7  Nichols.
8    Q. And who else was there, to the best of
9  your recollection?
10   A. Ted Tye, Allen Stone, somebody from the
11  architecture firm -- I don't remember their name --
12  and there were a couple other people that were
13  there. Some were there for part of the time. But
14  the main people that were involved in it were Ted
15  and Allen.
16   Q. How long did that meeting last?
17   A. I would say about two to three hours.
18  That's a guess.
19   Q. Well, let's -- let's try to nail it down just a
20  little bit. What time -- when did you fly from --
21  well, how did you get to Boston?
22   A. Flew.
23   Q. From where?
24   A. Louisville.
25   Q. And did you fly in the morning of the 20th?

# Bruce Merrick
## January 31, 2006

**Page 50**

1    A.  I don't recall.
2    Q.  Okay.  Do you remember how -- where did
3    you go from Boston?
4    A.  I don't remember that either.
5    Q.  Okay.  Do you know how the meeting came
6    to be scheduled?
7    A.  Matt.
8    Q.  Okay.  And do you know what Matt did to
9    schedule the meeting?
10   A.  I do not.
11   Q.  Okay.  Tell me everything you can
12   remember that happened at that meeting.
13   A.  I remember making a presentation about
14   our business and, you know, what it was we did,
15   what kind of projects we did, how this project fit
16   into what it is that we do, talked a lot about
17   references that we have in the industry.  And that
18   would have been my -- my participation in the
19   meeting at that point.
20       Then from a technical point of view, the
21   meeting would have been handled by B.J. Nichols,
22   who's a structural engineer.  And then Matt played
23   a very important role in explaining our products
24   and how those products applied to what it was they
25   were trying to accomplish.  And then we talked

**Page 51**

1    about the specifics of the site and how our
2    approach would, you know, deal with what was on
3    the site.  And then we -- we talked about how -- a
4    lot about the schedule and what would have to
5    happen.  And we explained that in order for us to
6    make the schedule we would have to use a
7    previously-built project to make the -- to make that
8    schedule.  And then we presented drawings that
9    were either a duplication of University of Virginia
10   or a modification of University of Virginia -- I can't
11   remember exactly, but -- and talked about how that
12   would apply.
13   Q.  And let's talk about how that meeting
14   worked.  Were there breakout sessions?
15       MR. ROSE:  And I'm going to -- I'm going
16   to object.  You're starting to stray a little bit from
17   my objection to the Notice of Deposition.
18       MR. KLEIN:  Uh-huh.
19       MR. ROSE:  He's only here to testify on
20   information that would lead to relevant evidence in
21   your case --
22       MR. KLEIN:  Uh-huh.
23       MR. KLEIN:  -- as I've objected to.  Let's
24   try to, you know, narrow it.  You know, he doesn't
25   -- we don't want to be here all day on -- outside the

**Page 52**

1    scope of this Notice.
2        MR. KLEIN:  Understood.
3        MR. ROSE:  Okay.
4        MR. KLEIN:  Do you object -- just quickly
5    for the record --
6        MR. ROSE:  It was the general objection
7    to the line of questioning --
8        MR. KLEIN:  Okay.
9        MR. ROSE:  -- not that particular
10   question.
11       MR. KLEIN:  Okay.
12   BY MR. KLEIN:
13   Q.  Were there breakout sessions?
14   A.  Yes.
15   Q.  Okay.  And what would happen during --
16   during those -- what I refer to as -- breakout
17   sessions?
18       THE REPORTER:  Are you saying sessions
19   or sections?
20       MR. KLEIN:  Sessions.
21       THE REPORTER:  Sessions.  I thought so.
22   I just wanted to be sure.
23   A.  I don't know if I remember the exact
24   specifics; but during that, we had to make
25   modifications in our scope of the work that we were

**Page 53**

1    providing and respond to the comments that they
2    had made and figure out how we were going to
3    respond to those.
4    BY MR. KLEIN:
5    Q.  Okay.  And let's see here.  Did Seating
6    Solutions come up during that meeting?
7    A.  Not to my knowledge.
8    Q.  Not to your knowledge.  Okay.
9    A.  Certainly they were not in the room that
10   we were in.
11   Q.  But did aspects of a concept plan come up
12   at that meeting?
13   A.  Well, yeah, you have to have a concept.
14   You can't price something without a concept.
15   Q.  Did aspects of a previously-existing
16   concept plan come up?
17       MR. ROSE:  From Seating Solutions?
18       MR. KLEIN:  Just a gen -- just generally
19   previously-existing, because I think previous
20   testimony didn't establish where that was from.
21   A.  The concept that we talked about looked
22   very similar to what was in these documents.  And I
23   don't know anything more specific than that.
24   BY MR. KLEIN:
25   Q.  And can you justify the documents that

# Bruce Merrick
## January 31, 2006

Page 54

1  you just pointed to for the record? Is it -- would it
2  be --
3      A.  In A.
4      Q.  2A?
5      A.  I don't know where 2 is -- what 2 is.
6      Q.  Okay.
7      A.  If this was attached to this, then 2A.
8      Q.  And, also, could you --
9      A.  Probably not to -- excuse me. Excuse me.
10  It would have been 2D.
11      Q.  Okay. So -- and who -- who made the
12  presentation about that previous concept? Who did
13  the talking for Dant Clayton about that?
14      A.  I can't recall.
15      Q.  Can't recall?
16      A.  I mean, there were three of us in there.
17      Q.  Sure. But each of the three of you would
18  be competent to talk about it?
19      A.  Well, in what regard?
20      Q.  About, say, site lines.
21      A.  Site lines, any of the three of us would be
22  competent to speak to that.
23      Q.  Okay. Do you remember a discussion
24  about site lines in that concept plan that you just
25  pointed to? It's 2D.

Page 55

1      A.  No.
2      Q.  You don't. Okay.
3      A.  I'm not saying we didn't. You asked me if
4  I recalled this conversation. I do not.
5      Q.  That's -- that's precisely correct.
6  And the presentation of the Virginia concept
7  that you shared with them, was that, do you recall,
8  in paper form or was there some type of electronic
9  presentation made?
10      A.  I believe it was paper.
11      Q.  Okay. Have we exhausted your
12  recollection of that meeting on the 20th?
13      A.  Yes.
14      Q.  Well, let me ask you this: When
15  you walked out of that meeting on the 20th, did you
16  think you had a deal with Worcester Baseball?
17      A.  No.
18      Q.  You didn't. Okay. Well, what happened
19  next in that respect as you were working towards
20  making a deal?
21      A.  They said they were going to get back to
22  us.
23      Q.  Uh-huh. And did they?
24      A.  They did.
25      Q.  On what date?

Page 56

1      A.  That same day.
2      Q.  Same day.
3  How did that communication take place?
4      A.  Ted Tye called Matt Dougherty on his cell
5  phone.
6      Q.  Okay. Were you with Mr. --
7      A.  Well, wait a minute. Wait. They talked to
8  on cell phones; I don't know who originated the
9  call.
10      Q.  Okay. Were you with Mr. Dougherty when
11  that conversation took place?
12      A.  I was.
13      Q.  Okay. Do you remember what time it was?
14      A.  No. We were eating dinner; that's all I
15  can tell you.
16      Q.  Do you remember what city you were
17  eating dinner in?
18      A.  It was -- it was not far from Ted Tye's
19  office.
20      Q.  I gotcha. Okay.
21  And this was, again, by telephone of some
22  type?
23      A.  That's correct.
24      Q.  And on your end, who was part of the
25  conversation, as far as you could tell?

Page 57

1      A.  Matt Dougherty.
2      Q.  And how long did the conversation last?
3      A.  I don't have any idea.
4      Q.  Do you know if it was Mr. Tye on the other
5  end of the line?
6      A.  No, I don't know that either.
7      Q.  You don't know that. Okay.
8      A.  I assume that it was Mr. Tye, but I don't
9  know that is was Mr. Tye.
10      Q.  Sure. Why do you assume it was Mr. Tye?
11      A.  He was the one that seemed to be
12  speaking on behalf of the organization.
13      Q.  Okay. And I hate to really get down to
14  overly brass tacks, but what gave you that
15  impression?
16      A.  I don't know.
17      Q.  Okay.
18      A.  What gave me the impression that Ted
19  spoke for the organization?
20      Q.  That he seemed to be speaking on behalf
21  of the organization I think is what you said.
22      A.  Yes. Well, he was clearly the money guy;
23  we were having the meeting in his office. Allen
24  Stone seemed to defer to him, who was president of
25  the team.

# Bruce Merrick
# January 31, 2006

## Page 58

1   Q.  Okay.  Tell me everything that you can
2   remember Matt said because you could, obviously,
3   really only hear him, I guess; right?
4       A.  I really don't recall anything about the
5   conversation.  They were -- I -- they seemed to be
6   talking about the price --
7       Q.  Uh-huh.
8       A.  -- and seemed to be talking about the
9   schedule.  But I don't remember any of the details.
10      Q.  But something after that conversation
11  gave you the impression you had a deal; is that
12  right?
13      A.  Yes.
14      Q.  Okay.  Can you give me some idea of what
15  gave you that impression?
16      A.  No.  Matt seemed to be pleased.
17      Q.  Do you remember what Matt said to you?
18      A.  No, I do not.
19      Q.  Okay.  So at that moment on that cell
20  phone, that's when you felt like you had reached an
21  agreement with Worcester Baseball, Mr. Merrick?
22      A.  That's correct.
23      Q.  Okay.  Was that before there had been a
24  Memorandum of Understanding signed?
25      A.  I do not remember the sequence.

## Page 59

1       Q.  Okay.  At any rate, was it before there
2   was an AIA contract signed?
3       A.  Yes.
4       Q.  Okay.  Now, this might be too legal and if
5   it's objectionable, it is.  But at this point, did Dant
6   consider Worcester Baseball to be bound?
7           MR. ROSE:  Yeah, I'm going to -- I'm
8   going to object.
9           MR. CIAVARRA:  Objection.
10  BY MR. KLEIN:
11      Q.  Can you understand the question, Mr.
12  Merrick?
13      A.  Not really.
14          MR. ROSE:  Maybe you can ask him if he
15  knew that he had a legally binding contract.
16  BY MR. KLEIN:
17      Q.  Yeah.  Mr. Merrick, was it your
18  understanding at this point that you had a legally
19  binding contract with Worcester Baseball?
20      A.  No, I didn't think that.
21      Q.  You didn't think that.  Okay.  At what
22  point did you believe you had a legally binding
23  contract?
24      A.  When I had an legally -- when I had an
25  AIA document signed.

## Page 60

1       Q.  Okay.  And before that, do you believe
2   that -- did you -- well, until that time, did you, Mr.
3   Merrick, think that Worcester Baseball could pull
4   out of the deal?
5           MR. CIAVARRA:  Object.  I'm sorry.  Until
6   what time?
7           MR. KLEIN:  Until there was that AIA
8   contract signed.
9   BY MR. KLEIN:
10      Q.  Did you just -- I'm just asking for your
11  belief, Mr. Merrick.
12          MR. ROSE:  And I'm going to object.
13  When you say "could pull out" --
14          MR. KLEIN:  Uh-huh.
15          MR. ROSE:  -- are you assuming legally to
16  pull, 'cause if you are, then he's already answered
17  the question.
18          MR. KLEIN:  Okay.
19          MR. ROSE:  Could pull out without
20  upsetting him is a different question.  I don't know
21  what you're asking.  I object to the form.
22          MR. KLEIN:  Okay.  I think -- I think we've
23  exhausted that topic, so I'm just going to move on.
24          MR. ROSE:  Okay.
25  BY MR. KLEIN:

## Page 61

1       Q.  Now, does Dant do case studies of
2   projects?
3       A.  We may have just started.
4       Q.  Okay.  Do you know -- can you tell me
5   what a case study is?
6       A.  Describes the -- what happened on a
7   project, ; what the owner's goal was and what role
8   we played in satisfying that goal.
9       Q.  And do you, Mr. Merrick, consider those
10  case studies to be proprietary information?
11      A.  No.
12      Q.  You do not.  Do you know, did Dant do a
13  case study of the Fit and Field project?
14      A.  We may have.
15          MR. KLEIN:  Can we go off the record for
16  just a second?
17  [WHEREUPON, an off-the-record discussion is
18  held.]
19          MR. KLEIN:  Back on the record.
20          THE REPORTER:  Yes.
21  BY MR. KLEIN:
22      Q.  Did Dant Clayton realize a profit on the
23  Fit and Field project?
24      A.  Yes.
25      Q.  What was Dant's project -- profit on that

16  (Pages 58 to 61)

Bruce Merrick
January 31, 2006

Page 62

1  project?
2      MR. CIAVARRA: I'm going to object.
3  "Profit" is not a self-defining word.
4  BY MR. KLEIN:
5      Q. You can answer.
6      A. You know, I don't recall. I mean, the
7  information is -- I mean, we, obviously, do job
8  costing but I don't -- we do several hundred
9  projects a year and I don't recall.
10     Q. Okay. But do you recall that there was a
11 profit earned?
12     A. Yes.
13     Q. Okay. Who at Dant would know what --
14 what its profit was on the Fit and Field project?
15     MR. ROSE: And I'm going to object to the
16 extent they consider that confidential.
17     MR. KLEIN: Okay.
18     MR. ROSE: They may or may not.
19     A. We do consider it confidential.
20 BY MR. KLEIN:
21     Q. Okay. So, just for the record, you
22 consider your profit figures on projects to be
23 confidential business information?
24     A. I do.
25     Q. Okay.

Page 63

1      A. All corporate financial records I consider
2  to be confidential.
3      Q. Okay. Is -- is Dant a public company?
4      A. No.
5      Q. Okay. So -- so does it produce any annual
6  reports or anything like that?
7      A. We have an audit --
8      Q. Uh-huh.
9      A. -- that's required by lenders.
10     Q. Uh-huh. But that audit you consider to be
11 private information?
12     A. It's absolutely private.
13     Q. Related to this -- and we probably have
14 already covered it -- but do you recall what Dant's
15 overall costs were on this project?
16     A. No.
17     Q. Okay.
18     A. If you were to get into that, that would
19 require a substantial definition of what "cost" is.
20     Q. Uh-huh. Well, what's your understanding
21 of what's included in costs?
22     A. How much time do you have? I mean,
23 that's a very long conversation.
24     MR. ROSE: I'm going to object. I don't
25 think we should have that conversation unless you

Page 64

1  have --
2      MR. KLEIN: Sure.
3      MR. ROSE: -- a particular need.
4      MR. KLEIN: Okay.
5  BY MR. KLEIN:
6      Q. All right. Mr. Merrick, have you
7  understood the questions I've asked you today?
8      A. Yes.
9      Q. And are there any answers that you would
10 like to supplement at this point?
11     A. No.
12     MR. KLEIN: Okay. At this point, I'm
13 going to conclude my examination of Mr. Merrick
14 and ask if Mr. Ciavarra or Ms. Korn have any
15 questions for him.
16     MR. CIAVARRA: Want to go ahead,
17 Lauren?
18     MS. KORN: Do you want me to go?
19     MR. CIAVARRA: Yeah, please.
20     MS. KORN: Okay.
21 CROSS EXAMINATION
22 BY MS. KORN:
23     Q. My name is Lauren Michaels Korn and I
24 represent -- excuse me -- the Defendant, Geller
25 Sport, Inc. and Geller Devellis, Inc. Let me know if

Page 65

1  you can't hear me.
2      A. I can hear you just fine.
3      Q. Okay. The Exhibit 2 that you've marked A,
4  the e-mail with the attached document --
5      A. Yes.
6      Q. -- in your opinion, do you consider that
7  attachment to contain any proprietary information?
8      A. I do not.
9      MR. ROSE: And I'm just going to object
10 to the form. If you just ask if he considers it
11 proprietary information --
12 BY MS. KORN:
13     Q. In your opinion, do you think that the --
14     MR. ROSE: -- without the "opinion."
15     MS. KORN: I'm sorry. I couldn't hear
16 what you said.
17     MR. ROSE: Without the "opinion" portion,
18 just ask him if he considers that proprietary or
19 confidential.
20     MS. KORN: Okay.
21 BY MS. KORN:
22     Q. Do you consider Exhibit A, the
23 attachment, to contain proprietary information?
24     A. No.
25     Q. Okay. Were you -- prior to that February

# Bruce Merrick
## January 31, 2006

### Page 66

1  20th meeting, were you aware of the exact scope of
2  Seating Solutions' proposal?
3    A.  No.
4    MR. KLEIN:  I'm going to object to the
5  form.
6  BY MS. KORN:
7    Q.  Were you aware of -- prior to the February
8  20th meeting, were you aware of the exact design of
9  the Seating Solution proposal?
10   A.  No.
11   Q.  Okay.  And I think you might have
12  answered this already.  But prior to February 20th --
13  the 20th meeting, were you aware of the exact price
14  of the Seating Solutions' proposal?
15   A.  No.
16   Q.  And the Dant Clayton design that went --
17  that was actually utilized at the site, did that differ
18  from what you understood to be the Seating
19  Solutions' design?
20   MR. KLEIN:  Object to the form.
21   A.  Our solution, what we built for the -- for
22  this project has no resemblance to this proposal
23  whatsoever.
24   MS. KORN:  Okay.  I think that's it for me.
25   MR. CIAVARRA:  This ought to be good.

### Page 67

1  I'll pick up the phone and see if you can hear me
2  better.  Sorry, guys, for this.  [coughs] Excuse me.
3  CROSS EXAMINATION
4  BY MR. CIAVARRA:
5    Q.  Hi.  This is Lou Ciavarra; I represent
6  Worcester Baseball and Perfect Game.
7    A.  Hi, Lou.
8    Q.  Hi.  And if I need to repeat, just tell me.
9  You told Mr. Klein about -- about a meeting
10  you had with Mr. Suprina.  Do you remember that
11  conversation?
12   A.  Yes.
13   Q.  And I may have missed it.  When,
14  approximately, did that meeting take place?
15   A.  I don't even know that I could give you the
16  month.
17   MR. ROSE:  I believe earlier you testified
18  a couple months after --
19   THE WITNESS:  Yeah.
20   MR. ROSE:  -- February 20th.
21   A.  That's approximately correct.  But, I
22  mean, that's a pretty big window.
23  BY MR. CIAVARRA:
24   Q.  Springtime?
25   A.  Springtime, yes.

### Page 68

1    Q.  Okay.  Do you know if it was before or
2  after the project was completed at Fit and Field?
3    A.  I don't know that.
4    Q.  Okay.  And I think you told us that Mr.
5  Suprina said that he had bid on or was attempting
6  to obtain the Fit and Field job that you were
7  working on.  I don't want to mischaracterize, but
8  something to that effect?
9    A.  He acknowledge that he'd worked on it and
10  acknowledged that we had got the contract.
11   Q.  Okay.  As you sit here today, do you recall
12  the exact words that he used?
13   A.  No, I do not.
14   Q.  Okay.
15   A.  It was not the primary purpose of our
16  meeting.
17   Q.  I appreciate that.
18   At -- at any time during that meeting, did he
19  state to you that his plans and designs had been
20  used in the construction of the seating?
21   A.  No, our conversation didn't get to that
22  level of detail.
23   Q.  Okay.  And during that conversation, did
24  he say to you that he had had a contract with the
25  baseball team that had been breached?

### Page 69

1    A.  I don't recall.
2    Q.  At any time during that meeting did Mr.
3  Suprina say to you that Geller had used his plans
4  and sent them to Dant?
5    A.  I don't recall.  I don't think so, but I -- we
6  just didn't get into that level of detail talking about
7  this project.
8    Q.  And I understand that.
9    A.  We mostly were talking about his new
10  product idea.
11   Q.  I understand.
12   I think you told Mr. Klein -- I'm off of that
13  conversation.
14   I think you told Mr. Klein that it was not
15  unusual in your business during the process of
16  trying to obtain a job that different contractors
17  would have the plans that had been developed by
18  each other.  Is that correct?
19   A.  That's correct.
20   Q.  And it was not unusual, therefore, in -- in
21  your industry for people to utilize that information
22  in developing their own plans; is that correct?
23   A.  That's correct.
24   Q.  Okay.  And you've had experiences, for
25  example, where your competitors have had Dant

# Bruce Merrick
## January 31, 2006

**Page 70**

1  Clayton designs that they would bid off of; is that
2  correct?
3    A.  That's correct.
4    Q.  The -- I believe that the supplier of the
5  bleachers and the seating that Seating Solutions
6  proposed to use was a company called Outdoor
7  Aluminum.  Are you familiar with that company?
8    A.  Yes, I'm familiar with that company.
9    Q.  Have you utilized their -- their product
10  before?
11    A.  No, we're competitors.
12    Q.  Okay.  Because you -- you build and
13  design your -- you build your own seating?
14    A.  Yes.
15    Q.  Okay.  Do you -- have you, in the past,
16  been involved in projects when you had, during the
17  bidding process, a copy of a designed created by
18  Outdoor Aluminum?
19    A.  Yes.
20    Q.  Has Outdoor Aluminum, to the best of your
21  knowledge, ever contacted Dant Clayton and made
22  a claim that its designs were somehow proprietary
23  confidential?
24    A.  No.
25      MR. CIAVARRA:  I have no further

**Page 71**

1  questions, sir.  Thank you.
2      MR. ROSE:  I just have a quick question.
3  CROSS EXAMINATION
4  BY MR. ROSE:
5    Q.  Ms. Korn talked about A -- Exhibit 2A.  I
6  don't believe she touched on the other drawing,
7  Exhibit 2D.  Could you take a look at that, Mr.
8  Merrick?
9    A.  Uh-huh.
10    Q.  Would you consider that drawing
11  confidential proprietary information?
12    A.  No.
13    Q.  Okay.  Did you use any information that
14  you considered confidential or proprietary from
15  Seating Solutions to -- to do -- to work on your
16  project?
17    A.  We didn't have anything I would consider
18  to be proprietary, so it would be no.
19    Q.  Okay.  And your -- and this Fit and Field
20  project you based off the University of Virginia
21  project; is that correct?
22    A.  That's correct.
23      MR. ROSE:  Okay.  That's all I had.
24      MR. KLEIN:  All right.  I have nothing
25  further for this witness.  And I'd like to ask that we

**Page 72**

1  go off the record for a moment.
2  [WHEREUPON, the Deposition of Bruce Merrick
3  concludes at 11:40 a.m.]
4  [WHEREUPON, Exhibit 4, Exhibit 5 and Exhibit 6
5  are marked for identification at the conclusion
6  of the deposition.]
7  .
8  .
9  .
10  .
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

**Page 73**

1        C A P T I O N
2      The Deposition of Bruce Merrick, taken in
3  the matter, on the date, and at the time and place
4  set out on the title page hereof.
5      It was requested that the deposition be
6  taken by the reporter and that same be reduced to
7  typewritten form.
8      It was agreed by and between counsel and
9  the parties that the reading and signing of the
10  transcript of said deposition be, and the same is
11  hereby, waived.
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Bruce Merrick
January 31, 2006

Page 74

```
 1          CERTIFICATE OF REPORTER
 2   STATE OF KENTUCKY AT LARGE:
 3     I, BARBIE A. HENNESSEY, Notary Public
 4   for the State of Kentucky at Large, do hereby
 5   certify that the foregoing was reported by
 6   stenographic and mechanical means, which matter
 7   was held on the date, and at the time and place set
 8   out in the caption hereof and that the foregoing
 9   constitutes a true and accurate transcript of same.
10     I further certify that I am not related to any of
11   the parties, nor am I an employee of or related to
12   any of the attorneys representing the parties, and I
13   have no financial interest in the outcome of this
14   matter.
15     GIVEN under my hand and Notarial seal this
16          day of                    , 2006.
17   .
18   My Commission Expires:      Notary Public
19   .
20   JANUARY 11, 2009
21   .
22   .
23   .
24   .
25   .
```